CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 3. Hartman Rocks Recreation Area**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
**AUGUST 2016**

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 4. Hartman Rocks Recreation Area with Tier 1, Tier 2 GUSG habitat**



APPENDIX C - GUSG Candidate Conservation Agreement, Gunnison Basin Population

## B. Signal Peak



**Current Condition:**

The Signal Peak Trail System is just outside and northeast of the city of Gunnison, east of Western State College (See Figure 98 & Figure 99).  Visitor use in this area is high due to its proximity to the college and Gunnison. Some routes that were closed in the 2010 TMP are still being used by runners and cyclists because they are looking for loop options. Running, riding and walking with dogs is popular in this area.  Many people stay close to the college but others venture out on the Contour and Ridgeline Trail.  Other major access points enter this area from subdivisions.  Shooting and motorized use is popular from subdivision access points.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Long-Term Planning – Future Need and Development:**
Managing recreation use in an area like Signal Peak is very difficult, and offering people structured recreation is a practical compromise to balance wildlife and recreation needs.  Developing a stacked loop trail system would keep people on designated trails and allow the BLM to successfully close routes—and gain public compliance with the closures— in areas where human presence is undesirable from a wildlife perspective.  This may require trail construction or designation in Tier 1 habitat.  While the proposed condition includes a greater number of open route miles, increased compliance with closures are expected via well-defined loop systems *(See Figure 7).*

**The Numbers:**
*Current condition*: 93 miles existing (open) and 140 miles (closed) = 233 miles of disturbance
*Proposed condition*: 121 miles of open routes, including up to approximately 28 miles of new construction. Decommission the remainder; target routes for reclamation in Tier 1 areas (140 miles).
*Total Acreage:* Tier 1 = 8856. Tier 2 = 4915.

**Proposed sage-grouse Conservation Measures in this Area:**
- No human uses before 9:00 a.m. between March 15 and May 15.
- No motorized travel between March 15 and May 15.
- Dogs on leash from March 15 to August 15. *Note: In the long-term, as Van Tuyl is developed and popularized for dog walkers originating in the city dog park, it may be appropriate and feasible to close areas of Signal Peak to dogs during critical grouse periods.*

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 5. Signal Peak.**

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population





**Figure 6. Signal Peak with Tier 1, Tier 2 GUSG habitat.**

Signal Peak Existing
Sage Grouse Priority Habitat
Tier 1
Tier 2
Highway
County Road
Unmaintained Passenger Car Road
Primitive Road (high clearance)
ATV Trail
Single Track Motorized
Single Track Mechanized
Single Track (foot/horse)
Signal Peak Exclusion Area
Land Ownership
Bureau of Land Management
National Park Service
Private
County/City Land
US Forest Service
Lost Canyon Road
135
GUNNISON
50
N
0
0.5
1 Miles



APPENDIX C - GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 7. Proposed future condition of Signal Peak.**



CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

## C. Van Tuyl Ranch

**Current Condition:**
The Van Tuyl Ranch is owned by the city of Gunnison and includes a system of trails on the east side of the Gunnison River, on the northwest side of Gunnison (*See Figure 8 & Figure 9*).  The trails are open to hiking and biking.

**Long-Term Planning – Future Need and Development:**
In order to provide for increased recreation opportunities for a growing population and to focus dog use away from Signal Peak, nonmotorized user groups envision future development in the area. In order to develop and maintain a limited trail system on the west side of the Gunnison River, a bridge may be constructed. Trails would be developed on BLM lands in a bench below the ridge line of the palisade.  Use on this trail system would be hiking and biking.

**The Numbers:**
*Total Acreage:* Tier 1 = 51; Tier 2 = 8.

**Proposed sage-grouse Conservation Measures in this Area:**
- No motorized travel.
- Possible closure from March 15 to May 15, or no human uses before 9:00 a.m. during that time period.
- Dogs on leashes in areas outside of the city-maintained/owned Ranch, which includes a dog park.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 8. Van Tuyl.**



BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 9. Van Tuyl with Tier 1, Tier 2 GUSG habitat.**



# APPENDIX C. Communication Towers Standards

From *Service Interim Guidelines for Recommendations On Communications Tower Siting, Construction, Operation, and Decommissioning,* US Fish And Wildlife Service Migratory Bird Program, 2000.

1. Any company/applicant/licensee proposing to construct a new communications tower should be strongly encouraged to co-locate the communications equipment on an existing communication tower or other structure (*e.g.,* billboard, water tower, or building mount). Depending on tower load factors, from 6 to 10 providers may collocate on an existing tower.

2. If collocation is not feasible and a new tower or towers are to be constructed, communications service providers should be strongly encouraged to construct towers no more than 199 feet above ground level (AGL), using construction techniques which do not require guy wires (*e.g.,* use a lattice structure, monopole, etc.). Such towers should be unlighted if Federal Aviation Administration regulations permit.

3. If constructing multiple towers, providers should consider the cumulative impacts of all of those towers to migratory birds and threatened and endangered species as well as the impacts of each individual tower.

4. If at all possible, new towers should be sited within existing "antenna farms" (clusters of towers). Towers should not be sited in or near wetlands, other known bird concentration areas (*e.g.,* state or Federal refuges, staging areas, rookeries), in known migratory or daily movement flyways, or in habitat of threatened or endangered species[44]. Towers should not be sited in areas with a high incidence of fog, mist, and low ceilings.

5. N/A If taller (>199 feet AGL) towers requiring lights for aviation safety must be constructed, the minimum amount of pilot warning and obstruction avoidance lighting required by the FAA should be used. Unless otherwise required by the FAA, only white (preferable) or red strobe lights should be used at night, and these should be the minimum number, minimum intensity, and minimum number of flashes per minute (longest duration between flashes) allowable by the FAA. The use of solid red or pulsating red warning lights at night should be avoided. Current research indicates that solid or pulsating (beacon) red lights attract night-migrating birds at a much higher rate than white strobe lights. Red strobe lights have not yet been studied.

6. Tower designs using guy wires for support which are proposed to be located in known raptor or waterbird concentration areas or daily movement routes, or in major diurnal migratory bird movement routes or stopover sites, should have daytime visual markers on

---

[44] With respect to the recommendation that towers not be sited in habitat of threatened or endangered species, the CCA and programmatic conference opinion would cover siting within Gunnison sage-grouse habitat, although such siting would be minimized via a minimum standard of co-locating the new towers with comparable development and/or locating it in a forested area.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

the wires to prevent collisions by these diurnally moving species. (For guidance on markers, see *Avian Power Line Interaction Committee (APLIC). 1994. Mitigating Bird Collisions with Power Lines: The State of the Art in 1994. Edison Electric Institute, Washington, D.C., 78 pp.*, and *Avian Power Line Interaction Committee (APLIC). 1996. Suggested Practices for Raptor Protection on Power Lines. Edison Electric Institute/Raptor Research Foundation, Washington, D.C., 128 pp.* Copies can be obtained via the Internet at http://www.eei.org/resources/pubcat/enviro/, or by calling 1-800/334-5453).

7.  Towers and appendant facilities should be sited, designed and constructed so as to avoid or minimize habitat loss within and adjacent to the tower "footprint". However, a larger tower footprint is preferable to the use of guy wires in construction. Road access and fencing should be minimized to reduce or prevent habitat fragmentation and disturbance, and to reduce above ground obstacles to birds in flight.

8.  If significant numbers of breeding, feeding, or roosting birds are known to habitually use the proposed tower construction area, relocation to an alternate site should be recommended. If this is not an option, seasonal restrictions on construction may be advisable in order to avoid disturbance during periods of high bird activity.

9.  In order to reduce the number of towers needed in the future, providers should be encouraged to design new towers structurally and electrically to accommodate the applicant/licensee's antennas and comparable antennas for at least two additional users (minimum of three users for each tower structure), unless this design would require the addition of lights or guy wires to an otherwise unlighted and/or unguyed tower.

10. Security lighting for on-ground facilities and equipment should be down-shielded to keep light within the boundaries of the site.

11. If a tower is constructed or proposed for construction, Service personnel or researchers from the Communication Tower Working Group [or respective federal land management Authorized Officer] should be allowed access to the site to evaluate bird use, conduct dead-bird searches, to place net catchments below the towers but above the ground, and to place radar, Global Positioning System, infrared, thermal imagery, and acoustical monitoring equipment as necessary to assess and verify bird movements and to gain information on the impacts of various tower sizes, configurations, and lighting systems.

12. Towers no longer in use or determined to be obsolete should be removed within 12 months of cessation of use.

# APPENDIX D. Grazing Management Guidelines for GUSG

*From pages 212 – 213 in the Rangewide Conservation Plan; modified December 2011 by Gunnison area participants in the CCA Grazing Team.*

The grazing management guidelines below represent a partial list of grazing management practices that may be compatible with achieving GUSG habitat objectives. Site-specific grazing prescriptions should specify timing, intensity, duration, and frequency of grazing that together provide a recovery period for plant health and maintenance and fit the specific circumstances (both biotic and abiotic factors) unique to that area, including other resource or operational considerations. This site specificity also maximizes potential flexibility or opportunities for each situation including incorporating private, state, and/or federal lands to reach habitat objectives.

## A.  Overall Guiding Principle & Objectives

Applicable to all livestock grazing in occupied sage-grouse habitat:

1.  To maintain and improve grouse sage-grouse seasonal habitat:

    a.  Control the distribution of livestock, duration of use, and the time of year that livestock graze a particular location by using grazing systems such as rest-rotation, deferred rotation, or low intensity/longer duration.
    b.  Allow for growth and/or re-growth in each pasture during the spring growing season to provide quality vegetation and vegetation height requirements during periods of sage-grouse seasonal use (refer to "GUSG Structural Habitat Guidelines", Appendix H).
       o  Specifically, retain adequate cover for nesting habitat during current season *and* residual cover for nesting habitat the subsequent year.

.

2.  Furthermore, in order to improve riparian, swales, and wet meadow habitat for grouse/other species:

    a.  Encourage continued use of irrigation water rights for existing hay meadows, particularly those that maintain riparian areas on allotments in sage-grouse habitat. *CCA team suggestion*
    b.  New spring developments and spring reconstructions should be designed to minimize changes to the natural flow of the water. *CO GrSG Conservation Plan – Grazing Management Options, p E-3*
       o  When possible, develop alternative livestock water sources outside of naturally occurring riparian areas (dig wells, install pipelines, etc.). *CCA team suggestion; RCP Grazing Management Guidelines for GUSG, #9,  p.213*
       o  Where possible (when sufficient water is present to support riparian habitat and supply livestock water), redesign existing water developments that are in naturally occurring riparian areas to protect riparian habitat and pipe a portion of the water to troughs that are well away from naturally occurring riparian habitat.

*CCA team suggestion; RCP Grazing Management Guidelines for GUSG, #9, p.213*

   **c.**   Place salt, minerals, and supplements at least 1/4 mile away from riparian areas, to the extent feasible within existing pasture boundaries.

   **d.**   Move 95% of all livestock from one pasture to the next within 3 days of scheduled move, with 100% moved within one week from scheduled move.

## B. Best Management Practices

*If monitoring data indicate that an allotment is not meeting RCP habitat guidelines, then apply the following strategies, as appropriate:*

1. Where possible, do not graze the same pasture at the same time of year for consecutive years. If not possible, develop smaller grazing units within large pastures using salting, supplements, water, herding, or fencing to facilitate improved grazing practices.

2. Consider rotating the type of livestock (age, species), if possible.

3. If needed, to avoid overuse of riparian areas, water sources, and other known livestock concentration areas, use management actions such as the placement of salt/supplements, herding, and/or fencing to achieve improved livestock grazing distribution.

4. If needed, manage grazing in riparian areas to maintain or move towards the desired riparian vegetation condition.

5. If needed, modify the livestock use in pastures or allotments when abnormal environmental events occur (e.g., drought, heavy snow fall, flooding) and stress vegetation.

6. If the need arises and as determined by, and with prior approval from the managing agency, periodically use livestock grazing as a vegetation treatment to improve the openness of lek sites. *Note:* temporary fencing, herding, or increased stocking rate may be used, but grazing needs to be limited to specific lek site, so as to not overgraze surrounding area. Consistent with #6, strategic grazing of lek sites should occur outside of the grouse breeding season.

7. Avoid placing salt, minerals or supplements within ½ mile of leks.

8. Avoid livestock concentrations in lek areas during the breeding season, approximately March 15 – May 15.  Depending on seasonal conditions, this date may fluctuate.

9. For areas failing to meet RCP habitat guidelines, develop a range vegetation improvement plan in consultation with the affected permittee, which could include but is not limited to:

*If monitoring data indicate forb density and height do not meet the RCP habitat guidelines or is declining:*

    **a.** Periodically defer spring grazing.
    **b.** Plant native forb seed in rangelands that have enough moisture and the soil characteristics to establish and support forbs.

*If sagebrush stands don't meet the RCP habitat guidelines::*
    **a.** Use grazing treatments that will rejuvenate new sagebrush growth, improve sagebrush quality and age diversity, and improve the understory.

*If an allotment or area is not meeting sage-grouse habitat guidelines due in part/all to weeds:*
    **a.** Strategically graze to control noxious and invasive weeds.

**10.** Restrict grazing in vegetation treatment areas for 2 full growing seasons after treatment, unless grazing is needed for seedbed preparation or desired understory and overstory are established.

# APPENDIX E. Monitoring Protocol

## A. Short-Term: Modified Stubble Height Method

*Excerpts consistent with the Colorado Rangeland Monitoring Guide (2011) for stubble height measurements; incorporates elements from the Interagency Technical Reference for Utilization Studies and Residual Measurements (1996) and the Gunnison sage-grouse Rangewide Conservation Plan (2005).*

Grass and forb (plants other than grasses & shrubs) plant cover is important to Gunnison sage-grouse for hiding cover for chicks, food, nesting, and insects. Retaining an adequate amount of standing herbaceous cover (stubble) in sagebrush plant communities, swales, wet meadows, and riparian areas is critical for maintaining sage-grouse habitat and long-term forage for livestock production.

This adapted Stubble Height method is simple to use and will help provide consistency in short-term monitoring of livestock and big game use in occupied sage-grouse habitat across all land ownerships. "Stubble height monitoring typically occurs on predetermined key plant species in key areas. Depending on the objectives and resource concerns, key areas may be along the streamside or in wet or dry meadow sites within the riparian area or in upland areas. In some instances, monitoring is based on species groups, such as sod-forming species with similar growth form and response to grazing" (Colorado Rangeland Monitoring Guide 2011).

For pastures that are grazed by livestock or big game before or during grouse nesting and/or early brood-rearing, monitoring should ideally be conducted within the season of use by grouse, approximately late March through mid-August (Phillips, pers. comm.). For pastures that are grazed during late brood-rearing (late summer/fall), short-term monitoring should be conducted following livestock use to determine if adequate residual cover remains to provide nesting and hiding cover the following spring (RCP 2005).

**Procedure**
- Measurements need to be made in designated key areas, within riparian areas (but possibly on uplands), and on predetermined key plant species. Alternatively, heights may be determined for a group of similar species, such as wet-site, wide-leaved sedges or rushes or dry-site, narrow-leaved grasses or sedges. The key is that this group of species be used by, and react similarly, to grazing effects [by livestock or big game]. *On BLM and Forest Service lands, permittees and other affected interests (CPW, USFWS, WSC students, etc.) are encouraged to assist in the establishment of transects and the measurement of stubble heights* (BLM 1996).

- For riparian areas, sampling should be done on both sides of a stream segment [or wetland] along the Greenline, when feasible. For upland or meadow sites, measurements should be taken along a predetermined transect or course.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

- Once the riparian segment or transect site has been selected, take a photograph looking down the stream segment or transect. Include a relocatable, prominent feature in the photo background, such as a rocky point or distinctive horizon. Determine the distance between observation points (this is the sample interval). This will vary depending on the size and shape of the site selected. Record the sample interval in the Sample Interval blank at the top of the form.

- Determine how many paces (2 steps per pace is typical) will give the selected sample interval, and begin pacing along the Greenline or the predetermined transect course. Stop at each sample interval and do the following:

  o Locate the individual plant nearest the toe of your boot for the identified key species. The nearest plant may not be immediately at your toe.

  o *Instead of recording the average stubble height (average leaf length) of the nearest key species (CRMI 2011), record the droop height using Gunnison sage-grouse Rangewide Conservation Plan (GSRSC 2007) guidelines attached below. This alteration in the CRMI method follows RCP guidelines and more closely measures hiding cover for sage-grouse. Measure height (leaf or flower) at the tallest vertical point (droop height – do not straighten up the plant) where the bulk of a plant's mass occurs. If the flower of the plant does not provide visual obstruction, measure where the bulk of the mass occurs in the leafy portion of the plant at the tallest leaf height (see Figure1 below). If the flower provides a bulk of the mass, then the tallest portion of the flower is measured (Figure 2 below)(GSRSC 2007).*

  o Where it is difficult to tell where one plant starts and another stops, visualize a three-inch circle and sample the key species within that circle. Estimate and record the average [droop] height within the three-inch circle.

  o If you are sampling for more than one key species, or grouping of similar species, record [droop] height for each key species. There will be a minimum of 30 [droop] height measurements for each species. Additional readings can be taken if variability on the site warrants. *This procedure does not provide guidelines for every species of plant. The individual conducting the sampling will have to make a judgment call for each measurement and each species along the transect. Consistency in following this protocol is key, as well as collecting an adequate number of measurements (BLM 1996).*

  o *The same protocol should be followed for forbs (Figure 3 below – the bulk of the mass of the plant occurs in the leafy portion where the tallest leaf height is measured). In Figure 4 below, the flower provides the bulk of the mass where the tallest portion of the flower is measured (GSRSC 2007).*

  o After a minimum of 30 samples have been recorded, total the measurements for each column, and divide by the number of plant samples for each species to calculate the average [droop] height.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**From the *Minimum Structural Vegetation Collection Guidelines for the Gunnison sage-grouse,* Rangewide Steering Committee (March 2007)**

Examples of where grass and forb heights should be taken.



Figure 1.



Figure 2.



Figure 3 [forb].



Figure 4 [forb].

## B. Long-Term: Structural Vegetation Collection Guidelines

**MINIMUM STRUCTURAL VEGETATION COLLECTION GUIDELINES
FOR THE GUNNISON SAGE-GROUSE
Rangewide Steering Committee**
March 2007

The following protocol was designed to assess suitability of vegetation conditions for the Gunnison sage-grouse as outlined in the Gunnison sage-grouse Rangewide Conservation Plan (RCP) (Appendix H [Gunnison sage-grouse Structural Habitat Guidelines]).

- This protocol is intended to provide a consistent method for measuring the minimum vegetation characteristics to evaluate site-specific suitability for Gunnison sage-grouse as described in the RCP Structural Habitat Guidelines (Appendix H). If additional vegetation data is needed, consult the BLM Technical Reference 1734-4 or other agency technical manuals.
- This protocol can be used to evaluate current suitability of site-specific conditions, monitor changes in the suitability of site-conditions over time (other techniques will be needed for specific monitoring projects) and evaluate impacts of habitat and restoration treatments on Gunnison sage-grouse site-suitability.
- Vegetation data must be collected during the season of use by Gunnison sage-grouse. For breeding habitat, measurements should start around the middle to the end of May or after the first nests begin to hatch and continue through June to encompass both nesting and early-brood-rearing habitat. Summer habitat measurements should start around mid-June (after the chicks are about 4 weeks old) and continue through mid-August to encompass late-brood-rearing habitat. Winter structural habitat variables (sagebrush canopy cover and sagebrush height) may be collected at any time of the year as these variables do not change substantially on a seasonal basis.
- To ensure repeatability in data collection, all methodology should be established before beginning field work and documented for future reference. To maintain consistency in data collection, use of this protocol is recommended. If an alternate methodology is used to evaluate site suitability with regards to the RCP Structural Habitat Guidelines (Appendix H), techniques must be reported.

**General Guidance**
- To measure sagebrush and other shrub canopy cover, the line intercept method developed by Canfield (1941) should be used. For other canopy cover estimates use Daubenmire (1959) plots.
- Take a minimum of 1 photo per vegetation transect preferably at the starting point of the transect line. Attempt to take the photo at a height and angle that will provide a good representation of the general condition of the site.
- Frequency, density, and composition are additional types of information that could be collected but are not required by this protocol to assess Gunnison sage-grouse with regards to the RCP Structural Habitat Guidelines (Appendix H). If this type of data is needed consult the Technical Reference 1734-4 (http://www.blm.gov/nstc/library/pdf/samplveg.pdf ).

**Specific Measurements**

<u>Transect Lines</u>
- Line transects should be 30 m in length.
- Placement of transects should be done using any statistically valid design.
- Collect a UTM coordinate with a GPS unit at the start pointing of the transect line and record on the field form so that transects can be located in the future.
- Transects placement could be stratified by community types and soils.

<u>Shrub Canopy Cover</u>
- Measure all shrubs and trees that intersect the line transect. The sagebrush species (if it can be identified) that intersects the line should be documented; all others non-sagebrush shrubs can be lumped into one category.
- Measure the amount of live shrub canopy cover that intersects the transect line. Large spaces in the foliage cover (>5 cm) should be excluded from the canopy cover measurement so that only live shrub cover is recorded.
- Do not measure overlap of canopy of species—i.e., if two sagebrush plants overlap along the transect, the length of the transect covered from a vertical vantage point is the percent canopy cover regardless of how may individual plants makeup that coverage. Canopy cover should never exceed 100%.

. <u>General Guidelines for Application of Daubenmire (1959)</u>
- See Daubenmire (1959) or USDI-BLM (1996) for additional details.
- Five other vegetation variables will be collected along line transects within a Daubenmire frame:
  - o Sagebrush Height
  - o Grass Height
  - o Forb Height
  - o Grass Cover
  - o Forb Cover
- Collect data in 10 Daubenmire frames along each 30 m transect.
- Select a consistent and statistically valid method for placement of the Daubenmire frame along each transect. Record your method on the field form so future transects can be completed in the same way.

<u>Sagebrush Height</u>
- Take one height measurement per sampling point (Daubenmire frame) by selecting the sagebrush closest to the lower left corner of the Daubenmire frame, based on its canopy and not its root. The closest sagebrush could be within the frame, in front of the frame, behind the frame, and on either side of the transect. Choose the sagebrush closest to the lower left corner of the frame regardless of its direction from that corner.
- Note on the data sheet whether the shrub measured is a seedling (no woody base) or a very young plant.
- Exclude seed heads (inflorescences) from height measurement of sagebrush.

- Do not re-measure the same shrub even if it is the closest sagebrush for a subsequent plot. Instead select the next nearest sagebrush within 10 meters of the plot. If there is no other sagebrush within 10 meters, do not take a height measurement for that plot.

Understory Cover

To the extent possible, plants should be identified to the species level, but training and time limitations may prevent this. The important habitat variables to be collected include:

- Grasses: break out perennial versus annual at a minimum. Identify dominant species to the extent possible in comments section of form. Identify cheat grass (e.g. *Bromus tectorum*) and other non-native species to the extent possible.
- Sedges are included in the grass category.
- Forbs: At a minimum list the number of different forb species per plot, even if you cannot identify the species. Identify species to the extent possible.
- Measure the live and residual foliar cover of grasses and forbs.

Understory Height

Height measurements are conducted to characterize the vertical and horizontal structure of the understory. Gunnison sage-grouse select habitat based on vertical (how tall it is) and horizontal (how thick it is) structure. Both aspects contribute to a diversity of structure and provide a sense of security for birds. These aspects contribute to nest, chick and adult concealment from predation events. That is why these measurements are relatively, but not absolutely consistent.

- Measure 1 grass and 1 forb in each Daubenmire frame. The plants must be rooted in the frame, and if there are no grasses or forbs in the frame, record as not present.
- Measure height of the nearest grass and forb from the bottom left corner of the Daubenmire frame.
- Grass height only includes the current year's growth. There are no criteria or guidelines for previous year's growth (e.g. residual grass height).
- Grass height can include annual or perennial grass. It should be documented on the datasheet if annual grass (cheat grass, e.g. *Bromus tectorum*) is measured. It is preferable to measure perennial grasses.
- Additional grass heights can be measured, but at a minimum grass height should be measured in the following manner:
  - Measure grass height (leaf or inflorescence) at the tallest vertical point (do not straighten up the plant, i.e. droop height) where the bulk of a plant's mass occurs. If the inflorescence of the plant does not provide visual obstruction, measure where the bulk of the mass occurs in the leafy portion of the plant at the tallest leaf height (Fig. 1). If the inflorescence provides a bulk of the mass, then the tallest portion of the inflorescence is measured (see Fig. 2 above).
  - This protocol does not provide guidelines for every species of grass. The individual conducting the sampling will have to make a judgment for each plot and each species along a plot. Consistency by following this protocol is key, as well as collecting an adequate number of measurements.
- The same protocol should be followed for forbs (see Fig. 3, above - the bulk of the mass of the plant occurs in the leafy portion and the tallest leaf height is measured; see Fig. 4, above - the inflorescence provides the bulk of the mass the tallest portion of the inflorescence is measured)

All cover estimates should be placed in the categories noted in Table 1. The standard Daubenmire method uses six cover classes, but the specific ranges lump too much in the 5-25% class for Gunnison sage-grouse vegetation variables. Therefore, this category was split into 2 cover classes below.

**Table 3. Cover classes for Gunnison sage-grouse habitat variable estimation.**

| Cover Class | Range of Coverage | Midpoint of Range |
|---|---|---|
| 1 | 0-5% | 2.5 |
| 2 | 5-15% | 10 |
| 3 | 15-25% | 20 |
| 4 | 25-50% | 38 |
| 5 | 50-75% | 63 |
| 6 | 75-100% | 88 |

# APPENDIX F.  Habitat Prioritization Tool

*The below listed information was incorporated into a spatial model to evaluate habitat within the Gunnison Basin for Gunnison sage-grouse.  The spatial model in itself can only be used on a broad scale for planning and rough habitat assessment.  Projects and development will still need to be evaluated with an onsite assessment on a project-by-project basis.  This model has been developed through collaborative efforts of Gunnison County, US Fish and Wildlife Service (USFWS), Bureau of Land Management (BLM), US Forest Service (USFS), Colorado Parks and Wildlife (CPW), National Park Service (NPS), Natural Resources Conservation Service (NRCS), and interested stakeholders.  This Tool/Model incorporates the most recent information as provided by agency input from those working on the ground through numerous meetings and hours of discussion about data layers that provide the best representation of current on the ground conditions in the Gunnison Basin.*

*High priority habitat consists of all habitat layers and all uncontrollable threat layers. Controllable and other impacts can be changed or adjusted to decrease the impact on grouse habitat.*

## A. Habitat

1. **Lek 0.6 mile buffer and average high male count for active leks:**  The official lek status and high male count are defined and reported from lekking data collected and published by CPW in their annual Gunnison Basin Lek Count Summary and Population Estimate.  The Official Status of a lek is given as a cumulative status and designated as Active, Historic, Inactive, or Unknown.  To be Officially Active, a lek only needs to be designated as Active in the current year.  A lek is not considered Officially Inactive unless it has been seasonally Inactive for five consecutive years.  Thus, a lek might not have any birds for a given season, but its official status may be Unknown because the lek had not been Inactive all of the past five years.  Historical lek status is not given until a lek has been Inactive for 10 consecutive years. (Jackson and Seward, 2011)

- **Geospatial Data:** This layer is the CPW lek polygon layer and includes a 0.6 mile buffer from the outside edge of the lek polygon with spatial boundaries from the 2011 update as well as the Official Status from 2011.   Buffering the lek polygons by 0.6 miles matches up with the disturbance guidelines in the Rangewide Conservation Plan.  This 0.6 mile buffer serves as a measure of protection to insure that the entire lek polygon is captured within the buffer polygon and that potential direct or indirect impacts directly adjacent to a lek that could influence lekking behavior are evaluated.

- **Evaluation class breaks (weight) justification:** Leks are considered the most important habitat for the grouse.  Habitat alteration on or near a lek has the potential to have the greatest impact to the population.  There is a need to conserve all leks, regardless of the number of birds displaying on the lek.  (Aldridge, 2011b; Phillips, 2011)
    o <u>Officially Active</u> (15) *Active leks are those of greatest value to the grouse population. Birds are displaying regularly on an annual basis.*

- o <u>Officially Unknown</u> (10) *These leks could have and Official Status of unknown for many reasons, including missing count data.  Leks can fall into this category in a one year time frame.*
- o <u>Officially Inactive</u> (8) *These leks should not be completely discounted. There is potential for the grouse to comeback and begin using these areas on a regular basis if numbers increase or surrounding habitat improves. It takes 5 years for a lek to move into this category.*
- o <u>Officially Historic</u> (1) *The majority of these leks are close to high build-out densities and will probably never be able to recover to active status regularly.*

- **Data for support:**
  - o 2011 Gunnison Basin Gunnison sage-grouse Lek Count Summary and Population Estimate Final Report (Jackson and Seward 2011).
  - o 2011. Seward, Nate.  Lek Status Definitions.
  - o 2011b. Aldridge, Cam. Public meeting information, December 1, 2011.  Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse.
  - o 2011. Phillips, Mike. Public meeting information, December 1, 2011.  Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse.

- **Area for improvement:**
  - o The Local Annual Report definitions do not align with the RCP or current statewide definitions for Official Status as defined by Colorado Parks and Wildlife. Local CPW staff has maintained consistency in local definitions and is working to align them with the RCP and Statewide definitions.

- **Updated:** This layer will be updated on a yearly basis.

2. **Brood-rearing habitat:** Brood rearing habitat is defined in the RCP.  It includes mesic areas (swales, meadows, sagebrush near irrigation ditches and irrigated meadows) with lush vegetation.  This layer is intended to capture priority habitat as defined in the RCP.

- **Geospatial Data:** Four spatial layers were combined to create this layer—NRCS mapped alluvial soils minus irrigated meadows, CPW streams, and wet meadow/sagebrush interface areas.  A 50m buffer was placed around the streams and the wet meadow/sagebrush interface layer (RCP 2005).  Areas not double-counted where overlap occurred and areas where mesic sites were greater than 50m from the sagebrush.

- **Evaluation class breaks (weight) justification:**
  - o <u>Present</u> (13)

- **Data for support:**
  - o RCP

- **Area for improvement:**

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

- o Updated NRCS soils mapping and range site mapping for alluvial and riparian sites. *(Not possible in current timeframe, but progress has begun on this endeavor.)*
- o Removal of any brood rearing habitat from forested areas.
- o There is a need to add other features including springs and seeps that are not captured in the current data layers.

- **Updated:** This layer will be updated if new and better data becomes available.

3. **Nesting/summer/late fall habitat:** These habitats are defined in the RCP. It includes sagebrush dominated areas. This layer is trying to capture priority habitat as defined in the RCP.

- **Geospatial Data:** This data layer was compiled from NRCS soils data and includes all sagebrush dominated range sites (mountain loam, subalpine loam, mountain outwash, and deep clay loam). Soils included from the Gunnison Soil Survey (CO662) are: CeC, CoE, CuE, DeB, DoE, GeB, GeE, JeE, KvE, LeE, MoE, MrE, PwE, RcE, SuE, YgE, YlE, YpE, EvD and the NE (331 to 149 degrees) aspects of CrE, DrE, DsE, KcE, LhF, PhF, PmF, and MrE. Soils included from the Grand Mesa-West Elk Soil Survey (CO660) are: 107, 138, 139, 142, 165, 172, 191 and the NE aspects of 153. Soils included from the Cochetopa Area Soil Survey (CO663) are: 103, 104, 108, 111, 119, 121, 122, 131, 132, 133, 134, 141, 142 and the NE aspects of 110.

- **Evaluation class breaks (weight) justification:** As we looked at the map we decided to differentiate nesting habitats. We thought it would provide important additional information to give nesting habitat closer to the brood rearing habitat a higher score. sage-grouse hens have to be able to move their broods from the nests to brood rearing habitat by walking. All nesting habitat is of value, but nesting habitat closer to brood rearing habitat has potential to be of higher benefit. Disjunction of brood rearing habitat from nesting habitat results in habitat fragmentation and possibly the loss of usability. It is recognized that In order to capture most of the nesting locations, one would have to have to account for all nesting habitat within 4 miles of a lek (Connelly et al 2000, Aldridge 2011b) - which is all nesting habitat in the basin.
  - o Present <1500 ft. from brood rearing habitat (15)
  - o Present >1500 ft. from brood rearing habitat (10)

- **Data for support:**
  - o RCP
  - o NRCS Soil Survey
  - o 2011b. Aldridge, Cam. Public meeting information, December 1, 2011. Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse.
  - o Connelly et. al 2000

- **Area for improvement:**

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

> o Updated NRCS soils mapping and range site mapping. *(Not possible in current timeframe, but progress has begun on this endeavor.)*

- **Updated:** This layer will be updated if new and better data becomes available.

4. **Winter habitat:** This habitat is defined in the RCP. It includes sagebrush dominated areas with both thermal cover and exposed sagebrush for winter use. This layer is intended to capture priority habitat as defined in the RCP.

- **Geospatial Data:** Winter habitat was modeled using the dry mountain loam soils from NRCS Soil Survey mapping layers. Dry mountain loam sites are mapped on SE to NW (150-330 degrees) facing slopes. A 10m DEM was used in the slope analysis and boundaries were then smoothed to reduce the pixilation. Soils included from the Gunnison Soil Survey (CO662) are: CrE, DrE, DsE, KcE, LhF, PhF, PmF, and MrE. Soils included from the Grand Mesa-West Elk Soil Survey (CO660) are: 153. Soils included from the Cochetopa Area Soil Survey (CO663) are: 110, and 130.

- **Evaluation class breaks (weight) justification:** Winter habitat was considered to be of lesser importance than the other habitat types for the grouse. In general, winter mortality of the Gunnison sage-grouse is low (Phillips, 2011)
    - o Present (10)

- **Data for support:**
    - o RCP
    - o NRCS Soil Survey/ Web Soil Survey
    - o 2011. Phillips, Mike. Public meeting information, December 1, 2011. Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse.

- **Area for improvement:**
    - o Updated NRCS soils mapping and range site mapping. *(Not possible in current timeframe, but progress has begun on this endeavor.)*

- **Updated:** This layer will be updated if new and better data becomes available.

5. **Habitat status:** The habitat status has been defined from the RCP and incorporates many researchers' and managers' expert knowledge of the current and historic distribution of the grouse. The occupied habitat layer will serve as this tool's boundary for grouse habitat evaluation. Potential and vacant/unknown habitats are not included in scoring because of lack of habitat and geospatial data. Vacant/Unknown habitat is apparent high quality habitat without birds. Potential habitat would require a significant amount of time, energy and resources to create to a habitat of sufficient quality that could be colonized by grouse, due to the large amount of forested acres. There are areas within the CPW mapped occupied habitat

layer that are unusable to grouse and have been removed.  These areas include within the landfill boundary, the UMTRA site, open water areas, and some gravel pits.

- **Geospatial Data:** The original occupied habitat with polygons delineated by the CPW/USFWS is defined in the RCP.  The current occupied habitat boundary is an updated version from May 2011 by CPW staff based on field observations.  The 2011 spatial layer was incorporated into the tool.

- **Evaluation class breaks (weight) justification:**
    o <u>Occupied</u> (0) *Occupied habitat was not actually scored. It was used as the outer boundary for the prioritization tool.*

- **Data for support:**
    o RCP (page 32-40)
    o Schroeder et al. 2004
    o CPW - Species Activity Mapping Data

- **Area for improvement:**
    o Potential and vacant/unknown habitats are not included in scoring because of lack of habitat and geospatial data.

- **Updated:** When revisions to the occupied habitat boundary occur, alterations and updates to this tool will be needed.


6. **Land near active leks:**   Land near active leks is considered a higher priority for preservation.  Leks are often in close proximity to quality nesting habitat. (Connelly et al. 2000; Aldridge et al. 2011)  The Local Gunnison Sage Grouse Conservation Plan notes that these areas are priority areas used by nesting hens (1997).

- **Geospatial Data:** A two mile buffer was placed around the outer edge of the lek polygon layer.  Both the area within the 2 mile buffer and the lek itself were included in this layer.  The two mile buffer is from the Gunnison Sage Grouse Conservation Plan (1997).

- **Evaluation class breaks (weight) justification:**
    o <u>Areas within active leks and  <2 miles from the edge of the active leks</u> (5)

- **Data for support:**
    o Connelly, J.W., M.A. Schroeder, A.R. Sands and C.E. Braun. 2000. Guidelines to manage sage-grouse populations and their habitat.  Wildlife Society Bulletin 28:967-985.
    o Aldridge et al. 2011
    o Gunnison Sage Grouse Conservation Plan; Gunnison Basin- Colorado. 1997. Local species management plan.

- **Area for improvement:**

- **Updated**: This layer will be updated if new and better data becomes available.

7. **Irrigated lands:** Irrigated areas greater than 50m from the sagebrush interface and outside CPW lek polygons are not considered as suitable grouse habitat.

- **Geospatial Data:** This layer was created by the Division of Water Resources using Landsat TM imagery. It is a spatial layer of irrigated meadows.

- **Evaluation class break (weight) justification**:
  o Present (-8)

- **Data for support:**
  o RCP
  o Federal Register
  o 2011. Phillips, Mike. Public meeting information, December 1, 2011. Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse.

- **Area for improvement:**

- **Updated**: This layer will be updated if new and better data becomes available.

8. **Non-Habitat:**
- Areas of no habitat such as open water and gravel pits are overlaid on top of the scoring polygons to show that these areas are not habitat. More areas, such as building footprints, could be added to this layer in the future when available.

## B. Uncontrollable Threats

1. **High density subdivisions:** A highly divided subdivision has a greater impact on grouse habitat than an individual home.

- **Geospatial Data:** Gunnison and Saguache County's parcel layers, as well as their 9-1-1 house point layers, have been combined to determine development potential/impact. Development was defined as home, barn, or any improvement valued at more than $30,000 on a parcel. At each house point, there was a 300 foot radius buffer added to the known structure. House points that where within 1000ft of another two house points location were then buffered by 1000ft due to the increased impact on the grouse. (Cochran, 2011) The 300ft buffered housing points buffer was clipped and removed from the 1000 ft. buffer so that points did not receive a negative score for both the buffers.

- **Evaluation class break (weight) justification:**
  o Areas within 300ft of a house point (-5) *Areas adjacent to houses are not suited for grouse habitation.*

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

- o <u>Areas where a housing point is within 1000ft of another 2 house points</u> (-20) *Areas where more house points are located closer together (subdivisions) will have an even greater negative impact on the grouse habitat.*
- o <u><70 acre parcels with development</u> (-7) *Smaller developed parcels have a greater impact on both degradation and fragmentation of surrounding habitats than larger developed parcels, in most circumstances.   They are given a negative score as a result of these negative impacts.*

- **Data for support:**
  - o Cochran, Jim. 2011. Personal communication.
  - o Phillips, Mike. 2011. Personal communication.

- **Area for improvement:**

- **Updated**: This layer will be updated on a yearly basis to track changes in development and subdivision.

2. **Roads/Trails:**  All roads and improved trails were evaluated for their impact to the habitat from fragmentation and predator corridors.  ***Use and recreation impacts from disturbance are considered under the recreation layer, not in this layer.   This is a habitat impact evaluation of the roads themselves.*** Improved roads are considered all roads bigger than all season, 2-wheel drive roads.   Improved roads are defined as passenger car roads, highways, and improved county roads.   Double track roads are considered unimproved roads and include: admin routes, jeep trails, primitive roads, high clearance roads, private roads, and ATV routes. Single track routes are considered trails (mechanized and motorized are included).  Closed routes are routes that are permanently closed (not seasonally) that have not been reclaimed.

- **Geospatial Data:** Road data from the county, CPW, BLM and USFS were used to create this layer.

- **Evaluation class break (weight) justification:**
  - o <u><150ft from the centerline of an improved road</u> (-4) *These roads are defined as passenger car roads, highways, and county roads.*
  - o <u><50ft from centerline of a double track</u>(-3)   *These roads are defined as roads with vegetation growing  between the tracks and include admin routes,  jeep trails, primitive roads,  private roads (driveways), unmaintained roads, and ATV routes.*
  - o <u><25ft from that center line of a single track</u> (-2) *These are defined as smaller disturbances that include trails, including both mechanized and motorized uses.*
  - o <u><25ft from that center line of a closed route</u> *(-1) These are defined as routes that are permanently closed (not seasonally) that have not been reclaimed.*
  - o <u><1000ft from a recreational use point</u> (0) *This includes known access points, shooting areas, and more.*
  - o <u><100ft from trails in Curecanti National Recreation Area</u> (0)
  - o <u>Curecanti National Recreation Area recreation polygons</u> (0)

- **Data for support:**
  - o Aldridge et al. 2010- Aldridge does not agree with the 150ft buffer.  He feels that improved roads can impact nesting habitat up to 8km away. Double track roads can have an impact to over 6 km away.  He feels that there is not a non-linear response as you move away from the road and that a regression model needs to be used to depict this.
  - o *Gunnison Basin USFS and BLM Federal Travel Management Plan*

- **Area for improvement:**

- **Updated:**  This layer will be updated on a yearly basis, if possible.

3. **Power lines:**  Power lines pose a potential risk for habitat degradation due to predation and fragmentation. There is a significant distinction between WAPA lines and the GCEA lines. WAPA lines do have large structures, high lines, and improved roads associated with them. GCEA lines are smaller primary and secondary lines that usually do not have roads associated with them.

- **Geospatial Data:** There is a data layer available with large, above ground, WAPA transmission lines mapped.

- **Evaluation class break (weight) justification:**
  - o <u><450 feet from a WAPA above ground power line</u> (-3)

- **Data for support:**
  - o 2011. Phillips, Mike. Public meeting information, December 1, 2011.  Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse. Mike feels that an impact from power lines is for direct mortality (2 birds within the scope of his study).
  - o 2011b. Aldridge, Cam. Public meeting information, December 1, 2011.  Meeting to validate the priority tool model called by the Technical Subcommittee for the Gunnison Basin Strategic Committee for the Gunnison sage-grouse.

- **Area for improvement:**
  - o Small power lines are not available and may need to be incorporated.  GCEA will not make this information publicly available through this mapping tool for safety/protection reasons.
  - o Exponential decay out to about 2.5 km is more probably the direct influence of the power lines.  This would reflect the impact of predation on the grouse from perching predators. (Aldridge 2011b.)

- **Updated:**  This layer will be updated when needed.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

## C. Controllable Threats – (No Weights Applied)

Attempts to combine controllable threats with the habitat map (which includes uncontrollable threats) were not successful. In order to allow future work on this issue, controllable threats were included in the scoring query but were assigned a zero (0) weight. Currently, it appears that the best way to approach the scoring issues associated with controllable threats is to overlay a "controllable threat layer" of interest over the habitat map for visual analysis.

1. **Development potential**: Areas that are currently developed pose risks to habitat degradation and fragmentation for the sage-grouse.   The hope would be to update this layer on a yearly basis.

- **Geospatial Data**: Gunnison and Saguache County's' parcel layers were used to assess parcel size and development status.  Seventy acres was chosen as a break point for this analysis because of the state law that allows for minimal restriction for subdivision of parcels as long as the final parcels are greater than 35 acres.  Development was defined as home, barn, anything >$30,000 worth of improvements on a parcel.

- **Evaluation class break (weight) justification**:
  - >70 acre parcels (0) *Parcels greater than 70 acres, even undeveloped, can represent a large risk for subdivision and development. Colorado State law allows the subdivision of private property into parcels equal to or greater than 35 acres with minimal restriction or regulation by local government. This poses a significant risk to habitat degradation and fragmentation and therefore receives a high score for needed habitat protection.*
  - <70 acre parcels without development (0) *Undeveloped parcels of this size have to go through a county review process to be further subdivided, in which a species conservation planner is consulted for risk to sage-grouse and mitigation opportunities to decrease the developmental impact.  The risk for habitat degradation is decreased with this consultation and although there is a potential for fragmentation there is a lower, but still positive, score given for needed habitat protection. This also means that this property has a conservation potential.*

- **Data for support:**

- **Area for improvement:**
  - There is a need for more support data for acreages and impact area sizes used in the model.  Is there good development impact data available that could inform this process?
  - There is a need for future analysis to be able to relate development densities to the RCP.  It would be beneficial to complete this exercise using the acres from Appendix F in the RCP.

- **Updated:** This layer will be updated on a yearly basis to track changes in development and subdivision.

2. **Invasive Species:**  Invasive species alter and degrade sage-grouse habitat.  Different plant species have different potentials to impact the habitat.

- **Geospatial Data:** Data from the BLM, USFS, NPS and Gunnison County are utilized in this layer.

- **Evaluation class break (weight) justification:**
    o <u>Cheatgrass</u> (0)
    o <u>Other weed species</u> (0)

- **Data for support:**
    o Cheatgrass research

- **Area for improvement:**
    o There are no comprehensive records for private land.
    o The data collected is sometimes incomplete and species at each point/line/polygon is not documented.

- **Updated:** This layer will be updated on a yearly basis to track changes in infestations.  This layer should be a cumulative layer where previous year's data is incorporated with each year's new data.

3. **Recreation:**  All recreational uses of the landscape have potential to impact the sage-grouse through habitat fragmentation, habitat degradation, and direct threat to individuals' survival.

- **Geospatial Data:** Large recreational area polygons have been drawn across the basin and have been rated with a seasonality and level of use.  The BLM and recreational stakeholders have worked together to create this very broad layer which reflects the diffuse use that may occur in these areas.  Impacts are not directly tied to specific routes, trails and points of interest.

- **Evaluation class break (weight) justification:**
    o Spring Use
        ▪ Low (0)
        ▪ Medium/Low (0)
        ▪ Medium (0)
        ▪ Medium/High (0)
        ▪ High (0)
    o Summer Use
        ▪ Low (0)
        ▪ Medium/Low (0)
        ▪ Medium (0)
        ▪ Medium/High (0)
        ▪ High (0)
    o Fall Use

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

- Low (0)
- Medium/Low (0)
- Medium (0)
- Medium/High (0)
- High (0)
  o Winter Use
    - Low (0)
    - Medium/Low (0)
    - Medium (0)
    - Medium/High (0)
    - High (0)

- **Data for support:**

- **Area for improvement:**
  o This layer should be further refined.
  o Spatial data layers will need to be collected for all recreational trails, fishing areas, parking areas, camp grounds, and boat launch areas from the BLM, USFS, CDOW, NPS, Gunnison County, and Saguache County. These are available, but not currently incorporated into the Tool.

- **Updated**: This layer will be updated on a yearly basis to track changes in development and subdivision.

4. **Landfill:** The Gunnison County landfill serves as a feeding/harboring location for sage-grouse predators.   The landfill's influence on the surrounding area is considered controllable because active measures can be taken to reduce the sage-grouse predator populations.

- **Geospatial Data:** This is a simple spatial layer that delineates a polygon around the landfill area as seen through ortho-imagery.

- **Evaluation class break (weight) justification:**
  o Areas within ½ mile of the landfill (0)
  o Area >½ mile and <1 mile of the landfill (0)

- **Data for support:**
-

- **Area for improvement:**
  o Data to supporting the evaluation classes and impact from predators will need to be documented.

- **Updated**: This layer will be updated as needed or when better information becomes available.

## D. Other Impacts – (No Weights Applied)

**1. Landownership - Protections:**  Areas that are currently developed pose risks to habitat degradation and fragmentation for the sage-grouse.  Areas with easements specifically for sage-grouse habitat protection or with non-development agreements are considered beneficial to the grouse.

- **Geospatial Data:** Gunnison County has a database and a spatial layer with all qualified conservation easements.  The CPW has also provided a layer of participating CCAA parcels (signed Certificate of Inclusion) which has been included in this layer.  Public land boundaries are also available and can be incorporated.

- **Evaluation class break (weight) justification:**
  o <u>Conservation Easements</u> (0) - *These are voluntary agreements that protects the land in perpetuity.  All of these easements have grouse mentioned in the documentation, whether management actually occurs to benefit the grouse is a different issue.*
  o <u>CCAA</u> (0) - *These are voluntary agreements that all have an endpoint of 2026 which can be renewed.  These agreements can be terminated with 30-60 days' notice.*
  o <u>Public lands</u> (0) - *These are mostly undevelopable.*

- **Area for improvement:**
  o This layer has not been totally fleshed out at this point.  Instead of being incorporated into the tool, it could be used as a layer for evaluation when looking at proximity to priority habitat.

- **Updated**: This layer will be updated on a yearly basis.

# APPENDIX D:  GUSG RANGEWIDE CONSERVATION PLAN STRUCTURAL HABITAT GUIDELINES

## Gunnison Sage-grouse Rangewide Conservation Plan

## APPENDIX H

## GUSG STRUCTURAL HABITAT GUIDELINES

### GUSG Structural Habitat Guidelines

*Background and Data Sources*

Guidelines for the maintenance of sage-grouse habitats were first provided by Braun et al (1977). Subsequent research improved knowledge about the seasonal habitat use, movements, and migratory patterns of sage-grouse across their range. Connelly et al (2000) built upon these findings and developed more specific habitat guidelines for the structural characteristics of the overstory and understory of sagebrush communities used by sage-grouse. Although Connelly et al (2000) improved the 1977 recommendations, they lacked in habitat structural information specific to GUSG.

The GUSG habitat guidelines formulated for the RCP differ slightly from the Connelly et al (2000) guidelines. As Connelly et al (2000:275) mention, "…the judgment of local biologists and quantitative data from population and habitat monitoring are necessary to implement the guidelines correctly." This is the case in current GUSG range.

GUSG inhabit the Colorado Plateau (Fig. 3, pg. 33) where some sagebrush communities are different from those which served as a basis for the guidelines in Connelly et al (2000). Connelly et al (2000) reported grass and big sagebrush cover values from floristic provinces other than the Colorado Plateau, including the Wyoming Basin, Columbia Basin, Northern Great Basin, Snake River Plain, and Silver Sagebrush provinces. The Colorado Plateau is older (geologically) and has less productive soils than some of the aforementioned provinces. The moisture regime is also more characteristic of warm season grasses (summer monsoon moisture patterns) (S. B. Monsen, personal communication) rather than cool season grasses (spring and fall moisture regimes). Therefore, the herbaceous communities on the Colorado Plateau are not directly comparable to the other floristic provinces, especially when comparing herbaceous understories. Thus, the basis for some differences in the 2 sets of guidelines (Connelly et al 2000 and RCP) are a result of local soil parent material and precipitation patterns.

In addition, much of the data used in development of the habitat structural characteristics in Connelly et al (2000) were dominated by GRSG habitat use and movement information. Connelly et al (2000) did use some GUSG habitat use information (Hupp 1987, Young 1994, Commons et al 1999), but other sources of information were not used because they were located in unpublished CDOW correspondence summary reports (Woods and Braun 1995), or were new (Apa 2004). Using this more extensive data for GUSG, we have developed vegetation structure guidelines specific to the sagebrush communities within GUSG range.

In developing these habitat guidelines, we summarized *only GUSG habitat use data*. Although GRSG investigations were reviewed, no GRSG data were used in the development of these habitat guidelines. All of the known structural vegetation data collected in breeding (Young 1994,

Apa 2004), summer - fall (Young 1994, Woods and Braun 1995, Commons 1997, Apa 2004), and winter (Hupp 1987) habitat were summarized. Note that Apa (2004), collected habitat data from 5 different GUSG population areas, while many of the other studies focused on Gunnison Basin.

Studies were not separated based on annual precipitation. Data reported in Apa (2004) were collected during a significant drought and variables such as grass and forb cover and height were likely lower than normal because of the lack of precipitation. Overstory shrub structural variables were less likely to be influenced by short-term drought.

Following the development of the guidelines, 1 additional GUSG vegetation dataset was used to validate the guidelines (NPS, unpublished data). In all vegetation structure categories, the mean or median reported in the NPS reports fell within the guideline ranges established in this plan.

*Seasonal Habitat Definitions*
Until seasonal GUSG habitats are mapped in a given population area (see "Habitat Monitoring" rangewide strategy, pg. 220, Objective 1, Strategies 7 and 8) the following definitions of seasonal habitats should be used. For additional limiting criteria, such as slope and aspect, consult with local biologists.

Breeding Habitat: sagebrush communities delineated within 4 miles (see "GUSG Disturbance Guidelines", Appendix I, for discussion) of an active strutting ground. Breeding habitat includes active strutting grounds, and nesting and early brood-rearing habitat (Connelly et al 2000), usually in use from mid-March through late-June.

None of the studies we reviewed for GUSG breeding habitat structural guidelines divided brood-rearing habitat into early- or late-brood-rearing (Young 1994, Apa 2004), so all of the brood habitat information was included in breeding habitat. The data summary to develop the guidelines for breeding habitat was done without respect to nest success, so data from both successful and unsuccessful nests were used. Although data have been presented that suggest herbaceous vegetation might differ between successful and unsuccessful GRSG nests (Connelly et al 2004), no consistent differences have been reported. There is, in fact, more conclusive and consistent evidence that shrub structure characteristics (i.e., horizontal and vertical cover values) differ between successful and unsuccessful nests (Connelly et al 2004).

Summer – Fall Habitat: vegetation communities including sagebrush, agricultural fields, and wet meadows (Connelly et al 2000) that are within 4 miles (see "GUSG Disturbance Guidelines", Appendix I, for discussion) of an active strutting ground.

For the summer - fall guidelines we used habitat use data from non-brooding females and males (Young 1994, Woods and Braun 1995, Commons 1997, Apa 2004).

Winter Habitat: sagebrush areas (Connelly et al 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters. These areas either have sufficient shrub height to be above average snow depths, or are exposed due to topographic features (e.g., windswept ridges, south-facing slopes). Sites are typically characterized by sagebrush canopy cover > 25% and sagebrush > 12–15 inches in height (Schoenberg 1982) associated with drainages, ridges, or southwest-facing aspects having slopes < 15% (Gill 1965, Wallestad 1975, Beck 1977, Robertson 1999).

Only 1 study (Hupp 1987) reported winter habitat information and these data were collected in the Gunnison Basin.

H-4 *Appendix H: GUSG Structural Habitat Guidelines* Gunnison Sage-grouse Rangewide Conservation Plan

*Habitat Guideline Development*

Where possible, study areas in the literature were categorized as arid or mesic. As per Connelly et al (2000), arid and mesic sites can be determined locally using the precipitation and soil characteristics (Tisdale and Hironaka 1981, Hironaka 1983, Winward 2004, Monsen 2005). We classified data from Gunnison Basin, Dry Creek Basin, and Dove Creek (south) as arid. It is well understood that the Gunnison Basin has both mesic and arid sites, but we were not able to discern between the sites. The data from Piñon Mesa, Miramonte (in San Miguel Basin), Cerro Summit - Cimarron, Crawford, north Dove Creek, and Hamilton Mesa (in San Miguel Basin), were considered more mesic sites. Most of the data reported were in the form of means and standard errors. The mean and standard error for each structural variable were summarized by arid or mesic sites across the entire range of the GUSG. The means were bounded by the standard errors to create a variable "distribution range" and a guideline was developed using the distribution range. Numerical maximum and minimum data points were not included. The guideline range is compared with Connelly et al (2000).

Seven overstory and understory vegetation structural characteristics guidelines for GUSG breeding and summer - fall habitats are reported: (1) sagebrush canopy cover; (2) non-sagebrush canopy cover; (3) sagebrush height; (4) grass cover; (5) forb cover; (6) grass height; and (7) forb height. Only 2 overstory vegetation structural characteristic guidelines were developed for winter habitat: (1) sagebrush canopy cover and (2) sagebrush height.

Many species of shrubs were included in the non-sagebrush canopy cover portion of the guidelines. In more arid locations, the non-sagebrush shrubs included, but are not limited to, horsebrush, rabbitbrush, bitterbrush, snakeweed, greasewood, and winterfat. In mesic locations, the aforementioned shrub species can occur, but the shrub community may also include Gambel's oak, snowberry, serviceberry, and chokecherry.

None of the 6 studies we evaluated sampled vegetation structural variables in the same manner. Commons (1997) used a modification of Daubenmire (1959) and Canfield (1941) to estimate understory and overstory coverages, respectively. Understory measurements were estimated to the nearest 5%. In contrast to most of the other studies, Commons (1997) did not use the foliar intercept to estimate shrub canopy cover (%), but instead used the canopy cover estimate. The canopy cover value overestimates foliar intercept (foliar cover), which is the standard used in essentially all other sage-grouse research. No grass or forb heights were reported (Commons 1997). Hupp (1987) estimated sagebrush canopy cover using the foliar intercept. Young (1994) used a modification of Canfield (1941) to estimate shrub, forb, and grass cover, but grass and forb heights were not reported. Woods and Braun (1995) used methods similar to Commons (1997), but it is unknown whether shrub foliar or intercept cover was used to estimate canopy cover. No grass or forb heights were reported. Apa (2004) used Canfield (1941) to estimate foliar cover for non-sagebrush and sagebrush canopy cover, and Daubenmire (1959) to estimate understory coverage. Although sagebrush height was sampled in many different ways, the actual measurement (not including inflorescences) was standard across all studies. The importance of using standard monitoring protocols and techniques within GUSG range is clear, and is addressed for the future in the "Habitat Monitoring" rangewide strategy (see pg. 220).

*H-4 Appendix H: GUSG Structural Habitat Guidelines* Gunnison Sage-grouse Rangewide Conservation Plan

CHAPTER 6 - APPENDIX D
GUSG RCP Structural Habitat Guidelines

*Using the Guidelines*

The vegetation structure guidelines we present (Tables 1 – 3) should be interpreted as minimum standards, and managers should strive to meet the full potential of any given site. These habitat guidelines should be considered adaptive, and interim in nature. The guidelines were developed from actual grouse use sites, but should be considered as guidance until further and more specific and quantified data are available from grouse research, or until the development of a rigorous mapping protocol. These guidelines are intended to represent a variety of landscape situations. Landscapes are diverse; some areas on the landscape will not meet these guidelines, some areas will meet the guidelines, and some areas will exceed the guidelines. As new information is collected, these guidelines, as well as the plan are meant to be adaptable.

CHAPTER 6 - APPENDIX D
GUSG RCP Structural Habitat Guidelines

Table 1. GUSG breeding habitat guidelines[a].

| BREEDING HABITAT[b] | | | | |
|---|---|---|---|---|
| **Vegetation Variable** | **Gunnison sage-grouse** | | **Connelly et al (2000)** | |
| | **Arid[c]** | **Mesic[c]** | **Arid** | **Mesic** |
| Sagebrush Canopy[d] % | 15 - 25 | 10 – 20 | 15 - 25 | 15 – 25 |
| Non-sagebrush Canopy[d] % | 5 - 15 | 5 – 15 | - | - |
| Total Shrub Canopy[d] % | 20 - 40 | 15 – 35 | - | - |
| Sagebrush Height cm(inches) | 25 – 50 (9.8 – 19.7) | 30 – 50 (11.8 – 19.7) | 30 – 80 (11.8 – 31.5) | 40 – 80 (15.7 – 31.5) |
| Grass Cover[d] % | 10 - 30 | 20 – 40 | - | - |
| Forb Cover[e] % | 5 - 15 | 20 – 40 | ≥ 15 | ≥ 25 |
| Grass Height[f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) | > 18 (> 7.1) | > 18 (> 7.1) |
| Forb Height[f] cm (inches) | 5 – 10 (2.0 – 3.9) | 5 – 15 (2.0 – 5.9) | - | |

[a] Breeding habitat guidelines were developed using data in GUSG studies by Young (1994) and Apa (2004).

[b] Breeding habitat is defined as sagebrush communities delineated within 4 miles of a lek (see "GUSG Disturbance Guidelines", Appendix I, for discussion. Breeding habitat includes lek, nesting and early brood-rearing habitat usually from mid-March through late-June.

[c] Arid or mesic communities are as defined by Winward (2004).

[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al (2003).

[e] Understory cover measured according to Daubenmire (1959).

[f] The tallest vertical point (droop height) where the bulk of a plant's mass occurs.

H-6 *Appendix H: GUSG Structural Habitat Guidelines* Gunnison Sage-grouse Rangewide Conservation Plan

CHAPTER 6 - APPENDIX D
GUSG RCP Structural Habitat Guidelines

Table 2. GUSG summer - fall habitat guidelines [a]. No specific habitat guidelines have been included for riparian or wet meadow habitat used by GUSG during this period. BLM and USFS currently have riparian and/or wet meadow management guidance which is consistent with the needs of GUSG.

| SUMMER - FALL HABITAT [b] | | | | |
|---|---|---|---|---|
| Gunnison sage-grouse | | | Connelly et al (2000) | |
| Vegetation Variable | Arid [c] | Mesic [c] | Arid | Mesic |
| Sagebrush Canopy [d] (%) | 5 – 15 | 5 – 20 | 10 – 25 | 10 – 25 |
| Non-sagebrush Canopy [d] (%) | 5 - 15 | 5 – 15 | - | - |
| Total Shrub Canopy [d] (%) | 10 - 30 | 10 – 35 | - | - |
| Sagebrush Height cm (inches) | 20 – 40 (7.9 - 15.7) | 25 – 50 (9.8 – 19.7) | 40 – 80 (15.7 – 31.5) | 40 – 80 (15.7 – 31.5) |
| Grass Cover [e] (%) | 10 - 25 | 10 – 35 | - | - |
| Forb Cover [e] (%) | 5 - 15 | 15 – 35 | > 15 | > 15 |
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) | variable | variable |
| Forb Height [f] cm (inches) | 3 – 10 (1.2 - 3.9) | 5 – 10 (2.0 - 5.9) | variable | variable |

[a] Summer - fall habitat guidelines were developed using data in GUSG studies by Young (1994), Woods and Braun (1995), Commons (1997), and Apa (2004)

[b] Summer – fall habitat is defined as vegetation communities, including sagebrush, agricultural fields, and wet meadows (Connelly et al 2000) that are within 4 miles (see "GUSG Disturbance Guidelines", Appendix I, for discussion) of an active strutting ground.

[c] Arid or mesic communities are as defined by Winward (2004).

[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al (2003).

[e] Understory cover measured according to Daubenmire (1959).

[f] The tallest vertical point (droop height) where the bulk of a plant's mass occurs.

H-7 *Appendix H: GUSG Structural Habitat Guidelines* Gunnison Sage-grouse Rangewide Conservation Plan

CHAPTER 6 - APPENDIX D
GUSG RCP Structural Habitat Guidelines

Table 3. GUSG winter habitat guidelines [a].

| WINTER HABITAT [b] | | | | |
|---|---|---|---|---|
| Gunnison sage-grouse | | | Connelly et al (2000) | |
| Vegetation Variable | Arid [c] | Mesic [c] | Arid | Mesic |
| Sagebrush Canopy [d]: % | 30 – 40 | - | 10 – 30 | 10 – 30 |
| Sagebrush Height [e]: cm (inches) | 40 – 55 (15.8 – 21.7) | - | 25 – 35 (9.8 – 13.8) | 25 – 35 (9.8 – 13.8) |

[a] Winter habitat guidelines were developed using GUSG data from Hupp (1987).

[b] Winter habitat is defined as sagebrush areas (Connelly et al 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.

[c] Arid or mesic communities are as defined by Winward (2004).

[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al (2003).

[e] Measured from ground level to the tallest stem (excluding inflorescence) according to Hupp (1987).

H-8 *Appendix H: GUSG Structural Habitat Guidelines* Gunnison Sage-grouse Rangewide Conservation Plan

# APPENDIX E:  BLM STANDARDS FOR PUBLIC LAND HEALTH AND GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT IN COLORADO AND UTAH

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

May 21, 2012

In Reply Refer To:
1600, 1700, 4000, 4100, 4400, 6000, 6500, 6600, 7100, 7200, 7300 (200) P

EMS TRANSMISSION 05/25/2012
Instruction Memorandum No. 2012-124
Expires: 09/30/2013

To:     All Field Offices (except Eastern States)

From:        Assistant Director, Renewable Resources and Planning

Subject:        Implementation of Land Health Reporting Data Standard: A New Standardized System for Reporting and Mapping Achievements in Land Health

**Program Areas:** Resource Management Planning; Renewable Resource Improvement and Treatments; Range Management; Standards and Guidelines for Grazing Administration; Rangeland Inventory Monitoring and Evaluation; Wildlife Management; Fish Wildlife and Special Status Plant Resources Inventory and Monitoring; Soil Resource Management; Water Resources; Air Resources

**Purpose**: This Instruction Memorandum (IM) transmits the Bureau of Land Management's (BLM's) digital geospatial data standard for reporting and mapping land health data, implementing a new standardized way to map and report achievements and non-achievements of Land Health Standards.

**Policy/Action**: The Land Health Reporting Data Standard Report and the Domains specific to Land Health Reporting and Mapping are found in Attachments 1 and 2 of this IM. All Field Offices must use this standard when reporting the results of land health evaluations.

- Field Offices are required to examine the existing land health evaluations that have been conducted at the allotment or watershed level, and if possible, retrofit the current land health reporting categories to the new land health reporting categories, by each individual Land Health Standard. Field Offices are required to map the new land health reporting categories for each individual Land Health Standard.

- Effective immediately, all new land health evaluations must be categorized to the new land health reporting categories.

Current land health reporting categories, and the replacement land health reporting and mapping categories can be found in Attachment 3. The implementation guidelines for this policy/action can be found in Attachment 6.

Land health geodatabases have been created for field offices to use to conduct mapping of land health achievements and non-achievements. Eighteen land health geodatabases are available, each of which has been customized to operate for a set of Land Health Standards that exists for each Administrative State or Resource Advisory Council area. Attachment 4 lists the 18 land health geodatabases. The land health geodatabases, and instructions outlining how to operate them can be found in Attachment 5. Each Field Office must maintain its respective land reporting and mapping data. There is no requirement to submit the land health reporting and mapping data to a national dataset.

**Timeframe**: The Land Health Reporting data standard is effective immediately.

**Budget Impact**: Workload associated with implementing this new standardized land health reporting and mapping must be accommodated within existing budgets at the Field Office/District Office/State Office level. Budget impact is expected to vary between offices but will generally be low as the mapping step is added to the current land health assessment and evaluation processes. Standardized mapping and data standards will accommodate State and National reports, significantly reducing or eliminating current data calls to the field needed to report land health achievement. Planning processes should be improved as this spatial data becomes available.

**Background**: The Land Health Reporting Data Standard is intended to provide consistent data in reporting the current status of land health on BLM-administered surface lands and standardizes mapping and reporting land health achievements and non-achievements, providing an improved way of reporting land condition, and trend in that condition over time. Reporting land health achievements and non-achievements will replace seral status of plant communities, which is the BLM's current way of reporting condition and trend-in-condition over time. Seral status of plant communities, by itself, is no longer comprehensive enough to reflect land condition and is no longer supported by science for that purpose. Implementing this data standard will satisfy the BLM's condition reporting mandate in the Public Rangelands Improvement Act of 1978.

This data standard will increase accuracy of land health reporting. Currently, acreages of entire allotments are the basis for reporting land health achievements and non-achievements. Spatial polygons and linear features, in acres and miles respectively, will be reported under this data standard, allowing for more accurate portrayal of land health achievements and non-achievements.

This data standard will create a spatial component to land health reporting. Neither the seral status reporting nor current reporting has a spatial component. The BLM cannot show where—on the ground—the reported conditions are. The ability to map land health achievements and non-achievements will increase the BLM's accountability, improve Congress' and the public understanding of land conditions, as well as improve the BLM's land use planning by providing current resource condition information.

This new reporting process will standardize electronic storage of land health achievement and non-achievement data, allowing the discontinuation of land health data calls to the field. Land health achievement and non-achievement data will be stored in geodatabases that can be queried for reporting, thereby discontinuing the need for data calls.

The new standardized method of reporting and mapping land health achievements and non-achievements has been pilot-tested in 13 Field /District Offices including Kremmling, Colorado; Carlsbad, New Mexico; Safford, Sonoran Desert National Monument, and Arizona Strip, Arizona; Cedar City and Grand Staircase-Escalante National Monument, Utah; Challis, Idaho; Cody, Newcastle, and Lander, Wyoming; and Burns and Prineville, Oregon.

**Manual/Handbook Sections Affected**: Manual 1283 Data Administration, Manual 1601 Land Use Planning, H-1601-1 Land Use Planning Handbook, Manual 1734 Inventory and Monitoring

Coordination, Manual 1740 Renewable Resource Improvements and Treatments, H-1740-2 Integrated Vegetation Management Handbook, Manual 4180 Land Health, H-4180-1 Rangeland Health Standards Handbook, Manual 4400 Rangeland Inventory, Monitoring, and Evaluation, and H-4400-1 Rangeland Monitoring and Evaluation Handbook.

**Coordination**: This IM has been coordinated with WO-200, OC-530, LLAZA00000, LLAZG01000, LLAZP04000, LLCON02000, LLIDI03000, LLNMP02000, LLORB00000, LLORP00000, LLUT030000, LLUTC01000, LLWYP08000, LLWYR02000 and LLWYR05000.

**Contact**: Questions related to this IM may be directed to Michael "Sherm" Karl, Rangeland Management Specialist, OC-570, at 303-236-0166, or Richard (Dick) Mayberry, Rangeland Management Specialist, WO-220, at 202-912-7229. Questions related to Land Health geodatabase assistance may be directed to Tom Chatfield, BLM Data Architect, OC-530, at 303-236-1936.

Signed by: Authenticated by:
Edwin L. Roberson Robert M. Williams
Assistant Director Division of IRM Governance, WO-560
Renewable Resources and Planning

6 Attachments
　　　　1 – Land Health Reporting Data Standards Report (52 pp)
　　　　2 – Land Health Reporting Domains (19 pp)
　　　　3 – Current Land Health Reporting Categories and New Land Health Reporting and Mapping Categories with Explanation (7 pp)
　　　　4 – Land Health Geodatabases Available for Use by Field Offices, Listed by the Administrative State or Resource Advisory Council Area in Which a set of Land Health Standard Exists (1 p)
　　　　5 – Geodatabase Instructions (32 pp)
　　　　6 – Implementation Guidelines (72 pp)

# Colorado Standards for Public Land Health

Standards describe conditions needed to sustain public land health, and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape.

Standard 1: Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

- Indicators:
    - Expression of rills, soil pedestals is minimal.
    - Evidence of actively-eroding gullies (incised channels) is minimal.
    - Canopy and ground cover are appropriate.
    - There is litter accumulating in place and is not sorted by normal overland water flow.
    - There is appropriate organic matter in soil.
    - There is diversity of plant species with a variety of root depths.
    - Upland swales have vegetation cover or density greater than that of adjacent uplands.
    - There are vigorous, desirable plants.

Standard 2: Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

- Indicators:
    - Vegetation is dominated by an appropriate mix of native or desirable introduced species.
    - Vigorous, desirable plants are present.
    - There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.
    - Streambank vegetation is present and is comprised of species and communities that have root systems capable of withstanding high streamflow events.
    - Plant species present indicate maintenance of riparian moisture characteristics.
    - Stream is in balance with the water and sediment being supplied by the watershed ( e.g., no headcutting, no excessive erosion or deposition).
    - Vegetation and free water indicate high water tables.
    - Vegetation colonizes point bars with a range of age classes and successional stages.
    - An active floodplain is present.
    - Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.
    - Stream channels with size and meander pattern appropriate for the stream's position in the landscape, and parent materials.
    - Woody debris contributes to the character of the stream channel morphology.

Standard 3: Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

- Indicators:
    - Noxious weeds and undesirable species are minimal in the overall plant community.
    - Native plant and animal communities are spatially distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.

- o Plants and animals are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations.
- o Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.
- o Photosynthetic activity is evident throughout the growing season.
- o Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.
- o Appropriate plant litter accumulates and is evenly distributed across the landscape.
- o Landscapes composed of several plant communities that may be in a variety of successional stages and patterns.

Standard 4: Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

- Indicators:
  - o All the indicators associated with the plant and animal communities standard apply.
  - o There are stable and increasing populations of endemic and protected species in suitable habitat.
  - o Suitable habitat is available for recovery of endemic and protected species.

Standard 5: The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

- Indicators:
  - o Appropriate populations of macroinvertebrates, vertebrates, and algae are present.
  - o Surface and ground waters only contain substances (e.g. sediment, scum, floating debris, odor, heavy metal precipitates on channel substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the Water Quality Standards established by the State of Colorado (5 CCR 1002-8).

## Guidelines for Livestock Grazing Management

Guidelines are the management tools, methods, strategies, and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the standards. Currently, the only guidelines for BLM Colorado that have been developed in concert with the Resource Advisory Councils are livestock grazing management guidelines.

1. Grazing management practices promote plant health by providing for one or more of the following:

- periodic rest or deferment from grazing during critical growth periods;
- adequate recovery and regrowth periods;
- opportunity for seed dissemination and seedling establishment.

CHAPTER 6 - APPENDIX E
BLM Public Land Health Standards and Livestock Grazing Management Guidelines

2. Grazing management practices address the kind, numbers, and class of livestock, season, duration, distribution, frequency and intensity of grazing use and livestock health.

3. Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion, to assist in maintaining appropriate soil infiltration and permeability, and to buffer temperature extremes. In riparian areas, vegetation dissipates energy, captures sediment, recharges ground water, and contributes to stream stability.

4. Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity. Where reseeding is required, on land treatment efforts, emphasis will be placed on using native plant species. Seeding of non-native plant species will be considered based on local goals, native seed availability and cost, persistence of non-native plants and annuals and noxious weeds on the site, and composition of non-natives in the seed mix.

5. Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts to other resources or uses of riparian/wetland and upland sites.

6. Grazing management will occur in a manner that does not encourage the establishment or spread of noxious weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds.

7. Natural occurrences such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape, including the maintenance, restoration, or enhancement of habitat to promote and assist the recovery and conservation of threatened, endangered, or other special status species, by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, and thus minimizing habitat fragmentation.

8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

# Utah Standards for Rangeland Health

**Standard 1.** Upland soils exhibit permeability and infiltration rates that sustain or improve site productivity, considering the soil type, climate, and landform.
As indicated by:
a) Sufficient cover and litter to protect the soil surface from excessive water and wind erosion, promote infiltration, detain surface flow, and retard soil moisture loss by evaporation.
b) The absence of indicators of excessive erosion such as rills, soil pedestals, and actively eroding gullies.
c) The appropriate amount, type, and distribution of vegetation reflecting the presence of (1) the Desired Plant Community (DPC), where identified in a land use plan, or (2) where the DPC is not identified, a community that equally sustains the desired level of productivity and properly functioning ecological conditions.

**Standard 2.** Riparian and wetland areas are in properly functioning condition. Stream channel morphology and functions are appropriate to soil type, climate and landform.
As indicated by:
a) Streambank vegetation consisting of, or showing a trend toward, species with root masses capable of withstanding high streamflow events. Vegetative cover adequate to protect stream banks and dissipate streamflow energy associated with high- water flows, protect against accelerated erosion, capture sediment, and provide for groundwater recharge.
b) Vegetation reflecting: Desired Plant Community, maintenance of riparian and wetland soil moisture characteristics, diverse age structure and composition, high vigor, large woody debris when site potential allows, and providing food, cover and other habitat needs for dependent animal species.
c) Revegetating point bars; lateral stream movement associated with natural sinuosity; channel width, depth, pool frequency and roughness appropriate to landscape position. d) Active floodplain.

**Standard 3.** Desired species, including native, threatened, endangered, and special status-species, are maintained at a level appropriate for the site and species involved.
As indicated by:
a) Frequency, diversity, density, age classes, and productivity of desired native species necessary to ensure reproductive capability and survival.
b) Habitats connected at a level to enhance species survival.
c) Native species reoccupy habitat niches and voids caused by disturbances unless management objectives call for introduction or maintenance of normative species.
d) Appropriate amount, type, and distribution of vegetation reflecting the presence of (1) the Desired Plant Community [DPC], where identified in a land use plan conforming to these Standards, or (2) where the DPC is identified a community that equally sustains the desired level of productivity and properly functioning ecological processes.

**Standard 4.** BLM will apply and comply with water quality standards established by the State of Utah (R.317-2) and the Federal Clean Water and Safe Drinking Water Acts. Activities on BLM Lands will fully support the designated beneficial uses described in the Utah Water Quality standards (R.317-2) for surface and groundwater.1
As indicated by:
a) Measurement of nutrient loads, total dissolved solids, chemical constituents, fecal coliform, water temperature and other water quality parameters.
b) Macro-invertebrate communities that indicate water quality meets aquatic objectives.
1 BLM will continue to coordinate monitoring water quality activities with other Federal, State and technical agencies.

# Utah Guidelines for Grazing Management

1. Grazing management practices will be implemented that:

a) Maintain sufficient residual vegetation and litter on both upland and riparian sites to protect the soil from wind and water erosion and support ecological functions;

b) Promote attainment or maintenance of proper functioning condition riparian/wetland areas, appropriate stream channel morphology, desired soil permeability and infiltration, and appropriate soil conditions and kinds and amounts of plants and animals to support the hydrologic cycle, nutrient cycle, and energy flow;

c) Meet the physiological requirements of desired plants and facilitate reproduction and maintenance of desired plants to the extent natural conditions allow;

d) Maintain viable and diverse populations of plants and animals appropriate for the site;

e) Provide or improve, within the limits of site potentials, habitat for Threatened or Endangered Species; f) Avoid grazing management conflicts with other species that have the potential of becoming protected or special status species;

g) Encourage innovation, experimentation and the ultimate development of alternatives to improve rangeland management practices;

h) Give priority to rangeland improvement projects and land treatments that offer the best opportunity for achieving the Standards.

2. Any spring or seep developments will be designed and constructed to protect ecological process and functions and improve livestock, wild horse and wildlife distribution.

3. New rangeland projects for grazing will be constructed in a manner consistent with the Standards. Considering economic circumstances and site limitations, existing rangeland projects and facilities that conflict with the achievement or maintenance of the Standards will be relocated and/or modified.

4. Livestock salt blocks and other nutritional supplements will be located away from riparian/wetland areas or other permanently located, or other natural water sources. It is recommended that the locations of these supplements be moved every year.

5. The use and perpetuation of native species will be emphasized. However, when restoring or rehabilitating disturbed or degraded rangelands nonintrusive, nonnative plant species are appropriate for use where native species:

a) are not available

b) are not economically feasible

c) can not achieve ecological objectives as well as normative species,

d) cannot compete with already established native species.

6. When rangeland manipulations are necessary, the best management practices, including biological processes, fire and intensive grazing, will be utilized prior to the use of chemical or mechanical manipulations.

7. When establishing grazing practices and rangeland improvements, the quality of the outdoor recreation experience is to be considered. Aesthetic and scenic values, water, campsites and opportunities for solitude are among those considerations.

8. Feeding of hay and other harvested forage (which does not refer to miscellaneous salt, protein, and other supplements) for the purpose of substituting for inadequate natural forage will not be conducted on BLM lands other than in:

a) emergency situations where no other resource exists and animal survival is in jeopardy

CHAPTER 6 - APPENDIX E
BLM Public Land Health Standards and Livestock Grazing Management Guidelines

b) situations where the Authorized Officer determines such a practice will assist in meeting a Standard or attaining a management objective.

9. In order to eliminate, minimize, or limit the spread of noxious weeds:
a) only hay cubes, hay pellets, or certified weed-free hay will be fed on BLM lands
b) reasonable adjustments in grazing methods, methods of transport, and animal husbandry practices will be applied.

10. To avoid contamination of water sources and inadvertent damage to non-target species, aerial application of pesticides will not be allowed within 100 feet of a riparian/ wetland area unless the product is registered for such use by the EPA.

11. On rangelands where a standard is not being met, and conditions are moving toward meeting the standard, grazing may be allowed to continue. On lands where a standard is not being met, conditions are not improving toward meeting the standard or other management objectives, and livestock grazing is deemed responsible, administrative action with regard to livestock will be taken by the Authorized Officer pursuant to CFR 4180.2(c).

12. Where it can be determined that more than one kind of grazing animal is responsible for failure to achieve a Standard, and adjustments in management are required, those adjustments will be made to each kind of animal, based on interagency cooperation as needed, in proportion to their degree of responsibility.

13. Rangelands that have been burned, reseeded or otherwise treated to alter vegetative composition will be closed to livestock grazing as follows:
a) burned rangelands, whether by wildfire or prescribed burning, will be ungrazed for minimum of one complete growing season following the burn;
b) rangelands that have been reseeded or otherwise chemically or mechanically treated will be ungrazed for a minimum of two complete growing seasons.

14. Conversions in kind of livestock (such as from sheep to cattle) will be analyzed in light of Rangeland Health Standards. Where such conversions are not adverse to achieving a Standard, or they are not in conflict with BLM land use plans, the conversion will be allowed.

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

# APPENDIX F:  GUSG DRAFT SOCIO-ECONOMIC DATA

## COUNTY-LEVEL EMPLOYMENT BY INDUSTRY

The following employment data was generated using IMPLAN Professional Version 3.0 (2012).

**Table F.113 - Delta County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **14,664.39** | – |
| Agriculture, Forestry, Fish & Hunting | 1,622.48 | 11.1% |
| Mining | 1,153.78 | 7.9% |
| Utilities | 56.84 | 0.4% |
| Construction | 1,449.12 | 9.9% |
| Manufacturing | 652.88 | 4.5% |
| Wholesale Trade | 242.86 | 1.7% |
| Retail Trade | 1,380.59 | 9.4% |
| Transportation & Warehousing | 170.56 | 1.2% |
| Information | 159.87 | 1.1% |
| Finance & Insurance | 402.66 | 2.7% |
| Real Estate & Rental | 320.11 | 2.2% |
| Professional, Science & Technology | 922.80 | 6.3% |
| Management of Companies | 10.20 | 0.1% |
| Administrative & Waste Services | 258.07 | 1.8% |
| Educational Services | 129.32 | 0.9% |
| Health & Social Services | 1,360.38 | 9.3% |
| Arts, Entertainment & Recreation | 179.77 | 1.2% |
| Accommodation & Food Services | 878.31 | 6.0% |
| Other Services | 831.69 | 5.7% |
| Government | 2,482.12 | 16.9% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.114 - Dolores County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **1,129.95** | **—** |
| Agriculture, Forestry, Fish & Hunting | 235.09 | 20.8% |
| Mining | 20.37 | 1.8% |
| Utilities | 0.00 | 0.0% |
| Construction | 86.43 | 7.6% |
| Manufacturing | 4.60 | 0.4% |
| Wholesale Trade | 24.47 | 2.2% |
| Retail Trade | 125.48 | 11.1% |
| Transportation & Warehousing | 19.46 | 1.7% |
| Information | 2.66 | 0.2% |
| Finance & Insurance | 10.92 | 1.0% |
| Real Estate & Rental | 6.72 | 0.6% |
| Professional, Science & Technology | 92.73 | 8.2% |
| Management of Companies | 0.00 | 0.0% |
| Administrative & Waste Services | 31.33 | 2.8% |
| Educational Services | 67.08 | 5.9% |
| Health & Social Services | 36.80 | 3.3% |
| Arts, Entertainment & Recreation | 16.24 | 1.4% |
| Accommodation & Food Services | 44.69 | 4.0% |
| Other Services | 84.10 | 7.4% |
| Government | 220.78 | 19.5% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.115 - Gunnison County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **10,464.31** | **—** |
| Agriculture, Forestry, Fish & Hunting | 268.57 | 2.6% |
| Mining | 777.68 | 7.4% |
| Utilities | 63.95 | 0.6% |
| Construction | 1,049.12 | 10.0% |
| Manufacturing | 124.21 | 1.2% |
| Wholesale Trade | 87.81 | 0.8% |
| Retail Trade | 958.97 | 9.2% |
| Transportation & Warehousing | 93.59 | 0.9% |
| Information | 81.62 | 0.8% |
| Finance & Insurance | 279.93 | 2.7% |
| Real Estate & Rental | 400.09 | 3.8% |
| Professional, Science & Technology | 697.64 | 6.7% |
| Management of Companies | 37.18 | 0.4% |
| Administrative & Waste Services | 201.34 | 1.9% |
| Educational Services | 181.60 | 1.7% |
| Health & Social Services | 371.02 | 3.5% |
| Arts, Entertainment & Recreation | 730.42 | 7.0% |
| Accommodation & Food Services | 1,443.05 | 13.8% |
| Other Services | 707.00 | 6.8% |
| Government | 1,909.52 | 18.2% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.116 - Hinsdale County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **637.47** | **—** |
| Agriculture, Forestry, Fish & Hunting | 20.32 | 3.2% |
| Mining | 5.24 | 0.8% |
| Utilities | 1.02 | 0.2% |
| Construction | 63.16 | 9.9% |
| Manufacturing | 0.00 | 0.0% |
| Wholesale Trade | 67.49 | 10.6% |
| Retail Trade | 52.66 | 8.3% |
| Transportation & Warehousing | 0.00 | 0.0% |
| Information | 4.41 | 0.7% |
| Finance & Insurance | 21.81 | 3.4% |
| Real Estate & Rental | 16.53 | 2.6% |
| Professional, Science & Technology | 38.23 | 6.0% |
| Management of Companies | 0.00 | 0.0% |
| Administrative & Waste Services | 29.05 | 4.6% |
| Educational Services | 81.19 | 12.7% |
| Health & Social Services | 8.10 | 1.3% |
| Arts, Entertainment & Recreation | 13.77 | 2.2% |
| Accommodation & Food Services | 63.65 | 10.0% |
| Other Services | 45.52 | 7.1% |
| Government | 105.33 | 16.5% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.117 - Mesa County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **83,293.29** | — |
| Agriculture, Forestry, Fish & Hunting | 1,693.52 | 2.0% |
| Mining | 4,275.61 | 5.1% |
| Utilities | 208.79 | 0.3% |
| Construction | 5,696.23 | 6.8% |
| Manufacturing | 2,482.46 | 3.0% |
| Wholesale Trade | 2,533.73 | 3.0% |
| Retail Trade | 9,005.65 | 10.8% |
| Transportation & Warehousing | 3,099.19 | 3.7% |
| Information | 874.36 | 1.0% |
| Finance & Insurance | 2,969.13 | 3.6% |
| Real Estate & Rental | 5,829.02 | 7.0% |
| Professional, Science & Technology | 4,774.98 | 5.7% |
| Management of Companies | 733.98 | 0.9% |
| Administrative & Waste Services | 4,956.07 | 6.0% |
| Educational Services | 1,669.59 | 2.0% |
| Health & Social Services | 10,891.44 | 13.1% |
| Arts, Entertainment & Recreation | 1,408.41 | 1.7% |
| Accommodation & Food Services | 6,605.76 | 7.9% |
| Other Services | 4,390.39 | 5.3% |
| Government | 9,194.98 | 11.0% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.118 - Montrose County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **21,842.66** | — |
| Agriculture, Forestry, Fish & Hunting | 1,578.16 | 7.2% |
| Mining | 1,028.21 | 4.7% |
| Utilities | 234.44 | 1.1% |
| Construction | 2,152.91 | 9.9% |
| Manufacturing | 1,324.36 | 6.1% |
| Wholesale Trade | 503.61 | 2.3% |
| Retail Trade | 2,468.40 | 11.3% |
| Transportation & Warehousing | 581.00 | 2.7% |
| Information | 185.28 | 0.8% |
| Finance & Insurance | 641.09 | 2.9% |
| Real Estate & Rental | 905.74 | 4.1% |
| Professional, Science & Technology | 1,197.51 | 5.5% |
| Management of Companies | 65.86 | 0.3% |
| Administrative & Waste Services | 438.53 | 2.0% |
| Educational Services | 194.80 | 0.9% |
| Health & Social Services | 2,378.72 | 10.9% |
| Arts, Entertainment & Recreation | 215.18 | 1.0% |
| Accommodation & Food Services | 1,245.76 | 5.7% |
| Other Services | 1,416.22 | 6.5% |
| Government | 3,086.86 | 14.1% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.119 - Ouray County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **3,057.73** | — |
| Agriculture, Forestry, Fish & Hunting | 110.21 | 3.6% |
| Mining | 54.31 | 1.8% |
| Utilities | 13.17 | 0.4% |
| Construction | 450.87 | 14.7% |
| Manufacturing | 56.04 | 1.8% |
| Wholesale Trade | 9.09 | 0.3% |
| Retail Trade | 426.96 | 14.0% |
| Transportation & Warehousing | 36.81 | 1.2% |
| Information | 17.39 | 0.6% |
| Finance & Insurance | 72.33 | 2.4% |
| Real Estate & Rental | 215.10 | 7.0% |
| Professional, Science & Technology | 331.50 | 10.8% |
| Management of Companies | 4.47 | 0.1% |
| Administrative & Waste Services | 87.31 | 2.9% |
| Educational Services | 14.71 | 0.5% |
| Health & Social Services | 94.19 | 3.1% |
| Arts, Entertainment & Recreation | 99.18 | 3.2% |
| Accommodation & Food Services | 426.25 | 13.9% |
| Other Services | 141.33 | 4.6% |
| Government | 396.52 | 13.0% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.120 - Saguache County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **2,550.36** | — |
| Agriculture, Forestry, Fish & Hunting | 867.17 | 34.0% |
| Mining | 25.09 | 1.0% |
| Utilities | 0.00 | 0.0% |
| Construction | 172.90 | 6.8% |
| Manufacturing | 52.24 | 2.0% |
| Wholesale Trade | 143.40 | 5.6% |
| Retail Trade | 137.38 | 5.4% |
| Transportation & Warehousing | 70.20 | 2.8% |
| Information | 12.05 | 0.5% |
| Finance & Insurance | 22.45 | 0.9% |
| Real Estate & Rental | 17.35 | 0.7% |
| Professional, Science & Technology | 117.02 | 4.6% |
| Management of Companies | 7.63 | 0.3% |
| Administrative & Waste Services | 26.35 | 1.0% |
| Educational Services | 50.46 | 2.0% |
| Health & Social Services | 63.66 | 2.5% |
| Arts, Entertainment & Recreation | 26.82 | 1.1% |
| Accommodation & Food Services | 53.51 | 2.1% |
| Other Services | 106.12 | 4.2% |
| Government | 578.56 | 22.7% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.121 - San Miguel County, Colorado Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **7,772.51** | **—** |
| Agriculture, Forestry, Fish & Hunting | 314.81 | 4.1% |
| Mining | 12.39 | 0.2% |
| Utilities | 19.77 | 0.3% |
| Construction | 781.29 | 10.1% |
| Manufacturing | 114.80 | 1.5% |
| Wholesale Trade | 43.01 | 0.6% |
| Retail Trade | 642.58 | 8.3% |
| Transportation & Warehousing | 120.08 | 1.5% |
| Information | 85.83 | 1.1% |
| Finance & Insurance | 132.99 | 1.7% |
| Real Estate & Rental | 401.69 | 5.2% |
| Professional, Science & Technology | 609.23 | 7.8% |
| Management of Companies | 4.96 | 0.1% |
| Administrative & Waste Services | 187.97 | 2.4% |
| Educational Services | 161.48 | 2.1% |
| Health & Social Services | 212.88 | 2.7% |
| Arts, Entertainment & Recreation | 1,445.44 | 18.6% |
| Accommodation & Food Services | 1,293.55 | 16.6% |
| Other Services | 359.57 | 4.6% |
| Government | 828.20 | 10.7% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.122 - Grand County, Utah Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **6,868.63** | **–** |
| Agriculture, Forestry, Fish & Hunting | 77.88 | 1.1% |
| Mining | 190.35 | 2.8% |
| Utilities | 28.23 | 0.4% |
| Construction | 494.73 | 7.2% |
| Manufacturing | 46.46 | 0.7% |
| Wholesale Trade | 93.09 | 1.4% |
| Retail Trade | 951.34 | 13.9% |
| Transportation & Warehousing | 85.79 | 1.2% |
| Information | 51.07 | 0.7% |
| Finance & Insurance | 168.81 | 2.5% |
| Real Estate & Rental | 296.02 | 4.3% |
| Professional, Science & Technology | 419.98 | 6.1% |
| Management of Companies | 138.42 | 2.0% |
| Administrative & Waste Services | 128.75 | 1.9% |
| Educational Services | 122.16 | 1.8% |
| Health & Social Services | 389.92 | 5.7% |
| Arts, Entertainment & Recreation | 448.31 | 6.5% |
| Accommodation & Food Services | 1,527.83 | 22.2% |
| Other Services | 258.13 | 3.8% |
| Government | 951.36 | 13.9% |

CHAPTER 6 - APPENDIX F
GUSG Draft Socio-Economic Data

**Table F.123 - San Juan County, Utah Employment by Industry**

| DESCRIPTION | EMPLOYMENT | SHARE OF EMPLOYMENT |
|---|---|---|
| **Total** | **6,191.15** | **–** |
| Agriculture, Forestry, Fish & Hunting | 705.58 | 11.4% |
| Mining | 480.86 | 7.8% |
| Utilities | 3.93 | 0.1% |
| Construction | 341.46 | 5.5% |
| Manufacturing | 112.85 | 1.8% |
| Wholesale Trade | 47.16 | 0.8% |
| Retail Trade | 304.33 | 4.9% |
| Transportation & Warehousing | 71.20 | 1.2% |
| Information | 12.47 | 0.2% |
| Finance & Insurance | 107.92 | 1.7% |
| Real Estate & Rental | 213.23 | 3.4% |
| Professional, Science & Technology | 61.00 | 1.0% |
| Management of Companies | 54.15 | 0.9% |
| Administrative & Waste Services | 165.31 | 2.7% |
| Educational Services | 41.46 | 0.7% |
| Health & Social Services | 559.34 | 9.0% |
| Arts, Entertainment & Recreation | 116.51 | 1.9% |
| Accommodation & Food Services | 518.55 | 8.4% |
| Other Services | 645.38 | 10.4% |
| Government | 1,628.45 | 26.3% |

# APPENDIX G: AREAS OF CRITICAL ENVIRONMENTAL CONCERN - RELEVANCE AND IMPORTANCE ANALYSIS AND DETERMINATION RATIONALE

**Date:** June 4, 2015

**Participants:**

Russell Japuntich, Wildlife Biologist, BLM Gunnison Field Office

Melissa Siders, Wildlife Biologist, BLM Uncompahgre Field Office

Heidi Plank, Wildlife Biologist, BLM Grand Junction Field Office

Travis Haby, Planning and NEPA, BLM Colorado State Office

**Consolidated and condensed ACEC proposals for evaluation of Relevance and Importance**

Information relevant to ACEC proposals from internal and external scoping[i] were analyzed, consolidated, and condensed into the following specific potential ACEC designations.

1. All GUSG Critical Habitat (Occupied and Unoccupied):
   a. for satellite populations
   b. for the Gunnison Basin

2. All GUSG Occupied Critical Habitat:
   a. for satellite populations
   b. for the Gunnison Basin

3. All GUSG Habitat (Occupied and Unoccupied)

4. All GUSG Occupied Habitat

**Criteria for Relevance and Importance analysis**

The criteria for establishing relevance and importance were analyzed for their applicability to ACECs for Gunnison Sage-Grouse.

## RELEVANCE

An area meets the relevance criterion if it contains **one or more** of the following:

**1. A significant historic, cultural, or scenic value**; (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans).

Out of scope: An analysis of areas for presence of significant historic, cultural, or scenic values for the purpose of determining relevance is beyond the scope of this plan amendment. The purpose

and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

**2. A fish and wildlife resource**; (including but not limited to habitat for endangered, sensitive, or threatened species, or habitat essential for maintaining species diversity).

In Scope

**3. A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).

In Scope

**4.** Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process.

Out of scope: An analysis of areas for presence of natural hazards for the purpose of determining relevance is beyond the scope of this plan amendment. The purpose and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

## IMPORTANCE

The value, resource, system, process, or hazard described above must have substantial significance and values in order to satisfy the "importance" criteria. This generally means that the value, resource, system, process, or hazard is characterized by one or more of the following:

**1.** Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

In Scope

**2.** Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

In Scope

**3.** Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of FLPMA.

In Scope

**4.** Has qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare.

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

Out of scope:  An analysis of areas for presence of qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare for the purpose of determining importance is beyond the scope of this plan amendment.  The purpose and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

**5.** Poses a significant threat to human life and safety or to property.

Out of scope:  An analysis of areas for presence of a significant threat to human life and safety or to property for the purpose of determining importance is beyond the scope of this plan amendment. The purpose and need of this RMP Amendment is the conservation of the Gunnison Sage-Grouse and the ecosystems upon which they rely.

# APPENDIX G: ANALYSIS OF ACEC PROPOSALS FOR RELEVANCE AND IMPORTANCE

## 1a. All GUSG Critical Habitat (Occupied and Unoccupied) for Satellite Populations

Meets criteria for both relevance and importance.

| # | Relevance Criterion Description | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species and the USFWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| # | Importance Criterion Description | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| 1 | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species".[ii] |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

| | Importance Criterion | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the FWS determines that it is "essential for the conservation of the species". |

## 1b. All GUSG Critical Habitat (Occupied and Unoccupied) for the Gunnison Basin

Does not meet criteria for both relevance and importance.

| | Relevance Criterion | Meets Criterion? Yes/ No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | GUSG are a federally threatened wildlife resource for which the FWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| | Importance Criterion | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the FWS determines that it is "essential for the conservation of the species". |

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated.  Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

## 2a. All GUSG Occupied Critical Habitat for Satellite Populations

Meets criteria for both relevance and importance.

| Relevance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species and the FWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

CHAPTER 6 - APPENDIX G
Draft Areas of Critical Environmental Concern Relevance and Importance Rationale

| # | Importance Criterion | Meets Criterion? Yes/No | Rationale for Determination |
| --- | --- | --- | --- |
| | Description | | |
| I | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated.  Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species".[iii] |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated.  Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated.  Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

## 2b. All GUSG Occupied Critical Habitat for the Gunnison Basin

Meets criteria for both relevance and importance.

| Relevance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species and the FWS has designated critical habitat (both occupied and unoccupied) necessary for their recovery. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Critical habitat consists of numerous natural processes and systems. However, critical habitat itself is not a discrete process or system and none of the components processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Have more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species".[iv] |
| 2 | Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the | Yes | Under the Endangered Species Act, any species that is determined to be a threatened species requires critical |

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| | mandates of FLPMA. | | habitat to be designated. Critical habitat is designated as such because the USFWS determines that it is "essential for the conservation of the species". |

## 3. All GUSG Habitat (Occupied and Unoccupied)

| Relevance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features). | No | Occupied habitat consists of numerous natural processes and systems. However, occupied habitat itself is not a discrete process or system, and none of the component processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| Importance Criterion | | Meets Criterion? Yes/No | Rationale for Determination |
|---|---|---|---|
| # | Description | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | |
| 3 | Has been recognized as warranting | Yes | |

| | | | |
|---|---|---|---|
| | protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | | |

## 4. All GUSG Occupied Habitat

| Relevance Criterion | | Meets Criterion? Yes/No | |
|---|---|---|---|
| # | Description | | Rationale for Determination |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Gunnison sage-grouse are a wildlife resource that is federally threatened species. |
| 3 | **A natural process or system** (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features**). | No | Occupied habitat consists of numerous natural processes and systems. However, occupied habitat itself is not a discrete process or system, and none of the component processes and systems are being proposed as ACECs separate and apart from their contribution to GUSG habitat. |

| Importance Criterion | | Meets Criterion? Yes/No | |
|---|---|---|---|
| # | Description | | Rationale for Determination |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | |

# APPENDIX H:  DRAFT STIPULATIONS APPLICABLE TO FLUID MINERAL LEASING AND LAND USE AUTHORIZATIONS

## Appendix H - Draft Stipulations Applicable to
## Fluid Mineral Leasing and Land Use Authorizations

This appendix lists the stipulations for fluid mineral leasing (e.g., oil, gas, and geothermal) referred to throughout this Draft RMP Amendment/Draft EIS.  These stipulations will also apply, where appropriate, to all surface-disturbing activities (and occupancy) associated with land use authorizations, permits, and leases issued on BLM lands.  The stipulations will not apply to activities and uses where they are contrary to laws, regulations, or specific program guidance.  The intent of these stipulations is to consistently mitigate impacts by applying the same stipulation to all land use authorizations across the board.  It is the BLM's intent to incorporate the same level of restrictions, to the extent practicable, on agency proposed projects.

Stipulations outlined in this appendix also apply to fluid mineral leasing on lands overlying federal mineral estate, which includes federal mineral estate underlying privately owned lands, and state-owned lands. The BLM will coordinate with the surface owner when applying stipulations on split estate at the leasing phase.

Surface-disturbing activities are those that normally result in more than negligible (i.e., immeasurable, not readily noticeable) disturbance to vegetation and soils on public lands and accelerate the natural erosive process.  Surface disturbances could require reclamation and normally involve use and/or occupancy of the surface, causing disturbance to soils and vegetation.  They include, but are not limited to: the use of mechanized earth-moving equipment; construction of facilities such as oil and gas wells and/or pads; major recreation sites; new trail construction.  Surface disturbance is not normally caused by casual-use activities.  Activities that are not normally considered surface disturbing include, but are not limited to: livestock grazing, cross country hiking, minimum impact filming, vehicular travel on designated routes.  Even where stipulations prohibit surface-disturbing activities, some surface-disturbing activities may be allowed under exceptions from stipulations.

Upon completion of the Proposed RMP Amendment/Final EIS, the list of stipulations that are included in the decision would supersede the relevant stipulations attached to the existing land use plans.  Those program areas/stipulations that are not considered in the Proposed RMP Amendment/Final EIS (not directly relevant only to GUSG and GUSG habitat) would continue in full force and effect where they apply (within individual BLM field offices).

## DESCRIPTION OF STIPULATIONS

Three types of stipulations could be applied to leasing authorizations and would also be applied as terms and conditions for land use authorizations: 1) No Surface Occupancy (NSO); 2) Controlled Surface Use (CSU); and 3) Timing Limitations (TL).  Lease Notices (LNs) are also described below.

## No Surface Occupancy (NSO)

Use or occupancy of the land surface for fluid mineral exploration or development is prohibited to protect GUSG and GUSG habitat. In areas open to fluid mineral leasing with NSO stipulations, fluid mineral leasing activities are permitted, but surface-disturbing activities cannot be conducted on the surface of the land unless an exception, modification, or waiver is granted. Access to fluid mineral deposits would require drilling from outside the boundaries of the NSO stipulation. An NSO/No Surface-Disturbing Activities stipulation does not apply to existing facilities and the maintenance of existing facilities, such as, but not limited to, range improvements, oil and gas wells and/or pads, and major recreation sites.

## Controlled Surface Use (CSU)

A CSU stipulation is a category of moderate constraint that allows some use and occupancy of public land while protecting identified resources or values. A CSU stipulation allows the BLM to require additional conditions be met to protect a specified resource or value in addition to standard lease terms and conditions.

## Timing Limitations (TL)

Areas identified for TLs, a moderate constraint, are closed to fluid mineral exploration and development during identified time frames. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. Administrative activities are allowed at the discretion of the BLM Authorized Officer.

## Lease Notice (LN)

A Lease Notice provides more detailed information concerning limitations that already exist in law, lease terms, regulations or operational orders. An LN also addresses special items that the lessee should consider when planning operations but does not impose additional restrictions. Lease Notices apply only to leasable minerals (e.g., oil, gas, and geothermal) and not to other types of leases, such as livestock grazing.

## Condition of Approval (COA)

Conditions of Approval are enforceable conditions or provisions under which an Application for Permit to Drill (APD) is approved.

## EXCEPTIONS, MODIFICATIONS, AND WAIVERS

An exception exempts the holder of the lease from the stipulation on a one-time basis. A modification changes the language or provisions of a stipulation due to changed conditions or new information either temporarily or for the term of the lease. A modification may or may not apply to all other sites within the leasehold. A waiver permanently exempts the surface stipulation for a specific lease, planning area, or resource based on absence of need, such as a determination that protection of winter use is unnecessary for maintenance or recovery of a species.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

**Exception, Modification, or Waiver Process**

An exception, modification, or waiver may be granted at the discretion of the BLM Authorized Officer if the specific criteria described below are met. In order to implement an action that would not normally be allowed because of a stipulation, the proponent must submit a written request for an exception, modification, or waiver and provide the data necessary to demonstrate that specific criteria have been met. Any such requests would be subject to appropriate consultation and/or coordination with the applicable state and/or federal wildlife agency(ies). Prior to any modification or waiver of a lease stipulation, a 30-day public notice and comment period could also be required.

## STIPULATIONS APPLICABLE TO LAND USE AUTHORIZATIONS

Restrictions on land use authorizations (including ROWs, permits, and leases) are administered through the identification of exclusion and avoidance areas. Exclusion areas are unavailable for location of ROWs under any conditions, unless specific exceptions and special stipulations are identified. Avoidance areas are to be avoided when practicable due to identified resource values but may be available with special stipulations. Those ROW terms and conditions that would be attached to authorizations sited in areas identified as avoidance areas are described in the draft action alternatives Table 2.7.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE ESA LISTED SPECIES NSO CO/UT

## NO SURFACE OCCUPANCY

## [Alternative C and Sub-Alternatives $D_1/D_2$]

**Stipulation:**  No surface occupancy or use is allowed within Occupied Habitat for the Gunnison Sage-Grouse as mapped in the Resource Management Plan, BLM's GIS database, or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM:

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To maintain the integrity of habitat for the Gunnison Sage-Grouse and promote recovery of the species.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see Bureau of Land Management Manuals 1624 and 3101 or Forest Service Manuals 1950 and 2820.)**

**Exception:**  An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis.  The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:**  A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease.  Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently.  The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE ESA LISTED SPECIES CSU CO/UT

## CONTROLLED SURFACE USE

### [Alternative B]

**Stipulation:** Surface occupancy or use may be restricted or prohibited in Non-Habitat Areas within Four Miles of a Gunnison Sage-Grouse Lek, as mapped in the Resource Management Plan Amendment, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM.

Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet) and/or prohibition on surface-disturbing operations for a period of more than 60 days may be required.

The lease area may now or hereafter contain Non-Habitat Areas within Four Miles of a Gunnison Sage-Grouse Lek adjacent to habitat for wildlife listed as threatened or endangered or identified as candidates for listing under the Endangered Species Act. An assessment of the potential to cause disruption to Gunnison Sage-Grouse may be required before drilling and construction may commence. The operator may be required to submit a plan of development that demonstrates how the proposed activities will avoid or minimize disruption of threatened and endangered species by siting or prioritizing vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, utility installation).

The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species, result in the destruction or adverse modification of designated or proposed critical habitat, or contribute to a need to list a proposed or candidate threatened and endangered species. The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until the agency completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. §1531 et seq., including completion of any required procedure for conference or consultation.

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose**: To protect federally listed, proposed, or candidate threatened or endangered wildlife species and promote recovery of the species.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP Amendment; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:** A waiver is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE ESA LISTED SPECIES CSU CO/UT

## CONTROLLED SURFACE USE

## [Alternative C and Sub-Alternatives D₁/D₂]

**Stipulation:** Surface occupancy or use may be restricted or prohibited within Unoccupied Habitat for the Gunnison Sage-Grouse, as mapped in the Resource Management Plan Amendment, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM.

Special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required.

The lease area may now or hereafter contain habitat for wildlife listed as threatened or endangered or identified as candidates for listing under the Endangered Species Act. An inventory of habitat may be required before drilling and construction may commence. The operator may be required to submit a plan of development that demonstrates how the proposed activities will avoid or minimize disruption of threatened and endangered species by siting or prioritizing vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, utility installation).

The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species, result in the destruction or adverse modification of designated or proposed critical habitat, or contribute to a need to list a proposed or candidate threatened and endangered species. The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. §1531 et seq., including completion of any required procedure for conference or consultation.

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose**: To maintain the integrity of habitat for federally listed, proposed, or candidate, threatened or endangered wildlife species and promote recovery of the species.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require

additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:**  A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease.  Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently.  The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE TL CO/UT

## TIMING LIMITATION

**Stipulation:** No surface use is allowed within habitat for Gunnison Sage-Grouse during the following time period:

March 1 to May 15 [Alternative B]

March 15 to May 15 [Alternative C and Sub-Alternatives $D_1/D_2$]

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To minimize disruption of Gunnison Sage-Grouse lekking/breeding activities.

This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see Bureau of Land Management manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development,

surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE TL CO/UT

## TIMING LIMITATION

**Stipulation:** No surface use is allowed within habitat for Gunnison Sage-Grouse during the following time period:

> April 15 to July 15 [Alternative B]

> April 15 to June 30 [Alternative C and Sub-Alternatives $D_1/D_2$]

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To minimize disruption of Gunnison Sage-Grouse nesting/early brood-rearing activities.

This stipulation only applies to construction and drilling, and does not apply to operations and maintenance. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE TL CO2/UT

## TIMING LIMITATION

**Stipulation:** No surface use is allowed in Gunnison Sage-Grouse winter range, as mapped in the Resource Management Plan Amendment, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM, during the following time period:

October 1 to February 28 [Alternative B]

December 1 to March 14 [Alternative C and Sub-Alternatives $D_1/D_2$]

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** To prevent disruption of Gunnison Sage-Grouse during the winter period.

This stipulation only applies to construction and drilling, and does not apply to operations and maintenance.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM manuals 1624 and 3101 or Forest Service manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development,

surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30-day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation.  When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30-day period.

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

Lease Number: <LEASE_NUMBER>

## GUNNISON SAGE-GROUSE NSO CO/UT

## NO SURFACE OCCUPANCY/NO SURFACE DISTURBANCE

**Stipulation:** No surface occupancy or use is allowed within a

4-mile [Alternative B]

1-mile [Alternative C]

0.6-mile [Sub-Alternatives $D_1/D_2$]

radius of Gunnison Sage-Grouse leks, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM

**On the following lands:**
<LEGAL_DESCRIPTION>

**Purpose:** To maintain integrity of Occupied and Unoccupied Habitat surrounding Gunnison Sage-Grouse leks.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see Bureau of Land Management Manuals 1624 and 3101 or Forest Service Manuals 1950 and 2820.)**

**Exception:** An exception is a one-time exemption for a particular site within the leasehold. Exceptions are determined on a case-by-case basis. The stipulation continues to apply to all other sites within the leasehold.

The Authorized Officer may grant an exception to a stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently such that: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; or 2) proposed operations would not cause unacceptable impacts. The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination.

**Modification:** A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may modify a stipulation or the area subject to the stipulation if it is determined that the factors leading to its inclusion in the lease have changed sufficiently. The Authorized Officer may modify a stipulation as a result of new information if: 1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; 2) the protection provided by the stipulation is no longer

CHAPTER 6 - APPENDIX H
Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

sufficient to meet resource objectives established in the RMP; or 3) proposed operations would not cause unacceptable impacts.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the modification may be subject to public review for at least a 30 day period.

**Waiver:**  A waiver is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere within the leasehold.

In accordance with the provisions of 43 C.F.R. 3101.1-4, the Authorized Officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease no longer exist.  The Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination, and the waiver may be subject to public review for at least a 30 day period.

## APPENDIX I:  DRAFT GUSG BEST MANAGEMENT PRACTICES

### DRAFT GUNNISON SAGE-GROUSE BEST MANAGEMENT PRACTICES

**Adapted from the *2011 BLM Technical Report:***
***A Report on National Greater Sage-grouse Conservation Measures***

### Travel and Transportation

- Conduct restoration of roads, primitive roads and trails not designated in travel management plans.  This also includes primitive route/roads that were not designated in Wilderness Study Areas and within lands with wilderness characteristics that have been selected for protection.
- When reseeding roads, primitive roads and trails, use appropriate seed mixes and consider the use of transplanted sagebrush.
- Utilize minimum constructions and maintenance standards appropriate for the operation
- Sign roads to prevent off road travel
- Place speed bumps, dips, etc. to slow traffic as needed.

### Recreation

- Only allow special recreation permits (SRPs) that have neutral or beneficial affects to Gunnison Sage-grouse (GUSG) Occupied Habitat.

### Lands and Realty

- Evaluate and take advantage of opportunities to remove, bury, or modify existing power lines within GUSG habitat areas.  Sage-grouse may avoid powerlines because of increased predation risk (Steenhof et al 1993, Lammers and Collopy 2007).  Powerlines effectively influence (direct physical area plus estimated area of effect due to predator movements) at least 39% of the sage-grouse range (Knick et al 2011).  Deaths resulting from collisions with powerlines were an important source of mortality for sage-grouse in southeastern Idaho (Beck et al 2006, 75 FR 13910)
- Where existing leases or ROWs have had some level of development (road, fence, well, etc.) and are no longer in use, reclaim the site by removing these features and restoring the habitat.

#### Land Tenure Adjustments

- Retain public ownership of GUSG Occupied Habitat.  Consider exceptions where:

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- o There is mixed ownership, and land exchanges would allow for additional or more contiguous federal ownership patterns within the sage-grouse habitat area.
- o In occupied sage-grouse habitat areas with minority federal ownership, include an additional, effective mitigation agreement for any disposal of federal land. As a final preservation measure consideration should be given to pursuing a permanent conservation easement.
- Where suitable conservation actions cannot be achieved, seek to acquire state and private lands with intact subsurface mineral estate by donation, purchase or exchange in order to best conserve, enhance or restore GUSG habitat.
- Identify areas where acquisitions (including subsurface mineral rights) or conservation easements, would benefit sage-grouse habitat.

***Proposed Land Withdrawals***
- Do not approve withdrawal proposals not associated with mineral activity unless the land management is consistent with GUSG conservation measures. (For example; in a proposed withdrawal for a military training range buffer area, manage the buffer area with GUSG conservation measures.)

## Range Management

- Work cooperatively on integrated ranch planning within GUSG habitat so that operations with deeded/BLM allotments can be planned as single units.
- Develop specific objectives for sage-grouse habitat based on ESDs and assessments (including within wetlands and riparian areas). If an effective grazing system that meets GUSG habitat requirements is not already in place, analyze at least one alternative that meets GUSG habitat requirements in the NEPA document prepared for the permit renewal (Doherty et al 2011b, Williams et al 2011).
- Manage for vegetation composition and structure consistent with ecological site potential and within the reference state to achieve GUSG seasonal habitat objectives.
- Analyze springs, seeps and associated pipelines to determine if modifications are necessary to maintain the continuity of the predevelopment riparian area within GUSG habitat. Make modifications where necessary, considering impacts to other water uses when such considerations are neutral or beneficial to GUSG.
- Only allow treatments that conserve, enhance, or restore GUSG habitat (including treatments that benefit livestock as part of an Allotment Management Plan/Conservation Plan to improve GUSG habitat).

- Evaluate the role of existing seedings that are currently composed of primarily introduced perennial grasses in and adjacent to GUSG habitat to determine whether they should be restored to sagebrush or habitat of higher quality for GUSG. If these seedings are part of an AMP/Conservation Plan or if they provide value in conserving or enhancing the rest of the habitats, then no restoration would be necessary. Assess the compatibility of these seedings for GUSG habitat or as a component of a grazing system during the land health assessments (Davies et al 2011).
- Design any new structural range improvements and location of supplements (salt or protein blocks) to conserve, enhance, or restore GUSG habitat through an improved grazing management system relative to sage-grouse objectives. Structural range improvements, in this context, include but are not limited to: cattle guards, fences, exclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments. Potential for invasive species establishment or increase following construction must be considered in the project planning process and monitored and treated post-construction.
- Evaluate existing structural range improvements and location of supplements (salt or protein blocks) to make sure they conserve, enhance or restore GUSG habitat.
  - To reduce outright GUSG strikes and mortality, remove, modify, or mark fences in high-risk areas within GUSG habitat based on proximity to lek, lek size, and topography (Christiansen 2009, Stevens 2011).
  - Monitor for and treat invasive species associated with existing range improvements (Gelbard and Belnap 2003 and Bergquist et al 2007).
  - General wildlife standards for fences should follow Wendy Hanophy's *Fencing with Wildlife in Mind* (CPW 2009).
  - Include the use of the NRCS fence collision risk tool (NRCS 2012) to identify low-risk areas for construction of new fences and to evaluate collision risk for existing fences.
  - When possible, develop alternative livestock water sources outside of naturally occurring riparian areas.
  - Place salt, minerals and supplements at least 0.25-mile away from riparian areas, to the extent feasible within existing pasture boundaries
  - Avoid placing salt, minerals or supplements within 0.50-mile of leks.

### Riparian Areas

- Where riparian areas and wet meadows meet proper functioning condition, strive to attain reference state vegetation relative to the ecological site description.

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

## Habitat Restoration

- Prioritize implementation of restoration projects based on environmental variables that improve chances for project success in areas most likely to benefit GUSG (Meinke et al 2009).
- Include sage-grouse habitat parameters as defined in the RCP and appropriate local information in habitat restoration objectives. Make meeting these objectives within occupied sage-grouse habitat areas the highest restoration priority.
- Require use of native seeds for restoration based on availability, adaptation (ecological site potential), and probability of success (Richards et al 1998). Where probability of success or adapted seed availability is low, non-native seeds may be used as long as they support GUSG habitat objectives (Pyke 2011).
- Design post restoration management to ensure long term persistence. This could include changes in livestock grazing management and travel management, etc., to achieve and maintain the desired condition of the restoration effort that benefits GUSG (Eiswerth and Shonkwiler 2006).
- Restore native (or desirable) plants and create landscape patterns which most benefit GUSG.
- Make re-establishment of sagebrush cover and desirable understory plants (relative to ecological site potential) the highest priority for restoration efforts.
- In fire prone areas where sagebrush seed is required for GUSG habitat restoration, consider establishing seed harvest areas that are managed for seed production (Armstrong 2007) and are a priority for protection from outside disturbances.

## West Nile Virus Transmission via Ponds (from Doherty 2007)

The following are seven distinct site modifications that if adhered to, would minimize exploitation of ponds by the Culex tarsalis mosquito:

1. Increase the size of ponds to accommodate a greater volume of water than is discharged. This will result in unvegetated and muddy shorelines that breeding Culex tarsalis avoid (De Szalay and Resh 2000). This modification may reduce Culex tarsalis habitat, but could create larval habitat for Culicoides onorensis, a vector of blue tongue disease, and should be used sparingly (Schmidtmann et al 2000). Steep shorelines should be used in combination with this technique whenever possible (Knight et al 2003).
2. Build steep shorelines to reduce shallow water and aquatic vegetation around the perimeter of impoundments (Knight et al 2003). Construction of steep shorelines also will create more permanent ponds that are a deterrent to colonizing mosquito

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

species like Culex tarsalis which prefer newly flooded sites with high primary productivity (Knight et al 2003).

3. Maintain the water level below that of rooted vegetation for a muddy shoreline that is unfavorable habitat for mosquito larvae. Rooted vegetation includes both aquatic and upland vegetative types. Avoid flooding terrestrial vegetation in flat terrain or low lying areas. Aquatic habitats with a vegetated inflow and outflow separated by open water produce 5-10 fold fewer Culex mosquitoes than completely vegetated wetlands (Walton and Workman 1998). Wetlands with open water also had significantly fewer stage III and IV instars which may be attributed to increased predator abundances in open water habitats (Walton and Workman 1998).

4. Construct dams or impoundments that restrict downslope seepage or overflow by digging ponds in flat areas rather than damming natural draws for effluent water storage, or lining constructed ponds in areas where seepage is anticipated (Knight et al 2003).

5. Line the channel where discharge water flows into the pond with crushed rock, or use a horizontal pipe to discharge inflow directly into existing open water, thus precluding shallow surface inflow and accumulation of sediment that promotes aquatic vegetation.

6. Line the overflow spillway with crushed rock, and construct the spillway with steep sides to preclude the accumulation of shallow water and vegetation.

7. Fence pond site to restrict access by livestock and other wild ungulates that trample and disturb shorelines, enrich sediments with manure and create hoof print pockets of water that are  attractive to breeding mosquitoes.

## Fluid Mineral Development

GUSG Occupied Habitat - BMPs are continuously improving as new science and technology become available and therefore are subject to change. Include from the following BMPs those that are appropriate to mitigate effects from the approved action.

### Roads

- Design roads to an appropriate standard no higher than necessary to accommodate their intended purpose.
- Locate roads to avoid important areas and habitats.
- Coordinate road construction and use among ROW holders.
- Construct road crossing at right angles to ephemeral drainages and stream crossings.
- Establish speed limits on BLM system roads to reduce vehicle/wildlife collisions or design roads to be driven at slower speeds.
- Establish trip restrictions (Lyon and Anderson 2003) or minimization through use of telemetry and remote well control (e.g., Supervisory Control and Data Acquisition).

- Do not issue ROWs to counties on newly constructed energy development roads, unless for a temporary use consistent with all other terms and conditions included in this document.
- Restrict vehicle traffic to only authorized users on newly constructed routes (use signing, gates, etc.)
- Use dust abatement practices on roads and pads.
- Use gravel, chip seal, soil, sand or other types of imported road and fill material only from sites with no weed infestations.
- Should grade or mow roads only when necessary for resource protection, safety, or function.
- Close and rehabilitate duplicate roads.
- Minimize operation of equipment when mud can accumulate on equipment.
- Clean all heavy equipment and mobilizing equipment before entering each project area.

### Operations

- Cluster disturbances, operations (fracture stimulation, liquids gathering, etc.), and facilities.
- Use directional and horizontal drilling to reduce surface disturbance.
- Place infrastructure in already disturbed locations where the habitat has not been restored.
- Consider using oak (or other material) mats for drilling activities to reduce vegetation disturbance and for roads between closely spaced wells to reduce soil compaction and maintain soil structure to increase likelihood of vegetation reestablishment following drilling.
- Apply a phased development approach with concurrent reclamation.
- Place liquid gathering facilities outside of habitat areas. Have no tanks at well locations within habitat areas (minimizes perching and nesting opportunities for ravens and raptors and truck traffic). Pipelines must be under or immediately adjacent to the road (Bui et al 2010).
- Restrict the construction of tall facilities and fences to the minimum number and amount needed.
- Site and/or minimize linear ROWs to reduce disturbance to sagebrush habitats.
- Place new utility developments (power lines, pipelines, etc.) and transportation routes in existing utility or transportation corridors.
- Bury distribution power lines.
- Corridor power, flow, and small pipelines under or immediately adjacent to roads.
- Bore pipeline crossings under perennial streams rather than trenching.

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- Design or site permanent structures which create movement (e.g. a pump jack) to minimize impacts to sage-grouse.
- Cover (with fine mesh netting or other effective techniques) all drilling and production pits and tanks regardless of size to reduce sage-grouse mortality.
- Encourage use of water tanks instead of open pits.
- Use low profile storage tanks.
- Paint wells to camouflage in background.
- Equip tanks and other above ground facilities with structures or devices that discourage nesting of raptors and corvids.
- Control the spread and effects of non-native plant species (e.g., by washing vehicles and equipment) (Evangelista et al 2011).
- Locate and use weed-free project staging areas.
- Avoid acquiring water for road dust abatement where access to the water is through weed-infested sites.
- Use only closed-loop systems for drilling operations and no reserve pits.
- Restrict pit and impoundment construction to reduce or eliminate threats from West Nile virus (Doherty 2007).
- Remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus.  If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat:
  o Overbuild size of ponds for muddy and non-vegetated shorelines.
  o Build steep shorelines to decrease vegetation and increase wave actions.
  o Avoid flooding terrestrial vegetation in flat terrain or low lying areas.
  o Construct dams or impoundments that restrict down slope seepage or overflow.
  o Line the channel where discharge water flows into the pond with crushed rock.
  o Construct spillway with steep sides and line it with crushed rock.
  o Treat waters with larvicides to reduce mosquito production where water occurs on the surface.
- Require noise shields when drilling during the lek, nesting, brood rearing, or wintering season.
- Fit transmission towers with anti-perch devices (Lammers and Collopy 2007).
- Require sage-grouse-safe fences.
- Locate new compressor stations outside habitats and design them to reduce noise that may be directed towards habitat.
- Clean up refuse (Bui et al 2011).
- Locate man camps outside of habitats.

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

### Reclamation

- Include objectives for ensuring habitat restoration to meet GUSG habitat needs in reclamation practices/sites (Pyke 2011). Address post-reclamation management in reclamation plans such that goals and objectives are designed to protect and improve GUSG habitat needs.
- Maximize the area of interim reclamation on long-term access roads and well pads including reshaping, topsoiling and revegetating cut and fill slopes.
- Restore disturbed areas at final reclamation to the pre-disturbance landforms and desired plant community.
- Irrigate interim reclamation if necessary for establishing seedlings more quickly.
- Utilize mulching techniques to expedite reclamation and to protect soils.

## Locatable Mineral Development

BMPs are continuously improving as new science and technology become available and therefore are subject to change. Include from the following BMPs those that are appropriate to mitigate effects from the approved action.

### Roads

- Design roads to an appropriate standard no higher than necessary to accommodate their intended purpose.
- Locate roads to avoid important areas and habitats.
- Coordinate road construction and use among ROW holders.
- Construct road crossing at right angles to ephemeral drainages and stream crossings.
- Establish speed limits on BLM system roads to reduce vehicle/wildlife collisions or design roads to be driven at slower speeds.
- Place speed bumps, dips, etc. to slow traffic as needed.
- Do not issue ROWs to counties on mining development roads, unless for a temporary use consistent with all other terms and conditions included in this document.
- Restrict vehicle traffic to only authorized users on newly constructed routes (e. g., use signing, gates, etc.)
- Use dust abatement practices on roads and pads.
- Close and reclaim duplicate roads, by restoring original landform and establishing desired vegetation.

### Operations

- Cluster disturbances associated with operations and facilities as close as possible.

- Place infrastructure in already disturbed locations where the habitat has not been restored.
- Restrict the construction of tall facilities and fences to the minimum number and amount needed.
- Site and/or minimize linear ROWs to reduce disturbance to GUSG habitat.
- Place new utility developments (power lines, pipelines, etc.) and transportation routes in existing utility or transportation corridors.
- Bury power lines.
- Cover (e.g., fine mesh netting or use other effective techniques) all pits and tanks regardless of size to reduce sage-grouse mortality.
- Equip tanks and other above ground facilities with structures or devices that discourage nesting of raptors and corvids.
- Control the spread and effects of non-native plant species (Gelbard and Belnap 2003, Bergquist et al 2007).
- Minimize operations of equipment during conditions when mud can accumulate on equipment.
- Clean all heavy equipment and mobilizing equipment before entering project area.
- Restrict pit and impoundment construction to reduce or eliminate threats from West Nile virus (Doherty 2007).
- Remove or re-inject produced water to reduce habitat for mosquitoes that vector West Nile virus. If surface disposal of produced water continues, use the following steps for reservoir design to limit favorable mosquito habitat:
  o Overbuild size of ponds for muddy and non-vegetated shorelines.
  o Build steep shorelines to decrease vegetation and increase wave actions.
  o Avoid flooding terrestrial vegetation in flat terrain or low lying areas.
  o Construct dams or impoundments that restrict down slope seepage or overflow.
  o Line the channel where discharge water flows into the pond with crushed rock.
  o Construct spillway with steep sides and line it with crushed rock.
  o Treat waters with larvicides to reduce mosquito production where water occurs on the surface.
- Require sage-grouse-safe fences around sumps.
- Clean up refuse (Bui et al 2010).
- Locate man camps outside of GUSG habitat.

### Reclamation

- Include restoration objectives to meet sage-grouse habitat needs in reclamation practices/sites.

- Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs.
- Maximize the area of interim reclamation on long-term access roads and well pads including reshaping, topsoiling and revegetating cut and fill slopes.
- Restore disturbed areas at final reclamation to pre-disturbance landform and desired plant community.
- Irrigate interim reclamation as necessary during dry periods.
- Utilize mulching techniques to expedite reclamation.

## Salable Mineral Materials

- Restore saleable mineral pits no longer in use to meet GUSG habitat conservation objectives.

## Fire & Fuels (WO IM 2013-128)

### Fuels Management

- Design fuels management projects in sage-grouse habitat to strategically and effectively reduce wildfire threats in the greatest area.  This may require fuels treatments implemented in a more linear versus block design (Launchbaugh et al 2007).
- Prioritize native seed allocation for use in GUSG habitat in years when preferred native seed is in short supply.  This may require reallocation of native seed from ES&R projects outside of sage-grouse habitat to those inside it.  Use of native plant seeds for ES&R seedings is required based on availability, adaptation (site potential), and probability of success Richards et al 1998. Where probability of success or native seed availability is low, non-native seeds may be used as long as they meet GUSG habitat conservation objectives (Pyke 2011).  Reestablishment of appropriate sagebrush species/subspecies and important understory plants, relative to site potential, shall be the highest priority for rehabilitation efforts.
- Design post ES&R management to ensure long term persistence of seeded or pre-burn native plants.  This may require temporary or long-term changes in livestock grazing, and travel management, etc., to achieve and maintain the desired condition of ES&R projects to benefit sage-grouse (Eiswerth and Shonkwiler 2006).
- Provide training to fuels treatment personnel on GUSG biology, habitat requirements, and identification of areas utilized locally.
- Use fire prescriptions that minimize undesirable effects on vegetation or soils (e.g., minimize mortality of desirable perennial plant species and reduce risk of hydrophobicity).

CHAPTER 6 - APPENDIX I
Draft GUSG Best Management Practices

- Ensure proposed sagebrush treatments are planned with interdisciplinary input from BLM and /or state wildlife agency biologist and that treatment acreage is conservative in the context of surrounding sagegrouse seasonal habitats and landscape.
- Where appropriate, ensure that treatments are configured in a manner (e.g., strips) that promotes use by GUSG (See Connelly et al, 2000*)
- Where applicable, incorporate roads and natural fuel breaks into fuel break design.
- Power-wash all vehicles and equipment involved in fuels management activities prior to entering the area to minimize the introduction of undesirable and/or invasive plant species.
- Design vegetation treatment in areas of high frequency to facilitate firefighting safety, reduce the risk of extreme fire behavior; and to reduce the risk and rate of fire spread to key and restoration habitats.
- As funding and logistics permit, restore annual grasslands to a species composition characterized by perennial grasses, forbs, and shrubs.
- Emphasize the use of native plant species, recognizing that non-native species may be necessary depending on the availability of native seed and prevailing site conditions.
- Remove standing and encroaching trees within at least 100 meters of occupied GUSG leks and other habitats (e.g., nesting, wintering, and brood rearing) to reduce the availability of perch sites for avian predators, as appropriate, and resources permit.
- Protect wildland areas from wildfire originating on private lands, infrastructure corridors, and recreational areas.
- Reduce the risk of vehicle or human-caused wildfires and the spread of invasive species by planting perennial vegetation (e.g., green-strips) paralleling road rights-of-way.
- Strategically place and maintain pre-treated strips/areas (e.g., mowing, herbicide application, and strictly managed grazed strips) to aid in controlling wildfire should wildfire occur near key habitats or important restoration areas (such as where investments in restoration have already been made).

### Fire Management

- Develop specific GUSG toolboxes containing maps, a list of resource advisors, contact information, local guidance, and other relevant information.
- Provide localized maps to dispatch offices and extended attack incident commanders for use in prioritizing wildfire suppression resources and designing suppression tactics.
- Assign a GUSG resource advisor to all extended attack fires in or near key GUSG habitat areas.  Prior to the start of fire season, provide training to

GUSG advisors on wildfire suppression organization, objectives, tactics, and procedures to develop a cadre of qualified individuals.

- On critical fire weather days, pre-position additional fire suppression resources to optimize a quick and efficient response in GUSG habitat.
- During periods of multiple fires, ensure line officers are involved in setting priorities.
- To the extent possible, locate wildfire suppression facilities (i.e., base camps, spike camps, drop points, staging areas, and heli-bases) in areas where physical disturbance to GUSG habitat can be minimized, including disturbed areas, grasslands, near roads/trails or in other areas where there is existing disturbance or minimal sagebrush cover.
- Power-wash all firefighting vehicles, to the extent possible, including engines, water tenders, personnel vehicles, and ATVs prior to deploying in or near sage-grouse habitat areas to minimize noxious weed spread.
- Minimize unnecessary cross-country vehicle travel during fire operations in GUSG habitat.
- Minimize burnout operations in key GUSG habitat areas by constructing direct fireline whenever safe and practical to do so.
- Utilize retardant and mechanized equipment to minimize burned acreage during initial attack.
- As safety allows, conduct mop-up where the black adjoins unburned islands, dog legs, or other habitat features to minimize sagebrush loss.

## APPENDIX J:  GUSG RANGEWIDE MITIGATION STRATEGY

## INTRODUCTION

The BLM will develop a GUSG Rangewide Mitigation Strategy (Mitigation Strategy) for inclusion in the Final EIS and Proposed GUSG Rangewide RMP Amendment. The Mitigation Strategy will be based on the BLM Mitigation Handbook H-1794-1, Department of the Interior Departmental Manual Chapter 6: *Implementing Mitigation at the Landscape-scale*, and the November 3, 2015 Presidential Memorandum: *Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment*.

The purpose of the Mitigation Strategy will be to identify mitigation needs and measures across the range of the GUSG at relevant and appropriate scales that, when implemented, will result in a net conservation gain to and assist with recovery (if the ESA listing remains in effect) and/or ongoing conservation (if the ESA listing is no longer in effect) of the species.  The goal will be to help increase the effectiveness, consistency, and transparency of mitigation efforts that assist with the recovery and/or ongoing conservation of the GUSG.

The Mitigation Strategy will incorporate guidance outlined in the BLM Mitigation Handbook.  Many components are already present in the overall NEPA analysis associated with this planning effort.  As a result, the strategy will build on this existing work rather than attempt to duplicate it. Examples of these components include descriptions of the uses of public land in the planning area, resource objectives, baseline conditions and trends, mitigation measures (including those referenced in the proposed amendment), and potential residual impacts.  It will also address whether there is a potential need for compensatory mitigation to address these residual impacts.

The Mitigation Strategy will provide a framework for managers to use in determining necessary and appropriate mitigation for project proposals within GUSG habitat.  By employing several key building blocks, the Mitigation Strategy will: 1) incorporate mitigation measures included in the alternatives and best management practices considered in this Draft EIS analysis, 2) incorporate comments received during the public review of this Draft EIS, 3) be based on the best available science, 4) be resource based (i.e., focused on GUSG habitat), 5) consider reasonably foreseeable impacts to GUSG habitat from all of the foreseeable public land uses within the planning area, and 6) be developed using a transparent and meaningful engagement process with cooperating agencies.

The intent of the Mitigation Strategy is to achieve a net conservation gain and assist with the recovery and ongoing conservation of GUSG habitat.  To achieve a net gain

goal, compensatory mitigation will be required for all residual impacts to GUSG habitat—and not just to those impacts determined to be "significant" as defined under NEPA. To do so, the BLM will undertake management actions identified in the RMP Amendment that are consistent with valid existing rights and applicable law, minimize actions that result in habitat loss, and include an accounting of uncertainty associated with the effectiveness of such mitigation.

The Mitigation Strategy will employ a full mitigation hierarchy. CEQ regulations describe the mitigation hierarchy as:

a) Avoiding the impact altogether by not taking a certain action or parts of an action.
b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.
d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
e) Compensating for the impact by replacing or providing substitute resources or environments.

The Mitigation Strategy should include guidance on avoidance, minimization, and compensation, as follows:

*Avoidance* is defined as those measures that result in a potential impact not occurring from the outset by not taking a certain action or parts of an action. The RMP Amendment alternatives identify a range of potential avoidance measures. Examples of avoidance measures include No Surface Occupancy, Controlled Surface Use, withdrawn areas, closures, and exclusion areas.

*Minimization* occurs through limiting the degree or magnitude of the action and its implementation. The RMP Amendment alternatives identify multiple potential minimization options for a variety of projects and land uses. The alternatives also identify multiple best management practices (Appendix I), design features (Table 2.4), and various stipulations that can be applied to projects as appropriate. Examples of minimization include facility placement, timing of activities, facility design, and interim reclamation.

*Rectification* is the repairing, rehabilitating, or restoring of the affected environment. This approach is more action specific. An example might be the reclamation of an abandoned mine location. Reduction of impacts involves preservation and maintenance operations during the life of the proposed project to be mitigated. This approach is more design specific. An example might be a phased development and reclamation project design or a similar approach to a related impact on the landscape.

*Compensation* can occur if, after applying avoidance and minimization techniques, residual impacts remain. *Residual impacts* are defined in the BLM Mitigation Handbook as any reasonably foreseeable impacts from a proposed project that are expected to remain after implementing the avoidance, minimization, rectification, and reduction elements of the mitigation hierarchy. These impacts include those that will continue until the benefits of the mitigation measure are fully realized on the ground. Compensation could include the discussion of impact valuation, compensatory mitigation options, siting, compensatory project types and costs, monitoring, reporting, and funds administration.

The RMP Amendment prioritizes the avoidance of impacts, followed by minimization techniques. If after applying avoidance and minimization techniques, any residual impacts remain, then compensatory mechanisms may be used to address those impacts. Compensatory mechanisms could take the form of a mitigation or conservation bank, habitat exchange, in lieu fee program, proponent mitigation, or other options that might be developed or suggested. Numerous methodologies or tools may be developed, to determine and quantify the nature and extent of the compensatory mitigation required under a given mitigation mechanism. These tested methodologies are used to quantify the nature and extent of the impact from a public land use and nature and extent of the compensatory mitigation measure.

The strategy, with input from cooperating agencies, will identify which methodology(ies) would be most appropriate for use in compensatory mitigation for the GUSG habitat within the scope of this RMP Amendment. The strategy will also identify the criteria for determining what compensatory mitigation mechanisms, and under what conditions, may be available to address residual impacts. This will include a methodology to cross-walk between various methodologies to ensure equivalent benefits are realized. The strategy will identify criteria for selection of locations, to prioritize for compensatory mitigation activities.

In addition, it is expected that the mitigation strategy should ensure that mitigation measures are implemented and monitored for effectiveness using approved methodologies such as the BLM Assessment, Inventory, and Monitoring (AIM) Strategy. It should describe how to remedy failed mitigation efforts, and incorporate adaptive management principles in the design and implementation of compensatory mitigation mechanisms.

## References

BLM 2016: Draft Mitigation Handbook H-1794-1

Department of the Interior's mitigation policy 600 DM 6

Presidential Memorandum - Mitigating Impacts on Natural Resources from Development

# 7. GLOSSARY

**Active Livestock Grazing Allotment** - An allotment that is being regularly grazed by livestock. This does not include allotments in a non-use status, e.g., through a voluntary non-use agreement, or in conservation use, allotments that are being removed from the grazing base through an RMP revision or amendment, or vacant allotments.

**Actual use** - The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by periodic field checks by the BLM.

**Adaptive Management** - A type of natural resource management in which decisions are made as part of an ongoing science-based process.  Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society.  Results are used to notify management policy, strategies and practices.

**Allotment** - An area of land in which one or more livestock operators graze their livestock. Allotments generally consist of BLM lands, but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Management Plan (AMP)** - A concisely written program of livestock grazing management, including supportive measures, if required, designed to attain specific management goals in a grazing allotment.  An AMP is prepared in consultation with the permittees, lessees, and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife.  An AMP establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**Amendment** - The process for considering or making changes in the terms, conditions, and decisions of approved Resource Management Plans or management framework plans.  Usually only one or two issues are considered that involve only a portion of the planning area.

**Animal Unit Month (AUM)** - The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

**Application for Permit to Drill (APD)** - An application for oil and gas drilling which includes 1) a drilling plan, 2) a surface use plan of operations, 3) evidence of bond coverage as required by DOI regulations, and 4) such other information as may be required by applicable orders and notices.

**Area of Critical Environmental Concern (ACEC)** - Areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

CHAPTER 7 - GLOSSARY

**Authorized Use** - This is an activity (i.e. resource use) occurring on the public lands that is either explicitly or implicitly recognized and legalized by law or regulations.  This term may refer to those activities occurring on the public lands for which the BLM or other appropriate authority has issued a formal authorization document (e.g. livestock grazing; lease/permit; right-of-way; oil and gas permit to drill; etc.).  Formally authorized uses typically involve some type of commercial activity, facility placement, or event.  Unless constrained or bounded by statute, regulation, or an approved land use plan decision, legal activities involving public enjoyment and use of the public lands (e.g. hiking, camping, etc.) require no formal BLM authorization.

**Avoid** - To stay away from when practicable due to identified resource values, but may be available with special stipulations or mitigation.  Establishes that the management priority is to not authorize an activity or parts of an activity in an area, but recognizes that an absolute prohibition is not available or reasonable.

**Avoidance/Avoidance area** - These areas usually address mitigation of some activity (i.e. resource use).  Paraphrasing the CEQ Regulations (40 CFR 1508.20), avoidance means to circumvent, or bypass, an impact altogether by not taking a certain action, or parts of an action.  Therefore the term "avoidance" does not necessarily prohibit a proposed activity, but it may require the relocation of an action, or the total redesign of an action to eliminate any potential impacts resulting from it.  Also see "*right-of-way avoidance areas*" definition.

**Best Management Practices** - A suite of techniques that guide or may be applied to management actions to aide in achieving desired outcomes.  BMPs are often developed in conjunction with land use plans, but they are not considered a planning decision unless the plans specify that they are mandatory.

**Big Game** - Indigenous ungulate wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biological Assessment** - Information prepared by, or under the direction of, a federal agency to determine whether a proposed action is likely to: (1) adversely affect listed species or designated critical habitat; (2) jeopardize the continued existence of species that are proposed for listing; or (3) adversely modify proposed critical habitat.

**Biological Opinion (BO)** - Document which includes: (1) the opinion of the Fish and Wildlife Service...as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat.

**Carrying Capacity** - The stocking rate (for livestock) that is sustainable over time per unit of land area.

**Casual use** - Activities involving practices that do not ordinarily cause appreciable disturbance or damage to the public lands, resources or improvements and, therefore, do not require a right-of-way grant or temporary use permit (43 CFR 2800).  Any short term noncommercial activity which does not cause appreciable damage or disturbance to public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities (43 CFR 2920).  Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Clean Air Act of 1963 and Amendments** - Federal legislation governing air pollution control.

**Clean Water Act of 1972 and Amendments** - Federal legislation governing water pollution control.

**Climate change** - Any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from natural factors, natural processes or human activities.

**Closed** - Generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 sets forth the specific meaning of "closed" as it relates to off-highway vehicle use, and 43 CFR 8364 defines "closed" as it relates to closure and restriction orders (from H-1601-1, BLM Land Use Planning Handbook).

**Collaboration** - A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration may take place with any interested parties, whether or not they are a cooperating agency.

**Compensatory mitigation** - Compensating for the residual impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

**Comprehensive Travel and Transportation Management (CTTM)** - The proactive interdisciplinary planning on-the-ground management and administration of ravel networks (both motorized and non-motorized) to ensure public access, natural resources, and regulatory needs are considered. It consists of inventory, easement acquisition, mapping and signing, and other measures necessary to provide access to public lands for a wide variety of uses including uses for recreational, traditional, casual, agricultural, commercials, educational, landing strips, and other purposes).

**Condition Class (Fire Regimes)** - Fire Regime Condition Classes are a measure describing the degree of departure from historical fire regimes, possibly resulting in alterations of key ecosystem components such as species composition, structural stage, stand age, canopy closure, and fuel loadings. One or more of the following activities may have caused this departure: fire suppression, timber harvesting, livestock grazing, introduction and establishment of exotic plant species, introduced insects or disease, or other management activities.

**Conditions of Approval** - Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

**Conformance** - A proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation measures** - Measures to conserve, enhance, and/or restore Gunnison Sage-Grouse habitat by reducing, eliminating, or minimizing threats to that habitat.

**Conservation plan** - The recorded decisions of a landowner or operator, cooperating with a conservation district, on how the landowner or operator plans, within practical limits, to use his/her land according to its capability and to treat it according to its needs for maintenance or improvement of the soil, water, animal, plant, and air resources.

**Conservation strategy** - A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are

CHAPTER 7 - GLOSSARY

designated as BLM sensitive species or that have been determined by the US Fish and Wildlife Service to be federal candidates under the ESA.

**Controlled surface use (CSU)** - CSU is a category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values and is applicable to fluid mineral construction and drilling activities (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads). CSU areas are open to fluid mineral leasing but the stipulation allows the BLM to require special operational constraints, or the activity can be shifted more than 200 meters (656 feet) to protect the specified resource or value.

**Communication site** - Sites that include broadcast types of uses (e.g., television, AM/FM radio, cable television, broadcast translator) and non-broadcast uses (e.g., commercial or private mobile radio service, cellular telephone, microwave, local exchange network, passive reflector).

**Cooperating agency** - Assists the lead federal agency in developing an environmental assessment or environmental impact statement. These can be any agency with jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any tribe or federal, state, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Council on Environmental Quality** - An advisory council to the President of the U.S. established by the National Environmental Policy Act of 1969. The council reviews federal programs to analyze and interpret environmental trends and information.

**Critical habitat** - For listed species consists of: (1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the Act, on which are found those physical or biological features (constituent elements) (a) essential to the conservation of the species and (b) which may require special management considerations or protection; and (2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of the Act, upon a determination by the Secretary that such areas are essential for the conservation of the species.

**Crucial wildlife habitat** - The environment essential to plant or animal biodiversity and conservation at the landscape level. Crucial habitats include, but are not limited to, biological core areas, severe winter range, winter concentration areas, reproduction areas, and movement corridors.

**Cultural resources** - Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social and/or cultural groups.

**Cumulative effects** - The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**dBA (A-weighted decibels)** - The commonly used frequency weighting for environmental sounds.

**Decision area** - Public lands and mineral estate managed by the BLM that are within the planning area and are encompassed by all designated habitat.

**Deferred/deferred use** - To set aside, or postpone, a particular resource use(s) or activity(ies) on the public lands to a later time. Generally when this term is used, the period of the deferral is specified.

CHAPTER 7 - GLOSSARY

Deferments sometimes follow the sequence timeframe of associated serial actions (e.g., action B will be deferred until action A is completed, etc.).

**Designated roads and trails** - Specific roads and trails identified by the BLM (or other agencies) where some type of motorized vehicle use is appropriate and allowed either seasonally or year-round.

**Desired future condition** - For rangeland vegetation, the condition of rangeland resources on a landscape scale that meet management objectives. It is based on ecological, social, and economic considerations during the land planning process. It is usually expressed as ecological status or management status of vegetation (species composition, habitat diversity, and age and size class of species) and desired soil qualities (soil cover, erosion, and compaction). In a general context, desired future condition is a portrayal of the land or resource conditions that are expected to result if goals and objectives are fully achieved.

**Desired outcomes** - A type of land use plan decision expressed as a goal or objective.

**Direct impacts** - Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place.

**Disposal** - Transfer of public land out of federal ownership to another party through sale, exchange, Recreation and Public Purposes Act, Desert Land Entry or other land law statutes.

**Disruptive Activity** - Public Land resource uses/activities that are likely to alter the behavior, displace, or cause excessive stress to existing GUSG populations occurring at a specific location and/or time. In this context, disruptive activity(ies) refer to those actions that alter behavior or cause the displacement of individuals such that reproductive success is negatively affected, or an individual's physiological ability to cope with environmental stress is compromised. This term does not apply to the physical disturbance of the land surface, vegetation, or features. Examples of disruptive activities may include noise, vehicle traffic, or other human presence regardless of the activity. The term is commonly used in conjunction with protecting wildlife during crucial life stages (e.g., breeding, nesting, birthing, etc.). The use of this term is not intended to prohibit all activity or authorized uses.

**Diversity** - The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Easement** - A right afforded a person or agency to make limited use of another's real property for other purposes.

**Ecological Site** - A distinctive kind of land with specific physical characteristics that differs from other kinds of land in its ability to produce a distinctive kind and amount of vegetation.

**Emergency stabilization** - Planned actions to stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize threats to life or property resulting from the effects of a fire, or to repair/replace/construct physical improvements necessary to prevent degradation of land or resources. Emergency stabilization actions must be taken within one year following containment of a wildfire.

**Endangered species** - Any species that is in danger of extinction throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Manual). Under the Endangered Species Act in the US, "endangered" is the more-protected of the two categories. Designation as endangered (or threatened) is determined by the FWS as directed by the Endangered Species Act.

CHAPTER 7 - GLOSSARY

**Endangered Species Act of 1973 (as amended)** - Designed to protect critically imperiled species from extinction as a consequence of economic growth and development untampered by adequate concern and conservation.  The Act is administered by two federal agencies, the FWS and the National Oceanic and Atmospheric Administration.  The purpose of the Act is to protect species and the ecosystems upon which they depend (16 US Code 1531-1544).

**Endemic species** - A plant or animal restricted to a defined geographic location.

**Enhance** - The improvement of habitat by increasing missing or modifying unsatisfactory components and/or attributes of the plant community to meet sage-grouse objectives.

**Environmental assessment** - A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.  It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental Impact Statement (EIS)** - A detailed statement prepared by the responsible official in which a major federal action which significantly affects the quality of the human environment is described, alternatives to the proposed action provided, and effects analyzed (from BLM National Management Strategy for OHV Use on Public Lands).

**Evaluation (plan evaluation)** - The process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and National Environmental Policy Act of 1969 analysis are still valid and whether the plan is being implemented.

**Exchange** - A transaction whereby the federal government receives land or interests in land in exchange for other land or interests in land.

**Exclusion Areas** - An area on the public lands where a certain activity(ies) is prohibited to insure protection of other resource values present on the site.  The term is frequently used in reference to lands/realty actions and proposals (e.g., rights-of-way, etc.), but is not unique to lands and realty program activities.  This restriction is functionally analogous to the phrase "no surface occupancy" used by the oil and gas program, and is applied as an absolute condition to those affected activities.  The less restrictive analogous term is avoidance area.  Also see definition for "right-of-way exclusion area."

**Existing routes** - The roads, trails, or ways that are used by motorized vehicles (jeeps, all-terrain vehicles, motorized dirt bikes, etc.), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders) and are, to the best of BLM's knowledge, in existence at the time of RMP/EIS publication.

**Exploration** - Active drilling and geophysical operations to:
    1. Determine the presence of the mineral resource; or
    2. Determine the extent of the reservoir or mineral deposit.

**Extensive Recreation Management Area (ERMA)** - Administrative units that require specific management consideration in order to address recreation use, demand, or Recreation and Visitor Services program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. ERMA management is commensurate and considered in context with the management of other resources and resource uses.

CHAPTER 7 - GLOSSARY

**Federal Land Policy and Management Act of 1976 (FLPMA)** - Public Law 94-579, October 21, 1976, often referred to as the BLM's "Organic Act," which provides the majority of the BLM's legislated authority, direction policy, and basic management guidance.

**Federal mineral estate** - Subsurface mineral estate owned by the US and administered by the BLM. Federal mineral estate under BLM jurisdiction is composed of mineral estate underlying BLM lands, privately owned lands, and state-owned lands.

**Fire management plan (FMP)** - A plan that identifies and integrates all wildland fire management and related activities within the context of approved land/resource management plans. It defines a program to manage wildland fires (wildfire, prescribed fire, and wildland fire use). The plan is supplemented by operational plans including, but not limited to, preparedness plans, preplanned dispatch plans, and prevention plans. Fire Management Plans assure that wildland fire management goals and components are coordinated.

**Fire suppression** - All work activities connected with fire extinguishing operations, beginning with discovery of a fire and continuing until the fire is completely extinguished.

**Fluid minerals** - Oil, gas, coal bed natural gas, and geothermal resources.

**Forested lands** - Lands primarily vegetated with trees that include one or more of the following types: aspen, ponderosa pine, lodgepole pine, limber pine, spruce and fir.

**Formal Consultation** - When a federal agency determines, through a biological assessment or other review, that an action is likely to adversely affect a listed species, the agency submits a request to the FWS for formal consultation.  During formal consultation, the FWS and the agency share information about the proposed project and the species likely to be affected.  Formal consultation may last up to 90 days, after which the FWS will prepare a biological opinion on whether the proposed activity is likely to jeopardize the continued existence of a listed species.

**Functional Groups** - The life form of a plant. Examples include trees, shrubs, vines, grasses, forbs.

**Functioning at Risk** - Condition in which vegetation and soil are susceptible to losing their ability to sustain naturally functioning biotic communities.  In uplands or riparian-wetland areas, conditions currently function properly, but a soil, water, or vegetation attribute makes them susceptible to degradation and lessens their ability to sustain natural biotic communities.  Human activities, past or present, may increase the risks.

**Geographic Information System (GIS)** - A system of computer hardware, software, data, people, and applications that capture, store, edit, analyze, and display a potentially wide array of geospatial information.

**Geophysical exploration** - Efforts to locate deposits of oil and gas resources and to better define the subsurface.

**Geothermal energy** - Natural heat from within the Earth captured for production of electric power, space heating, or industrial steam.

**Goal** - A broad statement of a desired outcome; usually not quantifiable and may not have established timeframes for achievement.

**Grazing preference** - Grazing preference or preference means a superior or priority position against others for the purpose of receiving a grazing permit or lease. This priority is attached to base property owned or controlled by the permittee or lessee (43 CFR 4100.0-5).

**Grazing system** - Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation. Include, but are not limited to, developing pastures, utilization levels, grazing rotations, timing and duration of use periods, and necessary range improvements.

**Habitat** - An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for all or part their life cycle.

Breeding Habitat:  Sagebrush communities known or suspected to be used by Gunnison Sage-Grouse for nesting and early brood rearing where sagebrush canopy cover is between 10 and 25%, and in a configuration such that it meets the habitat requirements for sage-grouse; to include cleared areas void of sagebrush used a strutting grounds.

| Table 1 — Gunnison sage-grouse Structural Guidelines for Breeding Habitat[1] | |
|---|---|
| **Vegetation Variable*** | **Amount of occurrence in the habitat** |
| Sagebrush Canopy Cover* | 10-25% |
| Non-sagebrush Canopy Cover* | 5-15% |
| Total Shrub Canopy Cover* | 15-40% |
| Sagebrush Height* | 25-50 cm (9.8-19.7 in.) |
| Grass Cover* | 10-40% |
| Forb Cover* | 5-40% |
| Grass Height* | 10-15 cm (3.9-5.9 in.) |
| Forb Height* | 5-15 cm (2 — 6 in.) |

[1]**These guidelines incorporate the vegetation variable range for arid and mesic sites identified in the RCP.**
***These habitat structure values are average values over a given area.**

Summer- Fall Habitat:  Vegetation communities known or suspected to be used by Gunnison Sage-grouse, including sagebrush, agricultural field, and wet meadows.

| Table 2 — Gunnison sage-grouse Structural Guidelines for Summer-Late Fall Habitat[1] | |
|---|---|
| **Vegetation Variable*** | **Amount of occurrence in the habitat** |
| Sagebrush Canopy Cover* | 5-20% |
| Non-sagebrush Canopy Cover* | 5-15% |
| Total Shrub Canopy Cover* | 10-35% |

CHAPTER 7 - GLOSSARY

| Table 2 — Gunnison sage-grouse Structural Guidelines for Summer-Late Fall Habitat[1] | |
|---|---|
| **Vegetation Variable\*** | **Amount of occurrence in the habitat** |
| Sagebrush Height\* | 25-50 CM (9.8 — 19.7 in.) |
| Grass Cover\* | 10-35% |
| Forb Cover\* | 5-35% |
| Grass Height\* | 10-15 cm (3.9-5.9 in.) |
| Forb Height\* | 3-10 cm (1.2-3.9 in.) |

[1]**These guidelines incorporate the vegetation variable range for arid and mesic sites identified in the RCP.**
**\*These habitat structure values are average values over a given area.**

<u>Winter habitat</u>:  Sagebrush areas known or suspected to be used by Gunnison Sage-grouse that area available (i.e., not covered by snow) to sage-grouse in average winters.

| Table 3 — Gunnison sage-grouse Structural Guidelines for Winter Habitat[1] | |
|---|---|
| **Vegetation Variable** | **Amount of occurrence in the habitat** |
| Sagebrush Canopy Cover\* | 30-40%, or areas of exposed sagebrush in a configuration capable of supporting sage-grouse |
| Sagebrush height\* | 40-55 cm (15.8 — 21.7 in.), or where shrub height is above snow cover |

[1]**These guidelines incorporate the vegetation variable range for arid and mesic sites identified in the RCP.**
**\*These habitat structure values are average values over a given area.**

**Habitat Prioritization Tool** - A spatial model used to evaluate GUSG habitat within the Gunnison Basin. (See Tier 1 Habitat and Tier 2 Habitat.)

**Harvest coefficient** - The percentage of total forage produced that is assigned to grazing animals for consumption.

**Heavy metal** - Occurs naturally in the ecosystem, with large variations in concentration.  In modern times, anthropogenic sources of heavy metals (pollution) have been introduced to the ecosystem.  Motivations for controlling heavy metal concentrations in gas streams are diverse.  Some heavy metals are dangerous to health or to the environment, some may cause corrosion, and some are harmful in other ways.

**Impact** - The effect, influence, alteration, or imprint caused by an action.

CHAPTER 7 - GLOSSARY

**Impairment** - The degree to which a distance of clear visibility is degraded by human-caused pollutants.

**Implementation decisions** - Decisions that take action to implement land use planning; generally appealable to Interior Board of Land Appeals under 43 CFR 4.410.

**Implementation plan** - An area or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans.

**Incidental Take** - The unintentional harming (including killing) or harassing of a listed species resulting from a Federal action, which may occur when authorized by the FWS through an incidental take statement that identifies the amount or extent of the take, as well as reasonable and prudent measures to minimize the take and terms and conditions that must be observed when implementing those measures.

**Indirect impacts** - Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

**Informal Consultation** - The requirement under Section 7 of the ESA for federal agencies to consult with the FWS when any action the agency carries out, funds, or authorizes (such as through a permit) has the potential to affect a listed endangered or threatened species. The process usually begins as informal consultation and if, after discussions with and concurrence from the FWS, the agency determines that the proposed action is not likely to affect any listed species in the project area, consultation is complete and the proposed project can proceed. If it appears that the agency's action might affect a listed species, the agency can prepare a biological assessment to assist in its determination of the project's effect on a species.

**Integrated Pest Management** - The use of all appropriate weed control measures, including fire, as well as mechanical, chemical, biological, and cultural techniques, in an organized and coordinated manner on a site-specific basis.

**Late season** - Fall or late summer grazing.

**Land classification** - When, under criteria of 43 CFR 2400, a tract of land has potential for either retention for multiple use management or for some form of disposal, or for more than one form of disposal, the relative scarcity of the values involved and the availability of alternative means and sites for realization of those values will be considered. Long-term public benefits will be weighed against more immediate or local benefits. The tract will then be classified in a manner that would best promote the public interest.

**Land Health Fundamental(s)** - Overarching principles of rangeland health listed at 43 CFR 4180.1 which establish the Department of Interior's policy of managing for healthy rangelands. State or regional standards must provide for conformance with the fundamentals for rangeland health.

**Land tenure adjustments** - Ownership or jurisdictional changes to improve the manageability of BLM lands and their usefulness to the public. The BLM has numerous authorities for repositioning lands into a more consolidated pattern, disposing of lands, and entering into cooperative management agreements. These land pattern improvements are completed primarily through the use of land exchanges, but also through land sales, jurisdictional transfers to other agencies, and through the use of cooperative management agreements and leases.

**Land use allocation** - The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions. (from H-1601-1, BLM Land Use Planning Handbook).

**Land use plan** - A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and MFPs.

**Land use plan decision** - Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**LANDFIRE** - A partnership program between the DOI, USFS, and Nature Conservancy begun in 2001 that produces geo-spatial products and databases covering the U.S. for the purpose of creating a nationally complete, comprehensive, and consistent set of products that support fire and natural resource management organizations and applications; also known as "Landscape Fire and Resource Management Planning Tools."

**Large transmission lines** - The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to customers, or is delivered to other electrical systems.  Transmission is considered to end when the energy is transformed for distribution to the customer.  For purposes of this EIS, large transmission lines are considered to be 230 kilovolts or higher.  230-kilovolt lines generally require a larger disturbance footprint to accommodate larger infrastructure.

**Late brood-rearing area** - Habitat includes mesic sagebrush and mixed shrub communities, wet meadows, and riparian habitats as well as some agricultural lands (e.g. alfalfa fields, etc.).

**Leasable minerals** - Those minerals or materials subject to lease by the federal government under the Mineral Leasing Act of 1920.  They include coal, phosphate, asphalt, sulphur, potassium, sodium minerals, oil and gas, as well as geothermal resources.

**Lease** - Section 302 of FLPMA provides the BLM with authority to issue leases for the use, occupancy, and development of public lands.  Leases are issued for purposes such as a commercial filming, advertising displays, commercial or noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, harvesting of native or introduced species, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy if the residential structures are not incidental to the mining operation, and water pipelines and well pumps related to irrigation and non-irrigation facilities.  The regulations establishing procedures for the processing of these leases and permits are found in 43 CFR 2920.

**Lease stipulation** - A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lek** - An area where certain bird species (such as sage-grouse) assemble to carry on display and courtship behavior.

Active Lek:  An open area that has been attended by ≥ 2 male sage-grouse in ≥ 2 of the previous 5 years.  For the smaller GUSG populations outside the Gunnison Basin, an active lek is defined as an open area where one or more sage-grouse have been observed on more than one occasion, engaging in courtship or breeding behavior.  An area used by displaying males in the last 5 years is considered an active lek. (RCP)

CHAPTER 7 - GLOSSARY

Historic lek:  A formerly active lek that has not been utilized for display or breeding within the last 10 years.

Inactive Lek:   To be considered inactive for a given season, a lek must have zero males in attendance for at least two count periods.  For the official status of a lek to be considered Inactive, a lek needs to be seasonally In active for five consecutive years.

**Limited** - Designated areas and trails where the use of off-road vehicles is subject to restrictions, such as limiting the number or types of vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year (from BLM National Management Strategy for OHV Use on Public Lands).

**Locatable minerals** - Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Maintenance action** - A minor adjustment to a land use plan that does not require an amendment.

**Management decision** - A decision made by the BLM to manage public lands.  Management decisions include both land use plan decisions and implementation decisions.

**Management unit** - A BLM field office, national monument, or national conservation area.

**Master Development Plans** - A plan addressing two or more APDs that share a common drilling plan, surface use plans of operations, and plans for future development and production.

**Mineral** - Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained for human use, usually from the ground. Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral entry** - The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral estate** - The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral materials** - Materials such as sand and gravel and common varieties of stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws. but that can be acquired under the Materials Act of 1947, as amended.

**Minimization mitigation** - Minimizing impacts by limiting the degree or magnitude of the action and its implementation (40 CFR 1508.20 (b)).

**Mining claim** - A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, mill site, and tunnel site.

**Mitigation** - Includes specific means, measures, or practices that could reduce, avoid, or eliminate adverse impacts.  Mitigation can include:

(a) Avoiding an impact altogether by not taking a certain action or parts of an action.
(b) Minimizing an impact by limiting the degree or magnitude of the action and its implementation.
(c) Rectifying an impact by repairing, rehabilitating, or restoring the affected environment.
(d) Reducing or eliminating an impact over time by preservation and maintenance operations during the life of the action.
(e) Compensating for an impact by replacing or providing substitute resources or environments.

**Modification** - A change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Monitoring (plan monitoring)** - The process of tracking the implementation of land use plan decisions and collecting and assessing data necessary to evaluate the effectiveness of land use planning decisions.

**Motorized vehicles or uses** - Vehicles that are motorized, including but not limited to jeeps, all-terrain vehicles (all-terrain vehicles, such as four-wheelers and three-wheelers), trail motorcycles or dirt bikes, and aircrafts.

**Multiple use** - Managing public lands and their various resource values so that they are utilized in a combination that will best meet the present and future needs of the American people. Making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

**National Environmental Policy Act of 1969 (NEPA)** - Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**National Register of Historic Places** - A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of, 1966 and maintained by the National Park Service.

**National Wild and Scenic Rivers System** - A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three types of streams: (1) **recreational:** rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) **scenic:** rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) **wild:** rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**No Surface Occupancy (NSO)** - A major constraint where use or occupancy of the land surface for fluid mineral exploration or development and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of

wells and/or pads) are prohibited to protect identified resource values.  Areas identified as NSO are open to fluid mineral leasing, but surface occupancy or surface-disturbing activities associated with fluid mineral leasing cannot be conducted on the surface of the land.  Access to fluid mineral deposits would require horizontal drilling from outside the boundaries of the NSO area.

**Non-energy leasable minerals** - Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920.  Non-energy minerals include resources such as phosphate, sodium, potassium, and sulfur.

**Nonfunctioning Condition** - Condition in which vegetation and ground cover are unable to sustain natural biotic communities.  In riparian-wetland areas, conditions do not provide adequate vegetation, landform, or large woody debris to dissipate stream energy associated with high flows and thus are unable to reduce erosion, improve water quality, or other normal characteristics of riparian areas.

**Notice of Intent to Conduct Oil and Gas Geophysical Exploration Operations** - Notice to the BLM to conduct oil and gas exploration proposals.

**Notice of Staking** - Notice to the BLM that staking has been or will be completed for well locations on Federal leases and serves as a request to schedule an onsite inspection.

**Noxious weeds** - A plant species designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the US.

**Objective** - A description of a desired condition for a resource.  Objectives can be quantified and measured and, where possible, have established timeframes for achievement.

**Off-highway vehicle (OHV) (off-road vehicle)** - Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any non-amphibious registered motorboat: (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Open** - Designated areas and trails where off-road vehicles may be operated, subject to operating regulations and vehicle standards set forth in BLM Manuals 8341 and 8343, or an area where all types of vehicle use is permitted at all times, subject to the standards in BLM Manuals 8341 and 8343.

**Outstandingly Remarkable Values** - Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act: "scenic, recreational, geological, fish and wildlife, historic, cultural, or other similar values..."  Other similar values which may be considered include ecological, biological or botanical, paleontological, hydrological, scientific or research values.

**Perennial stream** - Perennial streams carry flowing water continuously throughout the year, regardless of weather conditions. It exhibits well-defined geomorphologic characteristics and in the absence of pollution, thermal modifications, or other man-made disturbances has the ability to support aquatic life.  During hydrological drought conditions, the flow may be impaired.

**Permitted Use** - The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease, and expressed in Animal Unit Months.

**Permittee** - A person or company permitted to graze livestock on public land.

CHAPTER 7 - GLOSSARY

**Planning area** - A geographic area for which land use and resource management plans are developed and maintained.

**Planning criteria** - The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamlines and simplifies the resource management planning actions.

**Policy** - A statement of guiding principles, or procedures, designed and intended to influence planning decisions, operating actions, or other affairs of the BLM. Policies are established interpretations of legislation, executive orders, regulations, or other presidential, secretarial, or management directives.

**Potential Habitat** - Unoccupied habitats that could be suitable for occupation of sage grouse if practical restoration were applied.

**Prescribed fire** - Any fire intentionally ignited by management actions in accordance with applicable laws, policies and regulations to meet specific objectives.

**Primary Constituent Element (PCE)** - A physical or biological feature essential to the conservation of a species and upon which designated or proposed critical habitat is based, such as space for individual and population growth and normal behavior such as food, water, air, light, minerals, or other nutritional or physiological requirements, cover or shelter, sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal, and habitats that are protected from disturbance or are representative of historic geographic and ecological distribution for the species.

**Primitive route** - Any transportation linear feature located within areas that have been identified as having wilderness characteristics and not meeting the wilderness inventory road definition (BLM Manual 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands).

**Prohibit/Closed/Exclusion** - prevented, precluded or not available under any conditions for a particular use or uses to insure protection of other resource values present.

**Properly Functioning Condition** - (1) An element of the Fundamental of Rangeland Health for watersheds, and therefore a required element of state or regional standards and guidelines under 43 CFR § 4180.2(b). (2) Condition in which vegetation and groundcover maintain soil conditions necessary to sustain natural biotic communities. Riparian wetland areas are functioning properly when adequate vegetation, landform, or large woody debris is present to dissipate stream energy associated with high water flows, thereby reducing erosion and improving water quality; filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks against cutting action; develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and support greater biodiversity. The functioning condition of riparian-wetland areas is influenced by geomorphic features, soil, water, and vegetation. (4) Uplands function properly when the existing vegetation and groundcover maintain soil conditions capable of sustaining natural biotic communities. The functioning condition of uplands is influenced by geomorphic features, soil, water, and vegetation.

**Public land -** Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired ownership, except lands located on the Outer Continental Shelf, and lands held for the benefit of Indians, Aleuts, and Eskimos.

**Rangeland health -** The degree to which the integrity of the soil and ecological processes of rangeland ecosystems are sustained.

**Range Improvement -** An authorized physical modification or treatment designed to improve production of forage, change vegetation composition, control patterns of use, provide water, stabilize soil and water conditions, restore, protect, and improve the condition of rangeland ecosystems to benefit livestock, wild horses and burros, and fish and wildlife, including, but is not limited to, structures, treatment projects, and use of mechanical devices or modifications achieved through mechanical means.

**Reasonable Foreseeable Development (RFD) Scenario -** The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Recreation and Public Purposes Act (of 1926) -** The Recreation and Public Purposes Act provided for the lease and sale of public lands determined valuable for public purposes. The objective of the Recreation and Public Purposes Act is to meet the needs of state and local government agencies and nonprofit organizations by leasing or conveying public land required for recreation and public purpose uses. Examples of uses made of Recreation and Public Purposes lands are parks and greenbelts, sanitary landfills, schools, religious facilities, and camps for youth groups. The act provides substantial cost-benefits for land acquisition and provides for recreation facilities or historical monuments at no cost.

**Recreation management area -** Includes special recreation management areas (SRMAs) and extensive recreation management areas (ERMAs); see SRMA and ERMA definitions.

**Recreation Opportunity Spectrum -** A continuum used to characterize recreation opportunities in terms of setting, activity and experience opportunities. The spectrum covers a range of recreation opportunities from primitive to urban. With respective to river management planning, the Recreation Opportunity Spectrum represents one possible method for delineating management units or zones.

**Rehabilitate -** Returning disturbed lands as near to its pre-disturbed condition as is reasonably practical or as specified in approved permits.

**Renewable Energy -** Energy resources that constantly renew themselves or that are regarded as practically inexhaustible. These include solar, wind, geothermal, hydro, and biomass. Although particular geothermal formations can be depleted, the natural heat in the Earth is a virtually inexhaustible reserve of potential energy.

**Resource Advisory Council (RAC) -** Provides advice to the BLM on various resource issues.  A coordinated effort to involve RACs early on and throughout the process ensure that the BLM obtains and incorporates local input and advice throughout this project.

**Resource Management Plan (RMP) -** A land use plan as prescribed by the Federal Land Policy and Management Act that establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Restore/restoration -** Implementation of a set of actions that promotes plant community diversity and structure that allows plant communities to be more resilient to disturbance and invasive species over the long term. The long-term goal is to create functional, high quality habitat that is occupied by sage-grouse. Short-term goal may be to restore the landform, soils and hydrology and increase the percentage of preferred vegetation, seeding of desired species, or treatment of undesired species.

**Restriction/restricted use -** A limitation or constraint on public land uses and operations. Restrictions can be of any kind, but most commonly apply to certain types of vehicle use, temporal and/or spatial constraints, or certain authorizations.

CHAPTER 7 - GLOSSARY

**Revegetate/revegetation -** The process of putting vegetation back in an area where vegetation previously existed, which may or may not simulate natural conditions.

**Revision -** The process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

**Right-of-Way (ROW) -** Means the public lands authorized to be used or occupied for specific purposes pursuant to a right-of-way grant, which are in the public interest and which require rights-of-way over, upon, under, or through such lands.

**Right-of-way avoidance area -** An area identified through resource management planning to be avoided but may be available for ROW location with special stipulations.

**Right-of-way exclusion area -** An area identified through resource management planning that is not available for ROW location under any conditions.

**Riparian area -** A form of wetland transition between permanently saturated wetlands and upland areas.  Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water.  Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels.  Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Road -** A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Rock art -** Petroglyphs (carvings) or pictographs (paintings) created on natural rock surfaces by native people and depicting their history and culture.

**Rotation -** Regular change in grazing between pastures in an allotment for a permitted period.

**Routes -** Multiple roads, trails and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system.  Generically, components of the transportation system are described as "routes."

**Sagebrush habitat -** Areas of vegetation composed primarily of sagebrush plant communities - at least 25 percent of the land is dominated by sagebrush cover within a 0.9-mile [1.5-km] radius of any given location, of sufficient size and configuration to encompass all seasonal habitats for a give population of Gunnison Sage-grouse, and facilitate movement within and among populations (FWS 2014 primary constituent element 1).

**Salable minerals -** Common mineral varieties such as sand and gravel found on public lands and used mainly for construction.  Salable minerals are disposed of by sales to the public or free-use permits to government agencies or nonprofit organizations.

**Sale (public land) -** A method of land disposal pursuant to Section 203 of FLPMA, whereby the US receives a fair-market payment for the transfer of land from federal ownership.  Public lands determined suitable for sale are offered on the initiative of the BLM.  Lands suitable for sale must be identified in the RMP. Any lands to be disposed of by sale that are not identified in the current RMP, or that meet the disposal criteria identified in the RMP, require a plan amendment before a sale can occur.

**Scenic byway -** Highway route with a roadside or corridor of special aesthetic, cultural, or historic value.  An essential part of the highway is its scenic corridor.  The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

CHAPTER 7 - GLOSSARY

**Scoping process -** An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**Season of Use -** The time during which livestock grazing is permitted on a given range area, as specified in a grazing lease.

**Sensitive species -** Species designated as sensitive by the BLM State Director, including species that are under status review, have small or declining populations, live in unique habitats, or require special management.  BLM Manual 6840 provides policy and guidance for managing special status species.

**Site Specific Relocation (SSR) -** Allows some use and occupancy of public land while protecting identified resources or values.  SSR areas are potentially open to surface-disturbing activities but the restriction allows the BLM to require special constraints, or the activity can be shifted (spatially or temporally) to protect the specified resource or value.  Activities that are not considered surface disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the area by wildlife.

**Special Recreation Management Area (SRMA) -** A public land area identified in a land use plan to which recreation funding and personnel are committed in order to provide specific, structured recreation opportunities (including activities, experiences, and benefits).

**Special recreation permit (SRP) -** Authorization that allows for recreational uses of public lands and related waters.  Issued as a means to control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Commercial SRPs are also issued as a mechanism to provide a fair return for the commercial use of public lands.

**Special status species -** BLM special status species are: (1) species listed, candidate, or proposed for listing under the Endangered Species Act; and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the Endangered Species Act that are designated as BLM sensitive by the BLM State Director(s).  All federally listed candidate species, proposed species, and delisted species in the five years following delisting are conserved as BLM sensitive species.

**Split estate -** This is the circumstance where the surface of a particular parcel of land is owned by a different party than the minerals underlying the surface.  Split estates can have any combination of surface and subsurface owners (federal/state; federal/private; state/private) or percentages of ownership.  When referring to the split estate ownership on a particular parcel of land, it is generally necessary to describe the surface/subsurface ownership pattern of the parcel.

**Standard lease terms and conditions -** Areas may be open to leasing with no specific management decisions defined in a Resource Management Plan; however, these areas are subject to lease terms and conditions as defined on the lease form (Form 3100-11, Offer to Lease and Lease for Oil and Gas; and Form 3200-24, Offer to Lease and Lease for Geothermal Resources).

**State Implementation Plan -** A detailed description of the programs a state will use to carry out its responsibilities under the Clean Air Act.  State implementation plans are a collection of regulations used by a state to reduce air pollution.

**Stipulation (general) -** A term or condition in an agreement or contract.

**Stipulation (oil and gas) -** A provision that applies to construction and drilling which modifies standard oil and gas lease terms and conditions in order to protect other resource values or land uses and is attached to and made a part of the lease. Typical lease stipulations include No Surface Occupancy

CHAPTER 7 - GLOSSARY

(NSO), Timing Limitations (TL), and Controlled Surface Use (CSU). Lease stipulations are developed through the land use planning (RMP) process.

**Stocking rate -** the number of animals on a given amount of land over a certain period of time. Stocking rate is generally expressed as animal units per unit of land area.

**Structural range improvements –** Constructed developments such as fences, corrals, cattle guards, windmills, and other facilities that help with the distribution and control of livestock.

**Succession -** the observed process of change in the species structure of an ecological community over time.

**Surface access agreement -** A voluntary, private contract between the private surface owner and the Federal mineral lessee or operator to conduct applicable resource surveys and oil and gas operations necessary to develop the Federal mineral lease.  The Surface Access Agreement may include terms or conditions of use, be a waiver, or an agreement for compensation..

**Surface-disturbing activities (or surface disturbance) -** The physical disturbance and movement or removal of land surface and vegetation. These activities range from excavation and development activities associated with use of heavy equipment for road, pipeline, power line and other types of construction; blasting; strip, pit, and underground mining and related activities, including ancillary facility construction; oil and gas well drilling and field construction or development and related activities; range improvement project construction; and recreation site construction.  Surface disturbances normally involve use of surface lands resulting in disturbance to soils and vegetation that could require reclamation.  Surface disturbance is not normally caused by casual-use activities.  Activities not considered surface-disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, prescribed fire, some fuels and vegetation treatments, dispersed camping, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the land by wildlife.

**Surface use(s) -** These are all the various activities that may be present on the surface or near-surface (e.g., pipelines), of the public lands. It does not refer to those subterranean activities (e.g., underground mining, etc.) occurring on the public lands or federal mineral estate. When administered as a use restriction (e.g., *No Surface Use [NSU]*), this phrase prohibits all but specified resource uses and activities in a certain area to protect particular sensitive resource values and property. This designation typically applies to small acreage sensitive resource sites (e.g., plant community study exclosure, etc.), and/or administrative sites (e.g., government ware-yard, etc.) where only authorized, agency personnel are admitted.

**Tall Structures -** Infrastructure that is at least twice as tall as the surrounding vegetation, including poles and towers for lighting, communications, meteorology, telephone and electrical distribution, and high-tension transmission.

**Temporary/temporary use -** A relative term that must be considered in the context of the resource values affected and the nature of the resource use(s)/activity(ies) taking place. Generally, a temporary activity is considered to be one that is not fixed in place and is of short duration.

**Threatened species -** Any species that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Management). Under the Endangered Species Act in the US, "threatened" is the lesser-protected of the two categories. Designation as threatened (or endangered) is determined by USFWS as directed by the Endangered Species Act.

CHAPTER 7 - GLOSSARY

**Tier 1 Habitat -** Roughly 60% of GUSG Occupied Habitat in the Gunnison Basin population area is proposed to be managed as Tier 1 habitat. These areas were identified in the CCA using the habitat prioritization tool and are generally characterized by overlapping seasonal habitats and minimal existing permanent development.

**Tier 2 Habitat -** Roughly 40% of GUSG Occupied Habitat in the Gunnison Basin population area is proposed to be managed as Tier 2 habitat. These areas were identified in the CCA using the habitat prioritization tool and generally represent the more fragmented areas on the landscape.

**Timing Limitation (TL) -** The TL stipulation, a moderate constraint, is applicable to fluid mineral construction and drilling activities (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads), and other surface-disturbing activities (i.e., those not related to fluid mineral leasing). Areas identified for TL are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. TLs can overlap spatially with NSO and CSU, as well as with areas that have no other restrictions.

**Total Maximum Daily Load -** An estimate of the total quantity of pollutants (from point, nonpoint, and natural sources) allowed into waters without exceeding applicable water quality criteria.

**Traditional Cultural Property -** A property that derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community. A traditional cultural property may qualify for the National Register if it meets the criteria and criteria exceptions in 36 CFR 60.4.

**Trail -** A linear route managed for human power (e.g., hiking or bicycling), stock (e.g., equestrian), or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Transmission -** The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to consumers, or is delivered to other electric systems. Transmission is considered to end when the energy is transformed for distribution to the consumer.

**Transmission line (large) -** An electrical utility line with a capacity greater than or equal to 100 kilovolts or a natural gas, hydrogen, or water pipeline greater than or equal to 24 inches in diameter.

**Transportation system -** The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

**Travel management areas -** Polygons or delineated areas where a rational approach has been taken to classify areas open, closed or limited, and have identified and/or designated a network of roads, trails, ways, landing strips, and other routes that provide for public access and travel across the planning area. All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations (BLM Handbook H-1601-1, Land Use Planning Handbook).

**Trespass -** Any unauthorized use of public land.

CHAPTER 7 - GLOSSARY

**Tribal interests -** Native American or Native Alaskan economic rights such as Indian trust assets, resource uses and access guaranteed by treaty rights, and subsistence uses.

**Utility corridor -** Tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**Vacant or Unknown Habitat -** Suitable habitat for sage-grouse that is separated (not contiguous) from occupied habitat that either (1) has not been adequately inventoried, or (2) has not had documentation of grouse presence in the past 10 years.

**Valid existing rights -** Documented, legal rights or interests in the land that allow a person or entity to use said land for a specific purpose and that are still in effect. Such rights include but are not limited to fee title ownership, mineral rights, rights-of-way, easements, permits, and licenses. Such rights may have been reserved, acquired, leased, granted, permitted, or otherwise authorized over time.

**Vegetation treatments -** Management practices which change the vegetation structure to a different stage of development. Vegetation treatment methods include managed fire, prescribed fire, chemical, mechanical, and seeding.

**Visitor day -** Twelve visitor hours that may be aggregated by one or more persons in single or multiple visits.

**Visitor use -** Visitor use of a resource for inspiration, stimulation, solitude, relaxation, education, pleasure, or satisfaction.

**Visual Resource Management (VRM) classes -** Visual resource management classes define the degree of acceptable visual change within a characteristic landscape. A class is based on the physical and sociological characteristics of any given homogeneous area and serves as a management objective. Categories assigned to public lands based on scenic quality, sensitivity level, and distance zones. Each class has an objective which prescribes the amount of change allowed in the characteristic landscape.

**Watershed -** Topographical region or area delineated by water draining to a particular watercourse or body of water.

**West Nile virus -** A virus that is found in temperate and tropical regions of the world and most commonly transmitted by mosquitos. West Nile virus can cause flu-like symptoms in humans and can be lethal to birds, including sage-grouse.

**Wildcat well -** An exploratory oil well drilled in land not known to be an oil field.

**Wilderness -** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements and generally appear to have been affected primarily by the forces of nature.

**Wilderness characteristics -** Wilderness characteristics attributes include the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include supplemental values. Lands with wilderness characteristics are those lands that have been inventoried and determined by the BLM to contain wilderness characteristics as defined in section 2(c) of the Wilderness Act.

**Wilderness Study Area** - The Federal Land Policy and Management Act of 1976 directed the Bureau to inventory and study its roadless areas for wilderness characteristics. To be designated as a Wilderness Study Area, an area had to have the following characteristics:

- Size - roadless areas of at least 5,000 acres of public lands or of a manageable size;
- Naturalness - generally appears to have been affected primarily by the forces of nature;
- Opportunities - provides outstanding opportunities for solitude or primitive and unconfined types of recreation.

**Wildland fire -** Any fire, regardless of ignition source, that is burning outside of a prescribed fire and any fire burning on public lands or threatening public land resources, where no fire prescription standards have been prepared.

**Wildland-Urban Interface (WUI) -** An area within or adjacent to an at risk community that has been identified by a community in its wildfire protection plan or, for areas that do not have such a plan, an area: 1) extending one half mile from the boundary of an at risk community; 2) extending 1½ miles when other criteria are met (such as a sustained steep slope or a geographic feature aiding in creating an effective fire break) or comprised of Condition Class III land; or 3) adjacent to an evacuation route.

**Withdrawal -** An action that restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other federal agencies.

**Woodland –** lands vegetated primarily by juniper and pinyon-pine trees.

# 8. REFERENCES

Aldridge, C. L. and M. S. Boyce. 2007. Linking occurrence and fitness to persistence: habitat-based approach for endangered greater sage-grouse. *Ecological Applications* 17:508-526.

Aldridge, C. L., S. E. Nielsen, H. L. Beyer, M. S. Boyce, J. W. Connelly, S. T. Knick, and M. A. Schroeder. 2008. Range-wide patterns of greater sage-grouse persistence. *Diversity and Distributions* 17:983-994.

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial nesting habitat for Gunnison sage-grouse: a spatially explicit hierarchical approach. *Journal of Wildlife Management* 76(2):391-406.

Anderson, D. C., K. T. Harper, and S. R. Rushforth. 1982. Recovery of cryptogamic soil crusts from grazing on Utah winter ranges. *Journal of Range Management* 35(3).

Archer, S. A. and K. I. Predick. 2008. Climate change and ecosystems of the Southwestern United States. *Rangelands* 30(3): 23-38.

Armour, C. L., D. A. Duff, and W. Elmore. 1991. The effects of livestock grazing on riparian and stream ecosystems. *Fisheries* 16(1): 7-11.

Baker, W. L. 2006. Fire and restoration of sagebrush ecosystems. *Wildlife Society Bulletin* 34:177-185.

Balch, J. K., B. A. Bradley, C. M. D'Antonio, and J. Gomez-Dans. 2012. Introduced annual grass increases regional fire activity across the arid western USA (1980–2009). *Global Change Biology* vol. 19 (1) pp. 173-183.

Barney, M. A. and N. C. Frischeknecht. 1974. Vegetation changes following fire in the pinyon-juniper type of west-central Utah. *Journal of Range Management*, Volume 27, No. 2.

Batchelor, J. L., W. J. Ripple, T. M. Wilson, L. E. Painter. 2015. Restoration of riparian areas following the removal of cattle in the northwestern Great Basin. *Environmental Management* (2015) 55:930-942.

Beck, J. L., J. W. Connelly, and K. P. Reese. 2009. Recovery of greater sage-grouse habitat features in Wyoming big sagebrush following prescribed fire. *Restoration Ecology* 17:393-403.

Beck, J. L. and D. L. Mitchell. 2000. Influences of livestock grazing on sage grouse habitat. *Wildlife Society Bulletin* 28:993-1002.

Beck, J. L., K. P. Reese, J. W. Connelly, and M. B. Lucia (Beck et al). 2006. Movements and survival of juvenile greater sage-grouse in southeastern Idaho. *Wildlife Society Bulletin* 34:1070-1078.

Belnap, J. 1993. Recovery rates of cryptobiotic soil crusts: assessment of artificial inoculant and methods of evaluation. *Great Basin Naturalist* 53, 89-95.

CHAPTER 8 - REFERENCES

Belnap, J., J. H. Kaltenecker, R. Rosentreter, J. Williams, S. Leonard, and D. Eldridge (Belnap et al). 2001. Biological soil crusts: ecology and management. Bureau of Land Management. National Science and Technology Center Technical reference 1730-2.

Belnap, J., R. Prasse, and K. T. Harper (Belnap, Prasse, and Harper). 2001. Influences of biological soil crusts on soil environments and vascular plants. *Biological Studies*, Vol 150: 281-300.

Belsky, A. J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States. *Journal of Soil and Water Conservation* 54: 419-431.

BLM. (See U.S. Department of the Interior, Bureau of Land Management.)

Boyd, C. S. and T. J. Svejcar. 2011. The influence of plant removal on succession in Wyoming big sagebrush. *Journal of Arid Environments* Volume 75, Issue 8.

Boyle, S. A. and D. R. Reeder. 2005. Colorado sagebrush: a conservation assessment and strategy. Grand Junction: Colorado Division of Wildlife.

Braun, C. E. 1998. Sage-grouse Declines in Western North America: What are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies 78:139-56.

Brockway, D. G., R. G. Gatewood, and R. B. Paris. 2002. Restoring grassland savannas from degraded pinyon-juniper woodlands: effects of mechanical overstory reduction and slash treatment alternatives. *Journal of Environmental Management* Volume 64, Issue 2, February 2002.

Brown, J. K. 1982. Fuel and fire behavior prediction in big sagebrush. U.S. Department of Agriculture, Forest Service, Intermountain Forest and Range Experiment Station. Research Paper INT-290. Ogden, UT.

Bryce, S. A., J. R. Strittholt, B. C. Ward, and D. M. Bachelet. 2012. Colorado Plateau Rapid Ecoregional Assessment Report. Prepared for the U.S. Department of the Interior, BLM, Denver.

Budd, B. and J. Thorpe. 2009. Benefits of managed grazing: a manager's perspective. *Society for Range Management* October 2009.

Bui, Thuy-Vy, J. M. Marzluff, and B. Bedrosian. 2010. Common raven activity in relation to land use in western Wyoming: implications for greater sage-grouse reproductive success. *The Condor* 112(1):65-78.

Bui, Thuy-Vy. 2009. The Effects of Nest and Brood Predation by Common Ravens (Corvus corax) on Greater Sage-grouse (Centrocercus urohasianus) in Relation to Land Use in Western Wyoming. Thesis. University of Washington.

Bureau of Land Management. (See U.S. Department of the Interior, Bureau of Land Management.)

Burke, M. J. W. and J. P. Grime. 1996. An experimental study of plant community invasibility. *Ecology* 77: 776-790.

Burkhardt, J. W. and E. W. Tisdale. 1976. Causes of juniper invasion in southwestern Idaho. *Ecology* 57(3):472-484.

Cagney, J., E. Bainter, B. Budd, T. Christiansen, V. Herren, M. Holloran, B. Rashford, M. Smith, and J. Williams (Cagney et al). 2010. Grazing influence, objective development, and management in Wyoming's greater sage-grouse habitat with emphasis on nesting and early brood rearing. *Cooperative Extension Service Bulletin* B-1203, University of Wyoming: Laramie.

Callison, J., J. D. Brotherson, and J. E. Brown. 1985. The effects of fire on the blackbrush (Coleogyne ramisissima) community of southwestern Utah. *Journal of Range Management* 38:535-538.

Candidate Conservation Agreement for the Gunnison Sage-Grouse, *Centrocercus minimus* Gunnison Basin Population (CCA). 2013. Colorado Parks & Wildlife, Gunnison County, Saguache County, U.S. Bureau of Land Management, U.S. Fish and Wildlife Service, U.S. Forest Service, U.S. National Park Service, and U.S. Natural Resources Conservation Service.

Canfield, R. H. 1941. Application of the line interception method in sampling range vegetation. *Journal of Forestry* 39:388-394.

Cardille, J., S. J. Ventura and M. G. Turner. 2001. Environmental and social factors influencing wildfires in the upper Midwest, United States. *Ecological Applications* 11(1), 2001, pp. 111-127.

Carlisle, D. M., D. M. Wolock, and M. R. Meador. 2011. Alteration of streamflow magnitudes and potential ecological consequences: a multiregional assessment. *Frontiers in Ecology and the Environment* 9:264-270.

Carpenter, J., C. Aldridge, and M. S. Boyce. 2010. Sage-grouse habitat selection during winter in Alberta. *Journal of Wildlife Management* 74(8):1806-1814.

Carsey, K., G. Kittel, K. Decker, D. J. Cooper, and D. Culver. 2003. Field Guide to the Wetland and Riparian Plant Associations of Colorado. Colorado Natural Heritage Program: Fort Collins.

Cayan D. R., S. A. Kammerdiener, M. D. Dettinger, J. M. Caprio, and D. H. Peterson. 2001. Changes in the onset of spring in the western United States. *Bulletin of the American Meteorological Society* 82:399-415.

CBS News. Top 10 Fastest Growing States. New York, NY. http://www.cbsnews.com/ media/top-10-fastest-growing-states/ (accessed July 20, 2015).

Centers for Disease Control. 2012. West Nile Virus. http://www.cdc.gov/ncidod/ dvbid/westnile/birds&mammals.htm.

Chambers, J. C., B. A. Roundy, R. R. Blank, S. E. Meyer, and A. Whittaker. 2007. What makes Great Basin sagebrush ecosystems invasible by *Bromus tectorum?*

Chaudhary, V. B., M. A. Bowker, T. E. O'Dell, J. B. Grace, A. E. Redman, M. C. Rillig, and N. C. Johnson. 2009. Untangling the biological contributions to soil stability in semiarid shrublands. *Ecological Applications* 19(1):110-122.

Clark, L. J. Hall, R. McLean, M. Dunbar, K. Klenk, R. Bowen, and C. A. Smeraski. 2006. Susceptibility of greater sage-grouse to experimental infection with West Nile Virus. *Journal of Wildlife Diseases* 42:14-22.

Clary, W. P. and W. C. Leininger. 2000. Stubble height as a tool for management of riparian areas. *Journal of Range Management* 53:562-573.

Coates, P. S. 2007. Greater Sage-Grouse (Centrocercus urophasianus) nest predation and incubation behavior. Idaho State University: Boise.

Coates, P. S. and D. J. Delehanty (Coates and Delehanty).

2010. Nest predation of greater sage-grouse in relation to microhabitat factors and predators. *Journal of Wildlife Management* 74(2):240-248.

2008. Effects of environmental factors on incubation patterns of greater sage-grouse. *The Condor* 110(4):627-638.

Coates, P. S., J. W. Connelly, and D. J. Delehanty. 2008. Predators of greater sage-grouse nests identified by video monitoring. *Journal of Field Ornithology* 79(4):421-428.

Coates, P. S., K. B. Howe, M. L. Casazza, and D. J. Delehanty (Coates et al).

2014a. Common raven occurrence in relation to energy transmission line corridors transiting human-altered sagebrush steppe. *Journal of Arid Environments* V.111, pp.68-78.

2014b. Landscape alterations influence differential habitat use of nesting buteos and ravens within sagebrush ecosystem: Implications for transmission line development. *The Condor* 116(3):341-356.

Colorado Off-Highway Vehicle Coalition. 2009. Economic Contribution of Off-Highway Vehicle Recreation in Colorado. Lakewood.

Colorado Office of Economic Development and International Trade. 2015. Gov. Hickenlooper Establishes Colorado Outdoor Recreation Industry Office; Appoints Luis Benitez as Director. Denver.

Colorado Oil and Gas Conservation Commission (COGCC).

2015. Production and Sales by County Monthly. http://cogcc.state.co.us/ COGCCReports (accessed July 2, 2015).

2014. Colorado Oil and Gas Information System, Production. https://cogcc.state.co.us/ (accessed November 5, 2014).

Colorado Parks and Wildlife (CPW).

2015. 2015 Strategic Plan: Existing Conditions, Trends, and Projections. Denver.

2014a. Colorado Statewide Comprehensive Outdoor Recreation Plan. Denver.

2014b. Data Analysis Unit D-29, Deer Management Plan, Game Management Units 72 and 73.

2014c. Data Analysis Unit D-24, Deer Management Plan, Game Management Units 70, 71, & 711.

2014d. Geographic Information Systems data. Unpublished data. Colorado Department of Natural Resources, Parks and Wildlife, Denver.

2013a. Data Analysis Unit D-21, Deer Management Plan, Game Management Unit 54.

CHAPTER 8 - REFERENCES

2013b. Data Analysis Unit D-22, Deer Management Plan, Game Management Units 55 & 551.

2013c. Data Analysis Unit D-25, Deer Management Plan, Game Management Units 66 & 67.

2012. 2012 Gunnison Basin Gunnison sage-grouse Lek Count Summary and Population Estimate. Colorado Parks & Wildlife, Gunnison Basin, Colorado, USA.

2010a. Data Analysis Unit E-11, Elk Management Plan, Game Management Unit 82.

2010b. Data Analysis Unit D-18, Deer Management Plan.

2010c. Data Analysis Unit D-37, Deer Management Plan, Game Management Unit 82.

2008a. Data Analysis Unit E-26, Elk Management Plan, Game Management Units 68 & 681.

2008b. Data Analysis Unit D-26, Deer Management Plan, Game Management Units 68, 681, & 682.

2005. Data Analysis Unit E-52, Elk Management Plan, Game Management Units 53 & 63.

2001a. Data Analysis Unit E-43, Elk Management Plan, Game Management Units 55 & 551.

2001b. Data Analysis Unit E-54, Elk Management Plan, Game Management Unit 54.

2001c. Data Analysis Unit E-25, Elk Management Plan, Game Management Units 66 & 67.

Colorado Parks and Wildlife, Gunnison County, Saguache County, U.S. Bureau of Land Management, U.S. Fish and Wildlife Service, U.S. Forest Service, U.S. National Park Service, and U.S. Natural Resources Conservation Service (CCA). 2013. Candidate Conservation Agreement for the Gunnison Sage-Grouse, *Centrocercus minimus* Gunnison Basin Population (CCA).

Colorado Rangeland Monitoring Guide. 2011.

Colorado State Demography Office. 2014. Population Totals for Colorado and Sub-State Regions. Final Estimates – years (1985 to 2013). https://dola.colorado.gov/ demog_webapps/psParameters.jsf (accessed February 7, 2015).

Colorado State Department of Local Affairs. 2012. Population Forecasts. Denver, CO.

Colorado Weed Management Association. 2012. Noxious Weed Information. http://www.cwma.org/noxweeds.html (accessed April 23, 2015).

Commission for Environmental Cooperation (CEC). 2012. Invasive Species. The Northern American Mosaic: An Overview of Key Environmental Issues. Commission for Environmental Cooperation document. p. 1-4.

Connelly, J. W. and C. E. Braun. 1997. Long-term changes in sage-grouse Centrocercus urophasianus populations in western North America. *Wildlife Biology* 3:229-234.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation Assessment of Greater Sage-Grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to manage sage grouse populations and their habitats. *Wildlife Society Bulletin* 28:967-985.

Connelly, J. W., C. A. Hagen, and M. A. Schroeder. 2011a. Characteristics and dynamics of greater sage-grouse populations. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*, pp. 53-67, S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology Volume 38, University of California Press: Berkeley.

Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. *Station Bulletin* 80, University of Idaho: Moscow.

Connelly, J. W., E. T. Rinkes, and C. E. Braun. 2011b. Characteristics of Greater Sage-Grouse habitats: a landscape species at micro- and macroscales, pp. 69-83 in S.T. Knick and J.W. Connelly (editors). *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*. Studies in Avian Biology (vol. 38), University of California Press: Berkeley.

Cook, B. 2012. The Economic Contribution of CO2 Enhanced Oil Recovery in Wyoming's Economy. Enhanced Oil Recovery Institute: Laramie, WY. 43 p.

Cordell, Ken H., et al 2008. Off-Highway Vehicle Recreation in the United States and its Regions and States: An Update National Report from the National Survey on Recreation and the Environment (NSRE). www.fs.fed.us/recreation/programs/ ohv/IrisRec1rpt.pdf (accessed June 30, 2015).

Council on Environmental Quality (CEQ).

1997. Environmental Justice, Guidance Under the National Environmental Policy Act. Washington, DC. December 10, 1997. 40 p. http://ceq.hss.doe.gov/nepa/regs/ej/ej.pdf.

1981. Forty Most Asked Questions Concerning CEQ's NEPA Regulations. March 23, 1981.

Cronk, Q. and J. Fuller. 1995. Plant Invaders: The threat to natural ecosystems. Chapman & Hall. New York.

Daubenmire, Rexford. 1959. A canopy-coverage method of vegetation analysis. Northwest Science 33:43-64.

Davies, L. W., J. D. Bates and A. M. Nafus. 2011. Are there benefits to mowing Wyoming big sagebrush plant communities? An evaluation in southeastern Oregon. *Environmental Management* 48: 539-546.

Davis, J. N. and K. T. Harper. 1990. Weedy Annuals and Establishment of Seeded Species on a Chained Juniper-Pinyon Woodland in Central Utah. Proceedings-Symposium on Cheatgrass Invasion, Shrub Die-off, and Other Aspects of Shrub Biology and Management. United States Department of Agriculture, Forest Service, Intermountain Research Station General Technical Report INT-276.

DeBano, L. F. and L. J. Schmidt. 1989. Improving southwestern riparian areas through watershed management. General Technical Report RM 182-182. USDA Forest Service Rocky Mountain Forest and Range Experiment Station. Fort Collins, CO. 33 pp.

Deisenroth, D., J. Loomis, and C. Bond. 2009. Non-Market Valuation of Off-Highway Vehicle Recreation in Larimer County, Colorado: implications of trail closures. *Journal of Environmental Management* 90(11): 3490-3497.

CHAPTER 8 - REFERENCES

Deseret News. 2015. Utah Growth Rate Soaring. Salt Lake City. http://www.deseretnews.com/article/600128008/Utah-growth-rate-soaring.html?pg=all (accessed July 28, 2015).

Dether, D. 2005.  Prescribed Fire Lessons Learned. Escape prescribed fire reviews and near miss incidents. Report prepared for Wildland Fire Lessons Learned Center. http://training.nwcg.gov/pre-courses/rx301/Rx_Fire_LL_Escapes_Review.pdf (accessed July 30, 2015).

Dinkins, Jonathan B., M. R. Conover, C. P. Kirol, J. L. Beck, and S. N. Frey. 2014. Greater Sage-grouse (Centrocercus Urophasianus) hen survival: Effects of raptors, anthropogenic and landscape features, and hen behavior. Canadian Journal of Zoology 92:319–330.

Dinkins, Jonathan B., M. R. Conover, C. P. Kirol and J. L. Beck. 2012. Greater Sage-grouse (Centrocercus urophasianus) Select Nest Sites and Brood Sites Away from Avian Predators. The Auk 129(4)600-610.

Dodson, E. K. and C. E. Fiedler. 2006. Impacts of restoration treatments on alien plant invasion in Pinus ponderosa forests, Montana. Journal of Applied Ecology Vol. 43 Issue 5.

Doherty, K. E., D. E. Naugle, and B. L. Walker. 2010. Greater sage-grouse nesting habitat: the importance of managing at multiple scales. Journal of Wildlife Management 74:1544-1553.

Doherty, K. E., D. E. Naugle, B. L. Walker, and J. M. Graham. 2006. Greater sage-grouse winter habitat selection and energy development. Journal of Wildlife Management 72(1): 187-195.

Doherty, K. E., D. E. Naugle, and J. S. Evans. 2010. A currency for offsetting energy development impacts: horse-trading sage-grouse on the open market. PLoS ONE 5(4): e10339. doi:10.1371/journal.pone.0010339

Dolores County. 2014. Social and Economic Considerations. Board of County Commissioners: Dove Creek, CO. 7 p.

Driver, B. L., (Ed.). 2008. Managing to Optimize the Beneficial Outcomes of Recreation. State College, PA: Venture.

Dunk, Jeffery R., R. N. Smith and S. L. Cain. 1997. Nest-site selection and reproductive success in common ravens. The Auk 114(1): 116-120.

Dzialak, M. R., C. V. Olson, S. M. Harju, S. L. Webb, and J. B. Winstead. 2012. Temporal and hierarchical spatial components of animal occurrence: conserving seasonal habitat for greater sage-grouse. Ecosphere 3(4):30. http://dx.doi.org/10.1890/ES11-00315.1

Eiswerth, M. E. and J. S. Shonkwiler. 2006. Examining post-wildfire reseeding on arid rangeland: a multivariate tobit modeling approach. Ecological Modeling 192:286-298.

Ellis, K. L. 1984. Behavior of lekking sage-grouse in response to a perched golden eagle. Western Birds 15:37-38.

Ellis, K. L. 1985. Effects of a new transmission line on distribution and aerial predation of breeding male sage grouse. 28 pp. Final Report for Deseret Generation and Transmission Cooperative. Sandy, UT.

CHAPTER 8 - REFERENCES

Endangered and Threatened Wildlife and Plants; Determination for the Gunnison sage-grouse as a
        Threatened or Endangered Species; Notice of the results of the status review. 75 Federal Register
        187 (28 September 2010) pp. 59804-59863.

Enz, John W. 2003. North Dakota Topographic, Climatic, and Agricultural Overview. January 2003.

Erdman, J. A. 1970. Pinyon-juniper succession after natural fires on residual soils of Mesa Verde,
        Colorado. *Brigham Young University Science Bulletin*, Biological Series Volume 11, No. 2. June, 1970.

Evans, C. C. 1986. The relationship of cattle grazing to sage-grouse use of meadow habitat on the
        Sheldon National Wildlife Refuge. Thesis, University of Nevada: Reno.

Federal Interagency Council on Outdoor Recreation. 2015. Outdoor Recreation: Jobs and Income.
        Washington, DC. http://www.fs.fed.us/research/docs/outdoor-recreation/recreation-economy.pdf
        (accessed May 12, 2015).

Federal Register Notices. (See originating agency.)

Finney, M. A. 2001. Design of regular landscape fuel treatment patterns for modifying fire growth and
        behavior. *Forest Science* 47 (2) 2001.

Fire Effects Information System (FEIS).

        2015. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire
        Sciences Laboratory (Producer). http://www.fs.fed.us/database/feis/ (accessed July 30, 2015).

        2005. Potential Natural Vegetation Groups. Final Document 9-30-2005.
        http://www.fs.fed.us/database/feis/pdfs/PNVGs/Southwest/R3PIJUff.pdf (accessed June 18, 2015).

Fish and Wildlife Service.  (See U.S. Department of the Interior, Fish and Wildlife Service.)

Forman R. T. T. and L. E. Alexander. 1998. Roads and their major ecological effects. *Annual Review of
        Ecology and Systematics* 29, pp. 207-231.

Fowler, N. 1986. The role of competition in plant communities in arid and semi-arid regions. *Annual
        Review of Ecology and Systematics* 1986 17:89-110. Annual Reviews Inc.

Fuhlendorf, S. D. and D. M. Engle. 2001. Restoring heterogeneity on rangelands: ecosystem management
        based on evolutionary grazing patterns. *BioScience* 51(8): 625-632.

Gartner, W.C., and Lime, D.W. (Eds.). (2000). Trends in Outdoor Recreation, Leisure and Tourism. St.
        Paul, MN: CABI.

Garton, E. O., J. W. Connelly, J. S. Horne, C. A. Hagen, A. Moser, and M. Schroder. 2011. Greater sage-
        grouse population dynamics and probability of persistence. *Greater Sage-Grouse: Ecology and
        Conservation of a Landscape Species and Its Habitats*, pp. 293-382. S. T. Knick and J. W. Connelly,
        editors. Studies in Avian Biology 38. University of California Press: Berkeley.

Getz, H. L.  and W. L. Baker. 2008. Initial invasion of cheatgrass (Bromus tectorum) into burned pinyon-
        juniper woodlands in western Colorado. *American Midland Naturalist* Vol. 159, No. 2 (April 2008)
        pp. 489-497.

CHAPTER 8 - REFERENCES

Gibbons P. and D. B. Lindenmayer. 2007. Offsets for land clearing: no net loss or the tail wagging the dog? *Ecological Management and Restoration* 8: 26-31.

Gifford, G. F. and R. H. Hawkins. 1978. Hydrologic impact of grazing on infiltration: a critical review. *Water Resources Research* 12(2):305-313.

Golden Valley County. 2012. Golden Valley County Comprehensive Plan Update: 2012.

Gordon, E. and D. Ojima, eds. 2015. Colorado Climate Change Vulnerability Study. A report submitted to the Colorado Energy Office. Western Water Assessment and Colorado State University.

Grahame, J. D. and T. D. Sisk, editors. 1999-2002. Canyons, cultures and environmental change: An introduction to the land-use history of the Colorado Plateau. Center for Environmental Sciences and Education, Northern Arizona University, Flagstaff. http://www.cpluhna.nau.edu/Biota/wildfire.htm (accessed April 23, 2015).

Gregory, A. J. and J. L. Beck. 2014. Spatial Heterogeneity in Response of Male Greater Sage-grouse Lek Attendance to Energy Development. PLoS ONE 9(6): e97132.

Gunnison County. 2014. Gunnison County Economic Indicators Report, August 2014 Working Draft. Community Development Department: Gunnison, CO.

Gunnison Sage-grouse Rangewide Steering Committee (GUSGRSC). 2005. Gunnison Sage-grouse Rangewide Conservation Plan. Colorado Division of Wildlife: Denver.

Hagen, C. A., J. W. Connelly, and M. A. Schroeder. 2007. A meta-analysis for greater sage-grouse nesting and brood rearing habitats. *Wildlife Biology* 13 Supplement 1:42-50.

Hagen, C. A. 2010. Impacts of energy development on prairie grouse ecology: a research synthesis. Transactions of North American Wildlife and Natural Resource Conference 75:96-103.

Hann, W. J. and D. L. Bunnell. 2001. Fire and land management planning and implementation across multiple scales. *International Journal of Wildland Fire* 10:389-403.

Hann, W. J. and D. J. Strohm. 2003. Fire regime condition class and associated data for fire and fuels planning: methods and applications. *Fire, Fuel Treatments, and Ecological Restoration: Conference Proceedings*. U.S. Forest Service Proceedings RMRS-P-29.

Hann, W., A. Shlisky, D. Havlina, K. Schon, S. Barrett, T. DeMeo, K. Pohl, J. Menakis, D. Hamilton, J. Jones, and M. Levesque. 2008. Interagency Fire Regime Condition Class Guidebook. Version 1.3.0. http://www.frcc.gov.

Hanophy, W. 2009. Fencing with Wildlife in Mind. Colorado Division of Wildlife: Denver. 36 pp.

Harju, S. M., M. R. Dzialak, R. C. Taylor, L. D. Hayden-Wing, and J. B. Winstead. 2010. Thresholds and time lags in effects of energy development on greater sage-grouse populations. *Journal of Wildlife Management* 74(3):437-448.

Harrington, J. B. and R. E. Donnelly. 1978. Fire probabilities in Ontario's boreal forest. American Meteorological Society and the Society of American Foresters, pp. 1-4. Proceedings of the fifth

joint conference on fire and forest meteorology. Atlantic City, New Jersey 14-16 March 1978. American Meteorological Society: Boston.

Harrod, R. J. 2001. The effect of invasive and noxious plants on land management in eastern Oregon and Washington. *Northwest Science* 75, 85-89.

Herman-Brunson K. 2007. Nesting and Brood Rearing Habitat Selection of Greater Sage-Grouse and Associated Survival of Hens and Broods at the Edge of their Historic Distribution. Master's thesis, South Dakota State University. http://pubstorage.sdstate.edu/wfs/thesis/Herman-Brunson-Katie-M-M-S-2007.pdf.

Hess, J. E. and J. L. Beck. 2012. Disturbance factors influencing greater sage-grouse lek abandonment in north-central Wyoming. *Journal of Wildlife Management* 76(8):1625-1634.

High Country News.

2015a. Special Outdoor Recreation Issue. Paonia, CO.

2015b. Wilderness as therapist. Paonia, CO. https://www.hcn.org/issues/47.3/ wilderness-as-therapist (accessed July 12, 2015).

Hilty, J., D. J. Eldridge, R. Rosentreter, M. C. Wicklow-Howard, and M. Pellant. 2004. Recovery of biological soil crusts following wildfire in Idaho. *Journal of Range Management* 57: 89–96 January 2004.

Hobbs, R. J. and L. F. Huenneke. 1992. Disturbance, diversity, and invasion: implications for conservation. *Conservation Biology* 6, 324-337.

Holechek, J. L.

1988. An approach for setting the stocking rate. *Rangelands* 10(1):10-14.

1981. Livestock grazing impacts on public lands: a viewpoint. *Journal of Range Management* 34(3): 251-254.

Holechek, J. L., R. D. Pieper, and C. H. Herbel. 1989. Range Management Principles and Practices. Prentice-Hall, Inc. Englewood Cliffs, New Jersey. 501 pp.

Holloran, M. J. 2005. Greater Sage-Grouse (Centrocercus urophasianus) Population Response to Natural Gas Field Development in Western Wyoming. Dissertation, Department of Zoology and Physiology, University of Wyoming: Laramie.

Holloran, M. J., R. C. Kaiser, and W. A. Hubert.

2010. Yearling greater sage-grouse response to energy development in Wyoming. *Journal of Wildlife Management* 74(1): 65-72.

2007. Population response of Yearling Greater sage-grouse to the infrastructure of Natural Gas Fields in Southwestern Wyoming. Completion Report USGS, Wyoming Game and Fish Cooperative Fish and Wildlife Research Unit: Laramie.

CHAPTER 8 - REFERENCES

Hood, S. M., D. Long, M. Miller and K. C. Ryan. 2007. Introduction in: Fire ecology and management of the major ecosystems of southern Utah. Gen. Tech. Rep. RMRS-GTR-202, S. M. Hood and M. Miller, editors. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 1-5.

Howe, K. B. and P. S. Coates. 2015. Observations of territorial breeding common ravens caching eggs of greater sage-grouse. *Journal of Fish and Wildlife Management* 5(2).

Howe, K. B., P. S. Coates, and D. J. Delehanty. 2014. Selection of anthropogenic features and vegetation characteristics by nesting Common Ravens in sagebrush ecosystem. *The Condor* 116(1):35-49.

Huenneke L. F., S. P. Hamburg, R. Koide, H. A. Mooney and P. M. Vitousek. 1990. Effects of soil resources on plant invasion and community structure in Californian serpentine grassland. *Ecology* 71:478-491.

Hughes, R.M., Kaufmann, P.R., and M.H. Weber. 2011. Strahler order versus stream size. Journal of the North American Benthological Society 30:103-121.

Husby, P. 2007. Livestock Spring Developments and Wetland Policy. USDA Natural Resources Conservation Service. Conservation Planning Technical Note No. MT-13 (rev. 1) May 2007.

IMPLAN. 2012. IMPLAN Professional Version 3.0, 2012 Data.

IMPROVE. 2011. Spatial and Seasonal Patterns and Temporal Variability of Haze and its Constituents in the United States: Report V. Interagency Monitoring of Protected Visual Environments (IMPROVE). June 2011.

Industrial Economics, Incorporated (IEc). 2013. Draft Economic Analysis of Critical Habitat Designation for the Gunnison Sage-Grouse. Prepared for U.S. Fish and Wildlife Service: Arlington, VA. 204 pp.

Intergovernmental Panel on Climate Change (IPCC). 2007. Climate Change 2007: The Physical Science Basis: Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. Solomon, S. D. et al, editors. Cambridge University Press: New York. 996 pp. http://www.ipcc.ch/

International Mountain Bicycling Association (IMBA). 2015. Demographics of Mountain Biking. https://www.imba.com/resources/research/demographics-mountain-biking (accessed August 7, 2015).

Johansen, J. R. 2001. Impacts of fire on biological soil crusts. pp. 385–400. In: J. Belnap and O. Lange (eds.) Biological soil crusts: structure, management and function. Ecological studies 150. Springer-Verlag, Berlin.

Johnson, D. H., M. J. Holloran, J. W. Connelly, S. E. Hanser, C. L. Amundson, and S. T. Knick. 2011. Influences of environmental and anthropogenic features on Greater Sage-Grouse populations, 1997-2007. Pp. 407-450 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

CHAPTER 8 - REFERENCES

Johnson, T. N., P. L. Kennedy and M. A. Etterson. 2012. Nest success and cause-specific nest failure of grassland passerines breeding in prairie grazed by livestock. *The Journal of Wildlife Management* 76(8):1607–1616.

Jones, J. and D. Termenstein. 2013. Fire Regime Condition Class Mapping Tool User's Guide. Version 3.1.0 Wildland Fire Management R, D and A.

Kauffman, J. B. 1988. The status of riparian habitats in Pacific northwest forests, pp. 45–55. *Streamside Management: Riparian Wildlife and Forestry Interactions*. Institute of Forest Resources Contribution 59, K. J. Raedeke, editor. University of Washington: Seattle.

Kazcor, N. 2008. Nesting and Brood-rearing Success and Resource Selection of Greater Sage-grouse in Northwestern South Dakota. Master's thesis, South Dakota State University. http://pubstorage.sdstate.edu/wfs/thesis/Kaczor-Nicholas-W-M-S-2008.pdf.

Kelly, J. P., K. L. Etienne, and J. E. Roth. 2005. Factors influencing the nest predatory behaviors of common ravens in heronries. *The Condor* 107: 402–415.

Kiesecker et al 2010. Energy by design: making mitigation work for conservation and development, pp. 159–181. *Energy Development and Wildlife Conservation in Western North America*, D. E. Naugle, editor. Island Press: Washington, DC.

Kinch, G. 1989. Riparian Area Management: Grazing management in riparian areas. USDI BLM Technical Reference TR 1737-4.

Knapp, P. A. 1996. Cheatgrass (Bromus tectorum L.) dominance in the Great Basin Desert: history, persistence and influences to human activities. *Global Environmental Change* Vol. 6, Issue 1. April 1996.

Knick, S. T. 2011. Historical development, principal federal legislation and current management of sagebrush habitats: implications for conservation, pp. 13–31. Greater Sage-Grouse: Ecology of a Landscape Species and Its Habitats, S. T. Knick and J. W. Connelly, editors. Cooper Ornithological Union, University of California Press: Berkeley.

Knick, S. T. and J. W. Connelly, editors. 2011. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. *Studies in Avian Biology* 38. University of California Press: Berkeley.

Knick, S. T. and J. W. Connelly. 2011. Greater sage-grouse and sagebrush: an introduction to the landscape, pp. 1-9. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*, S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology (vol. 38), University of California Press: Berkeley.

Knick, S. T. and S. E. Hanser. 2011. Connecting pattern and process in greater sage-grouse populations and sagebrush landscapes, pp. 383-405. *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*. S. T. Knick and J. W. Connelly, editors. Studies in Avian Biology (vol. 38), University of California Press: Berkeley.

Knight, R. L. and M. W. Call. 1980. The Common Raven. BLM Technical Note 344.

Koniak, S. 1985. Succession in pinyon-juniper woodlands following wildfire in the Great Basin. *The Great Basin Naturalist* Vol. 45, No. 3.

CHAPTER 8 - REFERENCES

Kruse, R., E. Bend, and P. Bierzychudek. 2004. Native plant regeneration and introduction of non-natives following post-fire rehabilitation with straw mulch and barley seeding.

LANDFIRE.

2015. Miller, M. E., R. T. Belote, M. A. Bowker, and S. L. Garman. 2011. Alternative states of a semiarid grassland ecosystem: Implications for ecosystem services. *Ecosphere* 2(5):1-18 http://www.landfire.gov/index.php (accessed March 5, 2015).

2010. US_110VCC Metadata. http://landfire.cr.usgs.gov/distmeta/servlet/ gov.usgs.edc.MetaBuilder?TYPE=HTML&DATASET=F4T (accessed June 10, 2015).

2009. http://landfire.gov/NationalProductDescriptions10.php (accessed June 8, 2015).

LeBeau, C. W. 2012. Evaluation of greater sage-grouse reproductive habitat and response to wind energy development in south-central Wyoming. Master's Thesis. University of Wyoming: Laramie.

Lockyer, Z. B., P. S. Coates, M. L. Casazza, S. Espinosa, and D. J. Delehanty. 2013. Greater sage-grouse nest predators in the Virginia mountains of northwestern Nevada. *Journal of Fish and Wildlife Management* 4(2):242–254.

Long, et. al. 2010. The Principal Rare Earth Element Deposits of the United States—A Summary of Domestic Deposits and a Global Perspective.

Lyon, L. A. and S. H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. *Wildlife Society Bulletin* 31:486–491.

Lyons, J. E., et al 2008. Monitoring in the context of structured decision-making and adaptive management. *Journal of Wildlife Management* 72(8):1683–1692.

Main, W. A. and D. A. Haines. 1974. The causes of fires on northeastern national forests. U.S. Forest Service Research Paper NC-102.

Manier, D. J., D. J. A. Wood, Z. H. Bowen, R. M. Donovan, M. J. Holloran, L. M. Juliusson, K. S. Mayne,, S. J. Oyler-McCance, F. R. Quamen, D. J. Saher, and A. J. Titolo. 2013. Summary of Science, Activities, Programs and Policies that Influence the Rangewide Conservation of Greater Sage-Grouse (Centrocercus urophasianus). U.S. Geological Survey Open-File Report 2013-1098. Fort Collins, Colorado.

Manzer, D. L. and S. J. Hannon. 2005. Relating grouse nest success and corvid density to habitat: a multi-scale approach. *Journal of Wildlife Management* 69(1):110–123.

McKenney, B. 2005. Environmental Offset Policies, Principles, and Methods: A Review of Selected Legislative Frameworks. Amherst, NH: Biodiversity Neutral Initiative.

Meinke, C. W., S. T. Knick, and D. A. Pyke. 2009. A spatial model to prioritize sagebrush landscapes in the intermountain west (USA) for restoration. *Restoration Ecology* 17:652-659.

Milchunas, D. G., O. E. Sala, and W. K. Lauenroth. 1988. A generalized model of the effects of grazing by large herbivores on grassland community structure. *The American Naturalist* 132(1):87-106.

CHAPTER 8 - REFERENCES

Miller, M. E., R. T. Belote, M. A. Bowker, and S. L. Garman. 2011. Alternative states of a semiarid grassland ecosystem: Implications for ecosystem services. *Ecosphere* 2(5):1–18. http://www.landfire.gov/index.php (accessed March 5, 2015).

Miller, R. F. and L. L. Eddleman. 2001. Spatial and Temporal Changes of Sage Grouse Habitat in the Sagebrush Biome. Oregon State University Agricultural Experiment Station. Technical Bulletin 151. Corvallis, OR. 39 pp. http://greatbasin.wr.usgs.gov/ LWG/Floristic_Provinces.asp.

Monsen, S. B., R. Stevens, and N. L. Shaw. 2004. Restoring Western Ranges and Wildlands General Technical Report RMRS-GTR-136. Vol. 1. 294 pp.

National Atmospheric Deposition Program/National Trends Network. 2012. NTN Site ND00 interactive trend plots. http://nadp.sws.uiuc.edu/sites/ntn/ NTNtrends.html?siteID=ND00 (accessed January 16, 2013).

National Audubon Society. 2010. The Christmas Bird Count Historical Results. http://www.christmasbirdcount.org [20150618]

National Park Service (NPS). 2009. Air Resources Division. Air quality in national parks: 2008 annual performance and progress report. Natural Resource Report NPS/NRPC/ARD/NRR—2009/151. National Park Service: Denver.

National Renewable Energy Laboratory.

2012a. Classes of Wind Power Density at 10m and 50m. http://rredc.nrel.gov/ wind/pubs/atlas/tables/1-1T.html (accessed December 2012).

2012b. Fuel from the Sky: Solar Power's Potential for Western Energy Supply. http://www.nrel.gov/csp/pdfs/32160.pdf (accessed December 2012).

2011. Estimates of Windy Land Area and Wind Energy Potential, by State, for Areas >=30% Capacity at 80m. Updated April 13, 2011. http://www.windpoweringamerica.gov/filter_detail.asp?itemid=2542 (accessed May 3, 2013).

National Research Council (NRC).

2010. Climate Stabilization Targets: Emissions, Concentrations, and Impacts over Decades to Millennia. NRC of the National Academies, p. 180. Prepublication version released July 16. http://www.nap.edu/catalog.php?record_id=12877

2002. Riparian areas: functions and strategies for management. National Academy of Science. Washington, DC.

Natural Resources Conservation Service (NRCS). 2012. Applying the Sage-Grouse Fence Collision Risk Tool to Reduce Bird Strikes. November 2012. http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1049415.pdf

Nature Conservancy, The.

2015. http://www.nature.org/ourinitiatives/regions/northamerica/unitedstates/ colorado/colorado-simple-structures-help-wildlife.xml (accessed June 5, 2015).

2011. Gunnison Basin Climate Change Vulnerability Assessment for the Gunnison Climate Working Group.

NatureServe. 2014. NatureServe Explorer. http://explorer.natureserve.org/ (accessed January 21, 2015).

Naugle D. E., K. E. Doherty, B. L. Walker, M. J. Holloran, and H. E. Copeland. 2011. Energy development and greater sage-grouse, pp. 489-504. *Greater Sage-Grouse: Ecology of a Landscape Species and Its Habitats*, S. T. Knick and C. J. W., editors. Cooper Ornithological Union, University of California Press: Berkeley.

Neff, J. C., R. L. Reynolds, J. Belnap, and P. Lamothe. 2005. Multi-decadal impacts of grazing on soil physical and biogeochemical properties in southeast Utah. *Ecological Application* 15(1) 2005.

Obama, B. H. 2010. America's Great Outdoors [Presidential Memorandum]. Washington, DC.

Office of Natural Resources Revenue (ONRR). 2014. County-level Leasable Sales Volume, Value, and Royalties. Department of the Interior: Washington, DC.

Our Public Lands. 2015. Colorado. http://www.ourpubliclands.org/public-lands-report-co (accessed July 12, 2015).

Outdoor Foundation. 2014. Outdoor Participation Report. Washington, DC.

Outdoor Industry Association. 2012. The Outdoor Recreation Economy. Boulder, CO. https://outdoorindustry.org/pdf/OIA_OutdoorRecEconomyReport2012.pdf (accessed July 8, 2015).

Oyler-McCance, S. J., K. P. Burnham, and C. E. Braun. 2001. Influence of changes in sagebrush on Gunnison sage-grouse in southwestern Colorado. *The Southwestern Naturalist* 46(3):323-331.

Painter, T. H., A. P. Barrett, C. C. Landry, J. C. Neff, M. P. Cassidy, C. R. Lawrence, K. E. McBride, and G. L. Farmer. 2007. Impact of disturbed desert soils on duration of mountain snow cover. *Geophysical Research Letters* Vol. 34, L12502, doi:10.1029/2007GL030284, 2007.

Pellant, M., P. Shaver, D. Pyke, and J. Herrick. 2005. Interpreting indicators of rangeland health Version 4. *BLM Technical Reference* 1734-6.

Peppin, D., P. Z. Fulé, C. H. Sieg, J. L. Beyers, and M. E. Hunter. 2010. Post-wildfire seeding in forests of the western United States: an evidence-based review. *Forest Ecology and Management* 260.

Pitman, J. C., C. A. Hagen, R. J. Robel, T. M. Loughin, and R. D. Applegate. 2005. Location and success of lesser prairie-chicken nests in relation to vegetation and human disturbance. *Journal of Wildlife Management* 68(3):1259-1269.

Poff, B., K. A. Koestner, D. G. Neary, and V. J. Henderson. 2011. Threats to riparian ecosystems in western North America: an analysis of existing literature. *Journal of the American Water Resources Association* 1-14.

Prather, P. R. and T. A. Messmer. 2009. Raptor and corvid response to power distribution line perch deterrents in Utah. *Journal of Wildlife Management* 74(4):796-800.

CHAPTER 8 - REFERENCES

Pruett, C. L., Patten, M. A., and D. H. Wolfe. 2009. Avoidance behavior by prairie grouse: implications for development of wind energy. *Conservation Biology* 23(5):1253-1259.

Radle, A. L. 2007. The effect of noise on wildlife: a literature review. World Forum for Acoustic Ecology Online Reader. http://interact.uoregon.edu/MediaLit/wfae/library/articles/radle_effect_noise_wildlife.pdf

Ranglack, D. H., S. Durham, and J. T. du Toit. 2015. Competition on the range: science vs. perception in a bison-cattle conflict in the western USA. *Journal of Applied Ecology* 52:467-474.

Reinhart, E. D., R. E. Keane, D. E. Calkin and J. D. Cohen. 2008. Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States. *Forest Ecology and Management* 256.

Romme, W. H., C. D. Allen, J. D. Bailey, W. L Baker, B. T. Bestelmeyer, P. M. Brown, K. S. Eisenhart, M. L. Floyd, D. W. Huffman, B. F. Jacobs, R. F. Miller, E. H. Muldavin, T. W. Swetnam, R. J. Tausch and P. J. Weisberg. 2009. Historical and modern disturbance regimes, stand structures, and landscape dynamics in pinyon-juniper vegetation of the western United States. *Rangeland Ecology and Management* 62(3).

Rosgen, D. L. 1996. A Geomorphological Approach to Restoration of Incised Rivers. Proceedings of the Conference on Management of Landscapes Disturbed by Channel Incision, 1997.

Roth, J. E., J. P. Kelly, W. J. Sydeman, and M. A. Colwell. 2004. Sex differences in space use of breeding common ravens in western Marin County, California. *The Condor* 106(3):529-539.

Roundy, B. A., R. F. Miller, R. J. Tausch, K. Young, A. Hulet, B. Jessop, J. Chambers, and D. Effett. 2014. Understory cover responses to pinyon-juniper treatments across tree dominance gradients in the Great Basin. *Rangeland Ecology and Management* Vol. 67, No. 5.

Safe Harbor Agreements and Candidate Conservation Agreements with Assurances; Final Policy. 64 Federal Register 116 (17 June 1999) pp. 32705-32716.

Sage-Grouse National Technical Team (NTT). 2011. A Report on National Greater Sage-Grouse Conservation Measures. December 2011.

Sauer, J. R., J. E. Hines, J. E. Fallon, K. L. Pardieck, D. J. Ziolkowski, Jr., and W. A. Link. 2014. The North American Breeding Bird Survey, Results and Analysis 1966–2012. Version 02.19.2014 USGS Patuxent Wildlife Research Center, Laurel, MD.

Sawyer, H., M. J. Kauffman, and R. M. Nielson. 2009. Influence of well pad activity on winter habitat selection patterns of mule deer. *Journal of Wildlife Management* 73:1052-1061.

Sawyer, H., R. M. Nielson, F. G. Lindzey, L. Keith, J. H. Powell, and A. A. Abraham. 2007. Habitat selection of Rocky Mountain elk in a nonforested environment. *Journal of Wildlife Management* 71(3): 868-874.

Schroeder, M. A. and R. K. Baydack. 2001. Predation and the management of prairie grouse. *Wildlife Society Bulletin* 29(1): 24-32.

CHAPTER 8 - REFERENCES

Schroeder, M. A., C. L. Aldridge, A. D. Apa, J. R. Bohne, C. E. Braun, S. D. Bunnell, J. W. Connelly, P. Diebert, S. C. Gardner, M. A. Hilliard, G. D. Kobriger, S. M. McAdam, C. W. McCarthy, J. J. McCarthy, D. L. Mitchell, E. V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. *The Condor* 106:363-376.

Seager R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetmaa, N. Lau, C. Li, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. *Science* 316: 1181-1184.

Shlisky, A., J. Waugh, P. Gonzalez, M. Gonzalez, M. Manta, H. Santoso, E. Alvarado, A. Ainuddin Nuruddin, D. Arturo Rodríguez-Trejo, R. Swaty, D. Schmidt, M. Kaufmann, R. Myers, A. Alencar, F. Kearns, D. Johnson, J. Smith, and D. Zollner. 2007. Fire, ecosystems and people: threats and strategies for global biodiversity conservation. *The Nature Conservancy Global Fire Initiative Technical Report* 2007-2.

Singletracks. 2012. U.S. Mountain Bike Trail Stats: The West and States with Mountains Rule. http://www.singletracks.com/blog/mtb-trails/us-mountain-bike-trail-stats-the-west-and-states-with-mountains-rule/ (accessed August 7, 2015).

Sisk-A-Dee. 2015. Gunnison Sage Grouse Conservation. Gunnison, CO. https://www.siskadee.org/index.html (accessed July 17, 2015).

Slater, S. J. and J. P. Smith. 2010. Effectiveness of raptor perch deterrents on an electrical transmission line in southwestern Wyoming. *Journal of Wildlife Management* 74(5):1080-1088

Stednick, J. 2010. Cumulative Watershed Effects of Fuel Management in the Western United States. USDA Forest Service RMRS-GTR-231. 2010.

Steenhof, K., M. N. Kochert, and J. A. Roppe. 1993. Nesting by raptors and common ravens on electrical transmission line towers. *Journal of Wildlife Management* 57:271-281.

Stevens, B. S., J. W. Connelly, and K. P. Reese. 2012. Multi-scale assessment of greater sage-grouse fence collision as a function of site and broad scale factors. *Journal of Wildlife Management* 76(7):1370-1380.

Stevens, B. S. 2011. Impacts of fences on Greater sage-grouse in Idaho: collision, mitigation, and spatial ecology. M.S. Thesis, University of Idaho, Moscow, Idaho, USA.

Stevens, R. and S. B. Monsen. 2004. Guidelines for restoration and rehabilitation of principal plant communities. In Restoring Western Ranges and Wildlands. USDA Forest Service. General Technical Report RMRS-GTR-136.

Stiver, S. J., A. D. Apa, J. R. Bohne, S. D. Bunnell, P. A. Deibert, S. C. Gardner, M. A. Hilliard, C. W. McCarthy, and M. A. Schroeder. 2006. Greater Sage-Grouse Comprehensive Conservation Strategy. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming.

Stiver, S. J., E. T. Rinkes, D. E. Naugle, P. D. Makela, D. A. Nance, and J. W. Karl, eds. 2015. Sage-Grouse Habitat Assessment Framework: A Multiscale Assessment Tool. Technical Reference 6710-1. Bureau of Land Management and Western Association of Fish and Wildlife Agencies, Denver.

Stoddard, J. L., D. V. Peck, S. G. Paulsen, J. Van Sickle, C. P. Hawkins, A. T. Herlihy, R. M. Hughes, P. R. Kaufmann, D. P. Larsen, G. Lomnicky, A. R. Olsen, S. A. Peterson, P. L. Ringold, and T. R. Whittier. 2005. An ecological assessment of western streams and rivers. EPA 620/R-05/005, U.S. Environmental Protection Agency, Washington, DC.

Straughan, B. and T. Pollak. 2008. The Broader Movement: nonprofit environmental and conservation organizations, 1989–2005. The Urban Institute: Washington, DC. 50 p.

Swanson, C. 2009. Ecology of Greater Sage-Grouse in the Dakotas. PhD dissertation. Wildlife and Fisheries Science, South Dakota State University. http://pubstorage.sdstate.edu/wfs/ thesis/Swanson-Christopher-C-Ph-D-2009.pdf.

Szalavitz, M. 2010. Obesity in America 2010: Where does your state rank when it comes to obesity? MSN Health and Fitness.

Tack, J. 2009. Sage-grouse and the human footprint: Implication for conservation of small and declining populations. Thesis, University of Montana, Missoula.

Taylor R. L., B. L. Walker, D. E. Naugle, L. S. Mills. 2012. Managing multiple vital rates to maximize greater sage-grouse population growth. *Journal of Wildlife Management* 76: 336-347.

Theoharides, K. A. and J. S. Dukes. 2007. Plant invasion across space and time: factors affecting nonindigenous species success during four stages of invasion. Tansley Review, *The New Phytologist* Volume 176, Issue 2.

Torell, L. A., J. A. Tanaka, N. Rimbey, T. Darden, L. Van Tassell and A. Harp. 2002. Ranch-level impacts of changing grazing policies on BLM land to protect the Greater Sage-Grouse: Evidence from Idaho, Nevada and Oregon. Policy Analysis Center for Western Public Lands, policy paper SG-01-02, Caldwell, ID.

Trombulak, S. C. and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. *Conservation Biology*. pp. 18–30. Volume 14 No. 1, February 2000.

Utah Department of Natural Resources (UDNR). 2014. Division of Oil, Gas, and Mining – Statistics. http://oilgas.ogm.utah.gov/Statistics/Statistics.cfm (accessed November 5, 2014).

Utah Division of State Parks and Recreation. 2013. 2014 Utah State Comprehensive Outdoor Recreation Plan. Salt Lake City.

Utah Division of Wildlife Resources (UDWR).

2012. Deer Herd Unit Management Plan, Deer Herd Unit #14.

2005. Utah Comprehensive Wildlife Conservation Strategy. Salt Lake City. http://wildlife.utah.gov/cwcs/11-03-09_utah_cwcs_strategy.pdf (accessed July 20, 2015).

n.d. Utah Mule Deer Statewide Management Plan. http://wildlife.utah.gov/hunting/ biggame/pdf/mule_deer_plan.pdf (accessed June 2015).

n.d. Utah Elk Statewide Management Plan. http://wildlife.utah.gov/hunting/biggame/ pdf/elk_plan.pdf (accessed June 2015).

U.S. Bureau of Labor Statistics.

2014a. Consumer Price Index Calculator. http://www.bls.gov/data/inflation_calculator.htm (accessed November 20, 2014).

2014b. Local Area Unemployment Statistics. http://www.bls.gov/lau (accessed September 26, 2014).

2011. Local Area Unemployment Statistics. http://www.bls.gov/lau/#tables Unemployment Rates for States http://www.bls.gov/lau/lastrk10.htm.

U.S. Census Bureau (Census Bureau).

2015. Projections of the Size and Composition of the U.S. Population: 2014 to 2060.  Washington, DC. https://www.census.gov/content/dam/Census/library/ publications/2015/demo/p25-1143.pdf (accessed June 30, 2015).

2014. County Business Patterns. http://www.headwaterseconomics.org/tools/eps-hdt (accessed November 24, 2014).

2012a. American Community Survey, 2008-2012 5-year Estimates. http://factfinder2.census.gov (accessed September 16, 2014).

2012b. Population Estimates Program, Current Estimates. http://www.census.gov/popest/data/index.html (accessed September 24, 2014).

2000. Population Estimates Program, Historical Data. http://www.census.gov/popest/ data/historical/index.html (accessed September 24, 2014).

U.S. Climate Change Science Program. 2008. The Effects of Climate Change on Agriculture, Land Resources, Water Resources, and Biodiversity in the United States. May 2008.

U.S. Department of Agriculture, Forest Service (USFS).

2011. R2 Supplement 2600-2004-1 2011, Section 2631.1, Sage-Grouse and Sagebrush Habitats.

2009. Continental Divide Comprehensive Plan (CDNST) Plan Amendment. http://www.fs.fed.us/cdt/main/cdnst_comprehensive_plan_final_092809.pdf

2000. Coarse-Scale Potential Natural Vegetation Groups. v2000. http://www.firelab.org/science-applications/fire-fuel/181-pnvg (accessed August 28, 2012).

U.S. Department of Agriculture, National Agricultural Statistical Service. 2012. Statistics by State. http://www.nass.usda.gov/Statistics_by_State/North_Dakota/Publications/ County_Estimates/index.asp.

U.S. Department of Agriculture. National Resources Conservation Service (NRCS). 2003. National Range and Pasture Handbook. Revision 1, December 2003.

U.S. Department of Agriculture, Soil Conservation Service. 1975. Soil Survey of Gunnison Area, Colorado. Parts of Gunnison, Hinsdale and Saguache Counties.

U.S. Department of Agriculture and U.S. Department of the Interior. 2009. Guidance for Implementation of Federal Wildland Fire Management Policy. Wildland Fire Leadership Council. February 2009.

U.S. Department of Commerce.

2012a. Census Bureau, American Community Survey Office. Washington, DC.

2012b. Bureau of Economic Analysis, Regional Economic Information System, Washington, D.C. Table CA30.

2010, 2005, and 2000. Decennial census data Historic data. http://www.census.gov/population/cencounts/nd190090.

2007. Census of Governments Survey of State and Local Government Finances. Washington, DC (obtained from EPS-HDT Federal Payments report) p.4.

U.S Department of Energy (DOE). 2014. Final Uranium Leasing Program Programmatic Environmental Impact Statement.

U.S. Department of the Interior (DOI).

2014. U.S. Department of the Interior Economic Report FY13. http://www.doi.gov/ppa/economic_analysis/fy-2013-economic-report.cfm (accessed January 8, 2015).

2004. Bureau of Land Management National Sage-Grouse Habitat Conservation Strategy.

1979. Code of Federal Regulations 8340, Off-Road Vehicles. Washington, D.C.

U.S. Department of the Interior, Bureau of Land Management (BLM).

n.d. Rapid Ecoregional Assessment. BLM Fact Sheet: Level III Ecoregions of the Western U.S. map. Desert Managers Group. http://www.dmg.gov/documents/BR_Rapid_Ecoregional_Assessment_BLM_102809.pdf (accessed January 7, 2015).

2016. National Scenic and Historic Trails Strategy and Work Plan, U.S. Department of the Interior Bureau of Land Management. National Landscape Conservation System, National Scenic and Historic Trails Program, Washington, D.C. BLM-WO-GI-06-020-6250.

2015a. GIS analysis products.

2015b. Livestock Grazing. http://www.blm.gov/wo/st/en/prog/grazing.html (accessed July 14, 2015).

2015c. Proposed Resource Management Plan and Final Environmental Impact Statement for the Grand Junction Field Office, Colorado.

2015d. Rangeland Administration System (accessed June 10, 2015).

2015e. Rapid Ecoregional Assessments. BLM. http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas.html  (accessed January 6, 2015).

2015f. Record of Decision for the Approved Resource Management Plan for Public Lands Administered by the Tres Rios Field Office, Dolores, Colorado.

2015g. Tourism and Community Services Program. Washington, DC. http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/ tourism___community.html. (accessed February 2, 2015).

CHAPTER 8 - REFERENCES

2015h. Sage-Grouse Habitat Assessment Framework: A Multiscale Assessment Tool. Stiver, S. J., E. T. Rinkes, D. E. Naugle, P. D. Makela, D. A. Nance, and J. W. Karl, eds. Technical Reference 6710-1. Bureau of Land Management and Western Association of Fish and Wildlife Agencies, Denver.

2014a. BLM Recreation Strategy: Connecting with Communities. Washington, DC.

2014b. Colorado Instruction Memorandum No. 2014-026, Review of Draft Recreation Step-Down Recreation Strategy for the Bureau of Land Management Colorado.  Denver.

2014c. Handbook Section 8320-1, Planning for Recreation and Visitor Services. Washington, DC.

2014d. Instruction Memorandum No. 2014-094, State Strategy Development to Implement the *BLM Recreation Strategy: Connecting with Communities*. Washington, DC.

2014e. Rangeland Administration System (accessed October 31, 2014).

2014f. Reasonably Foreseeable Development Scenario for Potash in the Moab Master Leasing Plan Area, BLM Canyon Country District.

2014g. Recreation Management Information System (accessed November 14, 2014).

2014h. The BLM: A Sound Investment for America. Washington, DC. http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/ socioeconomic.Par.81563.File.dat/socioeconomic_2012.pdf (accessed July 2, 2015).

2014i. Uncompahgre Resource Management Plan Revision and Environmental Impact Statement, Preliminary Draft RMP/EIS (Internal Draft).

2013a. Approved Land Use Plan Amendments/ROD for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming and FEIS.

2013b. BLM National Training Center Course 8300-25, Planning for Travel and Transportation Management. Washington, DC.

2013c. Final Environmental Impact Statement,  BLM Tres Rios Field Office Land and Resource Management Plan.

2013d. Guidance on Estimating Nonmarket Environmental Values (Instruction Memorandum No. 2013-131). Washington, DC: E. Roberson.

2013e. Instruction Memorandum No. 2013-176, Seed Collection Policy and Pricing. Washington, DC.

2012a. Approved Resource Management Plan Amendments/Record of Decision for Solar Energy Development in Six Southwestern States.

2012b. Instruction Memorandum No. 2012-124. Implementation of Land Health Reporting Data Standard:  A New Standardized System for Reporting and Mapping Achievements in Land Health.

2012c. Colorado Plateau Rapid Ecoregional Assessment Report. http://www.blm.gov/ style/medialib/blm/wo/Communications_Directorate/public_affairs/ landscape_approach/documents1.Par.82149.File.dat/ COP_1_Final_Ch_1_2_and_3.pdf

2012d. Draft Environmental Impact Statement for the Grand Junction Field Office Resource Management Plan.

CHAPTER 8 - REFERENCES

2012e. Handbook Section 8342-1, Travel and Transportation Handbook. Washington, DC.

2012f. Instruction Memorandum No. 2012-169, RMP Alternative Development for Livestock Grazing. Washington, DC. August 16, 2012.

2012g. Instruction Memorandum No. 2012-124. Implementation of Land Health Reporting Data Standard: A New Standardized System for Reporting and Mapping Achievements in Land Health.

2012h. Instruction Memorandum No. 2012-043, Greater Sage-Grouse Interim Management Policies and Procedures. Washington, DC. December 22, 2011.

2012i. National Greater Sage-Grouse Planning Strategy, Land Use Plan Amendments and Environmental Impact Statements, Scoping Summary Report. Washington, DC. May 2012.

2011a. BLM History of Public Land Grazing. http://www.blm.gov/ut/st/en/prog/grazing/history_of_public.html (accessed June 8, 2015).

2011b. BLM Utah Grazing Standards.  http://www.blm.gov/ut/st/en/prog/grazing/utah_standards_for.html (accessed January 30, 2015).

2011c. BLM Utah Guidelines for Grazing Management. http://www.blm.gov/ut/st/en/prog/grazing/utah_guidelines_for.html (accessed August 3, 2015).

2011d. BLM Utah History of Public Land Grazing. http://www.blm.gov/ut/st/en/prog/grazing/history_of_public.html (accessed June 8, 2015).

2011e. BLM Utah Rangeland Health Standards. http://www.blm.gov/ut/st/en/prog/grazing/utah_standards_for.html (accessed January 30 and August 3, 2015).

2011f. BLM Utah Standards for Rangeland Health. http://www.blm.gov/ut/st/en/prog/grazing/utah_standards_for.html (accessed January 30, 2015).

2011g. Dominguez-Escalante National Conservation Area Analysis of the Management Situation.

2011h. Instruction Memorandum No. 2012-044, Greater Sage-Grouse Land Use Planning Strategy. Washington, DC. December 27, 2011.

2011i. Instruction Memorandum No. 2011-138, Sage-Grouse Conservation Related to Wildland Fire and Fuels Management. Washington, DC. June 13, 2011.

2011j. Instruction Memorandum No. 2011-061, Solar and Wind Energy Applications – Pre-Application and Screening. Washington, DC. February 7, 2011.

2011k. Instruction Memorandum No. 2011-003, Solar Energy Development 1 Policy. Washington, DC. October 7, 2010.

2011l. Manual Section 1626, Travel and Transportation Manual. Washington, DC.

2011m. Manual Section 8320, Planning for Recreation and Visitor Services. Washington, DC.

2010a. Analysis of the Management Situation for the BLM Uncompahgre Planning Area. Montrose, CO.

2010b. Instruction Memorandum No. 2011-004, Transmittal of Revised Recreation and Visitor Services Land Use Planning Guidance, Updated Checklist, and Three Land Use Planning Templates. Washington, DC.

2010c. Instruction Memorandum No. 2010-071, Gunnison and Greater Sage-Grouse Management Considerations for Energy Development.

2010d. Instruction Memorandum No. 2010-022, Managing Structures for the Safety of Sage-Grouse, Sharp-Tailed Grouse, and Lesser Prairie-Chicken.

2009a. Canyons of the Ancients Proposed Resource Management Plan and Final EIS.

2009b. Grand Junction Field Office, Colorado Resource Management Plan Revision: Final Analysis of the Management Situation.

2009c. Instruction Memorandum No. 2009-120, Updated Contract Clause for Utilization of Woody Biomass. Washington, DC. May 7, 2009.

2008. BLM Colorado Rangeland Management Standards and Guidelines. http://www.blm.gov/co/st/en/BLM_Programs/grazing/rm_stds_guidelines.html (accessed January 23-30, 2015).

2008a. Handbook Section 1740-01, Renewable Resource Improvement and Treatment Guidelines and Procedures. Washington, DC. February 29, 2008.

2008b. Handbook Section 1790-1, National Environmental Policy Act. Washington, DC. January 2008.

2008c. Manual Section 6840, Special Status Species Management. Washington, DC. December 12, 2008.

2008d. Moab Field Office Proposed Resource Management Plan and Final Environmental Impact Statement.

2008e. Moab Field Office Record of Decision and Approved Resource Management Plan.

2008f. Monticello Field Office Record of Decision and Approved Resource Management Plan.

2008g. Instruction Memorandum No. 2009-043, Wind Energy Development Policy. Washington, DC. December 19, 2008.

2008h. Instruction Memorandum No. 2009-018, Process for Setting Priorities for Issuing Grazing Permits and Leases. Washington, DC. October 31, 2008.

2008i. Instruction Memorandum No. 2008-204, Offsite mitigation. Washington, DC.

2007. Final Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement and Associated Record of Decision. Washington, DC. September 2007.

2006. Moab BLM Field Office Analysis of the Management Situation.

2005a. Canyons of the Ancients National Monument, Analysis of the Management Situation.

2005b. Colorado Instruction Memorandum No. 2005-038, Statement of Interim Policy, Implementation of the Gunnison Sage-Grouse Rangewide Conservation Plan.

CHAPTER 8 - REFERENCES

2005c. Handbook Section 1601-1, Land Use Planning Handbook. Washington, DC. March 2005.

2005d. Mineral Potential Report for the Monticello Planning Area.

2005e. Monticello BLM Field Office Analysis of Management Situation.

2005f. Record of Decision, Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments.

2004a. Gunnison Gorge National Conservation Area Approved Resource Management Plan.

2004b. Instruction Memorandum No. 2004-227, Bureau of Land Management's Biomass Utilization Strategy. Washington, DC. August 16, 2004.

2003. Draft Resource Management Plan and Environmental Impact Statement. Gunnison Gorge National Conservation Area. March 2003.

2000. Colorado Instruction Memorandum No. 2001-011, Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado. Washington, DC.

1999. Utilization Studies and Residual Measurements. Interagency Technical Reference.

1998. Riparian Area Management: Process for Assessing Proper Functioning Condition. Technical Reference 1737-9. Revised 1998.

1993. Gunnison Resource Area Record of Decision, Approved Resource Management Plan, and Rangeland Program Summary.

1991a. Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States. Washington, DC. May 1991.

1991b. Gunnison Resource Area Resource Management Plan and Environmental Impact Statement. United States Department of the Interior, Bureau of Land Management, Montrose District, Colorado. March 1991.

1990. Handbook Section 1624-1, Planning for Fluid Mineral Resources. Washington, DC. May 1990.

1989. Draft San Luis Resource Management Plan and Environmental Impact Statement.

1988. Manual Section 1613, Areas of Critical Environmental Concern. Washington, DC. September 29, 1988.

U.S. Department of the Interior, BLM and USFS. 2013. Volume II: Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan.

U.S. Department of the Interior, BLM Interagency Technical Team.

1996a. Interagency Technical Reference for Utilization Studies and Residual Measurements. Technical Reference 1734-3. National Science and Technology Center, Denver.

1996b. Sampling vegetation attributes. Technical Reference 1734-4. National Science and Technology Center, Denver, 172 pp.

U.S. Department of the Interior, Fish and Wildlife Service (FWS).

n.d. Using Existing Tools to Expand Cooperative Conservation for Candidate Species across Federal and on Federal Lands. http://www.fws.gov/endangered/esa-library/pdf/CCA-CCAA%20%20final%20guidance%20signed%208Sept08.PDF

2014a. National Survey of Fishing, Hunting, and Wildlife-Associated Recreation. 2011 (rev. 2014). https://www.census.gov/prod/2012pubs/fhw11-nat.pdf (accessed June 30, 2015).

2014b. Final Rule: Threatened Status for Gunnison Sage-Grouse. *Federal Register*, Vol. 79, No. 224, 69192-69310, November 20, 2014.

2014c. Final Rule: Designation of Critical Habitat for Gunnison Sage-Grouse. *Federal Register*, Vol. 79, No. 224, 69312-69363, November 20, 2014.

2013a. Proposed Rule: Endangered Status for Gunnison Sage-grouse. *Federal Register*, Vol. 78, No. 8, 2486-2538, January 11, 2013.

2013b. Proposed Rules: Designation of Critical Habitat for Gunnison Sage-grouse, *Federal Register*, Vol. 78, No. 8, 2540-2570, January 11, 2013.

2013c. Birding in the United States: A Demographic and Economic Analysis (Addendum to the National Survey of Fishing, Hunting, and Wildlife-Associated Recreation). Arlington, VA.

2013d. Greater Sage-grouse (Centrocercus urophasianus) Conservation Objectives: Final Report. U.S. Fish and Wildlife Service, Denver, CO. February 2013.

2011. Candidate Conservation Agreements. Fact Sheet. http://www.fws.gov/endangered/esa-library/pdf/CCAs.pdf.

2010a. Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species. *Federal Register*, Vol. 75, No. 187, 59804-59863, September 27, 2010.

2010b. 12-Month Findings for Petitions to List the Greater Sage-Grouse (Centrocercus urophasianus) as Threatened or Endangered: Notice of 12-month Petition Findings. *Federal Register*, Vol. 75, 13910, March 23, 2010.

2000. Service Interim Guidelines for Recommendations on Communications Tower Siting, Construction, Operation, and Decommissioning. US Fish and Wildlife Service Migratory Bird Program.

U.S. Department of the Interior, Fish and Wildlife Service and BLM. 2010. Programmatic Consultation Agreement between Bureau of Land Management and US Fish and Wildlife Service for Canada Lynx in Colorado.

U.S. Department of the Interior and U.S. Department of Agriculture. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp.

U.S. Department of the Interior, U.S. Department of Agriculture, U.S. Department of Energy, U.S. Department of Defense, U.S. Department of Commerce, U.S. Environmental Protection Agency, Federal Emergency Management Agency, and National Association of State Foresters (DOI and USDA et al). 2001. Review and Update of the 1995 Federal Wildland Fire Management Policy, January, 2001.

U.S. Department of the Interior, Wildland Fire Leadership Council (WFLC). 2009. Guidance for Implementation of Federal Wildland Fire Management Policy. February 2009.

U.S. Department of State. 2010. Fifth U.S. climate action report. Global Publishing Services: Washington, DC. 180 p. http://www.state.gov/e/oes/rls/rpts/car/index.htm

U.S. Energy Information Administration (U.S. EIA).

2015a. U.S. States, State Profiles and Energy Estimates. ttp://www.eia.gov/state/rankings/?sid=US#/series/47 and http://www.eia.gov/state/rankings/?sid=US#/series/46 (accessed July 28, 2015).

2015b. Petroleum and Other Liquids Prices. http://www.eia.gov/dnav/pet/ pet_pri_spt_s1_a.htm (accessed August 10, 2015).

2015c. Annual Energy Outlook 2015.

2014a. Natural Gas Prices. http://www.eia.gov/dnav/ng/ng_pri_sum_dcu_nus_a.htm (accessed November 21, 2014).

2014b. Petroleum and Other Liquids Prices. http://www.eia.gov/dnav/pet/ pet_pri_spt_s1_a.htm (accessed November 21, 2014).

2013a. State Energy Profiles. http://www.eia.gov/state/ state_energy_profiles.cfm?sid=ND (accessed March 19, 2013).

2013b. State Energy Reserves and Supply. http://www.eia.gov/state/ data.cfm?sid=ND#ReservesSupply (accessed March 19, 2013).

2013c. U.S. States, Rankings: Carbon Dioxide Emissions, 2010. http://www.eia.gov/ beta/state/rankings/?sid=US#/series/98 (accessed February 15, 2013).

U.S. Environmental Protection Agency (EPA).

2004-2010. CASTNET Annual Reports. http://java.epa.gov/castnet/documents.do (accessed January 31, 2013).

2010. Primary Distinguishing Characteristics of Level III Ecoregions of the Continental United States, revised July 2010. http://www.epa.gov/wed/pages/ ecoregions/level_iii_iv.htm (accessed August 22, 2011) p. 7.

2011a. Level III Ecoregions of the Continental United States. Revised December 2011.

2011b. Climate Change, Basic Information.  http://www.epa.gov/climatechange/ basicinfo.html (accessed October 18, 2011).

2012a. EPA Green Book. http://www.epa.gov/airquality/greenbook/ancl3.html (accessed September 5, 2012).

2012b. Air Quality Statistics Report. http://www.epa.gov/airquality/airdata/ ad_rep_con.html (accessed January 16, 2013).

2012c. Air Quality Index Report. http://www.epa.gov/airdata/ad_rep_aqi.html (accessed September 4, 2012).

2012d. Glossary of Climate Change Terms. http://www.epa.gov/climatechange/ glossary.html (accessed January 20, 2013).

2012e. Visibility, Basic Information. http://www.epa.gov/visibility/what.html (accessed January 21, 2013).

2012f. Ground Level Ozone, Basic Information. http://www.epa.gov/airquality/ ozonepollution/basic.html (accessed January 21, 2013).

2012g. Inventory of US Greenhouse Gas Emissions and Sink: 1990-2010. Chapter 3, Land Use, Land-Use Change, and Forestry. April 15, 2012. http://www.epa.gov/ climatechange/ghgemissions/usinventoryreport.html (accessed February 1, 2013).

2013a. Health Effects of Air Pollution. http://www.epa.gov/region07/air/quality/ health.htm (accessed March 20, 2013).

2013b. North Dakota Greater Sage-Grouse EIS/RMPA, Social and Economic Conditions and Analysis Report. TEAMS Planning Enterprise Unit. January 17, 2013.

U.S. Fish and Wildlife Service.  (See U.S. Department of the Interior, Fish and Wildlife Service.)

U.S. Geological Survey (USGS).

2012a. Gap Analysis Program, Protected Areas Database of the United States, Version 1.3. Accessed September 27, 2014 from Economic Profile System, Land Use Report.

2012b. National Hydrography Dataset.

2011. National Gap Analysis Program Land Cover Data Portal. Available online at: http://gapanalysis.usgs.gov/gaplandcover/gap-land-cover-updated/ (accessed January 21, 2015).

2010. GAP Land Cover Data Set, version 2.

U.S. Global Change Research Program. 2009. Global Climate Change Impacts in the United States. Cambridge University Press. Downloads.globalchange.gov/usimpacts/pdfs/climate-impacts-report.pdf.

Utah Department of Administrative Services. Division of Administrative Rules. 2014. Website: http://www.rules.utah.gov/publicat/code/r068/r068-009.htm (accessed April 22, 2015).

Utah Department of Natural Resources (UDNR). 2014. Division of Oil, Gas, and Mining – Statistics. http://oilgas.ogm.utah.gov/Statistics/Statistics.cfm (accessed November 5, 2014).

Van Dyke, Fred, and E. C. Klein. 1996. Response of elk to installation of oil wells. Journal of Mammalogy. 77(4): 1028-1041.

van 't Veld, K. and O. Phillips. 2009. Pegging Input Prices to Output Prices in Long-Term Contracts: $CO_2$ purchase agreements in enhanced oil recovery. Enhanced Oil Recovery Institute: Laramie, WY. 35 p.

Verma, S. and S. Jayakumar. 2012. Impact of forest fire on physical, chemical and biological properties of soil: A review. Proceedings of the International Academy of Ecology and Environmental Sciences 2(3): 168-176.

CHAPTER 8 - REFERENCES

Walker B. L. and D. E. Naugle. 2011. West Nile virus ecology in sagebrush habitat and impacts on greater sage-grouse populations. *Greater Sage-Grouse: Ecology of a Landscape Species and Its Habitat.* S. Knick, editor. Cooper Ornithological Union. University of California Press. Berkeley (pp. 127-143).

Walker, B. L., D. E. Naugle, and K. E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. *Journal of Wildlife Management* 71:2644-2654.

Walker, B. L., D. E. Naugle, K. E. Doherty, and T. E. Cornish. 2004. Outbreak of West Nile virus in greater sage-grouse and guidelines for monitoring, handling and submitting dead birds. *Wildlife Society Bulletin* 32: 1-7.

Walters, C. J., and S. Holling. 1990. Large-scale management experiments and learning by doing. *Ecology* 71:53-74.

Wambolt, C. L., K. S. Walhof and M. R. Frisina. 2001. Recovery of big sagebrush communities after burning in south-western Montana.

Warren, S. D. and D. J. Eldridge. 2001. Biological soil crusts and livestock in arid ecosystems: are they compatible? *Ecological Studies*, Vol. 150. J. Belnap and O.L. Lange (eds.) Biological Soil Crusts: Structure, Function and Management. Springer-Verlag Berlin Heidelberg 2001.

Watts, M. J. and C. L. Wambolt. 1996. Long-term recovery of Wyoming big sagebrush after four treatments. *Journal of Environmental Management* Vol. 46, Issue 1, January 1996.

Webb, W. C., W. I. Boarman, and J. T. Rotenberry. 2009. Movements of juvenile common ravens in an arid landscape. *Journal of Wildlife Management* 73(1):72-81

Webb, W. C., W. I. Boarman, and J. T. Rotenberry. 2004. Common raven juvenile survival in a human augmented landscape. *The Condor* 106:517-528.

Weltz, M., Kidwell M., and Fox, H. 1998. Influence of abiotic and biotic factors in measuring and modeling soil erosion on rangelands: State of knowledge. *Journal of Range Management* 51:482-495. Sept 1998.

Westbrooks, R. 1998. Invasive plants, changing the landscape of America: Fact book. Federal Interagency Committee for the Management of Noxious and Exotic Weeds. Washington, DC.

White, E., D. Gooding, and D. Stynes. 2013. Estimation of National Forest Visitor Spending Averages from National Visitor Use Monitoring: Round 2. General Technical Report PNW-GTR-883. U.S. Department of Agriculture, Forest Service: Portland, OR.

Williams, B. K., R. C. Szaro, and C. D. Shapiro (Williams et al). 2009. Adaptive Management: The U.S. Department of the Interior Technical Guide, p. iv. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.

Williams, M. I. and A. L. Hild. 2012. Characteristics of Gunnison Sage-Grouse Habitat in Dry Mountain Loam and Mountain Loam Ecological Sites of the Gunnison Basin. CPW. Report to the Colorado Division of Parks and Wildlife. University of Wyoming, Department of Ecosystem Science and Management, Laramie, WY.

CHAPTER 8 - REFERENCES

Wisdom, M. J., C. W. Meinke, S. T. Knick, and M. A. Schroeder. 2011. Factors associated with extirpation of Sage-Grouse. pp. 451-472. S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. *Studies in Avian Biology* vol. 38, University of California Press, Berkeley.

World Bank. 2014. Global Economic Monitor (GEM) Commodities http://data.worldbank.org/data-catalog/commodity-price-data (accessed November 10, 2014).

World Values Survey. 2014. World Values Survey Wave 6: 2010-2014. http://www.worldvaluessurvey.org/WVSOnline.jsp (accessed December 2, 2014).

Wyman, S. et al 2006. Riparian area management: grazing management processes and strategies for riparian-wetland areas. Technical Reference 1737-20. BLM/ST/ST-06/002+1737. U.S. Department of the Interior, BLM, National Science and Technology Center, Denver. 105 pp.

Zeedyk, B. 2014. Restoring wetlands. http://billzeedyk.com/2014/12/10/restoring-wetlands/#more-79 (accessed July 23, 2015).

Zouhar, K. 2003. Bromus tectorum. In: Fire Effects Information System, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory (Producer). http://www.fs.fed.us/database/feis/ (accessed July 30, 2015).

Case No. 1:20-cv-02484-MSK   Document 95   filed 05/06/21   USDC Colorado   pg 157 of 511

The Journal of Wildlife Management; DOI: 10.1002/jwmg.21179

*Research Article*

# Investigating Impacts of Oil and Gas Development on Greater Sage-Grouse

**ADAM W. GREEN**,[1,2] *Natural Resource Ecology Lab, Colorado State University, Fort Collins, CO 80526, USA, in Cooperation with the US Geological Survey, Fort Collins Science Center, Fort Collins, Colorado, USA*

**CAMERON L. ALDRIDGE**, *Natural Resource Ecology Lab, Department of Ecosystem Science and Sustainability, Colorado State University, Fort Collins, CO 80526, USA, in Cooperation with the US Geological Survey, Fort Collins Science Center, Fort Collins, Colorado, USA*

**MICHAEL S. O'DONNELL**, *Fort Collins Science Center, U.S. Geological Survey, Fort Collins, CO 80526, USA*

**ABSTRACT** The sagebrush (*Artemisia* spp.) ecosystem is one of the largest ecosystems in western North America providing habitat for species found nowhere else. Sagebrush habitats have experienced dramatic declines since the 1950s, mostly due to anthropogenic disturbances. The greater sage-grouse (*Centrocercus urophasianus*) is a sagebrush-obligate species that has experienced population declines over the last several decades, which are attributed to a variety of disturbances including the more recent threat of oil and gas development. We developed a hierarchical, Bayesian state-space model to investigate the impacts of 2 measures of oil and gas development, and environmental and habitat conditions, on sage-grouse populations in Wyoming, USA using male lek counts from 1984 to 2008. Lek attendance of male sage-grouse declined by approximately 2.5%/year and was negatively related to oil and gas well density. We found little support for the influence of sagebrush cover and precipitation on changes in lek counts. Our results support those of other studies reporting negative impacts of oil and gas development on sage-grouse populations and our modeling approach allowed us to make inference to a longer time scale and larger spatial extent than in previous studies. In addition to sage-grouse, development may also negatively affect other sagebrush-obligate species, and active management of sagebrush habitats may be necessary to maintain some species. © 2016 The Wildlife Society.

**KEY WORDS** Bayesian, *Centrocercus urophasianus*, greater sage-grouse, lek, oil and gas development, state-space model, Wyoming.

The sagebrush (*Artemisia* spp.) ecosystem is one of the largest ecosystems in western North America (Knick et al. 2003), and it provides habitat for species found nowhere else (e.g., sagebrush lizard [*Sceloporus graciosus*], sage thrasher [*Oreoscoptes montanus*], pygmy rabbit [*Brachylagus idahoensis*]; Rowland et al. 2011). Sagebrush habitats have decreased in size by 50% since the 1950s, and most of these declines are attributable to human disturbances (Griffin 2002, Bunting et al. 2003, Knick et al. 2011, Miller et al. 2011, Rowland and Leu 2011). Sagebrush habitats have been altered through the introduction of non-native grasses to provide forage for livestock (West 2000, Knick et al. 2011). Direct losses of sagebrush have also occurred through increasing agricultural and urban development and removal by prescribed fire and mechanical disturbance (Knick et al. 2011).

Development associated with oil and natural gas extraction is an increasing threat to sagebrush habitats as the number of wells associated with oil and natural gas extraction increase across the landscape. Construction of oil and gas wells results in the direct loss of sagebrush, but impacts have negative consequences at larger scales than the well pad and after drilling is complete, including alteration due to road and pipeline construction and changes in wildlife behavior (Northrup and Wittemyer 2012). Sawyer et al. (2006) reported that mule deer (*Odocoileus hemionus*) avoided well pads out to approximately 4 km and shifted their habitat use to less suitable areas in response to increased development. Other large mammals have changed home ranges, movement, and behavior in response to human activity (Dyer et al. 2002, Sawyer et al. 2009, Wasser et al. 2011, Northrup 2015). Disturbance from oil and gas development may also cause local declines in avian populations (Bayne et al. 2008, Gilbert and Chalfoun 2011, Jarnevich and Laubhan 2011), shifts in community structure (Bayne et al. 2008, Francis et al. 2012), and behavior modifications in response to increased noise pollution or other disturbance (Pitman et al. 2005, Francis et al. 2011). The cumulative effects of these impacts are not well studied but have potential negative consequences for ecosystem function (Francis et al. 2012).

The greater sage-grouse (*Centrocercus urophasianus*; sage-grouse), a sagebrush-obligate species, has experienced population declines of 2%/year over the last several decades

Received: 9 December 2015; Accepted: 28 August 2016

[1]E-mail: adam.green@birdconservancy.org
[2]Present address: Bird Conservancy of the Rockies, 230 Cherry Street, Suite 150, Fort Collins, CO 80521, USA

resulting in only 56% of its historical range currently being occupied (Connelly et al. 2004, Garton et al. 2011). These declines are partially attributed to negative impacts of oil and gas development on sage-grouse demographics and behavior. Oil and gas development negatively affects sage-grouse nest initiation rates and location (Lyon and Anderson 2003, Holloran et al. 2010, Fedy et al. 2014), chick survival (Aldridge and Boyce 2007), recruitment (Holloran et al. 2010), and adult survival (Holloran et al. 2010). Sage-grouse also avoid oil and gas wells and associated infrastructure when selecting wintering habitat (Doherty et al. 2008, Carpenter et al. 2010, Fedy et al. 2014).

Other studies have examined responses of sage-grouse populations to oil and gas development using lek counts, an often-used index of abundance (Harju et al. 2010, Taylor et al. 2013, Gregory and Beck 2014). All studies reported negative impacts of development on lek attendance or persistence (i.e., the presence of lekking males) across a variety of scales and using different measures of oil and gas development and response variables. Studies using lek persistence as a response variable (Harju et al. 2010, Hess and Beck 2012) provide insight into the factors influencing the presence of leks on the landscape but lose the ability to detect declining populations before they become inactive. Modeling lek attendance as a function of measures of oil and gas development addresses this issue, but some leks are inherently larger than others. A lek with a large number of attending males may be declining because of increasing development, but if counts remain relatively high, these declines might not be obvious. Additionally, many of these studies have been restricted to small spatial scales or short time periods because of inconsistent collection of lek count data prior to the late 1990s (Walker et al. 2007, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013). Attempts have been made to address this shortcoming in the available data (Gregory and Beck 2014) and potential cycles in sage-grouse populations (Fedy and Aldridge 2011) by interpolating and smoothing lek counts across 20 years. However, these studies did not incorporate the uncertainty associated with the interpolation into their analyses and potentially underestimated the uncertainty associated with estimated effects of factors that may affect lek attendance.

We investigated the impacts of oil and gas development and environmental and habitat conditions on changes in male sage-grouse lek attendance in Wyoming, USA, from 1984 to 2008 using a well-established hierarchical, Bayesian state-space modeling framework (Kéry et al. 2009, Kéry and Schaub 2012). Unlike previous analyses of lek data, a Bayesian framework allowed us to use data over a longer time period, including lek counts prior to the rapid increase in oil and gas development in Wyoming in the mid-1990s. It also interpolated unobserved lek counts and the uncertainty associated with them, avoiding the need to truncate the data set to only leks with complete observations or aggregating lek observations across a larger temporal period. This approach allowed us to borrow information from well-sampled leks to make inference at larger spatial and temporal scales where data were sparse. Using a state-space model, we were able to estimate the relationships between covariates and the proportional changes in lek attendance and account for variation in counts due to population cycles and observer error, though we are unable to separate these sources of uncertainty without repeated counts. Lek counts may not accurately represent populations because of low and inconsistent attendance within a day and across the breeding season and the inability of observers to detect all individuals present (Jenni and Hartzler 1978, Emmons and Braun 1984, Walsh et al. 2004). Our model incorporated this uncertainty in lek counts when estimating the effects of covariates, such that the precision of covariate effect sizes accurately represented all sources of uncertainty in the ecological and observation processes. Our objectives were to evaluate the impact of oil and gas development on changes in lek attendance over large spatial extents and long temporal scales, while accounting for habitat and environmental covariates and provide estimates of local and statewide trends in lek attendance.

Given the number of studies showing negative impacts of oil and gas development on sage-grouse fecundity (Lyon and Anderson 2003, Holloran et al. 2010, Fedy et al. 2014), recruitment (Holloran et al. 2010), survival (Aldridge and Boyce 2007, Holloran et al. 2010), and lek attendance (Doherty et al. 2010*a*, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013, Gregory and Beck 2014), we hypothesized that sage-grouse would respond negatively to oil and gas development. We also investigated the influence of precipitation and the amount of sagebrush vegetation surrounding a lek on changes in lek attendance. Sage-grouse are strongly dependent on sagebrush throughout their life-cycle (Connelly et al. 2000, 2011*b*; Fedy et al. 2014), and sage-grouse survival (Swenson 1986, Barnett and Crawford 1994, Johnson and Braun 1999) and recruitment (Connelly et al. 1991, Gregg et al. 1994, Holloran et al. 2005, Doherty et al. 2010*b*) are positively influenced by the amount and height of sagebrush. Likewise, studies have reported positive influences of precipitation on nest success, clutch size (Holloran et al. 2005, Blomberg et al. 2014*a*), and chick and juvenile survival (Aldridge and Boyce 2007, Blomberg et al. 2014*b*). Because of the positive response of sage-grouse survival and recruitment to precipitation and sagebrush, we expected lek attendance to respond positively to both variables.

Sage-grouse use large areas and selection of habitats takes place at multiple spatial scales (Aldridge and Boyce 2008; Doherty et al. 2008, 2010*b*; Aldridge et al. 2012; Fedy et al. 2014), so we examined whether the influence of each of the covariates described varied across multiple spatial scales. Because the majority of sage-grouse nests are located within 7.5 km of a lek (Wakkinen et al. 1992, Holloran and Anderson 2005) and we expected the covariates to influence recruitment, we expected larger scales to exhibit stronger influences on lek attendance. We also explored whether lek attendance exhibited delayed responses to the time-varying covariates. We expected support for longer lag effects because lek attendance would respond to the influence of covariates from prior years on recruitment because males mature and join the breeding population at 2–3 years old.

# STUDY AREA

We conducted our study across Wyoming, USA, which covers approximately 253,500 km²; current sage-grouse distribution covers approximately 69% of the state (Fig. 1). Sagebrush ecosystems account for approximately 37% of Wyoming's land cover followed by mixed-grass prairie (17.5%) and lodgepole pine (*Pinus contorta*) forest (6.5%; Driese et al. 1997). Sagebrush and mixed-grass prairie ecosystems also occur in large, relatively unbroken tracts. Approximately 44% of land in Wyoming is privately owned and the Bureau of Land Management (BLM) and the United States Forest Service are the largest public landowners at 28% and 14%, respectively. Most oil and gas development in Wyoming has occurred in the southwestern and northeastern corners of the state (Fig. 2). Average precipitation was lowest in central Wyoming, greater in the mixed-grass prairies of the eastern portion of the state, and the greatest at high elevations (PRISM Climate Group 2008).

# METHODS

## Sage-Grouse Lek Data

As part of a statewide monitoring effort of sage-grouse populations, the Wyoming Game and Fish Department (WGFD) and partnering agencies collected lek count data from across Wyoming using procedures approved by WGFD (Christiansen 2012). We used this survey data from 1980 to 2008 collected by WGFD, other natural resource agency personnel, or volunteers following WGFD protocols to model the impacts of environmental and anthropogenic factors on lek attendance. We also fit random intercept effects for each of the BLM field offices in Wyoming (Fig. 1). By doing this, we attempted to account for potential autocorrelation between lek counts within and among years due to environmental factors or management practices that may vary regionally and that we did not include as covariates in our analyses. Leks are designated based on the observation of $\geq 2$ male sage-grouse engaged in courtship displays (Christiansen 2012). A satellite lek is defined as a relatively small lek (<15 males) within 500 m of a larger lek and is assumed to be part of the same breeding population. Within the sage-grouse database, WGFD combines the counts from a satellite lek with those from the main lek with which it is associated. We restricted our analyses to active leks with count data ($n = 614$).

Lek counts have been criticized for their inability to accurately reflect abundance and sex ratios of sage-grouse (Beck and Braun 1980, Walsh et al. 2004, Johnson and Rowland 2007). This is due to low attendance rates across sexes and ages (Jenni and Hartzler 1978, Walsh et al. 2004), inconsistent use throughout the breeding season or within a day (Jenni and Hartzler 1978, Emmons and Braun 1984, Walsh et al. 2004), and imperfect detection of individuals that are present on leks during counts (Walsh et al. 2004). However, several studies have shown that standardizing survey protocols by performing counts around sunrise, repeating counts throughout the breeding season, and training observers can reduce the sampling variation in counts (Jenni and Hartzler 1978, Emmons and Braun 1984,



**Figure 1.** Location of 614 greater sage-grouse leks and 10 Bureau of Land Management field offices (bold name labels) in Wyoming, USA, used for state-space analysis, 1984–2008.



**Figure 2.** Location of 91,262 oil and gas wells in Wyoming, USA, used to calculate oil and gas metrics used in state-space analysis of greater sage-grouse, 1980–2008. Light grey lines represent Bureau of Land Management field office boundaries.

Walsh et al. 2004, Johnson and Rowland 2007) and provide a reasonable index with which to estimate population trends (Blomberg et al. 2013). Leks were sampled by WGFD from early March to early May to coincide with the peak of the breeding season based on latitude, elevation, and weather (Jenni and Hartzler 1978, Emmons and Braun 1984, Walsh et al. 2004, Christiansen 2012). We used only counts that occurred between 30 minutes pre-sunrise to 90 minutes post-sunrise, the most active lekking period of the day (Jenni and Hartzler 1978), which increases the likelihood that counts represent the maximum number of sage-grouse present on a given day. The WGFD recommends that counts occur between 30 minutes pre-sunrise to 60 minutes post-sunrise. Simulations have shown little difference in estimates or loss of precision in extending counts to 90 minutes post-sunrise (Monroe et al. 2016), so we included these counts to increase sample sizes. Because male sage-grouse have higher and more regular lek attendance than females (Emmons and Braun 1984, Walsh et al. 2004), we used the maximum male count within a year at a lek. Additionally, we restricted our analysis to leks with $\geq 2$ counts over the study period, because our parameter of interest was the change in lek attendance across years rather than the counts themselves. These restrictions resulted in a data set consisting of 3,382 lek-year counts at 614 leks from 1984–2008 (Fig. 1).

**Oil and Gas Data**

We obtained information on oil and gas well characteristics and locations from the Wyoming Oil and Gas Conservation Commission (WOGCC; WOGCC 2011) for 1980–2008.

We included pre-production wells with permits to drill, non-mechanical and mechanical producing wells, wells with a notice of intent to abandon, and active non-producing wells (Table S1, available online in Supporting Information). Within this original data set, 91.6% were producing wells. We calculated metrics for each year using non-abandoned wells with spud dates (i.e., date of ground penetration) or completion dates less than or equal to the year of interest. This resulted in the inclusion of 91,262 wells in our analyses (Fig. 2) for annual estimates of activity on the landscape.

We hypothesized that sage-grouse may respond differently to oil and gas disturbance depending on dispersion of wells surrounding a lek. If well pads are located near each other, they may have a smaller impact on sage-grouse populations than the same number of wells spread across the landscape because the infrastructure associated with the well pads will increase as the dispersion of wells increases. The well pad footprints may overlap, reducing the direct loss of sagebrush habitat, and any indirect disturbances (e.g., noise, lights, vehicular traffic) may also be reduced. Therefore, we included 2 measures of oil and gas development in our analysis calculated for each year of the study: well density (wells/km$^2$) and disturbance area of well pads (km$^2$). We calculated disturbance area in ArcGIS Desktop 10.0 (Environmental Systems Research Institute, Redlands, CA, USA) by creating a 60-m buffer around each well corresponding to the approximate size of a well pad, dissolving the resulting polygons to ensure areas were not accounted for more than once, and summing the area of the resulting polygons within a specified buffer around each lek.

Accounting for the overlap approximates the well pad size when $\geq 1$ well locations occur on a single well pad. The disturbance area measures the footprint area associated with the well pads within a given distance of a lek.

## Habitat and Environmental Conditions

We used remotely sensed geographic information system (GIS) vegetation products (Homer et al. 2008, 2012) that measured the percent vegetation composition within a 30-m pixel across the state of Wyoming. Homer et al. (2012) used a hierarchical classification of remotely sensed imagery and ground sampling to estimate the percent cover of bare ground, litter, herbaceous plants (i.e., forbs, grasses), and shrubs within 30-m pixels for 2006–2007 ground conditions. We used the percent cover of all sagebrush in our analyses to account for variation in lek count attendance due to the influence of sagebrush cover on demographic parameters (e.g., survival, fecundity). We used Geospatial Modelling Environment 0.7.3.0 (GME; http://www.spatialecology.com/gme, accessed 30 May 2016) and ArcGIS Desktop 10.2.2 to calculate the mean percent sagebrush cover for each lek at each spatial extent.

We examined the influence of precipitation during 2 time periods in the year prior to sage-grouse breeding that have positive relationships with nesting success (Holloran et al. 2005): winter-spring (Jan–Jun) and spring (Apr–May). We hypothesized that higher precipitation amounts would result in taller herbaceous vegetation in that year and, subsequently, taller residual cover in the next year to conceal nests (Skinner et al. 2002, Holloran et al. 2005). We obtained monthly, 4-km-resolution Parameter-Elevation Regressions on Independent Slopes Model (PRISM) precipitation data for 1980–2008 (PRISM Climate Group 2008). For each year, we summed the total precipitation for each 4-km pixel across winter-spring (Jan–Jun) and spring (Apr–May). We then used GME to calculate the mean precipitation for each of those periods at each spatial extent.

## Spatial and Temporal Scales

Because sage-grouse select habitats at multiple spatial scales (Aldridge and Boyce 2008; Doherty et al. 2008, 2010b; Aldridge et al. 2012; Fedy et al. 2014), we investigated how changes in lek attendance responded to each of these covariates at 5 spatial scales: 800 m, 1,600 m, 3,200 m, 5,000 m, and 6,400 m around a lek. Oil and gas wells may have effects at smaller scales, such as reducing lek attendance because of the direct avoidance of wells by males (Walker et al. 2007). Oil and gas development, along with precipitation and sagebrush cover, may also have impacts at larger scales by influencing nest location and initiation attempts (Wakkinen et al. 1992, Lyon and Anderson 2003, Holloran et al. 2005, Doherty et al. 2010b) or affecting chick survival (Aldridge and Boyce 2007).

The influence of covariates on lek attendance may not be immediate. Female sage-grouse are highly philopatric to nesting sites (Schroeder et al. 1999, Holloran 2005, Holloran and Anderson 2005) and adult males are philopatric to leks (Holloran 2005). However, yearling females avoid oil and gas infrastructure more than adult females and yearling males

avoid leks near infrastructure (Holloran 2005). Therefore, it may take several years for the impacts of development to become apparent in lek attendance because birds alive before development die and new generations move farther from disturbed areas. This hypothesis is supported by several studies (Walker et al. 2007, Holloran et al. 2010, Taylor et al. 2013, Gregory and Beck 2014) so we included time lags of 1–4 years on all of the time-varying covariates in analyses.

## Statistical Analysis

We used a Bayesian, hierarchical state-space model to estimate changes in lek attendance. State-space models typically allow the separation of process and observation error in time-series with unobserved processes or data, but they can still be useful when this separation in sources of variation are not possible (de Valpine and Hastings 2002, Buckland et al. 2004, Clark and Bjørnstad 2004, Kéry and Schaub 2012). We could not explicitly separate the 2 sources of error because of the inclusion of time-varying covariates and the lack of repeated counts.

We modeled the number of males at lek $i$ in year $t = 1$, $N_{i,1}$, as

$$\log(N_{i,1}) \sim Norm\left(\mu_{N_1}, \sigma_{N_1}^2\right)$$

where $\mu_{N_1}$ and $\sigma_{N_1}^2$ are the mean and variance, respectively, of counts across all leks in year 1. We modeled attendance at $t > 1$ as a function of the previous year's attendance and the intrinsic growth rate, $r_{i,t}$:

$$\log(N_{i,t+1}) = \log(N_{i,t}) + r_{i,t}$$

Growth rates were sampled from a normal distribution,

$$r_{i,t} \sim Norm\left(\mu_{r_{i,t}}, \sigma_r^2\right)$$

where $\mu_{r_{i,t}}$ is the mean growth rate, given the covariates measured at lek $i$ in year $t$, and $\sigma_r^2$ is the process error for growth rates at all leks. We modeled $\mu_{r_{i,t}}$ as a function of the covariates described in the previous section, such that

$$\mu_{r_{i,t}} = \beta_{FO_i} + x'_{i,t}\beta$$

where $\beta_{FO_i}$ is the intercept for the field office in which lek $i$ is located, $x'_{i,t}$ is a covariate vector, and $\beta$ is a regression coefficient vector. We assumed the field office-specific intercepts came from a normal distribution

$$\beta_{FO} \sim Norm\left(\mu_{\beta_{FO}}, \sigma_{\beta_{FO}}^2\right)$$

where $\mu_{\beta_{FO}}$ and $\sigma_{\beta_{FO}}^2$ are hyperparameters representing the state-level mean intercept in regional growth rates and its variance, respectively. This hyperdistribution represents the state-wide intercept, yet allows us to account for regional differences in lek attendance. We also calculated the finite rate of increase, $\lambda = \exp(r)$, as the percent change per year in lek attendance. We estimated changes in lek attendance for all lek/year combinations even when data were sparse, and the uncertainties in growth rates for infrequently surveyed leks were accounted for when estimating covariate

relationships. We standardized all covariates so that they had a mean of 0 and standard deviation of 1. To model the observation process, we assumed that the maximum male counts came from a Poisson distribution,

$$y_{i,t} \sim Pois(N_{i,t})$$

We took a Bayesian approach to estimate model parameters using Markov chain Monte Carlo (MCMC) simulation implemented in JAGS 3.4.0 (Plummer 2003, 2013) using the package R2jags in the R statistical computing environment (R Core Team 2013). We used vague prior distributions for all estimated parameters:

$$\sigma_r \sim Unif(0, 20)$$

$$\mu_{\beta_{FG}} \sim Norm(0, 100)$$

$$\sigma_{\beta_{FG}} \sim Unif(0, 20)$$

and

$$\beta \sim Norm(0, 100)$$

We converted all standard deviations to precision $(1/SD^2)$ for implementation in JAGS.

Because of the large number of possible combinations of covariates and the high correlation between covariates within a group of covariates (i.e., oil and gas, sagebrush cover, precipitation), we used a sequential approach to model building. We fit all univariate models and chose the best predictive model (see next paragraph) from each covariate group to include in the next step of model building. We then fit models for all additive and 2-way interactive combinations of the top covariates from each covariate group. We also included a null model to represent the overall lek trend across time and a quadratic term for the top oil and gas covariate in our final model set to test for thresholds, where lek attendance may not be affected by low levels of development (Doherty et al. 2010a). We obtained 20,000 MCMC samples and used a burn-in period of 10,000 iterations for models in the final model set from which we made inferences regarding the factors influencing sage-grouse lek attendance.

We used 10-fold cross-validation to measure the performance of the models in our model sets (Hooten and Hobbs 2015). Cross-validation consists of grouping the data into $K$ approximately even groups, fitting a model to the data excluding that in group $k$, $y_{-k}$, and comparing predictions for the left out data, $y_k$. We repeated the process for each group of data and calculated a metric for each iteration and summed across all iterations to produce a cross-validation score for the entire data set. We calculated our cross-validation score ($CVS$) as

$$CVS = -2\sum_{k=1}^{K} \log\left(\frac{\sum_{t=1}^{T} [y_k | y_{-k}, \theta^{(t)}]}{T}\right)$$

where $[y_k | y_{-k}, \theta^{(t)}]$ is the likelihood of $y_k$, given $y_{-k}$ and $\theta^{(t)}$, the $t^{th}$ MCMC sample (out of $T$ total MCMC samples) of

the model parameters. Unlike more widely used model selection criteria (e.g., Akaike's Information Criterion), there is no general rule of thumb regarding the amount of evidence provided by cross-validation scores within a model set (Hooten and Hobbs 2015); it is merely a measure of the predictive ability of a model. We considered the model with the smallest $CVS$ to be the best model.

We used 3 chains and computed the Gelman-Rubin convergence statistic ($\hat{R}$), which was <1.1 for all model parameters (Gelman and Rubin 1992, Brooks and Gelman 1998) to determine when the algorithms converged. We assessed the fit of the models using a Bayesian $P$-value based on the mean squared error (Kéry and Schaub 2012),

$$P = \frac{\sum_{t=1}^{T} MSE_t}{T}$$

where

$$MSE_t \begin{cases} 1, \text{if } \sum \frac{(\tilde{y} - \hat{y})^2}{k} > \sum \frac{(y - \hat{y})^2}{k} \\ 0, \text{if } \sum \frac{(\tilde{y} - \hat{y})^2}{k} \leq \sum \frac{(y - \hat{y})^2}{k} \end{cases}$$

and $y$ is the observed data, $\hat{y}$ is the predicted data, $\tilde{y}$ is simulated data based on MCMC samples at iteration $T$, and $k$ is the sample size. A $P$-value >0.05 suggests sufficient fit of the model to the data (Hooten and Hobbs 2015).

## RESULTS

As expected, most oil and gas covariates were correlated across space and time. Seventy-five percent of the 780 combinations of oil and gas metrics, including spatial scales and lag, had Pearson's correlation coefficients $r > 0.70$, with a minimum of $r = 0.56$. Percent sagebrush at the 3 scales were correlated, with all $r \geq 0.940$. Winter-spring and spring precipitation were correlated across scales for a given lag (all $r > 0.65$) but were uncorrelated across lags (range: 0.05–0.45).

Lek attendance decreased by 2.5% ($\lambda = 0.975$, 95% credible interval [CrI]: 0.962, 0.988) per year across the state from 1984 to 2008, based on the null model. Three hundred twenty-seven leks (53.3%) showed declines over the study period, with 45.6% of those (24.3% of leks overall) resulting in significant declines (Fig. 3). Significant declines ranged from 2.1% (95% CrI: [0.9%, 3.1%]; max. count: 48 M) to 42.4% (95% CrI: [33.9%, 50.0%]; max. count: 46 M) per year. Likewise, 46.7% of leks showed increasing lek attendance over the study period, with 56.1% of those leks showing significant gains (26.2% of leks overall). Overall, the magnitudes of annual gains were smaller than the losses for declining leks; significant increases ranged from 1.4% (95% CrI: [0.4%, 1.4%]; max. count: 155 M) to 55.4% (95% CrI: [38.1%, 76.3%]; max. count: 77 M) per year.

Cross-validation scores across all oil and gas metrics used to explain variation in changes in lek attendance were similar (Tables 1 and S2). This was likely due to high correlation between covariates. Models including well density within



**Figure 3.** Location and trends of male lek attendance (lambda; λ) of 614 greater sage-grouse leks in Wyoming, USA, 1984–2008. Shades of gray correspond to trend direction, with λ = 1 indicating stable attendance, and point sizes correspond to the magnitude of the trend, with larger points representing larger declines or increases. Bureau of Land Management field offices are labeled.

6,400 m at various time lags performed the best in each model set for all 4 time lags and a 4-year lag on well density was the best model for 4 of the 5 spatial scales. Effect sizes of oil and gas metrics did not vary much across time lags and by metric (i.e., well density or disturbance area), but effects decreased as spatial scale decreased, approaching zero at 800 m. The model that included a 4-year lag of well density within 6,400 m of a lek (well density, hereafter) had the best predictive ability for changes in lek attendance of any of the oil and gas metrics and showed a negative effect of well density on changes in lek attendance ($\beta = -0.020$, $[-0.034, -0.006]$).

The model including percent sagebrush cover within 3,200 m of a lek (sagebrush cover, hereafter) performed the best among the model set for sagebrush covariates. As with the oil and gas metrics, cross-validation scores were similar for all 3 models (1,600 m: $-50.41597$; 3,200 m: $-50.39557$; 6,400 m: $-50.38167$). Changes in lek attendance relative to sagebrush cover were effectively zero ($\beta = 0.001$, $[-0.015, 0.017]$).

The model including a 1-year lag on winter-spring precipitation at 6,400 m (spring precipitation, hereafter) was the best performing model overall (Tables 2 and S3), but effects were not significant ($\beta = 0.009$, $[-0.011, 0.029]$).

**Table 1.** Cross-validation scores (*CVS*) and model ranks for the top 5 univariable models including covariates of oil and gas development to estimate changes in male greater sage-grouse lek attendance in Wyoming, USA, 1984–2008. A smaller *CVS* suggests better predictive abilities of the model. All oil and gas metrics presented were measured within 6,400 m of a lek at lags of 1–4 years.

| Metric[a] | Lag[b] | CVS | Rank |
|---|---|---|---|
| Well density | 4 | −50.46247 | 1 |
| Well density | 3 | −50.44397 | 2 |
| Disturbance area | 2 | −50.44195 | 3 |
| Disturbance area | 1 | −50.42960 | 4 |
| Well density | 2 | −50.42844 | 5 |

[a] Well density is the number of wells/km². Disturbance area is the surface disturbance of oil and gas well pads (km²).
[b] A 1-year lag suggests that changes in lek attendance from $t$ to $t+1$ are influenced by the metric as calculated in $t-1$.

**Table 2.** Cross-validation scores (*CVS*) and model ranks for the top 5 univariable models including covariates of precipitation to estimate changes in male greater sage-grouse lek attendance in Wyoming, USA, 1984–2008. A smaller *CVS* suggests better predictive abilities of the model, and we considered the top model to be the one with the smallest *CVS*. We calculated the mean spring (Apr–May) or winter-spring (Jan–Jun) precipitation within a given radial distance (m) of a lek, as determined by the scale column, at lags of 1–4 years, using Parameter-Elevation Regressions on Independent Slopes Model (PRISM) precipitation data.

| Metric | Scale | Lag[a] | CVS | Rank |
|---|---|---|---|---|
| Winter-spring | 6,400 | 1 | −50.43018 | 1 |
| Spring | 3,200 | 3 | −50.42932 | 2 |
| Spring | 3,200 | 2 | −50.42345 | 3 |
| Spring | 1,600 | 4 | −50.41817 | 4 |
| Spring | 6,400 | 3 | −50.41615 | 5 |

[a] A 1-year lag suggests that changes in lek attendance from $t$ to $t+1$ are influenced by the metric as calculated in $t-1$.

There were no obvious patterns in models including precipitation covariates across time lags or spatial scales.

Models including well density performed the best within our final model set, with 10 of the top 11 models including well density. The top model included well density and an interactive term between sagebrush cover and winter-spring precipitation (Table 3). However, $CVS$s were the same to 2 decimal places for the 2 best models. We used the second best model (well density only) to make inferences because of the small differences in $CVS$s and because the sagebrush cover and precipitation main effects and their interaction were small and their 95% credible intervals included zero. The model that included a quadratic term on well density did not perform well and the null model performed the second worst in our final model set (Table 3). The Bayesian $P$-value for the best overall model (Bayesian $P = 0.46$) suggested an adequate fit of the model to the data.

Lek attendance in the average field office, given the average statewide well density, decreased over the study period, though not significantly (Table 4). Only the Buffalo field office showed a significant change in lek attendance, given the average statewide well density. When no wells were present within 6,400 m of a lek, attendance for the average field office was stable over the study period (Fig. 4). Lek attendance decreased more rapidly as well density increased and reached declines of 17.0%/year at 5.24 wells/km$^2$, the highest observed well densities at a 4-year lag. Declines became significant when well density reached approximately 4 wells/km$^2$ ($\lambda = 0.862$, 95% CrI: [0.748, 0.999]).

## DISCUSSION

Several studies have investigated the impacts of oil and gas development on sage-grouse lek attendance, though many

**Table 3.** Cross-validation scores ($CVS$) and model ranks for multivariable models including main effects and interactions between the top covariates of oil and gas development, sagebrush cover, and precipitation to estimate changes in male greater sage-grouse lek attendance in Wyoming, USA, 1984–2008. The top univariate models, a model including a quadratic term on well density, and the null model are also included in the model set. Well represents a 4-year lag on well density within 6,400 m of a lek, sagebrush represents the percent sagebrush cover within 3,200 m of a lek, and precip represents a 1-year lag on the mean winter-spring (Jan–Jun) precipitation within 6,400 m of a lek. A smaller $CVS$ suggests better predictive abilities of the model, and we considered the top model to be the one with the smallest $CVS$.

| Model | $CVS$ | Rank |
|---|---|---|
| Well + sagebrush + precip + sagebrush × precip | −50.46320 | 1 |
| Well | −50.46247 | 2 |
| Well + precip | −50.45359 | 3 |
| Well + sagebrush + precip | −50.45126 | 4 |
| Well + sagebrush | −50.44669 | 5 |
| Well + sagebrush + precip + well × sagebrush | −50.44571 | 6 |
| Well + precip + well × precip | −50.44324 | 7 |
| Well + sagebrush + precip + well × precip | −50.43915 | 8 |
| Well + sagebrush + well × sagebrush | −50.43368 | 9 |
| Precip | −50.43018 | 10 |
| Well + well$^2$ | −50.42801 | 11 |
| Sagebrush + precip + sagebrush × precip | −50.41598 | 12 |
| Sagebrush | −50.41597 | 13 |
| Null | −50.40264 | 14 |
| Sagebrush + precip | −50.39870 | 15 |

**Table 4.** Means and 95% credible intervals (CrI) from posterior distributions for the top model from the multivariate analysis of changes in male greater sage-grouse lek attendance in Wyoming, USA, 1984–2008. The model included a 4-year time lag on well density within 6,400 m of a lek ($\beta_{WD}$). Each Bureau of Land Management field office ($\beta_{FO_i}$) had a random intercept that came from a hyperdistribution with mean $\mu_{\beta_{FO}}$ and standard deviation $\sigma_{\beta_{FO}}$. The field offices included 1) Buffalo, 2) Casper, 3) Cody, 4) Kemmerer, 5) Lander, 6) Newcastle, 7) Pinedale, 8) Rawlins, 9) Rock Springs, and 10) Worland. The process error is represented by $\sigma_r$. Parameters with significant parameter estimates (i.e., 95% credible intervals do not include 0) are indicated with an asterisk.

| Parameter | $\bar{x}$ | 95% CrI |
|---|---|---|
| $\beta_{WD}$* | −0.020 | (−0.034, −0.006) |
| $\beta_{FO_1}$* | −0.096 | (−0.128, −0.066) |
| $\beta_{FO_2}$ | 0.003 | (−0.033, 0.039) |
| $\beta_{FO_3}$ | 0.000 | (−0.036, 0.037) |
| $\beta_{FO_4}$ | 0.012 | (−0.035, 0.061) |
| $\beta_{FO_5}$ | −0.018 | (−0.055, 0.019) |
| $\beta_{FO_6}$ | −0.029 | (−0.078, 0.019) |
| $\beta_{FO_7}$ | 0.008 | (−0.019, 0.036) |
| $\beta_{FO_8}$ | −0.002 | (−0.030, 0.027) |
| $\beta_{FO_9}$ | 0.018 | (−0.018, 0.054) |
| $\beta_{FO_{10}}$ | −0.007 | (−0.042, 0.028) |
| $\mu_{\beta_{FO}}$ | −0.011 | (−0.046, 0.025) |
| $\sigma_{\beta_{FO}}$ | 0.003 | (0.001, 0.010) |
| $\sigma_r$ | 0.534 | (0.514, 0.555) |

were conducted over short time periods, small spatial scales, or did not account for all sources of uncertainty in the ecological and observational processes (Harju et al. 2010, Taylor et al. 2013, Gregory and Beck 2014). We present an approach using a hierarchical, Bayesian state-space model (Kéry et al. 2009, Kéry and Schaub 2012) that addresses some of the shortcomings in these studies. The lack of repeated counts in our data did not allow us to separate the contribution of process and observation error to uncertainties



**Figure 4.** Mean (solid line) and 95% credible intervals (dashed lines) change in male greater sage-grouse lek attendance ($\lambda$) in response to a 4-year lag of well density within 6,400 m of a lek in Wyoming, USA. We manually drew values for the intercept using the posterior distribution for hyperparameters representing average Bureau of Land Management field office intercepts across Wyoming. The dashed horizontal line at $\lambda = 1$ represents a stable population.

in the response of lek attendance to covariates. However, this approach allowed us to make inference to a larger number of leks and over longer time periods by borrowing information from well-sampled leks to predict counts at poorly sampled leks. Uncertainties in the relationships between attendance at poorly sampled leks and oil and gas disturbance are accounted for in coefficient estimates, and, despite these uncertainties, we were still able to confirm the general findings of previous studies.

We estimated statewide annual declines in lek attendance of 2.5% based on our null model, which is similar to trends estimated in other studies for various Wyoming sage-grouse populations (Walker et al. 2007, Garton et al. 2011, Gregory and Beck 2014). However, as with other studies, we saw a large range of growth rates across our study area (Fig. 3) and declines were associated with higher well densities. Oil and gas development correlates well with sage-grouse population declines from 1984 to 2008 in Wyoming, which is supported by other findings (Doherty et al. 2010b, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013, Gregory and Beck 2014). As with other studies, we also found support for 4-year lag effects of oil and gas development on lek attendance (Walker et al. 2007, Doherty et al. 2010a, Harju et al. 2010, Gregory and Beck 2014). This result suggests that development likely affects recruitment into the breeding population rather than avoidance of wells by adult males or adult survival. Adult sage-grouse are highly philopatric to lek sites (Dalke et al. 1963, Wallestad and Schladweiler 1974, Emmons and Braun 1984, Dunn and Braun 1985, Connelly et al. 2011a), and males typically recruit to the breeding population in 2–3 years. We would expect a delayed response in lek attendance if development affects recruitment, either by reducing fecundity or avoidance of disturbance by nesting females, as adult males die and are not replaced by young males.

On average, lek attendance was stable when no oil and gas development was present within 6,400 m (Fig. 4). However, attendance declined as development increased. Declines did not become significant until well density reached approximately 4 wells/km$^2$; at this well density, we predict mean declines of nearly 14%/year ($\lambda = 0.862$, 95% CrI: [0.748, 0.999]). In 2008, Wyoming implemented measures to protect core areas of the sage-grouse population under the Sage-Grouse Executive Order (State of Wyoming 2008, 2015). The intent of this executive order was to maintain habitat for a large portion of Wyoming's sage-grouse population through fire suppression, habitat management, and limiting oil and gas development. The density of active wells near a lek within a core area is limited to 0.39 well pads/km$^2$ (State of Wyoming 2015), which may contain up to 64 wells/pad. The linear relationships we found between well density and lek attendance may not hold at such high densities, but even 1 well/pad at this pad density would correspond to a decline of approximately 1.4%/year ($\lambda = 0.986$, 95% CrI: [0.885, 1.100]) within core areas, based on our results (Fig. 4). These predicted declines are not significant because of the uncertainty associated with lek counts and sparse data but suggest that declines in sage-grouse populations may continue within core areas at these development levels.

Though several studies have examined the impacts of oil and gas development on sage-grouse lek attendance, we provide the first comparison of 2 measures of disturbance due to development. Other studies have typically used well or well pad density at various spatial scales and time lags as a measure of oil and gas development (Doherty et al. 2010a, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013, Gregory and Beck 2014). However, the distribution of wells around a lek may play an important role in the magnitude of the impacts (Walker et al. 2007), so we fit models including disturbance area to account for these differences. If wells are located close to other wells, disturbance due to light and noise will be concentrated in a smaller area, leaving a larger proportion of the landscape undisturbed. Additionally, fewer roads and pipelines may be necessary, resulting in reduced infrastructure and less habitat fragmentation and disturbance from vehicular traffic. We were unable to find differences between the models that included well density and those that included disturbance area because of high correlation between these covariates, suggesting that a simple measure of well density may be suitable to capture correlative effects of energy development on sage-grouse population trends across broad geographic extents. This does not dismiss that more local impacts on survival may be occurring in response to how development takes place (Holloran et al. 2005, Aldridge and Boyce 2007).

There was only one BLM field office that showed significant declines over the study period (Buffalo; Table S4). However, the largest mean growth for any field office was only 2.1%/year ($\lambda = 1.021$, [0.990, 1.052]), suggesting that future development may result in declines in these currently stable regions. We acknowledge that BLM field offices may be too large and arbitrary to represent natural groupings of leks that respond to local habitat and weather conditions, but all models including random intercepts for field office performed better than the best fixed-intercept model we fit in preliminary analyses. This suggests that some autocorrelation in changes in lek attendance occurs at this scale and it may provide a useful way to group leks to account for this correlation and improve the precision of estimates.

We found little evidence that the amount of sagebrush surrounding a lek influenced changes in lek attendance. However, numerous studies have described the importance of sagebrush to sage-grouse throughout their life cycle (Remington and Braun 1985, Gregg et al. 1994, Holloran et al. 2005, Doherty et al. 2010b, Fedy et al. 2014). Therefore, we think that the effects of sagebrush in our models were small and imprecise (coefficient of variation, $\sigma/\mu = 7.76$) because we were only able to obtain estimates of sagebrush cover from 2006 to 2007. Changes in sagebrush cover are negatively correlated with changes in well density because oil and gas development often occurs in areas of high sagebrush cover (Knick et al. 2003, Connelly et al. 2011b, Finn and Knick 2011) and removes sagebrush habitat. Though time-varying estimates of sagebrush cover would better represent changes in available habitat throughout the

study period, we expected the single estimate to represent sagebrush abundance. In addition, having an estimate from near the end of our study period allows us to evaluate the cumulative impacts of sagebrush loss at leks and it corresponds to the years with the highest data coverage. More frequent measures of sagebrush cover for southwestern Wyoming are being estimated (C. G. Homer, United States Geological Survey, unpublished data), and future studies should investigate the impacts of changes in sagebrush cover over time on sage-grouse population trends (lek attendance).

Precipitation can have a positive influence on nesting success, clutch size, and chick and juvenile survival (Holloran et al. 2005, Blomberg et al. 2014a,b), potentially resulting in impacts on male lek attendance as males enter the breeding population. We found little evidence for the effect of precipitation on lek attendance and responses to lags were not differentiated. The lack of evidence for strong impacts of precipitation is possibly due to the scale of the PRISM data used in our analyses (i.e., 4-km). This extent may be too coarse spatially and temporally to capture the mechanisms influencing sage-grouse recruitment or the error associated with estimation of these metrics may be too large, overwhelming any potential effects. However, other studies on sage-grouse in the Great Basin used similar measures and found positive responses of recruitment and population growth to increasing precipitation (Blomberg et al. 2012, Coates et al. 2015). The Great Basin has lower annual precipitation and drier and warmer soils than Wyoming (Coates et al. 2015), and its sage-grouse populations may be more sensitive to precipitation. Finally, the timing of precipitation may play an important role in how sage-grouse populations respond. We included time periods shown to affect recruitment in Wyoming (Holloran et al. 2005). However, precipitation during other times may influence other demographic parameters, such as adult survival, to which populations may be more sensitive. Future studies should investigate the importance of precipitation timing on various demographic vital rates and population growth.

We acknowledge that lek counts are not an ideal direct measure of sage-grouse populations. Attendance rates of sage-grouse vary throughout the day, breeding season, and across sexes and age classes (Jenni and Hartzler 1978, Emmons and Braun 1984, Walsh et al. 2004, Johnson and Rowland 2007). However, survey protocols are standardized within Wyoming to ensure that maximum male counts provide a reasonable index to abundance (Fedy and Aldridge 2011, Christiansen 2012, Blomberg et al. 2013). The assumption that detection rates of sage-grouse are constant across surveys and observers poses an additional problem (Walsh et al. 2004). Even if the number of males present at a lek is constant across surveys, counts will provide a biased index of abundance if detection probabilities are not constant (Anderson 2001). Standardization of protocols and training of observers likely reduces the variation in detection probabilities so that changes in lek counts more accurately reflect changes in abundance rather than detection (Walsh et al. 2004). Additionally, our model included an error term to account for some of the variation in counts due to process

error and assumed counts were a random variable, accounting for observation error. Because we could not assume closure of the lek-attending sage-grouse population between surveys, we were able to use only 1 count from each lek in a given year. Having additional counts, possibly from a second observer counting at the same time, could provide replication to estimate detection probabilities (Nichols et al. 2000, Forcey et al. 2006) and tease apart variation due to process and observation error. However, this requires financial and personnel resources, and tradeoffs between replication and the number of leks sampled should be assessed based on the information desired by management agencies (Fedy and Aldridge 2011).

## MANAGEMENT IMPLICATIONS

Our findings contribute to the growing number of studies suggesting oil and gas development has negative impacts on sage-grouse populations and suggest that current regulations may only be sufficient for limiting population declines but not for reversing these trends. Additionally, areas not protected under the executive order are not subject to core-area regulations and may experience larger increases in oil and gas development and, therefore, larger declines in sage-grouse populations.

## ACKNOWLEDGMENTS

Any use of trade, firm, or product names is for descriptive purposes only and does not imply endorsement by the U.S. Government. The authors do not have any conflicts of interest to report. We thank WGFD for use of lek survey data and all personnel that performed lek counts. A large number of people provided input throughout the analysis, particularly A. P. Monroe, D. R. Edmunds, J. A. Heinrichs, and D. J. Manier. M. B. Hooten and N. T. Hobbs provided useful discussion about the model structure and model selection. We thank P. S. Coates, S. L. Garman, and 2 anonymous reviewers for valuable feedback on previous versions of the manuscript. United States Geological Survey Fort Collins Science Center and the Wyoming Landscape Conservation Initiative provided funding for this research.

## LITERATURE CITED

Aldridge, C. L., and M. S. Boyce. 2007. Linking occurrence and fitness to persistence: a habitat-based approach for greater sage-grouse. Ecological Applications 17:508–526.

Aldridge, C. L., and M. S. Boyce. 2008. Accounting for fitness: combining survival and selection when assessing wildlife-habitat relationships. Israel Journal of Ecology and Evolution 54:389–419.

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial nesting habitat for Gunnison sage-grouse: a spatially explicit hierarchical approach. Journal of Wildlife Management 76:391–406.

Anderson, D. R. 2001. The need to get the basics right in wildlife field studies. Wildlife Society Bulletin 29:1294–1297.

Barnett, J. K., and J. A. Crawford. 1994. Pre-laying nutrition of sage grouse hens in Oregon. Journal of Range Management 47:114–118.

Bayne, E. M., L. Habib, and S. Boutin. 2008. Impacts of chronic anthropogenic noise from energy-sector activity on abundance of songbirds in the boreal forest. Conservation Biology 22:1186–1193.

Beck, T. D. I., and C. E. Braun. 1980. The strutting ground count: variation, traditionalism, management needs. Proceedings of the Western Association of Fish and Wildlife Agencies 60:558–566.

Blomberg, E. J., D. Gibson, M. T. Atamian, and J. S. Sedinger. 2014a. Individual and environmental effects on egg allocations of female greater sage-grouse. Auk 131:507–523.

Blomberg, E. J., J. S. Sedinger, M. T. Atamian, and D. V. Nonne. 2012. Characteristics of climate and landscape disturbance influence the dynamics of greater sage-grouse populations. Ecosphere 3:55. http://dx.doi.org/10.1890/E S11-00304.1

Blomberg, E. J., J. S. Sedinger, P. S. Coates, and M. L. Casazza. 2014b. Carryover effects and climatic conditions influence the postfledging survival of greater sage-grouse. Ecology and Evolution 4:4488–4499.

Blomberg, E. J., J. S. Sedinger, D. V. Nonne, and M. T. Atamian. 2013. Annual male lek attendance influences count-based population indices of greater sage-grouse. Journal of Wildlife Management 77:1583–1592.

Brooks, S. P., and A. Gelman. 1998. General methods for monitoring convergence of iterative simulations. Journal of Computational and Graphical Statistics 7:434–455.

Buckland, S. T., K. B. Newman, L. Thomas, and N. B. Koesters. 2004. State-space models for the dynamics of wild animal populations. Ecological Modelling 171:157–175.

Bunting, S. C., J. L. Kingery, and M. A. Schroeder. 2003. Assessing the restoration potential of altered rangeland ecosystems in the Interior Columbia Basin. Ecological Restoration 21:77–86.

Carpenter, J. E., C. L. Aldridge, and M. S. Boyce. 2010. Sage-grouse habitat selection during winter in Alberta. Journal of Wildlife Management 74:1806–1814.

Christiansen, T. J. 2012. Chapter 12: sage-grouse (Centrocercus urophasianus). Pages 12-1–12-55 in S. A. Tessmann and J. R. Bohne, editors. Handbook of biological techniques: third edition. Wyoming Game and Fish Department, Cheyenne, USA.

Clark, J. S., and O. N. Bjørnstad. 2004. Population time series: process variability, observation errors, missing values, lags, and hidden states. Ecology 85:3140–3150.

Coates, P. S., M. A. Ricca, B. G. Prochazka, K. E. Doherty, M. L. Brooks, and M. L. Casazza. 2015. Long-term effects of wildfire on greater sage-grouse—integrating population and ecosystem concepts for management in the Great Basin. U.S. Geological Survey Open-File Report 2015-1165, Reston, Virginia, USA.

Connelly, J. W., C. A. Hagen, and M. A. Schroeder. 2011a. Characteristics and dynamics of greater sage-grouse populations. Pages 53–68 in S. T. Knick and J. W. Connelly, editors. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology, volume 38. University of California Press, Berkeley, USA.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.

Connelly, J. W., E. T. Rinkes, and C. E. Braun. 2011b. Characteristics of greater sage-grouse habitats: a landscape species at micro and macro scales. Pages 69–83 in S. T. Knick and J. W. Connelly, editors. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology, volume 38. University of California Press, Berkeley, USA.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28:967–985.

Connelly, J. W., W. L. Waddinen, A. D. Apa, and K. P. Reese. 1991. Sage grouse use of nest sites in southeastern Idaho. Journal of Wildlife Management 55:521–524.

Dalke, P. D., D. B. Pyrah, D. C. Stanton, J. E. Crawford, and E. F. Schlatterer. 1963. Ecology, productivity, and management of sage grouse in Idaho. Journal of Wildlife Management 27:810–841.

de Valpine, P., and A. Hastings. 2002. Fitting population models incorporating process noise and observation error. Ecological Monographs 72:57–76.

Doherty, K. E., D. E. Naugle, and J. S. Evans. 2010a. A currency for offsetting energy development impacts: horse-trading sage-grouse on the open market. PLoS ONE 5:e10339.

Doherty, K. E., D. E. Naugle, and B. L. Walker. 2010b. Greater sage-grouse nesting habitat: the importance of managing at multiple scales. Journal of Wildlife Management 74:1544–1553.

Doherty, K. E., D. E. Naugle, B. L. Walker, and J. M. Graham. 2008. Greater sage-grouse winter habitat selection and energy development. Journal of Wildlife Management 72:187–195.

Driese, K. L., W. A. Reiners, E. H. Merrill, and K. G. Gerow. 1997. A digital land cover map of Wyoming, USA: a tool for vegetation analysis. Journal of Vegetation Science 8:133–146.

Dunn, P. O., and C. E. Braun. 1985. Natal dispersal and lek fidelity of sage grouse. Auk 102:621–627.

Dyer, S. J., J. P. O'Neill, S. M. Wasel, and S. Boutin. 2002. Quantifying barrier effects of roads and seismic lines on movements of female woodland caribou in northeastern Alberta. Canadian Journal of Zoology 80:839–845.

Emmons, S. R., and C. E. Braun. 1984. Lek attendance of male sage grouse. Journal of Wildlife Management 48:1023–1028.

Fedy, B. C., and C. L. Aldridge. 2011. Long-term monitoring of sage-grouse populations: the importance of within-year repeated counts and the influence of scale. Journal of Wildlife Management 75:1022–1033.

Fedy, B. C., K. E. Doherty, C. L. Aldridge, M. O'Donnell, J. L. Beck, B. Bedrosian, D. Gummer, M. J. Holloran, G. D. Johnson, N. W. Kaczor, C. P. Kiriol, C. A. Mandich, D. Marshall, G. McKee, C. Olson, A. C. Pratt, C. C. Swanson, and B. L. Walker. 2014. Habitat prioritization across large landscapes, multiple seasons, and novel areas: an example using greater sage-grouse in Wyoming. Wildlife Monographs 190:1–39.

Finn, S. P., and S. T. Knick. 2011. Changes to the Wyoming Basins landscape from oil and natural gas development. Pages 46–68 in S. E. Hanser, M. Leu, S. T. Knick, and C. L. Aldridge, editors. Sagebrush ecosystem conservation and management: ecoregional assessment tools and models for the Wyoming Basins. Allen Press, Lawrence, Kansas, USA.

Forcey, G. M., J. T. Anderson, F. K. Ammer, and R. C. Whitmore. 2006. Comparison of two double-observer point-count approaches for estimating breeding bird abundance. Journal of Wildlife Management 70:1674–1681.

Francis, C. D., N. J. Kleist, C. P. Ortega, and A. Cruz. 2012. Noise pollution alters ecological services: enhanced pollination and disrupted seed dispersal. Proceedings of the Royal Society B: Biology 279:2727–2735.

Francis, C. D., C. P. Ortega, and A. Cruz. 2011. Different behavioural responses to anthropogenic noise by two closely related passerine birds. Biology Letters 7:850–852.

Garton, E. O., J. W. Connelly, J. S. Horne, C. A. Hagen, A. Moser, and M. A. Schroeder. 2011. Greater sage-grouse population dynamics and probability of persistence. Pages 293–381 in S. T. Knick and J. W. Connelly, editors. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology, volume 38. University of California Press, Berkeley, USA.

Gelman, A., and D. B. Rubin. 1992. Inference from iterative simulation using multiple sequences. Statistical Science 7:457–472.

Gilbert, M. M., and A. D. Chalfoun. 2011. Energy development affects populations of sagebrush songbirds in Wyoming. Journal of Wildlife Management 75:816–824.

Gregg, M. A., J. A. Crawford, M. S. Drut, and A. K. DeLong. 1994. Vegetational cover and predation of sage grouse nests in Oregon. Journal of Wildlife Management 58:162–166.

Gregory, A. J., and J. L. Beck. 2014. Spatial heterogeneity in response of male greater sage-grouse lek attendance to energy development. PLoS ONE 9:e97132.

Griffin, D. 2002. Prehistoric human impacts on fire regimes and vegetation in the northern Intermountain West. Pages 77–100 in T. R. Vale, editor. Fire, native peoples, and the natural landscape. Island Press, Washington, D.C., USA.

Harju, S. M., M. R. Dzialak, R. C. Taylor, L. D. Hayden-Wing, and J. B. Winstead. 2010. Thresholds and time lags in effects of energy development on greater sage-grouse. Journal of Wildlife Management 74:437–448.

Hess, J. E., and J. L. Beck. 2012. Disturbance factors influencing greater sage-grouse lek abandonment in north-central Wyoming. Journal of Wildlife Management 76:1625–1634.

Holloran, M. J. 2005. Greater sage-grouse (Centrocercus urophasianus) population response to natural gas field development in western Wyoming. Dissertation, University of Wyoming, Laramie, USA.

Holloran, M. J., and S. H. Anderson. 2005. Spatial distribution of greater sage-grouse nests in relatively contiguous sagebrush habitats. Condor 107:742–752.

Holloran, M. J., B. J. Heath, A. G. Lyon, S. J. Slater, J. L. Kuipers, and S. H. Anderson. 2005. Greater sage-grouse nesting habitat selection and success in Wyoming. Journal of Wildlife Management 69:638–649.

Holloran, M. J., R. C. Kaiser, and W. A. Hubert. 2010. Yearling greater sage-grouse response to energy development in Wyoming. Journal of Wildlife Management 74:65–72.

Homer, C. G., C. L. Aldridge, D. K. Meyer, M. J. Coan, and Z. H. Bowen. 2008. Multiscale sagebrush rangeland habitat modeling in southwest Wyoming. U.S. Geological Survey Open-File Report 2008-1027, Washington, D.C., USA.

Homer, C. G., C. L. Aldridge, D. K. Meyer, and S. H. Schell. 2012. Multiscale remote sensing sagebrush characterization with regression trees over Wyoming, USA: laying a foundation for monitoring. International Journal of Applied Earth Observation and Geoinformation 14:233–244.

Hooten, M. B., and N. T. Hobbs. 2015. A guide to Bayesian model selection for ecologists. Ecological Monographs 85:3–28.

Jarnevich, C. S., and M. K. Laubhan. 2011. Balancing energy development and conservation: a method utilizing species distribution models. Environmental Management 47:926–936.

Jenni, D. A., and J. E. Hartzler. 1978. Attendance at a sage grouse lek: implications for spring censuses. Journal of Wildlife Management 42:46–52.

Johnson, K. H., and C. E. Braun. 1999. Viability and conservation of an exploited sage grouse population. Conservation Biology 13:77–84.

Johnson, D. H., and M. M. Rowland. 2007. The utility of lek counts for monitoring greater sage-grouse. Pages 15–24 in K. P. Reese and R. T. Bowyer, editors. Monitoring populations of sage-grouse. College of Natural Resources Experiment Station Bulletin 88, Moscow, Idaho, USA.

Kéry, M., R. M. Dorazio, L. Soldaat, A. Van Strien, A. Zuiderwijk, and J. A. Royle. 2009. Trend estimation in populations with imperfect detection. Journal of Applied Ecology 46:1163–1172.

Kéry, M., and M. Schaub. 2012. Bayesian population analysis using WinBUGS: a hierarchical perspective. Academic Press, Burlington, Vermont, USA.

Knick, S. T., D. S. Dobkin, J. T. Rotenberry, M. A. Schroeder, W. M. Vander Hagen, and C. van Riper, III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611–634.

Knick, S. T., S. E. Hanser, M. Leu, C. L. Aldridge, and M. J. Wisdom. 2011. An ecoregional assessment of the Wyoming Basins. Pages 1–9 in S. E. Hanser, M. Leu, S. T. Knick, and C. L. Aldridge, editors. Sagebrush ecosystem conservation and management: ecoregional assessment tools and models for the Wyoming Basins. Allen Press, Lawrence, Kansas, USA.

Lyon, A. G., and S. H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. Wildlife Society Bulletin 31:486–491.

Miller, R. F., S. T. Knick, D. A. Pyke, C. W. Meinke, S. E. Hanser, M. J. Wisdom, and A. L. Hild. 2011. Characteristics of sagebrush habitats and limitations to long-term conservation. Pages 145–184 in S. T. Knick and J. W. Connelly, editors. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology 38. University of California Press, Berkeley, California, USA.

Monroe, A. P., D. R. Edmunds, and C. L. Aldridge. 2016. Effects of lek count protocols on greater sage-grouse population trend estimates. Journal of Wildlife Management 80:667–678.

Nichols, J. D., J. E. Hines, J. R. Sauer, F. W. Fallon, J. E. Fallon, and P. J. Heglund. 2000. A double-observer approach for estimating detection probability and abundance from point counts. Auk 117:393–408.

Northrup, J. M. 2015. Behavioral response of mule deer to natural gas development in the Piceance Basin. Dissertation, Colorado State University, Fort Collins, USA.

Northrup, J. M., and G. Wittemyer. 2012. Characterising the impacts of emerging energy development of wildlife, with an eye towards mitigation. Ecology Letters 16:112–125.

Pitman, J. C., C. A. Hagen, R. J. Robel, T. M. Loughin, and R. D. Applegate. 2005. Location and success of lesser prairie-chicken nests in relation to vegetation and human disturbance. Journal of Wildlife Management 69:1259–1269.

Plummer, M. 2003. JAGS: a program for analysis of Bayesian graphical models using Gibbs sampling. Proceedings of the 3rd International Workshop on Distributed Statistical Computing DSC 2003, 20–22 March 2003, Vienna, Austria.

Plummer, M. 2013. JAGS version 3.4.0 user manual. http://sourceforge.net/projects/mcmc-jags/files/Manuals/3.x/jags_user_manual.pdf. Accessed 25 Jun 2015.

PRISM Climate Group. 2008. Oregon State University. http://prism.oregonstate.edu. Accessed 29 Apr 2011.

R Core Team. 2013. R: a language and environment for statistical computing. R Foundation for Statistical Computing, Vienna, Austria.

Remington, T. E., and C. E. Braun. 1985. Sage grouse food selection in winter, North Park, Colorado. Journal of Wildlife Management 49:1055–1061.

Rowland, M. M., and M. Leu. 2011. Study area description. Pages 10–45 in S. E. Hanser, M. Leu, S. T. Knick, and C. L. Aldridge, editors. Sagebrush ecosystem conservation and management: ecoregional assessment tools and models for the Wyoming Basins. Allen Press, Lawrence, Kansas, USA.

Rowland, M. M., L. H. Suring, M. Leu, S. T. Knick, and M. J. Wisdom. 2011. Sagebrush-associated species of conservation concern. Pages 46–68 in S. E. Hanser, M. Leu, S. T. Knick, and C. L. Aldridge, editors. Sagebrush ecosystem conservation and management: ecoregional assessment tools and models for the Wyoming Basins. Allen Press, Lawrence, Kansas, USA.

Sawyer, H., M. J. Kauffman, and R. M. Nielson. 2009. Influence of well pad activity on winter habitat selection patterns of mule deer. Journal of Wildlife Management 73:1052–1061.

Sawyer, H., R. M. Nielson, F. Lindzey, and L. L. McDonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70:396–403.

Schroeder, M. A., J. R. Young, and C. E. Braun. 1999. Sage grouse (Centrocercus urophasianus). Account 425 in A. Poole and F. Gill, editors. The birds of North America. The Birds of North America, Inc., Philadelphia, Pennsylvania, USA.

Skinner, R. H., J. D. Hanson, G. L. Hutchinson, and G. E. Schuman. 2002. Response of $C_3$ and $C_4$ grasses to supplemental summer precipitation. Journal of Range Management 55:517–522.

State of Wyoming. 2008. Office of Governor Freudenthal. State of Wyoming Executive Department Executive Order. Greater Sage Grouse Area Protection. 2008-02. http://will.state.wy.us/sis/wydocs. Accessed 10 Jun 2015.

State of Wyoming. 2015. Office of Governor Mead. State of Wyoming Executive Department Executive Order. Greater Sage-Grouse Core Area Protection. 2015-04. http://will.state.wy.us/sis/wydocs. Accessed 16 Sep 2016.

Swenson, J. E. 1986. Differential survival by sex in juvenile sage grouse and gray partridge. Ornis Scandinavica 17:14–17.

Taylor, R. L., J. D. Tack, D. E. Naugle, and L. S. Mills. 2013. Combined effects of energy development and disease on greater sage-grouse. PLoS ONE 8:e71256.

Wakkinen, W. L., K. P. Reese, and J. W. Connelly. 1992. Sage grouse nest locations in relation to leks. Journal of Wildlife Management 56:381–383.

Walker, B. L., D. E. Naugle, and K. E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71:2644–2654.

Wallestad, R., and P. Schladweiler. 1974. Breeding season movements and habitat selection of male sage grouse. Journal of Wildlife Management 38:634–637.

Walsh, D. P., G. C. White, T. E. Remington, and D. C. Bowden. 2004. Evaluation of the lek-count index for greater sage-grouse. Wildlife Society Bulletin 32:56–68.

Wasser, S. K., J. L. Keim, M. L. Taper, and S. R. Lele. 2011. The influences of wolf predation, habitat loss, and human activity on caribou and moose in the Alberta oil sands. Frontiers in Ecology and the Environment 9:546–551.

West, N. E. 2000. Synecology and disturbance regimes of sagebrush steppe ecosystems. Pages 15–26 in P. G. Entwistle, A. M. DeBolt, J. H. Kaltenecker, and K. Steenhof, editors. Proceedings: sagebrush steppe ecosystems symposium. USDI Bureau of Land Management Publication BLM/ID/PT-00100111150, Boise, Idaho, USA.

Wyoming Oil and Gas Conservation Coalition [WOGCC]. 2011. http://wogcc.state.wy.us. Accessed 5 Sep 2011.

*Associate Editor: Peter Coates.*

# SUPPORTING INFORMATION

Additional supporting information may be found in the online version of this article at the publisher's website.

08/04/2016

Cynthia Patterson
3122 Enfield Point
Marietta, GA 30068

My father grew up in Crawford and we often vacationed in the beautiful North Fork Valley.

Protecting water for residents, crops and livestock is of paramount importance. The Southwest is in a prolonged drought, likely to intensify as climate change accelerates. It is impossible to prevent spills and seepage, which contaminate soil and ground water. Across Colorado, there is an average of two spills from the oil and gas industry each day.

The largest concentration of organic farms in Colorado is in the North Fork. The organic produce and spin off products are shipped across the country.

The North Fork Valley is an agri-tourism destination, nicknamed Colorado's "farm-to-table capital." The noise, air, water and soil pollution that result from drilling and the associated infrastructure and traffic will contaminate the pristine North Fork. Large scale gas drilling and fracking are incompatible with the area.

I don't want the North Fork Valley to be despoiled by oil and gas development. However, my biggest concern is global. Scientific evidence indicates gas production, from drillpad to market is more polluting than originally believed. The biggest risk is intentionally and accidentally releasing methane. The Intergovernmental Panel on Climate Change concludes the global warming potential of methane is **34 times** that of carbon dioxide over a one-hundred-year time span.

To deliver a 50% probability of no more than 1.5C of warming this century, the world must leave two-thirds of its fossil fuel

reserves in the ground.

Thank you.

Sincerely,

Cynthia Patterson

Declaration of Oil and Gas Development Impact Statement:
**Name:** Eileen and Scot Milvenan
**Address:** 14099 Thompson Road, Paonia, CO 81428
**Date:** October 15, 2016

**Background:** My husband and I have been coming to Colorado for the past 21 years. When it came time to retire from our medical practices (neonatology and pathology), we chose to leave Texas and make Colorado our full-time home. We thought long and hard about where to start this chapter of our lives and ended up choosing the North Fork Valley, specifically Paonia, based on three main factors: 1) the natural beauty of the area, which geographer Thomas Huber likens to the Provence region in France and a place to be treasured and protected because of its special attributes; 2) the intriguing fact that most of the fruits, vegetables, and meats we commonly purchased in Colorado came from this particular valley; 3) we wanted to build a home and farm in an enlightened community that values organic living, sustainability, and progressive attitudes toward the environment.
We purchased 12 acres in Paonia at a cost of more than a quarter of a million dollars and built a farm focused on permaculture and renewable energy. We spent 5 years meticulously planning our home and developing the land for these purposes.

**Impact due to and cost to treat:**
If the public lands in the North Fork Valley become available for leasing by oil and gas companies, it will jeopardize our retirement. Deterioration of the air and/or water quality and disruption to the serenity of the area will ruin what Paonia has come to be known for in recent years – vineyards and wineries, organic agriculture, a vibrant festival and cultural scene for both locals and tourists, and a breathtaking natural landscape.
Fracking and its associated processes will undermine our ability to live a healthy life, and any accidents or contaminations will quash our plans to effectively grow organic produce on our farm. We will lose the investment in our property and the home and structures we built, the considerable effort made to prepare our land for permaculture, the crops we planted, and the energy-efficient systems we installed. If we have to move, since we are in our retirement years, our ability to recoup any losses is almost nil, and we will NOT be able to recreate our current setup elsewhere.

**Impact on:**
• Air quality - We are very concerned about the dangerous correlations between polluted air due to drilling and fracking processes and health issues. My husband has a recurrent chronic cough, and toxic chemicals in the air will only exacerbate the problem. While we are older and will thus have less lifetime exposure to these threats, we built this farm for our children, grandchildren, and future generations of our family, and it is unacceptable that they might have to grow up breathing contaminated air and suffering the consequences to their health.

• Water - The lack of regulations protecting our water resources from hydraulic fracturing means bad news for our water supply. Because we built our farm in an arid environment, we were

very intentional about where and how we would get both our drinking water and water for irrigation. Our drinking water comes from a domestic water tap, and should that be contaminated, there will be no way for us to remain in Paonia. Clean drinking water is necessary and priceless. The Bureau of Land Management does not know how hydraulic fracturing in the valley will affect our water sources, and we simply cannot risk anything happening to the quality or quantity of our water. This climate borders on high desert (~15" rainfall per year), and it is unknown how that status will change in the future. Significant water is required for fracking, and with inevitable changes in draught status, there could be scenarios in which *leasing* oil and gas companies get the water they need while *landowners* in the area don't get enough for their needs.

Our irrigation water comes from the Minnesota Ditch. The Minnesota Canal and Reservoir Company (of which we own 14 shares) obtained almost 4 million dollars in federal grant money to properly upgrade the water collection and delivery systems to decrease evaporative loss and salinity and maximize the amount of water available for use. If this water were contaminated due to a spill or an earthquake-related accident all those millions will have been wasted. Tainted ditch water will compromise our organic crops and any potential income we might derive from their sales. We have fruit and nut trees, root vegetables, berries, garden vegetables, and alfalfa, as well as plans and structures in place for chickens and goats. Few people would be interested in purchasing agricultural products from an area known to be a toxic environment.

Living in a place where people are so mindful of their water needs and careful about preserving the quality and quantity of their water makes it particularly tragic to introduce something like hydraulic fracturing that will endanger the water supply.

• Property value - Having the North Fork Valley opened to occupation by oil and gas operators extinguishes the potential for this area to remain a natural treasure and the highest concentration of organic farms in Colorado. If the farmers can't depend on their crops they will have to leave. Our economy will suffer, our growing tourist trade will suffer, our property values will fall. Occupation by oil and gas companies will limit the use of public lands by the public for recreation. People won't view the valley as a destination, and the monetary value of our properties will crumble. We have spent over one million dollars on this farm, the residence and structures, and improvements to the land. If fracking issues force us to sell our home and move elsewhere, we will never get back what we invested.

• Quality of life - One of our intentions in building our farm was for it to be a place for our children and their future generations. We also chose this valley because we wanted to stay active in our retirement in a beautiful natural environment. Our purchase of this land was the beginning of a dream. We have just now started to realize the fruits of our labors, and damage to the area - the wildlife, the landscape, the community, the future - is something that compromises our quality of life here. You cannot put a price on the loss of something like that.

Michael L. Drake – Declaration of Impacts

In 1977 I started my almost annual trip from Ohio to Colorado to hunt. In 2000, my job moved me from Dayton, Ohio to Ogden, Utah, which greatly reduced my trip to hunt in Colorado. In 2001, my wife and I started evaluating where in the West we were going to live when we retired. We investigated and visited multiple places in Idaho, Wyoming, Montana, and Colorado. We decided that Colorado was the best place for us to live. We looked across the state from Canon City to Craig. In late 2002, we found Paonia, in the North Fork Valley (NFV).

It was 2004 before we found and closed on our home in the NFV. We became permanent residents in early 2008. We live on a 7-acre mini farm where we have an organic home garden. We have been improving much of our property to allow organic grazing for sheep and goats, and expect to start the grazing operation in 2017.

We choose the NFV because of the following:
- The abundant organic animal, vegetable, and fruit farms
- The organic wineries
- The traditional farms and ranches
- The year-round outdoor activities such as hiking, biking, fishing, hunting, camping and cross-country skiing
- The clean air and water
- The small town and rural environment
- The brilliant night sky

Both the indigenous Ute Indians and the US immigrant population that settled this area after the Utes were forced out, were in the NFV because of the valley's abundant clean water, fertile soil, and climate. At the 1893 World Fair in Chicago, all six NFV fruits entered in that Fair won the Gold Medal for their category. The NFV continues to be known for the fruits, vegetables and livestock grown here.

My wife and I started hiking, camping, and fishing in the North Fork Valley in 2003. In 2006 we started archery hunting in the North Fork Valley. Since that time, I have killed two elk and two deer here, and my wife has killed one deer.

My direct impacts from the development of oil and gas in the North Fork Valley occur in each of the three major parts of my live – farm operations, home life, and outdoor activities.

**Farm Operations** – My farm, like most farms in the valley, exists because of the irrigation water rights that I own. Clean irrigation water is the key to successful farming in the NFV.

Two separate facts combine to prove that O&G development in the NFV will have a devastating impact on my farm and farming in general within the NFV, from the irrigation water prospective. The first fact is that all irrigation water in the NFV will directly be impacted by any surface water contamination. The second fact is that reports from all O&G development sites document a variety of regular spills that result in surface water contamination. In 2014 there were over 700 spills reported in Colorado. The only mitigation plan for a contaminated open dirt ditch irrigation system is the remediation of the contaminated dirt ditch and all the contaminated farms served by that ditch, including the on-farm irrigation system such as sprinkler systems. I should note that my particular irrigation company used sections of naturally occurring creeks, in conjunction with both dirt ditches and piped ditches, to deliver irrigation water to the farms served.

Air pollution from O&G development will provide a significant risk to both organic and traditional farming operations in the NFV, including my farm.

**Home Life –** We use irrigation water for our home organic garden. Therefore, all the comments above about irrigation water contamination from O&G applies to our organic garden. When a spill contaminates our irrigation water, our system of 10 raised beds will require complete replacement of the contaminated soil.

Our home drinking water comes from springs in the mountains close to Paonia. O&G spills will directly impact our drinking water source. The entire water system from the source, raw water storage, purification system, treated water storage, and water delivery will require decontamination. Not only will there be a large loss of water from the contamination event, but there also will be a large amount of water lost through the decontamination process. Water wasted in Colorado should be a crime because of the limited amount of water available and the predicted large water shortage for 2050.

Most of the drinking water in the NFV will be directly impacted by O&G spills that contaminate surface water. The town of Somerset and the three coal mines in the area get their drinking water directly from the North Fork of the Gunnison River, with the mines also getting their industrial water for mining operations. All creeks in the NFV Mountains flow into this river. Again, the cost of remediation of the town and coal mine water systems would be large.

**Life Activities –** Hunting and fishing will be directly impacted by O&G development. The impact will require us stop hunting 45 minutes from the house and revert to driving 3 to 7 hours to hunt. Needless to say, this defeats one of the main reasons we moved to the NFV. The impacts on hunting and fishing involve surface water contamination, air pollution, habitat fragmentation. Additional impacts are the industrial light and noise, traffic and human activities that O&G development brings to the area. Combined, the impacts cause the game to avoid these areas and disrupt migration patterns. We saw directly the habitat fragmentation impact from the results of logging in the area that reduced the elk population. The elk simply left the area to avoid the human traffic and activities, and the changes in the required elk habitat. As the area recovers from the logging, the elk are slowing coming back into the area.

Our hiking, biking, camping and cross-country skiing activities (including wildlife viewing during all these activities) will all be impacted by the industrialization from O&G development in the NFV. The prime drivers of the impacts will be the industrial noise, traffic and human activities that O&G development brings. Also included in the impacts are the surface water contamination and the air pollution. The impacts defined above also cause the wildlife to avoid these areas, disrupt migration patterns and greatly reducing the area's wildlife viewing opportunities.

Going to a Utah outdoors O&G evaporation pond facility to evaluate a new technology for handling produced water demonstrated my wife's susceptibility to O&G air pollution. Within a couple of minutes in the facility, she started feeling lightheaded and sick to her stomach. The people running the demonstration told her to stay inside the office trailer. They stated that other folks have had the same reaction. I, and a business associate that came along, had no problem. We were there for about 30 minutes. About an hour after leaving the facility, my wife's symptoms remained and we stopped in Rangely, Colorado to get something to settle her stomach. Obviously, we cannot go hiking, biking, fishing, hunting, camping or cross-country skiing in an area where there is O&G development.

**Overall Delta County Business note –** Delta County and the Delta County Economic Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expanded the agriculture base, increase "value added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections, you can rapidly see how O&G development poses a great risk to the plan that Delta County has started to implement.

Declaration of Oil and Gas Development Impact Statement

Mary Jursinovic
11491 3800 Rd
Paonia, Co 81428
970 275 6701

September 5, 2016

In 2000 my husband and I purchased 41 acres of agricultural land on Bone Mesa between Paonia and Hotchkiss as a retirement investment. We spent the next 7 yrs traveling on weekends from our home in Crested Butte to develop an infrastructure on the land, installing a well and water line, clearing weeds, planting trees, and generally preparing the raw land for a homestead. In 2008 we both closed down successful businesses in Crested Butte, purchased a RV as living quarters, and spent the next 2 years building a new home as well as studio for my pottery business. We installed gated irrigation pipe for the hay field, and built up a garden plot.

We now supplement our meager Social Security income with sale of hay, leasing pasture for grazing,  and selling my pottery through galleries in the area. We produce a large percentage of the food we consume in our organic garden.

Oil and Gas development in the North Fork Valley would devastate us:

 Our domestic water comes from a well on the property. The irrigation water, and water for livestock grazing comes from the Stewart Ditch along with a natural spring. Any contamination of these water sources would be irreparable.  Besides the loss of crops any chemicals introduced into our water supply would alter the glazes I mix for my pottery production, greatly affecting that source of income as well.

Air pollutants from drilling activity would settle on the hay crop and garden greatly impacting them. My husband suffers from asthma.  Industrial air pollutants in the form of released gases or surface particle disruption would adversely affect his health.

We have unobstructed 360 degrees views of mountains and mesas from our property. The introduction of drilling wells would greatly alter these pristine views thereby impacting the value of our property.  Visitors from Dallas stated "it must be incredibly quiet at night". Indeed it is. The BLM EA and Draft Fonsi of 2012 admitted that if oil and gas leases were developed "residents and visitors would experience some above normal ambient noises".

One of the amenities that made us chose this particular property is a nearly 3 acre pond located on the property. We built our home directly overlooking the pond. The pond is a magnet for deer, owls, egrets, geese, ducks, owls, and a variety of other mammals and avian species. The water in the pond is an irrigation water source for downstream users. Water, air, and noise pollution would deter any of these species from future use of the pond. Less than 2 miles from our property is a traditional winter grazing area for a large herd of elk. Drilling activity would impact this safe refuge. We fear dislocating the herd from that refuge could cause them to migrate to surrounding farmland, including our own, thus destroying fences and crops used for income and food.  During the winter we see a huge concentration of Bald Eagles in the

1

cottonwoods surrounding our home.  Drilling activity would certainly disrupt their habitat.

The roads in our area, specifically Crawford, Bone Mesa, and Back River Roads, are extremely narrow, lack shoulders, and are in a generally deteriorated state. Increase of traffic from drilling activity would create an extreme hazard. I personally recreate by riding a bike on a loop from our home that encompasses those roads. I always see others on bikes in this area. The additional traffic created by drilling would prevent any of us from doing so in a safe manner.

Even though we relocated from the resort community of Crested Butte, we have many more visitors to our home here than we did there. Friends from all parts of the country come to tour the farms and vineyards, accompany us on hikes and bike rides, purchase agricultural products and wines, kayak, swim and fish in our pond and surrounding rivers and lakes, and generally enjoy the lifestyle of the North Fork Valley. Allowing drilling would drastically alter and most likely end this much sought after lifestyle.


We have invested our retirement savings in creating a comfortable, safe, and self sustaining home in the North Fork Valley. Recently Oklahoma has experienced earthquakes as a result of fracking, Our home was neither designed nor built to earthquake resistant standards.

We are in our late 60's and are too old to be able to start over if we lose the value of our home and property. We cannot fully sustain ourselves on our Social Security income nor can we entirely depend on Social Security in the future due to the political climate.  We are dependent on the value of our property in the event either of us is forced into nursing home care. We have even looked into obtaining a reverse mortgage if needed for future care. Oil and gas development in the North Fork Valley would drastically affect the value of our property and our lives.

2



**Bruce & Lisa Joss**
40872 O Road
Paonia, CO  81428
(303) 547-0132
lisajoss7@gmail.com

October 16, 2016

To Whom It May Concern:

We are both retired and live in Paonia. We love our home, and we rely on the purity of its current resources, such as clean water that comes from an aquifer located at the base of Mt. Lamborn. This water, as well as clean soil and air, are essential to maintaining our property for producing hay and boarding horses. We also depend on and enjoy the unspoiled and beautiful public lands for horseback riding, hiking, biking, and sightseeing. It goes without saying that we cherish the North Fork Valley for its orchards, organic produce, and wineries.

We are very worried about BLM's Draft Resource Management Plan for the Uncompahgre Field Office. Why? If BLM leases our public lands to oil and gas companies, our livelihood and investment will be destroyed. For the sake of oil/gas profits, we will suffer:
- contaminated water, air, and soil;
- noise and light pollution;
- destruction of wildlife and their habitat;
- increased truck traffic;
- deteriorated roads;
- industrialized landscapes;
- jobs that are, in reality, only transitory; and
- climate degradation.

Taxpayer dollars fund BLM. How you manage public lands in the North Fork Valley DIRECTLY affects those of us who live here. If oil/gas drilling leases are granted, companies will come in, drill, and leave. What they leave behind is of no consequence to their profits. But to those of us who live here, it destroys our livelihood and quality of life—forever.

Please, No Oil/Gas Leases. Residents of the North Fork have no alternatives. Do not degrade our lives.

**Declaration of Oil and Gas Development Impact Statement**

Name: Jim Brett

Address: 1899 Hawks Haven RD, PO Box 1682, Paonia, CO 81428

Date:  August 23, 2016

Background:

I am a retired Department of Defense employee and have lived in the North Fork Valley since May 2008.

I have been actively involved with a number of nonprofits that focus on local food, such as Slow Food Western Slope, Valley Organic Growers Association (VOGA) and Kids' Pasta Project. I volunteer for the Paonia Chamber of Commerce that promotes tourism and agri-tourism in the North Fork Valley. I am also a web site developer who developed and maintain the sites for the above organizations plus other local producers and restaurants and the West Elks AVA wineries.

The comments below reflect the impact oil and gas development has on these organizations and their members.

**Potential impacts of oil and gas development.**

Slow Food Western Slope functions as a chapter of Slow Food USA, which is a 501(c)3 non-profit organization. Slow Food USA and its chapters' mission is to create a dramatic and lasting change in the food system. We envision a world in which all people can eat food that is good for them, good for the people who grow it and good for the planet: good, clean and fair food for all.

Valley Organic Growers Association was established in 1992 and has a membership of over 70 organic farms, ranches, orchards and agricultural-related businesses and advocates, representing a vibrant and sustainable local economy. Our guiding principles include the maintenance of healthy soil, air and water for the production of nutritious food, free from synthetic inputs.

For nearly half a century those involved with viticulture have crafted a vibrant wine industry from sagebrush, pastureland and failing orchards. Beginning in the early 1970s with university-sponsored test plots, through recognition by the then Federal Bureau of Alcohol, Tobacco and Firearms that the region warranted the special status of American Viticultural Area (AVA), to today's vibrant local wine and food culture, the vineyards and wineries surrounding Hotchkiss, Paonia and Crawford have been steadfastly crafting a sustainable, locally-based industry relying on premium quality wine crafted from premium quality grapes, diverse, nearby recreational opportunities set amid sweeping views, and a pastoral, bucolic local ambience.

1

North Fork Valley farmers, ranchers, orchardists and winemakers are building the economy of the Valley by using its resources wisely, conserving its soil and valuing its water and clean air.

The North Fork Valley's scenic beauty and temperate growing season have attracted the largest concentration of organic and chemical-free growers in the state of Colorado.

According to the 2007 Agricultural Census, in Colorado Delta County ranks first in apple production, second for fruits, nuts, and berries and third for bee colonies. Our region has a long history of producing quality high-country, chemical-free food, with a well-deserved reputation that extends around the state and nationally.

This history, coupled with the emerging consumer trend for organically crafted products has made this region increasingly known and marketable. The North Fork Valley has a forcefully developing market for agri-tourism, farm-stays and agriculture-based education. Products from the area supply markets and top restaurants in towns around western Colorado, including Aspen, Telluride and Crested Butte, and serves many Front Range communities, including Colorado Springs, Golden, Denver, Boulder, Longmont and Fort Collins.

Our producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy clean, organic food. The potential for soil, air and water contamination as a result of oil and gas development could destroy the producers' ability to market their products as organic and safe - thereby losing their livelihood.

As the economy of North Fork Valley changes, producers are concerned that the huge increase in truck traffic through our towns and through our farmlands; the inevitable worsening of our air quality from diesel motors, dust and drilling operations; and the threat to our fragile water supply from leaks and spills upstream of our ditches, will damage our farms, ranches, orchards, vineyards and our health.

Gas development upriver from the North Fork Valley is a tough sell for the community we live in, and pushes the long-term economic development of our area in the wrong direction.

Local producers will not benefit from the drilling. A spike in drilling could damage their reputation as a pristine place with clean air, clean water and some of the best produce and grapes available anywhere. A boom in oil and gas development threatens the success many of them have worked for years to achieve.

2

**Estimated Damages and Impact.**

Any spillage of toxic materials would have immediate impact, as would increased silting, erosion, runoff, etc. from surface operations. Interruption of irrigation service can, at certain times of the year, become critical after only a few hours.

The increase in highway traffic and traffic on secondary roads associated with gas development, impact the ability of potential visitors to safely get to farms and impact the farms' ability to suggest additional activities that enhance their visit. Surface activities associated with oil and gas development will undoubtedly interrupt visitors' use to access public and private lands for camping, hiking, fishing, mountain bike riding, foraging, and hunting plus reduce the attraction to potential visitors.

Decreased air quality, increased light pollution, and hillside scarring again reduce the attraction of the area by impacting the viewshed visible from several of the farms and wineries and from the primary and secondary access roads. Crops are susceptible to damage due to elevated ozone concentrations, which interfere with photosynthesis, resulting in an inferior product.

VOGA and Slow Food Western Slope represent a significant number of organic farms, ranches, orchards and other agricultural entrepreneurs comprising a sustainable local economy. This economy depends on our member farms' ability to produce high-quality, chemical-free fruit, vegetables, meat, cheese, wine, and farm-based products and experiences. Visitors seek out our farms to deepen their relationship with the food and land that nourishes them. Our citizens and visitors value access to public land, abundant wildlife, majestic views, clean mountain air, a safe and close-knit community, and nutritious and chemical-free food produced on local farms, wineries and ranches.

The impacts associated with oil and gas development to irrigation water, soil, domestic water, recreation, air quality, noise and light pollution, traffic, wildlife, community, contiguous farmland and viewshed threaten the livelihoods of North Fork Valley producers. They would bear a severe financial burden and loss of their costumer base when oil and gas drilling and construction activity result in environmental damage.

The nine wineries in this AVA now account for approximately $1.5 million annually in direct sales and an additional $5 to 10 million in indirect sales. One winery member notes that of the 3500 visitors it receives each year, more than 80% are given restaurant recommendations, and over half receive lodging recommendations.

The wines and wineries of the area routinely receive accolades from prestigious local, regional and national sources. Wines produced by West Elks Wineries have regularly won "Best of the Festival" status at the annual Colorado Wine Festival in Palisade. West Elks wines have been honored at the Colorado Governor's mansion and in prestigious restaurants regionally and nationally. The area and its

3

wines have been reviewed on multiple occasions in Sunset Magazine, Forbes Magazine, Practical Vineyard and Winery, USA Today, The Denver Post, Edible Front Range, Edible Aspen, and internationally in Gilbert and Gaillard, to name just a few. The West Elks area and its wineries are featured prominently in books such as, At Mesa's Edge, Mycophilia, Four Corners Vineyards and Wineries, Guide to Colorado Wines and more recently, An American Provence. In the past several years a "critical mass" has been reached. The number of wineries and the reputation of those wineries, together with the burgeoning organic, local food culture of the Valley, in combination with the abundant recreational opportunity afforded by nearby private and public lands, joined with the pastoral, bucolic setting in which these exist, unite to offer visitors a unique set of experiences for which they are willing to spend significant time and money.  All of this is threatened by oil and gas development.

The viability of the wine industry in the North Fork Valley rests upon our ability to reliably produce premium quality wines from Colorado-grown produce, our ability of offer those wines, together with locally-grown food, in a pastoral setting, and our ability to enhance our visitor's experience with abundant, nearby recreational activities.

The production of high quality wine depends upon the sufficient and timely availability of irrigation water free from pollutants. It further depends upon air free of dust, ozone and other pollutants. Offering these wines in a restful, pastoral setting requires a viewshed that is unspoiled by excessive road construction, drill pads and derricks, light pollution and air pollution. It also requires the quiet of small country roads with minimal traffic, and an absence of the industrial whine of engines, compressors and heavy equipment.  To be able to enhance our guest's visit we rely on plentiful and un-harried wildlife, accessible camping, hiking, biking, foraging and jogging in areas unhindered by traffic, noise, dust or pollution, pure water for fishing and boating and vistas untrammeled by industrial activity and its attendant air, water, noise and light pollution.

Oil and gas exploration and development activity, even when conducted in accordance with recognized standard operating procedures as evidenced in other areas of the West, is not compatible with the vibrant wine industry that has been developing for the last half century.

Here is an analysis of the costs involved with the wine industry. This Colorado State University (CSU) document serves as the basis for the analysis: http://webdoc.agsci.colostate.edu/aes/wcrc/techbulletins/costofgrowinggrapes10[1].pdf.

The short answer is that to establish a vineyard (without a winery) and operate it until it becomes profitable costs about $11,000/acre and, assuming no frost/winter damage, takes nearly 10 years to attain profitability. Additionally, the CSU analysis suggests that an expenditure of approximately $90,000 is needed for irrigation equipment, tractor, implements, etc. for any vineyard from 1 acre to 10 acre in size. They also assume that some portion of this investment would need to

4

be replaced between 10 and 20 years out. This analysis ignores that plus the cost of purchasing the land.

The vineyard sizes in the area are estimated below:

| | |
|---|---|
| Terror Creek | 10 ac. |
| Stone Cottage (including Steve Rhodes) | 10 ac. |
| Alfred Eames | 7 ac. |
| Mesa Winds | 7 ac. |
| Black Bridge (incl. Bowie Pinot) | 15 ac. |
| 5680 | 1 ac. |
| Peony Lane | 3 ac. |
| Leroux Creek | 5 ac. |
| New vineyard across from Black Bridge | 5 ac. |
| Stoney Mesa (Delta Co. only) | 10 ac. |

A defensible average commercially viable vineyard size for the wineries in Delta County would be 10 acres. Further, it is reasonable to assume that virtually all vineyards are associated directly with a winery. With establishment costs and equipment costs, 10 acre vineyards will never achieve profitability without a winery to add value to the grape production.

So, on average a vineyard in Delta County requires (10 x $11,000) plus $90,000 to establish and sustain losses for 10 years, or $200,000 total, plus land acquisition costs.

Nearly all of the wineries in the County are at least 10 years old.

A winery sized to accept the production of a 10 acre Delta County vineyard devoted to 1/2 white and 1/2 red would require the following:

| | |
|---|---|
| Barrels: 45 @ $1000 ea | 45,000 |
| Tanks: 6 - 1000L tanks @ $3000 ea. | 18,000 |
| Crusher | 5,000 |
| Pumps, hoses, etc. | 5,000 |
| Filter | 5,000 |
| Press | 8,000 |
| Filler | 5,000 |
| Corker | 8,000 |
| Capsuler, labeler, etc. | 10,000 |
| Material handling (lugs, fermenters, forklift, etc.) | 15,000 |

5

| | |
|---|---|
| Misc. | 10,000 |
| Total Winery Equipment | $134,000 |
| Winery building | $250,000 |
| Cellar/warehouse | $125,000 |
| Brand establishment (this is not a trivial task) | $100,000 |
| Finished goods investment prior to first sale | |
| (bottles, labels, corks, capsules, etc.) | $77,000 |
| Total Winery Investment Prior to First Sale | $686,000 |
| (Does not include labor, licensing, legal, etc.) | |

On average, each successful winery in Delta County has about $900,000 of investment excluding expenditures for land and winery labor.

For a guess on labor value, a winery of this average size needs one full time equivalent in the vineyard, approx. $10,000 of seasonal help in the vineyard, 1 full time equivalent in the tasting room for 6 months, 1 full time winemaker/cellar rat, and 1 full time sales/mktg./bus. admin. person.

Fully burdened estimates:

| | |
|---|---|
| Vineyard Manager | $40,000/yr |
| Winemaker/Cellar Rat | $40,000/yr |
| Tasting Room | $16,000/yr |
| Sales/Mktg./Bus. Admin. | $40,000/yr |
| Seasonal | $10,000/yr |
| Total Yearly Labor Costs | $146,000/yr |

Conclusion:

**With its industrial footprint and potential damage to landscape, air, water, soil and human health, extraction industries have no place in the future of the North Fork Valley.** We can build a new economy around clean food, outdoor recreation, healthy lifestyle and small nonthreatening businesses. **The BLM can be a contributor to this future by closing the lands in the watershed of North Fork Valley to oil and gas development.**

6

I am writing to document a declaration of impact related to the proposed Resource Management Plan released in June by the BLM.

Name: Dr. David W. Inouye
Address: 38213 Hwy 133, Hotchkiss, CO 81419
Date: 28 September 2016

In 2003 my wife and I purchased our 34-acre property, which is adjacent to a 25-acre BLM inholding (parcel 324303400011 in the Delta County Assessor's office records). We purchased our property because we were attracted by the isolation, views, solitude, and wildlife. We have watched eagles, bear, elk, deer, bobcat, and wild turkeys on our property. We are concerned about the impacts that development of gas production facilities on this property might have on our health and economic well-being.

The oil and gas industries can have a significant negative effect on property values of nearby properties because of the negative effects they can have on noise, air pollution, light pollution, and water pollution. We are concerned that if the adjoining property is developed for oil or gas extraction that we will no longer find the quiet, clean air, and solitude that attracted us to that area, that there would be potential health impacts from air pollution, and that the stream that flows across the BLM property and ours could be contaminated. These impacts would reduce the value of our property when we try to sell it in the future.

As documentation of the potential environmental impacts we could suffer as a consequence of leasing the BLM property adjacent to ours for oil or gas development, or if there is large-scale development in the North Fork valley, please consider these relevant scientific studies:

There has been much recent research on the potentially adverse health consequences of oil and gas extraction activities. For example, a recent study was designed to characterize and quantify emission rates and dispersion of air toxics, ozone precursors, and greenhouse gases from oil and gas operations in the Denver-Julesburg Basin on the northern Front Range of Colorado. Based on a review of critical knowledge gaps and input from a study Technical Advisory Panel, particular focus was placed on quantifying emissions of individual volatile organic compounds (VOCs), methane, and ethane from oil and gas production sites and from hydraulic fracturing ("fracking") and flowback, important steps in the completion of new wells." (http://www.colorado.gov/airquality/tech_doc_repository.aspx?action=open&file=CSU_NFR_Report_Final_20160908.pdf). Reported dated 15 September 2016, accessed 28 September 2016.

The chemicals released by fracking, flowback, and production included methane, ethane, propane, i-pentane, n-pentane, benzene, toluene, ethylbenzene, and m+p-xylene, at concentrations that can be predicted to have potential health impacts on humans for at least hundreds of meters from the release site. The consequences of the release of these chemicals for air quality and human health must be considered. They are likely to have

impacts on local vegetation and wildlife as well. Such risks led the Governor of New York to ban fracking in that state in December 2014. The risks include both air and water pollution.

**McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.**

This study examined associations between maternal residential proximity to natural gas development and birth outcomes in a retrospective cohort study of 124,842 births between 1996 and 2009 in rural Colorado. They calculated inverse distance-weighted natural-gas well counts within a 10-mile radius of maternal residence to estimate maternal exposure, and found an association between density and proximity of natural gas wells and the prevalence of congenital heart defects and possibly neural tube defects. The chemicals responsible are probably the same cohort described in the study described above.

Additional information on the health consequences of gas drilling is available in these publications, which are not cited in the RMP, but should be considered in a revision:

**Bamberger, M., Oswald, R. (2012).Impacts of Gas Drilling on Animal and Human Health. New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.**

The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.

**Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012.Natural Gas Operations from a Public Health Perspective,Human and Ecological Risk Assessment: an International Journal 17(5):1039-1056.**

The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns–causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

**McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, Science of the Total Environment,424:79-87.**

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living > ½ mile from wells and (2) residents living ≤ ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.

**Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.**

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking-water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

**Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697**
This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling-dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activities, suggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.

**Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009**
Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.

**Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale    -gas extraction. Center on Global Change, Duke University, Durham, NC.**

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground.

During the first month of drilling and production alone, a single well can produce a million or more gallons of waste water that can contain pollutants in concentrations far exceeding those considered safe for drinking water and for release into the environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid, and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the well to the surface along with the shale gas.

As a group, these studies raise serious concerns about the health and environmental impacts of development of natural gas wells. These impacts would have serious consequences for the economy of the North Fork valley, which depends on clean air and water for agriculture, recreation, and domestic consumption. These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no-fracking option in a revised resource management plan.

Sincerely,

Dr. David W. Inouye
38213 Hwy 133
Hotchkiss, CO 81419
inouye@umd.edu

**Declaration of Oil and Gas Development Impact Statement**

Name: Elaine Brett

Address: 1899 Hawks Haven RD, PO Box 1682, Paonia, CO 81428

Date:  July 24, 2016

Background:

I am a retired professional and have lived in the North Fork Valley for twelve years.  During my careers in Washington DC in Medical Diagnostics and Organizational Development, I interfaced with many public and private organizations.  I have done contracting and consulting with a number of Federal agencies at high levels and understand the internal processes of government.

Since coming to the Western Slope of Colorado, I have been actively involved with local government and nonprofits. I have served as Chairperson on a Delta County Planning Area Planning Committee, President of the Black Canyon Regional Land Trust, founder and president of the Western Colorado Food & Ag Council, Board member of the Western Colorado Community Foundation and President of the Friends of the Paradise Theatre.  I am currently an Advisor to Downtown Colorado, Inc., the Orton Family Foundation and Citizens for a Healthy Community.


**Potential impacts of oil and gas development.**

In 2014, my husband and I built a home just outside of Paonia at the base of Jumbo Mountain.  Our property is adjacent to the BLM and is surrounded by conservation easements.  Our water sources include the Town of Paonia water which originates in the West Elk Mountains and irrigation water from the Stewart Ditch which originates from the Paonia Reservoir.

We moved to this area to enjoy a simpler, healthier lifestyle. We built a home with healthy and local materials and used best practices for water conservation and energy efficiency.  Our electricity and heat are solar powered and we do not use natural gas or other fossil fuels.

We love the North Fork Valley for its beautiful landscape, access to clean, local food and for the wonderful community of friends.  It is like no other place we have ever lived.

The threat of oil & gas leases on the BLM lands that surround the North Fork Valley has caused us great concern.  We have spoken out against the use of our valley for extraction purposes on many occasions. We see the leases on the BLM  as a detriment to us personally as well as to the well-being of our community.  We, and many of our neighbors, have told the BLM time after time that allowing industrialization of this bucolic area will end the quality of life and the community that makes this place remarkably special.

So a few immediate impacts from this threat that we see include:

1. While it has been argued that just allowing oil and gas leases in the North Fork Valley has no inherent impact, we disagree.  **The opportunity to lease the surrounding lands will decrease the desirability and the property values of the area.**  In 2012, the reaction of consumers to the threat of leases was negative on many fronts.  Interest in real estate plummeted.  It is intuitively obvious that the proximity to an industrial complex and close access to pollution, negatively effects property values. Just a few documented examples from around the country include: [1]

   o In April 2014, a Texas jury awarded just under $3 million to a family whose health and lives were turned upside down by the emissions coming from dozens of wells that had been drilled near their home. The verdict, which compensated the family for pain and suffering from illnesses linked with exposure to oil production and fracking chemicals, also included $275,000 for the loss in market value of their property caused by all the drilling.

   o In a 2013 survey of 550 people conducted by business researchers at the University of Denver, a strong majority said they would decline to buy a home near drilling site. The study, published in the Journal *of Real Estate Literature, also* showed that people bidding on homes near fracking locations reduced their offers by up to 25 percent.

   o Realtors in Colorado are taking note as clients become increasingly hesitant about buying homes near drilling sites, with fewer and fewer bids rolling in. "Some don't want to even look at anything remotely close to any existing or proposed well sites," Boulder County real estate agent Nanner Fisher told the Colorado *Independent. She also* told Boulder i*Journal that "if* there is a well that's visible when you show a property, [the prospective buyer] will ask to look for something else. A lot of it is the visual effect of the well site," she said. "And, they think if you can see it, it's gotta be close enough that it's not healthy."

   o A study conducted by researchers at Duke University found that the risks and potential liabilities of drilling outweigh economic benefits like lease payments and potential economic development in Washington County, Penn. Even though lease payments can add overall value to homes with wells drilled on them, the possibility of contaminated water decreases

---

[1]  http://www.resource-media.org/drilling-vs-the-american-dream-fracking-impacts-on-property-rights-and-home-values/#.V5UmxmOd9gd

property value by an average of 24 percent, leaving a net decrease in value of 13 percent.
- o A 2010 study of the Texas real estate market in the heavily drilled suburban-Dallas area near Flower Mound concluded that homes valued at more than $250,000 and within 1,000 feet of a drilling pad or well site saw values decrease by 3 to 14 percent.

2. The impacts or perceived impacts of water and soil contamination will affect the quality or perceived quality of the organic food for which the North Fork Valley is known. As a cancer survivor, I came to Western Colorado for the opportunity to have direct access to organic vegetables and fruit, grass-fed animals for meat and other unprocessed foods. I have worked with chefs, culinary students, food writers and farmers. **We have a really good thing going here in the North Fork Valley – family farms, clean nutrient dense food, healthy lifestyle.**

In 2012, with the threat of oil and gas leases on the BLM lands surrounding the North Fork Valley, the Valley Organic Growers Association (VOGA), representing 93 members, gave a parcel by parcel analysis of the potential impacts of leases. In a letter to the BLM, they concluded:

> The impacts associated with oil and gas development to irrigation water, soil, domestic water, recreation, air quality, noise and light pollution, traffic, wildlife, community, contiguous farmland and viewshed threaten the livelihoods of VOGA member farms. VOGA members would bear a severe financial burden and loss of their customer base when oil and gas drilling and construction activity result in environmental damage

In a letter from the Slow Food Western Slope chapter, they stated

> In today's economy, consumers are demanding fresh, local and organic food while at the same time, family farms are struggling. The North Fork Valley has been an example of a place where high quality fruits, vegetables and meats are produced. In addition, farmers and ranchers are responding to local and regional markets and have created a model for a successful sustainable economy. The intrusion of oil and gas development on 30,730 acres surrounding the North Fork Valley put families and farms at risk.

> These real and potential hazards threaten the livelihoods of the North Fork Valley producers who are surrounded by the parcels subject for sale. Their access to clean water and air is at extreme risk - a risk, if realized, would destroy their ability to be an economic factor in the Valley.

3. Over the past 10 years, we have witnessed a change in demographics and a change in the local economy of the North Fork Valley. I am proud to have been a part of the movement that is seeing a change

3

away from a boom and bust economy to one of sustainability and resilience. We have the opportunity to become a model for a small-town rural area finding a way of maintaining a good quality of life while developing entrepreneurial businesses that align with the values of the community members. We are making strides in improving our communications technology and broadband capacity, creating opportunities in the solar power industry, nurturing agricultural businesses and attracting entrepreneurs to create new businesses that fit their lifestyle. We are being recognized by state agencies like the Colorado Tourism Office, Downtown Colorado Inc., the Colorado Office of Film, Television and Media, and the Colorado Office of Economic Development and International Trade (COEDIT).

**With its industrial footprint and potential damage to landscape, air, water, soil and human health, extraction industries have no place in the future of the North Fork Valley.** We can build a new economy around clean food, outdoor recreation, healthy lifestyle and small nonthreatening businesses. **<u>The BLM can be a contributor to this future by closing the lands in the watershed of North Fork Valley to oil and gas development.</u>**

Supporting our position that oil and gas development IS NOT a long-term economic solution, a 2013 study by Headwaters Economics concluded that [2]

> 1) Greater specialization in oil and gas over the long term leads to diminished economic performance.

> 2) Growth in the oil and gas sector is associated with diminished performance in other metrics of local well-being, such as crime rates, health, and education.

**Estimated Damages and Impact.**

The BLM certainly is aware of the many incidents of damage and negative impacts as a result of oil and gas development and hydraulic fracturing. In spite of the billions of advertising dollars spent by the energy industry to try to convince the American public otherwise, individual reports from New York to North Dakota demonstrate that at the local level, individual properties, family farms and small towns bear the risks and the consequences of the industries' profit-making plans.

---

[2] http://headwaterseconomics.org/wphw/wp-content/uploads/OilAndGasSpecialization_Manuscript_2013.pdf

4

1.  **Property Values and Infrastructure Impacts**

Studies have shown that home values in areas with oil and gas leasing drop on average of 15-25 percent, or more depending on the situation, if they can even be sold. For example, the possibility of contaminated water decreases property value by an average of 24 percent.  So we can personally count on a loss in equity of over $150,000.  The seven properties in our small subdivision would likely lose $1,000,000 - $1,500,000 in total.

If the area were to impose industrialization from oil and gas development, we can only assume that insurance rates would increase and local and county taxes would increase due to requirements for road repairs, increased crime and loss of population.

2.  **Agriculture and quality of life**

The North Fork Valley is home to the greatest concentration of organic farms in the state of Colorado.  In the 12 years that I have lived here, we have seen markets growing around the state demanding the fruit, vegetables and meats from this area.   Besides purchasing 90% of our personal food locally, we would see our farmers losing market position in Aspen, Telluride, Crested Butte, Carbondale, Colorado Springs, Boulder, Denver and more.   Fracking or even the threat of fracking would end the organic food market for North Fork Valley farmers.  Contamination of watersheds, air and soils necessarily would put an end to the *terroir* that makes our food and wine special.

Without the agriculture, the wine, the outdoor recreation, the North Fork Valley will no longer be attractive to retirees, visitors and those seeking second homes.

The "bottom line": millions of dollars in lost opportunities and sustainable, healthy living and the demise of a local economy that has been building -- all in the name of another boom and bust industry.

Would we stay here?  Probably not!   Congratulations BLM, you will have killed a thriving community.

3.  **Local Economy**

My husband and I are retired.  What does that mean to the local economy?  We spend our retirement dollars locally, we volunteer our time to numerous organizations locally, we encourage visitors and customers to our local businesses.   We are not alone.   There is a

growing population of those 60 years and older who are seeking a lifestyle that the North Fork Valley has to offer. A recently formed group called "A Little Help" has recently organized these leaders of our community. We are creating a network that sustains and supports people of all ages to live in their homes and be assets to their local community. What person in their right mind would want to live out their days in a small town surrounded by truck traffic, pollution and "rough necks?"

A current effort to bring more acceptable internet service to the North Fork Valley has garnered interest from independent businesses, small tech companies and commercial businesses to locate here. We are attracting millennials and entrepreneurs who want to not just make a living, they want to make a life that makes sense for them and their children. The oil and gas industry and the threat of fracking and industrialization is not what this generation is seeking.

So again, as Headwaters Economics research has demonstrated and as towns from New York to North Dakota have experienced, the industry is not good for local economies for the long term.


Conclusion:

BLM's Mission Statement is *"To sustain the health, productivity and diversity of America's public lands for the use and enjoyment of present and future generations."*

**Please help us help you to achieve your Mission. Designate the North Fork Valley as a protected area for agriculture, recreation and a special quality of life.**

Declaration of Oil and Gas Development Impact Statement

Name: Nicole Carpenter
Business Name: Fire Mountain Farmstead
Address: 4088I Hwy I33 Paonia, Co 8I428
Date: October 6, 20I6

Background:  My partner and I purchased a property near Paonia 4 years ago to start an organic farm. We recently decided to expand our business and open a healing retreat. We raise sheep, goats, pigs, chickens, ducks, turkeys, rabbits, veggies, herbs (culinary and medicinal),  and gourmet mushrooms. I make medicinal tinctures, salves, and teas. My partner is a glass artist. I also work as an EMT for the North Fork Ambulance Association and volunteer with the West Elk Mountain Rescue team. I have a background in biology and chemistry and my partner has a background in renewable energy. I moved to Paonia because of the laid-back, friendly people, the clean water, the fresh air, the fertile land and the beautiful mountain views. I utilize the backcountry for recreation and fishing, as well as for training with the West Elk Mountain Rescue team. After suffering for years with mysterious, vague symptoms, I was recently diagnosed with an autoimmune condition that causes me to be extraordinarily sensitive to chemicals and pollutants.

Impact due to and cost to treat: If the headwaters of the NFV and the valley itself were to become industrialized with natural gas development, it would threaten my livelihood and my health. If the air or water quality, the scenic beauty and laid back atmosphere were to deteriorate, I would have to relocate. I'm concerned that heavy fluid mineral development in and around the valley might decrease the value of our property and that we might not be able to sell at all. I'm concerned that heavy fluid mineral development would pollute the air and contaminate our water, which would make our property useless to us for the purposes we purchased it for. We could not advertise as a healing retreat if there were radioactive materials or heavy metals in our water. We couldn't offer people a haven to de-stress if there were heavy truck traffic driving by at all hours, or if the air was polluted with VOC's and smog. We would lose our investment in our property, all the renovations we've made, all the improvements and new structures we've built, all the trees and perennials we've planted. We would have to move. With my health issues, I could not live here if it turned into a Weld county. I refuse to raise a family and expose my future children to the endocrine disrupting chemicals (EDC's) and carcinogens known to be found in produced water and natural gas.

Impact on:
- Health—I already spend about $8,000 a year maintaining my health and lose at least $20,000 a year in lost income due to the symptoms of my autoimmune condition. As it is now, I am not on any prescription medications and I am able to work part time and volunteer some time to my community. Exposure to environmental toxins trigger autoimmune flares that render me unable to function. My health care costs would skyrocket, I would have to take medications to deal with the hormone fluctuations, pain, and overactive immune system. Being exposed to EDC's could compromise my fragile fertility and very likely trigger an autoimmune condition in my future children, due to the genetic predisposition to autoimmunity.
- Business—I would absolutely not be able to operate my business if the NFV were to become industrialized with natural gas wells. As stated above, the two cannot operate side by side. I cannot produce healthful food and medicine beside a polluting natural gas/oil field. Spills are inevitable. The produced water and fracking fluid used in the process of extraction are toxic. I cannot operate a healing retreat where the air and water are contaminated. I would lose out on at least $80,000 in annual revenue.
- Property Values— Depending on the level of development, and the proximity to my property (there are lease parcels within ¼ mile of my property that were proposed in the 2009 30,000 acre proposal), my property may become worth less than when we purchased it, which would make it difficult to sell, financially, especially if we're unable to operate our business and make up the difference in costs.
- Crops—I don't know what level of uptake occurs when contaminated water is used to irrigate crops. There are too many variables involved to say with any certainty how much of an impact a spill upstream from our farm would have on crop production. However, the public would not care about all that if they heard there was a fracking spill upstream from the North Fork Valley. The news alone would crush demand for products from our valley.

- Livestock-- There have now been several mainstream media articles and a handful of peer reviewed studies showing a causative link of impacts to livestock including neurological, reproductive and acute gastrointestinal problems after being exposed to fracking chemicals through contamination of air and water nearby. The river water irrigates the fields that our animals graze, and all the sheep, cattle, horses and hogs in the valley rely on the river for drinking water. The BLM wants to lease all around the tributaries that feed the North Fork River.

- Recreation—I work, fish, and play on the Grand Mesa and in the West Elk Mountains. When we open our retreat, we anticipate offering guided tours in our public lands including hiking, biking, rock climbing, fishing, and boating. When oil and gas operators occupy surface land to access minerals, they restrict public access to those lands. Will I still be able to access my public lands? Will the activity change the migration corridors and breeding grounds of large game? Will spills affect the fish populations? It's clear that these things will be affected to some degree. With 95% of our public lands being opened to leasing in the draft RMP's preferred alternative, I cringe to think of what our public lands will look like in 20 years.

- Water quality—I inquired with Jeb, the UFO hydrologist, about what kind of mapping the BLM has pertaining to drinking water hydrology. He responded that they had none. They don't understand how the springs and aquifers are fed. Without maps of the area's hydrology, it's impossible to predict how fluid mineral development will affect drinking water quality or quantity. In the arid West, that's a worrisome proposition. I'm not willing to trade drinking water for natural gas. I can't survive without clean water, you can't put a price tag on that. Our domestic water comes from a 175 foot deep well in the Mancos shale layer. It's too salty to drink but we wash with it. We haul drinking and cooking water in our truck. It comes from the Pitkin Mesa Spring. We're saving up to buy a Pitkin water tap. This water is some of the cleanest water in the State. Will some oil and gas operator come in and compromise this invaluable water source after I invest $40,000 for access to good water? How many homes would be affected if this were to happen?

- Air quality – Delta County currently has good air quality, typically. Exceptions include when wild fire smoke blows through. Weld and Larimer counties, however, obtained F grades from the American Lung Association for air quality. One of the reasons I moved to Paonia was to escape the pollution I was suffering from on the East Coast. I wanted to breathe fresh mountain air, not ozone, VOC's and particulates. I'm here to heal, and so are many others. You can't put a price on clean air. How much does it cost to treat the health issues caused by breathing polluted air: asthma, COPD, bronchitis, pneumonia, neurological disorders, headaches, sinus infections, etc.

- Quality of Life – As acknowledged in the draft RMP, energy development causes a marked decrease in perceived quality of life. I moved here because of the high quality of life I experience here. So did countless others. How many people would move away if the North Fork Valley were to become industrialized with drilling rigs? How many tourists would pass us by? How many consumers would stop buying our products? I don't know how to quantify these things. Quality of life is hugely important to me. It is not something I'm willing to sacrifice for some tax revenue or a handful of jobs.  The value is so much greater than that.

# EXHIBIT 153



# Potential Contaminant Pathways from Hydraulically Fractured Shale to Aquifers

by Tom Myers

## Abstract

Hydraulic fracturing of deep shale beds to develop natural gas has caused concern regarding the potential for various forms of water pollution. Two potential pathways—advective transport through bulk media and preferential flow through fractures—could allow the transport of contaminants from the fractured shale to aquifers. There is substantial geologic evidence that natural vertical flow drives contaminants, mostly brine, to near the surface from deep evaporite sources. Interpretative modeling shows that advective transport could require up to tens of thousands of years to move contaminants to the surface, but also that fracking the shale could reduce that transport time to tens or hundreds of years. Conductive faults or fracture zones, as found throughout the Marcellus shale region, could reduce the travel time further. Injection of up to 15,000,000 L of fluid into the shale generates high pressure at the well, which decreases with distance from the well and with time after injection as the fluid advects through the shale. The advection displaces native fluids, mostly brine, and fractures the bulk media widening existing fractures. Simulated pressure returns to pre-injection levels in about 300 d. The overall system requires from 3 to 6 years to reach a new equilibrium reflecting the significant changes caused by fracking the shale, which could allow advective transport to aquifers in less than 10 years. The rapid expansion of hydraulic fracturing requires that monitoring systems be employed to track the movement of contaminants and that gas wells have a reasonable offset from faults.

## Introduction

The use of natural gas (NG) in the United States has been increasing, with 53% of new electricity generating capacity between 2007 and 2030 projected to be with NG-fired plants (EIA 2009). Unconventional sources account for a significant proportion of the new NG available to the plants. A specific unconventional source has been deep shale-bed NG, including the Marcellus shale primarily in New York, Pennsylvania, Ohio, and West Virginia (Soeder 2010), which has seen over 4000 wells developed between 2009 and 2010 in Pennsylvania (Figure 1). Unconventional shale-bed NG differs from conventional

sources in that the host-formation permeability is so low that gas does not naturally flow in timeframes suitable for development. Hydraulic fracturing (fracking, the industry term for the operation; Kramer 2011) loosens the formation to release the gas and provide pathways for it to move to a well.

Fracking injects up to 17 million liters of fluid consisting of water and additives, including benzene at concentrations up to 560 ppm (Jehn 2011), at pressures up to 69,000 kPa (PADEP 2011) into low permeability shale to force open and connect the fractures. This is often done using horizontal drilling through the middle of the shale with wells more than a kilometer long. The amount of injected fluid that returns to the ground surface after fracking ranges from 9% to 34% of the injected fluid (Alleman 2011; NYDEC 2009), although some would be formation water.

Many agency reports and legal citations (DiGiulio et al. 2011; PADEP 2009; ODNR 2008) and peer-reviewed articles (Osborn et al. 2011; White and Mathes

Hydrologic Consultant, 6320 Walnut Creek Road, Reno, NV 89523; (775) 530-1483; fax: (775) 530-1483; tom_myers@charter.net

Received August 2011, accepted February 2012.
© 2012, The Author(s)
Ground Water © 2012, National Ground Water Association.
doi: 10.1111/j.1745–6584.2012.00933.x



**Figure 1. Location of Marcellus shale in the northeastern United States. Location of Marcellus wells (dots) drilled from July 2009 to June 2010 and total Marcellus shale wells in New York and West Virginia. There are 4064 wells shown in Pennsylvania, 48 wells in New York, and 1421 wells in West Virginia. Faulting in the area is documented by PBTGS (2001), Isachsen and McKendree (1977), and WVGES (2011, 2010a, 2010b).**

2006) have found more gas in water wells near areas being developed for unconventional NG, documenting the source can be difficult. One reason for the difficulty is the different sources; thermogenic gas is formed by compression and heat at depth and bacteriogenic gas is formed by bacteria breaking down organic material (Schoell 1980). The source can be distinguished based on both C and H isotopes and the ratio of methane to higher chain gases (Osborn and McIntosh 2010; Breen et al. 2007). Thermogenic gas can reach aquifers only by leaking from the well bore or by seeping vertically from the source. In either case, the gas must flow through potentially very thick sequences of sedimentary rock to reach the aquifers. Many studies which have found thermogenic gas in water wells found more gas near fracture zones (DiGiulio et al. 2011; Osborn et al. 2011; Breen et al. 2007), suggesting that fractures are pathways for gas transport.

A pathway for gas would also be a pathway for fluids and contaminants to advect from the fractured shale to the surface, although the transport time would be longer. Fracking fluid has been found in aquifers (DiGiulio et al.

2011; EPA 1987), although the exact source and pathways had not been determined. With the increasing development of unconventional NG sources, the risk to aquifers could be increasing. With so little data concerning the movement of contaminants along pathways from depth, either from wellbores or from deep formations, to aquifers, conceptual analyses are an alternative means to consider the risks.

The intent of this study is to characterize the risk factors associated with vertical contaminant transport from the shale to near-surface aquifers through natural pathways. I consider first the potential pathways for contaminant transport through bedrock and the necessary conditions for such transport to occur. Second, I estimate contaminant travel times through the potential pathways, with a bound on these estimates based on formation hydrologic parameters, using interpretative MODFLOW-2000 (Harbaugh et al. 2000) computations. The modeling does not, and cannot, account for all of the complexities of the geology, which could either increase or decrease the travel times compared to those considered herein. The article also does not include improperly abandoned

boreholes which could cause rapid transport in addition to natural pathways.

## Method of Analysis

Using the Marcellus shale region of southern New York (Figure 1), I consider several potential scenarios of transport from shale, 1500 m below ground surface (bgs) to the surface, beginning with pre-development steady state conditions to establish a baseline and then scenarios considering transport after fracking has potentially caused contaminants to reach formations above the shale. To develop the conceptual models and MODFLOW-2000 simulations, it is necessary first to consider the hydrogeology of the shale and the details of hydraulic fracturing, including details of how fracking changes the shale hydrogeologic properties.

### Hydrogeology of Marcellus Shale

Shale is a mudstone, a sedimentary rock consisting primarily of clay- and silt-sized particles. It forms through the deposition of fine particles in a low energy environment, such as a lake- or seabed. The Marcellus shale formed in very deep offshore conditions during Devonian time (Harper 1999) where only the finest particles had remained suspended. The depth to the Marcellus shale varies to as much as 3000 m in parts of Pennsylvania, and averages about 1500 m in southern New York (Soeder 2010). Between the shale and the ground surface are layers of sedimentary rock, including sandstone, siltstone, and shale (NYDEC 2009).

Marcellus shale has very low natural intrinsic permeability, on the order of $10^{-16}$ Darcies (Kwon et al. 2004a, 2004b; Neuzil 1986, 1994). Schulze-Makuch et al. (1999) described Devonian shale of the Appalachian Basin, of which the Marcellus is a major part, as containing "coaly organic material and appear either gray or black" and being "composed mainly of tiny quartz grains <0.005 mm diameter with sheets of thin clay flakes." Median particle size is $0.0069 \pm 0.00141$ mm with a grain size distribution of <2% sand, 73% silt, and 25% clay. Primary pores are typically $5 \times 10^{-5}$ mm in diameter, matrix porosity is typically 1% to 4.5% and fracture porosity is typically 7.8% to 9% (Schulze-Makuch et al. 1999 and references therein).

Porous flow in unfractured shale is negligible due to the low bulk media permeability, but at larger scales fractures control and may allow significant flow. The Marcellus shale is fractured by faulting and contains synclines and anticlines that cause tension cracks (Engelder et al. 2009; Nickelsen 1986). It is sufficiently fractured in some places to support water wells just 6 to 10 km from where it is being developed for NG at 2000 m bgs (Loyd and Carswell 1981). Conductivity scale dependency (Schulze-Makuch et al. 1999) may be described as follows:

$$K = C v^m$$

$K$ is hydraulic conductivity (m/s), $C$ is the intercept of a log-log plot of observed $K$ to scale (the $K$ at a sample volume of 1 m$^3$), $v$ is sample volume (m$^3$), and $m$ is a scaling exponent determined with log-log regression; for Devonian shale, $C$ equals $10^{-14.3}$, representing the intercept, and $m$ equals 1.08 (Schulze-Makuch et al. 1999). The very low intercept value is a statistical but not geologic outlier because it corresponds with very low permeability values and demonstrates the importance of fracture flow in the system (Schulze-Makuch et al. 1999). Most of their 89 samples were small because the deep shale is not easily tested at a field-scale and no groundwater models have been calibrated for flow through the Marcellus shale. Considering a 1-km square area with 30-m thickness, the Kh would equal $5.96 \times 10^{-7}$ m/s (0.0515 m/d). This effective $K$ is low and the shale would be an aquitard, but a leaky one.

### Contaminant Pathways from Shale to the Surface

Thermogenic NG found in near-surface water wells (Osborn et al. 2011; Breen et al. 2007) demonstrates the potential for vertical transport of gas from depth. Osborn et al. (2011) found systematic circumstantial evidence for higher methane concentrations in wells within 1 km of Marcellus shale gas wells. Potential pathways include advective transport through sedimentary rock, fractures and faults, and abandoned wells or open boreholes. Gas movement from fractures depends on fracture width (Etiope and Martinelli 2002) and is a primary concern for many projects, including carbon sequestration (Annunzi-atellis et al. 2008) and NG storage (Breen et al. 2007). Open boreholes and improperly sealed water and gas wells can be highly conductive pathways among aquifers (Lacombe et al. 1995; Silliman and Higgins 1990).

Pathways for gas suggest pathways for fluids and contaminants, if there is a gradient. Vertical hydraulic gradients of a up to a few percent, or about 30 m over 1500 m, exist throughout the Marcellus shale region as may be seen in various geothermal developments in New York (TAL 1981). Brine more than a thousand meters above their evaporite source (Dresel and Rose 2010) is evidence of upward movement from depth to the surface. The Marcellus shale, with salinity as high as 350,000 mg/L (Soeder 2010; NYDEC 2009), may be a primary brine source. Relatively uniform brine concentrations over large areas (Williams et al. 1998) suggest widespread advective transport. The transition from brine to freshwater suggests a long-term equilibrium between the upward movement of brine and downward movement of freshwater. Faults, which occur throughout the Marcellus shale region (Figure 1) (Gold 1999), could provide pathways (Konikow 2011; Caine et al. 1996) for more concentrated advective and dispersive transport. Brine concentrating in faults or anticline zones reflects potential preferential pathways (Wunsch 2011; Dresel and Rose 2010; Williams 2010; Williams et al. 1998).

In addition to the natural gradient, buoyancy would provide an additional initial upward push. At TDS equal to 350,000 mg/L, the density at 25 °C is approximately

1290 kg/m$^3$, or more than 29% higher than freshwater. The upward force would equal the difference in weight between the injected fluid and displaced brine. As an example, if 10,000,000 L does not return to the surface as flowback (Jehn 2011), the difference in mass between the volume of fracking fluid and displaced brine is approximately 3,000,000 kg, which would cause an initial upward force. The density difference would dissipate as the salt concentration in the fracking fluid increases due to diffusion across the boundary between the fluid and the brine.

In just Pennsylvania, more than 180,000 wells had been drilled prior to any requirement for documenting their location (Davies 2011), therefore the location of many wells is unknown and some have probably been improperly abandoned. These pathways connect aquifers through otherwise continuous aquitards; overpressurization of lower aquifers due to injection near the well pathway could cause rapid transport to higher aquifers (Lacombe et al. 1995). In the short fracking period, the region that is overpressurized remains relatively close to the gas well (see modeling analysis below), therefore it should be possible for the driller to locate nearby abandoned wells that could be affected by fracking. This article does not consider the potential contamination although unlocated abandoned wells of all types must be considered a potential and possibly faster source for contamination due to fracking.

### Effect of Hydraulic Fracturing on Shale

Fracking increases the permeability of the targeted shale to make extraction of NG economically efficient (Engelder et al. 2009; Arthur et al. 2008). Fracking creates fracture pathways with up to 9.2 million square meters of surface area in the shale accessible to a horizontal well (King 2010; King et al. 2008) and connects natural fractures (Engelder et al. 2009; King et al. 2008). No post-fracking studies that documented hydrologic properties were found while researching this article (there is a lack of information about pre- and post-fracking properties; Schweitzer and Bilgesu 2009), but it is reasonable to assume the $K$ increases significantly because of the newly created and widened fractures.

Fully developed shale typically has wells spaced at about 300-m intervals (Edwards and Weisset 2011; Soeder 2010). Up to eight wells may be drilled from a single well pad (NYDEC 2009; Arthur et al. 2008), although not in a perfect spoke pattern. Reducing by half the effective spacing did not enhance overall productivity (Edwards and Weisset 2011) which indicates that 300-m spacing creates sufficient overlap among fractured zones to assure adequate gas drainage. The properties controlling groundwater flow would therefore be affected over a large area, not just at a single horizontal well or set of wells emanating from a single well pad.

Fracking is not intended to affect surrounding formations, but shale properties vary over short ranges (King 2010; Boyer et al. 2006) and out-of-formation fracking is not uncommon. In the Marcellus shale, out-of-formation fracks have been documented 500 m above the top of the shale (Fisher and Warpinski 2011). These fractures could contact higher conductivity sandstone, natural fractures, or unplugged abandoned wells above the target shale. Also, fluids could reach surrounding formations just because of the volume injected into the shale, which must displace natural fluid, such as the existing brine in the shale.

## Analysis of Potential Transport along Pathways

Fracking could cause contaminants to reach overlying formations either by fracking out of formation, connecting fractures in the shale to overlying bedrock, or by simple displacement of fluids from the shale into the overburden. Advective transport, considered as simple particle velocity, will manifest if there is a significant vertical component to the regional hydraulic gradient.

Numerical modeling, completed with the MODFLOW-2000 code (Harbaugh et al. 2000), provides flexibility to consider potential conceptual flow scenarios, but should be considered interpretative (Hill and Tiedeman 2007). The simulation considers the rate of vertical transport of contaminants to near the surface for the different conceptual models, based on an expected, simplified, realistic range of hydrogeologic aquifer parameters.

MODFLOW-2000 is a versatile numerical modeling code, but there is insufficient data regarding the geology and water chemistry between aquifers and the deep shale, such as salinity profiles or data concerning mixing of the brine with fracking fluid, to best use its capabilities. As more data becomes available, it may be useful to consider simulating the added upward force caused by the brine by using the SEAWAT-2000 module (Langevin et al. 2003).

Vertical flow would be perpendicular to the general tendency for sedimentary layers to have higher horizontal than vertical conductivity. Fractures and improperly abandoned wells would provide pathways for much quicker vertical transport than general advective transport. This article considers the fractures as vertical columns with model cells having much higher conductivity than the surrounding bedrock. The cell discretization is fine, so the simulated width of the fracture zones is realistic. Dual porosity modeling (Shoemaker et al. 2008) is not justified because turbulent vertical flow through the fractures is unlikely, except possibly during the actual fracking that causes out-of-formation fractures, a scenario not simulated here. MODFLOW-2000 has a module, MNW (Halford and Hanson 2002), that could simulate rapid transport through open bore holes. MNW should be used in situations where open boreholes or improperly abandoned wells are known or postulated to exist.

The thickness of the formations and fault would affect the simulation, but much less than the several-order-of-magnitude variation possible in the shale properties. The overburden and shale thickness were set equal to 1500 and 30 m, respectively, similar to that observed in southern New York. The estimated travel times are proportional for thicker or thinner sections. The overburden could be predominantly sandstone, with sections of shale, mudstone, and limestone. The vertical fault is assumed

to be 6-m thick. The fault is an attempt at considering fracture flow, but the simulation treats the 6-m wide fault zone as homogeneous, which could underestimate the real transport rate in fracture-controlled systems which could be highly affected by dispersion. The simulation also ignores diffusion between the fracture and the adjacent shale matrix (Konikow 2011).

There are five conceptual models of flow and transport of natural and post-fracking transport from the level of the Marcellus shale to the near-surface to consider herein:

1. The natural upward advective flow due to a head drop of 30 m from below the Marcellus shale to the ground surface, considering the variability in both shale and overburden $K$. This is a steady state solution for upward advection through a 30-m thick shale zone and 1500-m overburden. Table 1 shows the chosen $K$ values for shale and sandstone.
2. Same as number 1, but with a vertical fracture connecting the shale with the surface, created using a high-conductivity zone in a row of cells extending through all from above the shale to the surface. This emulates the conceptual model postulated for flow into the alluvial aquifers near stream channels, the location of which may be controlled by faults (Williams et al. 1998). The fault $K$ varies from 10 to 1000 times the surrounding bulk sandstone $K$ ($K_{ss}$).
3. This scenario tests the effect of extensive fracturing in the Marcellus shale by increasing the shale $K$ ($K_{sh}$) from 10 to 1000 times its native value over an extensive area. This transient solution starts with initial conditions being a steady state solution from scenario 1. The $K_{sh}$ increases from 10 to 1000 times at the beginning of the simulation, to represent the relatively instantaneous change on the regional shale hydrogeology imposed by the fracking. The simulation estimates both the changes in flux and the time for the system to reach equilibrium.
4. As number 3, considering the effect of the same changes in shale properties but with a fault as in number 2.
5. This scenario simulates the actual injection of 13 to 17 million liters of fluid in 5 d into fractured shale from a horizontal well with and without a fault.

## Model Setup

The model domain was 150 rows and columns spaced at 3 m to form a 450-m square (Figure 2) with 50 layers bounded with no flow boundaries. The 30-m thick shale was divided into 10 equal thickness layers from layer 40 to 49. The overburden layer thickness varied from 3 m just above the shale to layer 34, 6 m from layer 33 to 29, 9 m from layer 28 to 26, 18 m in layer 25, 30 m from layer 24 to 17, 60 m from layer 16 to 6, 90 m from layer 5 to 3, and 100 m in layers 2 and 1. A 6-m wide column from layer 39 to the surface is added for some scenarios in the center two rows to simulate a higher $K$ fault.

| Table 1 | | |
|---|---|---|
| Sandstone (ss) and Shale (sh) Conductivity ($K$) (m/d) and the Steady State Flux (m$^3$/d) for Model 1 Scenarios | | |
| Flux | $K_{ss}$ | $K_{sh}$ |
| 1.7 | 0.1 | 0.00001 |
| 1.8 | 0.5 | 0.00001 |
| 1.9 | 1 | 0.00001 |
| 1.9 | 5 | 0.00001 |
| 2.0 | 10 | 0.00001 |
| 2.0 | 50 | 0.00001 |
| 2.0 | 100 | 0.00001 |
| 1.7 | 0.1 | 0.00001 |
| 9.5 | 0.1 | 0.00005 |
| 19.0 | 0.1 | 0.0001 |
| 81.2 | 0.1 | 0.0005 |
| 135.9 | 0.1 | 0.001 |
| 291.5 | 0.1 | 0.005 |
| 340.9 | 0.1 | 0.01 |
| 394.3 | 0.1 | 0.05 |
| 401.8 | 0.1 | 0.1 |
| 409.2 | 0.1 | 0.5 |
| 40.7 | 0.001 | 0.1 |
| 186.0 | 0.005 | 0.1 |
| 339.1 | 0.01 | 0.1 |
| 988.3 | 0.05 | 0.1 |
| 1297.3 | 0.1 | 0.1 |
| 1748.0 | 0.5 | 0.1 |
| 1826.1 | 1 | 0.1 |
| 1902.8 | 5 | 0.1 |
| 1915.4 | 10 | 0.1 |
| 338.3 | 0.1 | 0.01 |
| 984.1 | 0.5 | 0.01 |
| 1292.5 | 1 | 0.01 |
| 1731.5 | 5 | 0.01 |
| 1816.0 | 10 | 0.01 |
| 17.4 | 1 | 0.0001 |
| 86.3 | 1 | 0.0005 |
| 176.7 | 1 | 0.001 |
| 775.1 | 1 | 0.005 |
| 1292.5 | 1 | 0.01 |
| 2746.8 | 1 | 0.05 |
| 3183.2 | 1 | 0.1 |
| 3650.5 | 1 | 0.5 |
| 3719.9 | 1 | 1 |

The model simulated vertical flow between constant head boundaries in layers 50 and 1, as a source and sink, so that the overburden and shale properties control the flow. The head in layers 50 and 1 was 1580 and 1550 m, respectively, to create a gradient of 0.019 over the profile. Varying the gradient would have much less effect on transport than changing $K$ over several orders of magnitude and was therefore not done.

Scenario 5 simulates injection using a WELL boundary in layer 44, essentially the middle of the shale, from columns 25 to 125 (Figure 2). It injects 15 million liters over one 5-d stress period, or 3030 m$^3$/d into 101 model cells at the WELL. The modeled $K_{sh}$ was changed to its



**Figure 2. Model grid through layer 44 showing the horizontal injection WELL (red) and DRAIN cells (yellow) used to simulate flowback. There is only one monitoring well because the off-center well is not used in layer 44.**



**Figure 3. Sensitivity of the modeled head response to the storage coefficient used in the fractured shale for model layer 39 just above the shale.**

assumed fracked value at the beginning of the simulation. Simulating high rate injection generates very high heads in the model domain, similar to that found simulating oil discharging from the well in the Deepwater Horizon crisis (Hsieh 2011) and water quality changes caused by underground coal gasification (Contractor and El-Didy 1989). DRAIN boundaries on both sides of the WELL simulated return flow for 60 d after the completion of (Figure 2), after which the DRAIN was deactivated. The 60 d were broken into four stress periods, 1, 3, 6, and 50 d long, to simulate the changing heads and flow rates. DRAIN conductance was calibrated so that 20% of the injected volume returned within 60 d to emulate standard industry practice (Alleman 2011; NYDEC 2009). Recovery, continuing relaxation of the head at the well and the adjustment of the head distribution around the domain, occurred during the sixth period which lasted for 36,500 d.

There is no literature guidance to a preferred value for fractured shale storage coefficient, so I estimated $S$ with a sensitivity analysis using scenario 3. With fractured $K_{sh}$ equal to 0.001 m/d, two orders of magnitude higher than the in situ value, the time to equilibrium resulting from simulation tests of three fractured shale storage coefficients, $10^{-3}$, $10^{-5}$, and $10^{-7}$/m, varied twofold (Figure 3). The slowest time to equilibrium was for $S = 10^{-3}$/m (Figure 3), which was chosen for the transient simulations because more water would be stored in the shale and flow above the shale would change the least.

## Results

### Scenario 1

Table 1 shows the conductivity and flux values for various scenarios. The steady state travel time

for a particle through 1500 m of sandstone and shale equilibrates with one of the formations controlling the advection (Figure 4). For example, when the $K_{sh}$ equals $1 \times 10^{-5}$ m/d, transport time does not vary with $K_{ss}$. For $K_{ss}$ at 0.1 m/d, transport time for varying $K_{sh}$ ranges from 40,000 to 160 years. The lower travel time estimate is for $K_{sh}$ similar to that found by Schulze-Makuch et al. (1999). The shortest simulated transport time of about 20 years results from both the sandstone and shale $K$ equaling 1 m/d. Other sensitivity scenarios emphasize the control exhibited by one of the media (Figure 4). If $K_{sh}$ is low, travel time is very long and not sensitive to $K_{ss}$.

### Scenario 2

The addition of a fault with $K$ one to two orders of magnitude more conductive than the surrounding sandstone increased the particle travel rate by about 10 times (compare Figure 5 with Figure 4). The fault $K$ controlled the transport rate for $K_{sh}$ less than 0.01 m/d. A highly



**Figure 4. Sensitivity of particle transport time over 1500 m for varying shale and sandstone vertical K. Effective porosity equals 0.1. (1)—varying $K_{ss}$, $K_{sh} = 10^{-5}$ m/d; (2)—varying $K_{ss}$, $K_{sh} = 0.1$ m/d; (3)—varying $K_{ss}$, $K_{sh} = 0.1$ m/d; (4)—varying $K_{ss}$, $K_{sh} = 0.01$ m/d; and (5)—varying $K_{ss}$, $K_{sh} = 1.0$ m/d.**



**Figure 5. Variability of transport through various scenarios of changing the K for the fault or shale. Effective porosity equals 0.1. (1)—varying $K_{sh}$, $K_{sh} = 0.01$ m/d; (2)—varying $K_{sh}$, $K_{sh} = 0.1$ m/d; (3)—no fault; (4)—varying K fault, $K_{sh} = 0.1$ m/d, $K_{sh} = 0.01$ m/d. Unless specified, the vertical fault has $K = 1$ m/d for variable $K_{sh}$.**



**Figure 6. Monitoring well water levels for specified model layers due to fracking of the shale; monitor well in the center of the domain, including in the fault, $K$ of the shale changes from 0.00001 to 0.01 m/d at the beginning of the simulation.**

conductive fault could transport fluids to the surface in as little as a year for $K_{sh}$ equal to 0.01 m/d (Figure 5). However, a fault did not significantly change the overall model flux, so with fault values are not shown in Table 1.

### Scenarios 3 and 4

Scenarios 3 and 4 estimate the time to establish a new equilibrium once the $K_{sh}$ changes, due to fracking, between values specified in scenarios 1 and 2. Equilibrium times vary by model layer as the changes propagate through the domain, and flux rate for the simulated changes imposed on natural background conditions. The fracking-induced changes cause a significant decrease in the head drop across the shale and the time for adjustment of the potentiometric surface to a new steady state depends on the new shale properties.

The time to equilibrium for one scenario 3 simulation, $K_{sh}$ changing from $10^{-5}$ to $10^{-2}$ m/d with $K_{ss}$ equal to 0.1 m/d, varied from 5.5 to 6.5 years, depending on model layer (Figure 6). Near the shale (layers 39 and 40), the potentiometric surface increased from 23 to 25 m reflecting the decreased head drop across the shale. One hundred meters higher, in layer 20, the potentiometric surface increased about 20 m. Simulation of scenario 4, with a fault with $K = 1$ m/d, decreased the time to equilibrium to from 3 to 6 years within the fault zone, depending on model layer (Figure 6). Highly fractured sandstone would allow more vertical transport, but advective flow would also increase so that the base $K_{ss}$ would control the overall rate.

The flux across the upper boundary changed within 100 years for scenario 3 from 1.7 to 345 m³/d, or 0.000008 to 0.0017 m/d, reflecting control by $K_{ss}$. There is little difference in the equilibrium fluxes between scenario 3 and 4 indicating that the fault primarily affects the time to equilibrium rather than the long-term flow rate.

### Scenario 5: Simulation of Injection

The injection scenarios simulate 15 million liters entering the domain at the horizontal well and the subsequent potentiometric surface and flux changes throughout. The highest potentiometric surface increases (highest injection pressure) occurred at the end of injection (Figure 7), with a 2400 m increase at the horizontal well. The simulated peak pressure both decreased and occurred longer after the cessation of injection with distance from the well (Figures 7 and 8). The pressure at the well returned to within 4 m of pre-injection levels in about 300 d (Figure 7). After injection ceases, the peak pressure simulated further from the well occurs longer from the time of cessation, which indicates there is a pressure divide beyond which fluid continues to flow away from the well bore while within which the fluid flows toward the well bore. The simulated head returned to near pre-injection levels slower with distance from the well (Figure 7), with levels at the edge of the shale (layer 40) and in the near-shale sandstone (layer 39) requiring several hundred days to recover. After recovering from injection, the potentiometric surface above the shale increased in response to flux through the shale adjusting to the change in shale properties (Figure 8), as simulated in scenario 3. The scenario required about 6000 d (16 years) for the potentiometric surface to stabilize at new, higher, levels (Figure 8). Removing the fault from the simulation had little effect on the time to stabilization, and is not shown.

Prior to injection, the steady flux for in situ shale ($K_{sh} = 10^{-5}$ m/d) was generally less than 2 m³/d and varied little with $K_{ss}$ (Figure 4). Once the shale was fractured, the sandstone controlled the flux which ranges from 38 to 135 m³/d as $K_{ss}$ ranges from 0.01 to 0.1 m/d (Figure 9), resulting in particle travel times of 2390 and 616 years, respectively. More conductive shale would allow faster transport (Figure 4). Adding a fault to the scenario with $K_{ss}$ equal to 0.01 m/d increased the flux to approximately 63 m³/d and decreased the particle travel



**Figure 7. Simulated potentiometric surface changes by layer for specified injection and media properties. The monitoring point is in the center of the domain. Fault is included.** $K_{ss} = 0.01$ m/d, $K_{sh} = 0.001$ m/d. $S$ (fractured shale) $= 0.001$/m, $S$ (ss) $= 0.0001$/m.



**Figure 8. Simulated potentiometric surface changes for layers within the shale and sandstone. CW is center monitoring well and EW is east monitoring well, about 120 m from the centerline. Fault is included. The line for layer 2, CW plots beneath the line for layer 2, EW.** $K_{ss} = 0.01$ m/d, $K_{sh} = 0.001$ m/d, $S$ (fractured shale) $= 0.001$/m, $S$ (ss) $= 0.0001$/m.



**Figure 9. Comparison of flux for three scenarios. Flowback is the same for all scenarios. (1): Kss = 0.01 m/d, Ksh = 0.001 m/d, Fault K = 1 m/d; (2): Kss = 0.01 m/d, Ksh = 0.001 m/d, no fault; (3) Kss = 0.1 m/d, Ksh = 0.001 m/d, no fault.**



**Figure 10. Upward flux across the domain section as a function of distance above the top of the shale layer. Cross section is 202,500 m$^2$.**

time to 31 years. Approximately, 36 m$^3$/d flowed through the fault (Figure 9). The fault properties control the particle travel time, especially if the fault $K$ is two or more orders of magnitude higher than the sandstone.

Simulated flowback varied little with $K_{sh}$ because it had been calibrated to be 20% of the injection volume. A lower storage coefficient or higher $K$ would allow the injected fluid to move further from the well, which would lead to less flowback.

Vertical flux through the overall section with a fault varies significantly with time, due to the adjustments in potentiometric surface. One day after injection, vertical flux exceeds significantly the pre-injection flux about 200 m above the shale (Figure 10). After 600 d, the vertical flux near the shale is about 68 m$^3$/d and in

layer 2 at 58 m$^3$/d; it approaches steady state through all sections after 100 years with flux equaling about 62.6 m$^3$/d. The 100-year flux is 61.5 m$^3$/d higher than the pre-injection flux because of the changed shale properties.

## Discussion

The interpretative modeling completed herein has revealed several facts about fracking. First, MODFLOW can be coded to adequately simulate fracking. Simulated pressures are high, but velocities even near the well do not violate the assumptions for Darcian flow. Second, injection for 5 d causes extremely high pressure within the shale. The pressure decreases with distance from the well. The time to maximum pressure away from the well lags the time of maximum pressure at the well. The pressure drops back to close to its pre-injection level

at the well within 300 d, indicating the injection affects the flow for significantly longer periods than just during the fracking operation. Although the times may vary based on media properties, the difference would be at most a month or so, based on the various combinations of properties simulated. The system transitions within 6 years due to changes in the shale properties. The equilibrium transport rate would transition from a system requiring thousands of years to one requiring less than 100 years within less than 10 years.

Third, most of the injected water in the simulation flows vertically rather than horizontally through the shale. This reflects the higher $K_{ss}$ 20 m above the well and the no flow boundary within 225 m laterally from the well, which emulates in situ shale properties that would manifest at some distance in the shale.

Fourth, the interpretative model accurately and realistically simulates long-term steady state flow conditions, with an upward flow that would advect whatever conservative constituents exist at depth. Using low, unfractured $K$ values, the transport simulation may correspond with advective transport over geologic time although there are conditions for which it would occur much more quickly (Figure 4). If the $K_{sh}$ is 0.01 m/d, transport could occur on the order of a few hundreds of years. Faults through the overburden could speed the transport time considerably. Reasonable scenarios presented herein suggest the travel time could be decreased further by an order of magnitude.

Fifth, fracking increases the $K_{sh}$ by several orders of magnitude. Out-of-formation fracking (Fisher and Warpinski 2011) would increase the $K$ in the overburden, thereby changing the regional hydrogeology. Vertical flow could change over broad areas if the expected density of wells in the Marcellus shale region (NYDEC 2009) actually occurs.

Sixth, if newly fractured shale or out-of-formation fractures come close to contacting fault fracture zones, contaminants could reach surface areas in tens of years, or less. Faults can decrease the simulated particle travel time several orders of magnitude.

## Conclusion

Fracking can release fluids and contaminants from the shale either by changing the shale and overburden hydrogeology or simply by the injected fluid forcing other fluids out of the shale. The complexities of contaminant transport from hydraulically fractured shale to near-surface aquifers render estimates uncertain, but a range of interpretative simulations suggest that transport times could be decreased from geologic time scales to as few as tens of years. Preferential flow through natural fractures fracking-induced fractures could further decrease the travel times to as little as just a few years.

There is no data to verify either the pre- or post-fracking properties of the shale. The evidence for potential vertical contaminant flow is strong, but there are also almost no monitoring systems that would detect contaminant transport as considered herein. Several improvements could be made.

- Prior to hydraulic fracturing operations, the subsurface should be mapped for the presence of faults and measurement of their properties.
- A reasonable setback distance from the fracking to the faults should be established. The setback distance should be based on a reasonable risk analysis of fracking increasing the pressures within the fault.
- The properties of the shale should be verified, post-fracking, to assess how the hydrogeology will change.
- A system of deep and shallow monitoring wells and piezometers should be established in areas expecting significant development, before that development begins (Williams 2010).

## Acknowledgments

This research was funded by the Park Foundation and Catskill Mountainkeepers. The author thanks Anthony Ingraffea, Paul Rubin, Evan Hansen, two anonymous reviews, and the journal editor for helpful comments on this article.

## References

Alleman, D. 2011. Water used for hydraulic fracturing: Amounts, sources, reuse, and disposal. In *Hydraulic Fracturing of the Marcellus Shale*, National Groundwater Association short course. Baltimore, Maryland.

Annunziatellis, A., S.E. Beaubien, S. Bigi, G. Ciotoli, M. Coltella, and S. Lombardi. 2008. Gas migration along fault systems and through the vadose zone in the Latera calder (central Italy): Implications for $CO_2$ geological storage. *International Journal of Greenhouse Gas Control* 2; 353–372. DOI: 10.1016/j.ijggc.2008.02.003.

Arthur, J.D., B. Bohm, and M. Layne. 2008. *Hydraulic Fracturing Consideration for Natural Gas Wells of the Marcellus Shale*. Cincinnati, Ohio: Ground Water Protection Council.

Boyer, C., J. Kieschnick, R. Suarez-Rivera, R.E. Lewis, and G. Waters. 2006. Producing gas from its source. *Oilfields Review* 18, no. 3: 36–49.

Breen, K.J., K. Revesz, F.J. Baldassare, and S.D. McAuley. 2007. Natural gases in ground water near Tioga Junction, Tioga County, north-central Pennsylvania—Occurrence and use of isotopes to determine origins. Scientific Investigations Report Series 2007-5085. Reston, Virginia: U.S. Geological Survey.

Caine, J.S., J.P. Evans, and C.B. Forster. 1996. Fault zone architecture and permeability structure. *Geology* 24, no. 11: 1025–1028.

Contractor, D.N., and S.M.A. El-Didy. 1989. Field application of a finite-element water-quality model to a coal seam with UCG burns. *Journal of Hydrology* 109: 57–64.

Davies, R.J. 2011. Methane contamination of drinking water caused by hydraulic fracturing remains unproven. *Proceedings of the National Academy of Sciences USA* 108: E871.

DiGiulio, D.C., R.T. Wilkin, C. Miller, and G. Oberly. 2011. *DRAFT: Investigation of Ground Water Contamination near Pavillion, Wyoming*. Ada, Oklahoma: U.S. Environmental Protection Agency, Office of Research and Development.

Dresel, P.E., and A.W. Rose. 2010. Chemistry and origin of oil and gas well brines in western Pennsylvania. 4th ser., Open-File Report OFOG 10–01.0, 48. Harrisburg: Pennsylvania Geological Survey.

Edward, K.L., and S. Weisset. 2011. Marcellus shale hydraulic fracturing and optimal well spacing to maximize recovery and control costs. Paper 140463 in *SPE Hydraulic Fracturing Technology Conference*, January 24–26, 2011, The Woodlands, Texas.

Energy Information Administration (EIA). 2009. *Annual Energy Outlook with Projections to 2030*. Washington, D.C.: U.S. Department of Energy. http://www.eia.doe.gov/oiaf/aeo/ (accessed May 23, 2011).

Engelder, T., G.G. Lash, and R.S. Uzcategui. 2009. Joint sets that enhance production from Middle and Upper Devonian gas shales of the Appalachian Basin. *AAPG Bulletin* 93, no. 7: 857–889.

Environmental Protection Agency (EPA). 1987. Report to congress, management of wastes from the exploration, development, and production of crude oil, natural gas, and geothermal energy, volume 1 of 3, oil and gas. Washington, DC: EPA.

Etiope, G., and G. Martinelli. 2002. Migration of carrier and trace gases in the geosphere: an overview. *Physics of the Earth and Planetary Interiors* 129: 3–4.

Fisher, K., and N. Warpinski. 2011. Hydraulic fracture-height growth: real data. Paper SPE 145949 presented at the Annual Technical Conference and Exhibition, Denver, Colorado. DOI: 10.2118/145949-MS.

Gold, D. 1999. Lineaments and their interregional relationships. In *The Geology of Pennsylvania*, ed. C.H. Schultz, 307–313. Harrisburg: Pennsylvania Department of Conservation and Natural Resources.

Halford, K.J., and R.T. Hanson. 2002. User guide for the drawdown-limited, multi-node well (MNW) package for the U.S. Geological Survey's modular three-dimensional finite-difference ground-water flow model, Versions MODFLOW-96 and MODFLOW-2000, 33. Open-File Report 02-293. Sacramento, California: U.S. Geological Survey.

Harbaugh, A.W., E.R. Banta, M.C. Hill, and M.G. McDonald. 2000. Modflow-2000, the U.S. Geological Survey modular ground-water model—User guide to modularization, concepts and the ground-water flow process. Open-File Report 00-92. Reston, Virginia: U.S. Geological Survey.

Harper, J.A. 1999. Devonian. In *The Geology of Pennsylvania*, ed. C.H. Schultz, 108–127. Harrisburg: Pennsylvania Department of Conservation and Natural Resources.

Hill, M.C., and C.R. Tiedeman. 2007. *Effective Groundwater Model Calibration: With Analysis of Data, Sensitivities, Predictions, and Uncertainty*. Hoboken, New Jersey: John Wiley and Sons.

Hsieh, P.A. 2011. Application of MODFLOW for oil reservoir simulation during the Deepwater Horizon crisis. *Ground Water* 49, no. 3: 319–323. DOI: 10.1111/j.1745-6584.2011.00813.x.

Isachsen, Y.W., and W. McKendree. 1977. *Preliminary Brittle Structure Map of New York, Map and Chart Series No. 31*. Albany, New York: New York State Museum.

Jehn, P. 2011. Well and water testing—What to look for and when to look for it. In *Groundwater and Hydraulic Fracturing of the Marcellus Shale*, National Groundwater Association short course. Baltimore, Maryland.

King, G. 2010. Thirty years of gas shale fracturing: What have we learned? Paper SPE 133456 presented at the *SPE Annual Technical Conference and Exhibition*, September 19–22, 2010, Florence, Italy.

King, G.E., L. Haile, J. Shuss, and T.A. Dobkins. 2008. Increasing fracture path complexity and controlling downward fracture growth in the Barnett shale. Paper 119896 presented at the *SPE Shale Gas Production Conference*, November 16–18, 2008, Fort Worth, Texas.

Konikow, L.F. 2011. The secret to successful solute-transport modeling. *Ground Water* 49, no. 2: 144–159. DOI: 10.1111/j.1745-6584.2010.00764.x.

Kramer, D. 2011. Shale-gas extraction faces growing public and regulatory challenges. *Physics Today* 64, no. 7: 23–25.

Kwon, O., A.K. Kronenberg, A.F. Gangi, B. Johnson, and B.E. Herbert. 2004a. Permeability of illite-bearing shale: 1. Anisotropy and effects of clay content and loading. *Journal of Geophysical Research* 109: B10205. DOI: 10.1029/2004JB003052.

Kwon, O., B.E. Herbert, and A.K. Kronenberg. 2004b. Permeability of illite-bearing shale: 2. Influence of fluid chemistry on flow and functionally connected pores. *Journal of Geophysical Research* 109: B10206. DOI:10.1029/2004JB003055.

Lacombe, S., E.A. Sudickey, S.K. Frape, and A.J.A. Unger. 1995. Influence of leak boreholes on cross-formational groundwater flow and contaminant transport. *Water Resources Research* 31, no. 8: 1871–1882.

Langevin, C.D., W.B. Shoemaker, and W. Guo. 2003. MODFLOW-2000, the U.S. Geological Survey modular groundwater model—Documentation of the SEAWAT-2000 version with the variable-density flow process (VDF) and the integrated MT3DMS transport process (IMT), 43 p. Open-File Report 03-426. Tallahassee, Florida: U.S. Geological Survey.

Loyd, O.B., and L.D. Carswell. 1981. Groundwater resources of the Williamsport region, Lycoming County, Pennsylvania. Water Resources Report 51. Pennsylvania: Department of Environmental Resources.

Neuzil, C.E. 1994. How permeable are clays and shales? *Water Resources Research* 30, no. 2: 145–150.

Neuzil, C.E. 1986. Groundwater flow in low-permeability environments. *Water Resources Research* 22, no. 8: 1163–1195.

New York State Department of Environmental Conservation (NYDEC). 2009. *Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program—Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs*. Albany, New York: State Department of Environmental Conservation.

Nickelsen, R.P. 1986. Cleavage duplexes in the Marcellus Shale of the Appalachian foreland. *Journal of Structural Geology* 8, no. 3/4: 361–371.

Ohio Department of Natural Resources (ODNR). 2008. Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio. ODNR, Division of Mineral Resources Management.

Osborn, S.G., A. Vengosh, N.R. Warner, and R.B. Jackson. 2011. Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *Proceedings of the National Academy of Sciences* 108, no. 20: 8172–8176.

Osborn, S.G., and J.C. McIntosh. 2010. Chemical and isotopic tracers of the contribution of microbial gas in Devonian organic-rich shales and reservoir sandstones, northern Appalachian Basin. *Applied Geochemistry* 25, no. 3: 456–471.

Pennsylvania Bureau of Topographic and Geologic Survey (PBTGS). 2001. *Bedrock Geology of Pennsylvania (Digital Files)*. Harrisburg, Pennsylvania: PA Department of Conservation and Natural Resources.

Pennsylvania Department of Environmental Protection (PADEP). 2011. Marcellus Shale. http://www.dep.state.pa.us/dep/deputate/minres/oilgas/new_forms/marcellus/marcellus.htm (accessed June 1, 2011).

Pennsylvania Department of Environmental Protection (PADEP). 2009. Notice of Violation, Re: Gas Migration Investigation, Dimock Township, Susquehanna County, Letter from S. C. Lobins, Regional Manager, Oil and Gas Management, to Mr. Thomas Liberatore, Cabot Oil and Gas Corporation. February 27, 2009. 4 pp., PADEP, Meadville, Pennsylvania.

Schoell, M. 1980. The hydrogen and carbon isotopic composition of methane from natural gases of various origins. *Geochemica et Cosmochiica Act* 44, no. 5: 649–661.

Schulze-Makuch, D., D.A. Carlson, D.S. Cherkauer, and P. Malik. 1999. Scale dependence of hydraulic conductivity in heterogeneous media. *Ground Water* 37, no. 6: 904–919.

Schweitzer, R., and H.I. Bilgesu. 2009. The role of economics on well and fracture design completions of Marcellus Shale wells. Paper 125975 in SPE *Eastern Regional Meeting*, September 23–25, 2009, Charleston, West Virginia.

Shoemaker, W.B., E.L. Kuniansky, S. Birk, S. Bauer, and E.D. Swain. 2008. Documentation of a conduit flow process (CFP) for MODFLOW-2005. U.S. Geological Survey techniques and methods, Book 6, chapter A24, 50 p. Reston, Virgina: U.S. Geological Survey.

Silliman, S., and D. Higgins. 1990. An analytical solution for steady-state flow between aquifers through an open well. *Ground Water* 28, no. 2: 184–190.

Soeder, D.J. 2010. The Marcellus shale: Resources and reservations. *EOS* 91, no. 32: 277–278.

T.A.L. Research and Development (TAL). 1981. Geology, drill holes, and geothermal energy potential of the basal Cambrian rock units of the Appalachian Basin of New York State. In *Prepared for New York State Energy Research and Development Authority*, 54 p.

West Virginia Geological and Economic Survey (WVGES). 2011. *Completed Wells—Marcellus Shale, West Virginia*. Morgantown, West Virginia: WVGES.

West Virginia Geological and Economic Survey (WVGES). 2010a. *Structural Geologic Map (Faults)—Topo of the Onondaga Limestone or Equivalent, West Virginia*. Morgantown, West Virginia: WVGES.

West Virginia Geological and Economic Survey (WVGES). 2010b. *Structural Geologic Map (Folds)—Topo of the Onondaga Limestone or Equivalent, West Virginia*. Morgantown, West Virginia: WVGES.

White, J.S., and M.V. Mathes. 2006. Dissolved-gas concentration in ground water in West Virginia, 8. Data Series 156. Reston, Virginia: U.S. Geological Survey.

Williams, J.H. 2010. Evaluation of well logs for determining the presence of freshwater, saltwater, and gas above the Marcellus shale in Chemung, Tioga, and Broome Counties, New York. Scientific Investigations Report 2010–5224, 27. Reston, Virginia: U.S. Geological Survey.

Williams, J.H., L.E. Taylor, and D.J. Low. 1998. Hydrogeology and groundwater quality of the Glaciated Valleys of Bradford, Tioga, and Potter Counties, Pennsylvania. Water Resource Report 68. Pennsylvania Dept of Conservation and Natural Resources and U.S. Geological Survey.

Wunsch, D. 2011. Hydrogeology and hydrogeochemistry of aquifers overlying the Marcellus shale. In *Groundwater and Hydraulic Fracturing of the Marcellus Shale*, National Groundwater Association short course. Baltimore, Maryland.

# EXHIBIT 154

# Geochemical evidence for possible natural migration of Marcellus Formation brine to shallow aquifers in Pennsylvania

Nathaniel R. Warner[a], Robert B. Jackson[a,b], Thomas H. Darrah[a], Stephen G. Osborn[c], Adrian Down[b], Kaiguang Zhao[b], Alissa White[a], and Avner Vengosh[a,1]

[a]Division of Earth and Ocean Sciences, Nicholas School of the Environment, Duke University, Durham, NC 27708; [b]Center on Global Change, Nicholas School of the Environment, Duke University, Durham, NC 27708; and [c]Geological Sciences Department, California State Polytechnic University, Pomona, CA 91768

Edited by Karl K. Turekian, Yale University, North Haven, CT, and approved May 10, 2012 (received for review January 5, 2012)

The debate surrounding the safety of shale gas development in the Appalachian Basin has generated increased awareness of drinking water quality in rural communities. Concerns include the potential for migration of stray gas, metal-rich formation brines, and hydraulic fracturing and/or flowback fluids to drinking water aquifers. A critical concern common to these environmental risks is the hydraulic connectivity between the shale gas formations and the overlying shallow drinking water aquifers. We present geochemical evidence from northeastern Pennsylvania showing that pathways, unrelated to recent drilling activities, exist in some locations between deep underlying formations and shallow drinking water aquifers. Integration of chemical data (Br, Cl, Na, Ba, Sr, and Li) and isotopic ratios ($^{87}Sr/^{86}Sr$, $^2H/H$, $^{18}O/^{16}O$, and $^{228}Ra/^{226}Ra$) from this and previous studies in 426 shallow groundwater samples and 83 northern Appalachian brine samples suggest that mixing relationships between shallow ground water and a deep formation brine causes groundwater salinization in some locations. The strong geochemical fingerprint in the salinized (Cl > 20 mg/L) groundwater sampled from the Alluvium, Catskill, and Lock Haven aquifers suggests possible migration of Marcellus brine through naturally occurring pathways. The occurrences of saline water do not correlate with the location of shale-gas wells and are consistent with reported data before rapid shale-gas development in the region; however, the presence of these fluids suggests conductive pathways and specific geostructural and/or hydrodynamic regimes in northeastern Pennsylvania that are at increased risk for contamination of shallow drinking water resources, particularly by fugitive gases, because of natural hydraulic connections to deeper formations.

formation water | isotopes | Marcellus Shale | water chemistry

The extraction of natural gas resources from the Marcellus Shale in the Appalachian Basin of the northeastern United States (1, 2) has increased awareness of potential contamination in shallow aquifers routinely used for drinking water. The current debate surrounding the safety of shale gas extraction (3) has focused on stray gas migration to shallow groundwater (4) and the atmosphere (5) as well as the potential for contamination from toxic substances in hydraulic fracturing fluid and/or produced brines during drilling, transport, and disposal (6–9).

The potential for shallow groundwater contamination caused by natural gas drilling is often dismissed because of the large vertical separation between the shallow drinking water wells and shale gas formations and the relatively narrow zone (up to 300 m) of seismic activity reported during the deep hydraulic fracturing of shale gas wells (10, 11). Recent findings in northeastern Pennsylvania (NE PA) demonstrated that shallow water wells in close proximity to natural gas wells (i.e., <1 km) yielded, on average, higher concentrations of methane, ethane, and propane with thermogenic isotopic signature. By comparison, water wells farther away from natural gas development had lower combusti-

ble gas concentrations and an isotopic signature consistent with a mixture between thermogenic and biogenic components (4). In contrast, when inorganic water geochemistry from active drilling areas was compared to nonactive areas and historical background values, no statistically significant differences were observed (4). Increasing reports of changes in drinking water quality have nevertheless been blamed on the accelerated rate of shale gas development.

The study area in NE PA consists of six counties (Fig. 1) that lie within the Appalachian Plateaus physiographic province in the structurally and tectonically complex transition between the highly deformed Valley and Ridge Province and the less deformed Appalachian Plateau (12, 13). The geologic setting and shallow aquifer characteristics are described and mapped in greater detail in multiple sources (4, 14–19) and in SI Methods. The study area contains a surficial cover composed of a mix of unconsolidated glacial till, outwash, alluvium and deltaic sediments, and postglacial deposits (the Alluvium aquifer) that are thicker in the valleys (17–19) (Fig. S1). These sediments are underlain by Upper Devonian through Pennsylvanian age sedimentary sequences that are gently folded and dip shallowly (1–3°) to the east and south (Fig. S2). The gentle folding creates alternating exposure of synclines and anticlines at the surface that are offset surface expressions of deeper deformation (12, 20). The two major bedrock aquifers are the Upper Devonian Catskill and the underlying Lock Haven Formations (14, 15, 18, 19). The average depth of drinking water wells in the study area is between 60 and 90 m (Table S1). The underlying geological formations, including the Marcellus Shale (at a depth of 1,200–2,500 m below the surface) are presented in Fig. 2, Fig. S2 A and B, and SI Methods.

In this study, we analyze the geochemistry of 109 newly-collected water samples and 49 wells from our previous study (4) from the three principal aquifers, Alluvium (n = 11), Catskill (n = 102), and Lock Haven (n = 45), categorizing these waters into four types based on their salinity and chemical constituents (Figs. 1 and 2, and SI Text). We combine these data with 268 previously-published data for wells in the Alluvium (n = 57), Catskill (n = 147), and Lock Haven (n = 64) aquifers (18, 19) for a total of 426 shallow groundwater samples. We analyzed major and trace element geochemistry and a broad spectrum of isotopic tracers ($\delta^{18}O$, $\delta^2H$, $^{87}Sr/^{86}Sr$, $^{228}Ra/^{226}Ra$) in shallow

Author contributions: N.R.W., R.B.J., and A.V. designed research; N.R.W., R.B.J., S.G.O., A.D., A.W., and A.V. performed research; N.R.W., R.B.J., T.H.D., K.Z., and A.V. analyzed data; and N.R.W., R.B.J., T.H.D., and A.V. wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission.

Freely available online through the PNAS open access option.

[1]To whom correspondence should be addressed. E-mail: vengosh@duke.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1121181109/-/DCSupplemental.

ENVIRONMENTAL SCIENCES



**Fig. 1.** Digital elevation model (DEM) map of northeastern PA. Shaded brown areas indicate higher elevations and blue-green shaded areas indicate lower elevations (valleys). The distribution of shallow (<90 m) groundwater samples from this study and previous studies (18, 19) are labeled based on water types. Two low salinity (Cl < 20 mg/L) water types dominated by Ca-HCO$_3$ (type A = green circles) or Na-HCO$_3$ (type B = blue triangles) were the most common, and two higher salinity (Cl > 20 mg/L) water types were also observed: Br/Cl < 0.001 (type C = pink squares) and brine-type groundwater Br/Cl > 0.001 (type D = red diamonds). Type D groundwater samples appear associated with valleys (Table S1) and are sourced from conservative mixing between a brine and fresh meteoric water. The DEM data were obtained from NASA' Shuttle Radar Topography Mission http://srtm.usgs.gov/.

ground water and compared these to published (6, 21, 22) and new data of 83 samples from underlying Appalachian brines in deeper formations from the region (Table S2) to examine the possibility of fluid migration between the hydrocarbon producing Marcellus Formation and shallow aquifers in NE PA. We hypothesize that integration of these geochemical tracers could delineate possible mixing between the Appalachian brines and shallow groundwater.

### Results and Discussion
The water chemistry data from the Alluvial, Catskill, and Lock Haven shallow aquifers (Table S1) reveal a wide range of solute concentrations from dilute groundwater with total dissolved solids (TDS) <500 mg/L and Cl < 20 mg/L to highly saline water (e.g., a salt spring with TDS of 7,800 mg/L and Cl approximately 4,000). Based on these characteristics, we divide the water samples into four types of ground water (Fig. 1). Two groundwater types (A and B; n = 118 of 158 samples from this and our previous study (4) are characterized by low salinity and high Na/Cl and Br/Cl (all ratios reported as molar) ratios (Table S1). The two elevated salinity (Cl > 20 mg/L) water types (C and D) were divided based on their Br/Cl ratios. Type (C) (n = 13 of 158) has a distinctive low (<0.001) Br/Cl ratio (Fig. 3) and higher NO$_3^-$ concentrations that we attribute to salinization from domestic sources such as wastewater and/or road salt that have typically low Br/Cl ratios. The fourth subset of shallow groundwater (type D) (n = 27 of 158) was identified with a relatively high Br/Cl ratio (>0.001) and low Na/Cl ratio (Na/Cl < 5) with a statistically significant difference in water chemistry from types A–C (Table S3).

A geochemical analysis of published data collected in the 1980s (18, 19) revealed similar shallow salinized groundwater with a distinctive higher Cl (>20 mg/L) and low Na/Cl ratio. The saline groundwater mimics type D water with statistically indis-



**Fig. 2.** Generalized stratigraphic section in the subsurface of western and eastern PA plateau adapted from (14, 15, 18, 19) and Sr isotope data of Appalachian brines and type D saline groundwater. Variations of $^{87}Sr/^{86}Sr$ ratios in Appalachian Brine and type-D groundwater samples show enrichment compared to the Paleozoic secular seawater curve (dashed grey line) (49). Note the overlap in values of type-D shallow ground water with $^{87}Sr/^{86}Sr$ values in Marcellus brines or older formations (21, 22, 24) but no overlap with the Upper Devonian brines in stratigraphically equivalent formations (Table S2) (21, 24).



**Legend**

| | |
|---|---|
| ○ Historical Type A | △ Historical Type B |
| ▢ Historical Type C | ◇ Historical Type D |
| ◉ Type A | △ Type B |
| ▣ Type C | ◆ Type D |
| ◇ Salt Spring (Type D) | ◇ UD Venango (22, 24, this study) |
| ◇ UD Venango (6) | ◇ UD Bradford SS (22, 24, this study) |
| ◇ UD Bradford SS (6) | ◇ UD Undifferentiated (6) |
| ◆ UD Org Rich Sh (22, 24, this study) | ◆ Marcellus (22, 24, this study) |
| ◆ Marcellus (6) | ◇ Lower Devonian (6) |
| ◇ Lower Silurian (6) | ◇ Lower Silurian (22, 24, this study) |
| ◆ Ordovician Utica (this study) | ◇ Marcellus (this study) |
| Appalachian Basin Brines from Devonian, Ordovician and Silurian Formations | — Seawater Evaporation Curve |
| Brines from Middle Devonian or Older Formations | ★ Seawater Composition |

**Fig. 3.** Bromide vs. chloride concentrations (log-log scale) in shallow groundwater in NE PA and Appalachian brines from this and previous studies (18, 19). The linear relationship (type D: $r^2 = 0.99$, $p < 1 \times 10^{-5}$; sample types A–C: $r^2 = 0.14$) between the conservative elements Br and Cl demonstrates that the majority of the higher salinity samples of type D are derived from dilution of Appalachian brines that originated from evaporated seawater. Even with a large dilution of the original brine, the geochemical signature of type-D waters are still discernable in shallow groundwater from other high salinity (Cl > 20 mg/L) groundwater with low Br/Cl ratios (type C). Type C water likely originated from shallow sources such as septic systems or road deicing. Seawater evaporation line is from (25).

tinguishable (Table S3) concentrations of major cations and anions (Fig. 4 *A* and *B*); however, bromide concentrations were not available in the historical data set. Nonetheless, we designated historical samples with high Cl (>20 mg/L) and low Na/Cl ratio (Na/Cl < 5) as possible type D (n = 56 of 268). The remaining

historical samples with Cl concentrations (>20 mg/L) were designated as type C. All water types (A–D) were statistically indistinguishable from their respective historical types (A–D) (Table S3).

Type D saline waters are characterized by a Na-Ca-Cl composition with Na/Cl, Sr/Cl, Ba/Cl, Li/Cl, and Br/Cl ratios similar to brines from deeper Appalachian formations (e.g., the Marcellus brine) (4, 6, 21, 22) (Table S2). This suggests mixing of shallow modern water with deep formation brines. Furthermore, the linear correlations observed for Br, Na, Sr, Li, and Ba with chloride (Fig. 3 and Fig. S3 *A–F*) demonstrate the relatively conservative and nonreactive behavior of these constituents and that the salinity in these shallow aquifers is most likely derived from mixing of deeper formation brines.

The stable isotopes ($\delta^{18}O = -8$ to $-11‰$; $\delta^2H = -53$ to $-74‰$) of all shallow groundwater types (A–D) are indistinguishable (p > 0.231) and fall along the local meteoric water line (LMWL) (23) (Fig. 5). The similarity of the stable isotopic compositions to the modern LMWL likely indicate dilution with modern (post-glacial) meteoric water. Shallow groundwater isotopic compositions do not show any positive $\delta^{18}O$ shifts towards the seawater evaporation isotopic signature (i.e., higher $\delta^{18}O$ relative to $\delta^2H$) as observed in the Appalachian brines (Fig. 5 and Table S2). Because of the large difference in concentrations between the brines and fresh water, very small contributions of brine have a large and measureable effect on the geochemistry and isotopes of dissolved salts (Fig. 3) but limited effect on $\delta^{18}O$ and $\delta^2H$. Mass-balance calculations indicate that only a brine fraction of higher than approximately 20% would change the $\delta^{18}O$ and $\delta^2H$ of salinized groundwater measurably. Oxygen and hydrogen isotopes are, therefore, not sensitive tracers for the mixing of the Appalachian brines and shallow groundwater because of the large percentage of the fresh water component in the mixing blend. For example, the salt spring at Salt Springs State Park with the highest salinity among shallow groundwater samples is calculated to contain <7% brine.

The discrete areas of type D water have lower average elevations and closer distances to valley centers but do not correlate with distance to the nearest shale gas wells (Fig. 1 and Fig. S1 and Table S1). The lack of geospatial association with shale-gas wells and the occurrence of this type of saline water prior to shale gas development in the study area (14, 15, 18, 19) (see distribution in Fig. 4 *A* and *B*) suggests that it is unlikely that hydraulic fracturing for shale gas caused this salinization and that it is instead a naturally occurring phenomenon that occurs over longer timescales.

Distinguishing the ultimate source of the salinized water in NE PA requires an evaluation of the geochemical signatures of underlying brines in the Appalachian Basin. The data presented



**Fig. 4.** Ternary diagrams that display the relative percent of the major cations (*A*) and anions (*B*) in shallow groundwater samples from this and previous studies (18, 19). The overlap indicates that Na-Ca-Cl type saline water was present prior to the recent shale-gas development in the region and could be from natural mixing.

ENVIRONMENTAL SCIENCES



**Fig. 5.** $\delta^2H$ vs. $\delta^{18}O$ in shallow groundwater from this study and Appalachian brines. The water isotope composition of the shallow groundwater samples including the Salt Spring appear indistinguishable from each other and the local meteoric water line (LMWL) (23) and do not show any apparent trends toward the stable isotope ratios of the Appalachian brines (6, 22). The data indicate that dilution of the type-D waters likely occurred on modern (post-glacial) time scales. Symbol legend is provided in Fig. 3.

in this study (Figs. 2 and 3, and Fig. S3 *A–F* and Table S2) and previous studies (4, 6, 22, 24), suggest that the Appalachian brines evolved by evaporation from a common seawater origin but underwent varying stages of alteration. The first stage of evolution common to all of the brines is the evaporation of seawater beyond halite saturation resulting in brines with high Br/Cl and low Na/Cl ratios relative to seawater (6). The degree of evaporation that is computed based on the Br/Cl ratio in the Appalachian brines $(4–7 \cdot 10^{-3})$(Fig. 3) as compared to the evaporated sea water curve (25) is equivalent to 20–40-fold, though mixing between brines of different evaporation stages cannot be excluded. The brines then likely underwent dolomitization with carbonate rocks that enriched Ca and depleted Mg in the brine relative to the seawater evaporation curve (6) (Fig. S3 *B and C*) and sulfate reduction that removed all sulfate. In addition, the composition of each respective hypersaline Ca-Cl Appalachian brine (i.e., Salina and/or Marcellus) was differentially altered by interactions with the host aquifer rocks presumably under tectonically-induced thermal conditions (26) that resulted in resolvable variations in Sr/Ca, Ba/Sr, and $^{87}Sr/^{86}Sr$ ratios. The final stage of brine alteration that accounts for the observed brine compositions is dilution (6).

The net results of these processes generated large variations in brine salinity (TDS of 10–343 g/L), relatively homogeneous elevated Br/Cl ratios (range of $2.4 \cdot 10^{-3}$ to $7.6 \cdot 10^{-3}$) and enriched $\delta^{18}O$ (0‰ to −7‰) and $\delta^2H$ (−33‰ to −45‰) in all Appalachian brines. The remnant geochemical signatures (i.e., Sr/Ca, Ba/Sr, and $^{87}Sr/^{86}Sr$) of formation specific brine-rock interactions provide the most suitable basis for differentiating the Appalachian brines. The Sr/Ca ratios (0.03–0.17) of the produced waters from Marcellus wells are significantly higher than brines evolved through calcite $(0.4–1.6 \cdot 10^{-3})$ or aragonite $(1.5–2.2 \cdot 10^{-2})$ dolomitization but are consistent with equilibrium with other minerals such as gypsum or celestite (27). Similarly, the Ba/Sr (0.01–1.78) ratios range up to values observed for typical upper continental crust (Ba/Sr = 1.3–1.7) (28).

New and compiled data presented in Table S2 show distinctive geochemical fingerprints (Sr/Ca, Ba/Sr, Sr/Cl, Ba/Cl, Li/Cl, and

$^{87}Sr/^{86}Sr$) among the Appalachian brines in the different formations. We, therefore, used these variables as independent tracers to differentiate possible brine sources for the shallow type D groundwater. Brines from the Marcellus Formation show systematically low (less radiogenic) $^{87}Sr/^{86}Sr$ (0.71000–0.71212; n = 50) and high Sr/Ca (0.03–0.17) ratios compared to the more radiogenic Upper Devonian brines ($^{87}Sr/^{86}Sr$ ratio = 0.71580–0.72200; n = 12; Fig. 6) and low Sr/Ca (0.002–0.08)(Fig. S4). Because of the relatively high Sr concentration and diagnostic Sr/Ca, Ba/Sr, and $^{87}Sr/^{86}Sr$ ratios, this geochemical proxy has the potential to elucidate regional flow paths, salinity sources, and the specific source of the Appalachian brines (21, 24) (Fig. 6). The $^{87}Sr/^{86}Sr$ ratios (0.71030–0.71725 ± 0.000003 SE) of low-saline groundwater (type A and B) vary widely in the shallow aquifers, but the overwhelming majority are distinctly different from values of produced water brines from Upper Devonian (0.71580–0.72200) (24) (Table S2) and Middle Devonian Marcellus Formation (0.71000–0.71212) (21) (Fig. 6. Conversely, the type D shallow groundwater data show a linear correlation between Sr and Cl (i.e., conservative behavior of Sr) (Fig. S3D) and a decrease of $^{87}Sr/^{86}Sr$ from 0.71453–0.70960 with increasing Sr concentrations and salinity confirming that the resulting salinity is likely derived from mixing with Marcellus Formation brine (Fig. 6). Our data also display a strong association between $^{87}Sr/^{86}Sr$ and Sr/Ca ratios (Fig. S4), a relationship suggested as a sensitive indicator of Marcellus brines because of the unique combination of low $^{87}Sr/^{86}Sr$ ratios and high Sr/Ca ratios reported for brines from the Marcellus Formation (21).

The saline waters in the eastern portion of the study area follow the expected Sr-isotope mixing trend hypothesized from new and published data on produced water from the Marcellus Formation (Fig. 6). In contrast, the saline waters from the western portion of our study area show systematic mixing with an end



**Fig. 6.** $^{87}Sr/^{86}Sr$ vs. Sr concentrations (log scale) of Appalachian Brines (21, 24) and shallow groundwater samples in the study area. The shallow groundwater samples are divided in the figure based on water types. Increased concentrations of Sr in the shallow aquifers are likely derived from two component mixing: (*i*) A low salinity, radiogenic $^{87}Sr/^{86}Sr$ groundwater sourced from local aquifer reactions; and (*ii*) A high salinity, less radiogenic $^{87}Sr/^{86}Sr$ water consistent with Marcellus Formation brine. The Marcellus Formation $^{87}Sr/^{86}Sr$ appears lower in western Bradford than in Susquehanna and Wayne counties. Other brine sources such as the Upper Devonian formations have a more radiogenic $^{87}Sr/^{86}Sr$ ratio that does not appear to show any relationship to the salinized shallow groundwater. Symbol legend is provided in Fig. 3.

member of a slightly lower $^{87}Sr/^{86}Sr$ ratio (0.70960). This lower ratio could reflect provenance variations within the formation (e.g., lower siliclastic detrital component away from the Acadian clastic source) in the region (21). In sum, whereas the high Br/Cl ratio in type D saline groundwater reflects mixing with underlying Appalachian brines from a common evaporated seawater origin, the $^{87}Sr/^{86}Sr$ ratios indicate mixing with brines with lower $^{87}Sr/^{86}Sr$ fingerprints of approximately 0.7096–0.7110 that cannot be accounted for by Upper Devonian formations but are similar to the underlying Marcellus Formation brines.

Other features that characterize the produced waters from the Marcellus Formation are the high activities of naturally occurring nuclides of $^{226}Ra$ and $^{228}Ra$ and low $^{228}Ra/^{226}Ra$ ratios (7). $^{226}Ra$ and $^{228}Ra$ are the disintegration products of $^{238}U$ and $^{232}Th$, respectively, and are generated in groundwater from alpha recoil, desorption from sediments, and dissolution of aquifer material (7, 29). In most of the shallow groundwater we sampled (Table S1), combined Ra activities were low (<5 pCi/L). In contrast, reported activities of Ra in Marcellus brines from the study area were high (1.500–3,100 pCi/L) (Fig. S5) with low $^{228}Ra/^{226}Ra$ ratios (0.12–0.73) (7). The highest Ra activities that we measured were in type D waters, and the range (0.4 to 28 pCi/L) is consistent with our calculated mixing range of approximately 0.01–7% based on chloride and bromide mass-balance calculations (Fig. 3), though some interaction such as adsorption with the aquifer rocks (29) is likely. In addition, the $^{228}Ra/^{226}Ra$ ratio in the salinized groundwater (mean = 0.56) is higher than that of the majority of the Marcellus produced waters from the study area (mean = 0.33) (7) (Table S2) indicating that the dissolved Ra in the shallow groundwater is likely derived from a combination of local water-rock interactions and conservative mixing.

Methane data from our previous studies (4, 30) can be examined based on the four water types (A–D) we found in this study. The highest average methane concentrations were observed in type D waters throughout the dataset, followed by type B and A. In locations >1 km away from shale gas drilling sites only one sample, a type B water, out of total of 41 samples contained elevated methane concentrations (>10 mg/L). One newly sampled type D water from the spring at Salt Springs State Park (30) also had concentrations >10 mg/L. Within 1 km of a natural gas well, three type A, three type B, and five type D samples had methane concentrations >10 mg/L. In three type D groundwater samples that were located in the lowland valleys >1 km from shale gas drilling sites, methane concentrations were 2–4 mg/L for the two previously sampled shallow ground waters and 26 mg/L for the newly sampled salt spring. In contrast, type A groundwater >1 km away from drilling sites had methane concentrations <0.01 mg/L in all samples (n − 14). This could suggest that methane in type D water >1 km away from drilling sites could be derived from natural seepage (31) but at concentrations much lower than those observed near drilling (4).

Cross-formational pathways allowing deeper saline water to migrate into shallower, fresher aquifers have been documented in numerous study areas including western Texas (32, 33), Michigan Basin (34, 35), Jordan Rift Valley (36), Appalachian Basin (26), and Alberta, Canada (37). In the Michigan Basin, upward migration of saline fluid into the overlying glacial sediments (34, 35) was interpreted to reflect isostatic rebound following the retreat of glaciers, leading to fracture intensification and increased permeability (34). Alternatively, vertical migration of over-pressured hydrocarbons has been proposed for the Appalachian Basin in response to tectonic deformation and catagenesis (i.e., natural gas induced fracturing) during the Alleghenian Orogeny (38–40). This deformation resulted in joints that cut across formations ($J_2$) in Middle and Upper Devonian formations (39). In addition, the lithostatic and isostatic rebound following glacial retreat significantly increased fracture intensification and

permeability in the Upper Devonian aquifers within our study area.

We hypothesize that regions with the combination of deep high hydrodynamic pressure and enhanced natural flow paths (i.e., fracture zones) (39, 41, 42) could induce steep hydraulic gradients and allow the flow of deeper fluids to zones of lower hydrodynamic pressure (43, 44). The higher frequency of the saline type D water occurrence in valleys (Table S1) is consistent with hydrogeological modeling of regional discharge to lower hydrodynamic pressure in the valleys with greater connectivity to the deep subsurface (43–45).

The possibility of drilling and hydraulic fracturing causing rapid flow of brine to shallow groundwater in lower hydrodynamic pressure zones is unlikely but still unknown. By contrast, the time scale for fugitive gas contamination of shallow aquifers can be decoupled from natural brine movement specifically when gas concentrations exceed solubility (approximately 30 cc/kg) and forms mobile free phase gases (i.e., bubbles). In western PA, on the Appalachian Plateau, contamination of shallow aquifers has been described as leakage of highly pressurized gas through the over-pressurized annulus of gas wells and into the overlying freshwater aquifers via fractures and faults (43, 44). The faults are often connected to local and regional discharge areas (i.e., valleys) where the methane contamination is observed (43). Buoyant flow of methane gas bubbles through these fractures is far more rapid than head-driven flow of dense brine, occurring on time scales of less than a year (46).

This study shows that some areas of elevated salinity with type D composition in NE PA were present prior to shale-gas development and most likely are unrelated to the most recent shale gas drilling; however, the coincidence of elevated salinity in shallow groundwater with a geochemical signature similar to produced water from the Marcellus Formation suggests that these areas could be at greater risk of contamination from shale gas development because of a preexisting network of cross-formational pathways that has enhanced hydraulic connectivity to deeper geological formations (43). Future research should focus on systematically monitoring these areas to test potential mechanisms of enhanced hydraulic connectivity to deeper formations, confirm the brine source, and determine the timescales for possible brine migration.

## Methods

Drinking water wells were purged until pH, electrical conductance, and temperature were stabilized. Samples were collected prior to any treatment systems and filtered/preserved following USGS protocols (47). All major element and isotopic chemistry analyses were conducted at Duke University. Major anions were determined by ion chromatography, major cations by direct current plasma optical emission spectrometry, and trace metals by VG PlasmaQuad-3 inductively coupled plasma mass-spectrometry. Alkalinity was determined by titration with HCl to pH 4.5. Stable isotopes were determined by continuous flow isotope ratio mass spectrometry using a Thermo-Finnigan TCEA and Delta + XL mass spectrometer at the Duke Environmental Isotope Laboratory (DEVIL). Analytical precisions for $\delta^{18}O$ and $\delta^2H$ were estimated as ±0.1‰ and ±1.5‰, respectively. Radium isotope analyses ($^{226}Ra$ and $^{228}Ra$) were measured at the Laboratory for Environmental Analysis of RadioNuclides (LEARN) using a Durridge RAD7 radon-in-air monitor ($^{226}Ra$) and Canberra DSA2000BEGe gamma detector ($^{228}Ra$) following methods described in (29) and (48). Strontium isotopes were analyzed by a thermal ionization mass spectrometer on a ThermoFisher Triton. The mean $^{87}Sr/^{86}Sr$ of the Standard Reference Material-987 standard was 0.710266 ± 0.000005 (SD).

ACKNOWLEDGMENTS. Gary Dwyer performed trace element analysis and provided valuable guidance on sample preparation and analysis throughout the research. Jon Karr performed analyses of $\delta^{18}O$ and $\delta^2H$. Discussions with Bob Poreda helped refine this manuscript. Tom Bullen, Gary Dwyer, Flip Froelich, Terry Engelder, Karl Turekian, and two anonymous reviewers provided valuable and critical comments that greatly improved the manuscript. We thank William Chameides, the Dean of the Nicholas School of Environment, for supporting this research. We gratefully acknowledge financial support from Fred and Alice Stanback.

ENVIRONMENTAL SCIENCES

1. Kerr RA (2010) Natural gas from shale bursts onto the scene. *Science* 328:1624–1626.
2. Kargbo DM, Wilhelm RG, Campbell DJ (2010) Natural gas plays in the Marcellus Shale: Challenges and potential opportunities. *Environ Sci Technol* 44:5679–5684.
3. Howarth RW, Ingraffea A, Engelder T (2011) Natural gas: Should fracking stop? *Nature* 477:271–275.
4. Osborn SG, Vengosh A, Warner NR, Jackson RB (2011) Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *Proc Natl Acad Sci USA* 108:8172–8176.
5. Jiang M, et al. (2011) Life cycle greenhouse gas emissions of Marcellus shale gas. *Environ Res Lett* 6:034014.
6. Dresel P, Rose A (2010) Chemistry and origin of oil and gas well brines in Western Pennsylvania: Pennsylvania Geological Survey. *4th series Open-File Report OFOG 10-01.0* p 48 (Pennsylvania Department of Conservation and Natural Resources).
7. Rowan E, Engle M, Kirby C, Kraemer T (2011) Radium content of oil- and gas-field produced waters in the Northern Appalachian basin (USA)—Summary and discussion of data. *U.S. Geological Survey Scientific Investigations Report 2011–5135* p 31 (U.S. Geological Survey).
8. Gregory KB, Vidic RD, Dzombak DA (2011) Water management challenges associated with the production of shale gas by hydraulic fracturing. *Elements* 7:181–186.
9. Hayes T (2009) Sampling and analysis of water streams associated with the development of Marcellus shale gas. *Marcellus Shale Initiative Publications Database.*
10. Veil J (2011) White Paper on SPE Summit on Hydraulic Fracturing. *Society of Petroleum Engineers* (Society of Petroleum Engineers, Houston, TX).
11. Fisher K (2010) Data confirm safety of well fracturing. *Reporter*, http://www.fidelityepco.com/Documents/OilGasRept_072010.pdf.
12. Frey MG (1973) Influence of salina salt on structure in New York-Pennsylvania part of Appalachian plateau. *AAPG Bull* 57:1027–1037.
13. Faill R (1985) The Acadian orogeny and the Catskill Delta. *Geol S Am S* 201:15–38.
14. Lohman SW (1973) *Ground Water in North-Central Pennsylvania* (Department of Conservation and Natural Resources, Pennsylvania) p 219.
15. Lohman SW (1957) *Ground Water in Northeastern Pennsylvania* (Department of Conservation and Natural Resources, Pennsylvania) p 312.
16. Alexander S, Cakir R, Doden AG, Gold DP, Root SI (2005) Basementdepth and related geospatial database for Pennsylvania. *Pennsylvania Geological Survey Open-File General Geology) Report 05-01.00.*
17. Geyer A, Wilshusen JP (1982) Engineering characteristics of the rocks of Pennsylvania; environmental geology supplement to the state geologic map. *Pennsylvania Geological Survey* p 300.
18. Taylor L (1984) Groundwater Resources of the Upper Susquehanna River Basin, Pennsylvania: Water Resources Report 58. p 136 (Pennsylvania Department of Environmental Resources, Office of Parks and Forestry, Bureau of Topographic and Geologic Survey).
19. Williams J, Taylor L, Low D (1998) Hydrogeology and Groundwater Quality of the Glaciated Valleys of Bradford, Tioga, and Potter Counties, Pennsylvania: Water Resources Report 68. p 89 (Commonwealth of Pennsylvania Department of Conservation and Natural Resources).
20. Trapp H, Jr, Horn MA (1997) Ground Water Atlas of the United States: Delaware, Maryland, New Jersey, North Carolina, Pennsylvania, Virginia,   West Virginia HA 730-L. (U.S. Geological Survey).
21. Chapman EC, et al. (2012) Geochemical and strontium isotope characterization of produced waters from Marcellus Shale natural gas extraction. *Environ Sci Technol* 46:3545–3553.
22. Osborn SG, McIntosh JC (2010) Chemical and isotopic tracers of the contribution of microbial gas in Devonian organic-rich shales and reservoir sandstones, northern Appalachian Basin. *Appl Geochem* 25:456–471.
23. Kendall C, Coplen T (2001) Distribution of oxygen-18 and deuterium in river waters across the United States. *Hydrol Process* 15:1363–1393.
24. Osborn SG, Mcintosh J, Hanor J, Biddulph D (2012) Iodine-129, $^{87}Sr/^{86}Sr$, and trace elemental geochemistry of northern Appalachian Basin brines: Evidence for basinal-scale fluid migration and clay mineral diagenesis. *Am J Sci*, in press.

25. McCaffrey M, Lazar B, Holland H (1987) The evaporation path of seawater and the coprecipitation of Br and K with halite. *J Sediment Petrol* 57:928–937.
26. Schedl A, McCabe C, Montanez I, Fullagar P, Valley J (1992) Alleghenian regional diagenesis: A response to the migration of modified metamorphic fluids derived from beneath the Blue Ridge-Piedmont thrust sheet. *J Geol* 100:339–352.
27. Sass E, Starinsky A (1979) Behaviour of strontium in subsurface calcium chloride brines: Southern Israel and Dead Sea rift valley. *Geochim Cosmochim Acta* 43:885–895.
28. Rudnick R, Gao S (2003) *The Composition of the Continental Crust, in the Crust* (Elsevier-Pergamon, Oxford).
29. Vinson DS, Vengosh A, Hirschfeld D, Dwyer GS (2009) Relationships between radium and radon occurrence and hydrochemistry in fresh groundwater from fractured crystalline rocks, North Carolina. *Chem Geol* 260:159–171.
30. Osborn SG, Vengosh A, Warner NR, Jackson RB (2011) Reply to Saba and Orzechowski and Schon: Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *Proc Natl Acad Sci USA* 108:E665–E666.
31. Molofsky LJ, Connor JA, Farhat SK, Wylie AS, Jr, Wagner T (2011) Methane in Pennsylvania water wells unrelated to Marcellus shale fracturing. *Oil Gas J* 109:54–67.
32. Mehta S, Fryar AE, Banner JL (2000) Controls on the regional-scale salinization of the Ogallala aquifer, Southern High Plains, Texas, USA. *Appl Geochem* 15:849–864.
33. Hogan JF, et al. (2007) Geologic origins of salinization in a semi-arid river: The role of sedimentary basin brines. *Geology* 35:1063–1066.
34. Weaver TR, Frape SK, Cherry JA (1995) Recent cross-formational fluid flow and mixing in the shallow Michigan Basin. *Geol Soc Am Bull* 107:697–707.
35. Long DT, Wilson TP, Takacs MJ, Rezabek DH (1988) Stable-isotope geochemistry of saline near-surface ground water: East-central Michigan Basin. *Geol Soc Am Bull* 100:1568–1577.
36. Farber E, et al. (2004) The origin and mechanisms of salinization of the lower Jordan river. *Geochim Cosmochim Acta* 68:1989–2006.
37. Tilley B, et al. (2011) Gas isotope reversals in fractured gas reservoirs of the western Canadian Foothills: Mature shale gases in disguise. *AAPG Bull* 95:1399–1422.
38. Lash GG, Engelder T (2009) Tracking the burial and tectonic history of Devonian shale of the Appalachian Basin by analysis of joint intersection style. *Geol Soc Am Bull* 121:265–277.
39. Engelder T, Lash GG, Uzcategui RS (2009) Joint sets that enhance production from Middle and Upper Devonian gas shales of the Appalachian Basin. *AAPG Bull* 93:857–889.
40. Lash G, Blood DR (2007) Origin of early overpressure in the Upper Devonian Catskill Delta Complex, western New York State. *Basin Res* 19:51–66.
41. Llewellyn G (2011) Structural and topographic assessment of shallow bedrock permeability variations through Susquehanna County PA: A focus area of Marcellus Shale Gas Development. *Abstr Programs Geol Soc Am* 43:567.
42. Jacobi RD (2002) Basement faults and seismicity in the Appalachian Basin of New York State. *Tectonophysics* 353:75–113.
43. Harrison SS (1983) Evaluating system for ground-water contamination hazards due to gas-well drilling on the glaciated Appalachian plateau. *Ground Water* 21:689–700.
44. Harrison SS (1985) Contamination of aquifers by overpressuring the annulus of oil and gas wells. *Ground Water* 23:317–324.
45. Tóth J (1970) A conceptual model of the groundwater regime and the hydrogeologic environment. *J Hydrol* 10:164–176.
46. Etiope G, Klusman RW (2002) Geologic emissions of methane to the atmosphere. *Chemosphere* 49:777–789.
47. USGS (2011) National Field Manual for the Collection of Water-Quality Data. (US Geological Survey, Washington, DC).
48. Kim G, Burnett WC, Dulaiova H, Swarzenski PW, Moore WS (2001) Measurement of $^{224}Ra$ and $^{226}Ra$ activities in natural waters using a radon-in-air monitor. *Environ Sci Technol* 35:4680–4683.
49. Denison RE, Kirkland DW, Evans R (1998) Using strontium isotopes to determine the age and origin of gypsum and anhydrite beds. *J Geol* 106:1–18.

# EXHIBIT 155

# Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing

Stephen G. Osborn[a], Avner Vengosh[b], Nathaniel R. Warner[b], and Robert B. Jackson[a,b,c,1]

[a]Center on Global Change, Nicholas School of the Environment, [b]Division of Earth and Ocean Sciences, Nicholas School of the Environment, and [c]Biology Department, Duke University, Durham, NC 27708

Edited* by William H. Schlesinger, Cary Institute of Ecosystem Studies, Millbrook, NY, and approved April 14, 2011 (received for review January 13, 2011)

Directional drilling and hydraulic-fracturing technologies are dramatically increasing natural-gas extraction. In aquifers overlying the Marcellus and Utica shale formations of northeastern Pennsylvania and upstate New York, we document systematic evidence for methane contamination of drinking water associated with shale-gas extraction. In active gas-extraction areas (one or more gas wells within 1 km), average and maximum methane concentrations in drinking-water wells increased with proximity to the nearest gas well and were 19.2 and 64 mg CH$_4$ L$^{-1}$ ($n = 26$), a potential explosion hazard; in contrast, dissolved methane samples in neighboring nonextraction sites (no gas wells within 1 km) within similar geologic formations and hydrogeologic regimes averaged only 1.1 mg L$^{-1}$ ($P < 0.05$; $n = 34$). Average $\delta^{13}$C-CH$_4$ values of dissolved methane in shallow groundwater were significantly less negative for active than for nonactive sites ($-37 \pm 7$‰ and $-54 \pm 11$‰, respectively; $P < 0.0001$). These $\delta^{13}$C-CH$_4$ data, coupled with the ratios of methane-to-higher-chain hydrocarbons, and $\delta^2$H-CH$_4$ values, are consistent with deeper thermogenic methane sources such as the Marcellus and Utica shales at the active sites and matched gas geochemistry from gas wells nearby. In contrast, lower-concentration samples from shallow groundwater at nonactive sites had isotopic signatures reflecting a more biogenic or mixed biogenic/ thermogenic methane source. We found no evidence for contamination of drinking-water samples with deep saline brines or fracturing fluids. We conclude that greater stewardship, data, and—possibly—regulation are needed to ensure the sustainable future of shale-gas extraction and to improve public confidence in its use.

groundwater | organic-rich shale | isotopes | formation waters | water chemistry

Increases in natural-gas extraction are being driven by rising energy demands, mandates for cleaner burning fuels, and the economics of energy use (1–5). Directional drilling and hydraulic-fracturing technologies are allowing expanded natural-gas extraction from organic-rich shales in the United States and elsewhere (2, 3). Accompanying the benefits of such extraction (6, 7) are public concerns about drinking-water contamination from drilling and hydraulic fracturing that are ubiquitous but lack a strong scientific foundation. In this paper, we evaluate the potential impacts associated with gas-well drilling and fracturing on shallow groundwater systems of the Catskill and Lockhaven formations that overlie the Marcellus Shale in Pennsylvania and the Genesee Group that overlies the Utica Shale in New York (Figs. 1 and 2 and Fig. S1). Our results show evidence for methane contamination of shallow drinking-water systems in at least three areas of the region and suggest important environmental risks accompanying shale-gas exploration worldwide.

The drilling of organic-rich shales, typically of Upper Devonian to Ordovician age, in Pennsylvania, New York, and elsewhere in the Appalachian Basin is spreading rapidly, raising concerns for impacts on water resources (8, 9). In Susquehanna County, Pennsylvania alone, approved gas-well permits in the Marcellus formation increased 27-fold from 2007 to 2009 (10).



**Fig. 1.** Map of drilling operations and well-water sampling locations in Pennsylvania and New York. The star represents the location of Binghamton, New York. (*Inset*) A close-up in Susquehanna County, Pennsylvania, showing areas of active (closed circles) or nonactive (open triangles) extraction. A drinking-water well is classified as being in an active extraction area if a gas well is within 1 km (see *Methods*). Note that drilling has already spread to the area around Brooklyn, Pennsylvania, primarily a nonactive location at the time of our sampling (see inset). The stars in the inset represent the towns of Dimock, Brooklyn, and Montrose, Pennsylvania.

Concerns for impacts to groundwater resources are based on (*i*) fluid (water and gas) flow and discharge to shallow aquifers due to the high pressure of the injected fracturing fluids in the gas wells (10); (*ii*) the toxicity and radioactivity of produced water from a mixture of fracturing fluids and deep saline formation waters that may discharge to the environment (11); (*iii*) the potential explosion and asphyxiation hazard of natural gas; and (*iv*) the large number of private wells in rural areas that rely on shallow groundwater for household and agricultural use—up to one million wells in Pennsylvania alone (8, 9, 12). In this study, we analyzed groundwater from 68 private water wells from 36- to 190-m deep in

Author contributions: S.G.O., A.V., and R.B.J. designed research; S.G.O. and N.R.W. performed research; A.V. contributed new reagents/analytic tools; S.G.O., A.V., N.R.W., and R.B.J. analyzed data; and S.G.O., A.V., N.R.W., and R.B.J. wrote the paper.

The authors declare no conflict of interest.

*This Direct Submission article had a prearranged editor.

Freely available online through the PNAS open access option.

[1]To whom correspondence should be addressed. E-mail: jackson@duke.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1100682108/-/DCSupplemental.



**Fig. 2.** Geologic cross-section of Bradford and western Susquehanna Counties created from gas-well log data provided by the Pennsylvania Department of Conservation and Natural Resources. The approximate location of the Lawrenceville-Attica Lineament is taken from Alexander et al. (34). The Ordovician Utica shale (not depicted in the figure) underlies the Middle Devonian Marcellus at approximately 3,500 m below the ground surface.



**Fig. 3.** Methane concentrations (milligrams of $CH_4$ $L^{-1}$) as a function of distance to the nearest gas well from active (closed circles) and nonactive (open triangles) drilling areas. Note that the distance estimate is an upper limit and does not take into account the direction or extent of horizontal drilling underground, which would decrease the estimated distances to some extraction activities. The precise locations of natural-gas wells were obtained from the Pennsylvania Department of Environmental Protection and Pennsylvania Spatial Data Access databases (ref. 35; accessed Sept. 24, 2010).

northeast Pennsylvania (Catskill and Lockhaven formations) and upstate New York (Genesee formation) (see Figs. 1 and 2 and *SI Text*), including measurements of dissolved salts, water isotopes ($^{18}O$ and $^2H$), and isotopes of dissolved constituents (carbon, boron, and radium). Of the 68 wells, 60 were also analyzed for dissolved-gas concentrations of methane and higher-chain hydrocarbons and for carbon and hydrogen isotope ratios of methane. Although dissolved methane in drinking water is not currently classified as a health hazard for ingestion, it is an asphyxiant in enclosed spaces and an explosion and fire hazard (8). This study seeks to evaluate the potential impact of gas drilling and hydraulic fracturing on shallow groundwater quality by comparing areas that are currently exploited for gas (defined as active—one or more gas wells within 1 km) to those that are not currently associated with gas drilling (nonactive; no gas wells within 1 km), many of which are slated for drilling in the near future.

### Results and Discussion

Methane concentrations were detected generally in 51 of 60 drinking-water wells (85%) across the region, regardless of gas industry operations, but concentrations were substantially higher closer to natural-gas wells (Fig. 3). Methane concentrations were 17-times higher on average (19.2 mg $CH_4$ $L^{-1}$) in shallow wells from active drilling and extraction areas than in wells from nonactive areas (1.1 mg $L^{-1}$ on average; $P < 0.05$; Fig. 3 and Table 1). The *average* methane concentration in shallow groundwater in active drilling areas fell within the defined action level (10–28 mg $L^{-1}$) for hazard mitigation recommended by the US Office of the Interior (13), and our maximum observed value of 64 mg $L^{-1}$ is well above this hazard level (Fig. 3). Understanding the origin of this methane, whether it is shallower biogenic or deeper thermogenic gas, is therefore important for identifying the source of contamination in shallow groundwater systems.

The $\delta^{13}C$-$CH_4$ and $\delta^2H$-$CH_4$ values and the ratio of methane to higher-chain hydrocarbons (ethane, propane, and butane) can typically be used to differentiate shallower, biologically derived methane from deeper physically derived thermogenic methane (14). Values of $\delta^{13}C$-$CH_4$ less negative than approximately $-50‰$ are indicative of deeper thermogenic methane, whereas values more negative than $-64‰$ are strongly indicative of microbial methane (14). Likewise, $\delta^2H$-$CH_4$ values more negative than about $-175‰$, particularly when combined with low $\delta^{13}C$-$CH_4$ values, often represent a purer biogenic methane origin (14).

The average $\delta^{13}C$-$CH_4$ value in shallow groundwater in active drilling areas was $-37 \pm 7‰$, consistent with a deeper thermogenic methane source. In contrast, groundwater from nonactive areas in the same aquifers had much lower methane concentrations and significantly lower $\delta^{13}C$-$CH_4$ values (average of $-54\pm 11‰$; $P < 0.0001$; Fig. 4 and Table 1). Both our $\delta^{13}C$-$CH_4$ data and $\delta^2H$-$CH_4$ data (see Fig. S2) are consistent with a deeper thermogenic methane source at the active sites and a more biogenic or mixed methane source for the lower-concentration samples from nonactive sites (based on the definition of Schoell, ref. 14).

Because ethane and propane are generally not coproduced during microbial methanogenesis, the presence of higher-chain hydrocarbons at relatively low methane-to-ethane ratios (less than approximately 100) is often used as another indicator of deeper thermogenic gas (14, 15). Ethane and other higher-chain hydrocarbons were detected in only 3 of 34 drinking-water wells from nonactive drilling sites. In contrast, ethane was detected in 21 of 26 drinking-water wells in active drilling sites. Additionally, propane and butane were detected (>0.001 mol %) in eight and two well samples, respectively, from active drilling areas but in no wells from nonactive areas.

Further evidence for the difference between methane from water wells near active drilling sites and neighboring nonactive sites is the relationship of methane concentration to $\delta^{13}C$-$CH_4$ values (Fig. 4A) and the ratios of methane to higher-chain hydro-

**Table 1.** Mean values ± standard deviation **of methane concentrations (as milligrams of $CH_4$ $L^{-1}$) and carbon isotope composition in methane in shallow groundwater** $\delta^{13}C$-$CH_4$ **sorted by aquifers and proximity to gas wells (active vs. nonactive)**

| Water source, n | milligrams $CH_4$ $L^{-1}$ | $\delta^{13}C$-$CH_4$, ‰ |
|---|---|---|
| Nonactive Catskill, 5 | 1.9 ± 6.3 | −52.5 ± 7.5 |
| Active Catskill, 13 | 26.8 ± 30.3 | −33.5 ± 3.5 |
| Nonactive Genesee, 8 | 1.5 ± 3.0 | −57.5 ± 9.5 |
| Active Genesee, 1 | 0.3 | −34.1 |
| Active Lockhaven, 7 | 50.4 ± 36.1 | −40.7 ± 6.7 |
| Total active wells, 21 | 19.2 | −37 ± 7 |
| Total nonactive wells, 13 | 1.1 | −54 ± 11 |

The variable *n* refers to the number of samples.

ENVIRONMENTAL SCIENCES





**Fig. 4.** (*A*) Methane concentrations in groundwater versus the carbon isotope values of methane. The nonactive and active data depicted in Fig. 3 are subdivided based on the host aquifer to illustrate that the methane concentrations and $\delta^{13}$C values increase with proximity to natural-gas well drilling regardless of aquifer formation. Gray areas represent the typical range of thermogenic and biogenic methane taken from Osborn and McIntosh (18). VPDB, Vienna Pee Dee belemnite. (*B*) Bernard plot (15) of the ratio of methane to higher-chain hydrocarbons versus the $\delta^{13}$C of methane. The smaller symbols in grayscale are from published gas-well samples from gas production across the region (16–18). These data generally plot along a trajectory related to reservoir age and thermal maturity (Upper Devonian through Ordovician; see text for additional details). The gas-well data in the orange ovals are from gas wells in our study area in Susquehanna County, Pennsylvania (data from Pennsylvania Department of Environmental Protection). Gray areas represent typical ranges of thermogenic and biogenic methane (data from Osborn and McIntosh, ref. 18).

carbons versus $\delta^{13}$C-CH$_4$ (Fig. 4*B*). Methane concentrations not only increased in proximity to gas wells (Fig. 3), the accompanying $\delta^{13}$C-CH$_4$ values also reflected an increasingly thermogenic methane source (Fig. 4*A*).

Using a Bernard plot (15) for analysis (Fig. 4*B*), the enriched $\delta^{13}$C-CH$_4$ (approximately $> -50\permil$) values accompanied by low ratios of methane to higher-chain hydrocarbons (less than approximately 100) in drinking-water wells also suggest that dissolved gas is more thermogenic at active than at nonactive sites (Fig. 4*B*). For instance, 12 dissolved-gas samples at active drilling sites fell along a regional gas trajectory that increases with reservoir age and thermal maturity of organic matter, with samples from Susquehanna County, Pennsylvania specifically matching natural-gas geochemistry from local gas wells (Fig. 4*B*, orange oval). These 12 samples and local natural-gas samples are consistent with gas sourced from thermally mature organic matter of Middle Devonian and older depositional ages often found in Marcellus Shale from approximately 2,000 m below the surface in the northern Appalachian Basin (14–19) (Fig. 4*B*). In contrast, none of the methane samples from nonactive drilling areas fell upon this trajectory (Fig. 4*B*); eight dissolved-gas samples in Fig. 4*B* from active drilling areas and all of the values from nonactive areas may instead be interpreted as mixed biogenic/thermogenic gas (18) or, as Laughrey and Baldassare (17) proposed for their Pennsylvanian gas data (Fig. 4*B*), the early migration of wet thermogenic gases with low-$\delta^{13}$C-CH$_4$ values and high methane-to-higher-chain hydrocarbon ratios. One data point from a nonactive area in New York fell squarely in the parameters of a strictly biogenic source as defined by Schoell (14) (Fig. 4*B*, upper-left corner).

Carbon isotopes of dissolved inorganic carbon ($\delta^{13}$C-DIC $> +10\permil$) and the positive correlation of $\delta^2$H of water and $\delta^2$H of methane have been used as strong indicators of microbial methane, further constraining the source of methane in shallow groundwater (depth less than 550 m) (18, 20). Our $\delta^{13}$C-DIC values were fairly negative and show no association with the $\delta^{13}$C-CH$_4$ values (Fig. S3), which is not what would be expected if methanogenesis were occurring locally in the shallow aquifers. Instead, the $\delta^{13}$C-DIC values from the shallow aquifers plot within a narrow range typical for shallow recharge waters, with the dissolution of $CO_2$ produced by respiration as water passes downward through the soil critical zone. Importantly, these values do not indicate extensive microbial methanogenesis or sulfate reduction. The data do suggest gas-phase transport of methane upward to the shallow groundwater zones sampled for this study ($<190$ m) and dissolution into shallow recharge waters locally. Additionally, there was no positive correlation between the $\delta^2$H values of methane and $\delta^2$H of water (Fig. S4), indicating that microbial methane derived in this shallow zone is negligible. Overall, the combined gas and formation-water results indicate that thermogenic gas from thermally mature organic matter of Middle Devonian and older depositional ages is the most likely source of the high methane concentrations observed in the shallow water wells from active extraction sites.

A different potential source of shallow groundwater contamination associated with gas drilling and hydraulic fracturing is the introduction of hypersaline formation brines and/or fracturing fluids. The average depth range of drinking-water wells in northeastern Pennsylvania is from 60 to 90 m (12), making the average vertical separation between drinking-water wells and the Marcellus Shale in our study area between approximately 900 and 1,800 m (Fig. 2). The research area, however, is located in tectonically active areas with mapped faults, earthquakes, and lineament features (Fig. 2 and Fig. S1). The Marcellus Formation also contains two major sets of joints (21) that could be conduits for directed pressurized fluid flow. Typical fracturing activities in the Marcellus involve the injection of approximately 13–19 million liters of water per well (22) at pressures of up to 69,000 kPa. The majority of this fracturing water typically stays underground and could in principle displace deep formation water upward into shallow aquifers. Such deep formation waters often have high concentrations of total dissolved solids >250,000 mg L$^{-1}$, trace

toxic elements, (18), and naturally occurring radioactive materials, with activities as high as 16.000 picocuries per liter (1 pCi $L^{-1}$ = 0.037 becquerels per liter) for $^{226}$Ra compared to a drinking-water standard of 5 pCi $L^{-1}$ for combined $^{226}$Ra and $^{226}$Ra (23).

We evaluated the hydrochemistry of our 68 drinking-water wells and compared these data to historical data of 124 wells in the Catskill and Lockhaven aquifers (24, 25). We used three types of indicators for potential mixing with brines and/or saline fracturing fluids: (*i*) major inorganic chemicals; (*ii*) stable isotope signatures of water ($\delta^{18}$O, $\delta^{2}$H); and (*iii*) isotopes of dissolved constituents ($\delta^{13}$C-DIC, $\delta^{11}$B, and $^{226}$Ra). Based on our data (Table 2), we found no evidence for contamination of the shallow wells near active drilling sites from deep brines and/or fracturing fluids. All of the Na$^+$, Cl$^-$, Ca$^{2+}$, and DIC concentrations in wells from active drilling areas were consistent with the baseline historical data, and none of the shallow wells from active drilling areas had either chloride concentrations >60 mg $L^{-1}$ or Na-Ca-Cl compositions that mirrored deeper formation waters (Table 2). Furthermore, the mean isotopic values of $\delta^{18}$O, $\delta^{2}$H, $\delta^{13}$C-DIC, $\delta^{11}$B, and $^{226}$Ra in active and nonactive areas were indistinguishable. The $^{226}$Ra values were consistent with available historical data (25), and the composition of $\delta^{18}$O and $\delta^{2}$H in the well-water appeared to be of modern meteoric origin for Pennsylvania (26) (Table 2 and Fig. S5). In sum, the geochemical and isotopic features for water we measured in the shallow wells from both active and nonactive areas are consistent with historical data and inconsistent with contamination from mixing Marcellus Shale formation water or saline fracturing fluids (Table 2).

There are at least three possible mechanisms for fluid migration into the shallow drinking-water aquifers that could help explain the increased methane concentrations we observed near gas wells (Fig. 3). The first is physical displacement of gas-rich deep solutions from the target formation. Given the lithostatic and hydrostatic pressures for 1–2 km of overlying geological strata, and our results that appear to rule out the rapid movement of deep brines near the surface, we believe that this mechanism is unlikely. A second mechanism is leaky gas-well casings (e.g., refs. 27 and 28). Such leaks could occur at hundreds of meters underground, with methane passing laterally and vertically through fracture systems. The third mechanism is that the process of hydraulic fracturing generates new fractures or enlarges existing ones above the target shale formation, increasing the connec-

tivity of the fracture system. The reduced pressure following the fracturing activities could release methane in solution, leading to methane exsolving rapidly from solution (29), allowing methane gas to potentially migrate upward through the fracture system.

Methane migration through the 1- to 2-km-thick geological formations that overlie the Marcellus and Utica shales is less likely as a mechanism for methane contamination than leaky well casings, but might be possible due to both the extensive fracture systems reported for these formations and the many older, uncased wells drilled and abandoned over the last century and a half in Pennsylvania and New York. The hydraulic conductivity in the overlying Catskill and Lockhaven aquifers is controlled by a secondary fracture system (30), with several major faults and lineaments in the research area (Fig. 2 and Fig. S1). Consequently, the high methane concentrations with distinct positive $\delta^{13}$C-CH$_4$ and $\delta^{2}$H-CH$_4$ values in the shallow groundwater from active areas could in principle reflect the transport of a deep methane source associated with gas drilling and hydraulic-fracturing activities. In contrast, the low-level methane migration to the surface groundwater aquifers, as observed in the nonactive areas, is likely a natural phenomenon (e.g., ref. 31). Previous studies have shown that naturally occurring methane in shallow aquifers is usually associated with a relatively strong biogenic signature indicated by depleted $\delta^{13}$C-CH$_4$ and $\delta^{2}$H-CH$_4$ compositions (32) coupled with high ratios of methane to higher-chain hydrocarbons (33), as we observed in Fig. 4*B*. Several models have been developed to explain the relatively common phenomenon of rapid vertical transport of gases (Rn, CH$_4$, and CO$_2$) from depth to the surface (e.g., ref. 31), including pressure-driven continuous gas-phase flow through dry or water-saturated fractures and density-driven buoyancy of gas microbubbles in aquifers and water-filled fractures (31). More research is needed across this and other regions to determine the mechanism(s) controlling the higher methane concentrations we observed.

Based on our groundwater results and the litigious nature of shale-gas extraction, we believe that long-term, coordinated sampling and monitoring of industry and private homeowners is needed. Compared to other forms of fossil-fuel extraction, hydraulic fracturing is relatively poorly regulated at the federal level. Fracturing wastes are not regulated as a hazardous waste under the Resource Conservation and Recovery Act, fracturing wells are not covered under the Safe Drinking Water Act, and only recently has the Environmental Protection Agency asked fracturing

**Table 2. Comparisons of selected major ions and isotopic results in drinking-water wells from this study to data available on the same formations (Catskill and Lockhaven) in previous studies (24, 25) and to underlying brines throughout the Appalachian Basin (18)**

| | Active | | Nonactive | | Previous studies (background) | | |
|---|---|---|---|---|---|---|---|
| | Lockhaven formation $N = 8$ | Catskill formation $N = 25$ | Catskill formation $N = 22$ | Genesee group $N = 12$ | Lockhaven formation (25) $N = 45$ | Catskill formation (24) $N = 79$ | Appalachian brines (18, 23) $N = 21$ |
| Alkalinity as HCO$_3^-$, | | | | | | | |
| mg $L^{-1}$ | 285 ± 36 | 157 ± 56 | 127 ± 53 | 158 ± 56 | 209 ± 77 | 133 ± 61 | 150 ± 171 |
| mM | [4.7 ± 0.6] | [2.6 ± 0.9] | [2.1 ± 0.9] | [2.6 ± 0.9] | [3.4 ± 1.3] | [2.2 ± 1.0] | [2.5 ± 2.8] |
| Sodium, mg $L^{-1}$ | 87 ± 22 | 23 ± 30 | 17 ± 25 | 29 ± 23 | 100 ± 312 | 21 ± 37 | 33,000 ± 11,000 |
| Chloride, mg $L^{-1}$ | 25 ± 17 | 11 ± 12 | 17 ± 40 | 9 ± 19 | 132 ± 550 | 13 ± 42 | 92,000 ± 32,000 |
| Calcium, mg $L^{-1}$ | 22 ± 12 | 31 ± 13 | 27 ± 9 | 26 ± 5 | 49 ± 39 | 29 ± 11 | 16,000 ± 7,000 |
| Boron, µg $L^{-1}$ | 412 ± 156 | 93 ± 167 | 42 ± 93 | 200 ± 130 | NA | NA | 3,700 ± 3,500 |
| $\delta^{11}$B ‰ | 27 ± 4 | 22 ± 6 | 23 ± 6 | 26 ± 6 | NA | NA | 39 ± 6 |
| $^{226}$Ra, pCi $L^{-1}$ | 0.24 ± 0.2 | 0.16 ± 0.15 | 0.17 ± 0.14 | 0.2 ± 0.15 | 0.56 ± 0.74 | NA | 6,600 ± 5,600 |
| $\delta^{2}$H, ‰, VSMOW | −66 ± 5 | −64 ± 3 | −68 ± 6 | −76 ± 5 | NA | NA | −41 ± 6 |
| $\delta^{18}$O, ‰, VSMOW | −10 ± 1 | −10 ± 0.5 | −11 ± 1 | −12 ± 1 | NA | NA | −5 ± 1 |

Some data for the active Genesee Group and nonactive Lockhaven Formation are not included because of insufficient sample sizes (NA). Values represent means ±1 standard deviation. NA, not available.

$N$ values for $\delta^{11}$B ‰ analysis are 8, 10, 3, 6, and 5 for active Lockhaven, active Catskill, nonactive Genesee, nonactive Catskill, and brine, respectively. $N$ values for $^{226}$Ra are 6, 7, 3, 10, 5, and 13 for active Lockhaven, active Catskill, nonactive Genesee, nonactive Catskill, background Lockhaven, and brine, respectively. $\delta^{11}$B ‰ normalized to National Institute of Standards and Technology Standard Reference Material 951. $\delta^{2}$H and $\delta^{18}$O normalized to Vienna Standard Mean Ocean Water (VSMOW).

ENVIRONMENTAL SCIENCES

PNAS

firms to voluntarily report a list of the constituents in the fracturing fluids based on the Emergency Planning and Community Right-to-Know Act. More research is also needed on the mechanism of methane contamination, the potential health consequences of methane, and establishment of baseline methane data in other locations. We believe that systematic and independent data on groundwater quality, including dissolved-gas concentrations and isotopic compositions, should be collected before drilling operations begin in a region, as is already done in some states. Ideally, these data should be made available for public analysis, recognizing the privacy concerns that accompany this issue. Such baseline data would improve environmental safety, scientific knowledge, and public confidence. Similarly, long-term monitoring of groundwater and surface methane emissions during and after extraction would clarify the extent of problems and help identify the mechanisms behind them. Greater stewardship, knowledge, and—possibly—regulation are needed to ensure the sustainable future of shale-gas extraction.

## Methods

A total of 68 drinking-water samples were collected in Pennsylvania and New York from bedrock aquifers (Lockhaven, 8; Catskill, 47; and Genesee, 13) that overlie the Marcellus or Utica shale formations (Fig. S1). Wells were purged to remove stagnant water, then monitored for pH, electrical conductance, and temperature until stable values were recorded. Samples were collected "upstream" of any treatment systems, as close to the water well as possible, and preserved in accordance with procedures detailed in SI Methods. Dissolved-gas samples were analyzed at Isotech Laboratories and water chemical and isotope (O, H, B, C, Ra) compositions were measured at Duke University (see SI Methods for analytical details).

**ACKNOWLEDGMENTS.** We thank Rebecca Roter, Peggy Maloof, and many others who allowed us to sample their water wells; Laura Ruhl and Tewodros Rango for coordination and field assistance; Nicolas Cassar for thoughtful suggestions on the research; and Kaiguang Zhao and Rose Merola for help with figures. Jon Karr and the Duke Environmental Isotope Laboratory performed analyses of $\delta^{18}O$, $\delta^{2}H$, and $\delta^{13}C$ of groundwater samples. William Chameides, Lincoln Pratson, William Schlesinger, the Jackson Lab, and two anonymous reviewers provided helpful suggestions on the manuscript and research. We gratefully acknowledge financial support from Fred and Alice Stanback to the Nicholas School of the Environment and from the Duke Center on Global Change.

1. Pacala S, Socolow R (2004) Stabilization wedges: Solving the climate problem for the next 50 years with current technologies. *Science* 305:968–972.
2. Tour JM, Kittrell C, Colvin VL (2010) Green carbon as a bridge to renewable energy. *Nature Mater* 9:871–874.
3. Kerr RA (2010) Natural gas from shale bursts onto the scene. *Science* 328:1624–1626.
4. Raupach MR, et al. (2007) Global and regional drivers of accelerating $CO_2$ emissions. *Proc Natl Acad Sci USA* 104:10288–10293.
5. US Energy Information Administration (2010) *Annual Energy Outlook 2010 with Projections to 2035* (US Energy Information Administration, Washington, DC), DOE/EIA-0383; http://www.eia.doe.gov/oiaf/aeo/pdf/0383(2010).pdf.
6. US Environmental Protection Agency (2011) Hydraulic Fracturing. (US Environmental Protection Agency, Washington, DC), http://water.epa.gov/type/groundwater/uic/class2/hydraulicfracturing/.
7. Kargbo DM, Wilhelm RG, Campbell DJ (2010) Natural gas plays in the Marcellus shale: Challenges and potential opportunities. *Environ Sci Technol* 44:5679–5684.
8. Revesz KM, Breen KJ, Baldassare AJ, Burruss RC (2010) Carbon and hydrogen isotopic evidence for the origin of combustible gases in water supply wells in north-central Pennsylvania. *Appl Geochem* 25:1845–1859.
9. Zoback M, Kitasei S, Copithorne B Addressing the environmental risks from shale gas development. *Worldwatch Institute Briefing Paper 1* (Worldwatch Inst, Washington, DC), http://blogs.worldwatch.org/revolt/wp-content/uploads/2010/07/Environmental-Risks-Paper-July-2010-FOR-PRINT.pdf.
10. Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management (2010) 2009 Year End Workload Report. (Pennsylvania Dept of Environmental Protection, Bureau of Oil and Gas Management, Harrisburg, PA), http://www.dep.state.pa.us/dep/deputate/minres/oilgas/2009%20Year%20End%20Report-WEBSITE.pdf.
11. Colborn T, Kwiatkowski C, Schultz K, Bachran M (2010) Natural gas operations from a public health perspective. *Hum Ecol Risk Assess*, in press.
12. Pennsylvania Department of Environmental Protection (2011) Private Water Wells in Pennsylvania. (Pennsylvania Dept of Environmental Protection, Harrisburg, PA), http://www.new.dep.state.pa.us/dep/deputate/watermgt/wc/Subjects/SrceProt/well/.
13. Eltschlager KK, Hawkins JW, Ehler WC, Baldassare F (2001) *Technical Measures for the Investigation and Mitigation of Fugitive Methane Hazards in Areas of Coal Mining* (US Dept of the Interior, Office of Surface Mining Reclamation and Enforcement, Pittsburgh).
14. Schoell M (1980) The hydrogen and carbon isotopic composition of methane from natural gases of various origins. *Geochim Cosmochim Acta* 44:649–661.
15. Bernard BB (1978) Light hydrocarbons in marine sediments. PhD Dissertation (Texas A&M Univ, College Station, TX).
16. Jenden PD, Drazan DJ, Kaplan IR (1993) Mixing of thermogenic natural gases in northern Appalachian Basin. *Am Assoc Pet Geol Bull* 77:980–998.
17. Laughrey CD, Baldassare FJ (1998) Geochemistry and origin of some natural gases in the Plateau Province Central Appalachian Basin, Pennsylvania and Ohio. *Am Assoc Pet Geol Bull* 82:317–335.
18. Osborn SG, McIntosh JC (2010) Chemical and isotopic tracers of the contribution of microbial gas in Devonian organic-rich shales and reservoir sandstones, northern Appalachian Basin. *Appl Geochem* 25:456–471.
19. Repetski JE, Ryder RT, Harper JA, Trippi MH (2006) Thermal maturity patterns in the Ordovician and Devonian of Pennsylvania using conodont color alteration index (CAI) and vitrinite reflectance (%Ro). *Northeastern Geology Environmental Sciences* 28:266–294.
20. Martini AM, et al. (1998) Genetic and temporal relations between formation waters and biogenic methane: Upper Devonian Antrim Shale, Michigan Basin, USA. *Geochim Cosmochim Acta* 62:1699–1720.
21. Engelder T, Lash GG, Uzcategui RS (2009) Joint sets that enhance production from Middle and Upper Devonian gas shales of the Appalachian Basin. *Am Assoc Pet Geol Bull* 93:857–889.
22. Pennsylvania Department of Environmental Protection (2011) (Pennsylvania Dept of Environmental Protection, Harrisburg, PA). Marcellus Shale. http://www.dep.state.pa.us/dep/deputate/minres/oilgas/new_forms/marcellus/marcellus.htm.
23. New York State Department of Health, Bureau of Environmental Radiation Protection (2009) (New York State Dept of Health, Troy, NY), Comments, July 21, 2009, Supplemental Generic Environmental Statement on the Oil and Gas Regulatory Program Well Permit Issuance for Horizontal Drilling and Hydraulic-Fracturing to Develop the Marcellus Shale and other Low Permeability Gas Reservoirs; http://www.riverkeeper.org/wp-content/uploads/2010/01/Riverkeeper-DSGEIS-Comments-Appendix-3-NYSDOH-Environmental-Radiation-Memo.pdf.
24. Taylor LE (1984) Groundwater Resources of the Upper Susquehanna River Basin, Pennsylvania: Water Resources Report 58. (Pennsylvania Dept of Environmental Resources-Office of Parks and Forestry—Bureau of Topographic and Geologic Survey, Harrisburg, PA) 139.
25. Williams JH, Taylor L, Low D (1998) Hydrogeology and Groundwater Quality of the Glaciated Valleys of Bradford, Tioga, and Potter Counties, Pennsylvania: Water Resources Report 68. (Commonwealth of Pennsylvania Dept of Conservation and Natural Resources, Harrisburg, PA) p 89.
26. Kendall C, Coplan TB (2001) Distribution of oxygen-18 and deuterium in river waters across the United States. *Hydrol Processes* 15:1363–1393.
27. Van Stempvoort D, Maathuis H, Jaworski E, Mayer B, Rich K (2005) Oxidation of fugitive methane in groundwater linked to bacterial sulfate reduction. *Ground Water* 43:187–199.
28. Taylor SW, Sherwood Lollar B, Wassenaar LI (2000) Bacteriogenic ethane in near-surface aquifers: Implications for leaking hydrocarbon well bores. *Environ Sci Technol* 34:4727–4732.
29. Cramer B, Schlomer S, Poelchau HS (2002) Uplift-related hydrocarbon accumulations: the release of natural gas from groundwater. 196 (Geological Society Special Publications, London), 447–455.
30. Geyer AR, Wilshusen JP (1982) Engineering characteristics of the rocks of Pennsylvania; environmental geology supplement to the state geologic map, 1982 Pennsylvania Geological Survey. (Dept of Environmental Resources, Office of Resources Management, Harrisburg, PA).
31. Etiope G, Martinelli G (2002) Migration of carrier and trace gases in the geosphere: An overview. *Phys Earth Planet Inter* 129:185–204.
32. Aravena R, Wassenaar LI (1993) Dissolved organic carbon and methane in a regional confined aquifer, southern Ontario, Canada: Carbon isotope evidence for associated subsurface sources. *Appl Geochem* 8:483–493.
33. Coleman DD, Liu C, Riley KM (1988) Microbial methane in the shallow Paleozoic sediments and glacial deposits of the Illinois, USA. *Chem Geol* 71:23–40.
34. Alexander SS, Cakir R, Doden AG, Gold DP, Root SI (2005) Basement depth and related geospatial database for Pennsylvania: Pennsylvania Geological Survey, 4th ser., Open-File General Geology Report 05-01.0. (Pennsylvania Dept of Conservation and Natural Resources, Middletown, PA), http://www.dcnr.state.pa.us/topogeo/openfile.
35. Pennsylvania Spatial Data Access (PASDA) Online mapping, data access wizard, oil and gas locations. (Pennsylvania Dept of Environmental Protection, Harrisburg, PA), http://www.pasda.psu.edu/uci/SearchResults.aspx?searchType=mapservice&condition=OR&entry=PASDA.

# EXHIBIT 157

# Generation, transport, and disposal of wastewater associated with

# Marcellus Shale gas development

Brian D. Lutz[1,2], Aurana N. Lewis[1], and Martin W. Doyle[1]

1-Box 90328, Nicholas School of the Environment, Duke University, Durham, NC 27708

2-Present Address: Department of Biology, 105 Cunningham Hall, Kent State University, Kent, OH 44242

CORRESPONDING AUTHOR:

Brian D. Lutz

Department of Biology

Kent State University

105 Cunningham Hall

Kent, OH 44242

blutz6@kent.edu

330.672.9394

This article has been accepted for publication and undergone full peer review but has not been through the copyediting, typesetting, pagination and proofreading process which may lead to differences between this version and the Version of Record. Please cite this article as an 'Accepted Article', doi: 10.1002/wrcr.20096

## ABSTRACT

Hydraulic fracturing has made vast quantities of natural gas from shale available, reshaping the energy landscape of the United States (US). Extracting shale gas, however, generates large, unavoidable volumes of wastewater, which to date lacks accurate quantification. For the Marcellus shale, by far the largest shale gas resource in the US, we quantify gas and wastewater production using data from 2,189 wells located throughout Pennsylvania. Contrary to current perceptions, Marcellus wells produce significantly *less* wastewater per unit gas recovered (~35%) compared to conventional natural gas wells. Further, well operators classified only 32.3% of wastewater from Marcellus wells as flowback from hydraulic fracturing; most wastewater was classified as brine, generated over multiple years. Despite producing less wastewater per unit gas, developing the Marcellus shale has increased the total wastewater generated in the region by ~570% since 2004, overwhelming current wastewater disposal infrastructure capacity.

INDEX TERMS:  0495, 0498, 6615, 6620, 9810

KEYWORDS: Hydraulic Fracturing, Wastewater, Marcellus Shale, Unconventional Natural Gas

## 1. Introduction:

Organic rich shale formations have long been known to contain tremendous quantities of natural gas (hereafter "gas"), though the low-porosity of shale matrices makes recovering this gas difficult. Recent advances in directional drilling and hydraulic fracturing, which involves injecting large volumes of fluids at high pressure into shale formations to stimulate gas flow, are making shale gas extraction economical. In 2000, shale gas accounted for only 2% (0.01 trillion cubic meters, tcm) of United States (US) gas production; by 2010 shale gas increased to 23% (0.14 tcm) of production [*US EIA*, 2012c]. The surge in shale gas production has caused gas prices to plummet [*US EIA*, 2012b] and, as a result, natural gas has recently replaced coal as the dominant source of energy in power generation for the first time in US history [*US EIA*, 2012a]. With more than 70 major shale gas basins having been identified in countries outside of the US, shale resources are now estimated to account for more than 40% of the world's recoverable gas reserves [*US EIA*, 2011b].

Several environmental concerns have emerged surrounding shale gas development, notably the potential to contaminate groundwater [*Osborn et al.*, 2011; *Warner et al.*, 2012] or for natural gas—composed largely of the potent greenhouse gas methane—to escape to the atmosphere [*Howarth et al.*, 2011]. These, however, represent *potential* impacts and shale gas development should be possible while minimizing these risks. Wastewater, however, is an obligate byproduct of current methods and volumes will unavoidably increase with industry expansion. Recent public and regulatory attention has focused on hydraulic fracturing fluids (hereafter "frac fluids"), which consist of water treated with various chemicals to adjust pH and viscosity, as well as to reduce friction, chemical precipitation, scaling and biological fouling [*Arthur et al.*, 2009;

3

*MSAC*, 2011].  Some of the chemicals used in engineering frac fluids present human health and environmental risks, requiring careful management during use and proper disposal afterwards [*MSAC*, 2011].  Managing wastewater is likely to become a defining challenge for the shale gas industry to confront.

Modern hydraulic fracturing has existed since the 1940s and, while having become primarily associated with shale gas production, is commonly used to stimulate gas recovery from conventional gas resources [*Montgomery and Smith*, 2010]. Conventional resources generally consist of porous reservoir formations that accumulate gas from organic-rich sources below and are capped by impermeable barriers above [*US DOE*, 2009].  Shale gas resources are distinct from conventional resources because gas is extracted directly from the shale formation, which serves as both the source and reservoir for the gas.   For shale wells, hydraulic fracturing is essential and applied extensively, requiring large quantities of frac fluid [~11.5-19 ML per well, ML= million liters; *US DOE*, 2009].  Typically 10-70% of frac fluid returns to the surface during the initial period of production [<4 weeks from onset of gas production; *API*, 2010], referred to as "flowback."

Although most attention has focused on managing flowback, other important forms of wastewater are generated during natural gas development.  In drilling wells, water and drilling additives are used to cool and lubricate the drill head and to clear drill cuttings, generating wastewater referred to as "drilling fluid" often having high total dissolved and suspended solids. Recent advances in directional drilling technology—the ability to parallel to the plane of the target formation—have facilitated shale gas development by increasing the amount of the formation contacting the well bore.  Such horizontal drilling can radiate outward 1,500 m or more [*US DOE*, 2009], resulting in substantially longer bore lengths than conventional natural

gas wells (hereafter "conventional wells"), which are typically vertical and drilled to shallower depths. Because wells producing shale gas (hereafter "shale wells") often require more drilling than conventional wells, shale gas drilling likely generates more drilling wastewater.

In addition to drilling and flowback wastewater, water derived from the subsurface is often recovered with natural gas over the life of the well. The porous reservoir formations from which conventional wells produce gas can contain large volumes of produced water—typically highly saline aquifers—commonly referred to as "brine" due to its high salinity. Shale wells also generate wastewater after gas production begins, though this wastewater likely contains residual frac fluid in addition to produced brine originating from within or around the shale formation. Often brine produced throughout the Marcellus region also has high concentrations of metals, organics, and, in some cases, radioactive materials [*Veil et al.*, 2004].

Wastewater disposal presents a significant challenge and cost for the natural gas industry [*Veil*, 1997; *Veil et al.*, 2004]. Conventional gas production in the US generates ~890x10$^9$ L (5.6x10$^9$ barrels; 1 barrel = 42 US gal = 159 L) of wastewater annually [*Clark and Veil*, 2009]. Developing shale gas resources will not only increase wastewater volumes, but will also change the geographic distribution of where wastewater is generated and disposed [*US DOE*, 2009]. The Marcellus shale is the largest [8.3-76.5 tcm, gas in place; *Lee et al.*, 2011; *US DOE*, 2009] and most spatially expansive [>246,000 km$^2$; *US DOE*, 2009] shale gas deposit in the US. The Marcellus is estimated to account for 29-55% [*US EIA*, 2011a; 2012c] of domestic shale gas reserves, potentially larger than the other 18 known shale gas deposits in the US combined [*US EIA*, 2011a]. Developing this resource will create one of the largest on-shore gas-associated wastewater volumes in the nation. However, while most wastewater from conventional gas production in other regions of the US is disposed of via re-injection into deep geologic

formations [>95%; *Clark and Veil*, 2009], underground injection disposal is limited in the Marcellus region as the geology needed for safe injection disposal is not generally present [*MSAC*, 2011], challenging industry to identify and develop alternative disposal methods.

Several estimates exist of wastewater volumes generated by Marcellus wells [*Arthur et al.*, 2009; *Gregory et al.*, 2011; *MSAC*, 2011; *US DOE*, 2009]. In most cases it is unclear how these estimates have been made or what types of wastewater (drilling, flowback, or brine) they represent. Some estimates are reported as percentages of the volume of frac fluid injected into each well, which have ranged from 10-70% [*MSAC*, 2011], although the volume of frac fluid typically injected into an individual well is estimated to range from 11.5-19 ML [*API*, 2010; *MSAC*, 2011]. Moreover, most estimates focus on flowback and do not specifically consider drilling and brine wastewater [*Gregory et al.*, 2011; *US DOE*, 2009], likely underestimating the total wastewater volume generated. And many estimates can be traced back to when few Marcellus wells existed and information was limiting [*US DOE*, 2009]. To our knowledge, no comprehensive characterization of wastewater volumes generated by Marcellus wells exists using transparent methods and publically accessible data.

We analyzed data from 2,189 active Marcellus wells in Pennsylvania (PA) and compared gas production and wastewater volumes to conventional well data. While the Marcellus shale underlies several states in the NE US, the majority of shale gas development to date has occurred in PA. Our objectives were: (*i*) to quantify drilling, flowback, and brine wastewater volumes produced by Marcellus and conventional wells, (*ii*) to assess changes in the cumulative wastewater volume resulting from the rapid expansion of Marcellus wells, and (*iii*) to assess how wastewater disposal options and regulations are changing as the shale gas industry continues to develop.

## 2. Data and Methods:

### 2.1 Data Sources and Processing

Statewide natural gas and associated wastewater production data for the period of January 2000 through December 2011 were downloaded from the PA DEP Bureau of Oil and Gas Management website (https://www.paoilandgasreporting.state.pa.us/publicreports/; Accessed on February 20, 2012). These data are self-reported by gas well operators in accordance with PA law and represent substantially more thorough, albeit still incomplete, accounting of natural gas associated wastewater than is typically available elsewhere [*Clark and Veil*, 2009]. While some companies may either not report or misreport data, this database represents the best available information on wastewater generated from Marcellus well development and is currently being used in investigations aimed at guiding state and federal regulation of hydraulic fracturing [*EPA*, 2011]. We attempt to account for data omissions and inaccuracies, and to assess data consistency and validity, in order to avoid potential artifacts in our results.

Gas and wastewater records were associated by well permit number, and both data types included well location (latitude/longitude) and an indicator for conventional versus Marcellus well type. Marcellus wells are further classified as being vertical versus horizontal. While horizontal wells are likely to involve more extensive drilling and hydraulic fracturing than vertical wells, the lengths of the horizontal extensions can vary widely between wells. As a result, we do not differentiate between horizontal and vertical wells and consider our results to be representative of the range of current practices.

Data were initially reported based on calendar year (2000-2009), but in July 2009 data management for Marcellus wells changed so that data were instead reported for the period of July 2009 through June 2010. Gas production data for Marcellus wells during the period of July 2009 through December 2009 were duplicated between the two records. To correct for this duplication, we divided the amount of gas produced over this period by the number of gas production days reported. If the number of gas production days was less than 183, we assumed that the gas was produced after January 1, 2010. If the number of gas production days was greater than 183, we divided the volume of gas produced by the number of producing days and multiplied by 183 to estimate the amount of production in 2010, with the remaining production allocated to 2009. There was no similar overlap in the wastewater data [personal communication, *Roger Deitz* PA DEP]. Since July 2010 Marcellus data have been reported on six-month intervals with no overlap; we aggregated Marcellus well data reported on six-month intervals during 2010 and 2011 to the calendar year.

A separate issue requiring correction existed in the wastewater data. Each wastewater record specified the volume and type of wastewater generated by a given well and the specific facility for treatment or disposal. However, identical volumes of a given wastewater type for a single well were often repeatedly listed within a given year with each record indicating a different disposal facility. This was true for approximately 16% of all data entries for Marcellus wastewater. In these cases the volume listed was for the total amount of the wastewater type generated by the well that year, not for the amount taken to each facility [personal communication, *Roger Deitz* PA DEP]. The true volume accepted by each facility is unknown, but for the sake of our analyses, we assumed each facility received equal volumes, thus dividing the wastewater amount reported for each well within a given year by the number of entries listing

8

identical values.  Approximately 23% of all Marcellus wastewater by volume had to be divided across facilities using this method.  Importantly, without this correction, wastewater volumes are overestimated (by up to 45%) as well as systemically biased towards artificial inflation of Marcellus well wastewater, since Marcellus wastewater volumes are often large and more likely to be divided between multiple disposal facilities and thus more frequently listed repeatedly than conventional well wastewater records.

Due to an unrecoverable data loss by PA DEP, waste records for 2007 are not available.

*2.2 Estimating Wastewater Volumes*

Although drilling fluid and flowback are produced during the construction period or at the early stages of well operation, some wells are completed near the end of a given calendar year and, in these cases, drilling fluid and flowback volumes are not reported until the following calendar year or are split between years.  Because of this, we only analyzed drilling fluid and flowback volumes for wells producing in 2010 or earlier to avoid artificially underestimating these values by including wells constructed in 2011 that may have yet to report drilling fluid and flowback volumes.

Many wells (both conventional and Marcellus) report no drilling fluid.  Drilling either conventional or Marcellus wells should generate drilling fluid wastewater and we assume missing data values result from lack of reporting by well operators.  Within our dataset, drilling fluid volumes were reported for 548 Marcellus wells and 3,186 conventional wells during the period 2004-2010.  We assume that drilling fluid volumes for wells with data reported represent an unbiased sample of wells.

Similarly, many wells (both conventional and Marcellus) report no flowback.  Conventional wells can be produced without hydraulic fracturing and, therefore, if no flowback volume is reported it could be that either hydraulic fracturing did not occur or that hydraulic fracturing did occur and that the flowback volume was not reported.  Based on the data available, we are unable to distinguish between these two possibilities.  Because of this, of the 49,264 conventional wells included in this study we only use data for conventional wells where non-zero flowback volumes were reported (n=5,464).  Thus, our estimate for flowback from conventional wells is specific to only those that have been hydraulically fractured. For Marcellus wells, hydraulic fracturing is essential and we assume that a lack of flowback volume indicated for a given well is the result of failure to report data.  We characterize Marcellus flowback based on only those wells reporting data (n=824), and assume this represents an unbiased sample of wells.

Preliminary analysis of the distributions of reported drilling fluid and flowback volumes for both conventional and Marcellus wells were strongly right skewed.  Therefore, we show distributions of $\log_{10}$ transformed wastewater volumes for each well type using the *density* function in the R statistical software package (R Foundation for Statistical Computing, Vienna Austria, 2010, ISBN: 3-900051-07-0, http://www.R-project.org).  To compare wastewater volumes between well types, we estimated 95% bootstrap confidence intervals for 10,000 samples of the non-transformed data.

Brine generation can vary through time and, because of this, we analyzed brine volumes produced by year of production. We defined the first year of production for each well as being the calendar year in which a gas production value was first reported.  The first year was often only partial and therefore reported values corresponding to the first year of production are conservative.  In many cases, for both conventional and Marcellus wells, brine was not

consistently reported each year of well production. We assume that this is primarily a result of lack of reporting rather than a true value of zero and, therefore, omit these instances from the analysis. Because very few Marcellus wells were drilled prior to 2007 (n=46) and because 2007 data are unavailable (see above), we only had sufficient data to adequately quantify changes in brine production during the initial four years of well operation (there were n=1,517 wells reporting first-year production data, with the sample size declining to n=199 wells reporting fourth-year production data). We calculated the mean brine production for each of the first four years of operation for both Marcellus and conventional wells. We then calculated 95% confidence intervals by bootstrapping data for each waste type within each year 10,000 times.

*2.3 Gas to Wastewater Ratios*

Both wastewater (drilling fluid, flowback, and brine) and gas production volumes from Marcellus and conventional wells differed and, therefore, it was useful to compare the volume of gas recovered per unit wastewater produced. However, few Marcellus wells (n=24) report all values (drilling fluid, flowback, and four years of brine data). Because of this, we sum the mean values for each of the wastewater types calculated across the population of all wells in order to estimate the total wastewater generated by the average well.

*2.4 Cross-Validation of Data*

Wastewater and gas production data are reported by oil and gas well operators in accordance with PA law with no attempt by PA DEP to control data quality. Because of this, we assessed the validity of the data by separately analyzing the data reported by each of the five largest companies operating in the Marcellus region, which together account for >56% of all Marcellus wells. While these self-reported data may contain inaccuracies, it would be highly unlikely that multiple independent companies systematically misreport or misrepresent wastewater data

similarly.   We found results across companies to be generally consistent, particularly for the sum of all waste types and, further, individual company results were largely consistent with the values determined for the global dataset (*see* SI Table 1 for additional information).   The largest differences observed were within the volume estimates for the specific waste types, which is consistent with expectations since operators must often arbitrarily define the distinction between wastewater types, particularly between flowback and brine.   While we used the values as reported by well operators, the values reported for the different waste types should be interpreted with more caution than the total wastewater volume reported across waste types.

*2.5 Wastewater Transport and Disposal*

Wastewater records indicated the disposal facility to which the wastewater was transported, and each waste facility was associated with a specific disposal method (e.g., Industrial Treatment Plant, Municipal Sewage Treatment Plant, Underground Injection, etc.). In some cases multiple disposal methods were reported.   One value typically dominated and, therefore, we applied the modal value to all records associated with each facility assuming that conflicts were due to data entry errors.

When multiple disposal facilities were reported and wastewater from a single well had to be divided equally among them (*see* Section 2.2 above), the disposal methods used at the different receiving facilities were often the same.   For only 15% of the total Marcellus wastewater data were multiple disposal methods listed for a single wastewater volume.

All data included geographic coordinates for the producing wells, though only 13.6% of the data had geographic coordinates specifying the location of the disposal facilities.   In many cases where geographic coordinates were not provided for wastewater disposal facilities, a National Pollution Discharge Elimination System (NPDES) permit number for the facility was listed.   We

joined this field to the NPDES database maintained by PA DEP (http://www.dep.state.pa.us/dep/deputate/watermgt/Wqp/Forms/; Accessed February 25, 2012) and were able to determine the spatial location of the disposal facility for an additional 13.1% of the data.  Examining unique wastewater facility names indicated that many facilities had several similar but non-identical variants of the same name.  If coordinates were listed for one name variant but not others, we applied those coordinates to all name variants where it was missing. Further, we were able to assign coordinates based on the reported physical address of the wastewater facility or by obtaining the address through an internet search on the facility name, resulting in 60.0% of the total Marcellus wastewater data having well origination and wastewater facility destination coordinates specified.  Of the total wastewater volume, 32.8% was reported as having been recycled ("REUSE OTHER THAN ROAD SPREADING") in which case the location for reuse was not provided.  We could not account for the disposal locations of the remaining 7.2% of the wastewater volume based on the available information. We expect that the small amount of data for which we cannot resolve waste facility locations will have little effect on our results.

Using ArcGIS desktop v10.0 (ESRI, 2011) we determined the drainage basin (Delaware, Susquehanna, or Ohio) within which each Marcellus well was located.  Similarly, we determined both the drainage basin and state where each wastewater disposal facility was located.  We could then sum the wastewater records across basins or states to compare where wastewater was being generated versus where it was being disposed.

## 3. Results and Discussion:

### 3.1 Conventional versus Marcellus Wells

The first production records for Marcellus wells were recorded in 2004 (n=3), with the number of new wells each year increasing exponentially (Fig. 1) resulting in 2,189 active wells as of December 2011. Typically 3,000-5,000 new conventional wells were added each year since 2004 (Fig. 1), with 49,294 conventional wells reporting gas production in 2011. There were 3,513 Marcellus well permits issued in 2011 (Fig. 1), suggesting the number of new Marcellus wells is approaching—and may soon surpass—the rate of conventional well drilling.

While there has been much recent concern surrounding the chemical additives used to engineer frac fluids (MSAC 2011), the vast majority of the dissolved material representing the total pollution load in Marcellus wastewater is derived from the subsurface. This wastewater is often heavily laden with a variety of inorganic ions, metals, organics, and radioactive materials [*Haluszczak et al.*, 2012; *Veil et al.*, 2004]. *Haluszczak et al.* [2012] recently demonstrated that most flowback and brine from Marcellus shale gas wells is similar in chemical composition to the wastewater produced by conventional wells in this region and, thus, presents similar management challenges.

The average Marcellus well generated six-times more drilling waste (0.654 ML, where ML = $1 \times 10^6$ L; 95% CI = 0.556–0.767 ML) than the average conventional well (0.116 ML; 95% CI = 0.098–0.141 ML) (Fig. 2A), likely resulting from more extensive drilling associated with longer well bore lengths. Flowback generated from the average conventional well was small (0.107 ML; 95% CI = 0.102–0.113 ML) compared to the average flowback generated from a Marcellus well (1.683 ML; 95% CI = 1.537–1.843 ML) (Fig. 2B). For Marcellus wells, flowback represented 8-15% of the 11.5-19 ML volume typically injected into each well during construction [*US DOE*, 2009]; previously reported values of flowback recovery range from 10-

70% [*API*, 2010].   Additional flowback may be recovered gradually during gas production, although this wastewater is typically reported as brine shortly after production begins.

On average, each Marcellus well generated 1.365 ML (95% CI = 1.231–1.511 ML) of brine during the first year, with brine generation declining to 0.150 ML (95% CI = 0.116–0.189 ML) by year four (Fig. 2C).   Average brine volumes generated by each conventional well also declined from year one (0.102 ML; 95% CI = 0.093–0.112 ML) to year four (0.042 ML; 95% CI = 0.038–0.045 ML) (Fig. 2C).   When summed across years, the average cumulative brine volume generated by a single conventional well was only 0.291 ML while brine generated by each Marcellus well was an order of magnitude higher (2.874 ML; Table 1).   Importantly, for both well types brine accounted for the majority of the total wastewater generated (Table 1). While managing flowback volumes has captured considerable attention [*Gregory et al.*, 2011], flowback accounted for only 20.8% and 32.3% of the total wastewater generated by conventional and Marcellus wells, respectively.

Along with larger wastewater volumes, Marcellus wells also produced far more gas.   During the first year of production, the average Marcellus well produced 11,180.8 ML (95% CI = 10,863.2–11,876.8 ML) of gas compared with 198.0 ML (95% CI = 105.3–218.8 ML) in the first year from each conventional well.   However, the mean annual gas production from Marcellus wells declined rapidly, with only 1,885.2 ML (95% CI = 1,600.4–2,088.2 ML) produced in the fourth year of operation (Fig. 2D).   On average conventional wells showed a small but significant increase in gas production during years two and three, but year four was not significantly different from year one.   When summed across the four-year period, cumulative mean gas production for a Marcellus well was 30,038.7 ML compared with only 1,050.1 ML from an average conventional well (Table 1).

Marcellus and conventional wells were also quite different in how much gas was recovered per unit of wastewater generated. By summing the estimated volumes of the different wastewater types, the average Marcellus well generated 5.211 ML of total wastewater and 30,038.7 ML of gas over the first four years of operation (Table 1). For conventional wells, the total wastewater generated was 0.514 ML per well, while gas production was 1,050.1 ML (Table 1). Thus, the average Marcellus well produced only ~35% of the amount of wastewater per unit gas recovered when compared to conventional wells. Importantly, these estimates are limited to the first four years of well operation. Industry reports indicate similarly large declines in gas produced by Marcellus wells over time [*US EIA*, 2011a], though no similar estimates for brine volumes exist. Regardless, Marcellus wells would have to generate an additional 9.5 ML of wastewater—a ~280% increase over the current volume generated—as well as zero additional gas in order for the gas to wastewater ratio to approach that of conventional wells (Table 1). Thus, while the gas to wastewater ratio for Marcellus wells may decline in future years, it is unlikely to fall below the current value for conventional wells.

*3.2 Wastewater Generated: Regional Scale*

Despite Marcellus wells producing less wastewater per unit gas recovered, the Marcellus shale is massive and the cumulative volume of wastewater generated in the region is growing dramatically. Prior to the development of the Marcellus shale, the total wastewater volume generated by all conventional wells each year was small (~800 ML $yr^{-1}$; Fig. 3) and dominated by brine ($86.9\pm3.5\%$; flowback = $8.5\pm2.7\%$, drilling fluid = $4.6\pm1.0\%$). However, Marcellus wells collectively generated ~570% more wastewater in 2011 (3,144.3 ML) than conventional wells (Fig. 3) and the average composition of Marcellus wastewater was $44.7\pm8.2\%$ brine,

43.3±14.7% flowback, and 14.2±5.6% drilling fluid.  This composition is skewed towards greater flowback and drilling fluid because within the Marcellus well population most wells are in their first or second year of production; brine should dominate when the number of new wells drilled each year stabilizes.

Predicting increases in the total Marcellus wastewater volume generated annually depends on an accurate estimate of how many Marcellus wells will be drilled and placed into production in the coming years and the rate of decline in gas production over the long term.  Recent estimates predict a quadrupling of active wells to approximately 8,250 by 2014 [*MSETC*, 2011].  Assuming no additional brine production beyond the fourth year of operation (a highly conservative assumption), we estimate that the wastewater volume from Marcellus wells will exceed 5,370 ML yr$^{-1}$ in 2014, nearly 10-times greater than the volume of wastewater generated by conventional wells a decade earlier and prior to the development of the Marcellus shale (569.8 ML yr$^{-1}$ in 2004, Fig. 3).

### 3.3 Wastewater Disposal

The rapid growth in wastewater volumes is challenging current infrastructure capacity.  While underground injection disposal accounts for >95% of natural gas associated wastewater in the US [*Clark and Veil*, 2009], there is little suitable geology for underground injection in the Marcellus region [*MSAC*, 2011].  Four alternative wastewater management options have been used: (*i*) treatment at a municipal wastewater treatment facility (i.e., public sewage treatment facility), followed by discharge to a local waterway; (*ii*) treatment at a private industrial wastewater facility, followed by reuse of the treated effluent or discharge into a local waterway; (*iii*) transporting the wastewater greater distances to where underground injection capacity exists;

and (*iv*) partial treatment and recycling of wastewater in subsequent wells that will be hydraulically fractured. Road spreading of brines for ice and dust control has been used for conventional wastewater, but is not permitted for Marcellus wastewater [*MSAC*, 2011].

Treatment and disposal of wastewater effluent at municipal and industrial facilities has been used throughout the region for decades to manage wastewater from conventional wells, but the wastewater volumes from Marcellus wells have challenged their practicability.  As a result, regulation has co-evolved with industry growth.  A series of recent changes in regulations that differentially target conventional versus Marcellus wastes—and often identify flowback, brine, and drilling wastes separately—have affected patterns of waste disposal.

Most Marcellus wells are located in Northeast and Southwest PA, while most conventional wells are located in Northwest PA (Fig. 4). Municipal facilities that have accepted natural gas associated wastewater tend to be located throughout PA, while industrial treatment facilities are located primarily in Western PA, and most underground injection disposal wells are located in Ohio (Fig. 4).  As a result, changes in regulations differentially affecting disposal options alter wastewater transport across county and state borders and between major river basins.

Approximately 86.3% of all wastewater generated by Marcellus wells to date has been disposed of within PA, primarily at municipal and industrial wastewater treatment facilities. Municipal facilities accepted <30 ML of wastewater per year from conventional wells prior to Marcellus development (2001-2004).  In 2008, however, municipal facilities accepted 460.8 ML of wastewater (Fig. 5A).  Wastewater generated by Marcellus wells often has high total dissolved solids [TDS; typically ranging from 35,000-400,000mg L-1; *Blauch et al.*, 2009; *Clark and Veil*, 2009], and municipal facilities are generally not capable of removing TDS [*Veil*, 2010].  In 2008, high conductivity values reported in the Monongahela River basin prompted a temporary

mandate from PA DEP limiting municipal facilities from accepting large amounts of Marcellus wastewater [*Kargbo et al.*, 2010; *Tetra Tech*, 2009].  Despite formal regulation not occurring until April 2011, the volume of gas-associated wastewater taken to municipal facilities declined after 2008 (Fig. 5A).  In 2009, wastewater volumes taken to municipal facilities declined by 59.8% and, by 2011, wastewater volumes delivered to municipal facilities returned to values typical before Marcellus gas development and were composed almost entirely of wastewater from conventional wells.  Conventional well operators continue to dispose of wastewater at municipal facilities [*Perry*, 2011].

As the role of municipal facilities declined, the volume of wastewater produced by Marcellus wells continued to increase (Fig. 3), resulting in more wastewater processed at industrial treatment facilities: volumes taken to industrial facilities increased from 187.4 ML in 2004 to 644.4 ML in 2008 and 1,752.8 ML in 2010 (Fig 5B). This treatment facility shift also created a spatial shift – an interbasin transfer – in wastewater disposal because most industrial treatment facilities are located in Western PA, largely within the Ohio River basin (Fig. 4). From 2008 to 2009, wastewater generated by Marcellus wells located within the Ohio River basin increased by a factor of ~1.7 (2008 = 258.0 ML; 2009 = 440.2 ML), yet the volume of wastewater treated at industrial facilities in the Ohio River basin increased by a factor of ~3.3 (2008 = 290.1 ML; 2009 = 943.1 ML).  Between 2009-2011, of the 1,614.2 ML of wastewater generated from wells in the Delaware or Susquehanna River basins, 49.3% (796.3 ML) was disposed at facilities in the Ohio River basin.

While industrial treatment facilities often employ methods capable of precipitating metals and flocculating suspended solids, few facilities currently have the capacity to remove ions comprising the majority of the TDS load [*Veil*, 2010].  Prior to 2011, most treated effluent from

industrial facilities—still carrying high TDS loads—was discharged to rivers.  As a result, water quality continued to decline in the Monongahela as effluent discharges from industrial facilities were increasing despite discharges from municipal facilities declining.  In response, the PA legislature established new effluent standards that included strict limits on TDS [*Pa. Code § 95.10.*, 2010]. While existing industrial treatment facilities were waived from this requirement, the gas industry, represented by the Marcellus Shale Coalition, voluntarily ceased deliveries of Marcellus wastewater to many of these facilities by May 19, 2011 [*Perry*, 2011]; a decline in Marcellus wastewater volumes treated by industrial treatment facilities was observed in 2011 (Fig. 5B).

With transport to industrial and municipal facilities being constrained while wastewater volumes continued to increase, demand for underground injection disposal increased in 2011 (Fig. 5C).  Prior to 2010, only 79.8±20.4 ML (±SD) of wastewater was disposed via underground injection.  In 2011, however, this volume surged to 425.7 ML, of which 349.4 ML was from Marcellus wells (Fig. 5C).  Most underground injection wells for are located in Ohio (n=184), with only three commercial facilities in West Virginia and seven in PA [*Veil*, 2010].  Just as the shift from municipal to industrial treatment facilities instigated an inter-basin transfer of wastewater, the shift to greater underground injection instigated both an inter-basin and inter-state transfer of wastewater.  However, recent earthquakes presumed to be associated with Ohio injection wells resulted in a series of new regulations likely to constrain future underground injection disposal [*ODNR*, 2012].

*3.4 Recycling*

Prior to 2011 only 13% of wastewater was recycled for subsequent well development. With other disposal options becoming increasingly constrained, however, 56% (1,763.2 ML) of wastewater, largely flowback water, was recycled in 2011 (Fig. 5D). Reusing wastewater presents challenges: high concentrations of ions can result in sulfate-, carbonate-, and iron-based scales that impede gas flow, abundant anaerobic bacteria can cause corrosive byproducts (e.g., $H_2S$) and biological fouling, and variation in salinity can compromise well integrity by affecting clay shrinking and swelling within the formation [*Blauch*, 2010; *Montgomery and Smith*, 2010]. Although a variety of developments are facilitating wastewater recycling [*Blauch*, 2010], there are also logistical issues surrounding the timing and transport of water generated at one well to the next [*Mantell*, 2009]. Despite pressure to increase wastewater recycling in 2011 (Fig. 5D), 44% was still sent to wastewater facilities or underground injection wells. Existing infrastructure capacity cannot accommodate a similar percentage of wastewater in future years if volumes continue increasing at current rates. Further, while recycling is presently feasible because the number of new wells being constructed outnumbers those in production (such that demand for recycled wastewater is high), recycling must necessarily contract when new well construction declines.

### 3.5 Future Development

Advances in directional drilling and hydraulic fracturing have revolutionized natural gas production, positioning the US to become the largest natural gas producer worldwide [*IEA*, 2012]. Yet as the vast production potential from these resources becomes increasingly realized, so too do the environmental costs and associated management challenges. Wastewater management and disposal have emerged as central concerns and drivers of the controversy

surrounding these new methods, and have affected regulatory decisions governing the development of the Marcellus shale in particular and shale gas resources in other regions generally. Yet basic quantification and characterization of wastewater dynamics have been lacking, allowing rhetoric to precede understanding.

Natural gas from conventional wells has been produced in the Marcellus region since the 1800s, though there have been and continue to be few concerns about the environmental impacts associated with these wells and managing the wastewater that they produce. Yet our analysis shows that conventional wells produce nearly three-times as much wastewater per unit gas recovered compared to Marcellus wells. While the large wastewater volumes being generated in the Marcellus region have fostered a perception that shale gas development is comparatively wastewater intensive, in reality the rapid increase in wastewater generated is a consequence of the resource size rather than the development methods employed.

The immense size of the Marcellus shale, combined with limited underground injection disposal, has made it a proving ground that is shaping technology, policy, and industry activity simultaneously. Recent large shifts observable amongst disposal options (Fig. 5) demonstrate how alternative methods for managing wastewater have been tested iteratively, fostering a dynamic co-evolution of industry expansion and environmental regulation. However, these shifts also demonstrate that existing wastewater disposal capacity is being quickly saturated. This becomes critical as less than 1% of the Marcellus shale has been explored to date [*US EIA*, 2012c]. More than $45,000 km^2$ of undeveloped area is estimated to have production potential and, based on current well spacing (~1 well per $0.5 km^2$), developing this area could require >90,000 additional wells [*US EIA*, 2012c]. Because the current wastewater volume generated by only 2,189 active wells threatens to overwhelm existing infrastructure capacity, future

development of what is potentially the most important natural gas resource in America's energy future is likely to become increasingly dependent on novel logistical or technological solutions for wastewater management.

Not more than a decade ago, extracting natural gas from the Marcellus shale was commercially unfeasible. Yet technological advances have made unconventional gas production a reality. Potential technological solutions for wastewater management are being pursued, such as distillation and reverse osmosis, but currently come at high costs [*Gregory et al.*, 2011; *Veil*, 2010]. Likewise, ample underground injection capacity exists outside of the region [*Clark and Veil*, 2009], though requires high transportation costs. Advances in unconventional methods for wastewater management, comparable to the advances that facilitated the development of unconventional gas resource, are now needed.

ACKNOWLEDGMENT

We thank Emily Bernhardt, Amy Pickle, and 3 anonymous reviewers for their thoughtful comments on this manuscript.

**Table 1**.  Mean estimates of wastewater and gas production volumes for conventional and Marcellus wells.  Because drilling and flowback fluids are generated during or shortly following well construction, these estimates are complete.  Brine and gas volumes are estimated as cumulative production over the first four years of well operation and, while incomplete, the majority of production in Marcellus wells occurs within the first four years (*see* Section 3.1 for further discussion).  Total wastewater estimates are made by summing these values for drilling, flowback, and brine volumes.  Although Marcellus wells produce more wastewater in absolute terms, conventional wells generated approximately 2.8 times more wastewater per unit gas



| Well Type | Drilling[a] (L x 10^6 per well) | Flowback[a] (L x 10^6 per well) | Brine[b] (L x 10^6 per well) | Total Wastewater[c] (L x 10^6 per well) | Gas[b] (L x 10^6 per well) | Wastewater : Gas Ratio (L waste / MMBtu gas)[d] |
|---|---|---|---|---|---|---|
| Conventional | 0.116 | 0.107 | 0.291 | 0.514 | 1,050.1 | 13.4 |
| Marcellus | 0.654 | 1.683 | 2.874 | 5.211 | 30,038.7 | 4.8 |

[a] Values are for the total drilling and flowback volumes produced by each well.
[b] Values were summed over the first four years of brine production.
[c] Values based on summing estimates for drilling, flowback, and brine volumes reported in columns 1-3.
[d] Energy content of gas based on data from *US EIA* [2007]; Approx. 36.2 Btu L$^{-1}$ gas; MMBtu = 1x10$^6$ Btu recovered.

**Figure Captions**

**Fig 1**. Number ($\log_{10}$ scale) of new conventional and Marcellus wells by year (permit data from PA DEP).

**Fig 2.** Density distributions of drilling fluid (a) and frac flowback (b) volumes ($\log_{10}$ scale) for conventional and Marcellus wells (insets show untransformed data). Boxplots show brine (c) and gas (d) production ($\log_{10}$ scale) by Marcellus and conventional wells; black dots indicate the 95% confidence interval of the data; letters indicate significant differences among groups using a modified one-way ANOVA accounting for unbalanced group sizes, non-normality, and heteroscedacity [*Herberich et al.*, 2010].

**Fig 3.** Total wastewater volumes generated by conventional and Marcellus wells by year.

**Fig 4.** Map of wells and disposal facilities [spatial data from PA DEP; *Pennsylvania Spatial Data Access (PASDA)*, 2012].

**Fig. 5** Conventional and Marcellus wastewater volumes by year for each wastewater management method.

# REFERENCES

API (2010), Water management associated with hydraulic fracturing. *Rep. HF2*, 40 pp, American Petroleum Institute, Washington, DC.

Arthur, J., B. Bohm, B. J. Coughlin, M. Layne, and D. Cornue (2009), Evaluating the environmental implications of hydraulic fracturing in shale gas reservoirs, paper presented at SPE Americas E&P Environmental and Safety Conference, San Antonio, Texas, 23-25 March 2009.

Blauch, M. (2010), Developing Effective and Environmentally Suitable Fracturing Fluids Using Hydraulic Fracturing Flowback Waters, paper presented at SPE Unconventional Gas Conference, Society of Petroleum Engineers, Pittsburgh, Pennsylvania, USA, 23-25 February 2010.

Blauch, M., R. Myers, T. Moore, B. Lipinski, and N. Houston (2009), Marcellus Shale Post-Frac Flowback Waters-Where is All the Salt Coming from and What are the Implications?, paper presented at SPE Eastern Regional Meeting, Society of Petroleum Engineers, Charleston, West Virginia, USA, 23-25 September 2009.

Clark, C., and J. Veil (2009), Produced water volumes and management practices in the United States. *Rep. ANL/EVS/R-09/1*, Argonne National Laboratory.

EPA (2011), Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources *Rep. EPA/600/R-11/122*, 57 pp, US EPA, Washington, D.C.

Gregory, K. B., R. D. Vidic, and D. A. Dzombak (2011), Water management challenges associated with the production of shale gas by hydraulic fracturing, *Elements*, *7*(3), 181-186.

Haluszczak, L. O., A. W. Rose, and L. R. Kump (2012), Geochemical evaluation of flowback brine from Marcellus gas wells in Pennsylvania, USA, *Applied Geochemistry*. http://dx.doi.org/10.1016/j.apgeochem.2012.10.002

Herberich, E., J. Sikorski, and T. Hothorn (2010), A robust procedure for comparing multiple means under heteroscedasticity in unbalanced designs, *PloS one*, *5*(3), e9788.

Howarth, R. W., R. Santoro, and A. Ingraffea (2011), Methane and the greenhouse-gas footprint of natural gas from shale formations, *Climatic Change*, *106*(4), 679-690.

26

IEA (2012), Medium-term Gas Market Report 2012. *Rep. 9789264177987*, 168 pp, International Energy Agency, Paris.

Kargbo, D. M., R. G. Wilhelm, and D. J. Campbell (2010), Natural gas plays in the Marcellus shale: Challenges and potential opportunities, *Environmental Science & Technology*, *44*(15), 5679-5684.

Lee, D. S., J. D. Herman, D. Elsworth, H. T. Kim, and H. S. Lee (2011), A critical evaluation of unconventional gas recovery from the marcellus shale, northeastern United States, *KSCE Journal of Civil Engineering*, *15*(4), 679-687.

Mantell, M. E. (2009), Deep shale natural gas: abundant, affordable, and surprisingly water efficient, paper presented at GWPC Water/Energy Sustainability Symposium, Salt Lake City, Utah, USA, 13-16 September 2009.

Montgomery, C. T., and M. B. Smith (2010), Hydraulic Fracturing: History of an Enduring Technology *Journal of Petroleum Technology*, *62*(12), 26.

MSAC (2011), Governor's Report on the Marcellus Shale. *Rep. 2011-01*, 137 pp, Marcellus Shale Advisory Commission, Harrisburg, PA.

MSETC (2011), Pennsylvania Marcellus Shale workforce needs assessment. 60 pp, Marcellus Shale Education and Training Center, Harrisburg, PA.

ODNR (2012), Preliminary report on the Northstar 1 Class II Injection Well and the seismic events in the Youngstown, Ohio area *Rep. OCNR 2012-01*, 24 pp, Ohio Department of Natural Resources, Columbus, OH.

Osborn, S. G., A. Vengosh, N. R. Warner, and R. B. Jackson (2011), Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing, *P Natl Acad Sci USA*, *108*(20), 8172-8176.

Pa. Code § 95.10. (2010), Pennsylvania Revised Code Ch. 95: Wastewater Treatment Requirements,, edited.

Pennsylvania Spatial Data Access (PASDA) (2012), Oil and gas locations, http://www.pasda.psu.edu/uci/SearchResults.aspx?searchType=mapservice&condition=OR&entry=PASDA. (Accessed August 20, 2012). , edited, Harrisburg, PA.

Perry, S. (2011), Pennsylvania DEP Memo, edited by P. D. o. E. Protection, PA DEP, Harrisburg, PA.

Tetra Tech (2009), Evaluation of High TDS Concentrations in the Monongahela River *Rep.*, 126 pp, Prepared for Marcellus Shale Committee by Tetra Tech, Inc., Pittsburgh, PA.

US DOE (2009), Modern shale gas development in the United States: A primer. *Rep. DoE-FG26-04NT15455*, 116 pp, US Department of Energy, Washington, DC.

US EIA (2007), Annual Energy Outlook 2007*Rep. DOE/EIA-0383(2007)*, 324 pp, US Energy Information Administration, Washington, DC.

US EIA (2011a), Review of emerging resources: US shale gas and shale oil plays. *Rep.*, US Energy Information Agency, Washington, DC.

US EIA (2011b), World Shale Gas Resources: An Initial Assessment of 14 Regions Outside the United States. *Rep.*, 365 pp, US Energy Information Administration, Wasthington, DC.

US EIA (2012a), Monthly coal- and natural gas-fired generation equal for first time. , edited.

US EIA (2012b), Historical Natural Gas Price Data. US Energy Information Administration Natural Gas Data, Wasthington, DC.

US EIA (2012c), Annual Energy Outlook 2012. *Rep. DOE/EIA-0383(2012)*, 240 pp, US Energy Information Administration, Washington, DC.

Veil, J. (1997), Costs for Off-Site Disposal of Nonhazardous Oil Field Wastes: Salt Caverns Versus other Disposal Methods. 68 pp, Department of Energy; Argonne National Laboratory, Argonne, IL.

Veil, J. (2010), Water management technologies used by Marcellus Shale gas producers. *Rep. ANL/EVS/R-10/3*, 59 pp, Argonne National Laboratory, Argonne, IL.

Veil, J., M. G. Puder, D. Elcock, and R. J. Redweik Jr (2004), A white paper describing produced water from production of crude oil, natural gas, and coal bed methane. Argonne National Laboratory.

Warner, N. R., R. B. Jackson, T. H. Darrah, S. G. Osborn, A. Down, K. G. Zhao, A. White, and A. Vengosh (2012), Geochemical evidence for possible natural migration of Marcellus Formation brine to shallow aquifers in Pennsylvania, *P Natl Acad Sci USA*, *109*(30), 11961-11966.

**Figure Captions**



**Fig 1**. Number ($\log_{10}$ scale) of new conventional and Marcellus wells by year (permit data from PA DEP).



**Fig 2.** Density distributions of drilling fluid (a) and frac flowback (b) volumes ($\log_{10}$ scale) for conventional and Marcellus wells (insets show untransformed data). Boxplots show brine (c) and gas (d) production ($\log_{10}$ scale) by Marcellus and conventional wells; black dots indicate the 95% confidence interval of the data; letters indicate significant differences among groups using a modified one-way ANOVA accounting for unbalanced group sizes, non-normality, and heteroscedacity [*Herberich et al.*, 2010].





**Fig 3.** Total wastewater volumes generated by conventional and Marcellus wells by year.



**Fig 4.** Map of wells and disposal facilities [spatial data from PA DEP; *Pennsylvania Spatial Data Access (PASDA)*, 2012].





**Fig. 5** Conventional and Marcellus wastewater volumes by year for each wastewater management method.









Kilometers
0 25 50 100

New York

Pennsylvania

Ohio

New Jersey

Maryland

West Virginia

**d**

- Marcellus Wells
- Conventional Wells
- Ohio Basin
- Delaware Basin
- Susquehanna Basin

Municipal Treatment Facility
- 0.1 - 0.5
- 0.5 - 3
- 3 - 14
- 14 - 40
- 40 - 700

Industrial Treatment Facility
- 0.1 - 0.5
- 0.5 - 3
- 3 - 14
- 14 - 40
- 40 - 700

Injection Disposal Well
- 0.1 - 0.5
- 0.5 - 3
- 3 - 14
- 14 - 40
- 40 - 700

Total Marcellus Waste Received by Facilities (2004-2011)
Values in Million Liters



**COLORADO**
Department of
Regulatory Agencies
Public Utilities Commission

Joshua B. Epel, Chairman
Pamela J. Patton, Commissioner
Glenn A. Vaad, Commissioner
Doug Dean, Director

Joe Neguse, Executive Director
John W. Hickenlooper, Governor

October 17, 2016

Natasha Leger
Interim Executive Director
Citizens for a Healthy Community
PO Box 291, Hotchkiss, CO  81419

RE:     Unregulated gas gathering pipelines

Ms. Leger,

On September 21, 2016, you sent correspondence  requesting information from the Colorado Public Utilities Commission's Pipeline Safety Program (COPUC PSP) regarding unregulated gas gathering pipelines ("9/21 Gathering Line correspondence").  I extend my apologies for the significant delay in responding to your request.

Specifically, you wish clarification on several pipeline safety topics so that Citizens for a Healthy Community (CHC) could better understand the risks associated with unregulated gas gathering pipelines.   The 9/21 Gathering Line correspondence desired clarification on the following:

1. "Does the State review the geology of an area to determine if it poses risks to pipeline integrity management?"

    *Response:*

    *The Public Utilities Commission Pipeline Safety Regulations are largely adopted from Title 49, Code of Federal Regulations, Part 192 (Transportation of Natural and Other Gas by Pipeline:  Minimum Federal Safety Standards).   Regulation §192.317 (Protection from hazards) requires that, during pipeline construction, jurisdictional pipeline operators:*

    *"…must take all practicable steps to protect each transmission line or main from washouts, floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to sustain abnormal loads."*

    *It would be the COPUC PSP expectation that an operator be able to demonstrate through appropriate documentation that it has addressed its obligations under §192.317.   This would include addressing all potential geologic hazards.*



Public Utilities Commission
Pipeline Safety Program
RESPONSE: CHC 9/21 Gathering Line Information Request
October 17, 2016
Page 2 of 8

2.   "How would the public know of any failures that may have occurred or may occur in the future on unregulated gas gathering pipelines?"

   *Response:*

   *Current COPUC PSP Rule 723-3-4911 requires that <u>all</u> gas pipeline operators, "including a gathering pipeline in a class 1, 2, 3, or 4 area," report gas leaks that necessitate evacuation of people, close a public road, or result in a defined incident (NOTE: "Class 1" areas are rural areas; under Part 192 these would include unregulated gas gathering pipelines.). Leaks that do not result in these outcomes would not be captured under Rule 4911.*

3.   "How does one know if an operator has the proper skills and qualifications to construct, operate and monitor a pipeline?"

   *Response:*

   *Jurisdictional pipeline operators must have an approved and extensive "Operator Qualification," or "OQ" Program that addresses all pipeline operations and maintenance activities. Under new federal rulemaking anticipated to be final before the end of 2016, OQ Programs will extend to pipeline construction. In the meantime, the construction requirements of Part 192 SubPart G encompass all construction requirements that include some explicit qualifications for pipeline construction personnel (e.g. welders). There is no routine method to check whether an unregulated operator is constructing, operating, and maintaining their pipeline system in a way similar to a traditional OQ Program.*

4.   "Has SG Interests or Gunnison Energy provided proof of qualifications to construct, operate, and monitor the Bull Mountain pipeline and all other gas gathering lines under their control?"

   *Response:*

1560 Broadway, Suite 250, Denver, CO 80202     P 303.894.2000     F 303.894.2065     www.dora.colorado.gov/puc



*No.   Currently, SG Interests and Gunnison Energy have deemed that all of their pipeline operations are non-jurisdictional to Part 192.*

5.   "What are the types of incidents or risks that qualify for a Hazardous Facility Order (HFO)?"

*Response:*

*COPUC PSP rules define "Hazardous facility (HF)" to mean "a pipeline facility that, if allowed to go into operation or to remain in operation, would be hazardous to life and property."   In the last decade, the PSP has not initiated action under Rule 4940 (Hazardous Facilities Orders).   Rule 4940 requires that the PSP initiate a complaint against the operator of the presumed hazardous pipeline facility and that a formal hearing be held.   In any HF hearing, Commission needs to consider:*

> *"... (I) The characteristics of the pipe used in the pipeline facility or the LNG facility involved, including (without limitation) its age; manufacturer; physical properties, including its resistance to corrosion and deterioration; and the method of its manufacture, construction, or assembly.*
>
> *(II) The nature of the gas transported by the pipeline facility or the LNG facility, including its corrosive and deteriorative qualities; the sequence in which the gas is transported; and the pressure required for transportation of the gas.*
>
> *(III) The characteristics of the areas in which the pipeline facility or the LNG facility is located, in particular the climatic and geologic conditions (including soil characteristics) associated with the areas, the population, the population density, and the growth patterns of the areas.*
>
> *(IV) Any recommendation of the National Transportation Safety Board issued in connection with any investigation conducted by that Board.*
>
> *(V) Such other factors as may be relevant."*

6.   "What are the procedures for securing a Hazardous Facilities Order?"

*Response:*

*COPUC PSP Rule 4940 states that:*



Public Utilities Commission
Pipeline Safety Program
RESPONSE: CHC 9/21 Gathering Line Information Request
October 17, 2016
Page 4 of 8

*"...(a) After an inspection and/or a test, if the Chief is of the opinion that a pipeline facility or a LNG facility may be a hazardous facility, Staff may file a formal complaint with the Commission against the operator of the pipeline facility or the LNG facility. The complaint shall allege facts sufficient to establish the existence of a hazardous facility and to support a hazardous facility order. In an appropriate case and with the complaint, Staff may file a motion for an order pursuant to paragraph (j) of this rule.*

*(b) A formal complaint by Staff shall be issued, and hearing shall be conducted, in accordance with the Commission's Rules Regulating Practice and Procedure and Article 6 of Title 40, C.R.S.*

*(c) Except as provided (for a summary order of) this rule, if the Commission finds, after hearing, that a pipeline facility or a LNG facility is hazardous to life or property, the Commission shall issue an order directing the operator to take corrective action. Corrective action may include, without limitation, suspension or restriction of the use of the pipeline facility or LNG facility, physical inspection, testing, repair, or replacement.*

*(d) A pipeline facility or a LNG facility may be found to be a hazardous facility if the pipeline facility or a LNG facility has been constructed or operated with any equipment, material, or technique that is hazardous to life or property."*

7. "How does the State know – and how does the public have confidence – that a rural gas gathering pipeline was properly constructed to prevent risks of failure?"

*Response:*

*The COPUC PSP has no direct knowledge of the construction of specific rural gas gathering pipelines, as these are largely non-jurisdictional to current PSP rules.*

8. "How does the State know – and how does the public have confidence – that rural gas gathering pipelines were not constructed by unqualified personnel or contractors, or personnel or contractors under the influence of drugs or alcohol."

*Response:*

*The COPUC PSP has no direct knowledge of the construction of specific rural gas gathering pipelines, as these are largely non-jurisdictional to current PSP rules.*



Public Utilities Commission
Pipeline Safety Program
RESPONSE: CHC 9/21 Gathering Line Information Request
October 17, 2016
Page 5 of 8

9. "How can the Bureau of Land Management and United States Forest Service ensure that pipeline safety has been properly analyzed and all risks to people and the environment have been considered when rural gas gathering lines are exempt from federal pipeline safety and integrity regulations?"

*Response:*

*While rural gas gathering pipelines are currently non-jurisdictional, it is the opinion of the COPUC PSP that all parties that control access to any pipeline's right-of-way (ROW) may impose the practical duties of current pipeline safety and integrity regulations upon the pipeline operator, regardless of federal or state jurisdiction. Regarding these regulations, easement owners may contact the COPUC PSP for advice or the COPUC PSP's federal partner, the U.S. DOT Pipeline and Hazardous Materials Safety Administration (PHMSA) Western Region Community and Technical Services (CATS) Manager Tom Finch at Thomas.Finch@dot.gov or 720-963-3175.*

10. "What are the new COGCC guidelines on rural gas gathering lines?"

*Response:*

*The Colorado Oil and Gas Conservation Commission (COGCC) does not regulate gas gathering (gas which is, by definition, undergoing economic transport), but most aspects of gas production. Gas gathering is under the jurisdiction of the COPUC PSP. For an explanation of the COGCC rules and guidelines, please visit cogcc.state.co.us/reg.html#/overview .*

11. "How does the COGCC interface with DORA, PUC, the BLM and USFS on pipeline safety of rural gas gathering lines."

*Response:*

*As stated above, the COGCC has authority over gas production, not gas gathering. Nonetheless, the COPUC PSP and COGCC are set on improving inter-departmental communication on rural pipeline issues and meets quarterly with PHMSA Western Region CATS. For information on COGCC interactions with BLM and USFS, please contact COGCC or visit cogcc.state.co.us/reg.html#/overview.*



1560 Broadway, Suite 250, Denver, CO 80202      P 303.894.2000      F 303.894.2065      www.dora.colorado.gov/puc

12. "What are the public's options for holding an operator accountable and responsible for pipeline safety and integrity before an accident happens?"

*Response:*

*It is the opinion of the COPUC PSP that having pipeline operators comply with all applicable state and federal pipeline safety and environmental rules greatly minimizes the risks associated with pipeline operation.  However, in many respects, pipelines are a local matter that require an ongoing dialog between pipeline operators and the communities in which they operate.  One of the best examples in Colorado of a formal and ongoing venue for operator-public dialog is the Garfield County Oil and Gas Energy Advisory Board.   The Energy Advisory Board has information on its activities at* www.garfield-county.com/oil-gas/energy-advisory-board.aspx.

*Additionally, the public should feel free to monitor and participate in rulemakings at the state and federal levels that impact pipeline safety and integrity. Periodically contacting or reviewing the websites of the jurisdictional agencies (e.g., COPUC, COGCC, CDPHE) to inquire about upcoming rulemakings is a simple method of keeping up-to-date.*

13. "How can the public find out which contractors worked on a particular pipeline?"

*Response:*

*Unlike other safety rules, such as occupational safety rules, pipeline safety rule responsibility is created in a "top-down" fashion, i.e., the pipeline operator is responsible for all aspects of pipeline construction, operation and maintenance regardless of the use of one or several contractors to perform regulated activities. If an operator's contractor is found to be unqualified or not following procedure, it is the operator that is noticed on the violation(s) and not the contractor.*

*In this environment, state and federal pipeline safety inspectors do not specifically keep records on a jurisdictional pipeline operator's contractors.  However, it is expected that the operators themselves have records regarding work performed on the pipeline by contractors so that they have an adequate ability to trace and remedy any issues associated with the contractors' work.*



Public Utilities Commission
Pipeline Safety Program
RESPONSE: CHC 9/21 Gathering Line Information Request
October 17, 2016
Page 7 of 8

14. "Are gathering and transmission lines accurately mapped following construction? What agencies have access to those maps?"

*Response:*

*Modern pipeline industry standards call for accurate mapping, as many operations and maintenance tasks rely on this information.   However, this was not always the case; especially as regards older gathering systems, operators may not have accurate maps or even have a way of locating facilities if they were constructed of composite materials such as fiberglass.*

*Absent industry standard, existing federal pipeline safety rules have little regarding explicit requirements for "accurate" mapping.   The exception to this is that, under §191.29, PHMSA requires operators of gas transmission or liquefied natural gas facility to provide geospatial data to PHMSA for that pipeline or facility.     This information is placed into the National Pipeline Mapping System (NPMS) and is accessible at www.npms.phmsa.gov.   However, this means that the NPMS does not have distribution or gathering pipelines available for viewing.*

*§192.605(b)(3)  (Procedure manual for operations, maintenance, and emergencies) does require that a jurisdictional operator make "…construction records, maps, and operating history available to operating personnel."     This information, including the existence of accurate maps, is periodically audited during pipeline safety inspections of operators.   Due to the sheer mileage of active pipeline in the United States, regulatory agencies rarely keep detailed operator maps.*

15. "Can you provide examples of where BLM or USFS has prohibited pipelines from crossing their jurisdiction?"

*Response:*

*While the COPUC PSP rarely gets involves or sees the permitting phase of an operator's pipeline construction or repair project, the Program needs to be aware of permitting issues that jurisdictional pipeline operators face that so that timing and siting issues are considered (i.e., why an operator chose to repair/construct and where an operator chose to repair/construct).*

*With respect to the BLM and National Forest Service (NFS), these agencies use "Right-of-Way" (ROW - BLM) or Special Use Authorization/Special Use Permit (SUA/SUP - NFS) processes.     The typical distinction between the two agencies is that, regarding pipelines, BLM is allowing transit across BLM land or access to leases*



*for minerals, and the NFS is usually allowing simple transit across NFS land.  A better question may be "How do BLM and NFS use their processes to approve or prohibit pipeline traverses across their jurisdiction?"*

*Research shows that pipeline traverses are commonly approved.  NFS may have more of a history of denial of SUP for pipeline traverses, likely because the environmental, recreational, and historical aspects of the properties under their jurisdiction are more varied and complex when they are compared to typical BLM properties.   But, regardless of approval/denial, each agency has the requirement to interpret site-specific conditions through the agency's own regional review.   Two recent, common examples are as follows:*

- *In January 2016, the NFS formally denied the Atlantic Coast Pipeline application for a SUP (see FERC Docket No. CP15-554 and CP15-554-001).*

- *In April 2016, the BLM approved a ROW application by SourceGas for its Eagle, Colorado pipeline upgrade (see BLM site: eplanning.blm.gov/epl-front-office/projects/nepa/50494/74791/82355/DOI-BLM-CO-N040-2015-0080-EA.pdf).  However, BLM imposed site-specific conditions of approval to the ROW that the operator deemed to be burdensome, and the operator chose an alternative plan.*

I expect this answers the questions posed in your 9/21 Gathering Line correspondence.   If you have any specific questions regarding this response, feel free to contact me at 303.894.2852 or by e-mail at joseph.molloy@state.co.us .

Respectfully,

Joe Molloy, PE
Section Chief, COPUC Pipeline Safety Program

cc:      PSP COMPLAINTS e-file



## A Regulatory Review of Liquid and Natural Gas Pipelines in Colorado

I. Introduction
    A. Oil & Gas Production and Transportation
    B. General Regulatory Framework
        1. Pipeline Safety
        2. Environmental Protection
        3. Oil & Gas Conservation
        4. Other Regulations
    C. State Regulatory Agencies

II. Colorado Regulatory Framework
    A. Environmental Regulation (State & Federal)
        1. Spill/Release/Leak Reporting and Response
        2. Air Quality
        3. Water Quality and Waste Management
        4. Emissions Reporting
    B. Location Regulation (Local)

III. Safety
    A. Pipeline Safety
        1. General Framework
        2. Pipeline Safety Regulations
        3. High Consequence Areas and Unusually Sensitive Areas
        4. Colorado 811 "Call Before You Dig" Regulation
    B. Worker Safety

IV. Emergency Local Response

V. Agency contact information

List of Appendices

1

This document is the work product of representatives of the pipeline industry, federal and state regulators, elected officials, and local governments.  It provides an overview of hydrocarbon pipeline regulation in Colorado from the wellhead through the midstream distribution network, and does not address downstream pipelines to the final, metered point of sale.  Pipeline networks are complex with multiple jurisdictional points of oversight.  This document is intended to provide a broader understanding of the scope of regulatory oversight of these pipeline operations for the public, local governments, regulators, and those who are regulated. Regulatory changes will be reflected in future versions of this "living" document.

## I. Introduction

Pipeline networks of every type (e.g., energy products, water and wastewater, chemical products) represent a largely unobtrusive and ubiquitous transportation infrastructure that brings direct societal advantage.   As a (largely) buried infrastructure, pipelines do not normally interfere with routine human activities on the surface such as building, agriculture, or transport of people and products via roadway.   In this regard, pipelines can be an effective and virtually continuous and uninterruptable transport mode.

Regarding hydrocarbons specifically, in the United States pipelines transport nearly two-thirds of the petroleum products, and nearly all of the natural gas.  The United States' pipeline system is composed of more than 2.6 million miles of pipeline. Liquid pipelines transport crude oil or natural gas liquids from producing fields to refineries, where they are turned into gasoline, diesel, and other petroleum products.  Natural gas pipelines transport gas from wells, to processing plants, and then to distribution systems that take the natural gas directly to homes and businesses.

Both liquid and natural gas pipeline infrastructure can be broken down into four categories:
(1) Flowlines contain produced wellhead fluids from individual wells that feed production facilities near the wellhead;
(2) Gathering pipelines tie production facilities with gathering systems that feed into oil storage or natural gas processing facilities;
(3) Transmission pipelines transport pure natural gas and hydrocarbon liquids (refined or unrefined) over long distances; and
(4) Distribution pipelines deliver pure natural gas to end users (residential, commercial, industrial).
Visuals of pipeline infrastructure can be found in Appendices A-1 and A-2.

Four general industry segments use this infrastructure along the route to market:  Upstream exploration and production systems, midstream gathering systems, downstream transmission systems, and end-use distribution systems:

(1) The upstream segment includes exploration and production (E&P) and well drilling activities. Advanced seismic surveys assist exploration companies in finding the resources they wish to develop.  Once the resource is found and the drilled oil is piped to on-site storage tanks and raw gas is metered, and the transportation to market begins;

(2) The <u>midstream</u> gathering and processing (G&P) segment collects hydrocarbons starting at a meter point near the well site for processing;

(3) The <u>downstream</u> segment includes processing, transmission, and storage; and

(4)  The <u>end-use</u> segment represents the final market transport through local distribution companies or a gas utility company.

Pipelines are an effective mode to transport hydrocarbon liquids and natural gas to market and are by far the safest method for transporting large volumes of energy products.  Pipelines do not contribute to traffic congestion on our country's highways and waterways as trucks and barges can, nor do pipelines contribute to highway accidents.  When pipeline incidents occur, however, they can present significant risks to populated areas and the environment, making information about the current regulatory structure so important.

**A. Oil & Gas Production and Transportation**
Pipelines naturally follow where hydrocarbon production succeeds and markets mature.   On the highest level, the development of a pipeline network is a very organic process.  In-basin pipeline networks are developed to support production and gather product from multiple sites; other networks are developed to move the product to intrastate and interstate markets.   All the while, smaller distribution networks are built to take specific advantage of local resources (usually natural gas).   In the past, a "network" often meant just a few "farm taps" off of production lines from a single well site.

Colorado's pipeline network followed this organic model and, as elsewhere in the U.S., Front Range pipelines did not begin in earnest until the late 1920's as a strong national market for long-distance natural gas transportation was developing.  The discovery of an economic natural gas supply north of Fort Collins, coupled with continuing advances in pipe technology, spurred development. Operators built the first intrastate pipeline from the Wellington field, bringing natural gas to the Denver area.  Interstate pipelines followed, and quickly: Colorado Interstate Gas (CIG) began service in early June 1928 with the intent to bring Texas panhandle gas to the Front Range.  CIG gas pipelines reached Pueblo in mid-June, and by the end of June Denver was served.  Segments of those early pipelines still transport gas today.

Colorado's pipeline networks have expanded persistently since those early years, following the demand for petroleum products.  Recent increases in oil and gas production from the Denver-Julesburg and Piceance Basins have spurred numerous field (production and gathering) pipelines and a fair number of new long-distance (transmission) pipeline moving oil and gas within, and exporting oil and gas production from, Colorado.  Eastern Colorado projects include CIG expansions and the Front Range Pipeline, while the major Piceance-related project was the Rockies Express Pipeline (REX), designed to transport western slope gas to mid-American markets.

As a hydrocarbon-producing state, hydrocarbon pipeline networks in Colorado are naturally abundant. Like many types of infrastructure, these networks developed organically in response to physical and economic growth in the state.  Pipeline construction is expected to continue as long as Colorado's economy produces and/or consumes hydrocarbon products.

## B. General Regulatory Framework

### 1.  Pipeline Safety

As pipeline networks grew in the 1920's, they made hydrocarbons not only a local resource, but an interstate commodity of increasing national importance.   Although some states had made minor inroads into pipeline regulation, it was pipelines' role as a major interstate commodity transport mode that brought them under the jurisdiction of the federal government when, in 1938, the Natural Gas Act (NGA) was passed.   NGA provisions were enforced by the Federal Power Commission (FPC), a Federal Energy Regulatory Commission (FERC) precursor that drafted rules regulating interstate gas delivery rates and had the ability to approve/deny new interstate pipelines.

The NGA was an economic act only; it did not include any safety regulation.   However, it introduced the concept that pipelines transporting natural gas are vested in the public interest and can therefore be regulated, as well as the concept that transportation of natural gas is distinct from the act of production.

The first Federal statute regulating pipeline safety was the Natural Gas Pipeline Safety Act (the Act) of 1968, which applies to all "pipeline facilities used in the transportation of gas or the treatment of gas during the course of transportation." This means that the Act applies to all pipelines except for production pipelines and rural gathering pipelines.

Congress amended the Act in 1976 and added liquid pipelines to the statute in 1979. Subsequent bills that referenced and enhanced the original Act include the Pipeline Safety Reauthorization Act of 1988, the Pipeline Safety Act of 1992, the Accountable Pipeline Safety and Partnership Act of 1996, the Pipeline Safety Improvement Act of 2002, and two additional Acts in 2006 and 2012.

Concurrent with the Act, Congress created the Office of Pipeline Safety (OPS) in 1968 to oversee and implement pipeline safety regulations. OPS is housed in the U.S. Department of Transportation (DOT), originally under the Research and Special Programs Administration (RSPA) and now under the Pipeline and Hazardous Materials Safety Administration (PHMSA). OPS oversees interstate pipelines while states are responsible for intrastate pipelines.  The Hazardous Liquid Pipeline Safety Act of 1979 was enacted on November 30, 1979.

The PHMSA-OPS oversees interstate pipelines.  States are responsible for intrastate pipelines, via an interagency agreement with PHMSA. The statutes under which PHMSA operates provide for state assumption of all, or part of, the *intrastate* regulatory and enforcement responsibility through annual "certification agreements."  This cooperative, collaborative relationship

4

between federal and state governments forms the cornerstone of our country's pipeline safety program.

Federal statutes and regulations, CFR 49 Parts 190 – 199, prescribe comprehensive *minimum* pipeline safety standards for the pipeline transportation of natural gas and hazardous liquids. According to the Act, states may enact more stringent requirements upon pipeline operators, but cannot waive any minimum requirement without PHMSA approval.

While pipeline safety regulations include requirements for emergency plans, leak detection, and leak response, the bulk of the regulations are meant to prevent releases from jurisdictional pipelines.  This is accomplished through the requirement that operators create and adopt explicit procedures that allow for the proper construction, operation, and maintenance of the pipeline.

## 2.  Environmental Protection

Like pipeline safety regulations, current environmental protection regulations have their Federal beginnings in the late 1960s and early 1970s.  Particularly relevant to the hydrocarbon pipeline industry are the Clean Water Act, the Clean Air Act, the Safe Drinking Water Act, the Resource Conservation and Recovery Act, and the Emergency Planning and Community Right-to-Know Act.   And, similar to pipeline safety regulations, states may choose to enforce more stringent requirements.   None of these are specific to pipelines, but pipeline activities and/or releases from pipelines – both planned and unplanned – may trigger reporting and/or enforcement provisions of these regulations.

Unlike pipeline safety regulations, environmental protection regulations are indifferent to pipeline function (i.e., distribution versus transmission versus gathering versus production), although there are some specific environmental exemptions extended to the hydrocarbon production industry.

## 3.  Oil and Gas Conservation

 Many hydrocarbon producing states, including Colorado, have extensive statute and regulation regarding the development of hydrocarbon resources.   Since the basic element to oil and gas development is an underlying mineral right, and mineral rights are state-specific, the Federal government does not have overarching authority as with pipeline safety or environmental protection.

Oil and gas conservation agencies are multidisciplinary in function.   In addition to regulations, state agencies provide formal and informal guidance, develop field rules, and encourage Best Management Practices. They also conduct field inspections, engage in enforcement/oversight activities, and frequently witness specific operations like well construction, testing and plugging.

## 4.  Other Regulations

Pipeline networks are a unique type of infrastructure in that they can be both local and national.   As such, they can be subject to local, state, Federal, and Tribal permitting requirements such as land use, restoration, access, and specialized environmental

regulations.  In addition to land-use regulations, pipeline construction and operation can be subject to occupational safety regulations.

## C. State Regulatory Agencies

The Colorado Public Utilities Commission (COPUC) Gas Pipeline Safety Section is charged with confirming compliance with and enforcing the State's intrastate gas pipeline safety regulations in order to provide public safety to the citizens of Colorado.  Nationally, the majority of pipeline inspections are carried out by state inspectors who work for state agencies, generally their Public Utility Commissions or State Fire Marshal offices.  The COPUC carries out the inspection and monitoring of intrastate gas pipeline system operators under the review of PHMSA. Regulated pipeline facilities include transmission, distribution, gathering, master metered, liquefied natural gas (LNG), and propane (LPG) gas systems.  The COPUC does not have jurisdiction over pipelines not engaged in transport (i.e. pipelines directly associated with gas production, and gas piping within a home or business that is the responsibility of the customer and is regulated by the city or county building codes).

The Colorado Oil and Gas Conservation Commission (COGCC) regulates the production of oil and gas.  The mission of COGCC is to foster the responsible development of Colorado's oil and gas natural resources.  Responsible development results in the efficient exploration and production of oil and gas resources in a manner consistent with the protection of public health, safety and welfare, prevention of waste, protection of mineral owners' correlative rights, and prevention and mitigation of adverse environmental impacts.  COGCC pipeline jurisdiction generally pertains to flowline construction, inspection and integrity along with regulating the reporting of spills, releases or leaks from all flowlines and gathering lines.

The Colorado Department of Public Health and Environment (CDPHE) serves the people of Colorado by providing high-quality, cost-effective public health and environmental protection services. The Department pursues its mission through broad-based health and environmental protection that extends to pipeline operators in the areas of air and water quality, hazardous and solid waste management, pollution prevention, environmental leadership and consumer protection. The mission of the Department is to protect and improve the health of Colorado's people and the quality of its environment.

## II. Colorado Regulatory Framework

Relevant regulations covering liquid and natural gas pipelines fall into three principal categories: (1) environmental protection and location, (2) pipeline safety, and (3) worker safety. As described below, portions of these categories fall under the authority of federal, state, and local governments.

*In Colorado, pipelines are regulated to protect public health, safety, and the environment by a host of federal, state, and local agencies.*

Depending upon the type of product being handled and the location/function of the particular pipeline (e.g., gathering vs. transmission), pipelines and associated facilities are subject to regulation by the following agencies and programs:

- U.S. Environmental Protection Agency (EPA)
- U.S. Dept. of Transportation, Pipeline & Hazardous Materials Safety Admin. (PHMSA)
- U.S. Army Corps of Engineers (USACE)
- U.S. Occupational Safety/Health Admin. (OSHA)
- Colo. Dept. of Public Health & Envt. (CDPHE)
- Colo. Public Utilities Comm'n (COPUC)
- Colo. Oil & Gas Cons. Comm'n (COGCC)
- Colo. Dept. of Labor, Oil & Public Safety (CDOL)
- Utility Notification Center of Colorado (Colorado 811)
- County Commissions and Land Use Review

## A. Environmental Regulation (State & Federal)

### 1. Spill/Release/Leak Reporting and Response

- Prompt reporting of spills/releases/leaks is required to a variety of government agencies, depending upon the type, quantity, and location/affected media of the spill/release:
  - State & local – Release of exploration and production waste (condensate, produced water) > 1 barrel from any source to COGCC, local emergency response, surface owner; release of hazardous wastes to CDPHE and state/local Emergency Planning Committees; other reporting obligations to CDOL; COPUC requires operators of certain natural gas pipelines to report leaks on lines and systems that result in the closure of a roadway, railroad, or an evacuation of 50 or more people.
    - Example release reporting matrices are provided in Appendices B-1 and B-2, delineating how an operator complies with the levels of required reporting to relevant regulatory and emergency response entities.
    - COGCC's Pipeline Release Response Procedure is presented in Appendix C.
  - Federal – releases of hydrocarbon liquids to water or other pollutants above federal Reportable Quantities must be reported to the National Response Center; significant incidents, accidents resulting in explosions or fires, and releases of greater than 5 gallons or more generally must be reported to PHMSA.
    - The PHMSA and COPUC reporting and response process is presented in Appendix D.

- Response obligations are mandated under both state and federal regulations:
  - State requirements and regulations for hydrocarbon releases, commensurate with the applicable state agency (e.g. COPUC or COGCC).
  - Federal requirements and regulations for hydrocarbon releases and releases of other materials (Clean Water Act, Oil Pollution Act, Comprehensive Environmental Response, Compensation, and Liability Act), as well as emergency response training requirements.

### 2. Air Quality

- Both EPA and CDPHE regulate air emissions associated with certain facilities under the federal Clean Air Act and the Colorado Air Pollution Prevention and Control Act.

- o Direct <u>federal</u> regulation of equipment/activities (EPA):
  - New Source Performance Standards (NSPS) regulate emissions from specific processes and equipment; require emissions control and reduction practices.
  - National Emission Standards for Hazardous Air Pollutants (NESHAP) regulate emissions of HAPs, applying Maximum Achievable Control Technology (MACT) standards.
- o Direct <u>state</u> regulation of equipment/activities in Colorado (CDPHE):
  - Colorado adopts and implements federal regulations such as NSPS and MACT within the state.
  - Emission controls or operation requirements for condensate tanks, glycol dehydrators, pneumatic valves, RICE engines, and flares. Additional controls are now required as part of the new rules adopted by the Air Quality Control Commission in April 2014.
    - ♦ Colorado has perhaps the most comprehensive, in-depth air quality regulatory regimes for oil and gas facilities in the nation, from low permitting levels, emissions information, and robust direct emissions control regulation of equipment.
  - Reduced Emissions Completions or "green completions" for new wells regulated by both COGCC and CDPHE.
  - In determining a violation of state regulations during a malfunction an operator may establish an affirmative defense if they meet the notification requirements in a timely manner and prove the requirements listed in Appendix E.
    - ♦ Notification- The owner or operator of the facility experiencing excess emissions during a malfunction shall notify AQCD verbally as soon as possible, but no later than noon of the Division's next working day, and shall submit written notification following the initial occurrence of the excess emissions by the end of the source's next reporting period.

- Air quality construction and operating permits for facilities and equipment.
  - o State air permitting requirements govern regulation of "major and minor sources."
    - Permits incorporate specific state regulatory requirements to reduce air emissions.
    - Impose Reasonably Available Control Technology (RACT) requirements.
  - o State-issued Federal Title V Operating Permits apply to "major sources."
    - Title V permits incorporate all applicable federal regulations to manage and reduce air emissions, and also include monitoring, record keeping, and reporting requirements.
  - o State-issued Federal Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NANSR) permits for new/modified "major stationary sources."
    - Best Available Control Technology (BACT) for attainment areas, and Lowest Achievable Emission Rate (LAER) in non-attainment areas.

### *3. Water Quality and Waste Management*
- Spill containment – Spill Prevention, Control, and Countermeasure (SPCC) plans address spill preparedness, response, containment structures (CDOL).

- The plans, designed to prevent or contain releases of hydrocarbons, apply to liquids holding tanks in the field, at compressor stations, and at natural gas processing plants.

- Colorado Discharge Permit System (CDPS) permits regulate discharges to surface waters, and the stormwater pollution prevention program mitigates stormwater impacts (CDPHE).
  - Facilities with direct water discharges must hold and comply with CDPS permits, and as applicable hold stormwater plans.
  - Facilities that cross federally owned land, such as national parks or national wildlife refuges, may need to obtain a federal discharge permit under the National Pollutant Discharge Elimination System (NPDES) from the EPA in lieu of a CDPS permit.

- National Pollutant Discharge Elimination System (NPDES) permits regulate discharges to surface waters, and the stormwater pollution prevention program mitigates stormwater impacts (CDPHE).
  - Facilities with direct water discharges must hold and comply with NPDES permits, and as applicable hold stormwater plans.

- Underground Injection Control (UIC wells) regulations and permitting.
  - Manages proper disposal underground of certain appropriate oil and gas hydrocarbon and water wastes pursuant to EPA regulatory requirements.

- Wetlands protection – Clean Water Act § 404 permit requirements govern pipeline construction and facility siting (USACE).

- Landfill disposal requirements and waste management regulations/permitting.

### 4. Emissions Reporting

- Toxic Substances Control Act, the Emergency Planning and Community Right to Know Act, and the Superfund Amendments and Reauthorization Act (Title III) contain requirements for air pollutants, federal greenhouse gas reporting requirements (Subpart W), state/federal release reporting, and state emissions reporting (APEN forms).

### B.  Location Regulation (Local)

- Local governments exercise land use authority to provide certain regulation on natural gas and petroleum pipelines. It should be noted that regulations vary based on the county; however, the pipeline approval process usually falls into two permitting categories.
  - Special use permit- *May* be subject to approval by the Board of County Commissioners (BCC). If the diameter of the pipeline is less than 10", the hoop stress is less than 20%, and the pipeline is not in proximity to residences or other sensitive areas it is considered, by some counties, a "minor facility". If the pipeline is deemed a minor facility then the permit can be determined administratively, without BCC review, once the pipeline company submits the proper information to the planning commission.

- Conditional use permit- Must be approved by the Board of County Commissioners. Some counties consider conditional use permits for "major facilities". Pipelines determined to be a "major facility" typically have a diameter greater than 10", a hoop stress greater than 20%, and are in proximity to residences or other sensitive areas. Requirements include notification to adjacent landowners, legal notification in a public newspaper, and a public hearing. Some counties use their authority to identify, designate, and regulate areas and activities of state interest through their local permitting process prior to their decision (commonly referred to as 1041 powers).
- Most counties require pipeline companies to submit copies of federal regulators' approval permits, copies of landowner lease agreements, and additional materials.

## III. Safety

## A. Pipeline Safety

### 1. General Framework
- Pipeline safety is governed by federal law – Federal statutes and regulations, CFR 49 Parts 190 – 199, prescribe comprehensive pipeline safety standards for the pipeline transportation of natural gas and hazardous liquids.

- Interstate vs. intrastate pipelines, gas vs. liquid – PHMSA has exclusive jurisdiction over all aspects of *interstate* transmission pipeline safety.  For *intrastate* natural gas or hazardous liquids transmission and gathering pipelines, jurisdiction may be delegated to the states pursuant to a certification agreement between the U.S. DOT and the state.  In Colorado:
  - PHMSA directly regulates all **intrastate** hazardous liquid pipelines (including regulated rural gathering) and all **interstate** natural gas and hazardous liquid pipelines.
  - COPUC regulates all **intrastate** natural gas transmission, distribution, and gathering pipelines, pursuant to CRS § 40-2-115(1.5).  COGCC has no jurisdiction over pipeline safety, although it does regulate exploration and production flowlines operated by oil and gas producers from the well to the metering point.

- Federal preemption – Under federal law, states that assume jurisdiction may not adopt additional safety standards that are incompatible with the minimum federal safety standards.

### 2. Pipeline Safety Regulations
- Federal regulations prescribe comprehensive minimum safety requirements for the transportation of gas and hazardous liquids by pipeline.  See 49 CFR Parts 191 and 192 (gas) and Part 195 (hazardous liquids).  Specifically, these regulations govern:
  - Pipe materials and design, design of pipeline components, welding and other methods of joining, construction requirements, customer meters and service lines, corrosion control, testing, up rating, operations, maintenance, personnel qualifications, and integrity management.

10

- o This risk-based regulatory regime recognizes that pipelines located in populated areas, environmentally sensitive areas and High Consequence Areas (HCAs) require more stringent safety standards and practices than pipelines located in largely unpopulated rural areas.
- o As a result of these requirements, transmission pipeline operations are generally remotely monitored and controlled continuously, have extensive leak detection and back-up systems (for example, automate shutdown systems), and conduct regularly-scheduled inspections to monitor internal and external corrosion, third party damage, or construction/manufacturing issues.
- o Gas distribution systems are also subject to risk-based regulations, and operators have distribution integrity management plans that address the major threats to their systems. Most new gas services are installed with an excess flow valve that will shut off the flow of gas if the service is broken.

- State regulations prescribe comprehensive safety requirements for the upstream segment of the pipeline for gas and liquids. See COGCC 1100 Rule Series – Flowline Regulations, Rule 1101. Specifically, these regulations govern:
  - o Pipe materials, design, construction requirements, corrosion control, ground cover, excavation, backfill, reclamation, testing, maintenance, repair, and marking.
  - o Gathering lines with segments subject to safety regulation by PHMSA must prepare and submit an emergency response plan to the COGCC, the county sheriff, and each local government jurisdiction traversed by such pipeline segment.

- All pipelines are subject to one-call response obligations (see "Colorado 811," below) and environmental regulations.

- The federal 2011 Pipeline Safety Act directed PHMSA to study and make recommendations regarding the existing regulatory framework for gathering pipelines; a rulemaking is anticipated in the near future.
  - o Gathering line is defined as:
    - Gas - a pipeline that transports gas from a current production facility to a transmission line or main.
    - Liquid - a pipeline 219.1 mm (8 5/8 in) or less nominal outside diameter that transports petroleum from a production facility.

- For natural gas, Part 192 applies to all transmission pipelines, but is applied differently to the two general classes of gathering pipelines:
  - o *Non-rural* gathering pipelines (located in Class 2, 3 and 4 areas; see below) are subject to all transmission pipeline regulatory requirements except integrity management.
  - o *Rural* gathering pipelines (located in Class 1 areas) are not regulated under the federal standards, but are subject to the incident-reporting and pipeline marking requirements under COPUC regulations.
  - o This classification system for gas gathering pipelines considers (a) the type of material (metallic or non-metallic) and designed pressure rating of the pipe itself, and (b) the

11

"class" location of the pipeline, which is based upon the proximity of the gathering pipeline to buildings intended for human occupancy (class locations range from Class 1 (very rural) to Class 4 (urban)).

- Note that: Pipeline operators annually survey development activity in and around pipeline locations in order to identify changes in class categories.  If development around a rural Class 1 location causes a change in class category, additional safety regulation requirements are triggered.

- For hazardous liquid, Part 195 applies to all non-rural pipelines, but is applied differently to the two general classes of rural pipelines:
  - Regulated rural gathering pipelines meeting all of the following criteria:
    - Diameter from 6.625" to 8.625"
    - Located within ¼ mile of an unusually sensitive area ("USA")
    - Operates above 20% specified minimum yield strength (SMYS)
  - Low stress pipelines:  pipelines operating below 20% specified minimum yield strength (SMYS)
    - Category 1 (integrity management applies) – located within ½ mile of USA and larger than 8.625" diameter
    - Category 2 (integrity management applies) – located within ½ mile of USA (less than 8.625" diameter)
    - Category 3 – all other pipelines, no integrity management program (IMP) required

### 3. High Consequence Areas and Unusually Sensitive Areas

Under both Part 192 and Part 195, PHMSA requires pipeline operators to identify locations along a pipeline route where a pipeline release could have the most significant adverse consequences to human health and safety and the environment.  Additional regulatory requirements apply to these areas as part of an operator's integrity management program.

- Gas transmission pipelines – High Consequence Areas (HCAs) are identified solely on the density of population within a certain distance of the pipeline which correlates to the area potentially impacted by a breach or failure.  The distance is determined based on the physical and operational characteristics of the pipeline.  A large, high pressure pipeline will have a larger area of impact than a smaller, low pressure pipeline.
- Liquid pipelines – HCAs/USAs are identified based upon the proximity of the pipeline to drinking water sources and unusually sensitive ecological resources, and where the pipeline passes through an area of high population density.

### 4. Colorado 811 – "Call Before You Dig" Regulation

- The primary cause of distribution pipeline safety incidents is excavation damage.
- While pipelines are generally well-marked to prevent damage from digging, and the public can find pipeline location information using the National Pipeline Mapping System, the Colorado 811 program is the primary means by which pipeline accidents can be prevented.

- Colorado 811 is governed by both federal and state law, and is administered by the Utility Notification Center of Colorado (Colorado 811).
- Under State statute, operators/owners of underground facilities, third-party excavators, and the public are obligated to call 811 to submit a utility locate request prior to excavation activities:
  - Obligation to communicate and train the public on hazards associated with underground utilities, and the requirement to "call before you dig" per state law,
  - Obligation of public to call before you dig, and wait three days, and
  - Obligation of utility operators to respond and locate lines within three days.

- Pipeline operators must develop and implement a written continuing public education program that includes provisions to educate the public, appropriate government organizations, and persons engaged in excavation on the use of the Colorado 811 program.
- Pipeline operators must also inspect (via flying, walking, driving or other means) surface conditions on or adjacent to pipeline rights-of-way at regular intervals to ensure the integrity of rights-of-way.

## B. Worker Safety

- Process Safety Management (OSHA) (see 29 CFR 1910.119)
  - Unexpected releases of toxic, reactive, or flammable liquids and gases in processes involving highly hazardous chemicals have been reported for various industries that use chemicals with such properties. Regardless of the industry that uses these highly hazardous chemicals, there is a potential for an accidental release any time they are not properly controlled.
  - To help ensure safe and healthful workplaces, OSHA has issued the Process Safety Management of Highly Hazardous Chemicals standard at 29 CFR 1910.119, which contains requirements for the management of hazards associated with processes using highly hazardous chemicals.
  - Process Safety Management (PSM) is addressed in specific standards for the general and construction industries. OSHA's standard emphasizes the management of hazards associated with highly hazardous chemicals and establishes a comprehensive management program that integrates three broad dimensions:
    - Facilities that manufacture and handle hazardous materials,
    - Technology of the processes employed, and
    - Personnel who operate, maintain, and support the process.
  - PSM, for covered midstream gas processing facilities, defines 14 "elements" of PSM that are interlinked and interdependent.  Each element either contributes information to other elements for the completion or utilizes information from other elements in order to be completed.  These 14 elements include:
    - Process safety information; process hazard analysis; operating procedures; training; contractors; mechanical integrity; hot work; management of change; incident investigation; compliance audits; trade secrets; employee participation; pre-startup safety review; and emergency planning and response.

- Risk Management Plans (EPA-administered, *see* Clean Air Act Amendments of 1990, § 112(r))
  - The Clean Air Act Amendments of 1990 required the EPA to promulgate regulations and guidance for chemical accident prevention at facilities that use extremely hazardous substances. The Risk Management Plan (RMP) rule builds upon existing industry codes and standards, and requires companies of all sizes that use certain flammable and toxic substances to develop and submit to the EPA an RMP that includes:
    - A hazard assessment that details the potential effects of an accidental release, an accident history of the last five years, and an evaluation of worst-case and alternative accidental releases;
    - A prevention program that includes safety precautions and maintenance, monitoring, and employee training measures; and
    - An emergency response program that spells out emergency health care, employee training measures and procedures for informing the public and response agencies, should an accident occur.

- Equipment and Activity Safety Standards (OSHA)
  - Governs construction safety, trenching and shoring, personnel protective equipment, fall protection, hearing protection, hazardous materials training and protection.

## IV. Emergency Local Response

Colorado Revised Statute §29-22-102 (1) provides for the designation of emergency response authorities (DERAs) for hazardous substance incidents. Once designated, a DERA is responsible for providing and maintaining the capability for emergency response to a hazardous materials incident occurring within its jurisdiction. A DERA may provide and maintain that capability directly or through mutual aid and other agreements. Under Colorado statute, "emergency response to a hazardous substance incident" means taking the initial emergency action necessary to minimize the effects of a hazardous substance incident. Initial emergency action to minimize the effects ordinarily includes confining, containing, and controlling the product involved.

The identification of a DERA can normally be determined by relying on the following general principles:

- Where a spill or discharge actually occurs will determine the DERA. The location of the events that lead to a spill or discharge is not relevant; the DERA is dependent on the place of spill or discharge

- The Colorado State Patrol is the DERA for spills or discharges that occur within the boundaries of any publicly maintained highway not within a municipality's corporate limits.

- For spills or discharges that occur within the boundaries of a town, city, or city-county, the fire department is typically the DERA. These local governments will typically

designate a DERA by ordinance or resolution. In the absence of action by the local government, the fire department is deemed to be the DERA by default. However, another entity may be designated the DERA by ordinance or resolution.  For example, Weld County designated its Office of Emergency Management (OEM).  The Weld County OEM coordinates with pipeline operators and first responders in the event of a pipeline incident.

- Except for those spills or discharges that occur within the boundaries of any publicly maintained highway or within the limits of a municipality, the sheriff is typically the DERA. In the absence of such action the county sheriff is the DERA by default. However, another entity may be designated the DERA by ordinance or resolution by the relevant local government.

    - Note: By agreement, the Colorado State Patrol is not the DERA for spills or discharges occurring within the boundaries of publicly maintained highways in Arapahoe, Larimer and Mesa Counties.

- Spills or discharges occurring on private property are the responsibility of the property owner, who must either notify the pertinent DERA (municipality or county) and coordinate a response or develop a response independently.

DERAs coordinate with other local emergency response officials to respond to pipeline incidences.  Appendix F details two separate incident response scenarios.

## V. Agency Contact Information

**Bureau of Land Management**
BLM
(303) 236-7991
http://www.blm.gov

**Colorado Department of Public Health and Safety/Air Quality Control Commission**
CDPHE/AQCC
(303) 692-2000
www.colorado.gov/cdphe

**Colorado Emergency Planning Commission**
Local LEPCs

**Colorado Fire Protection Association**
Local fire districts
http://www.cofireprotection.org/contact-fire-districts.html

**Colorado Oil and Gas Conservation Commission**
COGCC
(303) 894-2100
Local Government Designees
www.colorado.gov/cogcc

**Colorado Public Utilities Commission**
COPUC
(303) 894-2854
http://cdn.colorado.gov/cs/Satellite/DORA-PUC/CBON/DORA/1251614750747

**Colorado State Patrol**
CSP
(303) 239-4501
http://cdpsweb.state.co.us/

**National Response Center**
NRC
1-800-368-5642
1-800-424-8802

**Pipeline and Hazardous Materials Safety Administration**
PHMSA
(202) 366-4433

16

**State Emergency Response Commission**
SERC

    Jack Cobb
    Colorado Dept. of Public Safety, Office of Emergency Management
     (720) 852-6603

    Greg Stasinos
    CDPHE
    (303) 692-3023

    Dave Hard
    Colorado Dept. of Public Safety, Office of Emergency Management
    (720) 852-6611

## List of Appendices

Appendix A-1
     Natural Gas Pipeline Systems Visual

Appendix A-2
     Petroleum Pipeline Systems Visual

Appendix B-1
     Sample Colorado Non-USDOT Release Reporting Matrix

Appendix B-2
     Sample Colorado USDOT Release Reporting Matrix

Appendix C
     COGCC Pipeline Release Response Procedure

Appendix D
     PHMSA/COPUC Pipeline Accident/Incident Reporting Processes

Appendix E
     Air Pollution Control Division Malfunction Requirements

Appendix F
     Local Incident Response Scenarios

**Acknowledgements**

Many thanks to the following agencies and organizations who contributed to the development of this document:

The final version will include logos from:  Williams, CCI, DOT/PHMSA, DNR, PUC, CDPHE, Colo. Petroleum Association, Black Hills, Garfield County and DCP Midstream (once waiver is signed).

**Appendix A-1**
*Natural Gas Pipeline Systems*



Figure 2 Natural Gas Pipeline Systems: From the Wellhead to the Consumer

**Appendix A-2**
*Petroleum Pipeline Systems*



Figure 3 Petroleum Pipeline Systems: From the Wellhead to the End User

# Sample Colorado Non-USDOT Release Reporting Matrix (Non-Tribal Lands)

DRAFT

A release of any size on a non-regulated DOT facility or pipeline
Natural gas or VOC release to the atmosphere
Liquid release
Evaluate any Natural Gas or VOC emissions to the atmosphere
E&P Exempt Substance
In Secondary Containment or Structure
No Threats to Impact Waters of the United States (as defined per 40 CFR 110)
Threats to Impact Groundwater
Report Immediately to COGCC**, LEPC, and Surface Owner or Lessee*. Optional courtesy reports may be made to State Police, FPD, & LGD
Submit COGCC Form 19 within 3 days of discovery (if an initial Form 19 was not previously submitted)
Submit a supplemental COGCC Form 19 within 10 days of discovery
No Threats to Impact Groundwater
≥ 5 bbls (≥ 210 gallons)
Report within 24 hours of discovery to COGCC, LEPC, and Surface Owner or Lessee*. Optional courtesy reports may be made to State Police, FPD, & LGD
Submit COGCC Form 19 within 3 days of discovery (if an initial Form 19 was not previously submitted)
Submit a supplemental COGCC Form 19 within 10 days of discovery
If the Reportable Quantity (RQ) of a CERCLA Hazardous Substance is met or exceeded, report verbally within 24 hours of discovery to NRC. Optional courtesy reports may be made to CDPHE, FPD, LGD, and State Police, in addition to COGCC, LEPC, Surface Owner or Lessee*. Consider the Petroleum Exclusion
Threats to Impact Waters of the United States (as defined per 40 CFR 110)
Report Immediately to COGCC, NRC, CDPHE, LEPC, and Surface Owner or Lessee*. Optional courtesy reports may be made to State Police, FPD, & LGD
Submit COGCC Form 19 within 3 days of discovery (if an Initial Form 19 was not previously submitted)
Submit a supplemental COGCC Form 19 within 10 days of discovery
Not In Secondary Containment or Structure
No Impacts or Threats to Impact Waters of the United States (as defined per 40 CFR 110)
Impacts or Threats to Impact Groundwater
Report immediately to COGCC**, LEPC, and Surface Owner or Lessee*. Optional courtesy reports may be made to State Police, FPD, & LGD
Submit COGCC Form 19 within 3 days of discovery (if an Initial Form 19 was not previously submitted)
Submit a supplemental COGCC Form 19 within 10 days of discovery
No Impacts or Threats to Impact Groundwater
≥ 1 bbl (≥42 gallons)
Report within 24 hours of discovery to COGCC, LEPC, and Surface Owner or Lessee*. Optional courtesy reports may be made to State Police, FPD, & LGD
Submit COGCC Form 19 within 3 days of discovery (if an Initial Form 19 was not previously submitted)
Submit a supplemental COGCC Form 19 within 10 days of discovery
If the Reportable Quantity (RQ) of a CERCLA Hazardous Substance is met or exceeded, report verbally within 24 hours of discovery to NRC. Optional courtesy reports may be made to CDPHE, FPD, LGD, and State Police, in addition to COGCC, LEPC, Surface Owner or Lessee*. Consider the Petroleum Exclusion.
Impacts or Threats to Impact Waters of the United States (as defined per 40 CFR 110)
Report immediately to COGCC, NRC, CDPHE, LEPC, and Surface Owner or Lessee*. Optional courtesy reports may be made to State Police, FPD, & LGD
Submit COGCC Form 19 within 3 days of discovery (if an Initial Form 19 was not previously submitted)
Submit a supplemental COGCC Form 19 within 10 days of discovery
Non - E&P Exempt Substance
No Impacts or Threats to Impact Waters of the United States (as defined per 40 CFR 110)
Impacts or Threats to Impact Groundwater
Report Immediately to CDPHE. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to LEPC, FPD, State Police, & LGD
No Impacts or Threats to Impact Groundwater
≥ 20 bbls (≥840 gallons)
Report verbally within 24 hours of discovery to CDPHE. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to LEPC, FPD, State Police, & LGD
If the Reportable Quantity (RQ) of a CERCLA Hazardous Substance is met or exceeded, report verbally within 24 hours of discovery to NRC. Optional courtesy reports may be made to LEPC, FPD, Sate Police, and LGD, In addition to CDPHE. Assess surface owner or lessee reporting requirements*. Consider the Petroleum Exclusion.
Impacts or Threats to Impact Waters of the United States (as defined per 40 CFR 110)
Immediately report to NRC and CDPHE***. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD
Determine if the emissions exceed a reporting threshold (consider permitted emissions and landowner requirements*, if any)
If emissions exceed a reporting threshold, report to the CDPHE Malfunction/Upset Reporting Hotline by 12PM the following business day ***
If the Reportable Quantity (RQ) of a CERCLA Hazardous Substance is met or exceeded, report verbally within 24 hours of discovery to NRC. Optional courtesy reports may be made to CDPHE, State Police, LEPC, LGD, & FPD. Consider the Petroleum Exclusion.
If the release occurred on a non-regulated onshore line, and required the closure of a roadway and/or railroad and/or the evacuation of 50 or more people from a normally occupied building or property, report to CPUC within 2 hours of discovery****

Appendix B-1
Colorado Non-USDOT Release
Reporting Matrix

DRAFT

## GLOSSARY

| | |
|---|---|
| COPUC | **Colorado Public Utilities Commission** |
| CDPHE | **Colorado Department of Public Health and Environment** |
| NRC | **National Response Center** |
| LEPC | **Local Emergency Planning Committee** |
| SERC | **State Emergency Response Commission** |
| FPD | **Fire Protection District** |
| BLM | **Bureau of Land Management** |
| LGD | **Local Government Designee** |
| USDOT | **US Department of Transportation** |
| CERCLA | **Comprehensive Environmental Response, Compensation, and Liability Act** |
| VOC | **Volatile Organic Compound** |

## CONTACT INFORMATION

| | |
|---|---|
| **Colorado Oil and Gas Conservation Commission** | Local COGCC Representative or 1-888-235-1101 |
| **Colorado Department of Public Health and Environment** | 1-877-518-5608 (Emergency Hotline), (303) 692-3155 (Gas Release - Malfunction/Upset Hotline) |
| **National Response Center** | 1-800-424-8802 |
| **Local Government Designees** | http://cogcc.state.co.us/Infosys/lgd/list.cfm |
| **Local Emergency Planning Committees** | http://www.coloradoepc.org/p/local-epcs.html |
| **Fire Protection Districts** | http://www.cofireprotection.org/contact-fire-districts.html |
| **State Police** | (303) 239-4501 |
| **Bureau of Land Management - Field Offices** | http://www.blm.gov/co/st/en/BLM_Information/directory.html |
| **Colorado Public Utilities Commission** | (303) 894-2854 |

Note: State Emergency Response Commission (SERC) will be contacted via CDPHE.

* **Private Landowners & Leases**

Private landowners may need to be contacted pursuant to a specific lease agreement or requirements.

**BLM Land & Leases - Undesirable Events**

| | |
|---|---|
| ≥ 100 barrels (inside containment) | Written report within 15 days to BLM Field Office |
| ≥ 100 barrels (outside containment) | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| ≥ 10 barrels, < 100 barrels (outside containment) | Written report within 15 days to BLM Field Office |
| Any volume within a Sensitive Area (i.e. waterway, park, refuge, wetland, etc.) | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| ≥ 500 MCF of Natural Gas (vented to atmosphere) | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| > 50 MCF, < 500 MCF of Natural Gas (vented to atmosphere) | Written report within 15 days to BLM Field Office |

** Per the Memorandum of Agreement for the implementation of Senate Bill 181 Amendents, to the Colorado Water Quality Control Act (25-8-101, et seq)

*** Only call if the release meets the Malfunction/Upset criteria, as defined per the Colorado Common Provisions Regulation. Please reference additional reporting requirements within the regulation.

**** Per 49 CFR 192.8, and 4 CCR 723-4 Part 4911.

*Last Revised: 06/09/2014*

# Sample Colorado USDOT Release Reporting Matrix
## (Non-Tribal Lands)




A release of any size on a regulated DOT facility or pipeline

Natural gas or VOC release to the atmosphere

Liquid release

- Fire, explosion that is not intentionally set by the Operator → Immediately report to NRC****. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD → Submit an Accident Report to PHMSA within 30 days of the event**

- ≥ 5 gallons to < 5 barrels hazardous liquid or carbon dioxide release that is caused by a maintenance activity. The release should be reported if it is not confined to property of pipeline ROW, and is not cleaned up promptly → Submit an Accident Report to PHMSA within 30 days of the event***. Assess surface owner or lessee reporting requirements*

- ≥ 5 gallons hazardous liquid or carbon dioxide release, that is caused by a maintenance activity → Submit an Accident Report to PHMSA within 30 days of the event***. Assess surface owner or lessee reporting requirements*

- ≤ 5 barrels hazardous liquid or carbon dioxide release, that is caused by a maintenance activity → Submit an Accident Report to PHMSA within 30 days of the event***. Assess surface owner or lessee reporting requirements*

- Impacts to Waters of the United States*, by a hazardous liquid or carbon dioxide → Immediately report to NRC**** and CDPHE. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD → Submit an Accident Report to PHMSA within 30 days of the event**

- Death and/or Injury Requiring Hospitalization → Immediately report to NRC****. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to State Police, LEPC, LGD, FPD, & OSHA → Submit an Accident Report to PHMSA within 30 days of the event**

- Estimated property damage, including cost of clean up, and value of lost product, exceeds $50,000 → Immediately report to NRC****. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD → Submit an Accident Report to PHMSA within 30 days of the event**

- If the Reportable Quantity (RQ) of a CERCLA Hazardous Substance is met or exceeded, report verbally within 24 hours of discovery to NRC. Assess surface owner or lessee reporting requirements*. Optional courtesy reports may be made to CDPHE, State Police, LEPC, LGD, & FPD. Consider the Petroleum Exclusion.

Evaluate any Natural Gas or VOC emissions to the atmosphere

Determine if the emissions exceed a reporting threshold (consider permitted emissions and landowner requirements*, if any)

- If emissions exceed a reporting threshold, report to the CDPHE Malfunction/Upset Reporting Hotline by 12PM the following business day*****

- If the Reportable Quantity (RQ) of a CERCLA Hazardous Substance is met or exceeded, report verbally within 24 hours of discovery to NRC. Optional courtesy reports may be made to CDPHE, State Police, LEPC, LGD, & FPD. Consider the Petroleum Exclusion.

Release of gas from a pipeline, or of liquified natural gas, liquified petroleum gas, refrigerant gas, or gas from a LNG facility

- Estimated property damage of $50,000 or more (excludes cost of gas lost)**** → Immediately report to NRC and COPUC. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD → Submit an Incident Report to PHMSA within 30 days of the event. Additionally, submit report to COPUC if an intrastate pipeline is involved

- Death and/or Injury Requiring Hospitalization**** → Immediately report to NRC and COPUC. Optional courtesy reports may be made to State Police, LEPC, LGD, FPD, & OSHA → Submit an Incident Report to PHMSA within 30 days of the event. Additionally, submit report to COPUC if an intrastate pipeline is involved

- ≥ 3 million cubic feet of unintentional gas loss**** → Immediately report to NRC and COPUC. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD → Submit an Incident Report to PHMSA within 30 days of the event. Additionally, submit report to COPUC if an intrastate pipeline is involved

- Emergency shutdown of a LNG facility**** → Immediately report to NRC and COPUC. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD → Submit an Incident Report to PHMSA within 30 days of the event. Additionally, submit report to COPUC if an intrastate pipeline is involved

- Evacuation of ≥ 50 people from a normally occupied building or property****** → Immediately report to COPUC. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD

- Closure of a roadway or railroad***** → Immediately report to COPUC. Optional courtesy reports may be made to State Police, LEPC, LGD, & FPD

## GLOSSARY

| | |
|---|---|
| COPUC | Colorado Public Utilities Commission |
| USDOT | US Department of Transportation |
| CDPHE | Colorado Department of Public Health and Environment |
| NRC | National Response Center |
| OSHA | Occupational Safety & Health Administration |
| LEPC | Local Emergency Planning Committee |
| SERC | State Emergency Response Commission |
| FPD | Fire Protection District |
| BLM | Bureau of Land Management |
| LGD | Local Government Designee |
| PHMSA | Pipeline Hazardous Materials Safety Administration |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| LNG | Liquified Natural Gas |
| VOC | Volatile Organic Compound |

## CONTACT INFORMATION

| | |
|---|---|
| Colorado Public Utilities Commission | (303) 894-2854 |
| Colorado Department of Public Health and Environment | 1-877-518-5608 (Emergency Hotline), (303) 693-3156 (Gas Release - Malfunction/Upset Hotline) |
| National Response Center | 1-800-424-8802 |
| Occupational Safety & Health Administration | (303) 844-5600, (720) 264-6550 |
| Local Emergency Planning Committees | http://www.coloradoepc.org/p/local-epcs.html |
| Fire Protection Districts | http://www.csfreprotection.org/contact-fire-districts.html |
| State Police | (303) 239-4501 |
| Bureau of Land Management - Field Offices | http://www.blm.gov/co/st/en/BLM_Information/directory.html |
| Local Government Designees | http://copuc.state.co.us/Interps/lgd-list.cfm |

Note: State Emergency Response Commission (SERC) will be contacted via CDPHE.

* Private Landowners & Leases

| | | |
|---|---|---|
| Private landowners may need to be contacted pursuant to a specific lease agreement or requirements. | | |
| BLM Land & Leases - Undesirable Events | | |
| ≥ 100 barrels   (inside containment) | | Written report within 15 days to BLM Field Office |
| ≥ 100 barrels   (outside containment) | | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| ≥ 10 barrels, < 100 barrels   (outside containment) | | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| Any volume within a Sensitive Area (i.e. waterway, park, refuge, wetland, etc.) | | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| ≥ 500 MCF of Natural Gas (vented to atmosphere) | | Verbal report within 24 hours to BLM Field Office, Written report within 15 days to BLM Field Office |
| > 50 MCF, < 500 MCF of Natural Gas (vented to atmosphere) | | Written report within 15 days to BLM Field Office |

** As defined per 49 CFR 118
*** As defined per 49 CFR 195
**** As defined per 49 CFR 191
***** As defined per 4 CCR 723-4 Part 4511
****** Only call if the release meets the Malfunction/Upset criteria, as defined per the Colorado Common Provisions Regulation. Please reference additional reporting requirements within the regulation.

Last Revised: 06/03/2014

**Appendix C**
*COGCC Pipeline Release Response Procedure*

### COGCC Pipeline Release Response Procedure

When COGCC is notified of a reportable release associated with a pipeline the following procedures are followed similar to other reportable spill reports received:

1. COGCC requests the operator submit a Form 19 within the appropriate reporting period in accordance with Rule 906.b.
2. COGCC verifies with the reporting party that the source of the spill has been stopped – that the source has been terminated or the leaking line segment has been isolated.
3. If the source has not been stopped, COGCC verifies that emergency response measures are in progress to control the release.
4. COGCC makes preliminary determination with reporting party if groundwater, domestic water wells or surface water have been impacted or threatened.
5. COGCC verifies that all appropriate parties have been notified – surface owner, CDPHE, NRC, local government.
6. COGCC field staff will respond as needed to document spill conditions and provide regulatory oversight.
7. If not already performed, COGCC directs operator to expose leaking segment of line, and when safe, to remove all subsurface impacts.
8. After source material surrounding the release has been removed, COGCC requires the operator collect confirmation soil samples, and if appropriate, groundwater samples to verify compliance with Table 910-1 standards in accordance with Rule 909 Site Investigation, Remediation and Closure requirements.
9. If release was limited in extent, no groundwater or surface water were impacted and contaminated soil is easily removed and properly treated or disposed, COGCC will request supporting closure documentation and close the Spill Report.
10. If release was extensive requiring significant follow-on remediation or if groundwater or surface water were impacted by release, COGCC will request a Form 27 Site Investigation and Remediation Workplan.
11. In either case (8 or 9), COGCC will request documentation that verifies compliance with Table 910-1 standards for affected media and waste disposal documentation prior to final closure.
12. COGCC requires that any resulting surface damage be properly reclaimed in accordance with the 1000 Series Reclamation Regulations or that surface improvements are repaired to pre-existing conditions.
13. COGCC may request documentation that the operator was in compliance with Rule 1101.e. regarding pressure testing of flowlines.  COGCC may also request verification that the repaired line or replaced line meets pressure testing requirements prior to return to service.
14. COGCC field staff will respond as needed to verify that remediation and surface reclamation were performed as reported.

**Appendix D**
*PHMSA/COPUC Pipeline Accident/Incident Reporting Processes*

<u>**PHMSA/COPUC Pipeline Accident/Incident Reporting Processes**</u>:

1.      **Telephonic Reporting incidents/accidents.**

**"Incident" is defined by PHMSA as a release of gas and resulting in: death, injury, property damage > $50,000, or an unintentional release of gas loss of > three million cubic feet.**

**"Accident" is defined by PHMSA as a failure resulting in the release of a hazardous liquid or carbon dioxide and resulting in: explosion or fire, death, injury, property damage including clean up and recovery > $50,000, release of > 5 gallons outside of company property or pipeline right-of-way or a release not cleaned up promptly, or results in the pollution of a stream/body of water.**

- National pipeline safety regulations require transportation pipeline operators of natural gas and hazardous liquid to report any Incident (gas) or Accident (liquid) to the National Response Center of the Department of Transportation (NRC).  An incident and accident telephonic report is defined within its respective code (49 CFR 192/195).
- The NRC automatically forwards the reported information to all federal and state agencies who have registered to receive that information.  Individual agencies will initiate a response based on their statutory authority/mission.
- PHMSA responds to an accident occurring on a hazardous liquid pipeline and interstate gas pipeline incidents.
- The COPUC responds to an intrastate gas pipeline incident and also requires intrastate gas operators to report  certain "events" when a gas leak occurs on a gas pipeline.  A reportable COPUC "Event" occurs when there is a release of gas and an evacuation of $\geq$ 50 people from a normally occupied building, the closure of a roadway or railroad, or when an evacuation of a master metered gas system such as a trailer park occurs.
- Unless specific reasons warrant, an inspector will respond to an incident/accident when any death, injury, or explosion related to natural gas facility occurs.  An investigation is initiated with the primary goal of determining if a violation of 49 CFR Parts 192 or 195 occurred.

2.      **Written Reports:**

A written report is required to be submitted to PHMSA within 30 days of an accident or incident.  COPUC also requires a copy of the PHMSA report when an intrastate natural gas pipeline is involved.

*Appendix E*

*Air Pollution Control Division Malfunction Requirements*

Air Pollution Control Division Malfunction Requirements

1. The excess emissions were caused by a sudden, unavoidable breakdown of equipment, or a sudden, unavoidable failure of a process to operate in the normal or usual manner, beyond the reasonable control of the owner or operator;

2. The excess emissions did not stem from any activity or event that could have reasonably been foreseen and avoided, or planned for, and could not have been avoided by better operation and maintenance practices;

3. Repairs were made as expeditiously as possible when the applicable emission limitations were being exceeded.

4. The amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

5. All Reasonably possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

6. All emissions monitoring systems were kept in operation (if at all possible);

7. The owner or operator's actions during the period of excess emissions were documented by properly signed, contemporaneous operating logs or other relevant evidence;

8. The excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance;

9.  At all times, the facility was operated in a manner consistent with good practices for minimizing emissions. This Section II.E.1.i. of the Common Provisions is intended solely to be a factor in determining whether an affirmative defense is available to an owner or operator, and shall not constitute an additional applicable requirement; and

10.  During the period of excess emissions, there were no exceedances of the relevant ambient air quality standards established in the Commissions' Regulations that could be attributed to the emitting source.

*Appendix F*
*Local Incident Response Scenarios*

Local Incident Response Scenarios

## 1.   General Local Hazmat Spill Response Process

A spill occurs and local governments ask the follow questions:

1. Who is responding to the spill?  Dispatch sends appropriate resources to scene.
2. Are they capable of handling the response?
3. What jurisdiction is the spill located in?
4. Who is the DERA for this incident?

Local governments assess the scene, what may have spilled and how much:

1. Identification of the product spilled, how much has leaked and how much is left?
2. Try to stop leak and/or contain the spill.
3. Is it close to a water way or water intake?  If so, notify downstream water users.
4. Contact County, State, EPA, Coast Guard (water ways), Public Health, Sheriff, COGCC
5. Identify property ownership.
6. Who spilled the product?  Are they willing to clean it up?
7. DERA contacts third-party company for clean up, if entity responsible for the spill doesn't have someone they use or are not willing to clean it up.  If no one can be identified as responsible for the spill, it is the DERA's responsibility to get it cleaned up.
8. Once the clean up has started, DERA monitors the progress to make sure it is being cleaned up correctly and efficiently.
9. Contact BOCC, State or City Council about the amount of funds needed to complete clean up.

## 2.   Pipeline Incident Scenario

March 19, 2014, 1700 Hrs, a call into police dispatch center indicating a natural gas gathering line was hit by a company drilling in the area and gas is venting. The area is rural, agricultural, with other Oil and Gas facilities in the area. There are several homes within ¾ of a mile.

The local fire department has been dispatched to the call and is enroute.  The Sheriff's Office is notified of the call. Once the Fire Department gets on scene they set up incident command and are working to identify the gas line that was hit to get it shut down. While talking with the drilling company that hit the line, the Fire Department is advised that according to locate information there should not be any pipelines in the area.

At 1715 the Sheriff's Office is requested to help with road blocks in the area due to the gas line that is still venting. One of the Captains with the Sheriff's Office hears the call and contacts Dispatch by phone and gets the information on the original call, the Captain issues an evacuation reverse 9-1-1 for the area. Deputies set up road blocks at intersections one mile away from the location of the leak.

1720 hrs, the Fire Department is working to have local Gas Operators included with incident command but they are having trouble getting through the road blocks.

At 1730 the gas line is shut down and was identified as an old line that had not been mapped but was still active.

**Questions to improve incident response:**

How do local governments improve coordination of First Responders and industry in incident command?

How do local governments improve access of industry partners past roadblocks, and communicate this to First Responders?

How do local governments help responders understand the risk associated with gas leaks, as they determine a response of community evacuation vs shelter in place? How do local governments communicate this to citizens and help First Responders understand the process?



# Natural Gas Pipelines

*Excerpt from Report 2 of the Pennsylvania Energy Impacts Assessment*

December 16, 2011

Authors: Nels Johnson, Tamara Gagnolet, Rachel Ralls, and Jessica Stevens

The Nature Conservancy – Pennsylvania Chapter

*The Nature Conservancy gratefully acknowledges generous financial support for this assessment from the Heinz Endowments, the R.K. Mellon Foundation, and the William Penn Foundation.*

## Natural Gas Pipelines

An extensive web of pipelines is needed to collect gas from well sites and transport it to storage areas and major markets. Even before Marcellus shale natural gas development started, Pennsylvania had over 8,600 miles of large diameter interstate and intrastate gas pipelines (8th highest in U.S.), due to the Commonwealth's long history of oil and gas production, its existing gas storage sites in depleted gas reservoirs, and its location between gas production areas and major northeastern markets (USDOE, 2011). Current and future Marcellus gas development will dramatically increase the miles of large diameter gas pipelines in the state. The two most important reasons for the pipeline expansion are the large number Marcellus well sites that are likely to be developed over the next two decades and the transport lines needed to get growing volumes of shale gas – from various formations – delivered to different parts of the country (INGAA, 2011).  Although pipelines are buried, their construction, monitoring, and maintenance require clearing and maintaining open rights-of-way. While their widths vary, pipeline rights-of-way often create a significant and permanent fragmenting feature through natural habitats. Extensive soil disturbance during construction can also increase the risk of erosion and sedimentation if controls are not carefully designed and implemented. This assessment looks closely at pipeline development associated with Marcellus gas development in Bradford County, Pennsylvania, to better understand the potential scale and scope of statewide habitat impacts.

## What Is Natural Gas Transmission?

The vast majority of natural gas gets to markets through pipelines, though some related products—including propane and butane—are transported in pressurized tanks via rail and trucks. Natural gas transportation infrastructure consists of **gathering lines** which take the gas from each well to a **transport line** which takes the gas either to another transport line (sometimes called "mid-stream" lines) or directly to markets (often referred to as "interstate" lines).  This report does not address service lines that take gas from storage areas or transport lines directly to commercial, industrial, and residential consumers.  In the Marcellus region, gathering lines may range from 6 to 24 inches in diameter and may clear rights-of-way (ROW) of 30 to 150 feet wide. These are much larger than gathering lines used in shallow gas fields, which generally range from 2 to 6 inches in diameter. Transport lines vary in size, generally ranging from 24 to 36 inches in diameter, and have right-of-way widths of up to 200 feet, depending on the size and number of lines. At various points along the pipeline, including at line junctions, compressor stations pressurize the natural gas to ensure a continuous and regulated flow. This report assesses the spatial footprint and scenarios for future expansion of gathering lines.  Gathering lines are likely to comprise by far the greatest extent of new large diameter pipeline constructed in Pennsylvania during the next 20 years.



Gathering pipeline construction in Bradford County, PA © Nels Johnson /TNC

## Current and Projected Natural Gas Pipeline Development

An estimated 8,600 miles of large diameter natural gas pipeline already crossed Pennsylvania before Marcellus development began (USDOE, 2008).  This number is changing rapidly as pipelines are installed to move large volumes of Marcellus natural gas to markets.  Unfortunately, there is no statewide source of data on new pipelines, including the expanding web of Marcellus gathering pipelines. Given the fast pace of Marcellus development and lack of a centralized regulatory framework for gathering pipelines, we recognize the many challenges associated with maintaining an accurate and updated pipeline dataset.

The Bradford County Office of Community Planning and Grants is tackling that challenge and maintains one of the best available datasets representing built and proposed gas pipelines. As of November 2011, Bradford County has Pennsylvania's highest number of permitted (almost 2,000) and drilled (781) Marcellus gas wells (DEP, 2011a) and has over 500 miles of built and proposed gas pipelines (Bradford County, 2011) (see Figure 1).  Given the dearth of statewide datasets, we used gas pipeline data from Bradford County as a case study to develop statewide projections of gathering gas pipeline development.



Figure 1. Marcellus gas development in Bradford County, PA, including wells and pipelines. Data sources are the Pennsylvania Department of Environmental Protection and Bradford County Geographic Information Systems.

Using Bradford County data, we estimated the average gathering pipeline length for each well pad by counting all well pads within one-half mile of an existing or proposed gathering pipeline (263 well pads) and dividing them by the total distance of existing and proposed gathering pipelines (434 miles).  Well pads further than one-half mile were considered unlikely to be connected to existing and proposed pipelines and would likely connect through future proposed pipelines. The result is an average of 1.65 miles of gathering pipeline for each Marcellus well pad.  Although the entire network of wells and gathering pipelines will take years to complete, the density of development in Bradford County is one of the highest in Pennsylvania. The ratio of pipelines to pads may be higher in other counties where gas development is more dispersed.

Based on an average of 1.65 miles of gathering pipeline per pad, we used Marcellus pad projections from Report 1 to estimate the length of new gathering pipelines that could be expected under each of

the development scenarios. Six thousand Marcellus pads are projected under the low development scenario, resulting in the construction of approximately **10,000 miles** (6,000 pads x 1.65 miles/pad) of new gathering pipeline by 2030 in Pennsylvania alone. The medium development scenario projects ten thousand new Marcellus pads, resulting in **16,500 miles** (10,000 pads x 1.65 miles/pad) of new gathering pipeline by 2030. Finally, under the high development scenario, fifteen thousand new pads are projected, which would mean approximately **25,000 miles** (15,000 pads x 1.65 miles/ pad) of new gathering pipeline would need to be added. Even the low scenario would more than double the miles of large diameter natural gas pipeline in Pennsylvania while the high scenario would nearly quadruple the mileage (see total projections of existing and new gathering pipelines in Figure 2, below).



Figure 2.  Projections for total miles of natural gas gathering pipelines under low, medium, and high development scenarios. As of the end of 2010, total gathering pipeline length was approximately 2,000 miles, based on the number of well pads at the time.

We assessed all existing gathering pipelines in Bradford County that were visible in 2010 aerial imagery (from the USDA National Agriculture Imagery Program; see Figure 3 below) and noted the following attributes: (a) the width of the cleared right-of- way, and (b) the land cover type through which the right-of-way passed (forested, agricultural, or existing cleared). We found that cleared rights-of-way were usually 100 feet wide but ranged between 30 to 150 feet. About one third of the mileage for built pipelines was in forest areas, with a somewhat higher portion (44%) for proposed pipelines. About one third of that length was in forest interior areas that were previously at least 300 feet from the edge of

4

the forest patch. In counties with more extensive forest cover and larger forest patches, we can anticipate a higher percentage of gas pipeline mileage will be cutting through forest interior areas.

Given that Bradford County is less forested than Pennsylvania's Marcellus region as a whole, we anticipate that the statewide percentage of pipelines built in forest areas will be higher. A conservative estimate would be that 50 percent of all future pipelines will be built in forest areas, or approximately 5,000 miles in the low Marcellus development scenario, 8,250 miles in the medium scenario, and 12,500 miles in the high scenario. Each mile of a 100-foot right-of-way directly disturbs 528,000 square feet or approximately 12 acres and creates an additional 72 acres of new forest edges.

 

Figure 3. A right-of-way cleared for a gathering natural gas pipeline in Bradford County, PA. (Aerial imagery from USDA National Agriculture Imagery Program)

Therefore, we project that statewide forest area cleared from future pipeline development could be approximately 60,000 acres in the low scenario, 100,000 acres in the medium scenario, and 150,000 acres in the high scenario over the next two decades. In addition to these direct impacts, new gathering pipelines will create between 360,000 and 900,000 acres of new forest edges that deprive interior forest species, such as black-throated blue warblers, salamanders, and many woodland flowers, of the shade, humidity, and tree canopy protection that only deep forest environments can provide. We were unable to find any comprehensive plans for new transport lines in Pennsylvania. In general, however, we believe that the length of new gathering lines will dwarf mileage of new transport lines, perhaps by an order of magnitude.

Finally, compressor stations are an important part of natural gas transmission infrastructure. According to Bradford County data from March 2011, there are currently 14 built or proposed compressor stations in the county. Based on an aerial imagery assessment, these sites occupy an average area of slightly over 5 acres each (see Figure 4). Projecting how many compressor stations will be built in Pennsylvania is

difficult at this point in time, but the number is likely to be in the hundreds. Impacts from air emissions and noise pollution at compressor stations are likely to be more significant than land-use impacts.



Figure 4. Natural gas compressor station in Bradford County, PA. (Aerial imagery from USDA National Agriculture Imagery Program, 2010)

## Conservation Impacts of Natural Gas Pipelines

Natural gas pipelines can impact the environment in several ways.  This includes natural habitat loss and fragmentation, changes in species movement, sedimentation, and air emissions.

Rights-of-way for Marcellus gathering lines are generally cleared up to a width of 100 feet, but may be up to 150 or 200 feet if transport lines share the same corridor. After construction is completed, some portion of the right-of-way may be allowed to re-vegetate to trees and shrubs. At least 50 feet of the right-of-way, centered on the pipeline, is generally kept open, though vegetated with grass to minimize erosion and to facilitate monitoring, maintenance and repairs of the pipeline.  This area represents a long-term loss of the cleared habitat.  Even where forest remains, pipeline corridors can fragment large patches of forest into smaller ones (see Box 1, below). The new open corridor inhibits the movement of some species, such as forest interior nesting birds, which are reluctant to cross openings where they are more exposed to predators (Bennett, 2003).  Pipelines, however, can also facilitate the movement of other species, both native and invasive (Transportation Research Board, 2004).

The large amount of soil disturbance involved in laying pipelines also poses erosion and sedimentation risks, particularly in steeper areas, near water bodies, and during heavy rain events. Heavy rains during two tropical storms in August and September 2011 caused extensive failures to erosion and sediment controls on pipelines under construction in north central Pennsylvania (Tanfani & McCoy, 2011). Stream and wetland crossings may create erosion and sedimentation problems, as well, especially with an "open cut" process, and there is a risk of stream bed collapse with "bore crossing" techniques if poorly designed or executed. The "open cut" process uses a trench dug across the stream channel with water temporarily diverted around the trench, while the "bore crossing" technique uses a drill or hydraulic ram to create a bore for the pipeline under the stream. Stream crossings require a permit from the PA Department of Environmental Protection with specific requirements to minimize erosion and sedimentation during and following construction.

> **Box 1.  Large Forest Patches**
>
> Large contiguous forest patches are especially valuable because they sustain wide-ranging forest species, such as northern goshawk, and provide more habitat for "forest interior" species. Habitat fragmentation deprives "interior" forest species—such as black-throated blue warblers, salamanders, and many woodland flowers—of the shade, humidity, and tree canopy protection that only deep forest environments can provide. Large forest patches are also more resistant to the spread of invasive species, suffer less tree damage from wind and ice storms, and provide more ecosystem services—from carbon storage to water filtration—than small patches.

Air emissions from pipelines and compressor stations are another concern, and may include methane, ethane, benzene, tolulene, xylene, carbon monoxide, ozone and other pollutants (DEP, 2011b). High emission levels for some of these pollutants have been detected in the Barnett Shale region of Texas near pipelines and compressor stations and have exceeded human health standards at times (Armedariz, 2009). Short-term monitoring in north central Pennsylvania has detected some of the same pollutants but at lower levels not likely to trigger public health concerns, according to the Pennsylvania Department of Environmental Protection (DEP, 2011b). Air emissions – especially low level ozone – can also affect forest health. The focus of this assessment, however, is on habitat impacts from natural gas pipelines.

The Pennsylvania Marcellus Shale Advisory Commission (MSAC, 2011) recommended that pipeline impacts be reduced by identifying changes needed to:

- Share pipeline capacity  and reduce surface disturbance and related environmental impacts;

- Encourage expansion of existing pipeline capacity and co-location of new capacity with other rights-of-way;

- Improve coordination and consistency of infrastructure planning and siting decisions by state, county and local governments, and;

- Provide authority and resources for government agencies to ensure ecological and natural resource information is used to review siting of pipelines in order to avoid or minimize habitat impacts.

## Key Findings

Key findings from the Pennsylvania Energy Impacts Assessment for natural gas pipelines include:

- Pennsylvania's existing network of large diameter natural gas pipelines (including transport and gathering pipelines) will at least double, and possibly even quadruple, over the next two decades. This expansion will be largely due to a five- to twelve-fold increase in gathering pipeline mileage associated with Marcellus development.

- A low expansion scenario indicates 10,000 miles of new pipelines could be built (based on 6,000 new well pads), a medium scenario projects 16,500 miles (10,000 new well pads), and a high scenario shows up to 25,000 miles (15,000 well pads).  Each new well pad on average requires 1.65 miles of gathering pipeline (based on data from Bradford County);

- Between 120,000 and 300,000 acres will be affected by natural gas pipeline construction, an area larger than the cumulative area affected by all other Marcellus gas infrastructure (e.g., well pads, roads, water containment, and staging/storage areas).  Approximately half of this area is likely to be in forest areas.

- The expanding pipeline network could eliminate habitat conditions needed by "interior" forest species on between 360,000 and 900,000 acres as new forest edges are created by pipeline right-of-ways.  This is substantially greater than the combined forest interior impacts from all other energy types examined in the *Pennsylvania Energy Impacts Assessment*.

## References

Armendariz, A. (2009). Emissions from Natural Gas Production in the Barnett Shale Area and Opportunities for Cost-Effective Improvements. Retrieved from: http://energy.wilkes.edu/PDFFiles/Issues/Air%20Pollution/Air%20barnett%20shale.pdf

Bennett, A.F. (2003). *Linkages in the Landscape:  The Role of Corridors and Connectivity in Wildlife Conservation*.  Retrieved from http://data.iucn.org/dbtw-wpd/edocs/FR-021.pdf

Bradford County, Office of Community Planning and Grants. (2011). [Gas line data as of March 22, 2011]. Current maps available from: http://www.bradfordcountypa.org/Natural-Gas.asp?specifTab=2

Interstate Natural Gas Association of America (INGAA). (2011). North American Gas Midstream Infrastructure Through 2035: A Secure Energy Future.  Retrieved from:
http://www.ingaa.org/Foundation/Foundation-Reports/Studies/14904/14889.aspx

Marcellus Shale Advisory Commission (MSAC). (2011). Governor's Marcellus Shale Advisory Commission Report. Retrieved from:
http://files.dep.state.pa.us/PublicParticipation/MarcellusShaleAdvisoryCommission/MarcellusShaleAdvisoryPortalFiles/MSAC_Final_Report.pdf

Pennsylvania Department of Environmental Protection (DEP). (2011a). 2011 Permit and Rig Activity Report. Retrieved from: http://www.dep.state.pa.us/dep/deputate/minres/OILGAS/RIG11.htm

Pennsylvania Department of Environmental Protection (DEP). (2011b).  Northcentral Pennsylvania Marcellus Shale Short-Term Ambient Air Sampling Report. Retrieved from:
http://energy.wilkes.edu/PDFFiles/Issues/NCMarcellusAirSamplingStudy_Final_5_6_11.pdf

Tanfani, J. & McCoy, C.R. (2011, December 13). Environmentalists and sportsmen raise alarms over pipelines.  *Philadelphia Inquirer*.  Retrieved from:
http://www.philly.com/philly/news/special_packages/inquirer/marcellus-shale/20111212_Environmentalists_and_sportsmen_raise_alarms_over_pipelines.html?cmpid=131298059

Transportation Research Board. (2004). *Transmission Pipelines and Land Use:  A Risk-Informed Approach*.  Transportation Research Board of The National Academies.  Washington, DC.

United States Department of Energy (USDOE), Energy Information Administration. (2008). [Table showing estimated gas pipeline mileage in continental US]. *Estimated Natural Gas Pipeline Mileage in the Lower 48 States, Close of 2008*. Retrieved from:
http://205.254.135.24/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/mileage.html



**United States Government Accountability Office**

Report to Congressional Requesters

**August 2014**

# OIL AND GAS TRANSPORTATION

# Department of Transportation Is Taking Actions to Address Rail Safety, but Additional Actions Are Needed to Improve Pipeline Safety



# GAO Highlights

Highlights of GAO-14-667, a report to congressional requesters

**August 2014**

# OIL AND GAS TRANSPORTATION

## Department of Transportation Is Taking Actions to Address Rail Safety, but Additional Actions Are Needed to Improve Pipeline Safety

## Why GAO Did This Study

Technology advancements such as horizontal drilling and hydraulic fracturing (pumping water, sand, and chemicals into wells to fracture underground rock formations and allow oil or gas to flow) have allowed companies to extract oil and gas from shale and other tight geological formations. As a result, oil and gas production has increased more than fivefold from 2007 through 2012. DOT oversees the safety of the U.S. transportation system.

GAO was asked to review oil and gas transportation infrastructure issues. This report examines (1) overall challenges that increased oil and gas production may pose for transportation infrastructure, (2) specific pipeline safety risks and how DOT is addressing them, and (3) specific rail safety risks and how DOT is addressing them. GAO analyzed federal transportation infrastructure and safety data generally from 2008 to 2012 or 2013 (as available), reviewed documents, and interviewed agency, industry, and safety stakeholders, as well as state and industry officials in states with large-scale shale oil and gas development.

## What GAO Recommends

DOT should move forward with a proposed rulemaking to address safety risks—including emergency response planning—from newer gathering pipelines. DOT generally concurred with the recommendation and stated that it is developing a rulemaking to revise its pipeline safety regulations.

View GAO-14-667. For more information, contact Susan Fleming at (202) 512-2834 or flemings@gao.gov or Frank Rusco at (202) 512-3841 or ruscof@gao.gov.

## What GAO Found

Increased oil and gas production presents challenges for transportation infrastructure because some of this increase is in areas with limited transportation linkages. For example, insufficient pipeline capacity to transport crude oil has resulted in the increased use of rail, truck, and barge to move oil to refineries, according to government and industry studies and publications GAO reviewed. These transportation limitations and related effects could pose environmental risks and have economic implications. For instance, natural gas produced as a byproduct of oil is burned—a process called flaring—by operators due, in part, to insufficient pipelines in production areas. In a 2012 report, GAO found that flaring poses a risk to air quality as it emits carbon dioxide, a greenhouse gas linked to climate change, and other air pollutants. In addition, flaring results in the loss of a valuable resource and royalty revenue.

Due to the increased oil and gas production, construction of larger, higher-pressure gathering pipelines (pipelines that transport products to processing facilities and other long-distance pipelines) has increased. However, these pipelines, if located in rural areas, are generally not subject to U.S. Department of Transportation (DOT) safety regulations that apply to other pipelines, including emergency response requirements. Historically, gathering pipelines were smaller and operated at lower pressure and thus posed less risk than long-distance pipelines. But the recent increase in their size and pressure raises safety concerns because they could affect a greater area in the event of an incident. In 2011, DOT began a regulatory proceeding to address the safety risks of gathering pipelines, but it has not proposed new regulations. Although states may regulate gathering pipelines, an association of state pipeline regulators' report on state pipeline oversight shows that most states do not currently regulate gathering pipelines in rural areas.

Crude oil carloads moved by rail in 2012 increased by 24 times over that moved in 2008. Such an increase raises specific concerns about testing and packaging of crude oil, use of unit trains (trains of about 80 to 120 crude oil cars), and emergency response preparedness. Crude oil shippers are required to identify their product's hazardous properties, including flammability, before packaging the oil in an authorized tank car. DOT has issued safety alerts on the importance of proper testing and packaging of crude oil. However, industry stakeholders said that DOT's guidance on this issue is vague and that clarity about the type and frequency of testing is needed. In July 2014, DOT proposed new regulations for crude oil shippers to develop a product-testing program subject to DOT's review. Additionally, unit trains, which can carry 3 million or more gallons of crude oil and travel to various locations through the country, are not covered under DOT's comprehensive emergency response planning requirements for transporting crude oil by rail because the requirements currently only apply to individual tank cars and not unit trains. This raises concerns about the adequacy of emergency response preparedness, especially in rural areas where there may be fewer resources to respond to a serious incident. Also in July 2014, DOT sought public comment on potential options for addressing this gap in emergency response planning requirements for transporting crude oil by rail.

_____

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | Increased Oil and Gas Production Presents Challenges for Transportation Infrastructure That Could Pose Environmental and Safety Risks and Have Economic Implications | 12 |
| | DOT Has Not Fully Addressed Safety Risks from Expansion of Federally Unregulated Gathering Pipelines | 22 |
| | DOT Is Working to Address Risks Related to the Increase in Transportation of Oil by Rail | 30 |
| | Conclusions | 47 |
| | Recommendation | 48 |
| | Agency Comments and Our Evaluation | 48 |

| Appendix I | Objectives, Scope, and Methodology | 50 |
|---|---|---|

| Appendix II | Impacts of Shale Oil and Gas Development on Highways in Selected States | 56 |
|---|---|---|

| Appendix III | Comments from Department of Transportation | 58 |
|---|---|---|

| Appendix IV | GAO Contacts and Staff Acknowledgments | 60 |
|---|---|---|

| Tables | | |
|---|---|---|
| | Table 1: Characteristics of U.S. Gathering and Transmission Pipelines | 9 |
| | Table 2: National-Level Industry and Safety Stakeholders GAO Interviewed | 53 |
| | Table 3: State-Level Stakeholders GAO Interviewed | 54 |

| Figures | | |
|---|---|---|
| | Figure 1: Shale Plays and Basins in the Contiguous 48 States | 5 |
| | Figure 2: Increased Domestic Oil and Gas Production from Shale and Tight Sandstone Formations from 2007 to 2012 | 6 |

Figure 3: Oil and Gas Transportation from Production to Users                    8
Figure 4: Crude Oil Refinery Receipts by Pipeline, Rail, Truck, and
          Barge from 2008 to 2012 (Millions of Barrels)                         15
Figure 5: Estimated Number of Crude Oil Rail Carloads in the
          United States, 2008 to 2012                                           31
Figure 6: Crude Oil Unit Train                                                  32
Figure 7: North American Originations and Destinations of Crude
          Oil Carloads Hauled by Rail, 2012                                     33
Figure 8: Proposed Upgrades to Crude Oil Rail Tank Cars                         42

**Abbreviations**

| | |
|---|---|
| AAR | Association of American Railroads |
| DOT | Department of Transportation |
| EIA | Energy Information Administration |
| FRA | Federal Railroad Administration |
| INGAA | Interstate Natural Gas Association of America |
| LNG | liquefied natural gas |
| Mcf | thousand cubic feet |
| MMBtu | million British thermal units |
| NOx | nitrogen oxides |
| NTSB | National Transportation Safety Board |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PSI | pounds per square inch |
| STB | Surface Transportation Board |
| Tcf | trillion cubic feet |

This is a work of the U.S. government and is not subject to copyright protection in the
United States. The published product may be reproduced and distributed in its entirety
without further permission from GAO. However, because this work may contain
copyrighted images or other material, permission from the copyright holder may be
necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

August 21, 2014

The Honorable John D. Rockefeller, IV
Chairman
The Honorable John Thune
Ranking Member
Committee on Commerce, Science, and Transportation
United States Senate

The Honorable Ron Wyden
United States Senate

U.S. production of oil and gas resources has increased in recent years, driven in part by improvements in technologies. Oil and gas resources contained in underground shale formations were previously considered to be inaccessible because traditional techniques did not yield sufficient amounts for economically viable production. The application of horizontal drilling techniques and hydraulic fracturing—a process that injects a combination of water, sand, and chemical additives under high pressure to create and maintain fractures in underground rock formations that allow oil and natural gas to flow—have increased U.S. crude oil and natural gas production dramatically.

This rapid expansion of domestic oil and gas production has also changed dynamics for transporting these products to the market and has raised questions about safety. While pipelines transport the majority of oil and gas in the United States, recent development of crude oil in parts of the country underserved by pipeline has led shippers to use other modes, with rail seeing the largest percentage increase. Although pipeline operators and railroads have generally good safety records, the increased transportation of these flammable hazardous materials creates the potential for serious incidents. The explosion and fire caused by the July 2013 derailment of a crude oil train in Lac-Mégantic, Quebec killed 47 people and extensively damaged the city's downtown area, highlighting the consequences that may result from such incidents. The U.S. Department of Transportation (DOT) is responsible for ensuring the safety of the U.S. transportation system, including protecting people and the environment from the risks of transporting hazardous materials by pipeline, rail, and other modes. In particular, DOT's Pipeline and Hazardous Materials Safety Administration (PHMSA) has responsibility for pipeline safety oversight as well as hazardous materials transportation safety oversight for other transportation modes, including rail.

You requested that we examine the impact of shale oil and gas development on transportation infrastructure and safety. We are providing a broad overview of transportation infrastructure impacts and a closer look at the infrastructure changes and associated safety issues with pipeline and rail.[1] Specifically, this report addresses:

(1) challenges, if any, that increased domestic oil and gas production poses for U.S. transportation infrastructure and examples of associated risks and implications;

(2) how pipeline infrastructure has changed as a result of increased oil and gas production, the key related safety risks, and to what extent DOT has addressed these risks; and

(3) how rail infrastructure has changed as a result of increased oil production, the key related safety risks, and to what extent DOT has addressed these risks.

To identify challenges increased domestic oil and gas production poses for U.S. transportation infrastructure and the associated implications, we reviewed and synthesized information from studies and other publications from federal, state, and tribal government agencies; industry; academics; and other organizations. We identified these studies and publications by conducting a search of web-based databases and other resources containing general academic articles, government resources, and "gray literature."[2] We believe the studies and publications identified through our literature search provide key examples of transportation infrastructure limitations and associated implications. In addition, we analyzed data from the U.S. Department of Energy's Energy Information Administration (EIA) on oil and gas produced from 2007 to 2012. To assess the reliability of these data, we examined EIA's published methodology for collecting

---

[1]We focused our work on pipeline and rail because pipeline is the most used mode for transporting oil and gas products and rail has seen the largest percentage increase in use in recent years.

[2]"Gray literature" publications may include, but are not limited to, the following types of materials: reports (pre-prints, preliminary progress and advanced reports, technical reports, statistical reports, memorandums, state-of-the art reports, market research reports, etc.); theses; conference proceedings; technical specifications and standards; non-commercial translations; bibliographies; technical and commercial documentation; and official documents not published commercially (primarily government reports and documents).

this information and found the data sufficiently reliable for the purposes of this report.

To determine how pipeline infrastructure has changed as a result of increased oil and gas production, we analyzed PHMSA data on pipeline construction from January 1, 2010 through December 31, 2012 and interviewed DOT officials and industry representatives, including pipeline operators. To determine how rail infrastructure has changed, we analyzed the Surface Transportation Board's (STB) data for calendar years 2008 through 2012 on crude oil shipments by rail and interviewed DOT officials and industry representatives, including railroads. To identify the key safety risks related to changes in pipeline and rail infrastructure, we analyzed PHMSA data from January 1, 2008 through December 31, 2013 on pipeline and rail incidents, reviewed documents submitted as part of DOT's rulemaking on rail safety, and interviewed DOT officials and representatives from safety organizations, emergency responder associations, and industry. We assessed the reliability of PHMSA's data on pipeline construction and pipeline and rail incidents and STB's data on crude oil shipments by rail by reviewing documentation about the data sources, interviewing agency officials about how the data were collected, and reviewing related internal controls. We also reviewed some of the data for potential inconsistencies through testing and comparing the data to publicly available sources of similar information. We concluded that these data were sufficiently reliable for the purposes used in our report. Additionally, to examine infrastructure impacts and safety risks closely associated with transporting shale oil and gas, we interviewed officials and reviewed related documents from state oil and gas safety regulatory agencies, transportation departments, industry associations and oil and gas transportation companies (such as pipeline operators, railroads, and operators of rail loading terminals) in four states: North Dakota, Pennsylvania, Texas, and West Virginia. We selected these states because of their significant shale oil and gas development and varying geographic locations. To evaluate to what extent DOT has addressed safety risks, we reviewed federal laws and regulations and DOT emergency orders and guidance, interviewed DOT officials, and compared DOT's actions against risk-based management principles. See appendix I for a more detailed description of our objectives, scope, and methodology.

We conducted this performance audit from August 2013 to August 2014 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our

findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Location of Oil and Gas Development in the United States

Oil and natural gas are found in a variety of geologic formations distributed across the country, such as shale and tight sandstone.[3] Shale plays—sets of discovered or undiscovered oil and natural gas accumulations or prospects that exhibit similar geological characteristics—are located within basins, which are large-scale geological depressions, often hundreds of miles across, that also may contain other oil and gas resources. Figure 1 shows the location of shale plays and basins in the contiguous 48 states.

---

[3]Shale is a sedimentary rock that is predominantly composed of consolidated clay-sized particles.

**Figure 1: Shale Plays and Basins in the Contiguous 48 States**



Sources: Energy Information Administration (shale location data); (map) copyright © Corel Corp., all rights reserved.  |  GAO-14-667

Note: Tight sandstone basins are found in some of the same basins as shale plays.

Shale plays can contain oil, natural gas, or both. In addition, a shale gas play may contain "dry" or "wet" natural gas. Dry natural gas is a mixture of hydrocarbon compounds that exists as a gas both underground in the reservoir and during production under standard temperature and pressure conditions. Wet natural gas contains natural gas liquids, or the portion of the hydrocarbon resource that exists as a gas when in natural underground reservoir conditions but that is liquid at surface conditions. The natural gas liquids are typically propane, butane, and ethane and are separated from the produced natural gas at the surface. Operators may then sell the natural gas liquids, which may give wet shale gas plays an economic advantage over dry gas plays. According to a 2014 EIA publication, operators moved away from the development of shale plays

that are primarily dry gas in favor of developing plays with higher concentrations of crude oil and natural gas liquids such as the Eagle Ford in Texas, because given natural gas prices at that time, crude oil and natural gas liquids were more valuable products.[4] Another advantage of liquid petroleum and natural gas liquids is that they can be transported more easily through different modes of transportation than dry natural gas, which is transported almost entirely by pipelines to markets and consumers.

## Oil and Gas Production

In recent years, domestic onshore production of oil and gas has been steadily rising. For example, from 2007 through 2012, annual production from shale and tight sandstone formations increased more than sixfold for oil and approximately fivefold for gas (see fig. 2). Horizontal drilling and hydraulic fracturing have advanced significantly over the last decade and are largely credited with spurring the boom in oil and gas production in the United States.

**Figure 2: Increased Domestic Oil and Gas Production from Shale and Tight Sandstone Formations from 2007 to 2012**



Source: Energy Information Administration. | GAO-14-667

*Oil:* Average domestic crude oil production from shale and tight sandstone formations in 2012 has increased more than sixfold compared with average production in 2007, from 0.34 million barrels per day in 2007 to 2.25 million barrels per day in 2012. To put this into context, according to EIA data, the United States consumed an average of more than 18

---

[4]EIA, "High value of liquids drives U.S. producers to target wet natural gas resources," *Today In Energy* (May 8, 2014).

million barrels of petroleum products per day in 2012.[5] According to EIA officials, oil from shale and tight sandstone formations accounts for 31 percent of total U.S. production. According to EIA, increased production in 2012 and 2013 was the largest annual increase since the beginning of U.S. commercial crude oil production in 1859. Much of the increase in crude oil production has been from shale formations, such as the Bakken in North Dakota, the Eagle Ford in Texas, and the Niobrara in Colorado. According to EIA officials, U.S. production of crude oil is expected to continue to increase—by 48 percent from 2012 to 2019—and will remain above the 2012 level through 2040.

*Natural Gas:* Domestic natural gas production in 2012 has increased about fivefold compared with production in 2007, from less than 2 trillion cubic feet in 2007 to more than 10 trillion cubic feet in 2012.[6] To put this into context, annual domestic consumption of natural gas was just over 25 trillion cubic feet in 2012, according to EIA data. In September 2012, we found that, assuming current consumption levels without consideration of a specific market price for future gas supplies, the amount of domestic technically recoverable shale gas could provide enough natural gas to supply the nation for the next 14 to 100 years.[7] Much of the increase in natural gas has been from shale formations, such as the Barnett, Fayetteville, Haynesville, and Marcellus formations.

---

[5]Petroleum includes crude oil and petroleum products. Petroleum products include gasoline, diesel fuel, heating oil, jet fuel, chemical feedstocks, asphalt, biofuels, and other products.

[6]Natural gas is generally priced and sold in thousand cubic feet (abbreviated Mcf, using the Roman numeral for 1,000). Units of a trillion cubic feet (Tcf) are often used to measure large quantities, as in resources or reserves in the ground, or annual national energy consumption. One Tcf is enough natural gas to heat 15 million homes for 1 year or fuel 12 million natural-gas-fired vehicles for 1 year.

[7]Technically recoverable gas resources are a subset of in-place resources that are producible given available technology. Technically recoverable resources include those that are economically producible and those that are not. Estimates of technically recoverable resources are dynamic, changing to reflect the potential of extraction technology and knowledge about the geology and composition of geologic formations. For additional information on shale oil and gas estimates and methodology to develop the estimates, see GAO, *Oil and Gas: Information on Shale Resources, Development, and Environmental and Public Health Risks,* GAO-12-732 (Washington, D.C.: Sept. 5, 2012).

## Transportation Modes

Multiple modes of transportation, including pipeline, rail, highways, and waterways, connect oil and gas production infrastructure (such as wells and processing plants) in shale areas to customers, which include refineries, industrial users, and individual consumers. Additionally, when products switch modes of transportation, oil-loading terminals, sometimes referred to as "transload" terminals, transfer the product from one mode to another, such as when crude oil is transferred from a truck or gathering pipeline to a train. Responsibility for maintaining these modes vary: pipelines and rail are generally privately owned, while highways and waterways are generally public. Figure 3 illustrates how various transportation modes work together to bring oil and gas from production areas to users.

**Figure 3: Oil and Gas Transportation from Production to Users**



Source: GAO.  |  GAO-14-667

Note: This figure illustrates concepts presented in this report. It does not include all modes of transportation for oil and gas products nor does it depict all types of potential end users.

Approximately 2.5 million miles of pipelines transport roughly two-thirds of domestic energy supplies throughout the United States. These pipelines carry natural gas and hazardous liquids, including crude oil and natural

gas liquids from production areas to end users, such as residences and businesses. Gathering pipelines collect produced oil and gas from their source and transport these products to processing facilities and transmission pipelines. Transmission pipelines then transport these products longer distances to users such as residences and businesses.[8] Distribution pipelines transport natural gas to consumers for use and are not within the scope of this report. Characteristics of gathering and transmission pipelines are described in table 1.

**Table 1: Characteristics of U.S. Gathering and Transmission Pipelines**

| | Gathering pipelines | Transmission pipelines |
|---|---|---|
| **Estimated number of miles** | At least 230,000 | More than 400,000 |
| **Function** | Collect gas or hazardous liquids from production areas and then typically transport these products to processing facilities where they are refined. | Carry gas or hazardous liquid to communities and large-volume users (e.g., factories). |
| **Description** | Traditionally, range in diameter from 2 to 12 inches and operate at pressures ranging from 5 to 800 pounds per square inch (psi). | Traditionally over hundreds of miles long, range in diameter from 12 to 42 inches, and operate at pressures ranging from 400 to 1440 psi. |

Source: GAO analysis of information from Pipeline and Hazardous Materials Safety Administration.  | GAO-14-667

The U.S. rail network consists of about 200,000 miles of track, which runs mostly through rural areas. The railroad industry is dominated by the seven largest railroads, known as Class I railroads, which collectively accounted for more than 90 percent of annual railroad-freight revenues in 2012. Smaller regional and short-line railroads transport freight shorter distances and can help connect customers in areas not served by the larger railroads. The railroads' national association, the Association of American Railroads (AAR), represents the interests of the industry and works with railroads and other stakeholders to develop industry standards. Crude oil travels by rail in tank cars, commonly DOT-111 tank cars, which are generally owned by shippers or third parties. The DOT-111 is a DOT-specification tank car, meaning it must be built to conform to standards specified in DOT regulation.[9] It is a non-pressurized car that is used to transport a variety of liquid products, including hazardous,

---

[8]We use the term transmission pipeline to refer to both hazardous liquids and natural gas pipelines carrying product over long distances to users.

[9]See 49 C.F.R. §179.200. In addition to DOT specification tank cars, there are also tank cars built to specifications set by AAR.

flammable materials like crude oil. Terminals, referred to as transload facilities, transfer crude oil from other transportation modes (typically trucks or gathering pipelines) to tank cars for transport by train.

In addition to pipeline and rail, other modes, including barge and truck may transport oil and gas products. For example, barges may transport oil over longer distances on major waterways, such as the Mississippi River, while trucks typically transport oil over short distances to transload facilities. While this report provides a closer look at transportation infrastructure and safety impacts of shale oil and natural gas development on pipeline and rail nationwide, we also discuss highway infrastructure and safety impacts in the four selected states we examined (see app. II for a summary of highway-related impacts).

## Department of Transportation

DOT is responsible for ensuring the safe transportation of people and goods through regulations, oversight, inspections, and other efforts, sometimes in partnership with states. Within DOT, PHMSA's Office of Pipeline Safety oversees the safety of pipelines through regulation and an inspection program, which includes over 100 PHMSA inspectors, and also collects information about the location of pipelines. PHMSA also has arrangements with states, which collectively have over 300 inspectors, to assist with overseeing interstate pipelines, intrastate pipelines, or both.[10] PHMSA's current pipeline regulations cover all hazardous liquid (including crude oil) and natural gas transmission pipelines. In addition to minimum safety standards that all transmission pipeline operators must meet, PHMSA employs a risk-based approach to transmission pipeline regulation and requires operators to systematically identify and mitigate risks in "high-consequence areas," which include populated and environmentally sensitive areas.[11] PHMSA also applies this risk-based approach to gathering pipelines and regulates gathering pipelines in non-

---

[10]These arrangements, in which states act as "agents" for PHMSA, can cover hazardous liquid pipelines only, gas pipelines only, or both (49 U.S.C. § 60105). States' pipeline safety offices are allowed to issue regulations supplementing or extending federal regulations for intrastate pipelines, but these state regulations must be at least as stringent as the minimum federal regulations (49 U.S.C. § 60104(c)). If a state wants to issue regulations that apply to pipelines that PHMSA does not regulate, such as federally unregulated gathering pipelines, there are no minimum federal standards that need to be adhered to, and the state is free to regulate as it sees fit.

[11]49 C.F.R. 192, Subpart O.

rural areas, resulting in regulation of approximately 10 percent of the nation's gathering pipelines.[12] Generally, PHMSA retains full responsibility for inspecting interstate pipelines for compliance with its regulations and taking enforcement actions when needed. However, states may be authorized to conduct inspections of interstate pipelines, as well as inspections and associated enforcement for intrastate pipelines. States can also promulgate regulations for intrastate pipelines, including gathering pipelines, even if these pipelines are not covered by PHMSA's federal safety requirements.[13]

PHMSA, through its Office of Hazardous Materials Safety, also regulates shippers and railroads transporting hazardous materials like crude oil by rail and other modes.[14] A memorandum of agreement details how PHMSA works with the other DOT modal agencies to address hazardous-material transportation safety. DOT's other modal administrations have responsibility for safety of their respective modes, such as the Federal Railroad Administration (FRA), which oversees rail safety. FRA enforces its own and PHMSA's safety regulations through inspections by FRA officials and state partners in some states.[15] PHMSA also has hazardous materials inspectors who enforce requirements for hazardous material packaging for transportation. Additionally, PHMSA's regulations include emergency response planning requirements for pipelines and the transportation of crude oil by rail. Specifically, regulations require operators of transmission pipelines and urban gathering pipelines to prepare emergency response plans and coordinate them with emergency responders.[16] Railroads that transport crude oil in tanks larger than 42,000 gallons are required to develop comprehensive oil-spill response plans with additional requirements for contingency planning, ensuring response resources by contract or other means, and training. Railroads

---

[12]49 C.F.R. Part 192.5 and 49 C.F.R. § §195.1(a)((4) and 195.11(a)(2).

[13]For pipelines, there are 48 states, the District of Columbia, and Puerto Rico in PHMSA's natural gas pipeline program and 17 states in its hazardous liquid pipeline program (49 U.S.C. § 60104(c)).

[14]49 C.F.R. Parts 171-179.

[15]FRA has 30 state partners for rail safety.

[16]49 C.F.R. § § 192.615 (a)(8) and 195.402 (c)(12). Operators of hazardous liquid pipelines must also establish a response-training program and maintain firefighting equipment for their personnel who will execute the spill response plan, including firefighting equipment, techniques, and use of protective clothing.

are required to submit comprehensive plans to FRA for review. Otherwise, railroads are required to develop basic response plans, for which there are fewer requirements.[17] Because PHMSA applies a risk-based approach to its transportation oversight, we believe it is appropriate to apply principles of risk-based management to assessing the agency's efforts in this area. Risk-based management has several key characteristics that help to ensure safety, including (1) using information to identify and assess risks; (2) prioritizing risks so that resources may be allocated to address higher risks first; and (3) promoting the use of regulations, policies, and procedures to provide consistency in decision making.[18]

## Increased Oil and Gas Production Presents Challenges for Transportation Infrastructure That Could Pose Environmental and Safety Risks and Have Economic Implications

Increased oil and gas production presents challenges for transportation infrastructure because some of the growth in production has been in areas with limited transportation linkages to processing facilities. According to studies and publications we reviewed, infrastructure limitations and related effects could pose environmental and safety risks and have economic implications, including lost revenue and hindered oil and gas production.

---

[17] 49 C.F.R. § 130.31.

[18] We applied these principles to PHMSA's efforts in our previous report on pipeline safety, see GAO, *Gas Pipeline Safety: Guidance and More Information Needed before Using Risk-Based Reassessment Intervals*, GAO-13-577 (Washington, D.C.: June 27, 2013). A fourth principle, monitoring performance, was also discussed in that report.

## Increased Domestic Oil and Gas Production Presents Challenges for Transportation Infrastructure

Though capital investments in U.S. infrastructure for oil and gas transportation, processing, and storage have increased significantly in recent years—by 60 percent from 2008 to 2012, according to a December 2013 industry report—expansions in infrastructure have not kept pace with increased domestic oil and gas production.[19] In the United States, most oil and nearly all natural gas are transported by pipeline.[20] According to EIA data, U.S. refinery receipts of domestic crude oil by pipeline increased almost 25 percent from 2008 to 2012, from 1.6 billion barrels to nearly 2 billion barrels.[21] However, according to a number of studies and publications we reviewed, including a 2013 report from the Fraser Institute, oil and natural gas production in the United States is outpacing the capacity to transport the resources through existing pipeline infrastructure.[22] In February 2013, EIA reported that pipeline capacity to deliver crude oil to a key hub increased by about 815,000 barrels per day from 2010 through 2013; however, the increase has been inadequate to transport crude oil from production sites to refineries. In March 2014, we found that most of the system of crude oil pipelines in the United States was constructed in the 1950s, 1960s, and 1970s to accommodate the needs of the refining sector and demand centers at that time. We also found that, according to Department of Energy officials, this infrastructure was designed primarily to move crude oil from the South to the North, but emerging crude oil production centers in Western Canada, Texas, and

---

[19]IHS Global Inc., *Oil and Natural Gas Transportation & Storage Infrastructure: Status, Trends, & Economic Benefits*, prepared for the American Petroleum Institute (Washington, D.C.: December 2013).

[20]In February 2013, we found that both the interstate and intrastate natural gas pipeline permitting processes are complex and can involve multiple federal, state, and local agencies, as well as public interest groups and citizens, and include multiple steps. According to some industry representatives we spoke with at that time, the interstate permitting process can be time-consuming, depending on the size and complexity of a project. GAO, *Pipeline Permitting: Interstate and Intrastate Natural Gas Permitting Processes Include Multiple Steps, and Time Frames Vary*, GAO-13-221 (Washington, D.C.: Feb. 15, 2013).

[21]According to EIA, a refinery is an installation that manufactures finished petroleum products from crude oil, unfinished oils, natural gas liquids, other hydrocarbons, and oxygenates. Oxygenates are additives, such as ethanol that increase the oxygen content of the fuel.

[22]For example, Fraser Institute, *Intermodal Safety in the Transport of Oil*, Studies in Energy Transportation (October 2013). The Fraser Institute is a public policy research and educational organization. For another example, see John R. Aures and John Mayes, "North American Production Boom Pushes Crude Blending," *Oil and Gas Journal* (May 6, 2013).

North Dakota have strained the existing pipeline infrastructure.[23] For example, according to a 2013 industry publication, oil production exceeded pipeline capacity in North Dakota by about 300,000 barrels of oil per day in the state.[24]

The limited pipeline capacity to transport crude oil has resulted in the increased use of other transportation options, in particular rail, truck, and barge (see fig. 4).

---

[23]GAO, *Petroleum Refining: Industry's Outlook Depends on Market Changes and Key Environmental Regulations*, GAO-14-249 (Washington, D.C.: Mar. 14, 2014).

[24]Kevin Smith, "Risk and Reward from the U.S. Fracking Boom," *International Railway Journal* (Sept. 11, 2013).

**Figure 4: Crude Oil Refinery Receipts by Pipeline, Rail, Truck, and Barge from 2008 to 2012 (Millions of Barrels)**

Source: GAO analysis of EIA data.  |  GAO-14-667

Note: Oil shipments may involve multiple modes. This figure indicates only the mode used for the last leg of the shipment.

- *Rail:* According to a 2014 EIA report, U.S. refinery receipts of domestic crude oil by rail increased more than sevenfold from 2008 to 2012, from 4 million barrels to 30 million barrels.[25] The increased use of rail for transporting crude oil is due to the increases in crude oil production in North Dakota, Texas, and other states, which have exceeded the capacity of existing pipelines to move oil from

---

[25]EIA, *Annual Refinery Report*, Form EIA-820 (June 25, 2014).

production areas to refineries, according to a number of studies and publications we reviewed.[26]

- **Truck:** According to a 2014 EIA report, U.S. refinery receipts of domestic crude oil by truck increased almost 90 percent from 2008 to 2012, from 69 million barrels to 131 million barrels.[27] In addition, according to a North Dakota Pipeline Authority publication, some natural gas liquids are transported to market by truck.[28]

- **Barge:** According to a 2014 EIA report, U.S. refinery receipts of domestic crude oil by barge increased more than 200 percent from 2008 to 2012, from 48 million barrels to 151 million barrels.[29] According to the EIA report, the increase in barge shipments may be partially explained by crude oil being transferred to barges from rail cars for the final leg of some journeys to refineries, particularly on the East Coast and along the Mississippi River.

According to a number of studies and publications that we reviewed, in addition to pipeline capacity limitations, rail, barges, and processing facilities and storage facilities also face limitations. For example, a 2013 industry publication identified a backlog for tank cars, needed to transport oil by rail, in the United States at nearly 60,000—representing over 20 percent of the existing U.S. tank car fleet.[30] In addition, a 2014

---

[26]For example, see Fraser Institute, *Intermodal Safety in the Transport of Oil*, Studies in Energy Transportation (October 2013); Paula Dittrick, "US shale production boosts midstream growth," *Oil and Gas Journal* (Nov. 25, 2013); and Statement of Adam Sieminski, Administrator, Energy Information Administrations, U.S. Department of Energy, before the Subcommittee on Energy and Power, Committee on Energy and Commerce, U.S. House of Representatives, 113th Cong., 2nd sess., March 6, 2014.

[27]EIA, *Annual Refinery Report* (2014).

[28]In addition to transporting oil to refineries, in 2012 we found that oil and gas development can require a few hundred to more than a thousand truck loads to transport the water, chemicals, sand, and other equipment needed for drilling and hydraulic fracturing. Further, some of the fracturing fluid that was injected into the well will return to the surface (commonly referred to as "flowback") along with water that occurs naturally in the oil- or gas-bearing formation, collectively referred to as produced water (GAO-12-732). The produced water may also be transported by truck from the well site to an injection well or a wastewater treatment plant.

[29]EIA, *Annual Refinery Report* (2014).

[30]IHS Global Inc., *Oil and Natural Gas Transportation and Storage Infrastructure: Status, Trends, and Economic Benefits* (December 2013).

Congressional Research Service report states that significant development of loading and unloading facilities could be required if rail is to continue substituting for pipeline capacity.[31] Further, a number of studies and publications identified that oil and gas production in some areas can exceed the capacity to process and store the resources.[32] For example, state officials in North Dakota reported in 2013 that maintaining sufficient natural gas processing capacity is a challenge of increased production.

## Transportation Infrastructure Limitations and Related Effects Could Pose Environmental and Safety Risks and Have Economic Implications

A number of studies and publications we reviewed identified environmental and safety risks or economic implications from transportation infrastructure limitations. For example:

*Risks to air quality:* These risks can be the result of intentional flaring—a process of burning the gas developed along with oil—of associated natural gas that results from limited pipeline infrastructure and of engine exhaust from increased truck and rail traffic.

Oil and natural gas are often found together in the same reservoir. The natural gas produced from oil wells is generally classified as "associated-dissolved," meaning that it is associated with or dissolved in crude oil. In areas where the primary purpose of drilling is to produce oil, operators may flare associated natural gas because no local market exists for the gas and transporting to a market may not be economically feasible. In September 2012, we found that flaring poses a risk to air quality because it emits carbon dioxide—a greenhouse gas linked to climate change—and other air pollutants that can increase ground-level ozone levels and contribute to regional haze.[33] In January 2014, the North Dakota Industrial Commission reported that nearly 30 percent of all natural gas produced in the state is flared. According to a 2013 report from Ceres, flaring in North

---

[31]Congressional Research Service, *U.S. Rail Transportation of Crude Oil: Background and Issues for Congress,* R43390 (Washington, D.C.: Feb. 6, 2014).

[32]For example, Nick Snow, "Massive investment needed for oil, gas facilities, experts say," *Oil and Gas Journal* (May 28, 2012) and Ceres, *Flaring Up: North Dakota Natural Gas Flaring More Than Doubles in Two Years* (July 2013). Ceres is a nonprofit organization.

[33]GAO-12-732.

Dakota in 2012 resulted in greenhouse gas emissions equivalent to adding 1 million cars to the road.[34]

Increased truck and rail traffic associated with the movement of oil from well sites also creates a risk to air quality as engine exhaust, containing air pollutants such as nitrogen oxides and particulate matter that affect public health and the environment is released into the atmosphere.[35] Specifically, the Department of State reported in 2014 that increasing the number of unit trains transporting crude oil could increase greenhouse gases emitted directly from the combustion of diesel fuel in trains[36] and in 2011 we found that trucking freight produces more air pollution than other transportation modes.[37] Air quality may also be degraded as fleets of trucks traveling on newly graded or unpaved roads increase the amount of dust released into the air—which can contribute to the formation of regional haze.[38]

*Inherent safety risks:* Transporting oil and gas by any means—through pipelines, rail, truck, or barge—poses inherent safety risks. However, in January 2013, we found that pipelines are relatively safe when compared with other modes, such as rail and truck, for transporting hazardous goods because pipelines are mostly underground.[39] For example, we

---

[34]Ceres, *Flaring Up: North Dakota Natural Gas Flaring More Than Doubles in Two Years* (July 2013).

[35]Nitrogen oxides are regulated pollutants commonly known as NOx that, among other things, contribute to the formation of ozone and have been linked to respiratory illness, decreased lung function, and premature death. Particulate matter is a ubiquitous form of air pollution commonly referred to as soot. GAO, *Diesel Pollution: Fragmented Federal Programs That Reduce Mobile Source Emissions Could Be Improved*, GAO-12-261 (Washington, D.C.: Feb. 7, 2012).

[36]According to the Department of State's Final Environmental Impact Statement for the Keystone XL Pipeline, the use of liquefied natural gas (LNG) as a fuel source for trains is being developed and tested. The use of LNG could reduce greenhouse gas emissions compared to the use of diesel fuel.

[37]GAO, *Surface Freight Transportation: A Comparison of the Costs of Road, Rail, and Waterways Freight Shipments That Are Not Passed on to Consumers*, GAO-11-134 (Washington, D.C.: Jan. 26, 2011).

[38]T. Colborn, C. Kwiatkowski, K. Schultz, and M. Bachran, "Natural Gas Operations From a Public Health Perspective," *International Journal of Human & Ecological Risk Assessment* 17, no. 5 (2011).

[39]GAO, *Pipeline Safety: Better Data and Guidance Needed to Improve Pipeline Operator Incident Response*, GAO-13-168 (Washington, D.C.: Jan. 23, 2013).

found that large trucks and rail cars transporting hazardous materials, including crude oil and natural gas liquids, resulted in far more fatalities and incidents than pipelines. Specifically, we found that from 2007 to 2011, fatalities averaged about 14 per year for all pipeline incidents reported to PHMSA, including an average of about 2 fatalities per year resulting from incidents on hazardous liquid and natural gas transmission pipelines.[40] In comparison, in 2010, 3,675 fatalities resulted from incidents involving large trucks and 730 additional fatalities resulted from railroad incidents. Therefore, increased transport of oil and gas by rail, truck, or barge could increase safety risks.

According to state officials and several publications we reviewed, increased truck traffic resulting from increased oil and gas production can present hazardous driving conditions—particularly on roads not designed to handle heavy truck traffic.[41] Our analysis of data from PHMSA found that in recent years, the number of reported incidents involving the transport of crude oil by truck in both Texas and North Dakota has increased. Specifically, such incidents increased in Texas from 17 incidents in 2008 to 70 incidents in 2013, and in North Dakota they increased from 1 incident in 2008 to 16 incidents in 2013.

Barge accidents also pose safety risks and can have associated environmental and economic effects. For example, according to the U.S. Coast Guard Polluting Incident Compendium, in 2011, a barge struck a bridge on the Lower Mississippi River causing damage to the barge and a discharge of just over 11,000 gallons of oil.[42] In February 2014, a barge crash resulted in the spilling of about 31,500 gallons of crude oil into the Mississippi River, temporarily shutting down transportation along the river. According to a 2012 Congressional Research Service report, an oil spill from a barge can cause significant harm to marine ecosystems and

---

[40]More recently, we analyzed PHMSA's pipeline incident data for 2008 through 2013 and found that there was an average of about 3 fatalities per year from incidents involving natural gas pipelines and hazardous liquid pipelines that carry crude oil. Of the 17 reported fatalities during that time, 8 were attributed to a natural gas pipeline incident in 2010.

[41]For example, testimony of Dana "Sam" Buckles Tribal Executive Board Member Assiniboine and Sioux Tribes of the Fort Peck Reservation before the Senate Committee On Indian Affairs Oversight hearing on Tribal Transportation: Pathways to Infrastructure and Economic Development in Indian Country, 113th Cong., 2nd sess., March 13, 2014.

[42]U.S. Coast Guard, *Polluting Incident Compendium Part II* (December 2012).

individual aquatic organisms and negatively affect business activity near the spill, particularly businesses and individuals that count on the resources and reputation of the local environment.[43] For instance, the local fishing and tourist industry may be affected, and in some cases, a well-publicized oil spill can weaken local or regional industries near the spill site, regardless of the actual threat to human health created by the spill.

*Economic implications:* According to a number of studies and publications we reviewed, infrastructure limitations and related effects could have economic implications, including lost revenue, higher energy prices, and hindered development.

- *Lost revenue:* In addition to the risks to air quality from flaring, we found in October 2010 that flaring natural gas has economic implications,[44] and in April 2014 the Environmental Protection Agency reported that flaring results in the destruction of a valuable resource.[45] For example, in 2010 we found that on federal oil and gas leases, natural gas that is flared, instead of captured for sale, represents a loss of about $23 million annually in royalty revenue for the federal government. According to a 2013 report from the North Dakota Pipeline Authority, in August 2013, 2.7 percent of the total economic value and 7.2 percent of the total energy content being produced in North Dakota were lost due to flaring.[46] In another example, a Ceres report found that in May 2013 roughly $3.6 million of revenue was lost per day, at market rates, as a result of flaring in North Dakota.[47]

---

[43]Congressional Research Service, *Oil Spills in U.S. Coastal Waters: Background and Governance*, RL33705 (Washington, D.C.: Jan. 11, 2012).

[44]GAO, *Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases*, GAO-11-34 (Washington, D.C.: Oct. 29, 2010).

[45]Environmental Protection Agency, *Oil and Natural Gas Sector Hydraulically Fractured Oil Well Completions and Associated Gas During Ongoing Production*, (April 2014).

[46]North Dakota Pipeline Authority, "North Dakota Natural Gas: A Detailed Look at Natural Gas Gathering," Oct. 21, 2013.

[47]Ceres, *Flaring Up: North Dakota Natural Gas Flaring More Than Doubles in Two Years* (July 2013).

- **Higher energy prices:** Growing shale development and the resulting increased availability and lower prices of natural gas have contributed to an increasing reliance on natural gas as a source of producing electricity in some parts of the country. However, pipeline infrastructure limitations have at times contributed to price spikes. For example, according to a paper from ICF International, pipeline limitations were a contributing factor to higher natural gas prices in the northeast in January 2014.[48] A cold weather pattern involving record low temperatures led to increased demand for natural gas for space heating and for generating electricity across parts of the country. With the surge in demand, several major pipeline systems became constrained and could not deliver sufficient natural gas to meet demand. According to a 2014 EIA publication, prices at the Algonquin, Massachusetts trading point, which normally are around $3 to $6 per million British thermal units (MMBtu) during unconstrained periods, reached up to $38/MMBtu in early January.[49] These price increases for natural gas led electricity systems to use more oil-fueled generating resources during this period.

- **Hindered oil and gas production:** A 2013 study sponsored in part by the Utah Department of Transportation found that oil and gas production from the Uinta Basin is likely to be constrained by limitations in the capacity of transportation infrastructure. Specifically, the study found that existing pipelines in the state are already at or near capacity, and by 2020, demand on the infrastructure network to transport oil and gas will exceed capacity—resulting in a loss of 12 percent of potential production over the next 30 years.[50] Further, according to a 2013 industry report, infrastructure constraints such as pipeline limitations and bottlenecks from the Permian Basin in Texas to a key hub have contributed to discounted prices for some domestic crude oils.[51] For example, we found in March 2014 that West Texas

---

[48]ICF International is a consulting firm that provides information to public- and private-sector clients.

[49]EIA, *Northeast and Mid-Atlantic power prices react to winter freeze and natural gas constraints* (Jan. 21, 2014).

[50]Duchesne County, Uintah County, Uintah Transportation Special Service District, and the Utah Department of Transportation, *Final Report: Uinta Basin Energy and Transportation Study,* Project No. S-LC47 (14) (Salt Lake City, Utah: April 2013).

[51]John R. Auers and John Mayes, "North American Production Boom Pushes Crude Blending," *Oil and Gas Journal* (May 6, 2013).

Intermediate crude oil—a domestic crude oil delivered to a key hub that is used as a benchmark for pricing for all crude oil—was priced just under $18 per barrel less in 2012 than Brent, an international benchmark crude oil from the European North Sea that has historically been about the same price as West Texas Intermediate.[52] These discounted prices mean resource developers have received lower prices for their crude oil production. According to a 2013 Energy Policy Research Foundation report, discounted prices may eventually lead to production growth constraints.[53]

## DOT Has Not Fully Addressed Safety Risks from Expansion of Federally Unregulated Gathering Pipelines

### Increases in the Number, Size, and Operating Pressure of Gathering Pipelines Pose Additional Risk, Particularly Where They Are Not Federally Regulated

Gathering pipeline construction has increased significantly as a result of increased shale oil and gas development; however, the increase in pipeline mileage is unknown because data on gathering pipelines are not systematically collected by PHMSA nor by every state. The Interstate Natural Gas Association of America (INGAA), a trade organization representing interstate natural gas transmission pipeline companies, estimated in March 2014 that shale oil and gas development will result in approximately 14,000 miles of new gas gathering pipelines and 7,800 miles of new oil gathering pipelines added each year from 2011 through 2035.[54] State officials in Pennsylvania, North Dakota, Texas, and West

[52]GAO, *Petroleum Refining: Industry's Outlook Depends on Market Changes and Key Environmental Regulations*, GAO-14-249 (Washington, D.C.: Mar. 14, 2014).

[53]Energy Policy Research Foundation, *Pipelines, Trains and Trucks: Moving Rising North American Oil Production to Market* (Washington, D.C.: Oct. 21, 2013). The Energy Policy Research Foundation Inc. is a not-for-profit organization that studies energy economics and policy issues.

[54]The INGAA Foundation Inc. *North American Midstream Infrastructure through 2035: Capitalizing on Our Energy Abundance, An INGAA Foundation Report, Prepared by ICF International* (Mar. 18, 2014), available at http://www.ingaa.org/File.aspx?id=21498 (accessed May 16, 2014).

Virginia said that companies have invested significantly in gathering pipeline infrastructure. For example, according to data published by Texas state officials, 15,684 new miles of federally unregulated gathering pipelines were added in the state between 2010 and 2013.[55] In response to the growth in gathering pipelines, Texas officials told us that their state enacted legislation to increase state regulatory authority over gathering pipelines. Similarly, North Dakota passed rule changes in 2013 to increase state regulatory authority over gathering pipelines. Texas officials told us that they plan to study and determine what parts of their rules should apply to gathering pipelines during 2014 and then issue guidance in 2015. In April 2014, North Dakota implemented regulations requiring companies to report the location and characteristics of gathering pipelines carrying any products including natural gas, crude oil, natural gas liquids, water, and others. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations showing that most states with delegated authority from PHMSA to conduct intrastate inspections do not have expanded regulations that cover increased oversight of gathering pipelines.[56] As a result, companies building gathering pipelines in rural areas are generally not subject to inspection and do not have to report the location and characteristics of much of the gathering pipelines being installed.

Although the majority of the total gathering pipeline network that exists are the traditional small pipelines, state pipeline regulators, PHMSA officials, and pipeline operators we spoke with said that some newly built

---

[55]State officials from the other three states could not provide precise numbers on gathering pipeline construction because most of this new construction is in rural locations where pipeline operators are exempt from federal reporting and oversight regulations and these states, unlike Texas, did not have their own reporting requirements. PHMSA regulations for natural gas gathering pipelines do not apply to rural areas designated as Class 1 which is defined as any location with 10 or fewer buildings intended for human occupancy within 220 yards of the centerline of the pipeline for a 1-mile segment of pipeline, see 49 C.F.R. § § 192.5 and 192.8 . For hazardous liquid gathering pipelines, PHMSA regulates only certain rural gathering pipelines within one-quarter mile of environmentally sensitive areas, see 49 C.F.R. §195.11. However, as discussed in the background of this report, PHMSA regulates non-rural pipelines.

[56]Based on our analysis, we determined that expanded regulations vary by state, but the compendium shows that at least 6 states have some form of expanded regulation. National Association of Pipeline Safety Representatives, *Compendium of State Pipeline Safety Requirements & Initiatives Providing Increased Public Safety Levels compared to Code of Federal Regulations*, second edition (Sept. 9, 2013).

gathering pipelines have larger diameters and higher operating pressures that more closely resemble transmission pipelines than traditional gathering pipelines. For example, while gathering pipelines have traditionally been 2 to 12 inches in diameter, one company operating in the Texas Eagle Ford shale region showed us plans to build 30- and 36-inch natural gas gathering pipelines, which is near the high end of diameters for regulated transmission pipelines. Historically, federally unregulated gathering pipelines were low pressure, smaller-diameter pipelines and were generally in rural areas where there was less safety risk. Now, according to PHMSA, industry, and state pipeline safety officials we spoke to, gathering pipelines of larger diameter and higher pressure are being constructed, including in areas closer to populations. Such construction could increase safety risk, since an incident occurring on one of these larger, high-pressure unregulated gathering pipelines could affect a greater area and be as serious as an incident involving a regulated transmission pipeline of similar diameter and pressure.

Pipeline operators and industry organizations told us that new gathering pipelines are likely safer because new pipelines are less susceptible to issues like corrosion—a common reason for failure in older pipelines. Pipeline operators also told us that some large-diameter, high-pressure gathering pipelines are built to the same specifications as regulated transmission pipelines and that these pipelines are in very rural areas with little risk to people. They also expressed that safety is very important to the industry and that companies understand not only the potential harm to the network, people, and environment, but also the public perception following a high-profile incident and therefore manage their assets to avoid incidents. Nonetheless, state pipeline regulators, PHMSA officials, and safety organizations expressed concern with the potential safety threat of unregulated gathering pipelines of this size. For example, a citizens' shale development awareness group in Pennsylvania has documented construction of several unregulated gathering pipelines in the state that are 24 inches in diameter. The group argues that while these gathering pipelines are in rural areas, they are being built unnecessarily close to homes. PHMSA officials told us that the large diameter and pressure of the pipelines increase the concern for the safety of the environment and people nearby.

In addition to potential increased safety risk as a result of the changing characteristics of the pipelines, some stakeholders shared concerns about the readiness of emergency responders to address potential incidents that could occur with unregulated gathering pipelines. PHMSA's emergency response planning requirements that apply to other pipelines

do not apply to rural unregulated gathering pipelines. Consequently, response planning in rural areas with unregulated gathering lines may be inadequate to address a major incident. Transmission pipeline operators with pipelines similar in size to the new gathering pipelines are required to develop comprehensive emergency response plans and coordinate with local emergency responders. Emergency response officials whom we spoke with stated that lacking information about the location of some gathering pipelines, responders—particularly in rural areas—may not be adequately prepared to respond to an incident. A representative from the National Association of State Fire Marshals told us that training and communication with pipeline companies are key for emergency responders' knowledge and awareness. Additionally, emergency response officials also told us that rural areas in particular lack the level of hazardous-materials response resources found in metropolitan areas where more is known about the extent of local pipeline networks. The National Transportation Safety Board (NTSB) has also stated that emergency response planning is critical for pipeline safety and has recommended that pipeline operators help ensure adequate emergency response by providing local jurisdictions and residents with key information on the pipelines in their areas.

## DOT Has Not Proposed Regulatory Changes to Address Risks Posed by Gathering Pipelines

As previously discussed, PHMSA applies a risk-based approach to regulating pipeline safety. A key principle of risk-based management is promoting the use of regulations, policies, and procedures to provide consistency in decision-making. PHMSA has acknowledged the growing potential risk of federally unregulated gathering pipelines as more are constructed and at larger diameters and higher pressures, but DOT has not proposed regulatory changes to address this risk. In August 2011, PHMSA published an Advance Notice of Proposed Rulemaking, stating that the existing regulatory framework for natural gas gathering pipelines may no longer be appropriate due to recent developments in gas production.[57] In the notice, PHMSA asked for comment on whether it should consider establishing new, risk-based safety requirements for large-diameter, high-pressure gas gathering pipelines in rural locations, among other potential changes to gathering pipeline regulations.[58] The

---

[57]An Advance Notice of Proposed Rulemaking is an initial step in a rulemaking proceeding seeking comment on issues the agency may address in future proposed regulation.

[58]76 Fed. Reg. 53086 (Aug. 25, 2011).

proposal also states that enforcement of current requirements has been hampered by the conflicting and ambiguous language of the current regulation that can produce multiple classifications for the same pipeline system, which means that parts of a single pipeline system can be classified as rural gathering pipelines and therefore be unregulated, while other parts of the same pipeline with the same characteristics are regulated. PHMSA officials told us they have drafted proposed regulations for both gas and hazardous liquid gathering pipelines but as of June 2014, the agency had not issued the Notice of Proposed Rulemaking for comment. According to DOT officials, the proposed gas rule is being reviewed internally and the proposed hazardous liquid rule is with the Office of Management and Budget for review.[59] PHMSA officials also told us they have studied existing federal and state gathering pipeline regulation to help identify where gathering pipelines are currently regulated and remaining gaps; however, this study has been in the final stages of review during the course of our work and has not yet been published.

Given the lack of PHMSA regulation of rural gathering pipelines, the extent, location, and construction practices for rural gathering pipelines is largely unknown by federal, state, and local officials, and oversight to verify the construction and monitor operators' safety practices is lacking. In 2012, we concluded that unregulated gathering pipelines also pose risks due to construction quality, maintenance practices, and limited or unknown information on pipeline integrity. [60] We recommended at that time that PHMSA collect data on unregulated gathering pipelines to facilitate quantitatively assessing the safety risks posed by these pipelines, which we said could assist in determining the sufficiency of

---

[59]75 Fed. Reg. 63774 (Oct. 18, 2010).

[60]GAO, *Pipeline Safety: Collecting Data and Sharing Information on Federally Unregulated Gathering Pipelines Could Help Enhance Safety,* GAO-12-388 (Washington, D.C.: Mar. 22, 2012). For this report, we surveyed state pipeline agencies, among which there were 39 agencies that reported they had gathering pipelines in their state that PHMSA does not regulate. Eighteen of the state agencies reported that the quality of installation procedures and construction materials is a safety risk for unregulated gathering pipelines because the construction phase of pipeline installation is critical to ensure the long-term integrity of the pipeline. Sixteen state agencies reported that the extent to which pipeline operators maintain their pipelines is a moderate or high safety risk for unregulated gathering pipelines. According to agency officials, after a pipeline is installed and operational, periodic maintenance—such as inspecting and testing equipment—is important to prevent leaks and ruptures and could extend the operating life of a pipeline.

safety regulations for gathering pipelines. According to DOT officials, as of July 2014, PHMSA has compiled data on existing gathering pipeline requirements, and the resulting report is under internal review. Furthermore, officials said that data collection is part of the proposed rules also under review. In 2010, the National Association of Pipeline Safety Representatives recommended that PHMSA modify federal pipeline regulations to establish requirements for gathering pipelines in rural areas that are presently not regulated. The association stated that with the advent of new production technologies, there has been rapid development of gas production from shale formations such as the Barnett, Marcellus, and Bakken resulting in a significant amount of new gathering pipeline construction. Further, in these newer gas gathering systems, it is not uncommon to find rural gathering pipelines up to 30 inches in diameter and operating at 1480 psi, which is the higher end of traditional transmission operating pressure.[61] Enhanced pipeline safety for all types of pipeline was also on NTSB's "Most Wanted List" in 2013 and 2014. NTSB has prioritized overall pipeline safety because of the increased demand in oil and gas and the aging pipeline infrastructure.

Resources are an important consideration in evaluating how to address the increased risk of gathering pipelines. According to PHMSA officials, inspection resources are limited and would be further stretched if rural gathering pipelines were regulated. If PHMSA were to receive increased staff funding in the near future, there could be a lag in ramping up the inspection workforce because inspectors would have to complete PHMSA's 3-year pipeline-inspection training to become fully certified.[62] However, if PHMSA were to set minimum federal regulations for gathering pipelines, this would enable the agency to include currently federally unregulated rural gathering lines in decisions for prioritizing resources for addressing safety risks. This is in line with the principles of risk-based management, while also enabling data-driven, evidence-based decisions about the risks of rural gathering pipelines, which our previous

---

[61]National Association of Pipeline Safety Representatives, *Urging PHMSA to Establish Regulatory Requirements for Gas Gathering Lines in Class 1 Areas*, Resolution 2010-2 AC-2 (Sept. 30, 2010).

[62] Some state officials also expressed concern about the capacity of PHMSA's inspector training program, which all state inspectors are also required to complete. The 3-year program must be completed mostly in PHMSA's Oklahoma City, Oklahoma, training center, which can create scheduling and budget challenges.

work has shown is especially important in a time of limited resources.[63] State regulators in all four states we spoke with acknowledged their resources could also be strained; however, the officials supported regulating rural gathering pipelines. State officials said that without rural gathering pipeline regulation, such as provisions for inspections or industry reporting, they have limited knowledge of the construction and maintenance practices of rural gathering pipeline operators, do not always know where new rural gathering pipelines are being constructed, and may not even have communication with the operators.

## Transmission Pipeline Infrastructure Has Not Increased Substantially as a Result of Shale Development

Gas flows from shale plays into transmission pipelines have increased, but construction of new transmission pipelines has not increased dramatically as a result of increased shale development. According to PHMSA data, approximately 4,500 miles of new oil and gas transmission pipelines were built between January 2010 and December 2012. This includes about 2,000 miles each of crude oil and natural gas pipelines and the remaining is pipeline for natural gas liquids.

Oil and gas pipeline industry representatives and transmission pipeline companies we spoke with stated that transmission pipeline companies have been able to accommodate increased demand in various ways. Transmission pipeline companies have repurposed existing pipelines, made operational changes—including increased compression and change in directional flow—and added additional capacity to the current network through smaller-scale construction projects. Companies have repurposed pipelines by changing them from one product to another, such as converting a natural gas pipeline to a natural gas liquid pipeline or a crude oil pipeline. Companies have also instituted operational changes such as adding additional compression to their line, which allows them to move more gas through the same lines, and changing directional flow of a pipeline. One pipeline operator we spoke with is reversing flow of its gas transmission pipeline. Prior to shale development, this pipeline moved natural gas from the Gulf Coast to the Northeast. By 2017, the volume of gas that once flowed north will flow south. The pipeline operator stated that changing the direction of the flow, while not as easy as flipping a switch, requires significantly less time and money than

---

[63]We have applied these criteria to PHMSA before when reviewing its gas integrity management program; see GAO-13-577.

building a new pipeline. Smaller-scale construction projects, such as short pipeline extensions, help meet the demands of shale areas like the Marcellus because the natural gas being produced is in close proximity to its destination market. Therefore, it is primarily a matter of connecting new gas production into the existing transmission pipeline network.

However, accommodating increased demand through new construction is a challenging proposition. To build a transmission pipeline requires a long-term commitment—often a contract that spans 30 to 50 years from producers. Major transmission pipeline projects may also face long timeframes. Pipeline companies we spoke with stated that once contracts are in place it usually takes 2 to 4 years to complete a pipeline. This is in part a result of the permitting process, which can include multiple federal and state agencies as well as obtaining rights to build on properties of individual land owners.[64] Timelines can be longer if the pipeline construction project is contentious.[65] The construction timeline is also dependent on terrain and weather. Pipeline industry representatives in West Virginia told us that constructing pipelines in mountainous terrains is much more difficult than in flat land. State officials in North Dakota said that long winters and short construction seasons cause construction projects to last over several construction seasons to complete. Other reasons provided by state officials and industry officials for a slower growth in pipeline infrastructure in North Dakota include the challenge of securing right-of-ways, as well as uncertainty in market demand. It is possible that continued shale exploration and development in other parts of the country could displace demand for Bakken shale products. Developers have proposed some future pipeline projects, and some have been approved in areas like North Dakota, but transmission pipeline mileage has not seen the same kind of rapid increase as gathering pipeline mileage. For example, Enbridge Energy Partners has proposed a transmission pipeline called Sandpiper that spans 612 miles from North Dakota through Minnesota to Wisconsin. The pipeline is proposed to be 24 inches and 30 inches in different places and will carry between

---

[64]GAO-13-221.

[65]For example, the Keystone pipeline, which would move approximately 100,000 barrels of Bakken crude oil per day, applied for a Presidential Permit in 2008, which has not been approved. For proposed petroleum pipelines that cross international borders of the United States, the President, through Executive Order (EO) 13337, directs the Secretary of State to decide whether a project serves the national interest before granting a Presidential Permit.

225,000 and 375,000 barrels of oil. WBI Energy announced planning for a 375-mile natural gas transmission line called the Dakota Pipeline in January 2014. The proposed route would start in North Dakota and continue into Minnesota.

In areas of shale development without access to an established pipeline network, such as the Bakken region, lengthy timelines and high costs associated with building transmission pipeline have led producers to seek alternative methods for transporting some of the production—primarily rail.

# DOT Is Working to Address Risks Related to the Increase in Transportation of Oil by Rail

## Crude Oil Is Transported Increasingly by Rail and Travels Long Distances in Large Volumes

The use of rail to transport crude oil from development areas to refineries has increased dramatically. STB data show that rail moved about 236,000 carloads of crude oil in 2012, which is 24 times more than the approximately 9,700 carloads moved in 2008 (see fig. 5).[66] Carloads further increased in 2013, with AAR reporting that Class I freight railroads originated 407,761 carloads of crude oil that year.[67]

---

[66]Due to a lag in data reporting, 2013 STB data were not available for this report.

[67]We did not independently verify the AAR data.

**Figure 5: Estimated Number of Crude Oil Rail Carloads in the United States, 2008 to 2012**



**Estimated carloads per year** (in thousands)

Year

Source: GAO analysis of Surface Transportation Board Data. | GAO-14-667

Note: The number of crude oil carloads, which was small in 2008-2011, had for those years a declining margin of error that started at 19 percent in 2008 and went down to about 8 percent in 2011. For 2012, the margin of error for crude oil carloads was less than 5 percent.

According to railroads, the majority of this increased movement of crude oil by rail is done using unit trains, which are trains that carry only one commodity to a single destination. Crude oil unit trains may consist of 80 to 120 tank cars, each carrying about 30,000 gallons of product, for a total of about 2.4 million to 3.6 million gallons of crude oil per train (see figure 6). This has resulted in an increase in demand for tank cars. According to AAR, nearly 50,000 tank cars were used to transport crude oil by rail as of April 2014.[68]

---

[68]Specifically, AAR stated that during the period of 2013 through April 2014, there were 104,597 tank cars used to transport flammable liquids by rail, including 49,182 tank cars used for crude oil.

**Figure 6: Crude Oil Unit Train**



Source: GAO. | GAO-14-667

There are different types of crude oil, which affects where crude is refined, as refineries are configured differently to handle the various types. This, in turn, affects where crude oil is transported for refining.[69] Increasingly, crude oil produced in the United States is "light and sweet" (lower in density and sulfur content); in contrast, a portion of new Canadian production has been "heavy and sour" crude oil (higher in density and sulfur content).[70] We have previously reported that not all U.S. refineries can take advantage of domestic crude oils to the same extent because of configuration constraints at some refineries.[71] Therefore, oil may travel long distances to a refinery with the matching refining configuration even if there is refinery capacity nearer to the crude oil source. According to an oil industry association in North Dakota, much of the domestic refining capacity for Bakken crude oil, which is a lighter crude, is located along the Gulf, East, and West Coasts. According to

---

[69]According to DOT officials, commodity price is also a factor in where crude oil is shipped.

[70]Crude oil is generally classified according to two parameters: density and sulfur content. Less dense crude oils are known as "light," while denser crude oils are known as "heavy." Crude oils with relatively low sulfur content are known as "sweet," while crude oils with higher sulfur content are known as "sour." In general, heavier and more sour crude oils require more complex and expensive refineries to process the crude oil into usable products.

[71]GAO-14-249.

STB data, about 69 percent of crude oil transported by rail in 2012 originated in North Dakota, followed by Texas and all other states (see fig. 7). STB data show that crude oil originating in North Dakota in 2012 traveled to 19 destination American states or Canadian provinces across North America. While most Bakken crude oil was shipped to destinations along the Gulf Coast, there was a large increase in oil shipped to East and West Coast destinations in 2012, signaling a shift in demand from the Gulf region to the other coasts.

**Figure 7: North American Originations and Destinations of Crude Oil Carloads Hauled by Rail, 2012**



Sources: GAO analysis of Surface Transportation Board data. | GAO-14-667

[a]"Other" originations include 22 other American states and Canadian provinces, among the largest of which are Saskatchewan, Alberta, Oklahoma, California, and Colorado.

[b]"Other" destinations include 5 other American states and Canadian provinces where the estimated carloads received was fewer than 1,000, including oil that was shipped to final destinations within the state of North Dakota. Multiple destinations may exist in some states.

Notes: Carload numbers are rounded to the nearest hundred. The sum of carloads by destination does not equal the number of carloads originated in North Dakota due to rounding. The margins of error for estimates of carloads received by individual states or provinces are as follows: Missouri (57%), Quebec (55%), New Brunswick (52%), Arkansas (50%), California (40%), Delaware (40%), Michigan (38%), New Jersey (35%), Washington (32%), Texas (27%), Illinois (26%), Oklahoma (25%), New York (22%), and Louisiana (9%). For example, we are 95 percent confident that the value

for Missouri is within +/- 57 percent of the estimate itself. Additionally, the relative margins of error for estimates of origination carloads are as follows: Texas (16%), North Dakota (7%), and all other originations (9%).

While pipelines generally deliver commodities to a fixed customer, rail offers the flexibility to serve different customers, allowing shippers to shift product quickly in response to market needs and price opportunities. Despite the great increase in crude oil transported by rail, the commodity remains a small percentage of railroads' business, comprising about 1.4 percent of Class I railroads' freight originations in 2013, according to AAR. As previously discussed, there are thousands of miles of track in the United States, providing various shipping opportunities for crude oil, as well as other commodities.[72] Officials from Class I railroads said they have not extensively added new infrastructure to specifically accommodate the increased shipping of crude oil by rail, although officials from some railroads said they have added track infrastructure in specific areas of increased shale oil development to increase capacity.

## DOT Is Taking Action to Address Safety Risks Resulting from the Transport of Crude Oil by Rail

As the movement of crude oil by rail has increased, incidents, such as spills and fires involving crude oil trains have also increased. PHMSA's hazardous materials incident data show that rail crude oil incidents in the United States increased from 8 incidents in 2008 to 119 incidents in 2013.[73] These data show that the majority of the 2013 incidents were small; however, two incidents in 2013, in Aliceville, Alabama and Casselton, North Dakota resulted in large spills and greater damage. Significant incidents have continued to occur in 2014, including an April derailment and fire in Lynchburg, Virginia. During a presentation at an April 2014 forum on rail safety, NTSB noted that significant accidents involving crude oil have increased in recent years, with one incident occurring between 2008 and 2012 compared to eight incidents since 2012.

DOT, primarily through PHMSA and FRA, sometimes jointly, has taken steps to engage the rail and oil and gas shipping industries and emergency responders to address the safety of transporting crude oil by

---

[72]We have ongoing work examining freight congestion in railroad corridors and the impact on local communities.

[73]PHMSA's incident database can be searched at https://hazmatonline.phmsa.dot.gov/IncidentReportsSearch/ (accessed June 12, 2014).

rail, particularly in response to concerns stemming from the July 2013 Lac-Mégantic, Quebec accident:

- In August 2013, February 2014, and May 2014, DOT issued emergency orders to compel shippers and railroads to address safety risks by taking steps to secure unattended trains, ensure proper testing and packaging of crude oil, and notify emergency responders about crude oil shipments.[74] DOT also issued safety advisories during this period recommending additional actions.[75]

- In August 2013, PHMSA, with FRA assistance, initiated an ongoing special inspection program to examine whether crude oil rail shipments are appropriately tested and packaged. The effort consists of spot inspections, data collection, and testing crude oil samples taken from tank cars. Initial information from the program has identified deficiencies; DOT issued fines against three companies in February 2014 for not following proper crude oil packaging procedures. According to PHMSA officials, this effort inspects about 2 percent of Bakken crude oil trains.

- In September 2013, PHMSA issued an Advance Notice of Proposed Rulemaking seeking comments from industry and other stakeholders on improvements to standards for crude oil rail tank cars.[76] This action was in response to the railroad industry's 2011 petition for improved standards and recommendations from NTSB.

---

[74]FRA's August 2013 emergency order required railroads to take additional steps to secure unattended trains to prevent unintended movement; DOT's February 2014 emergency order, amended in March 2014, specified requirements for testing and classifying crude oil for transportation by rail and required shippers to package crude oil under the more stringent standards as allowed by regulation; DOT's May 2014 emergency order required railroads shipping 1,000,000 or more gallons of crude oil in a single train (about 35 car loads) to notify states' emergency response commissions about the movement of such trains through their states and which specific counties trains would be traveling through.

[75]DOT's August 2013 safety advisory recommended that railroads review the circumstances of the Lac-Mégantic accident and consider changes to their operating practices related to crew staffing, human factors, and train securement. DOT's November 2013 safety advisory reinforced the importance of proper testing and packaging for flammable liquids transported by train. DOT's May 2014 safety advisory asked companies to use tank cars with the highest integrity available for transporting Bakken crude oil and to avoid using older DOT-111 tank cars.

[76]78 Fed. Reg. 54849 (Sept. 6, 2013).

- In January 2014, PHMSA issued a safety alert notifying the general public, emergency responders, shippers, and carriers that Bakken crude oil may be more flammable than traditional heavy crude oil based on tests associated with PHMSA and FRA's special inspection program. PHMSA said it planned to issue final results of the tests at a later date.

- In February 2014, DOT entered into a voluntary agreement with AAR to improve the safety of moving crude oil by rail including increased track inspections, improved emergency braking capabilities, use of a risk-based routing tool to identifying the safest routes, travel at lower speeds, and emergency response training and planning.

- Also in February 2014, PHMSA officials met with emergency responders and industry groups to discuss training and awareness related to the transport of Bakken crude oil.

- In July 2014, DOT issued an update on PHMSA and FRA's joint special inspection program that includes results to date of their crude oil testing efforts and related discussion of the appropriate packaging of oil tested.

Additionally, in July 2014, PHMSA, in coordination with FRA, proposed new rules that align with key areas of concern cited by stakeholders: crude oil classification, testing, and packaging; crude oil tank car design; and emergency response. Specifically, PHMSA issued a Notice of Proposed Rulemaking seeking comment on proposals for new regulations to lessen the frequency and consequences of train accidents involving large volumes of flammable liquids, such as crude oil. The proposal includes new operational requirements for certain trains transporting a large volume of flammable liquids; revisions to requirements for crude oil classification, testing, and packaging; and improvements in tank car standards.[77] Additionally, PHMSA, also in consultation with FRA, issued an Advance Notice of Proposed Rulemaking seeking comments in response to questions about potential revisions to current regulations for emergency response planning for crude oil transported by rail.[78]

---

[77] 79 Fed. Reg. 45016 (Aug. 1, 2014).

[78] 79 Fed. Reg. 45079 (Aug. 1, 2014).

Crude Oil Classification, Testing, and Packaging

PHMSA's current regulations for transporting hazardous materials require that shippers classify and characterize the materials they ship to identify the materials' characteristic properties and select an appropriate shipping package based on those properties.[79] "Classification" refers to identifying a material's hazard class, which could be one or more from the list of nine in PHMSA's hazardous materials regulations, such as a flammable liquid or flammable gas. "Characterization" refers to ascertaining other characteristics of the product to determine its proper packing group, a designation based on risk that identifies acceptable packages.[80] Specifically, PHMSA's regulations classify crude oil as a flammable liquid and offer acceptable tank cars under three packing groups based on characteristics such as the oil's flash point—lowest temperature at which a liquid can vaporize to form an ignitable mixture in air—and boiling point.[81] PHMSA's regulations provide options for the tests shippers may use to determine these characteristics.[82] Crude oil with higher boiling and flash points is considered less risky, since it is less likely to form flammable vapor unless exposed to extreme temperatures, and more approved packaging choices exist for such oil than for oil with lower boiling and flash points that could form ignitable vapor at lower temperatures. Substances that are gases, rather than liquid, at ambient temperatures are even more flammable, and thus more stringent packaging requirements apply to flammable gases than to flammable

---

[79]49 C.F.R. Parts 172 and 173.

[80]49 C.F.R. § 172.101. Hazardous liquids, including crude oil, can be packaged under three sets of increasingly stringent requirements known as "packing groups," which range from the least restrictive group III to the most restrictive group I. In addition to specifying what types of tank cars may be used under each packing group, packing groups I and II require the shipper to develop a security plan that includes assessment of transportation security risks and measures to address those risks, see 49 C.F.R. § 172.800 (a)(6). According to PHMSA officials, the security plan would include planning for leaving a train unattended, which could have been a factor in the Lac-Mégantic accident, since that train was unattended at the time of the accident. The crude oil in the Lac-Mégantic accident had been assigned to packing group III, which does not require this plan. Subsequently, investigators have determined that it should have been assigned to packing group II, which would have required a plan. Details of the Lac-Mégantic accident are incomplete because the Transportation Safety Board of Canada's investigation of the accident is still ongoing. As of January 2014, the agency was completing its examination and analysis phase and planned to soon move onto its reporting phase.

[81]49 C.F.R. § § 172.101(g), 173.120, 173.121, 173.242, 173.243, and 179.200.

[82]49 C.F.R. § § 173.120(c) and 173.121 (a)(1).

liquids. In particular, flammable gases must be packaged in pressure tank cars, which provide additional safety in the event of an accident.[83]

According to PHMSA officials, because crude oil is a natural resource, it has greater characteristic variability than a hazardous material manufactured under strict specifications or quality guidelines. Thus, testing may need to be done more frequently to make sure the proper packaging rules are followed, since different rules may apply depending on the characteristics of a particular oil shipment. A review by Canadian transportation safety officials determined that the crude oil involved in the Lac-Mégantic accident was packaged under less stringent packing requirements than those which should have been followed, given the flammability characteristics of the oil involved. Although, as DOT officials pointed out, a different packing group would not have changed the package itself, since the type of tank car involved in the incident, the DOT-111 tank car, is allowed for crude oil transport under all three packing groups.[84]

Stakeholders we spoke to have differing views on the volatility of crude oil from the Bakken region, the area where the most crude oil is being shipped by rail. Some industry stakeholders, including the operators of Bakken crude oil rail terminals, characterized Bakken crude oil as being like any other crude oil produced in the United States, while other stakeholders said it has differences that may make it more volatile. In particular, PHMSA and AAR officials said that Bakken oil has variable composition and may sometimes contain higher than usual levels of dissolved natural gases. According to AAR officials, this can lead to flammable gases building up in a tank car during transport. AAR officials also said that the presence of natural gas makes fires more likely when crude oil tank cars are involved in an accident. Additionally, a May 2014 industry study noted that Bakken crude oil may contain higher amounts of dissolved flammable gases; however, the report states that it is not enough to warrant new regulations for crude oil rail transportation.[85]

---

[83]49 C.F.R § § 172.101, 173.115(a), 173.314, and 179.100.

[84]Transportation Safety Board of Canada, *Rail Safety Advisory Letter—12/13* (Gatineau, Quebec, Canada: Sept. 11, 2013).

[85]American Fuel & Petrochemical Manufacturers and Dangerous Goods Transport Consulting Inc., *A Survey of Bakken Crude Oil Characteristics Assembled For the U.S. Department of Transportation* (May 14, 2014).

According to PHMSA officials, the current regulatory framework for classifying and packaging crude oil for transport by rail may need to be further examined to ascertain if it addresses all of the risks posed by some shale crude oils that have properties unlike other typical crudes. PHMSA's July 2014 Notice of Proposed Rulemaking calls for shippers of mined gases and liquids to be transported by rail, including crude oil, to develop and implement a program for sampling and testing to ensure the shippers' materials are properly classified and characterized. The procedures must outline a frequency of sampling and testing that accounts for the potential variability of the material being tested, sampling at various points to understand the variability of the material during transportation, sampling methods that ensure a representative sample of the entire packaged mixture is collected, and testing methods used, among other requirements. The sampling and testing program must be documented in writing and retained for as long as it remains in effect and be made available to DOT for review upon request.

Representatives from railroads and crude oil terminals we spoke to, as well as from the oil and gas industry, have indicated that clarification about the requirements for testing and packaging crude oil is needed. Specifically, two of the railroads and two crude oil rail terminal operators told us that PHMSA needs to clarify its crude oil testing requirements, including to more clearly state which tests should be done and with what frequency.[86] One of the terminal operators told us that without clearer guidance, they are unsure whether they are performing the right tests and testing with sufficient frequency. They are also concerned they may be incurring unnecessary expense from over-testing. PHMSA's July 2014 Notice of Proposed Rulemaking does not state which tests should be performed or specifically how often, but does state that testing methods used should enable complete analysis, classification, and characterization of the material as required by PHMSA's regulations and that the frequency of testing should account for the potential variability of the material. The notice also seeks comment on whether more or less specificity of these requirements would aid shippers and whether the proposed guidelines provide sufficient clarity for shippers to understand whether they are in compliance. PHMSA has also drafted more detailed

---

[86]The other railroads did not mention the issue, and the third terminal operator said the current guidance is sufficient.

guidance on classification and packaging crude oil, including testing procedures, but had not released it publicly as of June 2014.[87]

Additionally, the American Petroleum Institute, an oil and gas industry association, formed a working group in 2014 to develop industry standards for testing and packaging of crude oil for transportation by rail, which the group hopes to implement by October 2014. PHMSA officials said that PHSMA scientists have been attending the group's meetings and providing input. In its July 2014 Notice of Proposed Rulemaking, PHMSA noted that it is encouraged by the development of an industry standard and that once finalized, PHMSA may consider adoption of such a standard.

**Crude Oil Tank Car Design**

Under PHMSA's current packaging regulations, a number of types of tank cars are approved for transporting crude oil.[88] However, DOT-111 tank cars are most commonly used, according to industry and railroad representatives, and PHMSA's regulations allow its use for all types of crude oil, regardless of packing group.

NTSB has documented a history of safety concerns with the DOT-111 tank car. Specifically, NTSB has raised concerns regarding the tank car's puncture resistance, heat tolerance, and potential for overpressurization during a fire. In its report of a 2011 investigation of the derailment of a train hauling ethanol tank cars, NTSB noted that its 1991 safety study and four train-derailment investigations from 1992 to 2009 had identified problems with DOT-111 tank cars.[89] The report further concluded that the car's poor performance suggested that DOT-111 tank cars are inadequately designed to prevent punctures and breaches and that the catastrophic release of hazardous materials can be expected when derailments involve DOT-111 cars.[90] In response to that and other rail incidents, in 2012, NTSB recommended that PHMSA upgrade its DOT-

---

[87]PHMSA provided us a draft of this guidance in March 2014; according to PHMSA officials, the document is still under development.

[88]49 C.F.R. § § 173.242(a) and 173.243(a),

[89]NTSB, *Railroad Accident Brief, NTSB/RAB-13/02* (Washington, D.C.: Aug.14, 2013).

[90]According to FRA officials, tank car specifications and design requirements were based on forces and stresses incident to normal transportation, not crash survivability, since derailments are not normal transportation events. Officials said that recently crash survivability has been a metric for tank car specification and design.

111 tank car standards to improve tank shielding and puncture resistance, a move the industry had already begun to address.

In 2011, the railroad industry petitioned PHMSA to adopt improved standards for DOT-111 tank cars and worked with tank car manufacturers and other stakeholders to develop improved industry standards that were implemented later that year. These standards called for a thicker shell to improve puncture resistance, shielding at both ends of the tank car, and protection for the top fittings of the tank car. More recently in November 2013, following the Lac-Mégantic accident, the railroad industry called for further tank car upgrades, including a thicker shell, protection to prevent overheating, additional shielding, protection for outlet handles on the bottom of a tank, and high-capacity pressure relief valves.[91] Figure 8 shows how these various proposed upgrades may be incorporated into a crude oil tank car.

---

[91]Additionally, an AAR official speaking at an NTSB forum and officials from one railroad that we spoke to suggested that the type of tank cars currently used may not be appropriate for transporting crude oil of higher flammability and that pressure tank cars may be preferable. PHMSA's hazardous materials regulations require flammable gases to be transported in pressure tank cars. According to FRA officials, if the vapor pressure of crude oil is high enough, regulations would require putting it in a pressure car. According to PHMSA's and FRA's July 2014 update on its special inspection effort, the current classification of Bakken crude oil as a flammable liquid is accurate under the current classification system; however, the update also notes that Bakken crude oil tested has a higher gas content, higher vapor pressure, lower flash point, and lower boiling point than most other crude oil in the United States. Consequently, the update concluded that Bakken crude oil has a higher degree of volatility than other oil, which correlates to increased ignitability and flammability.

Figure 8: Proposed Upgrades to Crude Oil Rail Tank Cars



**Head shields**
Shielding at both ends of a tank car provide additional puncture resistance.

**Bottom outlet handles**
Handles for the tank's bottom outlets are reconfigured to prevent them from inadvertently opening during an accident.

**High-capacity pressure-relief valve**
A high-capacity pressure-relief device is designed to protect against the risk of increased internal pressure resulting from a fire, providing for faster pressure release.

**Top fittings protection**
Valves and other fittings on the top of the tank car are protected from damage in the event of an accident.

**Thermal protection and jacket**
A thermal protection layer insulates tank contents to protect against overheating in the event the tank is exposed to fire. A metal jacket protects the thermal protection layer and may offer additional puncture resistance.

**Tank thickness**
Tank thickness is increased to provide better puncture resistance.

Sources: GAO, AAR and railroads.  |  GAO-14-667

Although tank cars are generally owned by shippers or third parties, one railroad told us they intend to acquire their own fleet of tank cars built to the railroad industry's 2013 proposed standards. The railroad hopes to incentivize the cars' use by shippers; however, railroads are obligated to move materials as long as they are packaged according to federal standards, and told us they cannot force customers to use upgraded cars and have to accept cargo so long as it is in an allowable package, which includes older model DOT-111 cars.

A wide range of stakeholders we interviewed—including those from PHMSA, NTSB, state transportation agencies, railroad industry, and rail suppliers—told us that crude oil tank car standards need to be improved. Most shippers, railroads, and rail suppliers providing comments in response to PHMSA's September 2013 rail safety Advance Notice of Proposed Rulemaking also stated this opinion. However, there were some differences in their views on how improvements should be implemented. Those who commented in response to PHMSA's notice supported enacting the industry's upgraded tank car standard into

regulation and were generally supportive of proposals to strengthen tank cars' puncture resistance through design features such as thicker tank walls, jackets, and shielding. However, stakeholders disagreed on the extent to which existing tank cars should—or even could—be retrofitted to meet higher standards. For example, shippers and rail suppliers stated that existing tank cars built to the current industry standards that already exceed the regulatory standard should be exempt from retrofitting if PHMSA were to adopt an even higher standard. Shippers also expressed concerns that retrofitting would be costly, take tank cars out of service, and put a burden on the already busy shops that also build new tank cars. Local-government and rail-industry commenters supported retrofitting existing cars.

In its July 2014 Notice of Proposed Rulemaking, PHMSA sought comment on requirements for a new DOT-117 tank car standard to replace the current DOT-111 standard for newly manufactured tank cars transporting flammable liquids, which could be one of three options: 1) a design by PHMSA and FRA that would increase puncture resistance, provide thermal protection, protect top fittings and bottom outlets, and improve braking performance; 2) the design in the railroad industry's proposal from November 2013 previously discussed; and 3) the 2011 industry-developed tank car design with some enhancements. PHMSA's Notice of Proposed Rulemaking concluded that cars built to the option 3 standard would likely be built in the absence of a new rule, based on commitments from industry, but that options 1 and 2 would provide additional safety benefits, along with additional cost. Specifically, PHMSA estimated that the improved braking, roll-over protection and increased shell thickness under option 1 would cost $5,000 more per car than option 3. According to PHMSA, option 2 would have most of the same safety features as option 1 except rollover protection and the improved braking system, resulting in a cost of $2,000 more per car than option 3. In addition to the new DOT-117 standard, the proposal would create a performance standard for the design and construction of new tank cars equivalent to the DOT-117, subject to FRA approval. Under the proposal, existing tank cars would have to be retrofitted to comply with the performance standard.[92] The proposal calls for phasing out use of all

---

[92]PHMSA's Notice of Proposed Rulemaking notes that retrofitting could be costly, potentially exceeding $30,000 per car, and would result in out-of-service time of at least 1 month. Due to cost concerns, PHMSA's proposal for retrofitting existing tank cars does not include requirements for top-fittings protections.

DOT-111 tank cars for transporting flammable liquids by October 1, 2020, although the cars could still be used to transport other materials.[93]

Although this proposed rule had previously been scheduled for release in November 2014, PHMSA accelerated its efforts to issue a proposal, resulting in the July 2014 release. According to PHMSA officials, the agency did not issue a proposal sooner because the industry, as well as the public, have had different opinions on tank car specifications. Since 2011, PHMSA has received multiple petitions seeking changes to tank car safety standards. In the interim, the railroad industry has moved to adopt higher standards, and in a May 2014 safety advisory, PHMSA and FRA asked companies to refrain from using older tank cars if possible.

**Emergency Response**

Transporting a large volume of flammable liquid in one train increases the risk of a large fire or explosion in the event of a derailment, such as in the Lac-Mégantic incident. DOT has noted that the transportation of crude oil in unit trains compounds the risk of ignition, and NTSB has reported that crude oil unit trains present the potential for disastrous consequences in the event of an accident. Associations representing emergency responders told us they are particularly concerned about the risk these trains pose to rural areas, which generally have fewer resources to respond to hazardous materials incidents. They also cited concerns with the general lack of awareness about risks and the need for industry to better communicate with local responders about them. Railroad officials told us that risks from unit trains can be managed. Further, railroad officials told us that transporting crude oil in trains that carry a mixture of freight commodities could be higher risk, due to the need to sort crude oil tank cars in rail yards, and that doing so would lead to reduced efficiency by increasing the turn-around times for crude oil trains. In August 2013, AAR revised its guidance on hazardous materials operating practices so that its restrictions would apply to crude oil unit trains; these restrictions include a 50 MPH speed limit, limitations on the use of track siding, and requirements for addressing defective bearings.[94] However, associations

---

[93]Specifically, PHMSA's Notice of Proposed Rulemaking states that existing DOT-111 tank cars may be retrofitted to DOT-117 standards, retired, repurposed, or operated under speed restrictions.

[94]AAR's hazardous materials operating practices guidance had previously applied to trains carrying poison inhalation hazards, toxic inhalation hazards, spent nuclear fuel, and high-level radioactive waste, but was expanded to also include trains carrying 20 car loads or intermodal portable tank loads of any combination of hazardous material, which would include unit trains carrying 20 or more carloads of crude oil.

representing emergency responders told us that industry should do more to prepare responders for potential incidents, such as by providing information, training, and resources. These organizations also shared concerns about rural responders lacking resources and information to respond as effectively as responders in urban areas. As previously mentioned, stakeholders told us that rural areas may lack sufficient resources to respond to a major event, like an accident involving a crude oil unit train.

As previously discussed, PHMSA has engaged emergency responders on crude oil transportation safety, and the voluntary commitment DOT secured from railroads included emergency response planning and training efforts. However, PHMSA's requirements for comprehensive emergency response planning do not apply to unit trains used to transport crude oil, raising concerns about the abilities of responders and other stakeholders to effectively handle potential incidents. As currently worded, PHMSA's regulations require comprehensive plans for trains that haul any liquid petroleum or non-petroleum oil in a quantity greater than 42,000 gallons per package—greater than the about 30,000 gallons of crude oil typically transported in a tank car—even though a unit train of 100 cars could carry about 3 million gallons of crude oil.[95] Instead, PHMSA requires railroads to have a basic plan that includes information about the maximum potential discharge, response plans, and identification of (but not coordination with) private response personnel and the appropriate people and agencies to contact in the event of an incident.[96] Federal regulations require that comprehensive emergency response plans include a written plan outlining contingency planning, an identified central coordinating official during an incident, private personnel secured by contract or other means to respond to a worst-case incident, training, equipment, and response actions and be subject to review by FRA.[97] Without a comprehensive plan, PHMSA does not have assurance that railroads have taken steps to plan for response needs and identified and coordinated with the appropriate responders. PHMSA's July 2014 Advance Notice of Proposed Rulemaking seeks comment on several

---

[95]The House Appropriations Committee called on PHMSA to address this problem in a report that accompanied the committee's Transportation-HUD appropriations bill H.R. 4745, for fiscal year 2015. H. Rpt. 113-464, p.62.

[96]49 C.F.R. § 130.31(a).

[97]49 C.F.R. § 130.31(b).

possible ways of expanding the comprehensive planning requirement to include crude oil unit trains by changing the threshold under which such plans are required.[98]

Although this review focuses on the packaging and movement of crude oil in tank cars, our prior work has found that while DOT has taken actions in this area, there are other safety issues that are also relevant to the context of the safety of transporting crude oil by rail. Specifically, in a December 2013 report, we found that FRA has developed a risk-based approach to direct its inspection efforts, but the agency had been slow to implement broader risk reduction planning.[99] As required by the Rail Safety Improvement Act of 2008, FRA was tasked with overseeing railroads' development of risk reduction plans.[100] Specifically, FRA was required to issue a final rule by October 2012 directing railroads to develop these plans, but our report found that FRA had not yet issued the final rule. Our report described safety challenges that railroads face, some of which can contribute to derailments. Other actions have been taken subsequently. FRA issued a final rule in January 2014 revising track inspection requirements to increase the standard for track used to transport hazardous materials.[101] And, as discussed, railroads entered into a voluntary agreement with DOT in February 2014 to improve the safety of crude oil trains.[102] In their comments in response to PHMSA's September 2013 Advance Notice of Proposed Rulemaking on rail safety, several shippers noted that recent incidents have generally been caused by defective track, railroad equipment or operational issues, and supported improvements in these areas. NTSB's accident report for the aforementioned 2011 derailment of ethanol tank cars noted that although problems with tank cars were a contributing factor, the probable cause of the accident was a broken rail. PHMSA has also noted that addressing

---

[98]Specifically, the notice asks whether the threshold should be set at 1) 1,000,000 gallons or more of crude oil per train, 2) 20 or more carloads of crude oil per train, 3) 42,000 gallons of crude oil per train, or 4) another threshold. The notice states that comments will inform a potential future Notice of Proposed Rulemaking on the issue.

[99]GAO, *Rail Safety: Improved Human Capital Planning Could Address Emerging Safety Oversight Challenges,* GAO-14-85 (Washington, D.C.: Dec. 9, 2013).

[100]Pub. L. No. 110-432, § 103, 122 Stat. 4848, 4853.

[101]79 Fed. Reg. 4234, 4245 (Jan. 24, 2014).

[102]Additionally, railroads we spoke to said they have invested heavily in upgrading their track in recent years.

the causes of derailments, not just upgrading tank cars, is important for improving the safety of transporting crude oil by rail. According to PHMSA officials, the severity of a derailment may present a wide range of forces for any particular tank car to withstand, and therefore, even an enhanced tank car may have variable performance and may not always perform better in a given derailment. PHMSA's July 2014 Notice of Proposed Rulemaking to address safety of transporting crude oil by rail includes a number of other provisions in addition to those already discussed for trains carrying 20 or more tank carloads of flammable liquids, including a routing analysis, enhanced braking, and codifying the May 2014 emergency order requiring notification to emergency responders about crude oil shipments.

## Conclusions

The advent of new oil and gas production technologies has created a new energy boom for the United States. However, with this increase in production comes the responsibility to move those flammable, hazardous materials safely.

While the Department of Transportation has worked to identify and address risks, its regulation has not kept pace with the changing oil and gas transportation environment. Gathering pipeline construction has increased, but some of these new pipelines in rural areas fall outside the current safety framework, despite operating at the size and pressure (and therefore similar risk) as federally regulated transmission lines. DOT began a rulemaking to address this issue in 2011 but did not issue proposed rules. Subsequently, new gathering pipeline infrastructure has continued to grow, with industry predicting such growth will continue for the foreseeable future, raising concerns where such pipelines are not subject to safety regulations.

The growth in the use of rail to move crude oil has likewise revealed risks not fully addressed by the current safety framework, particularly in ensuring that oil is properly tested and packaged for shipping. Emergency responders also need to be adequately prepared in the event that incidents occur, both for pipeline and for rail. Recent transportation incidents, such as the July 2013 train accident in Lac-Mégantic, Quebec, have highlighted the need for risk-based federal safety oversight. Since the Lac-Mégantic accident, much emphasis has been placed on the need to upgrade standards for tank cars that carry crude oil, but attention to tank cars alone is not sufficient to address safety, a sentiment shared by some railroads and shippers, as well as DOT. Oil and gas shippers, railroads and pipeline operators, emergency responders, and government

all have a role to play. Shippers, in particular, play an important role in making sure that hazardous materials like crude oil are properly packaged for safe transport. This underscores the importance of DOT's role in assessing the risk such oil poses and providing clear guidance for handling it safely. Without timely action to address safety risks posed by increased transport of oil and gas by pipeline and rail, additional accidents that could have been prevented or mitigated may endanger the public and call into question the readiness of transportation networks in the new oil and gas environment. DOT's recent proposed rulemakings to address concerns about transporting crude oil by rail signal the department's commitment to addressing these important safety issues. Because of the ongoing rail safety rulemakings, we are not making recommendations related to rail at this time.

## Recommendation

To address the increased risk posed by new gathering pipeline construction in shale development areas, we recommend that the Secretary of Transportation, in conjunction with the Administrator of PHMSA, move forward with a Notice of Proposed Rulemaking to address gathering pipeline safety that addresses the risks of larger-diameter, higher-pressure gathering pipelines, including subjecting such pipelines to emergency response planning requirements that currently do not apply.

## Agency Comments and Our Evaluation

We provided a draft of this report to DOT for comment. We received written comments from DOT's Assistant Secretary for Administration, which are reproduced in appendix III. These comments stated that PHMSA generally concurred with our recommendation to move forward with a rulemaking to address risks posed by gathering pipelines. Further, the letter stated that PHMSA is developing a rulemaking to revise its pipeline safety regulations and is examining the need to adopt safety requirements for gas gathering pipelines that are not currently subject to regulations. Additionally, the letter stated that proposed regulations are under development to ensure the safety of natural gas and hazardous liquid gathering pipelines that include collecting new information about gathering pipelines to better understand the risk they pose.

In the version of the draft report we sent to DOT for comment, we had also recommended that PHMSA develop and publish additional guidance on testing, classification and packaging of crude oil for transport by rail and that PHMSA address emergency response planning regulations for transporting oil by rail so that they include shipments of crude oil by unit trains. DOT's written response stated that PHMSA generally concurred

with these recommendations and was taking steps to address them. Subsequently, on July 23, 2014, PHMSA, in coordination with FRA, issued rulemaking proposals that, if implemented, would likely address these concerns. Therefore, we are no longer making those recommendations in this report and we have added language to the report describing the objectives of the proposals. We also received technical comments from DOT, which we incorporated as appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate congressional committees and to the Secretary of Transportation. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staffs have any questions about this report, please contact Susan Fleming at (202) 512-2834 or flemings@gao.gov or Frank Rusco at (202) 512-3841 or ruscof@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Major contributors to this report are listed in appendix IV.

Susan Fleming
Director, Physical Infrastructure Issues

Frank Rusco
Director, Natural Resources and Environment

# Appendix I: Objectives, Scope, and Methodology

This report addresses (1) challenges, if any, that increased domestic oil and gas production poses for U.S. transportation infrastructure and examples of associated risks and implications; (2) how pipeline infrastructure has changed as a result of increased oil and gas production, the key related safety risks, and to what extent the U.S. Department of Transportation (DOT) has addressed these risks; and (3) how rail infrastructure has changed as a result of increased oil production, the key related safety risks, and to what extent DOT has addressed these risks.

To identify challenges increased domestic oil and gas production poses for U.S. transportation infrastructure and examples of the associated risks and implications, we reviewed and synthesized information from 36 studies and other publications from federal, state, and tribal government agencies; industry; academics; and other organizations. We identified these studies and publications by conducting a search of web-based databases and resources—including Transport Research International Documentation, ProQuest, and FirstSearch—containing general academic articles, government resources, and "gray literature."[1] Studies and publications were limited to those focused on domestic onshore oil and gas production and published in the years 2008 through 2013. In addition, we reviewed prior work we have conducted. We included examples of known transportation infrastructure limitations and associated effects from these studies and publications in this report. We believe the studies and publications identified through our literature search and included in our review have identified key examples of known transportation infrastructure limitations and associated effects. In addition, we analyzed data from the U.S. Department of Energy's Energy Information Administration (EIA) to identify oil and gas produced from 2007 to 2012. To assess the reliability of these data, we examined EIA's published methodology for collecting this information and found the data sufficiently reliable for the purposes of this report.

---

[1] "Gray literature" publications may include, but are not limited to, the following types of materials: reports (pre-prints, preliminary progress and advanced reports, technical reports, statistical reports, memorandums, state-of-the art reports, market research reports, etc.), theses, conference proceedings, technical specifications and standards, non-commercial translations, bibliographies, technical and commercial documentation, and official documents not published commercially (primarily government reports and documents).

Appendix I: Objectives, Scope, and Methodology

To determine how pipeline infrastructure has changed as a result of increased oil and gas production, we analyzed data from DOT's Pipeline and Hazardous Materials Safety Administration (PHMSA) on pipeline construction from January 1, 2010 through December 31, 2012 and interviewed PHMSA officials and representatives of pipeline industry associations and operators. We assessed the reliability of the data on pipeline construction by reviewing documentation about the database, interviewing agency officials about how the data are collected, comparing the data to similar information from EIA on completed pipeline projects, and reviewing the agency's related internal controls. We determined that the data were sufficiently reliable for describing new pipeline construction projects. We identified key pipeline safety risks by reviewing documents provided by and interviewing officials from PHMSA, pipeline industry associations and operators, and safety organizations. To examine trends in pipeline incidents, we analyzed PHMSA's pipeline incident data from January 1, 2008 through December 31, 2013. This analysis only examined transmission pipeline incidents, since many gathering pipelines are not regulated and therefore the data may not include potential gathering pipeline incidents. We assessed the reliability of these data by reviewing documentation on the collection of these data, interviewing agency officials about how the data are collected and whether there are potential limitations for using the data as we intended, and reviewing the agency's related internal controls. We determined that these data were sufficiently reliable for identifying trends in pipeline incidents. We also examined transportation infrastructure changes and safety risks specific to key shale development areas in four states selected because they are located above shale plays in different parts of the country with generally the highest levels of oil and gas production from 2007 through 2011, according to EIA data. The states and corresponding shale plays were Pennsylvania and West Virginia (Marcellus shale play), North Dakota (Bakken shale play), and Texas (Eagle Ford shale play). In these states, we spoke with state oil and gas regulatory and transportation agencies, oil and gas industry associations, oil and gas companies, railroads, and crude oil rail terminal operators, as well as a community advocacy organization in Pennsylvania. We also reviewed documents provided by these organizations.

To determine how rail infrastructure has changed, we analyzed Surface Transportation Board (STB) data on crude oil shipments by rail for calendar years 2008 through 2012 and interviewed DOT officials from

PHMSA and the Federal Railroad Administration and industry representatives, including railroads.[2] We assessed the reliability of the STB data by reviewing documentation about the data, interviewing agency officials about how the data were collected and ways they could be analyzed, and reviewing the agency's related internal controls. We determined that the data were sufficiently reliable for describing trends in the movement of crude oil. To identify the key safety risks related to changes in rail infrastructure, we analyzed PHMSA's data on rail hazardous-materials incidents from January 1, 2008 through December 31, 2013, reviewed documents submitted to a DOT rulemaking proceeding on rail safety, and interviewed DOT officials and representatives from safety organizations and industry. We assessed the reliability of PHMSA's incident data by reviewing documentation about the data, interviewing agencies officials about how the data were collected, testing the data for inconsistencies, and reviewing the agency's related internal controls. We concluded that the data were sufficiently reliable for discussing trends in rail hazardous-materials incidents. Additionally, to examine infrastructure impacts and safety issues closely associated with shale areas, we Interviewed officials from state oil and gas regulatory and transportation agencies, industry associations and oil and gas transportation companies in the four states mentioned previously: North Dakota, Pennsylvania, Texas, and West Virginia. To evaluate to what extent DOT has addressed safety risks, we reviewed federal laws and regulations, DOT emergency orders and guidance, and interviewed DOT officials. National and state-level stakeholders we interviewed are listed in tables 2 and 3.[3]

---

[2]In addition to DOT officials from PHMSA and FRA, we also interviewed officials from the Federal Highway Administration, Federal Motor Carriers Safety Administration, and Maritime Administration. Since we focused our evaluation of DOT's efforts on pipeline and rail, we did not evaluate the efforts of these other DOT administrations.

[3]Additionally, Kinder-Morgan, an oil pipeline operator, declined to participate, and Enbridge, an oil pipeline company, was not able to schedule an interview with us within our time frame. We also contacted five other crude oil rail terminals in North Dakota that either did not respond to our requests or declined to be interviewed.

**Table 2: National-Level Industry and Safety Stakeholders GAO Interviewed**

| Stakeholder | Description |
| --- | --- |
| **Industry stakeholders** | |
| American Petroleum Institute | Oil and gas industry |
| American Short Line and Regional Railroad Association | Railroad industry |
| American Trucking Associations | Trucking industry |
| Association of American Railroads | Railroad industry |
| Association of Oil Pipe Lines | Pipeline industry |
| BNSF Railway | Class I railroad |
| CN | Class I railroad |
| Canadian Pacific | Class I railroad |
| CSX Transportation | Class I railroad |
| Dominion | Gas pipeline operator |
| Interstate Natural Gas Association of America | Pipeline industry |
| National Tank Truck Carriers | Trucking industry |
| Norfolk Southern | Class I railroad |
| Railway Supply Institute | Tank car manufacturers |
| Spectra | Gas pipeline operator |
| Williams/Transco | Gas pipeline operator |
| Union Pacific Railroad | Class I railroad |
| **Safety stakeholders** | |
| Commercial Vehicle Safety Alliance | Highway safety |
| International Association of Fire Chiefs | Emergency responders |
| National Association of Regulatory Utility Commissioners | State regulatory officials |
| National Association of State Fire Marshals | Emergency responders |
| National Fire Protection Association | Emergency responders |
| National Transportation Safety Board | Federal incident investigation |
| Pipeline Safety Trust | Pipeline safety advocates |

Source: GAO.  | GAO-14-667

**Table 3: State-Level Stakeholders GAO Interviewed**

| Stakeholder | Description |
|---|---|
| **North Dakota** | |
| Crestwood Colt Hub | Rail crude oil terminal operator |
| Hess Corporation | Rail crude oil terminal operator |
| North Dakota Department of Mineral Resources | State oil and gas regulator |
| North Dakota Department of Transportation | State highway agency |
| North Dakota Petroleum Council | Oil and gas industry |
| North Dakota Pipeline Authority | State pipeline agency |
| North Dakota Pipeline Association | Pipeline industry |
| North Dakota Public Service Commission | State oil and gas regulator |
| Savage Services | Rail crude oil terminal operator |
| **Pennsylvania** | |
| C.O.G.E.N.T. | Community pipeline safety |
| MarkWest | Gas company |
| Pennsylvania Department of Transportation | State transportation agency |
| Pennsylvania Public Utility Commission (Gas Safety Division) | State gas regulator |
| Wheeling & Lake Erie Railroad | Regional railroad |
| **Texas** | |
| Gardendale Railroad | Short line railroad |
| Marathon Oil | Oil and gas pipeline operator |
| Railroad Commission of Texas | State oil and gas regulator |
| South Texas Energy Economics Roundtable | Oil and gas industry |
| Southcross | Gas company |
| Texas Department of Transportation (Rail Division) | State rail agency |
| Texas Oil and Gas Association | Oil and gas industry |
| Texas Pipeline Association | Pipeline industry |
| **West Virginia** | |
| Energy Partners | Gas pipeline operator |
| West Virginia Department of Transportation (Division of Highways) | State highway agency |
| West Virginia Public Safety Commission | State oil and gas pipeline regulator |

Source: GAO.  | GAO-14-667

We conducted this performance audit from August 2013 to August 2014
in accordance with generally accepted government auditing standards.
Those standards require that we plan and perform the audit to obtain
sufficient, appropriate evidence to provide a reasonable basis for our
findings and conclusions based on our audit objectives. We believe that

**Appendix I: Objectives, Scope, and
Methodology**



the evidence obtained provides a reasonable basis for our findings and
conclusions based on our audit objectives.

# Appendix II: Impacts of Shale Oil and Gas Development on Highways in Selected States

Pipeline and rail are used to transport shale oil and gas long distances; however, truck transportation via local roads and highways also plays an important role. Trucks transport these goods from production areas to pipeline and rail as well as haul most materials needed to develop oil and gas, such as water, sand, and equipment used during drilling and hydraulic fracturing. State agencies within the four states we examined (Pennsylvania, North Dakota, Pennsylvania, and Texas) have noted significant local road and highway impacts and safety concerns as a result of shale oil and gas development and have taken steps to address these impacts.

## Infrastructure Impacts

States have reported a significant increase in truck traffic as a result of shale oil and gas development, the effects of which are particularly acute in rural areas unused to this level of road congestion. State officials provided estimates of the number of truck-loads required to drill and fracture a shale gas well ranging from about 1,200 to about 3,000. Although the number of trucks is greatest during the initial drilling and fracturing phases, significant truck volume may return if a well is re-fractured and, in the case of oil wells, trucks can be used to remove oil if the wells are not connected by pipeline. State officials told us that roads in many of these areas prior to development were built for light local and farm use and were not built for the additional thousands of heavy truck loads associated with oil and gas development, leading to deterioration. North Dakota officials told us that many of the roads the oil industry is using were built to handle approximately 600 loads a day and now these roads can see thousands of heavy truck loads per day. Officials also told us that state-wide, truck traffic accounts for approximately 18 percent of all traffic, but in development areas truck traffic can account for 35 to 50 percent. As a result, it has been much more difficult to predict where the biggest road deterioration is going to happen because it depends on the location and intensity of shale development. In Pennsylvania, officials told us the increased volume of trucks has shortened the roads' normal life cycle, leading to accelerated deterioration and significant damage. The costs of shoring up and rebuilding roads to address these impacts are significant. The Texas Department of Transportation estimated an annual impact to farm-to-market roads, state highways, and local roads in the Eagle Ford area of about $4 billion.

## Safety Concerns

Road deterioration and increased truck volumes have created safety concerns in these states. Reported highway incidents involving crude oil have increased in recent years in North Dakota and Texas, the two states

we examined with significant shale oil development.[1] In Texas, for example, the Texas Department of Transportation reported an increase in highway crashes in the Eagle Ford shale and Permian Basin areas, with the Permian area seeing a 13 percent increase in roadway fatalities between 2012 and 2013.

## Actions to Address Impacts and Safety

The following actions are examples of ways state officials said they have addressed highway infrastructure and safety concerns:

- *Extraction taxes.* Officials in North Dakota told us the state uses taxes on extracted mineral resources to pay for road improvements. In 2013, the Texas state legislature voted to transfer a portion of the state's oil and gas severance tax to pay for road maintenance, a measure that will go before Texas voters for approval in November 2014.

- *Use agreements.* In Pennsylvania and West Virginia, states have entered into road-use agreements with energy companies making the companies responsible for their damage to the roads and maintaining them. Companies must also pay a bond as part of the agreement. Officials told us these agreements have helped make companies more responsible for their impact. For example, in Pennsylvania, officials told us industry had invested over $750 million in roadway infrastructure improvements.

- *Public awareness.* Texas launched a public education campaign to alert drivers to the need to use caution when driving through energy-related work zones.

Although much of the impact has been on rural, nonfederal roads, the Federal Highway Administration has been involved in helping states to coordinate information sharing. For example, in 2011, the Federal Highway Administration hosted an information-sharing meeting between officials in Pennsylvania and West Virginia, who told us the session was beneficial.

---

[1]The other two states, Pennsylvania and West Virginia, have shale formations where natural gas is primarily developed, which is not transported by truck.

# Appendix III: Comments from Department of Transportation



**U.S. Department of Transportation**

Office of the Secretary
of Transportation

1200 New Jersey Ave., SE
Washington, DC 20590

Ms. Susan Fleming
Director, Physical Infrastructure
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

Re: GAO Draft Report on Oil and Gas Transportation (GAO-14-667)

Safety is the Department's top priority. Over the past 12 months, the Department has aggressively increased its efforts to improve the safe transport of crude oil and other hazardous materials through emergency orders, voluntary agreements with the industry, and regulatory actions.

The Department combined immediate actions to protect safety with a comprehensive longer term approach to address the transportation safety challenges related to new domestic energy production. The Pipeline and Hazardous Materials Safety Administration (PHMSA) and the Federal Railroad Administration (FRA) are working on comprehensive long term solutions to the issues concerning crude oil transportation by rail and have also made full and appropriate use of regulatory authority including Emergency Orders and enhanced oversight to address urgent public safety issues.[1] The Department has taken numerous specific actions to date, including:

- **Safety Alerts and Advisories** – have been issued warning of potential safety challenges and calling for the proper classification and management of crude shipments and the use of enhanced tank cars.
- **Emergency Orders (EO)** – requiring companies to address the risks associated with rail transportation of crude oil, including proper testing and classification, and notification requirements to ensure State Emergency Response Commissions are aware of shipments.
- **Enhanced Oversight** - to verify industry actions have resulted in enforcement action including three Notices of Probable Violations.
- **Voluntary Measures** – were enacted through agreements with industry to implement a number of voluntary measures that immediately improved safety.
- **Updated Regulations** –
  - The Department announced a comprehensive Notice of Proposed Rulemaking (NPRM), on July 23, 2014. This proposed rule would strengthen tank car standards for new and existing tank cars used to transport ethanol and crude oil. The proposed rule would also require offerors of mined gases and liquids to create a sampling and testing program to aid in proper classification and impose operational restrictions on railroads that transport large volumes of these liquids, including speed restrictions and advanced braking systems.

---

[1] For more details of the actions taken to date, please visit our Safe Delivery website at: http://phmsa.dot.gov/hazmat/osd/calltoaction

Appendix III: Comments from Department of
Transportation

2

- ○ The Department also announced an Advanced Notice of Proposed Rulemaking (ANPRM), on July 23, 2014, which requests comment on revisions to the thresholds requiring a comprehensive Oil Spill Response Plans (OSRP), clarity of the current comprehensive OSRP plan requirements, and costs of developing and implementing comprehensive OSRP.
- ○ Additionally, proposed regulations are under development to ensure the safety of natural gas and hazardous liquid gathering lines that include collecting new information about gathering lines to better understand the risks they pose.
- **Encouraging States** – to adopt requirements that go beyond Federal Regulations for gathering lines. Both the federal government and the states have jurisdiction over gathering pipelines.
- **Workshops** – have been conducted to engage industry on technical and safety topics related to the safe transport of crude by pipeline and gathering lines.
- **National Standards Committee** – PHMSA actively participates in national consensus standards incorporated by reference in pipeline safety regulations.

The Department will continue to develop long term comprehensive solutions including new technologies, constructive interaction with industry, and effective oversight to mitigate risk and enhance safety through all phases of oil and gas transport.

PHMSA generally concurs with the recommendation concerning gathering line safety and is developing a rulemaking to revise the Pipeline Safety Regulations applicable to gas transmission and gathering pipelines, and examining the need to adopt safety requirements for those gas gathering lines that are not currently subject to the regulations. PHMSA also generally concurs with the recommendation for additional guidance for testing, classification and packaging of crude oil transport by rail, and is considering alternatives for providing that information (e.g., revised regulation or industry guidance). PHMSA also generally concurs with the recommendation related to emergency response planning, and will ensure that the public is afforded the opportunity to comment on appropriate regulatory thresholds. The Department will provide a detailed response to each recommendation within 60 days of the GAO report issuance.

We appreciate the opportunity to offer additional perspective on the draft report. Please contact Martin Gertel, Director of Audit Relations, at 202-366-5145 with any questions or if you would like to obtain additional detail about these comments.

Sincerely,

Brodi Fontenot
Assistant Secretary for Administration

# Appendix IV: GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contacts** | Susan Fleming, (202) 512-2834 or flemings@gao.gov<br><br>Frank Rusco, (202) 512-3841 or ruscof@gao.gov |
| **Staff Acknowledgments** | In addition to the individuals named above, Karla Springer (Assistant Director), Sara Vermillion (Assistant Director), Melissa Bodeau, Lorraine Ettaro, Quindi Franco, David Hooper, Andrew Huddleston, John Mingus, Joshua Ormond, James Russell, Holly Sasso, Jay Spaan, Jack Wang, Amy Ward-Meier, and Jade Winfree made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: http://www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



# Colorado Pikeminnow
# *(Ptychocheilus lucius)*

## 5-Year Review:
## Summary and Evaluation



## U.S. Fish and Wildlife Service
## Upper Colorado River Endangered Fish Recovery Program
## Denver, Colorado

## 2011

# TABLE OF CONTENTS

1.0    GENERAL INFORMATION ...........................................................................................1

    1.1    Purpose of 5-year Reviews ...........................................................................1

    1.2    Reviewers....................................................................................................1

    1.3    Methodology Used to Complete Review........................................................2

    1.4    Background ...................................................................................................3

        1.4.1   Federal Register Notice Citation Announcing Initiations of This Review .............3

        1.4.2   Listing History ................................................................................3

        1.4.3   Associated Rulemakings..................................................................3

        1.4.4   Review History ................................................................................3

        1.4.5   Species' Recovery Priority Number at Start of 5-year Review .................3

        1.4.6   Recovery Plan or Outline.................................................................4

2.0    REVIEW ANALYSIS ...................................................................................................5

    2.1    Application of the 1996 Distinct Population Segment Policy ...........................5

    2.2    Recovery Criteria .........................................................................................5

        2.2.1   Does the species have a final, approved recovery plan containing objective, measureable criteria? ....................................................5

        2.2.2   Adequacy of recovery criteria..........................................................6

            2.2.2.1. Do the recovery criteria reflect the best available and most up-to-date information on the biology of the species and its habitat? .........6

            2.2.2.2. Are all of the 5 listing factors that are relevant to the species addressed in the recovery criteria?..................................................6

        2.2.3   List the recovery criteria as they appear in the recovery plan, and discuss how each criterion has or has not been met, citing information ...........................6

    2.3    Synthesis ...................................................................................................19

3.0    RESULTS ..................................................................................................................20

    3.1    Recommended Classification.......................................................................20

    3.2    New Recovery Priority Number ...................................................................20

4.0    RECOMMENDATIONS FOR FUTURE ACTIONS .....................................................21

5.0    REFERENCES .........................................................................................................22

# LIST OF FIGURES

FIGURES

1.   Colorado pikeminnow adult estimates, confidence intervals and trend for the Green River .........8

2.   Colorado pikeminnow recruits estimates, confidence intervals and trend for the Green River.................................................................................................................................9

3.   Colorado pikeminnow adult population abundance estimates in the Colorado River with 95% confidence intervals and trend line...................................................................10

4.   Colorado pikeminnow recruits estimates, confidence intervals and trend for the Colorado River.................................................................................................................11

# LIST OF TABLES

TABLES

1.   Coordinated water releases to benefit endangered fish in the Colorado River, Colorado; 1997-2010 ................................................................................................................13

2.   Summary of the downlisting demographic and recovery factor criteria and a determination if the criteria have been met, partially met or not met for analyzing whether Colorado pikeminnow can be downlisted...................................................................20

**5-YEAR REVIEW**
**Colorado pikeminnow *(Ptychocheilus lucius)***

## 1.0    GENERAL INFORMATION

### 1.1    Purpose of 5-year Reviews

The U.S. Fish and Wildlife Service (Service) is required by section 4(c)(2) of the Endangered Species Act (Act) to conduct a status review of each listed species at least once every 5 years.  The purpose of a 5-year review is to evaluate whether or not the species' status has changed since it was listed (or since the most recent 5-year review).  Based on the 5-year review, we recommend whether the species should be removed from the list of endangered and threatened species, be changed in status from endangered to threatened, or be changed in status from threatened to endangered.  Our original listing as endangered or threatened is based on the species' status considering the five threat factors described in section 4(a)(1) of the Act.  These same five factors are considered in any subsequent reclassification or delisting decisions.  In the 5-year review, we consider the best available scientific and commercial data on the species, and focus on new information available since the species was listed or last reviewed.  If we recommend a change in listing status based on the results of the 5-year review, we must propose to do so through a separate rule-making process including public review and comment.

### 1.2    Reviewers

**Lead Regional Office**:  Mountain-Prairie Region (6)
Mike Thabault, Assistant Regional Director-Ecological Services, 303/236-4210
Bridget Fahey, Chief of Endangered Species, 303/236-4258
Seth Willey, Regional Recovery Coordinator, 303/236-4257

**Lead Field Office**:
Upper Colorado River Endangered Fish Recovery Program
Thomas Chart, Program Director, 303/969-7322, ext. 226

**Cooperating Field Offices**:
Ecological Services Field Office, Grand Junction, Colorado
Al Pfister, Assistant Field Supervisor, 970/243-2778

Colorado River Fisheries Program, Grand Junction, Colorado
Michelle Shaughnessy, Field Supervisor, 970/245-9319, ext.19

Ecological Services Field Office, Salt Lake City, Utah
Larry Crist, Field Supervisor, 801/975-3330, ext. 126

Ecological Services Field Office, Cheyenne, Wyoming
Mark Sattelberg, Field Supervisor, 307/772-2374, ext. 34

San Juan River Recovery Implementation Program, Albuquerque, New Mexico
Dave Campbell, Program Director 505/346-2525, ext. 4745

New Mexico Fishery Resources Office, Albuquerque, New Mexico
Jim Brooks, Field Supervisor, 505/342-9900, ext. 102

Ecological Services Field Office, Albuquerque, New Mexico
Wally Murphy, Field Supervisor, 505/761-4781

Arizona Fishery Resources Office, Whiteriver, Arizona
Stewart Jacks, Field Supervisor, 928/338-4288

Lower Colorado River Coordinator, Phoenix, Arizona
Sam Spiller, Coordinator, 602/242-0210, ext. 240

Ecological Services Field Office, Phoenix, Arizona
Steve Spangle, Field Supervisor, 602/242-0210, ext. 244

California-Nevada Ecological Services Field Office, Reno, Nevada
Ted Koch, Field Supervisor, 775/861-6331

**Cooperating Regional Office(s)**:
Southwest Region (2)
Beth Oms, Acting Assistant Regional Director-Ecological Services, 505/248-6646
Susan Jacobsen, Chief of Endangered Species, 505/248-6641
Wendy Brown, Regional Recovery Coordinator, 505/248-6664

Pacific Southwest Region (8)
Larry Rabin, Deputy Division Chief for Listing, Recovery, and Environmental
Contaminants, 916/414-6464

**1.3      Methodology Used to Complete the Review:**

On April 18, 2007, we published a Notice of Review in the *Federal Register*
(72 FR 19549) soliciting any new information on the Colorado pikeminnow that
may have a bearing on its classification as endangered or threatened.  Fewer than
20 people/agencies provided comments.  All substantive comments and issues
raised were considered.  This 5-year review was primarily written by the Upper
Colorado River Endangered Fish Recovery Program Office with substantive
contributions and review by cooperating field and regional offices.  It summarizes
and evaluates information provided in the recovery goals, current scientific
research, and surveys related to the species.  All pertinent literature and
documents on file at the Upper Colorado River Endangered Fish Recovery
Program Office were used for this review (see References section below for cited
documents).  Interviews with individuals familiar with Colorado pikeminnow
were conducted as needed to clarify or obtain specific information.

## 1.4    Background

### 1.4.1   FR Notice Citation Announcing Initiation of This Review:
72 FR 19549, April 18, 2007.

### 1.4.2   Listing History

Original Listing
**FR notice:** 32 FR 4001, March 11, 1967
**Entity listed:** Pikeminnow (=squawfish), Colorado; *Ptychocheilus lucius*
**Classification:** Endangered, rangewide.

### 1.4.3   Associated Rulemakings:

50 FR 30194; July 24, 1985 - Experimental nonessential populations established in the Salt and Verde Rivers.

59 FR 13374; March 21, 1994 - Critical Habitat Designated.

66 FR 47033, September 10, 2001.  Notice of availability of draft recovery goals for four endangered fishes of the Colorado River Basin.

66 FR 58748, November 23, 2001.  Reopening of public comment on draft recovery goals for four endangered fishes of the Colorado River Basin.

67 FR 55270, August 28, 2002.  Notice of availability of recovery goals for four endangered fishes of the Colorado River Basin.

### 1.4.4   Review History:  Historic 5-year reviews for all species, including the Colorado pikeminnow, were initiated by the Service's Washington, D.C., office in 1979, 1985, and 1991 (44 FR 29566, May 21, 1979; 50 FR 29901, July 22, 1985; 56 FR 56882, November 6, 1991).  The Colorado pikeminnow's status also was considered in the 1978, 1991, and 2002 recovery plans (Service 1991; 2002).

### 1.4.5   Species' Recovery Priority Number at Start of 5-year Review:
The Colorado pikeminnow has a recovery priority number of 8C meaning there is a moderate degree of threat, a high degree of recovery potential and it is at the species level taxonomically.  The "C" identifies the potential for conflicts between needed recovery actions and economic activities.

| Degree of Threat | Recovery Potential | Taxonomy | Priority | Conflict |
|---|---|---|---|---|
| High | High | Monotypic Genus | 1 | 1C |
| | | Species | 2 | 2C |
| | | Subspecies/DPS | 3 | 3C |
| | Low | Monotypic Genus | 4 | 4C |
| | | Species | 5 | 5C |
| | | Subspecies/DPS | 6 | 6C |
| Moderate | High | Monotypic Genus | 7 | 7C |
| | | Species | 8 | 8C |
| | | Subspecies/DPS | 9 | 9C |
| | Low | Monotypic Genus | 10 | 10C |
| | | Species | 11 | 11C |
| | | Subspecies/DPS | 12 | 12C |
| Low | High | Monotypic Genus | 13 | 13C |
| | | Species | 14 | 14C |
| | | Subspecies/DPS | 15 | 15C |
| | Low | Monotypic Genus | 16 | 16C |
| | | Species | 17 | 17C |
| | | Subspecies/DPS | 18 | 18C |

The above ranking system for determining Recovery Priority Numbers was established in 1983 (48 FR 43098, September 21, 1983 as corrected in 48 FR 51985, November 15, 1983).

### 1.4.6   Recovery Plan

**Name of plan or outline**:  Colorado Pikeminnow (*Ptychocheilus lucius*)

**Recovery Goals:**  Amendment and Supplement to the Colorado Squawfish Recovery Plan

**Date approved**:  August 1, 2002

**Dates of previous revisions, if applicable**:  March 1978; August 1991.

## 2.0 REVIEW ANALYSIS

### 2.1 Application of the 1996 Distinct Population Segment Policy

This section of the 5-year review is not applicable to this species because the Colorado pikeminnow was not listed as a distinct population segment nor is there relevant new information for this species regarding the application of the distinct population segment policy.

### 2.2 Recovery Criteria

Recovery plans provide guidance to the Service, States, and other partners and interested parties on ways to minimize threats to listed species, and on criteria that may be used to determine when recovery goals are achieved. There are many paths to accomplishing the recovery of a species and recovery may be achieved without fully meeting all recovery plan criteria. For example, one or more criteria may have been exceeded while other criteria may not have been accomplished. In that instance, we may determine that, over all, the threats have been minimized sufficiently, and the species is robust enough, to downlist or delist the species. In other cases, new recovery approaches and/or opportunities unknown at the time the recovery plan was finalized may be more appropriate ways to achieve recovery. Likewise, new information may change the extent that criteria need to be met for recognizing recovery of the species. Overall, recovery is a dynamic process requiring adaptive management, and assessing a species' degree of recovery is likewise an adaptive process that may, or may not, fully follow the guidance provided in a recovery plan. We focus our evaluation of species status in this 5-year review on progress that has been made toward recovery since the species was listed (or since the most recent 5-year review) by eliminating or reducing the threats discussed in the five-factor analysis. In that context, progress towards fulfilling recovery criteria serves to indicate the extent to which threat factors have been reduced or eliminated.

There are two recovery programs in the Upper Colorado River Basin working to recover Colorado pikeminnow: The San Juan River Recovery Implementation Program and the Upper Colorado River Endangered Species Recovery Program (Recovery Program; collectively programs). Each program has its own website that contains information about its respective program, projects and reports that were used to analyze the status of Colorado pikeminnow.

### 2.2.1 Does the species have a final, approved recovery plan containing objective, measurable criteria?

 X  Yes
____ No

2.2.2   **Adequacy of recovery criteria.**

2.2.2.1 **Do the recovery criteria reflect the best available and most up-to-date information on the biology of the species and its habitat?**

_____ **Yes**
  X   **No**

We recommend revising the Service's 2002 Colorado Pikeminnow Recovery Goals to incorporate new information on population dynamics as presented for the Green River subbasin (Bestgen et al. 2010) and Colorado River subbasin populations (Osmundson and White 2009). More specifically, the as-written Recovery Goal requirement that these populations always display positive recruitment (i.e., recruitment that is greater than adult mortality) contradicts the best available information that indicates these populations have and likely will experience fluctuations.

2.2.2.2 **Are all of the 5 listing factors that are relevant to the species addressed in the recovery criteria (and is there no new information to consider regarding existing or new threats)?**

  X   **Yes**
_____ **No**

2.2.3   **List the recovery criteria as they appear in the recovery plan, and discuss how each criterion has or has not been met, citing information:**

The current status of Colorado pikeminnow is endangered. Only the downlisting criteria are considered in this 5-year status review to determine if status can be changed (downlisted) to threatened. Analysis for each downlisting criterion is provided in italics directly below the criterion. Recovery of the species is considered necessary only in the upper basin (Colorado, New Mexico, Utah, and Wyoming) (Service 2002); Colorado pikeminnow historic populations in the lower basin (Arizona, California, Nevada, and New Mexico) are extirpated and the only extant population is a nonessential, experimental population in the Salt and Verde Rivers, which continues to be stocked. Based on the best available information, the Service maintains that recovery of the species is only required in the upper basin. The downlisting criteria are derived from the recovery goals established by the Service (Service 2002, Section 5.3 Objective, Measurable Recovery Criteria, pp. 44–47):

**DEMOGRAPHIC DOWNLISTING CRITERIA FOR COLORADO PIKEMINNOW**

The Colorado pikeminnow is endemic to the Colorado River basin, where it was once widespread and abundant in warm-water rivers and tributaries. Wild populations of Colorado pikeminnow are found only in the upper basin of the Colorado River (above Lake Powell). Three wild populations of Colorado pikeminnow are found in about 1,090 miles of riverine habitat in the Green River, upper Colorado River, and San Juan River subbasins.

**Green River Subbasin Criterion 1a:** A self-sustaining population is maintained over a 5-year period, starting with the first point estimates acceptable to the Service, such that the trends in separate adult (age-7+; ≥450 mm TL) point estimates for the middle Green River and the lower Green River do not decline significantly.

**Status of Green River Subbasin Criterion 1a.** *This criterion has been partially met. Whereas during the period of 2000-2003 the middle Green River population experienced a significant decline, the variability associated with the most recent sampling rotation (2006–2008) precludes a clear determination with regard to this criterion. The next 3-year sampling rotation is scheduled to commence in 2011. If the population estimates for these two reaches does not deviate significantly from the previous 3-year mean (2001–2003) this criterion will have been met. When the recovery goals were written biologists thought that there may be separate populations of Colorado pikeminnow in the middle and lower Green River reaches. However, since then the Green River is considered as one population. For this criterion, the entire Green River population of Colorado pikeminnow is considered, which includes tributaries of the Yampa, White, and reaches of the Green Rivers (middle, Desolation/Grey Canyons and lower reaches; Figure 1). This criterion has been met with respect to the entire Green River population. A Huggins robust design multi-strata model suggested about a 50% increase in abundance of adults throughout the Green River Basin from 2006 to 2008, and about a 70% increase over 2003 estimates. Population models measure a variety of parameters, including probability of capture; these parameters provide a level of certainty and reliability to the Service for these estimates in determining acceptance. As a result, we can accept these estimates and consider the population to be self-sustaining and since 2007 above the minimum viable population (MVP) value (Figure 1).*



**FIGURE 1.   Colorado pikeminnow adult estimates, confidence intervals and trends for the entire Green River subbasin.  The horizontal line represents the current demographic criterion of 2,600 adults, the number calculated for a MVP value in the recovery goals (Service 2002).**

**Green River Subbasin Criterion 1b:**  A self-sustaining population is maintained over a 5-year period, starting with the first point estimates acceptable to the Service, such that mean estimated recruitment of age-6 (400 to 449 mm TL) naturally produced fish equals or exceeds mean annual adult mortality for the Green River subbasin.

**Status of Green River Subbasin Criterion 1b.  *This criterion references the entire Green River subbasin population and has been partially met.***  *Abundance estimates for recruitment sized fish (400 to 449 mm TL) during 2000-2003 averaged 8.9% (4.7 to 13.3%) of the estimated abundance of adult Colorado pikeminnow (Bestgen et al. 2005; Figure 2).  Average survival rate for adult Colorado pikeminnow was 0.65 (95% CI: 0.586–0.708), (i.e., 35% mortality) from 2000–2003 (Bestgen et al. 2005).  Hence, the number of fish recruiting to adults (approximately 10% of the adult population or about 300) was not sufficient to offset the number of adults that had died (about 950 based on 65% survival rate).  From 2006–2008, average annual adult survival rate was estimated as 0.80 (95% CI: 0.60–0.91),( i.e., 20% mortality) a substantial increase over the 0.65 rate for the 2000–2003 period (Bestgen, et al. 2010).  Abundance estimates of recruitment-sized fish during 2006–2008 averaged 22%; thus recruitment rates were more than sufficient to offset mortality rates of adults (Bestgen, et al. 2010; Figure 2).  This criterion is currently being revised to accommodate a longer tracking period to accommodate natural population fluctuations as witnessed in the Green River population from 2001–2008.*



**FIGURE 2. Colorado pikeminnow recruits (400 to 450 mm TL) estimates, confidence intervals and trend for the Green River.**

**Green River Subbasin Criterion 1c:** A self-sustaining population is maintained over a 5-year period, starting with the first point estimates acceptable to the Service, such that each population point estimate for the Green River subbasin exceeds 2,600 adults [Note: 2,600 adults is the estimated MVP number; see section 3.3.2].

**Status of Green River Subbasin Criterion 1c.** *This criterion references the entire Green River subbasin population and has been partially met. See 1.a. above. As identified earlier for the years 2001, 2002, 2007, and 2008 the estimated adult abundance exceeded 2,600 MVP number. This criterion is currently being revised to incorporate the best available information on adult Colorado pikeminnow survival (Bestgen et al. 2005, 2010), which factors heavily into the calculation of the MVP.*

**Upper Colorado River Subbasin Criterion 1a.** A self-sustaining population of at least 700 adults (number based on inferences about carrying capacity) is maintained over a 5-year period, starting with the first point estimate acceptable to the Service, such that the trend in adult (age-7+; ≥450 mm TL) point estimates does not decline significantly.

**Status of Upper Colorado River Subbasin Criterion 1a.** *This criterion has been partially met. The population trend aspect of this criterion has been met; maintenance of the carrying capacity metric, although very close to being met, has not been met. A general increasing trend in adult Colorado pikeminnow has occurred since the early 1990s, from around 440 in 1992 (95% CI: 251–832; Osmundson and Burnham 1996; Figure 3) to about 890 (95% CI: 746-1075) in 2005 (Osmundson and White 2009). In years that population estimates were conducted (1992–2005, not all years), the estimate was above 700 in 1993, 2000, and 2005. The fourth 3-year sampling rotation was completed in 2010 and will be reported in 2011.*



**FIGURE 3.** Colorado pikeminnow adult population abundance estimates in the Colorado River with 95% confidence intervals and trend line. The horizontal line represents the demographic criterion of 700 adults; number identified in the recovery goals (Service 2002)

**Upper Colorado River Subbasin Criterion 1b.** A self-sustaining population of at least 700 adults (number based on inferences about carrying capacity) is maintained over a 5-year period, starting with the first point estimate acceptable to the Service, such that mean estimated recruitment of age-6 (400 to 449 mm TL) naturally produced fish equals or exceeds mean annual adult mortality.

**Status of Upper Colorado River Subbasin Criterion 1b.** *This criterion has been partially met. Length frequency was used to estimate that 23 captured sub-adults (400 to 449 mm) in 2003 represented about 14% of the estimated population of Colorado pikeminnow >250 mm that year, providing an estimate of 203 sub-adults (Osmundson and White 2009). In 2004, these calculations resulted in an estimate of 110 sub-adults. In both cases, the estimates were larger than the number of adults expected to die in each year (118 in 2003 and 72 in 2004), assuming an annual mortality rate of 15% (Osmundson et al. 1997). Hence, in 2003 and 2004, recruitment (as measured by the number of sub-adults) exceeded expected adult mortality resulting in overall net gains to the adult population. In 2005, only 7 of the 306 different fish captured fell between 400 to 449 mm in length, representing about 2.3% of the population, or 21 of the estimated 931 pikeminnow >250 mm (Osmundson and White 2009). Recruitment of these individuals will be insufficient to balance out the estimated 134 expected to die in 2005 (assuming an annual adult mortality rate of 15% and a population size of 890 adults). The estimated number of recruits, with variability and trend are depicted in Figure 4. This criterion is currently being revised to accommodate a longer tracking period to accommodate natural population fluctuations as witnessed in the Green River population from 2001–2008.*



**FIGURE 4.  Colorado pikeminnow recruits (400 to 450 mm TL) estimates, confidence intervals and trend for the Colorado River.**

**San Juan River Subbasin Criterion 1.**  A target of 1,000 age-5+ fish (≥300 mm TL; number based on estimated survival of stocked fish and inferences about carrying capacity) is established through augmentation and/or natural reproduction.

**Status of San Juan River Subbasin Criterion 1.**  *This criterion has been partially met.  A stocking plan has been developed (Ryden 2003) and is being implemented to meet delisting requirements of 1,000 age-7+ adult Colorado pikeminnow in the San Juan River.  About 983 stocked Colorado pikeminnow were recaptured from the San Juan River in 2004–2008 (Ryden 2009).*
**Recovery Factor Downlisting Criteria for Colorado Pikeminnow to Minimize or Remove Threats to the Species**

**Factor A.—Adequate habitat and range for recovered populations provided.**

Streamflow regulation and associated habitat modification are identified as primary threats to Colorado pikeminnow populations.  The Colorado pikeminnow was first listed as endangered following a period of dam construction throughout the Colorado River Basin.  Total Colorado pikeminnow habitat lost to reservoir inundation in the upper basin is about 435 miles, including Flaming Gorge on the Green River (99 miles), Lake Powell (199 miles on the Colorado River and 75 miles on the San Juan River), and Navajo Reservoir on the San Juan River (62 miles).  Cold-water releases have eliminated most native fishes from river reaches immediately downstream of dams.

Adult Colorado pikeminnow are long-distance migrators to and from spawning sites; 10 barriers are identified in the upper basin upstream of Glen Canyon Dam within occupied habitat of Colorado pikeminnow.

Maintenance of streamflow is important to the ecological integrity of large western rivers.  Flow recommendations have been developed for some river systems in the Upper Colorado River Basin that identify and describe flows with necessary magnitude, frequency, duration, and timing to benefit the endangered fish species.  Flows necessary to restore and maintain required habitats of Colorado pikeminnow mimic the natural hydrograph and include spring peaks flows and summer–winter base flows.  Flow recommendations have been developed that specifically consider flow habitat relationships within occupied habitat of Colorado pikeminnow in the upper Colorado River.

**Criterion 1.**   Flow regimes to benefit Colorado pikeminnow populations in the Green River, upper Colorado River, and San Juan River subbasins should be identified, implemented, evaluated, and revised, such that:

    a.   Adequate spawning habitat and appropriate spawning cues (e.g., flow patterns and water temperatures) are available to maintain self-sustaining populations, as reflected by downlisting demographic criteria.

    b.   Adequate nursery habitat is available to maintain self-sustaining populations, as reflected by downlisting demographic criteria.

    c.   Adequate juvenile and adult habitat (e.g., cover, resting, and feeding areas) is available to maintain self-sustaining populations, as reflected by downlisting demographic criteria.

**Status of Criterion 1.  *Criterion 1 has been partially met.*  *Flow recommendations have been developed throughout the Green River subbasin (Irving et al. 2004 [White River]; Muth et al. 2000 [Green River]; Modde and Keleher 2003 [Duchesne River]; Modde et al. 1999 [Yampa River]; the upper Colorado River subbasin (Osmundson et al. 1995 [15-mile reach] and McAda 2003 [upper Colorado and Gunnison Rivers]); and the San Juan River subbasin (Holden 1999).  These flow recommendations are being implemented and monitored.  A Green River study plan has been developed (Green River Study Plan ad hoc Committee 2007) to determine the response of Colorado pikeminnow to the implemented flow recommendations downstream of Flaming Gorge.  The Recovery Program collaborated with the Colorado River Water Conservancy District (District) and the City of Craig, Colorado, on the enlargement of Elkhead Reservoir in the Yampa River drainage and thereby secured 5,000 ac-ft of "fish water" (with the option to lease an additional 2,000 ac-ft annually) to augment Yampa River baseflows.  Since the enlargement was completed in 2007, the "fish water" has been delivered every year.  Since 1997, Water Users, the District, and Bureau of Reclamation have coordinated with the Service to deliver in excess of a million ac-ft of water to assist in the recovery of the endangered fish in the Colorado River (Table 1).***

**TABLE 1. Coordinated Water Releases to Benefit Endangered Fish in the Colorado River, CO; 1997–2010**

| RESERVOIRS | ACRE-FEET |
|---|---|
| Windy Gap | 3,718 |
| Willow Creek | 9,853 |
| Granby | 39,914 |
| Palisade Bypass | 72,572 |
| Williams Fork | 84,471 |
| Wolford Mountain | 129,465 |
| Ruedi | 258,180 |
| Green Mountain | 500,120 |
| **Total** | **1,098,292** |

*Colorado pikeminnow have successfully spawned in Green River and Colorado River subbasins every year since the Recovery Goals were approved in 2002. Colorado pikeminnow spawning has been documented in 6 of the last 15 years in the San Juan River. As discussed above, researchers have documented periods of positive recruitment in both the Green and Colorado Rivers. However, we cannot say this criterion has been fully met until we are convinced the demographic criteria have been met.*

**Criterion 2.**   Passage over Redlands Diversion and Grand Valley Diversion should be continued to allow adequate movement of Colorado pikeminnow in the upper Colorado River and Gunnison River.

**Status of Criterion 2.** *Criterion 2 has been met. A 350-foot long, U-shaped fish passage at the Redlands Water and Power Company diversion dam on the Gunnison River was completed in 1996. The passage restored access to 50 miles of critical habitat for the endangered fish. To date, 108 Colorado pikeminnow, 27 razorback sucker (Xyrauchen texanus), 1 bonytail (Gila elegans), 1 humpback chub (G. cypha), and over 97,000 other native fish have used the passage (Burdick 2010). Colorado pikeminnow and razorback sucker reproduction has been documented in reaches upstream of the fish passage (Osmundson and Seal 2009).*
*A 300-foot long, rock channel fish passage at the Grand Valley Irrigation Company diversion dam on the Colorado River became operational in 1998. Unlike the fish passage structure at the Redlands diversion, this fish passage is a "non-selective" passage, meaning that all fish species are allowed to move through it. An Obermeyer Gate was installed in 2007 to remotely open and close the passage. The Obermeyer Gate system is most simply described as a row of steel gate panels supported on their downstream side by inflatable air bladders. By controlling the pressure in the bladders, the pond elevation maintained by the gates can be infinitely adjusted within the system control range (full inflation to full deflation) and accurately maintained at user-selected set-points.*

*These passages continue to be operated.*

**Criterion 3.**  Modification of Price-Stubb Dam and Government Highline Dam should be initiated to allow adequate movement of Colorado pikeminnow in the upper Colorado River.

> **Status of Criterion 3.  *Criterion 3 has been met.*  *Construction of a passive non-selective fish passage structure was completed on Price-Stubb diversion and began functioning on March 20, 2008.*
>
> *Construction of a 373-foot long concrete fish passage at the Grand Valley Project diversion dam (also referred to as the Government Highline Dam) on the Colorado River was completed in 2005.  The structure provides selective fish passage at this historic, roller dam that is 15 feet high and spans 546 feet across the Colorado River.  During trial operations in 2005 and 2006, which consisted of only a few weeks, 1 razorback sucker, 3 humpback chubs, and about 14,000 other native fish moved upstream.  Beginning in 2008, the passage has operated from the spring through the fall, passing 1 razorback sucker in 2008 and over 20,900 native fish for both years.*

**Criterion 4.**  Barriers on the San Juan River should be identified and evaluated, and modifications should be initiated to allow adequate movement of Colorado pikeminnow.

> **Status of Criterion 4.  *Criterion 4 has been met.*  *Fish access has been restored to 36 miles of critical habitat on the San Juan River with the construction of passages at the Public Service Company of New Mexico weir, the Hogback Diversion Dam, and removal of the Cudei Diversion Dam.  The Hogback Diversion Dam was modified with a 500-foot long rock channel fish passage to provide nonselective fish passage in 2001.*
>
> *Construction of a 400-foot long, selective fish passage at the Public Service Company of New Mexico weir was completed in 2003.  Since then, 22 razorback sucker, 29 Colorado pikeminnow, and nearly 87,000 other native fish have used this passage which is operated by the Navajo Nation.  No new construction is required to prevent fish entrainment.*
> *Additional projects beyond 2011 will include addressing the need for fish passage at Arizona Public Service (APS) Diversion and Fruitland Diversion Dam.  Stamp and Golden (2005) concluded that the APS Diversion has the potential to impede passage at flows less than 5,000 cfs.  This means that, in most years, there is the potential for spawning Colorado pikeminnow to be impeded by the APS Diversion and unable to access 16 miles of upstream habitat.  A selective fish barrier above Lake Powell is also being considered to prevent the upstream movement of nonnative fish species. These additional tasks were not contemplated when the recovery goals were developed.*

**Criterion 5.**  Investigations should be initiated on the feasibility of modifying releases from Aspinall Unit dams to increase water temperatures in the Gunnison River that would allow for upstream range expansion of Colorado pikeminnow.

**Status of Criterion 5.** *Criterion 5 has been met. Osmundson (1999) recommended a feasibility study for increasing Gunnison River temperatures near Delta, Colorado, by modification of outlet structures on the Aspinall Unit dams. A two-phased study that suggested temperature could be modified through the timing of release through Crystal Dam was completed in 2004 (Hydrosphere Resource Consultants 2001, 2004; Boyer and Cutler 2004). The results of this feasibility study indicated that the installation of a multi-level outlet would be needed at Blue Mesa Reservoir to create a measurable warming effect in the Gunnison River at Delta, Colorado. The Recovery Program concluded that the apparent limited benefit was not worth the associated costs based on the available information.*

**Criterion 6.** Measures should be identified and implemented to minimize entrainment of sub-adult and adult Colorado pikeminnow at problematic diversion structures.

**Status of Criterion 6.** *Criterion 6 has been partially met. Screens are in place and operating at Grand Valley Irrigation Company (2002), Grand Valley Project (2004), and Redlands Diversion (2007). Screen mesh size on these facilities is 3/32 inch. The programs are still considering a screening option at the Tusher Wash Diversion on the lower Green River. A fish screen in the Hoagback Diversion Canal to prevent entrainment has been designed.*

**Factor B.—Protection from overutilization for commercial, recreational, scientific, or educational purposes.**

Overutilization of Colorado pikeminnow for commercial, recreational, scientific, or educational purposes is not currently considered a threat to the species. Historically, Colorado pikeminnow were opportunistically used as food by American Indians and early explorers to the region, and were commercially harvested as "white salmon" in the early 1900s. Collection of Colorado pikeminnow for scientific or educational purposes is regulated by the Service under the Act.

**Criterion 7.** Overutilization of Colorado pikeminnow for commercial, recreational, scientific, or educational purposes should be reevaluated and, if necessary, actions should be identified to ensure adequate protection.

**Status of Criterion 7.** *Criterion 7 has been met. No commercial or recreational activities exist. Educational activities are minimal and do not threaten Colorado pikeminnow. Bestgen et al. (2005) indicate that sampling methods for research (electrofishing, trammel nets, etc.) are not a cause of mortality.*

**Factor C.—Adequate protection from diseases and predation.**

Diseases and parasites are not currently considered to be significant in the decline of the Colorado pikeminnow.

Colorado pikeminnow populations in the upper basin live sympatrically with about 20 species of warm-water, nonnative fishes that are potential predators, competitors, and vectors for parasites and diseases. Channel catfish and northern pike have been identified as the principal nonnative threats to sub-adult and adult Colorado pikeminnow in the upper basin. A Strategic Plan for Nonnative Fish Control was developed for the Upper Colorado River Basin. Control of the release and escapement of nonnative fishes into the main river, floodplain, and tributaries also is a necessary management action to stop the introduction of new fish species into occupied habitats and to thwart periodic escapement of highly predaceous nonnatives from riverside features. Annual flooding of the river can inundate riverside ponds potentially containing large numbers of green sunfish (*Lepomis cyanellus*), black bullhead (*Ameiurus melas*), largemouth bass (*Micropterus salmoides*), and other nonnative fishes that may escape to the river during high flows. Three management actions are identified to reduce the threat of nonnative fishes: high spring flows, nonnative fish control strategies, and stocking agreements. Active control programs should be implemented or continued for problematic nonnative fishes in Colorado pikeminnow nursery habitats, northern pike (*Esox lucius*) in the Yampa and middle Green Rivers, and channel catfish (*Ictalurus punctatus*) in river reaches occupied by Colorado pikeminnow.

**Criterion 8.**    Effects of diseases and parasites on Colorado pikeminnow populations should be reevaluated and, if necessary, actions should be identified to ensure adequate protection.

> **Status of Criterion 8.** ***Criterion 8 has not been met.*** *The effects of disease and parasites on Colorado pikeminnow populations have not been reevaluated.*

**Criterion 9.**    Procedures should be developed, implemented, evaluated, and revised for stocking nonnative fish species in the Upper Colorado River Basin (including the San Juan River subbasin) to minimize negative interactions between nonnative fishes and Colorado pikeminnow.

> **Status of Criterion 9.** ***Criterion 9 has been met.*** *Nonnative fish stocking procedures were initially developed in 1996 and modified in 2009 for the Green River and Colorado River Subbasins, these procedures are being implemented (Service 1996; 2009). The San Juan River Subbasin is developing similar procedures.*

**Criterion 10.**    Control programs for small-bodied nonnative fishes in backwater nursery habitats in river reaches occupied by young Colorado pikeminnow should be developed and implemented to identify levels of control that will minimize negative interactions.

> **Status of Criterion 10.** ***Criterion 10 has been met.*** *Small-bodied cyprinid control studies indicate that reduction in the numbers of small-bodied cyprinids only lasted for a short period of time (Trammel et al. 2004). However, in response to poor catches of age-0 Colorado pikeminnow in the middle Green River since the mid-1990s a study was recently initiated to reduce competition*

*and predation on Colorado pikeminnow larvae by nonnative fish (predominantly cyprinids) in backwaters. Prior to Colorado pikeminnow larval drift researchers seine nonnatives from backwaters; then place screens at entrances to the backwaters with a mesh size that allows entry of Colorado pikeminnow larvae but precludes entry of adult nonnative cyprinids. Catches of age-0 Colorado pikeminnow in the middle Green River have rebounded in 2009 and 2010; however, no clear correlation has been made with this new nonnative fish removal effort.*

**Criterion 11.**  Channel catfish control programs in river reaches occupied by Colorado pikeminnow should be developed and implemented to identify levels of control that will minimize negative interactions.

> **Status of Criterion 11.  *Criterion 11 has been partially met.*  *Channel catfish control has been implemented in the San Juan River, but levels of control necessary to minimize negative interactions have not been identified. Various attempts (Fuller 2009; Badame and Jones 2009) in the Upper Colorado River Basin have indicated mechanical removal has no effect on channel catfish populations.***

**Criterion 12.**  Northern pike control programs in reaches of the Yampa and middle Green Rivers occupied by Colorado pikeminnow should be developed and implemented to identify levels of control that will minimize negative interactions.

> **Status of Criterion 12.  *Criterion 12 has been partially met.*  *Interim Yampa River Nonnative Fish Removal Criteria have been developed and a Yampa River Nonnative Fish Control Strategy (Valdez et al. 2008) are being implemented. Northern pike control in the Yampa and Green Rivers is specifically implemented through four ongoing projects by the Recovery Program. Northern pike are removed whenever encountered during all other Recovery Program projects.***

**Factor D.—Adequate existing regulatory mechanisms.**

Implementation of regulatory mechanisms is necessary for the recovery of Colorado pikeminnow and to ensure long-term conservation of the species. After removal from the list of species protected by the Act, the Colorado pikeminnow and its habitat will continue to receive consideration and some protection through the following Federal laws and related State statutes: National Environmental Policy Act; Clean Water Act; Organic Act; and Fish and Wildlife Coordination Act.

The need for conservation plans and agreements was identified to provide reasonable assurances that recovered Colorado pikeminnow populations will be maintained.

**Criterion 13.**   Mechanisms should be determined for legal protection of adequate habitat.

> ***Status of Criterion 13.   Criterion 13 has been partially met.   Filing for legal rights to protect water for fish would be junior to the legal rights of others that have already claimed water for irrigation and power.   Utah is currently reviewing the water rights from Flaming Gorge and how they may be modified for fish protection.   See also Status of Criterion 1 above.***

**Criterion 14.**   Elements of conservation plans should be identified that are necessary to provide for the long-term management and protection of Colorado pikeminnow populations.

> ***Status of Criterion 14.   Criterion 14 has not been met.   Conservation plans and the necessary elements have not been developed.***

**Factor E.—Other natural or manmade factors for which protection has been provided.**

The potential role of pesticides and pollutants in suppressing populations of Colorado pikeminnow is not well understood.  Potential spills of petroleum products threaten wild populations of Colorado pikeminnow.  All States have hazardous-materials spills emergency-response plans that provide a quick cleanup response to accidental spills.

Another cause of degraded water quality is the Atlas Mills tailings pile located on the north bank of the Colorado River near Moab, Utah.  There are two significant threats to endangered fish posed by the Atlas Mills tailings pile:  toxic discharges of pollutants, particularly ammonia; and the risk of catastrophic pile failure.

Selenium is hypothesized as contributing to the decline of endangered fishes of the Colorado River Basin.

**Criterion 15.**   State and Federal hazardous-materials spills emergency-response plans should be reviewed and modified to ensure adequate protection for Colorado pikeminnow populations from hazardous-materials spills.

> ***Status of Criterion 15.   Criterion 15 has not been met.   Hazardous-materials spills emergency-response plans have not been reviewed or modified.***

**Criterion 16.**   Locations of all petroleum-product pipelines within the 100-year floodplain of critical habitat should be identified and the need for emergency shut-off valves should be assessed.

> ***Status of Criterion 16.   Criterion 16 has partially been met.   Although some progress has been made in locating all petroleum-product pipelines, determination for the need of emergency shut off valves has not been assessed. The Service now requires (via section 7 consultation) that new pipelines crossing the rivers are equipped with emergency shut-off valves.***

**Criterion 17.** Actions should be identified for remediation of groundwater contamination at the Atlas Mills tailings pile located near Moab, Utah.

> **Status of Criterion 17.** *Criterion 17 has been met. Under the Moab Uranium Mill Tailings Remedial Action Project Site Record of Decision (70 FR 55358), the action identified for remediation of groundwater contamination (principally ammonia) at the Atlas Mills tailings pile located near Moab, Utah, was to remove the tailings pile to Crescent Junction, Utah. The pile is currently in the process of being moved and ground water remediation (a very long-term commitment) is underway.*

**Criterion 18.** Effects of selenium contamination on Colorado pikeminnow reproductive success and survival of young should be reevaluated and, if necessary, actions should be identified to reduce deleterious levels of selenium contamination.

> **Status of Criterion 18.** *Criterion 18 has not been met. Levels of selenium contamination in certain reaches of endangered fish critical and occupied river habitat exceed those shown to impact fish and wildlife elsewhere (e.g., Stephens et al. 1992; Stephens and Waddell 1998; Thomas et al. 1998; Simpson and Lusk 1999; U.S. Bureau of Reclamation 2006; Thomas et al. 2008). Tissue samples from endangered fish in some of these areas (Simpson and Lusk 1999; Osmundson et al. 2008) had selenium concentrations greater than toxicity guidelines for fish muscle tissue suggested by Lemly (1996) and NIWQP (1998) for protection of reproductive health in freshwater fish. The Bureau of Reclamation has committed to developing the Selenium Management Program (a remediation program) on the Gunnison River as a requirement of the Aspinall programmatic biological opinion.*

## 2.3    Synthesis

Recovery is based on reduction or removal of threats and improvement of the demographic status of a species during the period in which it is listed, and not just from the time a listed species is proposed for reclassification. Environmental conditions and the structure of populations change over time, and threats recognized at listing or in subsequent recovery plans may no longer be directly applicable when reclassification is considered. Management actions and tasks identified for listed species are expected to minimize or remove threats and improve the species' status.

Recovery is achieved when management actions and associated tasks have been implemented and/or completed to allow genetically and demographically viable, self-sustaining populations to thrive under minimal ongoing management and investment of resources. Achievement of recovery does not mandate returning a species to all or a significant portion of its historic range, nor does it mandate establishing populations in all possible habitats, or everywhere the species can be established or reestablished.

At the time of listing, habitat losses were documented but the threats to Colorado pikeminnow were poorly understood and distribution and abundance of the species were not well known. The decline of the species was probably a combination of threats, including direct loss of habitat, changes in flow and temperature, and blockage of migration routes by the construction of large reservoirs. In addition, interaction with nonnative fish may have had a decimating effect in waters not affected by dams.

Recovery of Colorado pikeminnow is considered in the Upper Colorado River Basin, which includes the Green River, upper Colorado River, and San Juan subbasins. The analysis above of the demographic criteria has shown, none of the 6 downlisting demographic subcriteria has been fully met; all have been partially met (Table 2). From the above list of recovery factor criteria: 9 of the 18 downlisting recovery factor criteria have been met, 5 have been partially met, and 4 have not been met. Although the category "has been partially met" is identified, this is only to reflect that some progress is being made on that particular criterion. Since less than half of the all downlisting criteria/subcriteria have been met (1 of 6 demographic and 9 of 18 recovery factor), no change in the endangered status of Colorado pikeminnow is recommended. The definition of endangered applies here until the demographic criteria are met and the threats minimized or removed.

**TABLE 2.  Summary of the downlisting demographic and recovery factor criteria in the Upper Colorado River Basin and a determination if the criteria have been met, partially met or not met for analyzing whether Colorado pikeminnow can be downlisted.**

| Criteria for Downlisting | Has been met | Has been partially met | Has not been met |
|---|---|---|---|
| Demographic | | | |
|    Green River Subbasin | | 1a, 1b, 1c | |
|    Colorado River Subbasin | | 1a, 1b | |
|    San Juan Subbasin | | 1 | |
| Recovery Factor A | 2, 3, 4, 5 | 1, 6 | |
| Recovery Factor B | 7 | | |
| Recovery Factor C | 9, 10 | 11, 12 | 8 |
| Recovery Factor D | | 13 | 14 |
| Recovery Factor E | 17 | 16 | 15, 18 |

## 3.0   RESULTS

### 3.1   Recommended Classification:

   X   **No change is needed**

### 3.2   New Recovery Priority Number:  We do not recommend a change in the Recovery Priority Number. The degree of threat is moderate, with a high degree of recovery potential representing a species, which falls under the 8c category for a recovery priority number according to the "Endangered and threatened species listing and recovery priority guidance" (48 FR 43098).

## 4.0   RECOMMENDATIONS FOR FUTURE ACTIONS

The San Juan River Recovery Implementation Program and the Upper Colorado River Endangered Species Recovery Program continue working to meet the recovery factor criteria to minimize or remove threats:  9 of the 18 have been met, 5 have been partially met, and 4 have not been met.  These programs develop annual work plans through adaptive management (Recovery Implementation Program Recovery Action Plan, i.e., "RIPRAP" and Long Range Plan), to recover the fish by achieving the recovery factor criteria.  By meeting these criteria, the demographics of the species should improve.  This is somewhat evidenced by the fact that flow recommendations are being implemented in the upper Colorado River reach and fish passage and screens are in place and a subsequent increasing trend in adult abundance has been detected. More work on control of nonnative fish and meeting the recovery factors will improve the status of the species.

We recommend revising the Service's 2002 Colorado Pikeminnow Recovery Goals to incorporate new information on population dynamics as presented for the Green River subbasin (Bestgen et al. 2010) and Colorado River subbasin populations (Osmundson and White 2009). More specifically, the as-written Recovery Goal requirement that these populations always display positive recruitment (i.e., recruitment that is greater than adult mortality) contradicts the best available information that indicates these populations have and likely will experience fluctuations.

In addition, the recovery goal revision needs to consider the impacts of mercury.  Beckvar et al. (2005) associated studies involving survival, growth, reproduction, and behavior and recommended that 0.2 mg/kg in whole fish be viewed as protective, while adverse biological effects are more likely at higher concentrations.  Based on this threshold, the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure.  Management strategies for controlling anthropogenic mercury emissions are necessary as atmospheric pollution can indirectly affect this endangered species, its critical habitat, and its recovery by ambient air exposure, deposition into aquatic habitat and bioaccumulation in diet and in fish tissues.

Uncertainty surrounding the effects of climate change to Colorado pikeminnow should be considered for each of the threats as those impacts are realized.  For example, the potential for alteration of flows in the basin as a result of climate change should be in the recovery goals. Climate change could have large impacts on the basin's aquatic ecosystem, including (but not limited to):

- Change in the timing of peak flows from an earlier snowmelt;

- Change in the size of peak flows because of altered snowpacks; and

- Higher water temperatures from increased air temperature.

Not only would climate change affect the ecology of the species because of the factors listed above, but it also would greatly affect the management of the programs through changes in politics and economics, such as:

- Greater evaporation losses in the larger reservoirs may reduce flexibility of operations; and

- Drier conditions in the basin may cause irrigators to call on their water rights more often or request more water rights.

Colorado pikeminnow is a spotlight species within the Service.

## 5.0    REFERENCES

Badame, P., and T. Jones.  2009.  Smallmouth Bass Control in the Green River.  Annual Report, Project 123a, of the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Beckvar, N., T.M. Dillon, and L.B. Reads.  2005.  Approaches for linking whole-body fish tissue residues of mercury or DDT to biological effects threshold.  Environmental Toxicology and Chemistry 24:2094-2105.

Bestgen, K.R., J.A. Hawkins, G.C. White, K. Christopherson, M. Hudson, M.H. Fuller, D.C. Kitcheyan, R. Brunson, P. Badame, G.B. Haines, J. Jackson, C.D. Walford, T.A. Sorensen, and T.B. Williams.  2005.  Population status of Colorado pikeminnow in the Green River Basin, Utah and Colorado.  Final Report of the Larval Fish Laboratory, Colorado State University to the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Bestgen, K.R., J.A. Hawkins, G.C. White, C.D. Walford, P. Badame, and L. Monroe.  2010.  Population status of Colorado pikeminnow in the Green River Basin, Utah and Colorado, 2006-2008.  Final Report of the Larval Fish Laboratory, Colorado State University to the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Boyer, J.M., and A. Cutler.  2004.  Gunnison River / Aspinall Unit Temperature Study – Phase II, Final Report.  Upper Colorado River Endangered Fish Recovery Program.  Project #107.  USBR Contract #01-FC-40-5340.

Burdick, B.  2010.  Annual Operation and Maintenance of the Fish Passage Structure at the Redlands Diversion Dam on the Gunnison River.  Annual Report of the U.S. Fish and Wildlife Service to the Upper Colorado River Endangered Species Recovery Program, Denver, CO.

Fuller, M.  2009.  Lower Yampa River channel catfish and smallmouth bass control program, Colorado, 2001–2006.  Synthesis Report of the U.S. Fish and Wildlife Service to the Upper Colorado River Basin Recovery Implementation Program, Denver, CO.

Green River Study Plan Ad Hoc Committee.  2007.  Study plan for the implementation and evaluation of flow and temperature recommendations for endangered fishes in the Green River downstream of Flaming Gorge Dam.  Coordinated by the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Holden, P.B. (Ed.).  1999.  Flow recommendations for the San Juan River.  San Juan River Basin Recovery Implementation Program, U.S. Fish and Wildlife, Albuquerque, NM.

Hydrosphere Resource Consultants.  2001.  Gunnison River / Aspinall Unit Temperature Study - Phase I.

Hydrosphere Resource Consultants.  2004.  Gunnison River / Aspinall Unit Temperature Study - Phase II.

Irving, D., B. Haines, and T. Modde.  2004.  White River base flow studies, Colorado and Utah, 1996–1998.  Final Report of the U.S. Fish and Wildlife Service, Vernal, UT.

McAda., C.W.  2003.  Flow recommendations to benefit endangered fishes in the Colorado and Gunnison Rivers.  Final Report of the U.S. Fish and Wildlife Service, Grand Junction, CO.

Modde, T., and C. Keleher.  2003.  Flow recommendations for the Duchesne River with a synopsis of information regarding endangered fishes.  Draft Final Report to the Upper Colorado River Basin Endangered Fishes Recovery Implementation Program, Denver, CO.

Modde, T., W.J. Miller, and R. Anderson.  1999.  Determination of habitat availability, habitat use, and flow needs of endangered fishes in the Yampa River between August and October.  Final Report of the U.S. Fish and Wildlife Service to the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Muth, R.T., L.W. Crist, K.E. LaGory, J.W. Hayse, K.R. Bestgen, T.P. Ryan, J.K. Lyons, and R.A. Valdez.  2000.  Flow and temperature recommendations for endangered fishes in the Green River downstream of Flaming Gorge Dam.  Final Report to the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Osmundson, D.B.  1999.  Longitudinal variation in fish community structure and water temperature in the Upper Colorado River.  Final Report of the U.S. Fish and Wildlife Service to the Upper Colorado River endangered Fish Recovery Program, Denver, CO.

Osmundson, D.B., and K. Burnham.  1996.  Status and trends of the Colorado squawfish in the upper Colorado River.  Final Report of the U.S. Fish and Wildlife Service, Grand Junction, CO.

Osmundson, D.B., and S.C. Seal.  2009.  Successful spawning by stocked razorback sucker in the Gunnison and Colorado Rivers, as evidenced by larval fish collections, 2002-2007.  Final Report of the U.S. Fish and Wildlife Service to the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Osmundson, D.B., and G.C. White.  2009.  Population status and trends of Colorado pikeminnow of the upper Colorado River, 1991–2005.  Final Report of the U.S. Fish and Wildlife Service to the Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Osmundson, D.B., P. Nelson, K. Fenton, and D.W. Ryden.  1995.  Relationships between flow and rare fish habitat in the 15-mile reach of the upper Colorado River.  Final Report of the U.S. Fish and Wildlife Service and Bureau of Reclamation, Grand Junction, CO.

Osmundson, D.B., R.J. Ryel, and T.E. Mourning.  1997.  Growth and survival of Colorado squawfish in the upper Colorado River.  Transactions of the American Fisheries Society 126:687—698.

Ryden, D.  2003.  An augmentation plan for Colorado pikeminnow in the San Juan River.  Final Report of the U.S. Fish and Wildlife Service to the San Juan River Recovery Implementation Program, Albuquerque, NM.

Ryden, D.  2009.  Long term monitoring of sub-adult and adult large-bodied fishes in the San Juan River: 2008.  Interim Progress Report (Final Report) of the U.S. Fish and Wildlife Service to the San Juan River Recovery Implementation Program, Albuquerque, NM.

Stamp, M., and M. Golden.  2005.  Evaluation of the need for fish passage at the Arizona Public Service and Fruitland Irrigation Diversion Structures.  Final Report of BIO-West, Inc., Logan, Utah, to the San Juan River Recovery Implementation Program, Albuquerque, NM.

Trammel, M., S. Meismer, and D. Speas.  2004.  Nonnative cyprinid removal in the lower Green and Colorado Rivers, Utah.  Final Report of the Utah Division of Wildlife Resources to Division of Wildlife Resources, Denver, CO.

U.S. Fish and Wildlife Service.  1991.  Colorado squawfish recovery plan.  U.S. Fish and Wildlife Service, Region 6, Denver, CO.

U.S. Fish and Wildlife Service.  1996.  Procedures for stocking nonnative fish species in the Upper Colorado River Basin.  Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

U.S. Fish and Wildlife Service.  2002.  Colorado pikeminnow (*Ptychocheilus lucius*) Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan.  U.S. Fish and Wildlife Service, Mountain-Prairie Region, Denver, CO.

U.S. Fish and Wildlife Service.  2009.  Procedures for stocking nonnative fish species in the Upper Colorado River Basin.  Upper Colorado River Endangered Fish Recovery Program, Denver, CO.

Valdez, R., T. Chart, T. Nesler, D. Speas, and M. Trammel.  2008.  Yampa River Nonnative Fish Control Strategy.  Upper Colorado River Endangered Fish Recovery Program, Lakewood, CO.

U.S. FISH AND WILDLIFE SERVICE
5-YEAR REVIEW of *Colorado pikeminnow*

Current Classification: Endangered

Recommendation resulting from the 5-Year Review:
_____ Downlist to Threatened
_____ Uplist to Endangered
_____ Delist
__X__ No change needed

Review Conducted By:  Upper Colorado River Endangered Fish Recovery Program Office

FIELD OFFICE APPROVAL:

Tom Chart, Upper Colorado River Endangered Fish Recovery Program
Lead Field Supervisor, Fish and Wildlife Service

Approve _____     Date _____

REGIONAL OFFICE APPROVAL:

Steve Guertin, Regional Director, Mountain-Prairie Region (6)
Lead Regional Director, Fish and Wildlife Service

Approve _____     Date 2/24/11

OTHER REGIONAL OFFICES (within range of species)

Dr. Benjamin Tuggle, Regional Director, Southwest Region (2)
Cooperating Regional Director, Fish and Wildlife Service

_____ Concur          _____ Do Not Concur

Signature _____     Date 8/11/11

Michael Fris, Assistant Regional Director, Pacific Southwest Region (8)
Cooperating Assistant Regional Director, Ecological Services

_____ Concur          _____ Do Not Concur

Signature _____     Date 8/29/11

25

BLM

## Chapter 3
# Affected Environment



Public Lands USA: Use, Share, Appreciate

**CHAPTER 3 AFFECTED ENVIRONMENT**................................................................. **3-1**

3.1    Introduction ................................................................................................. 3-1
       3.1.1   Overview of the WRFO Planning Area................................................ 3-1
       3.1.2   Overview of the Proposed Dinosaur Trail MLP Area ........................... 3-3

3.2    Physical Resources ..................................................................................... 3-3
       3.2.1   Air and Atmospheric Values .............................................................. 3-3
               3.2.1.1    Climate ..................................................................................3-3
               3.2.1.2    Climate Change ....................................................................3-5
               3.2.1.3    Air Quality .............................................................................3-8
               3.2.1.4    Proposed Dinosaur Trail MLP ..............................................3-14
       3.2.2   Geology .......................................................................................... 3-14
               3.2.2.1    Geologic Formations.............................................................3-15
               3.2.2.2    Geologic Hazards .................................................................3-18
               3.2.2.3    Proposed Dinosaur Trail MLP ..............................................3-18
       3.2.3   Soil Resources ............................................................................... 3-18
               3.2.3.1    Proposed Dinosaur Trail MLP ..............................................3-25
       3.2.4   Water Resources ............................................................................ 3-25
               3.2.4.1    Surface Water .......................................................................3-27
               3.2.4.2    Water Quality ........................................................................3-31
               3.2.4.3    Groundwater .........................................................................3-36
               3.2.4.4    Proposed Dinosaur Trail MLP ..............................................3-41

3.3    Biological Resources ................................................................................... 3-41
       3.3.1   Vegetation Communities .................................................................. 3-41
               3.3.1.1    Forests and Woodlands .........................................................3-41
               3.3.1.2    Riparian and Wetland Communities .......................................3-44
               3.3.1.3    Grassland and Shrubland Communities .................................3-46
               3.3.1.4    Invasive, Non-native Plant Species and Pest Control .............3-49
               3.3.1.5    Remnant Vegetation..............................................................3-51
               3.3.1.6    Proposed Dinosaur Trail MLP ..............................................3-52
       3.3.2   Fish and Wildlife Resources ............................................................ 3-52
               3.3.2.1    Wildlife .................................................................................3-52
               3.3.2.2    Fish......................................................................................3-64
               3.3.2.3    Proposed Dinosaur Trail MLP ..............................................3-68
       3.3.3   Special Status Species - Animals .................................................... 3-68
               3.3.3.1    Federal Endangered, Threatened, Proposed and
                          Candidate Animal Species.....................................................3-68
               3.3.3.2    Other Special Status Species – Animals .................................3-72
               3.3.3.3    Proposed Dinosaur Trail MLP ..............................................3-82
       3.3.4   Special Status Species - Plants ....................................................... 3-82
               3.3.4.1    Federal Endangered, Threatened, Proposed and
                          Candidate Plant Species.......................................................3-83
               3.3.4.2    Other Special Status Species.................................................3-86
               3.3.4.3    Proposed Dinosaur Trail MLP ..............................................3-91

3.4    Wild Horse Management ............................................................................... 3-91
       3.4.1.1    Proposed Dinosaur Trail MLP ..............................................3-93

3.5    Wildland Fire Ecology and Management ....................................................... 3-93
       3.5.1   Unplanned/Wildland Fire ................................................................. 3-95
       3.5.2   Planned/Prescribed Fire .................................................................. 3-96
       3.5.3   Proposed Dinosaur Trail MLP .......................................................... 3-96

*Chapter 3 – Affected Environment*

3.6     Heritage and Visual Resources ....................................................................................3-96
        3.6.1   Cultural Resources ..............................................................................................3-96
                3.6.1.1   Proposed Dinosaur Trail MLP ...........................................................3-101
        3.6.2   Paleontological Resources .................................................................................3-101
                3.6.2.1   Proposed Dinosaur Trail MLP ...........................................................3-102
        3.6.3   Visual Resources ...............................................................................................3-102
                3.6.3.1   Proposed Dinosaur Trail MLP ...........................................................3-106

3.7     Resource Uses .............................................................................................................3-106
        3.7.1   Forest Products ..................................................................................................3-106
                3.7.1.1   Proposed Dinosaur Trail MLP ...........................................................3-106
        3.7.2   Livestock Grazing ..............................................................................................3-107
                3.7.2.1   Proposed Dinosaur Trail MLP ...........................................................3-108
        3.7.3   Minerals ..............................................................................................................3-108
                3.7.3.1   Leasable Minerals ..............................................................................3-108
                3.7.3.2   Locatable Minerals .............................................................................3-113
                3.7.3.3   Salable Minerals .................................................................................3-114
                3.7.3.4   Proposed Dinosaur Trail MLP ...........................................................3-114
        3.7.4   Recreation ...........................................................................................................3-115
                3.7.4.1   Proposed Dinosaur Trail MLP ...........................................................3-118
        3.7.5   Comprehensive Trails and Travel Management ................................................3-119
                3.7.5.1   Proposed Dinosaur Trail MLP ...........................................................3-121
        3.7.6   Lands and Realty ................................................................................................3-122
                3.7.6.1   Renewable Energy ..............................................................................3-125
                3.7.6.2   Rights-of-Way and Utility Corridors ..................................................3-126
                3.7.6.3   Proposed Dinosaur Trail MLP ...........................................................3-127

3.8     Special Designations and Other Management Areas ...................................................3-127
        3.8.1   Areas of Critical Environmental Concern and Other Management Areas .........3-128
                3.8.1.1   Proposed Dinosaur Trail MLP ...........................................................3-130
        3.8.2   National Back Country and Scenic Byways .......................................................3-130
                3.8.2.1   Proposed Dinosaur Trail MLP ...........................................................3-130
        3.8.3   National Historic Trails and Other Historic Trails .............................................3-131
        3.8.4   Wild and Scenic Rivers ......................................................................................3-131
        3.8.5   Wilderness Study Areas .....................................................................................3-131
                3.8.5.1   Proposed Dinosaur Trail MLP ...........................................................3-132

3.9     Lands with Wilderness Characteristics .......................................................................3-132
        3.9.1   Resource Overview .............................................................................................3-132
        3.9.2   Methods of Analysis ...........................................................................................3-134
        3.9.3   Current Conditions .............................................................................................3-135
        3.9.4   Proposed Dinosaur Trail MLP ...........................................................................3-148

3.10    Socioeconomic Resources ...........................................................................................3-148
        3.10.1  Social, Economic and Environmental Justice ...................................................3-150
                3.10.1.1   Social Conditions .............................................................................3-150
                3.10.1.2   Economic Conditions .......................................................................3-167
                3.10.1.3   Environmental Justice ......................................................................3-177
                3.10.1.4   Proposed Dinosaur Trail MLP .........................................................3-180
        3.10.2  Public Health and Safety ...................................................................................3-180
                3.10.2.1   Hazardous Materials and Wastes ....................................................3-180

*Chapter 3 – Affected Environment*

## List of Tables

Table 3-1     Average Annual Temperature and Precipitation ......................................................... 3-4
Table 3-2     Piceance Basin (Bar-D) Wind Data Summary (Years 2002–2007).......................... 3-4
Table 3-3     Background Concentrations ...................................................................................... 3-9
Table 3-4     Natural and Existing Visibility at WHRI1 Monitoring Station, 2001–2004 ........... 3-11
Table 3-5     Federal Class I and Sensitive Class II Areas .......................................................... 3-12
Table 3-6     2005 Deposition at Rocky Mountain National Park .................................................. 3-13
Table 3-7     2006 Point Source Emissions in the WRFO Planning Area ...................................... 3-13
Table 3-8     Generalized Stratigraphic Column ......................................................................... 3-15
Table 3-9     Major Sub-Basins within the WRFO Planning Area ................................................ 3-27
Table 3-10    Select USGS Sites and Annual Stream Flows ......................................................... 3-29
Table 3-11    Water Chemistry Results for Selected USGS Surface Water Quality Stations
              in the WRFO Planning Area .................................................................................... 3-33
Table 3-12    Acres and Percent Cover of Vegetative Types within the WRFO Planning
              Area ....................................................................................................................... 3-41
Table 3-13    Number of Stream Miles within each Geographic Reference Area in PFC,
              FAR, or NF ............................................................................................................ 3-46
Table 3-14    WRFO Planning Area Noxious Weeds .................................................................... 3-50
Table 3-15    WRFO Planning Area Remnant Vegetation ............................................................ 3-51
Table 3-16    Elk Herd Populations ............................................................................................. 3-53
Table 3-17    Mule Deer Populations .......................................................................................... 3-55
Table 3-18    Pronghorn Populations .......................................................................................... 3-56
Table 3-19    Raptor Species and Habitats .................................................................................. 3-59
Table 3-20    Other Important Bird Species ................................................................................. 3-61
Table 3-21    Stream Fish Habitats Managed by BLM .................................................................. 3-65
Table 3-22    Federally Listed Animal Species that May Occur in the WRFO Planning Area ..... 3-69
Table 3-23    Other Special Status Animal Species ...................................................................... 3-72
Table 3-24    Federally Listed and Candidate Plant Species that May Occur in the WRFO
              Planning Area ......................................................................................................... 3-83
Table 3-25    Other Special Status Plant Species ......................................................................... 3-86
Table 3-26    Wild Horse Herd Management and Herd Areas ....................................................... 3-92
Table 3-27    Wild Horse Populations in Herd Management and Herd Areas ............................... 3-92
Table 3-28    Current Fire Regime Condition Classes ................................................................. 3-94
Table 3-29    Unplanned Wildfires in the WRFO Between 2000–2007 ........................................ 3-95
Table 3-30    Cultural Time Periods Represented in the WRFO Planning Area ............................ 3-97
Table 3-31    VRM and VRI Class Acreage in the WRFO Planning Area on BLM Surface ..... 3-104
Table 3-32    VRM Classes Associated with Major Oil and Gas Production Fields ................. 3-106
Table 3-33    Oil, Gas, and Water Produced in the WRFO Planning Area from 1999 to
              2006 ..................................................................................................................... 3-110
Table 3-34    Surface Management in the WRFO Planning Area................................................. 3-122
Table 3-35    Areas of Critical Environmental Concern ............................................................ 3-128
Table 3-36    Leased Acreage within ACECs ............................................................................. 3-129
Table 3-37    Wilderness Study Areas in the White River Field Office...................................... 3-131
Table 3-38    Units Containing Lands with Wilderness Characteristics ..................................... 3-136

| Table 3-39 | Housing Units, Primary and Secondary Socioeconomic Study Area, 2000-2011 | 3-154 |
| Table 3-40 | Summary of Published Research Estimates of Non-Market Values for Recreation and Passive Use Benefits of Designated Wilderness in the U.S., 1981 to 1999 | 3-161 |
| Table 3-41 | Average Consumer Surplus Value per Person per Day by Activity on Public Land Based upon Existing Studies - Intermountain Region, 2004 Dollars | 3-162 |
| Table 3-42 | Market Transaction Values of Restricting Colorado Lands from Development, 1998 Dollars | 3-162 |
| Table 3-43 | Employment Growth by Industry, Rio Blanco County, 1970 and 2011 | 3-170 |
| Table 3-44 | Employment Totals and Average Annual Growth Rate, Combined Socioeconomic Study Area, 1970–2011 | 3-170 |
| Table 3-45 | Number of Wage and Salary Jobs by Industry, Primary and Secondary Study Areas, Year 2007 | 3-171 |
| Table 3-46 | Percentages of Minorities in the State of Colorado, Rio Blanco and Garfield Counties, and Selected Areas | 3-178 |
| Table 3-47 | Percentages of Persons in Poverty in the State of Colorado, Rio Blanco and Garfield Counties, and Selected Areas | 3-179 |

## List of Figures

| Figure 3-1 | Bar-D Wind Rose | 3-5 |
| Figure 3-2 | PM$_{10}$ Ambient Concentrations | 3-10 |
| Figure 3-3 | Stream Hydrograph for Piceance Creek below Ryan Gulch | 3-30 |
| Figure 3-4 | Stream Hydrograph for the White River near Meeker, Colorado | 3-30 |
| Figure 3-5 | Primary and Secondary Socioeconomic Study Areas and Location of the WRFO Management Area | 3-150 |
| Figure 3-6 | Calculation of Severance Taxes, Colorado | 3-175 |
| Figure 3-7 | Colorado Severance Tax Distribution, 2013 | 3-176 |

*Chapter 3 – Affected Environment*

**List of Maps**

Map 3-1      Major Streams, Watersheds, and Proper Functioning Condition Assessments
Map 3-2      Land Cover Types
Map 3-3      Fisheries, Fragile Watersheds, Impaired Waters, and Waters on the M&E List
Map 3-4      Mule Deer Summer Habitats
Map 3-5      Mule Deer Winter Habitats
Map 3-6      Elk Summer Habitats
Map 3-7      Elk Winter Habitats
Map 3-8      Pronghorn Habitat
Map 3-9      Selected Special Status Wildlife Species
Map 3-10     Greater Sage-Grouse Habitats
Map 3-11     Wild Horse
Map 3-12     Fire Regime Condition Classes
Map 3-13     Livestock Grazing Allotments
Map 3-14     Federal Oil and Gas Mineral Estate and Surface Management
Map 3-15     Oil Shale Lease Area, Sodium Lease Area, Multimineral Lease Area, and Coal Field Areas
Map 3-16     Travel Management Designations
Map 3-17     Realty Corridors
Map 3-18     Special Designations
Map 3-19     Lands with Wilderness Characteristics
Map 3-20     Visual Resource Management Areas
Map 3-21     Visual Resource Inventory Areas
Map 3-22     Threatened, Endangered, and Sensitive Vegetation

*This page intentionally left blank*

# CHAPTER 3
# AFFECTED ENVIRONMENT

## 3.1   Introduction

Chapter 3 describes existing conditions for BLM resource programs, resource uses, special designations, other management areas, and the socioeconomic environment within the WRFO Planning Area. Management of resources and resource uses on public lands administered by the BLM is directed by a variety of laws, regulations, policies, and other requirements. The WRFO also considers BMPs in the management of resources and resource uses in the WRFO Planning Area. Appendix B identifies potential BMPs.

In addition to describing existing conditions, Chapter 3 identifies, where appropriate, management challenges for resource programs and resource uses on BLM-administered land. These management challenges were identified by the BLM's AMS (BLM 2007b), as well as by issues identified during the 2006 scoping process for amending the 1997 White River RMP (BLM 1997a). For example, BLM has identified challenges for management of air quality in the WRFO Planning Area. These management challenges are based, in part, on historic activities and current conditions and trends. By describing existing conditions for resource programs in the WRFO Planning Area, this chapter serves as the baseline against which the impacts of the different alternatives are analyzed and compared in Chapter 4. Maps 3-1 through 3-21 are located at the end of the chapter.

### 3.1.1   Overview of the WRFO Planning Area

The WRFO administrative office is located in the town of Meeker in northwestern Colorado. The BLM-administered lands include all but a small portion of Rio Blanco County, with additional small tracts located in northern Garfield County and southern Moffat County. The FS administers approximately 376,100 acres of the 2.3 million acre White River National Forest (WRNF) in Rio Blanco and Garfield counties. Also contained within the WRFO Planning Area boundary are National Park Service, state, and private lands. Table 1-1 in Chapter 1 presents a summary of land ownership which also includes FS, state, and private lands in Rio Blanco, Moffat, and Garfield counties.

The western portion of the WRFO Planning Area lies within the Colorado Plateau physiographic province, which is characterized by dissected plateaus with strong relief. The eastern portion of the WRFO Planning Area lies in the Southern Rocky Mountains physiographic province. The Grand Hogback, a monoclinal structure of steeply dipping sedimentary rocks, traverses the area in a general north-south direction and divides these two major provinces. East of the Grand Hogback, in the White River Uplift, land elevations range from about 6,000 to 12,000 feet.

The WRFO Planning Area primarily consists of pinyon/juniper woodlands at elevations from 6,000 to 9,000 feet with an average annual precipitation between 11 to 16 inches. The climate of the WRFO Planning Area is classified as semiarid with a wide variation in daily and annual temperatures due to relatively high elevation and dry air. Summer temperatures average approximately 60 degrees Fahrenheit and winter temperatures average approximately 27 degrees Fahrenheit.

Soils and vegetation in the WRFO Planning Area generally provide rangeland suitable for year-round cattle and sheep grazing at lower elevations; however, supplemental feeding is often required, especially at higher elevations.

**Rio Blanco County**

Rio Blanco County was established in 1889 in response to the early gold rush of the 1860s and 1870s and the subsequent mining boom. Today, energy development and resource extraction, agriculture, and recreation remain important to the area economy.

The county seat and largest city in Rio Blanco County is Meeker. Rio Blanco's population at the 2010 Census was 6,666 (U.S. Census Bureau 2013a). The BLM-administered lands in the northeast corner of Rio Blanco County are administered by the Little Snake Field Office (LSFO) in Craig.

The White River generally runs in an east-west direction through Rio Blanco County. Other major tributaries located in Rio Blanco County include Piceance Creek and Douglas Creek.

Colorado State Highway (SH) 64 generally bisects Rio Blanco County, traversing west to east along the White River from Dinosaur in Moffat County to Meeker. Major south-north roads include SH 13 from Rifle to Meeker, and eventually to Craig, county seat of Moffat County and a rail yard/head that often serves Rio Blanco County; and SH 139 from Loma to Rangely.

**Garfield County**

Garfield County was founded in 1883. Like Rio Blanco County, Garfield County was settled in response to the gold rush and mining boom. In 1887, the Denver and Rio Grande Railroad extended service to Glenwood Springs, thus providing an economical way to transport products to market. Today, energy development, tourism, ranching, and farming are the main industries.

The county seat is Glenwood Springs. Garfield County's population at the 2010 Census was 56,389 (U.S. Census Bureau 2013b). The BLM Grand Junction Field Office and Colorado River Valley Field Office administer the majority of BLM lands within Garfield County.

The Colorado River generally traverses in an east-west direction through the eastern half of Garfield County. Water bodies in Garfield County within the WRFO Planning Area include Trappers Lake and the headwaters of the White River; upstream portions of Piceance Creek and several of its tributaries; the east and west forks of Douglas Creek; and the headwaters of Parachute and Roan Creeks, which drain directly into the Colorado River.

Interstate 70 (I-70) is the main thoroughfare through Garfield County in the east-west direction. State Highway 13 is the main north-south highway in Garfield County, traversing from Meeker to Rifle, and SH 139 runs in a north-south direction from Rangely to Loma.

**Moffat County**

Moffat County was established in 1911. Similar to Rio Blanco and Garfield counties, Moffat County was settled in response to resource extraction booms. Today, agriculture and mining are the main industries in Moffat County. The county seat is Craig. Moffat County's population in the 2010 Census was 13,795 (U.S. Census Bureau 2013c). The majority of BLM lands in Moffat County are administered by the LSFO.

There are three main rivers in Moffat County. The Green River is located in the northwestern corner of the county and crosses the Utah border. The portion of the Green River within Colorado is mostly within Dinosaur National Monument. The Yampa River flows in an east-west direction and generally bisects the county. The Little Snake River runs in a northeast to southwest direction from the Wyoming border and flows into the Yampa River. In Moffat County, the WRFO administers BLM lands on which several tributaries flow to the White River, including Wolf Creek.

The main east-west thoroughfare through Moffat County is U.S. Highway 40 (US 40) from Craig to Dinosaur. State Highway 13 traverses the county in a north-south direction connecting I-80 in Wyoming to Meeker.

## 3.1.2   Overview of the Proposed Dinosaur Trail MLP Area

The Master Leasing Plan (MLP) concept, introduced in May 2010 via the Oil and Gas Leasing Reform IM 2010-117, promotes a proactive approach to planning for oil and gas development. Generally, the BLM uses RMPs to make oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values and reasonably foreseeable oil and gas development scenarios. However, this policy acknowledged that additional planning and analysis may be necessary in some areas prior to new oil and gas leasing because of changing circumstances, updated policies, and new information. An MLP is not a special designation but rather it delineates a planning area in which there is analysis of decisions related to oil and gas leasing and development of a distinct geographic area.

Citizen groups had proposed the Eastern Bookcliffs/Piceance Basin and Dinosaur Lowlands MLPs which are not being carried forward for detailed analysis (Section 2.5.8). However, the BLM has modified the boundary of the Dinosaur Lowlands MLP to develop the Dinosaur Trail MLP, which is located in the northwest corner of the field office (Map 1-1). The Dinosaur Trail MLP includes western Moffat County and northwest Rio Blanco County.

## 3.2   Physical Resources

## 3.2.1   Air and Atmospheric Values

This section describes the climate and typical ambient air quality conditions (i.e., existing air quality) in the region potentially affected by alternatives described in Chapter 2. Air pollutants addressed in this Draft Oil and Gas Development RMPA/EIS include greenhouse gases, criteria pollutants, HAPs, and compounds that could cause visibility impairment or atmospheric deposition. Regional air quality is influenced by the interaction of several factors, including meteorology, climate, the magnitude and spatial distribution of local and regional air pollutant sources, and the chemical properties of emitted air pollutants.

### 3.2.1.1   Climate

The WRFO Planning Area is primarily comprised of pinyon/juniper woodland at elevations from 6,000 to 9,000 feet with average annual precipitation between 11 to 16 inches. Further east is the Flat Tops Wilderness Area, a large elevated and flattened dome plateau ranging from nearly 9,000 to just over 12,000 feet. The complex terrain causes considerable climatic variability because elevation, slope, and aspect affect precipitation and temperatures. Precipitation at lower elevations is typically distributed fairly evenly throughout the year at nearly one inch per month, with mid-winter receiving the lowest average amounts and spring and fall the highest levels. Table 3-1 provides average temperature and annual precipitation measurements. Representative temperature and precipitation data were obtained from the Western Regional Climate Center (WRCC) (WRCC 2008a).

*Chapter 3 – Affected Environment*

### Table 3-1. Average Annual Temperature and Precipitation

| Station Name[1] | Station ID[2] | Annual Temperature | | Annual Precipitation | | County |
|---|---|---|---|---|---|---|
| | | Minimum (°F)[3] | Maximum (°F) | Total (in)[4] | Snow (in) | |
| Dinosaur National Monument | 52286 | 33.4 | 61.5 | 11.60 | 40.2 | Moffat |
| Little Hills | 55048 | 24.0 | 60.7 | 13.82 | 56.7 | Rio Blanco |
| Meeker | 55484 | 27.4 | 60.4 | 16.43 | 69.6 | Rio Blanco |
| Rangely | 56832 | 30.9 | 62.9 | 9.99 | 26.2 | Rio Blanco |
| Yampa | 59265 | 25.4 | 53.6 | 16.36 | 120.1 | Routt |

SOURCE: WRCC 2008a.

NOTES:

[1]The period of record for each station is:

Dinosaur National Monument: 6/1/1965–12/31/2006

Little Hills: 7/1/1946–9/30/1991

Meeker: 1/1/1893–12/31/2006

Rangely: 7/1/1894–12/31/2006

Yampa: 3/1/1909–12/31/2006

[2]ID = identification number

[3]°F = degrees Fahrenheit

[4]in = inches

Representative wind measurements are limited within the WRFO administrative boundary. Table 3-2 shows wind data collected by the CDPHE at the Piceance Basin Bar-D station, which is located within WRFO jurisdiction. The wind tends to blow from the south southeast in the spring and more from the south during summer and fall. Average wind speed is highest in the spring, with highest peak gusts occurring in January through July.

### Table 3-2. Piceance Basin (Bar-D) Wind Data Summary (Years 2002–2007)

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Avg[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIR[2] | S[3] | SSE[4] | SSE | SSE | SSE | SSE | S | SSE | S | S | S | S | SSE |
| SPD[5] | 7.1 | 7.4 | 8.5 | 9.6 | 8.9 | 8.8 | 7.8 | 7.9 | 8.1 | 7.6 | 7.4 | 7.2 | 8.0 |
| PGU[6] | 30.0 | 31.8 | 27.3 | 29.3 | 29.3 | 29.8 | 31.5 | 28.2 | 26.8 | 26.8 | 24.2 | 23.9 | 31.8 |

SOURCE: Data recorded from January 1, 2002 through March 15, 2007 (CDPHE APCD 2007).

NOTES:

[1]Avg = Annual Average

[2]DIR = prevailing wind direction (in compass points)

[3]S = south

[4]SSE = south southeast

[5]SPD = mean wind speeds (miles per hour)

[6]PGU = peak gust (mph)

Figure 3-1 illustrates wind speed in knots and direction based on data collected at the Bar-D meteorological monitoring station in the Piceance Basin. The position of the bars indicates the direction from which wind originates. The length of each bar is proportional to the frequency of time that wind blows from that direction. Each bar is further broken down into segments showing the frequency of wind speed occurrences. At the Bar-D monitoring station, wind originates from the southeast approximately 17.7 percent of the time based on the total length of the southeasterly bar. As shown by the length of each colored segment of this bar, the wind originates from the southeast

and has a wind speed of 2–3 knots 1.8 percent of the time, 4–5 knots 4.0 percent of the time, 6-7 knots 6.7 percent of the time, 8–9 knots 4.8 percent of the time, and greater than 10 knots 0.4 percent of the time. In contrast, the wind blows from the east-southeast 1.8 percent of the time and the wind speed from that direction never exceeded seven knots.

**Figure 3-1. Bar-D Wind Rose**



SOURCE: CDPHE APCD 2007.
NOTE: Data recorded from January 1, 2002 through March 15, 2007.

### 3.2.1.2   Climate Change

Climate is both a driving force and a limiting factor for biological, ecological, and hydrological processes, and it has great potential to influence resource management. Climate change is a phenomenon that could alter natural resource and ecologic conditions on spatial and temporal scales that have not yet been experienced. The Intergovernmental Panel on Climate Change (IPCC) has stated, "Most of the observed increase in global average temperatures since the mid-20[th] century is very likely due to the observed increase in anthropogenic [man-made] GHG concentrations" (IPCC 2007). The general consensus is that as atmospheric concentrations of GHGs continue to rise, average global temperatures and sea levels will rise, precipitation patterns will change, and climatic trends will change and influence earth's natural resources in a variety of ways.

Ongoing scientific research has identified the potential impacts of man-made GHG emissions, changes in biological carbon sequestration, and other changes due to land management activities on the global climate. Through complex interactions on a regional and global scale, these changes cause a net warming of the atmosphere, primarily by decreasing the amount of heat energy radiated by the earth back into space. Although natural GHG levels have varied for millennia, recent industrialization and burning fossil carbon sources have caused carbon dioxide equivalent ($CO_2e$) concentrations to increase dramatically and are likely to contribute to overall global climatic changes.

There are uncertainties associated with the science of climate change, but this does not imply that scientists do not have confidence in many aspects of climate change science. According to EPA some aspects of the science are "known with virtual certainty because they are based on well-known physical laws and documented trends" (EPA 2010e).

Decisions made under the RMP will have no meaningful direct effects on area weather conditions, but can have indirect effects resulting from activities that release GHG air pollutants, or from activities that terrestrially sequester carbon that would otherwise exist in the atmosphere as carbon dioxide.

### Current GHG Conditions

GHGs are compounds in the atmosphere that absorb infrared radiation and re-radiate a portion of that back toward the earth's surface, thus trapping heat and warming the earth's atmosphere. The most important naturally occurring GHG compounds are carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), ozone ($O_3$), and water vapor. $CO_2$, $CH_4$, and $N_2O$ are produced naturally by respiration and other physiological processes of plants, animals, and micro-organisms; by decomposition of organic matter; by volcanic and geothermal activity; by naturally occurring wildfires; and by natural chemical reactions in soil and water. Ozone is not released directly by natural sources, but forms during complex chemical reactions in the atmosphere among organic compounds and nitrogen oxides in the presence of ultraviolet radiation. While water vapor is a strong GHG, its concentration in the atmosphere is primarily a result of, not a cause of, changes in surface and lower atmospheric temperature conditions.

Although naturally present in the atmosphere, concentrations of $CO_2$, $CH_4$, and $N_2O$ also are affected by emissions from industrial processes, transportation technology, urban development, agricultural practices, and other human activity. In addition to these GHGs, three industrially generated GHGs also contribute to climate change: sulfur hexafluoride (SF6), hydrofluorocarbons (HFCs), and perfluorocarbons (PFCs). $CO_2$ and $CH_4$ account for the most significant anthropogenic GHG emissions. BLM-authorized activities accounting for the largest quantities of GHG emissions include mineral and energy development and operations, large wildland fires, and activities using combustion engines (such as generators and vehicles). Therefore, for this RMPA, quantification of GHG emissions includes only $CO_2$, $CH_4$, and $N_2O$.

A GHG's ability to contribute to global warming is based on its longevity in the atmosphere and its heat-trapping capacity. In order to aggregate GHG emissions and assess their contribution to global warming, the EPA has assigned each GHG a global warming potential (GWP) that is used to calculate $CO_2e$. The $CO_2e$ for each GHG is calculated by multiplying the quantity of emissions by the GWP for that GHG. Total $CO_2e$ emissions for all GHGs are then determined by adding the $CO_2e$ emissions of each GHG. GWPs used for GHG emission calculations and reporting are $CO_2 = 1$, $CH_4 = 21$, and $N_2O = 310$. GWPs for other GHGs, including SF6, HFCs, and PFCs, are typically much higher.

*Chapter 3 – Affected Environment*

**Global Climate Change Trends and Predictions**

The IPCC and the National Oceanic and Atmospheric Administration (NOAA) estimated the following changes in global atmospheric concentrations of the most important GHGs (IPCC 2007; NOAA 2010):

- Atmospheric concentrations of $CO_2$ have risen from a preindustrial background of 280 parts per million by volume (ppmv) to 386 ppmv in 2009.

- Atmospheric concentrations of $CH_4$ have risen from a preindustrial background of about 0.70 ppmv to 1.79 ppmv in 2009.

- Atmospheric concentrations of $N_2O$ have risen from a preindustrial background of 0.270 ppmv to 0.322 ppmv in 2009.

The IPCC has concluded that these changes in atmospheric composition are almost entirely the result of human activity, not the result of changes in natural processes that produce or remove these gases (IPCC 2007). The IPCC estimates that mean global surface temperatures increased by 0.74°C (1.3°F) from 1906 to 2006 (IPCC 2007). In addition, the rate of warming averaged over the past 50 years is nearly twice that for the past 100 years.

Global and regional climate changes have already been documented and will continue to occur due to GHG concentrations already present in the atmosphere and ongoing global emissions of GHGs. The global mean surface temperature has increased by approximately 1.5°F since 1900 (USGCRP 2009). Climate models indicate that average temperature changes are likely to be greater in the Northern Hemisphere. Northern latitudes (above 24° N) have exhibited temperature increases of nearly 2.1°F since 1900, with nearly a 1.8°F increase since 1970 alone. Without additional meteorological monitoring systems, it is difficult to determine the spatial and temporal variability and change of climatic conditions, but increasing concentrations of GHGs are likely to accelerate the rate of climate change.

In 2007, the IPCC indicated that by 2100 the global average surface temperature would increase by between 2.0°F and 11.5°F above 1980–1999 levels, depending on the assumptions made in the predictive model (IPCC 2007). The National Academy of Sciences has confirmed these findings but has indicated there are uncertainties regarding how climate change may affect different regions. Computer model predictions show that temperature increases will not be equally distributed but will likely be accentuated at higher latitudes. Warming during the winter is expected to be greater than during the summer, and increases in daily minimum temperatures are likely to be greater than increases in daily maximum temperatures. Increases in temperature would increase water vapor retention in the atmosphere and reduce soil moisture, increasing generalized drought conditions, while enhancing heavy storms. Although large-scale spatial shifts in precipitation distribution may occur, these changes are more uncertain and difficult to predict.

Climate change predictions are based on multiple modeling scenarios involving different sets of GHG emission assumptions. Emission assumptions are primarily based on determinations of global population growth, economic growth, fossil fuel development and use, and many other factors. The predictions described below are not based on implementation of GHG emission reduction programs, such as the Kyoto Protocol or EPA regulation of GHG emissions. For example, EPA recently began to regulate GHGs, and these regulations will decrease future US GHG emissions though a variety of methods. EPA regulatory actions to date are as follows:

- Setting GHG emission standards for new light-duty vehicles.

- Requiring mandatory reporting of annual GHG emissions from many types of stationary sources responsible for the bulk of US GHG emissions.

- Requiring air pollution control agencies to review GHG emissions when issuing air quality construction and operating permits for stationary sources with large quantities of GHG emissions.

- Requiring identification and imposition of GHG emission reduction control technologies for large GHG emission sources before constructing new facilities or modifying or reconstructing existing facilities.

Projected changes are likely to occur over several decades to a century. Therefore, many of the projected changes associated with climate change described below may not be measurable within the reasonably foreseeable future. However, research on climate change science is ongoing, and it is expected that regional projects will only be finer in scale and will be more confident over time, as the science advances. To the extent practicable, BLM management will review its authorized actions and the impacts to or from climate change as the state of the science advances over the life of this RMPA.

### 3.2.1.3    Air Quality

The Clean Air Act (CAA) requires the EPA to set National Ambient Air Quality Standards (NAAQS) for seven criteria pollutants that are considered harmful to public health and the environment. The CAA established two types of air quality standards (primary and secondary). Primary standards set limits necessary to protect public health, including the health of "sensitive" populations such as asthmatics, children, and the elderly. Secondary standards set limits to protect public welfare, including protection of the general environment, as well as preventing damage to animals, crops, vegetation, and buildings.

The Federal NAAQS are implemented by state agencies with EPA oversight. The State of Colorado has adopted all of the NAAQS. In addition, Colorado has adopted a 3-hour sulfur dioxide ($SO_2$) standard of 700 micrograms per cubic meter ($\mu g/m^3$). Six criteria pollutants have been monitored in or near the WRFO Planning Area: (1) CO, (2) nitrogen dioxide ($NO_2$), (3) ozone, (4) respirable particulate matter less than 2.5 microns in effective diameter ($PM_{2.5}$), (5) respirable particulate matter less than 10 microns in effective diameter ($PM_{10}$), and (6) $SO_2$. Due to low emissions of lead in the WRFO Planning Area, no monitoring data have been collected for this criteria pollutant.

The CDPHE provided ambient background concentration data to be used for modeling air quality in the WRFO Planning Area. Reported in micrograms per cubic meter ($\mu g/m^3$), these background data are presented in Table 3-3, which includes ambient air concentrations from monitors located inside and outside the WRFO administrative boundary. Concentration data collected within the Piceance Basin includes CO data collected at the American Soda Plant monitor and $SO_2$ data collected at the Unocal monitor. Background concentration data for other pollutants was collected outside of the WRFO Planning Area. Table 3-3 also presents national and state air quality standards for each of the criteria pollutants monitored in the WRFO area. The maximum pollutant concentrations are below applicable Colorado Ambient Air Quality Standards (CAAQS) and NAAQS, respectively, for all pollutants except ozone. Ozone levels approaching, but not exceeding the federal standard have been observed. The cause of observed high ozone levels is uncertain, although regional transport, "cold pool" ozone formation, or subsidence of stratospheric ozone is possible (see further discussion below).

*Chapter 3 – Affected Environment*

## Table 3-3. Background Concentrations

| Pollutant | Averaging Time[1] | Maximum Measured Background Concentration (µg/m) | NAAQS (µg/m) | CAAQS (µg/m) | PSD[2] Class I Increments (µg/m) | PSD Class II Increments (µg/m) |
|---|---|---|---|---|---|---|
| CO[3] | 1-hour | 1,145 | 40,000 | 40,000 | NA[4] | NA |
| | 8-hour | 1,145 | 10,000 | 10,000 | NA | NA |
| NO$_2$[5] | Annual | 9 | 100 | 100 | 2.5 | 25 |
| Ozone[6] | 1-hour | --- | 235 | 235 | NA | NA |
| | 8-hour | 128 | 147 | 147 | NA | NA |
| Ozone[7] | 1-hour | --- | 235 | 235 | NA | NA |
| | 8-hour | 132 | 147 | 147 | NA | NA |
| Ozone[8] | 1-hour | 161 | 235 | 235 | NA | NA |
| | 8-hour | 141 | 147 | 147 | NA | NA |
| PM$_{2.5}$[9] | 24-hour | 18 | 35 | 65 | NA | NA |
| | Annual | 8 | 15 | 15 | NA | NA |
| PM$_{10}$[3] | 24-hour | 41 | 150 | 150 | 8 | 30 |
| | Annual | 11 | 50 | 50 | 4 | 17 |
| SO$_2$[10] | 3-hour | 24 | 1,300 | 700 | 25 | 512 |
| | 24-hour | 13 | 365 | 365 | 5 | 91 |
| | Annual | 5 | 80 | 80 | 2 | 20 |

SOURCE: CDPHE APCD 2006a and CDPHE-APCD 2011.

NOTES:
[1]Annual standards are not to be exceeded; short-term standards are not to be exceeded more than once per year.
[2]PSD = Prevention of Significant Deterioration Program.
[3]Data collected by American Soda, Piceance Basin, 2003-2004.
[4]NA = not applicable.
[5]Based on data collected by Southern Ute Indian Tribe at Ignacio, CO.
[6]Based on data collected in Rifle, Garfield County, Colorado. 2008-2010. Provided by CDPHE-APCD.
[7]Based on data collected by the Clean Air Status and Trends Network (CASTNET) Network at Gothic Station, GTH 161, Gunnison, CO. 2007-2009. Provided by CDPHE-APCD.
[8]Based on recent data collected in Greasewood (Piceance Basin). Provided by CDPHE-APCD.
[9]Data collected in Grand Junction, CO (515 Patterson).
[10]Data collected by Unocal, Piceance Basin, 1983-1984.

Based on the monitoring data that is available in and near the WRFO Planning Area, air quality is good (substantially below the NAAQS for all pollutants except ozone), due to relatively few large air pollutant emission sources. With regard to large non-gas industrial sources, there are no petroleum refineries, electric utility power plants, or major manufacturing facilities in the WRFO Planning Area. Oil and gas wells, gas pipelines, compressor stations, gas plants, and agricultural activities are prevalent. People live in small communities and isolated ranches. Good atmospheric dispersion conditions due to reliable winds and vertical mixing, as well as limited air pollutant transport into the area, result in relatively low local air pollutant concentrations. Based on the data shown in Table 3-3, the air quality within the WRFO Planning Area complies with the applicable air quality standards.

In May 2005, a two-year air quality monitoring study was initiated by the Garfield County Public Health Service (documented in a report entitled Status of Garfield County Air Quality Monitoring

*Chapter 3 – Affected Environment*

Program) to collect ambient air quality data for $PM_{10}$ and VOCs. Results from this effort show generally low $PM_{10}$ concentrations and very low VOC concentrations (Garfield County Public Health Service 2007). It should be noted that a more recent health risk assessment conducted in the region concluded that risk management approaches should focus on reducing exposures to air pollutant emissions during the natural gas well completion phase and that health effects resulting from air emissions during unconventional natural gas development warrant further study (McKenzie 2012).

Figure 3-2 shows the $PM_{10}$ data collected over an eight-year period at the Parachute Monitoring Station located in Garfield County. Data are shown for both the 24-hour maximum and annual average.

**Figure 3-2. $PM_{10}$ Ambient Concentrations**



SOURCE: EPA 2008.

Recent ozone monitoring data from the Rangely, Colorado monitor indicate periods of elevated winter ozone concentrations within the WRFO planning area. The highest daily maximum 8-hour averages in 2013 at the Rangely monitor were above the 75 ppb NAAQS, with the highest 4th high (i.e., in the form of the ozone standard) measured at 90 ppb. Although the 2013 monitoring data will not be fully validated until approximately May of 2014, the preliminary 3 year average of the 4th highest high 8-hour (i.e., in the form of the standard) indicates the current NAAQS for ozone is not being met. If the preliminary data holds, then the area will likely be designated as a non-attainment area at some point in the future as determined by the CDPHE and EPA. The exact boundaries of the potential non-attainment area are unknown at this time. However, in accordance with the General Conformity Rule contained within the CAA, the federal government (i.e., BLM) will be obligated to ensure that any federally authorized action conforms to any State Implementation Plan (SIP) that would be put into effect to bring the area back into attainment.

In Utah's Uinta Basin (located in eastern Utah and a portion of western Colorado), 8-hour daily maximum winter ozone exceedances have been measured at the Ouray and Redwash monitoring stations between 2009 and 2011. This winter ozone pattern is similar to ozone monitoring observations made in other oil and gas fields including the Upper Green River Basin and Jonah-Pinedale Anticline. The EPA issued a final rule on April 30, 2012, designating Duchesne and Uintah counties in Utah as an ozone unclassifiable area. The current scientific consensus is that the

*Chapter 3 – Affected Environment*

photochemical processes that form tropospheric ozone in the presence of $NO_2$ and free radical volatile organics are heightened by increased concentrations of ozone precursors from the stagnant winter atmospheric conditions and increased solar radiation reflected from the winter snow cover. However, this is an area of ongoing scientific research.

**Visibility**

Visibility within the Planning Area is measured under the Interagency Monitoring of Protected Visual Environments (IMPROVE) program. Visibility measurements for the Flat Tops Wilderness Area are recorded by the WHRI1 monitor, which is the closest visibility monitor and is located approximately 57 miles southeast from the boundary of the Flat Tops Wilderness Area within the White River National Forest. The WHRI1 monitor has been specifically designated by the EPA as the monitor to be used for determining visibility impacts at the Flat Tops Wilderness Area. Impairment to visibility is measured in deciviews (dv). The deciview scale indicates visibility impairment or haziness due to light extinction. The deciview scale is a logarithmic scale (similar to acoustic decibels). An increase of one deciview indicates visibility impairment of approximately ten percent and could be perceived by most individuals. Table 3-4 provides EPA estimates of expected natural visibility if no human-caused impairment occurred. Values for years 2001-2004 would be the 4 year average of the best (cleanest) and worst (dirtiest) 20 percent days. The 20 percent best days are essentially the top 20 percent cleanest days (approximately 0.2 * 365 = 73 days), and likewise the 20 percent worst days are the bottom 20 percent cleanest (or dirtiest) days (approximately 0.2 * 365 = 73 days). The values measured for the 20 percent best visibility days indicate that actual (i.e., measured) visibility is slightly better than EPA's expected natural (i.e., estimated) visibility.

**Table 3-4. Natural and Existing Visibility at WHRI1 Monitoring Station, 2001–2004**

|  | 20 Percent Best Days | | 20 Percent Worst Days | |
|---|---|---|---|---|
|  | Natural (estimated) | Existing (measured) | Natural (estimated) | Existing (measured) |
| Visibility Impairment (deciview) | 0.52 | 0.70 | 6.54 | 9.6 |
| Visual Range (miles) | 231 | 227 | 120 | 93 |
| Visual Range (kilometers) | 371 | 365 | 193 | 150 |

SOURCE: CDPHE APCD 2006b.

Recent guidance from the U.S. Forest Service suggests that the IMPROVE site near Buford, Colorado (FLTO) is more representative of visibility impacts to the Flat Tops Wilderness than the WHRI Site. Data analyses and emissions impacts assessments indicate that the location of the Buford, Colorado Site is in a better location to pick up emissions originating from oil and gas development within the WRFO RMPA Planning Area.

Several national parks, wilderness areas, and national monuments exist in the region. The BLM supports ambient air quality monitoring programs in Colorado for criteria pollutants, visibility, and air quality-related values in Class I pristine areas. Table 3-5 presents a list of Class I and Sensitive Class II areas within 100 miles of the WRFO Planning Area.

**Table 3-5. Federal Class I and Sensitive Class II Areas**

| Area Name | Distance from WRFO Planning Area (miles) | Direction from WRFO Planning Area |
|---|---|---|
| **Class I Areas** | | |
| Arches National Park | 54 | Southwest |
| Black Canyon of the Gunnison National Park | 67 | South |
| Canyonlands National Park | 77 | Southwest |
| Eagles Nest Wilderness Area | 38 | East |
| Flat Tops Wilderness Area | On eastern boundary | East end |
| Maroon Bells-Snowmass Wilderness Area | 33 | South-Southeast |
| Mount Zirkel Wilderness Area | 43 | Northeast |
| Rawah Wilderness | 77 | Northeast |
| Rocky Mountain National Park | 72 | East |
| West Elk Wilderness | 62 | South-Southeast |
| **Sensitive Class II Areas** | | |
| Colorado National Monument | 31 | South |
| Dinosaur National Monument | On northern boundary | North end |

SOURCE: URS 2007.

**Atmospheric Deposition**

Atmospheric deposition refers to processes in which air pollutants are removed from the atmosphere and deposited into terrestrial and aquatic ecosystems. Much of the concern about deposition is due to secondary formation of sulfur and nitrogen compounds, which could contribute to acidification of lakes, streams, and soils and affect other ecosystem characteristics, including nutrient cycling and biological diversity.

The secondary formation of pollutants occurs when primary pollutants (such as nitrogen oxides or $SO_2$) chemically react in the atmosphere to produce new compounds, such as nitrates or nitric acid that could have additional effects on fragile ecosystems. There is an existing body of evidence, including evidence from ecosystems similar to those at Dinosaur NM and Arches National Park, which suggest that nitrogen deposition is a significant concern in these Parks (Sullivan 2011).

Air pollutants could be deposited by either wet (precipitation) or dry (gravitational settling of particles and adherence of gaseous pollutants to soil, water, and vegetation) deposition. The BLM works cooperatively with the EPA to measure dry deposition and with private, state, and other federal organizations to measure precipitation chemistry and wet deposition.

The closest total deposition monitoring station to the WRFO Planning Area is part of the Clean Air Status and Trends Network (CASTNET) and is located east of the Continental Divide in Rocky Mountain National Park, approximately 75 miles east of the eastern tip of the WRFO administrative boundary. Table 3-6 presents total nitrogen and sulfur deposition measured at this monitoring site during 2005. Because deposition at Rocky Mountain National Park would be influenced by industrial and urban emissions along the Front Range, these values represent a conservative upper estimate of atmospheric depositions within the WRFO Planning Area, located west of the Continental Divide.

*Chapter 3 – Affected Environment*

**Table 3-6. 2005 Deposition at
Rocky Mountain National Park**

| Pollutant | Deposition (kg/ha-yr)[1] |
|---|---|
| Total Nitrogen | 2.72 |
| Total Sulfur | 1.05 |

SOURCE: CASTNET 2007.
NOTE:
[1]kg/ha-yr = kilograms per hectare per year

## Hazardous Air Pollutants

Hazardous air pollutants include air pollutants that could produce serious illnesses or increased mortality, even in low concentrations. Hazardous air pollutants are compounds that have no established federal ambient standards, but they could have thresholds established by some states and are typically evaluated for potential chronic inhalation and cancer risks. The impact of HAPs on sensitive members of the population is a special concern of the BLM. Sensitive groups include children, the elderly, and the acutely and chronically ill. Existing sources of HAPs within the WRFO Planning Area include (1) fossil fuel combustion that emits HAPs, such as formaldehyde, and (2) oil and gas operations that emit VOCs and may emit hydrogen sulfide ($H_2S$).

## Existing Emissions in the WRFO Planning Area

Table 3-7 presents an estimate of annual emissions during 2006 from stationary point sources located within the WRFO Planning Area.

**Table 3-7. 2006 Point Source Emissions in the WRFO Planning Area**

| Pollutant | Point Source Emissions (tons/year) |
|---|---|
| CO | 1,944 |
| $NO_x$ | 2,884 |
| $PM_{10}$ | 1,105 |
| $SO_2$ | 47 |
| VOC | 2,620 |

SOURCE: CDPHE 2007.

## Management Challenges

The BLM has identified challenges for management of air quality in the WRFO Planning Area. These management challenges are based, in part, on historic activities and current conditions and trends. One challenge is that the regulation of air quality standards, emission controls and other requirements are shared by many government agencies. The BLM works cooperatively with regulatory agencies, including the CDPHE and the EPA, as well as other federal land management agencies such as the FS and the NPS.

Another challenge, prescribed burning, is a tool that has potential benefits in managing the WRFO Planning Area, but also has air quality implications that need to be considered, including possible public health and visibility impacts. In addition, energy development in the region is rapidly expanding and has potential for increasing emissions and affecting air quality.

Management actions anticipated to address the above challenges include characterizing the current status and future trends in ambient air quality in the region potentially affected by activity within the WRFO Planning Area, determining the range of air quality issues in the WRFO Planning Area, and implementing actions to maintain compliance or improve air quality. Three additional air monitoring stations in Meeker, Rangely, and Maybell have been established and data from these sites will help to inform decisions in the future. Management actions are incorporated in the alternatives and described in more detail in Chapter 2.

### 3.2.1.4   Proposed Dinosaur Trail MLP

The Dinosaur Trail MLP is bounded by the Vernal Field Office's Uintah Basin to the west and Dinosaur National Monument (a Sensitive Class II Area) to the north. The Rangely air monitor is located just south of the MLP.

## 3.2.2   Geology

Geologic maps show the area of western Colorado underlain at the surface by sedimentary deposits of Tertiary age. These deposits are underlain by sedimentary rocks of Cretaceous to Cambrian age, which are in turn underlain by Precambrian igneous and metamorphic bedrock. The majority of the WRFO Planning Area overlaps two U.S. Geological Survey (USGS) petroleum resource assessment provinces: the Uinta-Piceance Province and the Greater Green River Province (formerly called the Ohio Creek Formation) (USGS 1995; USGS 2003). Most of the potential for oil and gas development is found in the Uinta-Piceance Province, which encompasses about 86 percent of the WRFO Planning Area.

Surface geology in the WRFO Planning Area consists mostly of sedimentary rocks ranging in age from Paleozoic to the Cenozoic. Paleozoic and Mesozoic sedimentary rocks are most common in the eastern third of the WRFO Planning Area; Mesozoic and Cenozoic sedimentary rocks dominate the northern, central, and western parts of the WRFO Planning Area. During the last half of the Cenozoic era, extrusive volcanic rocks of mostly basaltic composition intermittently covered exposed rocks along the crest of the White River Uplift. The volcanic rocks are exposed as resistant rock layers that cap older sedimentary rocks in the eastern part of the WRFO Planning Area. Cretaceous and Tertiary shales and siltstones are common in the central and western part of the area and are generally less resistant to erosion than the rocks in the White River Uplift in the eastern part of the WRFO Planning Area.

Major geologic features of the Uinta-Piceance Province include the Piceance Basin, Douglas Creek Arch, Grand Hogback, portions of the Rangely Anticline and the White River Uplift (USGS 1989). The Piceance Basin is located to the west of the Grand Hogback. The basin is a broad, southeast-northwest trending structural and topographic basin. It is bordered by the White River Dome to the east, the West Elk Mountains to the southeast and south, the Uncompahgre Uplift to the southwest, the Douglas Creek Arch to the west-northwest, the Yampa Plateau to the north, and the Axial Basin Uplift to the northeast (Dunn 1972).

The Piceance Basin encompasses 3,900 square miles of exposed Tertiary rocks. The Tertiary-Cretaceous contact is continuously exposed along the basin margin. The basin is asymmetric with gently dipping beds along the southwest flank and steeply dipping beds along the northeast flank forming the Grand Hogback. The basin axis parallels the Grand Hogback in the central part of the basin; however, the axis on the northern and southern portions of the basin is bifurcated due to basinward plunging anticlinal features (Dunn 1972). The interior portion of the northern part of the basin is characterized by a series of broad northwest trending folds in the eastern and central

portions of the basin, and a series of northeast trending normal faults across the Douglas Creek Arch. Deposition of sediments into this region began with downwarping of the Piceance Basin floor during the Cretaceous era and continued through the Eocene era. Low stream gradients and moderate uplift of the marginal mountains prevented significant erosion of the basin's perimeter. This sequence of events resulted in the deposition of the Wasatch, Green River, and Uinta formations in and around a series of landlocked lakes (Bradley 1964). The surface drainage system of the basin is defined by Piceance Creek and its tributaries which drain surface exposures of the Uinta Formation in the central portion of the WRFO Planning Area (BLM 2007).

The Douglas Creek Arch and Rangely Anticline are large north trending anticlinal features that extend northward from the Uncompaghre Uplift through Rangely to the Yampa Plateau. These features separate the Piceance Basin from the Uinta Basin of Utah. The Douglas Creek Arch contains significant resources of recoverable oil and gas. Structural relief (i.e., the difference between the highest and lowest points of a stratigraphic horizon), is more than 12,000 feet in the northern portion of the Douglas Creek Arch (Kellogg 1977).

The Yampa Plateau is defined by Jurassic and older rocks at the northern end of the basin (BLM 2007). The Axial Basin Uplift is a west-northwesterly trending structural saddle that separates the Sand Wash Basin on the north from the Piceance Basin to the south. The uplift is defined by Mesozoic rock outcrops bounded on the northeast and southwest by Tertiary rocks of the Sand Wash and Piceance Basins (Dunn 1972).

### 3.2.2.1   Geologic Formations

The Piceance Basin contains stratified rock units ranging in age from Cambrian through middle Tertiary. This discussion of the stratigraphy describes the rock units from youngest to oldest. Stratigraphically there are approximately 28,000 feet of rock units between the highest point on the White River Uplift to the east and the Precambrian crystalline basement at the lowest depth of the basin. Table 3-8 is a generalized geologic stratigraphic column of western Colorado. Tertiary and Mesozoic formations with the potential for significant oil production and underlying formations are described in the following paragraphs.

**Table 3-8. Generalized Stratigraphic Column**

| Geologic Time | | Formation |
|---|---|---|
| Cenozoic | Quaternary | Alluvium, valley fill, and terrace deposits |
| | Tertiary | Uinta Fm<br>Green River Fm (includes: Parachute Creek Mbr, Garden Gulch Mbr, Douglas Creek Mbr, and Anvil Points Mbr)<br>Wasatch Fm (includes: Shire Mbr, Molina Mbr, and Atwell Gulch Mbr) |
| | Cretaceous | Mesaverde Gp (includes: Hunter Canyon Fm, Mount Garfield Fm, and Sego Ss)<br>Mancos Sh<br>Niobrara Fm<br>Frontier Fm<br>Mowry Sh<br>Dakota Ss |
| Mesozoic | Jurassic | Morrison Fm<br>Curtis Fm<br>Entrada Ss<br>Carmel Fm<br>Navajo Ss |

**Table 3-8. Generalized Stratigraphic Column**

| Geologic Time | | Formation |
|---|---|---|
| | Triassic | Kayenta Fm<br>Wingate Ss<br>Dolores Fm<br>Chinle Fm (includes Shinarump Cgl)<br>Moenkopi Fm |
| | Permian | Park City Fm/Phosphoria Fm<br>Cutler Fm |
| Paleozoic | Carboniferous | Weber Ss<br>Rico Fm<br>Hermos Gp / Morgan Fm<br>Molas Fm / Round Valley Ls<br>Leadville Ls |
| | Devonian | Ouray Ls<br>Elbert Fm |
| | Silurian | Regional Unconformity |
| | Ordovician | |
| | Cambrian | Ignacio Qtzt / Lodore Fm |
| Pre-Cambrian | | Undifferentiated Crystalline Basement Rocks |

SOURCE: Ghist 2005.
NOTES:

| | | |
|---|---|---|
| Cgl = Conglomerate | Ls = Limestone | Sh = Shale |
| Fm = Formation | Mbr = Member | Ss = Sandstone |
| Gp = Group | Qtzt = Quartzite | |

In general, a thin veneer of unconsolidated Quaternary alluvium, valley fill, and terrace deposits occupies low-lying areas. Approximately 8,000 feet of Tertiary sedimentary deposits lie below these unconsolidated sediments.

The Tertiary section consists of three major formations: the Uinta (Eocene), Green River (Eocene) and Wasatch (Paleocene-Eocene) formations. The Wasatch Formation unconformably overlies the Cretaceous Mesaverde Group throughout the basin; meaning that the younger strata that do not succeed the underlying older rocks in age or in parallel position, as a result of a long period of erosion or nondeposition.

The Uinta Formation is the surficial geologic formation throughout most of the Piceance Basin and is present below unconsolidated Quaternary sediments. The Uinta Formation consists of sandstones with interbedded sequences of siltstones and marly siltstones. Marlstone is more abundant in the lower portion of the formation. It also includes conglomerates and tuff. The Uinta Formation was formed mainly from clastic fluvial-deltaic sediments prograding southward and inter-tonguing with the lacustrine Green River Formation. The thickness of this formation varies within the WRFO Planning Area (BLM 2007b).

The Green River Formation lies below the Uinta Formation and includes beds of oil shale (Cashion 1973). The contact of the Uinta Formation with the Green River Formation is marked by an abrupt transition from gray siltstone to dark brown, moderately rich oil shale. The Green River Formation in the Piceance Basin is divided into four members: the Parachute Creek (upper member), Garden Gulch (intermediate member), Douglas Creek (lowest member), and Anvil Points (lateral correlative of the Douglas Creek and Garden Gulch Members, and part of the lower Parachute Creek Member). The Parachute Creek Member contains virtually all of the oil shale, nahcolite, and dawsonite

resources in the Piceance Basin. At the top of the Parachute Creek Member, tongues of the Green River Formation are interfingered with the lower part of the Uinta Formation. The Green River Formation rests conformably on top of the Wasatch Formation (BLM 2007); meaning there is an unbroken sequence of strata or beds, characteristic of uninterrupted deposition.

The Wasatch Formation could reach a maximum thickness of 5,500 feet, making this stratigraphic sequence the thickest Tertiary unit in the Piceance Basin. In the southern and eastern portion of the basin, the Wasatch Formation has been subdivided from top to bottom into the Shire, Molina, and Atwell Gulch members. The Shire Member has variegated siltstone, claystone, and sandstones. The Molina Member is dominated by massive, cross-stratified sandstone. The basal Atwell Gulch Member is composed of variegated siltstone and claystone (Donnell 1961). The Wasatch Formation is undivided in the northern part of the basin.

Rocks of Cretaceous age are extensive in the area and cover more than 31,000 square miles. Thicknesses range from 6,000 to 10,000 feet. The Cretaceous section is characterized by complex interfingering of marine and continental strata. The environments of deposition were mainly marine in the eastern part of the basin and mainly continental in the western part. Nine principal marine transgressions and regressions have been recognized. The seas were mostly transgressive in the early Cretaceous and early parts of the Late Cretaceous, and then mostly regressive throughout the remaining portion of the Late Cretaceous (Kellogg 1977). From oldest to youngest, Cretaceous rocks consist of the Dakota Sandstone, Mowry Shale, Frontier Formation, Niobrara Formation (limestone and calcareous shale), Mancos Shale, and Mesaverde Group. The Mesaverde Group, in descending order, consists of: Hunter Canyon Formation, Mount Garfield Formation (Rollins Member, Cozzette Member, and Corcoran Member), and Sego Sandstone (Johnson 1979). The Hunter Canyon Formation and the upper part of the Mount Garfield Formation consist of fluvial channel-form sandstone that is locally conglomeratic and interbedded with siltstone, claystone, and carbonaceous shale. The Hunter Canyon Formation grades into the Williams Fork Formation in the northern part of the basin. The members of the Mount Garfield Formation consist of laterally extensive marine sandstone interbedded with paludal organic-rich shale, carbonaceous claystone, and coal. The Cozzette Member also contains marine shale. The Sego Sandstone consists of laterally extensive marine sandstone.

Jurassic and Triassic rocks are composed of interbedded marine and continental strata. Total thicknesses range from 500 to 6,000 feet. Three marine cycles of deposition are represented in this section. The cycles consist of red and varicolored continental shale and red, orange, and white fluvial and eolian sandstone. The Shinarump, Navajo, and Entrada sedimentary rocks include regionally well-developed porous sandstones that provide reservoirs for several producing oil and gas fields, including Wilson Creek (Kellogg 1977).

Pennsylvanian and Permian rock thicknesses range from zero to more than 10,000 feet. Sediments were deposited during a period of great tectonic activity. Large quantities of clastic sediment were eroded and a large amount of sand was transported into the area during the uplift of the ancestral Rockies. The rock units consist predominantly of sandstone and arkose with interbedded carbonate rocks present in northwestern Colorado. At least three, and possibly four, major unconformities have been recognized within these sequences.

In northwestern Colorado, lower Pennsylvanian rocks contain interbedded dark gray organic shale and limestone, above which are evaporite rocks that were deposited in a basin that developed locally. Two types of sandstone are prevalent in this sedimentary sequence: mature quartzose sandstone and arkose. The arkose lies in thick wedges adjacent to Precambrian granite uplifts. The

ancestral Rockies were the source for these arkosic sediments. The uppermost of the quartzose sandstone is the Weber Sandstone of Pennsylvanian and Permian age. Overlying the Weber Sandstone is the Upper Permian Park City or Phosphoria Formation, a marine cyclic deposit rich in hydrocarbons (Kellogg 1977).

The Devonian rock of northwestern Colorado is composed of dolomite and quartzitic sandstone. Devonian and Mississippian age rocks range in thickness from zero to more than 3,000 feet with predominantly carbonate rocks (dolomite) and an upper dark shale sequence. Some sandstone is present at the base and also overlies the carbonate rocks. The sandstone is usually cemented by calcite and has limited porosity (Kellogg 1977).

Precambrian crystalline basement rock is estimated to be 24,000 feet below ground surface in the central portion of the northern Piceance Basin (Murray and Haun 1974). Precambrian rocks are exposed in the White River Plateau and include metamorphic rocks (gneiss and schist) ranging in age from 1,700 million years old (MY) to 1,800 MY. Precambrian granitic rocks approximately 1,700 MY are also present in the White River Plateau.

### 3.2.2.2   Geologic Hazards

The WRFO Planning Area lies within Seismic Risk Zone 1 (on a scale of 0 to 3, with Zone 3 having the highest risk) (Algermissen 1969). Within Zone 1, minor damage to structures from distant earthquakes could be expected. The National Earthquake Information Center database (USGS 2006a) was searched in the area within approximately 100 miles of the WRFO Planning Area. Since 1950, the largest seismic event within the search area was magnitude 5.7 (Modified Mercalli Intensity VII) and was centered at approximately 39º 47'N, 108º 22'W, which is 6 miles south of the southern border of the WRFO boundary.

Unstable slopes occur on hillsides or cliffs, or in areas that are susceptible to landslides, mudflows, rock falls, or accelerated creep of slope-forming materials. Unstable slopes occur naturally and are widespread in the WRFO Planning Area. Most unstable slopes consist of weathered sedimentary strata and/or recent colluvium deposits that move downhill due to gravity. Unstable slopes could be active or inactive. Slope failure could be initiated by a change of conditions, either natural or man-induced. Natural factors contributing to slope instability include weathering and erosion, changes in the hydrologic characteristics of the hillside, loss of vegetation cover, earthquakes, and the slow natural deterioration of slope strength. Artificial factors that could undermine slope strength are cut and fill operations, alteration of surface drainages, excessive irrigation, removal of vegetation cover, blasting, and vehicular traffic.

### 3.2.2.3   Proposed Dinosaur Trail MLP

The Dinosaur Trail MLP includes the Yampa Plateau and areas adjacent to the Rangely Anticline. Surface geology is more varied compared to other areas of the field office, such as the MPA, south of Rangely, or the Danforth Hills (Map 1-3).

## 3.2.3   Soil Resources

Several resources and resource uses, such as livestock grazing, wildlife habitats, and recreation, depend on the suitability and qualities of soils. Thus, the preservation of soils and the productivity of soils on public lands are a high priority in BLM land management decisions.

The USDA has mapped soil resources in most of the WRFO Planning Area. The soil resources in Rio Blanco County were previously mapped by the USDA SCS (USDA 1982) and more recently by

the USDA NRCS (USDA 2008a). Soil resources in Garfield County were mapped by the SCS (USDA 1985; 2003) and NRCS (USDA 2008b; 2008c). More recently, the soils in Moffat County were mapped by the NRCS (USDA 2008d). The NRCS also completed a separate soil survey for Dinosaur National Monument (USDA 2008c). Soil data are not available for FS lands in the eastern portion of Rio Blanco County.

Soils are the product of the climate, the underlying bedrock lithology, erosional processes and topography. Many of the soils in the WRFO Planning Area are derived from lithologies such as the sandstones, siltstones, and marlstones associated with the Uinta Formation and the Green River Formation; and the claystones, shale, and sandstones associated with the lower part of the Green River Formation, the Mesaverde Group, the Wasatch Formation, the Fort Union Formation, and the Mancos Shale. Soils derived from Mancos Shale or from other saline sedimentary formations tend to be high in salts and trace elements like selenium. Due to the salt content in these soils, vegetative cover is sparse, resulting in soil particles not being "anchored" in place; thus, the soil is easily eroded by wind and water. These sparsely vegetated sedimentary basins with poor soil, known as shale deserts, occur primarily in the northwestern portion of the WRFO Planning Area. These areas are characterized as nearly level basins and valleys, benches, and low rounded hills containing shallow clayey and silty soils (BLM 2007).

Management actions are incorporated in the alternatives and described in Chapter 2 for soils. The mapped soil associations in each soil survey are most closely correlated to the various landforms and surface geology of the WRFO Planning Area. The following descriptions for each county are primarily developed from the NRCS soil surveys. Map 1-1 shows counties in the Planning Area in relation to the WRFO boundary.

## Rio Blanco County

Soil types in Rio Blanco County are as diverse as the underlying parental material. In the westernmost quarter of the county, along much of the northern county boundary, and along the Grand Hogback that bisects the county from north to south, the most prevalent soil associations include the Rentsac-Moyerson-Rock Outcrop complex. This is a shallow, well-drained group of loam soils formed on the Mesaverde Group sandstones and shales. The Rentsac soil type is a grayish brown channery loam formed in residuum derived primarily from sandstone. It is the most widespread soil type by acreage in the county. The Moyerson soil is a light gray clay loam formed in residuum derived primarily from shale. This complex has a moderate to very high erosion hazard.

The Irigul-Parachute complex and its component soils are common in much of the west-central half of Rio Blanco County, as is the Castner channery loam. The Irigul soil is a grayish brown channery loam and is shallow and well drained. The Parachute soil is a grayish brown loam and is moderately deep and well drained. These soils are formed on the sandstone, siltstone, shale and claystone of the Uinta, Wasatch, and Green River Formations. This complex is common on ridges and mountainsides and has a moderate to very high erosion hazard. The Castner channery loam consists of shallow, well-drained soil with moderate permeability that is mainly suitable for rangeland. It has a moderate erosion hazard.

The southeastern portion of Rio Blanco County contains a diversity of soil types. The most common soils include the Tampico-Miracle complex. The Tampico soil consists of brown, deep, well-drained loam that is moderately permeable and forms on mountain slopes. This soil has a moderate to high erosion hazard. The Miracle soil is a brown, moderately deep, well-drained fine sandy loam that formed in material weathered from sandstone. Miracle soils are on upland hills and plateaus and have a slight erosion hazard. The overall erosion potential for the Tampico-Miracle complex is

*Chapter 3 – Affected Environment*

moderate to very high. These soils are derived from Paleozoic sandstone, shale and limestone, as well as younger volcanic and granitic parent material.

The Winnemucca-Clayburn loams are common in southeastern Rio Blanco County. The Winnemucca soil is dark gray brown and consists of very deep, well-drained loam and has a slow permeability. The Winnemucca soils formed in alluvium and colluvium derived from intermediate volcanic materials. The Clayburn loam is very dark gray brown, very deep, well drained soil that formed in glacial drift, colluvium, or alluvium derived mainly from shale, sandstone, and andesite. This complex has a moderate to high erosion hazard.

Throughout Rio Blanco County, the Torriorthents-Rock Outcrop complex is found on steep slopes. This soil complex is well drained and varies from loamy to clayey with variable amounts of gravel and stones. This complex has a severe erosion hazard.

**Moffat County**

Soil types in the WRFO Planning Area within southwestern Moffat County are generally comparable to those in northwestern Rio Blanco County. A portion of the WRFO Planning Area south of the Yampa River is within Dinosaur National Monument, which has its own soil survey containing different mapped soil units.

The eastern area of Moffat County within the WRFO Planning Area and east of Strawberry Creek contains extensive acreage of the Rentsac-Moyerson-Rock Outcrop complex. This is a shallow, well-drained group of loam soils formed on the Mesaverde Group sandstones and shales. The Rentsac soil type is a grayish brown channery loam formed in residuum derived primarily from sandstone. It is the most widespread and abundant soil type by acreage in the county. The Moyerson soil is a light gray clay loam formed in residuum derived primarily from shale. This association supports a pinyon/juniper woodland community on moderate clayey slopes. This complex has a moderate erosion hazard. A very common soil downslope from the Rentsac-Moyerson-Rock Outcrop complex is the Torriorthents-Rock Outcrop complex. This soil complex forms on steep slopes, is well drained and varies from loamy to clayey textures with variable amounts of gravel and stones. This complex has a severe erosion hazard.

The eastern area of Moffat County within the WRFO Planning Area and west of Strawberry Creek contains the Jerry-Thornburg-Rhone complex and Veatch soils. The Jerry soil is a dark gray loam. It is a deep to very deep and well-drained soil formed from residuum of sandstone and shale. It has rapid runoff and low permeability. The Thornburg loam soil is brown, deep and very well drained, with rapid runoff and moderate permeability. Rhone loam soils are formed on the sandstone, siltstone, shale and claystone of the Uinta, Wasatch, and Green River Formations. The Rhone soil is common on ridges and mountainsides and has a moderate erosion hazard. The Veatch soil is dark brown channery loam formed from colluvium and alluvium. It is moderately deep and well drained with moderate permeability.

The most common soils in the western part of Moffat County, both within and south of Dinosaur National Monument, are Rock Outcrops, Ustorthents soils, and the previously described Torriorthents-Rock Outcrop complex. These soil types indicate the relative scarcity of developed soil profiles and stabilizing vegetative cover on steep slopes.

The Cragnot-Pensore-Grapit Association is also present in the western part of the WRFO Planning Area. The Cragnot soil is dark brown channery loam. It is a very deep, well-drained soil with moderate runoff and low to moderate permeability. The Pensore soil is a gray brown gravelly loam

that is shallow and well drained. The Grapit soil is a very deep and well-drained brown gravelly loam with low to high runoff and moderate permeability. The Cragnot-Pensore-Grapit Association is a stony soil complex with moderate erosion hazard.

## Garfield County

Soil types in the WRFO Planning Area within northern Garfield County are generally comparable to those described for southern Rio Blanco County. In the northwest part of Garfield County (Douglas Plateau area) in the WRFO Planning Area, the Parachute-Irigul complex is common. The Parachute soil is a grayish brown loam and is moderately deep and well drained. The Irigul soil is a grayish brown channery loam and is shallow and well drained. These soils are formed on the sandstone, siltstone, shale and claystone of the Green River and Wasatch Formations. This complex is common on ridges and mountainsides and has a moderate to very high erosion hazard. The common soil downslope from the Parachute-Irigul complex is the Torriorthents-Rock Outcrop complex.

The Wrayha-Veatch-Rabbitex and Wrayha-Rabbitex-Veatch complexes are also common on slopes in the northwestern part of the WRFO Planning Area in Garfield County, and could be comparable to the Rentsac-Moyerson complex in Rio Blanco County. The Wrayha soil is brown stony clay loam that is deep and well drained with slow permeability. It is formed from residuum derived from shale. The Veatch soil is dark brown channery loam formed from colluvium and alluvium. It is moderately deep and well drained with moderate permeability. The Rabbitex soil is a brown loam formed from colluvium weathered from limestone. It is a deep to very deep well drained soil. The hazard of water erosion is very severe in this complex.

The Caballo is a dark gray brown, deep, and well-drained soil that formed in material weathered from residuum of limestone, siltstone and limy soft shale derived from the Green River Formation. Caballo soils are on mountain sideslopes. The soil has a rapid runoff potential and a very severe erosion hazard.

In the central part of northern Garfield County, the Parachute-Irigul and Northwater-Adel complexes are formed from residuum derived from the sandstones and siltstones of the Uinta Formation. The Northwater-Adel complex is found on mountainsides and footslopes of 5 to 50 percent. The Northwater soil consists of deep, grayish brown loam with rapid runoff and moderate drainage. The Adel soil is a deep and well-drained dark gray clay loam. It has moderate permeability and medium runoff. The water erosion hazard for this complex is moderate to very severe.

In northern Garfield County east of the Grand Hogback, common soils include the Lamphier-Miracle complex. The Lamphier soil is a brown loam that is very deep and well drained, with moderate runoff and moderate permeability. This complex has a slight to moderate erosion hazard. The Miracle soil is a brown, moderately deep, well-drained fine sandy loam that formed in material weathered from sandstone. Miracle soils are on upland hills and plateaus and have a slight erosion hazard. The overall erosion potential for the Lamphier-Miracle complex is moderate to very high. These soils are derived from Paleozoic sandstone, shale and limestone, as well as younger volcanic and granitic parent material.

## Fragile Soils

Soils identified as fragile in the 1997 White River RMP are located on steep slopes (greater than 35 percent) and also have one of the following characteristics:

- A surface texture of sand, loamy sand, very fine sandy loam, fine sandy loam, silty clay, or clay.

- A depth to bedrock that is less than 20 inches.

- An erosion condition rated as poor.

- A soil erodibility factor (K factor) that exceeds 0.32.

Areas designated for CSU stipulations include fragile soils on slopes greater than 35 percent and saline soils derived from Mancos Shale. These soil classes are managed as CSU-1 areas according to the 1997 White River RMP. Surface disturbing activities in CSU-1 areas require an engineered construction/reclamation plan that addresses restoration of soil productivity and soil erosion and is analyzed under Alternative A Current Management.

In addition to fragile soils, fragile watersheds were identified in the 1997 White River RMP. These watersheds were identified as having soils that could need additional protection and treatment to meet the Standards for Public Land Health. Site specific COAs are applied in these areas to meet resource objectives (Appendix B). During comprehensive watershed planning, protection methods may be identified to help watersheds which are contributing accelerated erosion, trace elements and salt contributions to the Colorado River System.

**Unstable Soils**

Unstable soils identified in soils surveys were designated with an NSO stipulation, more specifically NSO-1 Landslide Areas in the 1997 White River RMP, designate areas where soils are considered unstable and subject to slumping and mass movement. Surface disturbance is generally not allowed in NSO-1 areas unless exceptions or modifications are granted by the Authorized Officer.

**Biological Soil Crusts**

Biological soil crusts (BSC), also known as cryptogamic soils, are more likely to occur in locations that have not experienced significant livestock grazing or other disturbance. Biological soil crusts are an important component of soil productivity that result from associations between soil particles and cyanobacteria, algae, microfungi, lichens, and bryophytes living within or on top of the uppermost soil horizons (Belnap et al. 2001). Biological soil crusts retain soil moisture and contribute nutrients in soils. Soil crusts are also an indicator and contributor to rangeland health (Pellant et al. 2000). Depending on the site, BSC can be a significant factor in stabilizing soils and reducing erosion, and they often play a decisive role in the success of vegetation and retention and/or production of soil nutrients.

Biological soil crusts are known to occur on public lands near and within the WRFO Planning Area (BLM 2004a). They are typically more abundant in some locations due to microclimate conditions and plant communities that modify the local environment by providing nutrients, moisture, reducing sunlight, and protecting BSC from erosion. Spatial inventories of BSC on public lands have not been performed in the WRFO Planning Area. Thus, it is not possible at this time to assess the current state of these resources.

The BLM recognizes the ecological value of fragile BSC and typically implements site specific COAs (see Appendix B), when possible, to preserve them. Disturbance of BSC may require considerable time to revegetate up to 56 years from one study (Kade and Warren 2002). Vehicle tires are particularly destructive to soil crusts (Belnap et al. 2001; Kade and Warren 2002), but if the

vehicle tracks are isolated and infrequent soil crusts may recolonize the area more quickly than a constructed road.

**Important Farmlands**

Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) prime farmlands; (2) unique farmlands; (3) farmlands of statewide importance; and (4) farmlands of local importance. Important farmlands are a distinction made by the USDA for soils that support the crops necessary for the preservation of the nation's domestic food and other supplies, specifically the capacity to preserve high yields of food, seed, forage, fiber, and oilseed with minimal agricultural amendment of the soil, adequate water, and a sufficient growing season. Several USDA and other federal natural resource programs, permits, and regulations require the identification of important farmlands.

No important farmlands occur on BLM administered lands. Important farmlands do occur in the WRFO Planning Area on private lands that could have BLM administered mineral resources. These areas (private surface but public minerals) are very rare and typically small portions of irrigated pastures along the White River and Piceance Creek. These important farmlands would be protected when possible through site specific COAs.

**Erosion Hazard for Soils**

A summary of the percentage of soils in each county within the WRFO Planning Area that have a severe or very severe erosion hazard are presented below:

- Garfield County: CSU-1 (9.0 percent);
- Moffat County: CSU-1 (7.6 percent);
- Rio Blanco County: CSU-1 (21.1 percent).

**Calculation of a Background Erosion or Soil Loss Rate**

The BLM WRFO has used an erosion model to better understand how management under each alternative would impact hillside erosion rates in the planning area. Specifically, the Disturbed WEPP (Water Erosion Prediction Project) model was used to calculate erosion rates which are based on parameters that estimate conditions in the planning area (Elliot and Hall 2010). This method was implemented in the Bighorn Basin Draft RMP (BLM 2012), to calculate a general erosion rate that could be multiplied by the acres of disturbance expected under each alternative. The disturbance acreage estimated at the end of the 20 year planning period will be used in the impact analysis to compare annual mean erosion rates by alternative in tons/year.

Disturbed WEPP is a good choice for such a broad and general application as what was needed for this analysis. Other hillslope sediment yield models typically needed more site specific data then could be assembled for this RMPA/EIS and would not be accurate or useful at the scale that was needed for analysis. It may be possible to use these models in the future to better predict sediment yields from specific watersheds. Two such models are part of the Automated Geospatial Watershed Assessment Tool (AGWA) is a GIS based Hydrological Modeling Tool developed by the EPA and USDA. This tool uses Kinematic Runoff and Erosion Model (KINEROS) and the Soil and Water Assessment Tool (SWAT) to predict the infiltration, surface runoff, erosion and the impact of land management practices on sediment yields. Erosion and sediment yields are predicted based on surface disturbance (change in land use) specifically identified in GIS. Although a useful GIS tool such as AGWA is designed to provide qualitative estimates and cannot provide reliable quantitative

estimates of runoff and erosion without physical and careful calibration using actual data (EPA 2013).

Using Disturbed WEPP the Draft RMP for Bighorn Basin calculated one erosion rate for short-term disturbance to simulate no reclamation and one rate for long-term disturbance to simulate successful reclamation. The Bighorn Basin Draft EIS used erosion rates based on WEPP input parameters selected to mimic conditions that may be expected with soil disturbance. Model runs used with older versions of the WEPP model may be expected estimate different erosion rates. Model runs for this analysis were done using version Model 2.0-beta, available on the internet at http://forest.moscowfsl.wsu.edu/cgi-bin/fswepp/wd/weppdist.pl and accessed on May 23, 2012.

Accelerated erosion is a term that is used to define erosion above background conditions. It was assumed for the Bighorn Basin Draft RMP, that undisturbed areas had no change in the erosion rate due to surface disturbance. This is not to say that natural erosion does not occur in undisturbed areas, that erosion rates do not change in time, nor that undisturbed areas may not be affected by surface disturbance for oil and gas, just that this detail is beyond the scope of this document. The analysis in Chapter 4 is designed to estimate accelerated erosion or the erosion above background conditions for comparison across alternatives and should be viewed qualitatively. Therefore, actual erosion rates may be very different in practice from estimates. It is important to know that estimates are only calculated to allow for a quantitative comparison of erosion rates by alternative.

Susceptibility to erosion is a function of slope, soil surface texture, vegetation cover and soil cohesion within and between soil layers. Often erosion is driven by chemical changes in soil layers or subsurface hydrology; this can often lead to piping and/or mass movement that will be location specific and can be catastrophic. This type of mass movement of soils is more likely when there is a water-dissolvable soil layer overlain by a soil with changing infiltration characteristics or in area of high and preferential groundwater flow. This is common in many of the fragile watersheds identified in Map 3-3, but can occur locally in most areas of the MPA. The application of the WEPP model in this analysis does not consider any of these site specific factors that may impact erosion, nor does it anticipate the potential for transportation of sediment to surface waters.

Using the United States Forest Service (USFS) web-based Disturbed WEPP erosion model (Elliot and Hall 2010) long-term and short-term erosion rates were calculated for the MPA by selecting local parameters when possible and according to the methodology developed for the Bighorn Basin Draft EIS (BLM 2012). The following assumptions and parameters were selected in the Disturbed WEPP Model to estimate short-term (un-reclaimed) and long-term (successful reclamation) in the MPA:

- Years to simulate: 50 years.

- Climate: Maybell, Colorado.

- Soil Texture: Sandy Loam.

- Treatment/Vegetation: high severity fire with zero percent cover to model short-term disturbance and short-grass prairie with 40 percent cover for long-term disturbance for the upper and lower elements.

- Gradient: Upper slope of 35-50 percent and lower slopes of 0-35 percent with a slope length of 300 feet for both, which is the standard length used in environmental planning (BLM 2012).

- Rock Cover: 20 percent due to the predominance of channery loam soil types.

Results of the model run using these parameters were 0.08 tons/acre for un-reclaimed areas and 0.02 tons/acre for reclaimed areas. This was based on 50 years of climate data that calculated storms for the 50, 25, 10, 5 and 2.5 year storms. The average or mean erosion over the simulated 50 years was used. The model also estimates the amount of sediment that would leave the profile modeled, which was roughly 1/5 the rate calculated for both simulations. According to Elliot and Hall, 2010, the rate is likely within +/- 50 percent of the actual value for erosion.

### 3.2.3.1   Proposed Dinosaur Trail MLP

The Dinosaur Trail MLP includes most of the lands within Moffat County that occur within the WRFO and a portion of the northwest corner of Rio Blanco County. There are no landslide areas identified within the Dinosaur Trail MLP however there are fragile soils (e.g., within the Raven Ridge ACEC). The soil description for Moffat County is a good general description of soils in this area.

## 3.2.4   Water Resources

This section characterizes surface water and groundwater resources and describes water use and current water management practices within the WRFO Planning Area. Management actions for this amendment are incorporated in the alternatives and described in more detail in Chapter 2.

The primary regulatory framework for water resources is the Clean Water Act (CWA). The 1987 CWA as amended (33 USC 1251) established objectives to restore and maintain the chemical, physical, and biological integrity of the nation's water. The act also requires permits for point source discharges to navigable Waters of the U.S., provisions for the protection of wetlands, and monitoring and research provisions for protection of ambient water quality. The Safe Drinking Water Act (SDWA) is the federal law that ensures the quality of Americans' drinking water. The SDWA was originally passed by Congress in 1974 and amended in 1986 and 1996 to require actions to protect rivers, lakes, reservoirs, springs, and groundwater wells used as public water supplies. In February 1998, the President issued the "Clean Water Action Plan: Restoring and Protecting America's Waters." The Clean Water Action Plan calls for federal agencies to engage in watershed management as a core guiding principle for water quality management.

Executive Order 11988 requires Federal agencies to avoid to the extent possible the long and short-term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct and indirect support of floodplain development wherever there is a practicable alternative. Each agency is directed to take action to preserve the natural and beneficial values including but not limited to water related land resources planning, regulation and licensing activities.

The BLM contributes to the protection of water quality by instituting BMPs such as well completion practices, site location, design features for roads and pads, measures for the prevention, containment and remediation of spills and leaks on public lands among other measures (See Appendix B, Best Management Practices and Resource Protection Measures, and Appendix H, Oil and Gas Operations in the White River Field Office).

Public water supplies in the WRFO Planning area include municipal systems for Meeker, Rangely, and smaller communities such as Dinosaur and Massadona. Domestic and household private drinking water sources for ranch houses are typically wells or springs on private land and may include BLM administered land and/or oil and gas leases in the contributing areas for these wells. Meeker's municipal water supply comes from groundwater wells completed in the White River

alluvium in an area of low-potential for oil and gas development on private land up river from town. This area was identified in the Meeker Sourcewater Protection Plan completed in 2010 as the primary protection zone for Meeker. Rangely's water supply is from an inlet along the White River between town and the Taylor Draw Dam and Kenny Reservoir. Historical and current oil and gas development has and is occurring around the town of Rangely. Both towns have gone through source water protection planning processes and are currently in the implementation phase. Dinosaur, Dinosaur National Monument Headquarters, and Massadona are served by groundwater wells.

Colorado Oil and Gas Conservation Commission (COGCC) Rule 317B is designed to protect surface water supply areas. It became effective on federal lands in April of 2009 and is applicable to drilling, completion, production, and storage operations for oil and gas development. The COGCC buffers in the 317B rule that occur in the WRFO Planning Area are a 300 feet internal buffer (1,900 acres), a 500 feet intermediate buffer (3,100 acres), a half- mile external buffer (12,300 acres) and requires pre and post water quality testing. These buffers were established to protect the surface water intake for the town of Rangely. Drilling, completion, production and storage activities cannot occur on the surface within the internal buffer without a variance. Pitless drilling systems using tanks is required in the intermediate buffer, as well as water quality testing before and after drilling, notification of the public water supplier and an emergency response program. The external buffer requires similar measures to the intermediate buffer. The public water supplies in the rest of the WRFO Planning Area are groundwater supplies and are not affected by the 317B rule. BLM would expect all oil and gas operators to abide by COGCC rules for public water supplies and other rules on Federal lands and to develop Federal minerals (COGCC 1991).

It is expected that 95 percent of the proposed new wells considered in this amendment would be drilled into the MPA (BLM 2007). The MPA within the WRFO Planning Area roughly corresponds to the Piceance and Yellow Creek watershed boundaries. Ninety-five percent of new drilling activity is expected to occur in these two watersheds. Oil and gas drilling activity occurred in the rest of the WRFO Planning Area during and prior to the 1997 White River RMP and is currently in various stages of production depending on the location and the resource. There is a significant amount of field maintenance in these older development areas that would continue throughout the analysis period. Some exploration and development is anticipated outside of the MPA. Several of the watersheds identified in the 1997 White River RMP as fragile, coincide with past oil and gas development, and could experience limited development in the future (e.g., Red Wash, Stinking Water Creek, Cottonwood Creek, Evacuation Creek, and Douglas Creek). The 2007 RFD scenario assumes areas outside the MPA would be exploratory or conventional development with single well pads as opposed to the multi-well pads more common throughout the MPA.

Rugged topography is characteristic of much of the WRFO-managed lands, causing large variations in precipitation and climate within short distances (WRCC 2008a). Annual precipitation ranges from over 40 inches at the headwaters of the White River to less than 10 inches near the Utah border (National Atlas 2005; WRCC 1997). About half of the precipitation falls as snowfall and typically persists through the winter only at higher elevations (USGS 1987). Annual evaporation data for this portion of northwestern Colorado is not available; however, the WRCC records evaporation at two sites near Grand Junction in the Colorado River valley, which has a similar (albeit slightly drier) climate to the WRFO Planning Area. From 1962 to 2005, average evaporation near Grand Junction was approximately 64 inches per year (WRCC 2008b). Climate conditions for the WRFO Planning Area are further described in Section 3.2.1.1.

### 3.2.4.1  Surface Water

The lands managed by the WRFO are located within four basins of the Colorado River Region (Yampa, Green, White, and Upper Colorado River basins). This region has been divided into nine sub-basins (Table 3-9). The majority of the WRFO Planning Area (88 percent) is within the White River Basin. The White River, formed by forested headwater creeks in the eastern portion of the WRFO Planning Area, flows to the west and is joined by Piceance Creek, Yellow Creek, Douglas Creek, and other minor tributaries as it approaches the Colorado-Utah state line. Beyond the WRFO Planning Area, the White River joins the Green River and eventually the Colorado River. Natural flows in the White River are modified by Taylor Draw Dam which forms Kenny Reservoir on the mainstem of the White River near Rangely, as well as Lake Avery, an on channel reservoir along Big Beaver Creek, which is tributary to the White River and joins the main channel just downstream of the North and South Forks of the White River confluence. In addition, flow in the river is affected by diversions for the irrigation of hay meadows located along stream channels; by off-channel reservoirs such as Rio Blanco Lake; and by a number of small, in-channel reservoirs built in tributaries for sediment retention or livestock watering (see Map 3-1).

A small segment of the WRFO Planning Area extends south to encompass portions of the Roan Plateau in Garfield County. This part of the WRFO Planning Area is drained by Parachute and Roan Creeks, which flow south into the Colorado River. The northwestern portion of the WRFO Planning Area, located in Moffat County, contains the upper portions of several small watersheds that flow north into the Yampa River and Green River basins. Table 3-9 identifies the major sub-basins and their acreage within the WRFO Planning Area.

#### Table 3-9. Major Sub-Basins within the WRFO Planning Area

| Major Subbasins | Hydrologic Unit Code (HUC) | Acres in the WRFO Planning Area | Acres on BLM Land |
|---|---|---|---|
| **White River** | | **2,338,600** | **1,364,400** |
| Upper White River | 14050005 | 824,500 | 186,700 |
| Piceance-Yellow | 14050006 | 582,800 | 412,900 |
| Lower White River | 14050007 | 931,400 | 764,800 |
| **Yampa River** | | **192,500** | **43,200** |
| Upper Yampa | 14050001 | 10,600 | 0 |
| Lower Yampa | 14050002 | 181,900 | 43,200 |
| **Green River** | | **38,200** | **21,600** |
| Lower Green-Diamond | 14060001 | 38,200 | 21,600 |
| **Colorado River** | | **93,800** | **18,800** |
| Colorado headwaters | 14010001 | 200 | 0 |
| Colorado headwaters-Plateau | 14010005 | 19,000 | 9,700 |
| Parachute-Roan | 14010006 | 85,100 | 16,900 |
| **TOTAL WATERSHEDS** | | **2,673,700** | **1,455,800** |

SOURCE: BLM GIS Data; September 12, 2011.

The MPA (Map 3-1) is contained mostly within the Piceance-Yellow Creek sub-basin (Hydrologic Unit Code [HUC] 14050006), which is tributary to the Upper and Lower White River (HUC 14050005 and 14050007). Small portions of the MPA are also located in the Upper Colorado and in the Douglas Creek drainage of the Lower White River sub-basin. The primary drainages in the

*Chapter 3 – Affected Environment*

Mesaverde Play Area include mainstream Piceance, Dry Fork Piceance, Black Sulphur, Hunter, Willow, Cow, and Yellow creeks.

The BLM has ongoing water resource monitoring efforts for Piceance Creek, Yellow Creek, and the White River in the MPA. These efforts include supporting USGS stream flow sites by funding water quality sampling, collecting macroinvertebrate samples, and supporting automated data collection of water quality parameters. Electrical conductivity probes have been installed at two locations on Piceance Creek and one location on Yellow Creek to supplement ongoing data collection. The BLM is also supporting groundwater monitoring efforts in conjunction with the USGS to evaluate water quality and availability for regional aquifers. Additional hydrologic data, including precipitation, stream flow, and water quality, are collected by BLM from public lands throughout the WRFO.

<u>**Water Quantity**</u>

The major perennial streams within the WRFO Planning Area are shown on Map 3-1. Snowmelt in spring and early summer provides the major source of runoff for perennial streams, with groundwater inflow along gaining stream segments being a contributor during the remainder of the year. During dry periods, most of the annual stream flow in the WRFO Planning Area is derived from groundwater discharging into streams (baseflow).

Perennial streams receiving significant flow from lands administered by BLM include Piceance Creek, Yellow Creek, and Douglas Creek. Major tributaries to Piceance Creek include Cow Creek, Stewart Gulch, Willow Creek, Hunter Creek, Black Sulphur Creek, Ryan Gulch, and Dry Fork Piceance Creek. Many of the perennial streams and their major tributaries include diversions for irrigation of hay meadows adjacent to the channel. There is also surface water use for oil and gas activities including drilling, domestic use, construction, dust abatement, well completion actives, and hydrostatic testing of pipelines.

Ephemeral streams in the WRFO Planning Area generally have their headwaters at lower elevations (i.e., below 8,000 feet) and are tributary to perennial systems such as the White River, Piceance Creek, Yellow Creek, and Douglas Creek. Ephemeral streams only flow during spring runoff and after intense storms. Frequently these ephemeral drainages occur as steep and relatively straight channels that are actively incising across upper reaches, and that deposit sediments throughout the lower reaches as gradients flatten. Peak flows in these streams occur during spring snowmelt (March through May) and after intense summer and fall thunderstorms (July-October). Many of these systems are found in the Yellow Creek watershed, the Douglas Creek watershed, and around tributaries to the Lower White River such as Red Wash and Wolf Creek.

Interrupted and intermittent streams in the Piceance Creek watershed are common. Hunter Creek, Ryan Gulch, Fawn Creek and others have significant flows in the alluvial aquifer with only limited surface expression. Although these watersheds are large with high water yields, surface expression of the creeks is limited to areas with high stormwater runoff or where permeability of the alluvium is reduced and water is forced to the surface.

Historic stream flow data are available from the USGS for several streamflow monitoring stations on the White River and other drainages that flow into the White River. Table 3-10 lists data from several of these streamflow monitoring stations arranged in an upstream to downstream order. Figure 3-3 and Figure 3-4 show the 2006 daily mean discharges and historical statistics for streamflow stations on Piceance Creek and the White River, respectively. The majority of the flow originates in the eastern portion of the WRFO Planning Area (North Fork and South Fork of the White River) where topographic elevations and precipitation amounts are highest. Tributary streams

entering the White River in the western portion of the WRFO Planning Area (e.g., Piceance, Yellow, and Douglas creeks) have lower flow rates. Both the low-flow and high-flow calculated annual rates show significant but consistent departure from the average or mean flow rate.

**Table 3-10. Select USGS Sites and Annual Stream Flows**

| Streamflow Monitoring Location[1] | Years Recorded | Average, cfs[2] | Low, cfs (year) | High, cfs (year) |
|---|---|---|---|---|
| North Fork White River near Buford (09303000) | 1910-2001 | 316 | 157 (1977) | 523 (1984) |
| South Fork White River near Buford (09304000) | 1919-1997 | 256 | 129 (1977) | 362 (1985) |
| White River below North Elk Creek near Buford (09304115) | 2003-2009 | 568 | 459 (2004) | 677 (2005) |
| White River near Meeker (09304500) | 1910-2010 | 619 | 274 (1977) | 1,004 (1984) |
| Piceance Creek below Rio Blanco (09306007) | 1974-1998 | 21 | 5.0 (1977) | 55 (1984) |
| Stewart Gulch above West Fork (09306022) | 1975-1985 | 2.0 | 1.0 (1979) | 7.0 (1985) |
| Willow Creek near Rio Blanco (09306058) | 1974-1985 | 3.0 | 1.0 (1978) | 9 (1985) |
| Piceance Creek below Ryan Gulch (09306200) | 1965-2010 | 28 | 6.4 (2003) | 96 (1985) |
| Piceance Creek at White River (09306222) | 1965-2010 | 34 | 6.0 (2003) | 110(1985) |
| Corral Gulch near Rangely (09306242) | 1974-2010 | 1.7 | 0.2(2006) | 7.8 (1984) |
| Yellow Creek near White River (09306255) | 1973-2010 | 2.7 | 0.9 (2010) | 8.9 (1989) |
| White River below Boise Creek near Rangely (09306290) | 1983-2010 | 723 | 333 (2002) | 1,345 (1984) |
| Douglas Creek at Rangely (09306380) | 1977-1995 | 12 | 7.0 (1977) | 23 (1995) |

SOURCE: USGS 2011.
NOTES:
[1]Streamflow monitoring locations represent select active and inactive USGS sites in the area.
[2]cfs = cubic feet per second

*WRFO Oil and Gas Development*

*Chapter 3 – Affected Environment*

**Figure 3-3. Stream Hydrograph for Piceance Creek below Ryan Gulch**



SOURCE: USGS 2011.

**Figure 3-4. Stream Hydrograph for the White River near Meeker, Colorado**



SOURCE: USGS 2011.

### 3.2.4.2   Water Quality

Water quality classifications and standards are assessed during project planning and permitting. Entities responsible for protecting surface water quality under the CWA are the EPA and CDPHE. Surface water protections are based on the CWA; state regulations; BLM guidance, memoranda, and directives; best scientific and monitoring practices; and environmental planning documents such as this one. Water quality is measured by the USGS, BLM, CDPHE, local agencies, and private parties, depending on funding and interest.

Water quality classifications in the WRFO Planning Area are established by Water Quality Control Commission (WQCC) based on current conditions and beneficial uses to maintain and improve the quality of Colorado's surface waters. Classifications result in basic, numerical and site specific narrative standards that define the chemical, biological, and physical qualities of waters needed to protect the identified beneficial uses. Aquatic life beneficial uses can be for warm or cold water and are based on the abundance of species present; both classifications can be found within the MPA and the WRFO Planning Area. Recreation is protected based on human health and current and expected recreational uses of surface waters. Agriculture is protective of irrigated crops and livestock watering. Domestic water supply uses are for any surface waters that are suitable or intended to become suitable for potable water supplies.

Water quality is influenced by the type of rock and soils that water has come in contact with, as well as vegetation, groundwater interaction, and pollutants discharged into water bodies from point and non-point sources. Most of the long-term water quality sampling locations in the WRFO Planning Area are concentrated along larger drainages (such as the White River) and are managed by the USGS. Pollutants such as selenium are directly linked to upstream surface geology, which is naturally occurring, but still may lead to water quality impairments. For example, mancos shale outcrops around Meeker contribute to selenium loads in Flag and Sulphur Creek leading to an impairment of water quality standards. Saline soils and fragile soils discussed in the soils section generally correspond to areas with surface geology that contribute trace elements and dissolved solids to surface waters.

An extensive analysis of water quantity and quality analysis of the White River Basin was completed by the USGS in 1984 that included 45 water quality sites and extensive streamflow measurements (Boyle et al. 1984). The study found that water types in the upper basin are predominantly calcium-bicarbonate, but change to a sodium-calcium-sulfate-bicarbonate signature downstream. The water type changes as a result of groundwater inputs from the Meeker Dome geologic formation and inflows from Piceance and Yellow Creek. This change in chemistry can be seen in the differences in total dissolved solid (TDS) concentrations as measured in the White River, and in Piceance and Yellow Creeks. Below Yellow Creek sulfate is the dominant anion, whereas bicarbonate is the dominant anion in the White River headwaters. Dissolved solids also show a sharp increase at Meeker Dome and again at Piceance Creek. The BLM has provided support for additional streamflow and water quality monitoring at some of these sites to establish baseline conditions and monitor oil and gas development as it occurs.

Water quality typically varies as a function of flow conditions and can be impacted by water uses. The quality of runoff in ephemeral and intermittent stream channels is largely dependent upon the amount of salts, sediments, trace elements and organic materials that accumulate in dry stream channels between flow periods. Periodic flushing of accumulated salts, trace elements and sediments occurs during flow events, which represent the only time that water quality samples can be collected. The flushing of these materials helps account for the greater concentrations of dissolved and suspended solids recorded in ephemeral drainages. Factors that could govern the

accumulation of salt, trace elements and sediments include physical properties of the watershed (e.g., topography, geology, and climate), land use in the watershed, and seasonal fluctuations in temperature and precipitation.

Surface water quality would be protected to the maximum extent possible within BLM's authority (BLM 1997a). BLM will implement mitigation to protect public water supplies through support of site placement, best management practices, drilling practices and other measures during oil and gas permitting based on classifications established entities responsible for protecting the beneficial uses of surface water (EPA and the CDPHE). Most of the long-term water quality sampling locations in the WRFO Planning Area are concentrated along larger drainages (such as the White River) and are managed by the USGS (Table 3-11) or CDPHE.

Water quality regulations are updated by the WQCC on a recurring 3 to 6-year interval and include segment descriptions, classifications, and numeric standards. The summaries provided in this document should be reviewed knowing that, although based on the latest regulations promulgated, they are subject to change based on CDPHE regulatory processes. The WRFO would adjust its future management approaches for water quality based on the most current water quality regulations, classifications and standards.

Stream segments within the WRFO Planning Area are in the Lower Colorado River Basin (Region 11), with the majority in the White River Basin. The Status of Water Quality in Colorado – 2008 (CDPHE Water Quality Control Division 2008), and Regulation No. 37: Classifications and Numeric Standards for Lower Colorado River Basin (CDPHE Water Quality Control Commission [WQCC] 2011) were reviewed for information relating to drainages within the WRFO Planning Area. The tables in Regulation No. 37 (Section 37.6) list the description, designation, classifications, and numeric standards for physical and biological parameters, inorganic constituents, and metals. Some stream segments are designated "use-protected" in these tables. If a stream segment is not use-protected it is subject to the antidegradation review requirements in the CDPHE's Antidegradation Rule. For use-protected waters, only the protection specified and numeric standards given in Regulation No. 37 apply. White River Basin segment 13a including all tributaries to the with river from Piceance Creek to Douglas Creek is the most prominent use protected segment in the WRFO Planning Area.

Chapter 3 – Affected Environment

### Table 3-11. Water Chemistry Results for Selected USGS Surface Water Quality Stations in the WRFO Planning Area

| Stream Name and Location | White River Below Meeker, CO | | Piceance Creek Below Ryan Gulch, Near Rio Blanco, CO | | Yellow Creek Near White River, CO | | White River Below Boise Creek, Near Rangely, CO | |
|---|---|---|---|---|---|---|---|---|
| USGS Site Number | 09304800 | | 09306200 | | 09306255 | | 09306290 | |
| Sample period | 1961–2008 | | 1964–2008 | | 1965–2008 | | 1982–2008 | |
| Number of samples[1] | 885 | | 823 | | 722 | | 603 | |
| **Parameter** | **Mean Result** | **No. of Analyses** | **Mean Result** | **No. of Analyses** | **Mean Result** | **No. of Analyses** | **Mean Result** | **No. of Analyses** |
| Mean Temperature (°C) | 9.0 | 846 | 10.7 | 703 | 12.7 | 502 | 13.3 | 532 |
| Max. Temperature (°C) | 26.0 | 846 | --- | --- | --- | --- | --- | --- |
| Mean Discharge (cfs) | 110 | 105 | --- | --- | --- | --- | --- | --- |
| Min. Discharge (cfs) | 68.0 | 105 | --- | --- | --- | --- | --- | --- |
| Max. Discharge (cfs) | 163 | 105 | 10.7 | 703 | 12.7 | 502 | 13.3 | 532 |
| pH | 8.25 | 463 | 8.28 | 276 | 8.60 | 162 | 8.40 | 173 |
| Conductance[2] (mean) | 552 | 650 | 1,570 | 372 | 3,410 | 310 | 643 | 378 |
| Conductance (min.) | 220 | --- | 600 | --- | 460 | --- | 268 | --- |
| Conductance (max.) | 1,100 | --- | 2,800 | --- | 5,200 | --- | 1,040 | --- |
| TDS[3] (mean) | 354 | 271 | 1,160 | 34 | 2,770 | 3 | 368 | 7 |
| TDS (min.) | 140 | --- | 861 | --- | 2,530 | --- | 204 | --- |
| TDS (max.) | 609 | --- | 1900 | --- | 3,040 | --- | 455 | --- |
| TSS[4] (mean) | 32.0 | 19 | NM[5] | --- | NM | --- | NM | --- |
| Turbidity, NTU[6] | 16.1 | 32 | 4.0 | 2 | 1,080 | 11 | 49.3 | 15 |
| Calcium | 65.7 | 395 | 80.4 | 239 | 41.4 | 163 | 63.8 | 93 |
| Magnesium | 18.4 | 394 | 81.3 | 239 | 131 | 164 | 26.4 | 93 |
| Potassium | 1.82 | 372 | 3.11 | 238 | 3.95 | 162 | 1.76 | 84 |
| Sodium | 25.8 | 373 | 180 | 238 | 679 | 162 | 46.2 | 84 |
| Sulfate | 124 | 374 | 389 | 238 | 695 | 162 | 173 | 85 |
| Chloride | 20.6 | 409 | 16.4 | 239 | 111 | 164 | 11.8 | 85 |
| Iron, micrograms per liter (µg/L) | 35.9 | 111 | 38.9 | 167 | 39.0 | 63 | 26.9 | 68 |
| SAR (Sodium Adsorption Ratio) | 0.71 | 373 | 3.37 | 238 | 12.1 | 161 | 1.18 | 83 |
| Bicarbonate[2] | 166 | 204 | 645 | 158 | 1,510 | 52 | 190 | 3 |
| Hardness ($CaCO_3$) | 240 | 394 | 538 | 239 | 645 | 163 | 268 | 93 |
| Dissolved Oxygen | 10.1 | 196 | 9.86 | 249 | 10.1 | 166 | 9.60 | 154 |

SOURCE: USGS 2011. Water Quality Samples for the Nation.
NOTES:
[1] Total number of grab samples analyzed; not every parameter was analyzed in every sample.
   Conductance is reported in units of micromhos per centimeter (µmhos/cm).
   Residue on evaporation, dried at 180 degrees Celsius, water, filtered, milligrams per liter.
   Total concentration; except as noted here, reported values represent dissolved concentrations.
[2] Units are milligrams per liter, except as noted.
[3] TDS = Total dissolved solids, reported in milligrams per liter.
[4] TSS = Total Suspended Solids (mean), reported in milligrams per liter.
[5] NM = Not measured
[6] NTU = Nephelometric turbidity units

Classifications for stream segments in the WRFO are generally for cold water aquatic life in the perennial headwaters and warm water aquatic life in ephemeral, intermittent and lower elevations of perennial stream segments. Agricultural uses are generally protected for all stream segments in the WRFO. Existing primary contact recreation is protected in the mainstem of the White River for boating and fishing and potential or non-primary contact use is typically protected for perennial waters. Domestic water supply is protected in the mainstem of the White River and many of the larger tributaries, but not in Yellow or Piceance Creeks.

Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List (Section 303(d) list) was updated for 2012 and became effective, March 30,2012 in Regulation No. 93 (5 Code of Colorado Regulations [CCR] 1002-93). Regulation No. 93 is the State's Section 303(d) list of water-quality-limited segments requiring Total Maximum Daily Loads (TMDL) monitoring. A TMDL is a calculation of the maximum amount of a pollutant that a water body could receive and still meet water quality standards. The 2010 303(d) list and the monitoring and evaluation list included twelve river segments that are at least partially within the WRFO, including eight segments within the White River drainage, one segment within the Yampa River drainage, and three segments that drain into the lower Colorado River. The updated 2012 303(d) list included the majority of the old listing, four new provisional listings for aquatic life standards, a new listing for pH in Rio Blanco Reservoir, and a new listing for aquatic life and total recoverable iron on Yellow Creek. The Monitoring and Evaluation List included a new listing for Duck Creek for aquatic life standards.

### Listed Segments of the White River Basin

- Segment 07, mainstem of the White River from a point above the confluence with Miller Creek to a point immediately above the confluence with Piceance Creek, specifically the White River below Meeker (on the monitoring and evaluation list for copper).

- Segment 09a, tributaries to the White River from North and South Forks to Piceance Creek, not with the boundary of National Forest lands except segments 9b and 10b, specifically Strawberry Creek (on the monitoring and evaluation list for copper and zinc).

- Segment 09d, Sulphur Creek and tributaries from source to White River, Flag Creek and tributaries from the East Fork of Flag Creek to the White River (on the impairment list for selenium with a low priority for TMDL development).

- Segment 10b, mainstem of Coal Creek, including all tributaries from the source to the confluence with the White River (on the monitoring and evaluation list for selenium).

- Segment 11, Rio Blanco Reservoir (on the impaired list for pH with a high priority for TMDL development).

- Segment 13b, Duck Creek tributary to Yellow Creek (on the monitoring and evaluation list for aquatic life).

- Segment 13c, Mainstem of Yellow Creek from Barcus Creek to the confluence with the White River (impaired for total recoverable iron and aquatic life with a low priority for TMDL development).

- Segment 14a, Mainstem of Piceance Creek from Willow Creek to Hunter Creek (impaired for total recoverable iron with a high priority for TMDL development).

- Segment 15, Mainstem of Piceance Creek from Ryan Gulch to the confluence with the White River (provisionally listed as impaired for aquatic life with a low priority for TMDL development).

- Segment 16, all tributaries to Piceance Creek, including all wetlands, lakes and reservoirs, from the source to the confluence with the White River, specifically Ryan Gulch (on the monitoring and evaluation list for *Escherichia coli* [also called *E. coli*]).

- Segment 20, Mainstem of Black Sulphur Creek from the source to the confluence with Piceance Creek (provisionally lists as impaired for aquatic life with a low priority for TMDL development).

- Segment 22, tributaries to the White River, from the confluence of Douglas Creek to the Colorado/Utah border, specifically West Evacuation Wash (or Creek) above the Utah border and the lower section of Douglas Creek (sediment impairments with a low priority for TMDL development).

- Segment 23, mainstem of East Douglas Creek and West Douglas Creek including all tributaries from their sources to the confluence, specifically East Douglas Creek (on the monitoring and evaluation list for total recoverable iron). West Douglas Creek from the source to the confluence with East Douglas (provisionally listed for aquatic life with a low priority for TMDL development).

**Listed Segments in the Yampa River Basin**

- Segment 03c, Yampa River, Milk Creek and tributaries from CR 15 to the Yampa River, specifically Stinking Gulch (on the monitoring and evaluation Plans list for copper, iron, selenium, and zinc).

**Listed Segment in the Lower Colorado River Basin**

- Segment 10, East Rifle Creek, West Rifle Creek and Rifle Creek, including tributaries from Rifle Gap to the Colorado River (on the monitoring and evaluation list for *E. coli* and impaired for selenium with a low priority for TMDL development).

- Segment 14b, Clear Creek from Tom Creek to Roan Creek, including tributaries from Clear Creek to Kimball Creek (on the monitoring and evaluation list for *E. coli* and total recoverable iron).

**Fragile Watersheds**

The 1997 White River RMP included a list of fragile watersheds in Appendix D, Table 2-1 (BLM 1997a). Streams listed on Table 2-1 had Watershed Action Plans (WAPs) or were candidates for a WAP. Currently, BLM considers many of the fragile watersheds listed in the 1997 White River RMP as "high priority" watersheds. This includes the watersheds associated with Wolf Creek, Evacuation Creek, Douglas Creek, Cathedral Creek, Willow Creek in the Douglas Creek watershed, Soldier Creek, Black Sulphur Creek, Willow Creek in the Piceance Creek watershed, Piceance Creek, and Yellow Creek. Many of these creeks are considered high priority because of their proximity to future oil and gas development. This is particularly true for creeks in the Piceance Creek watershed, which roughly coincides with the MPA. The BLM's future plans for these high priority watersheds could include implementing measures to maintain aquatic habitat for current fish populations and macroinvertebrate communities, streamflow monitoring, water quality sampling, performing flow surveys and designing projects that would maintain or improve the conditions of these watersheds on stream segments that pass through BLM lands. Collectively, stream segments listed in Regulation No. 93, and perennial stream segments in fragile watersheds designated by the BLM, are highlighted on Map 3-1 as high priority stream segments.

*Chapter 3 – Affected Environment*

### 3.2.4.3   Groundwater

The geology of an area controls the occurrence, movement, and chemical characteristics of groundwater. In the WRFO Planning Area, much of the surficial geology consists of consolidated sedimentary formations with water bearing properties that are largely dependent on secondary porosity from faults, fractures, and joints. Groundwater recharge in the White River Basin primarily occurs at higher elevations where precipitation exceeds evapotranspiration. This excess precipitation remains at the surface as overland flow, or recharges shallow groundwater systems and/or bedrock aquifers.

Where groundwater occurs near the land surface it is available for plants, as well as in the alluvium of stream systems. Alluvial aquifers are present along the larger perennial, intermittent, and interrupted flow segments within the WRFO Planning Area, and are generally composed of coarse sand and gravel deposits alternating with layers of clay, silt, and sand (Van Liew and Gesink 1985). The alluvial aquifers serve as either recharge or discharge points for underlying bedrock aquifers. Groundwater discharge also occurs as a result of permeability changes at or near the ground surface (geologic contacts between formations or rock units), or from the surface expression of faults, fractures, or joints in underlying bedrock aquifers. These discharge areas are often manifested as groundwater springs or gaining stream segments. Faults, improperly abandoned well bores, fractures, and joints can provide a pathway for the mixing of shallow, low-salinity groundwater and non-tributary water such as saline deep basin waters.

Groundwater quality and chemistry depends on the lithology and mineral composition of the aquifer and any upgradient formations that the groundwater flowed through. Aquifer properties such as hydraulic conductivity and primary and secondary porosity also influence water quality based on the residence time of the groundwater in the subsurface. Finer grained rocks such as claystone and shale typically have lower permeabilities and contain more mineral types than sand and gravel units. The mineral content of several of the sedimentary formations underlying the WRFO Planning Area includes relatively high amounts of soluble minerals and salts. These soluble zones include sodium bicarbonate (nahcolite) and sodium chloride (halite) deposited in lacustrine mudstones. The nahcolite occurs as interbeds with the oil shale units, which were also deposited in a lacustrine environment. Where sodium bicarbonate and other salts have been leached into solution, the end result is groundwater with high dissolved mineral concentrations.

#### Groundwater in the Piceance Creek Basin

Scientists have used the term Piceance Creek Basin to describe the geographic area between the White River on the north, the Colorado River on the south, the Douglas Creek Arch on the west and the Grand Hogback on the east (MacLachlan 1987). This area generally corresponds to the MPA, and contains most of the Yellow Creek watershed, all of the Piceance Creek watershed, and a small portion of the Upper Colorado River basin in the headwaters of Parachute and Roan Creeks.

Most of the understanding of groundwater resources in the Piceance Creek Basin is based upon studies completed in the late 1970s and early 1980s during a period of intense focus on oil shale development. More recently, field activities associated with oil shale Research, Development, and Demonstration (RD&D) leases and nahcolite solution mining have resulted in monitoring well establishment and studies of the groundwater systems in the Piceance Creek basin (USGS 1987). The conceptual hydrogeologic model for the area is evolving as more data is collected.

The simplest hydrogeologic model that has been used for the Piceance Creek Basin consists of three major aquifers: an alluvial aquifer, an upper aquifer, and a lower aquifer (Weeks and Welder 1974).

*Chapter 3 – Affected Environment*

Most studies by the USGS in the 1970s and early 1980s focused on two bedrock aquifer zones, one within the Uinta Formation and another in the Green River Formation. The Green River Formation could be further subdivided into an upper and lower aquifer separated by a confining unit called the Mahogany zone. Throughout the remainder of this document, aquifers within the Uinta Formation and the upper Green River will be referred to as the Upper aquifers, and those in the Green River Formation below the Mahogany zone will be referred to as the Lower aquifers which was the most common convention.

The Upper aquifers are generally within layers of permeable sandstone and fractured siltstone. The Lower aquifers occur within fractured lean oil shale. Oil shale is a kerogenous marlstone, i.e., a calcium carbonate or lime-rich mud or mudstone, deposited in rich (greater than 25 gallons of oil per ton of rock) and lean (lower oil assay value) layers. Within these mudstones are blebs, seams, and beds of nahcolite. Dissolution and leaching of the nahcolite salts has formed continuous intervals of voids that could be linked by faults and joints, resulting in zones of higher permeability and movement of groundwater. Near the paleobasin-center, the nahcolite units are thicker and are of very low permeability. This nahcolite zone could act as a barrier to flow, and in some cases, could facilitate the upward migration and mixing of deeper saline waters in the lower aquifers with less saline waters in the upper aquifers.

Taylor (USGS 1987) describes the Mahogany zone as an aquiclude for the lower aquifers. However, a more appropriate term could be aquitard or leaky aquiclude, since the low permeability of the Mahogany zone retards, but does not completely restrict, water movement between the upper and lower aquifers. The average thickness of the upper aquifers was estimated at 700 feet, compared to 900 feet for the lower aquifers and 160 feet for the Mahogany zone.

Although the hydrogeologic conceptual model just described is an accurate general model for parts of the basin, a more recent investigation indicated that the primary confining unit in the Parachute Creek Member is the R5 layer, which is located several hundred feet below the R7 or Mahogany Zone (BLM 2006b). This finding was based on a review of potentiometric surface elevations at a number of groundwater monitoring well clusters installed at oil shale test sites. During the same study, a downward hydraulic gradient was observed at 15 of 16 monitoring well clusters screened above and below the R5 Unit.

An upward hydraulic gradient was observed at one well across the R5 Unit, which provides an indication of the mechanism for upward migration of groundwater through both the R5 and Mahogany zones. Vertical groundwater flow in the lower aquifers occurs within fractures and associated dissolution zones, and in the overlying aquifers (particularly the Uinta Formation), groundwater flow occurs within permeable sandstone and fractured siltstone (USGS 1987). These fractures and dissolution features act as preferred pathways for vertical groundwater flow between the upper and lower aquifers. Where hydraulic head in the lower aquifers is higher than the upper aquifers, mixing of water types could occur. Variations in groundwater recharge along the basin margin could also result in lower hydraulic heads that could facilitate mixing of waters from different aquifers and allow for migration of fluids.

**Groundwater Quantity**

Surface expression of groundwater occurs naturally through springs that originate from confined bedrock aquifers and unconfined alluvial aquifers. Springs from confined aquifers typically arise from relatively deep groundwater that follows fractures, old well bores, faults and/or joints to the surface. Variations in permeability across alluvial aquifers in the Piceance Creek Basin are likely responsible for the groundwater-dominated hydrographs of Piceance and Yellow Creeks.

*Chapter 3 – Affected Environment*

Stream systems that are dominated by groundwater typically exhibit a flat hydrograph due to relatively consistent rates of groundwater discharge. Other causes could also be responsible for flat hydrographs, most notably irrigation. However, rivers that display flat hydrographs from irrigation will typically have significant upstream storage reservoirs. In the case of Piceance Creek, water is withdrawn for irrigation, but no substantial reservoir storage is present along the stream channel. Consequently, groundwater discharge (rather than irrigation) is the likely driver for the relatively flat Piceance Creek hydrograph (see Figure 3-3). This groundwater input to surface water is also observed in water quality changes along the White River (refer to Section 3.2.4.2, Groundwater).

Exploratory drill holes completed in the alluvium along Piceance and Yellow Creeks have helped explain the groundwater-surface water interactions that occur along the creek channels. One exploratory drill hole completed in the Piceance Creek watershed just upstream from the Willow Creek confluence showed 70 feet of highly permeable sand and gravel alluvium. Another drill hole located 8 miles downstream at the junction of Piceance Creek and Ryan Gulch indicated that the alluvium was composed of 70 feet of dense organic clay, with low permeability. Similar trends were observed along Yellow Creek, where the alluvium at an upstream location consisted of 35 to 45 feet of saturated sand and gravel. In contrast, at a location just 5 miles downstream, the alluvium consisted of 80 feet of dense organic clay (Welder 1987).

As a result of these permeability differences, Piceance and Yellow Creeks are predominantly losing streams in their upper reaches, but transition to gaining streams as lower permeability alluvium is encountered. This change in permeability in the alluvium also leads to streams with interrupted flows (no surface expression along portions of an otherwise intermittent or perennial system), and periodic surface expression of groundwater as water in the alluvium is forced to the surface. The upwelling of groundwater in lower permeability materials results in the formation of groundwater springs from bedrock aquifers along these stream channels.

In the WRFO Planning Area, perched groundwater zones occur locally within the Uinta Formation within the Piceance Creek Basin. These perched groundwater zones manifest themselves as springs and seeps above the valley floors in outcrop areas (Weeks and Welder 1974; Cole et al. 1995). Water bearing formations within the Uinta can be accessed by wells. These Uinta aquifers provide viable sources of well water for livestock watering and may be the best source of drinking water in this area (Welder and Saulnier 1978).

**Groundwater Use**

Groundwater in the WRFO Planning Area provides an important source of water in this area for livestock grazing, domestic and household supplies, wildlife, and oil and gas activities. Over 700 springs have been documented throughout the WRFO Planning Area, and the BLM has filed for water rights on approximately half of them for stock watering and wildlife uses. There are also many wells that have been completed in alluvium and deeper aquifers that are used as water sources. Range improvement projects have been built for some of these wells and springs. In addition to wildlife and stock watering, groundwater in the WRFO Planning Area is used for natural gas and oil development activities, solute mining (i.e., solution mining of nahcolite), and oil shale RD&D lease activities.

Colorado distinguishes between tributary and non-tributary groundwater in the regulation of groundwater use. Water that discharges naturally from aquifers to streams is called tributary groundwater. Groundwater that does not naturally discharge into streams is called non-tributary groundwater. Tributary groundwater could occur in bedrock or alluvial aquifers. Wells completed in aquifers that contain tributary groundwater are considered along with surface water rights.

*Chapter 3 – Affected Environment*

Non-tributary groundwater is regulated based on the volume of storage in the aquifers. In the absence of a competing water right, a landowner is allowed to pump from non-tributary wells a maximum of one percent per year of the estimated volume of groundwater stored below their land.

**Groundwater Quality**

Weeks and Welder (1974) compiled groundwater chemistry data for the alluvial aquifers, as well as for the upper and lower bedrock aquifers. The alluvial aquifers had 27 samples collected from wells located along Piceance Creek, Yellow Creek, Ryan Creek, Black Sulphur Creek, and Fawn Creek. Water from these wells is typically classified as a sodium bicarbonate type with TDS concentrations ranging from 470 to 6,700 mg/L. Higher TDS values were typically observed along the downstream segments, which could reflect the influence of groundwater discharge of water from deeper portions of the basin.

The assessment of groundwater quality for the upper aquifers was based on 17 samples that generally exhibited a sodium bicarbonate water type, with TDS values ranging from 350 to 2,180 mg/L for the saturated portion of the Uinta Formation and 610 to 3,300 mg/L for the Parachute Creek Member. For the lower aquifers, the groundwater quality assessment was based on 27 samples. The lower aquifers typically displayed a sodium bicarbonate-chloride water type with TDS concentrations ranging from 490 mg/L along the basin margin to 38,900 mg/L in the center of the basin near the nahcolite zone.

As reported by Saulnier (1999), groundwater quality in the bedrock aquifers is largely described by TDS concentrations. The TDS concentrations change markedly both vertically and horizontally within the basin depending upon the proximity of groundwater to soluble saline mineral deposits in the Parachute Creek Member (Saulnier 1999; BLM 2006b). The suitability of groundwater for use by livestock, wildlife, domestic and household use and/or industry may be characterized by dissolved solids concentrations.

The TDS concentrations are lowest in higher elevation recharge areas present around the basin margins (400 to 800 mg/L), and generally increase to the north, where groundwater discharges to the lower reaches of Yellow and Piceance Creeks and the White River (some samples contain up to 30,000 mg/L TDS). Saulnier (1999) also described several locations in the Piceance Creek Basin where elevated TDS concentrations have been observed in the upper aquifers at locations downgradient of older exploratory well completions. Antiquated exploratory well completion practices, as well as inadequate plugging and abandonment procedures, could account for some of the inter-aquifer migration of saline waters and/or the cross-contamination of aquifers by higher TDS-containing groundwater.

Most researchers report that groundwater quality is generally better in the alluvium and the upper aquifers than in the lower aquifers, with the lower aquifers generally having higher concentrations of fluoride, boron, barium, lithium, sodium, TDS, and dissolved methane ($CH_4$) (Cole et al. 1995).

The WRFO Planning Area bedrock aquifers are recharged by snowmelt and precipitation that replenish the groundwater migrating through the Uinta and Green River formations. As the water percolates through these formations, minerals are dissolved and ion exchange reactions occur (USGS 1987). Zones of mixing within the upper and lower aquifers could also increase dissolved solid concentrations in groundwater. These higher TDS-containing groundwaters discharge in the northern part of the Piceance Creek Basin via groundwater springs and gaining streams such as Piceance and Yellow Creeks. The exact location and extent of hydraulic connections between aquifers, springs, and streams are not well known. BLM has funded a USGS study to look at the

surface and groundwater interaction in these zones and salinity dynamics which are important to shaping water quality in Piceance and Yellow Creek.

The groundwater chemistry of the upper bedrock aquifers is dominated by dissolved calcium, magnesium, and bicarbonate along the rim of the basin; and by sodium, magnesium, bicarbonate, and sulfate in the central part of the basin (USGS 1987). In the Alkali Flats area in the Piceance Creek watershed below Dry Fork, bicarbonate concentrations in surface water increase by several hundred milligrams per liter compared to the surrounding area. This change in surface water quality is caused by the discharge of relatively high TDS-containing groundwater from the upper and possibly lower aquifers, as a result of the extensive fracture network present in the bedrock zones. Extensive salt deposits can be observed in this area at ground surface during low-flow conditions, and have given rise to the Alkali Flats designation. During higher flow periods, the same salts are dissolved and flushed back into Yellow and Piceance Creeks.

Special state water quality classifications of interest in the WRFO include a special regulation imposed for the Rangely Oil and Gas field in Rio Blanco County with site specific groundwater classification and standards that apply to the Morrison and Sundance formations. This field is exempt from Colorado basic groundwater standards (WQCC Regulation No. 42) for select organic constituents, unless the origin of the compounds is caused by exploration or production activities in these specific formations.

The State of Colorado's source water protection program identifies aquifers for special protection because of their beneficial uses such as municipal water supplies. For example, groundwater in unconfined and confined aquifers present beneath the city of Meeker's well field (just east of Meeker in the White River Valley alluvium), which has been designated as Domestic Use and Agricultural Use-Quality. Aquifers may contain trace elements such as selenium that where eroded from land surfaces in soils with high amounts of these trace elements, such as soils derived from Mancos Shale. As surface waters containing these trace elements interact with stream alluvial aquifers these aquifers and any domestic water sources in these aquifers may contain elevated amounts of these elements. In a similar way nutrients and pesticides associated with land uses may become elevated in stream aquifers and domestic wells due to surface water sources.

Groundwater protection zones for public water supplies have been identified for Dinosaur, Massadona, and for campgrounds and the headquarters of Dinosaur National Monument. Oil and gas development is unlikely near these public water supplies since only 5 percent of the development is expected outside the MPA. There are no public water supplies that obtain drinking water from groundwater within the MPA, however there are many wells that are permitted for domestic and household use. The Safe Drinking Water Act presumes that aquifers are Underground Sources of Drinking Water (USDWs), unless they are specifically exempted or if they have been shown to fall outside the definition of USDW (e.g., over 10,000 mg/L total dissolved solids or from a mineral producing zone).

The majority of wells permitted for domestic and household use in the MPA are completed in the Uinta formation, but some are completed in the upper aquifer zones in the Parachute member of the Green River formation. The BLM has established one groundwater monitoring well which is completed in the Uinta and several which are completed in the upper aquifer zones in the Parachute member of the Green River formation. Outside the MPA the majority of wells permitted for domestic and household use are completed in the White River alluvium and alluviums of perennial streams that are tributary to the White River.

#### 3.2.4.4   Proposed Dinosaur Trail MLP

The Lower Green-Diamond, Lower Yampa, and Lower White watersheds occur within the Dinosaur Trail MLP. Major intermittent stream systems include Red Wash and Wolf Creek (Map 3-1) and much of the southern boundary of the MLP follows the White River. Fragile watersheds within the MLP include Wolf Creek, Stinking Water Creek, and Red Wash (Map 3-3). There are no 303-d listed stream segments within the MLP.

## 3.3   Biological Resources

### 3.3.1   Vegetation Communities

Table 3-12, summarizes the extent in terms of acres and percent of five vegetative types that comprise the WRFO Planning Area (i.e., vegetation on BLM land). The vegetative types presented here reflect those found in the White River Resource Area Draft RMP and EIS (BLM 1994). Forest and woodlands followed closely by shrubland dominate vegetation in the WRFO administered lands. The remaining vegetative types within the administered area are far less common.

#### Table 3-12. Acres and Percent Cover of Vegetative Types within the WRFO Planning Area

| Vegetative Type | Acres | Percent |
|---|---|---|
| **Forest and woodlands** | **685,600** | **47** |
| Pinyon/juniper woodlands | 636,200 | 44 |
| Ponderosa pine, lodgepole, and spruce/fir woodlands | 30,700 | 2 |
| Aspen forests | 18,700 | 1 |
| **Riparian areas** | **9,500** | **0.6** |
| **Grasslands** | **74,400** | **5** |
| **Shrublands** | **659,300** | **45** |
| Sagebrush | 456,600 | 31 |
| Salt desert | 100,400 | 7 |
| Foothill/mountain shrub | 102,300 | 7 |
| **Developed and Non-vegetated Land** | **26,300** | **2** |
| **Total** | **1,455,100** | **100** |

SOURCE: WRFO GIS data 2009.

The vegetative types presented in Table 3-12 are described below under the following five categories: (1) forest and woodlands; (2) riparian and wetland communities; (3) grassland and shrubland communities; (4) invasive, non-native plant species (INPS) and pest control, and (5) remnant vegetation. Existing conditions of vegetative resources are addressed to the extent possible based upon available data.

#### 3.3.1.1   Forests and Woodlands

This section describes existing conditions for forests and woodlands, as well as old-growth characteristics and forest and woodland health. This section also discusses management of forests and woodlands.

<u>Forest and Woodland Communities</u>

Forests and woodlands cover 685,600 acres (47 percent) of the WRFO Planning Area. The forest and woodland cover type found at the lowest elevation in the WRFO Planning Area is pinyon/juniper woodlands and the highest is spruce/fir forest. Other forest types are found at various elevations, in between, and include quaking aspen (*Populus tremuloides Michx.*), few scattered stands of ponderosa pine (*Pinus ponderosa*), and lodgepole pine (*Pinus contorta*) communities. Herbaceous cover within woodlands is generally very low, although some areas, with openings, could have a substantial understory (including shrubs).

**Pinyon/Juniper**
Pinyon/juniper woodlands cover 636,200 acres (44 percent) of the WRFO Planning Area. This vegetation community is mostly found between 5,200 and 8,000 feet on somewhat xeric ridgetops (BLM 1994). It is the climax association in these locations and varies from an open to closed canopy with a highly variable understory of shrubs and herbaceous plants. Old growth pinyon/juniper and areas with a greater dominance of juniper generally have less understory vegetation (BLM 2007b). Dominant plants in this community include pinyon pine (*Pinus edulis*), Utah juniper (*Juniperus utahensis*), Gambel oak (*Quercus gambeli*), sagebrush (*Artemisia* spp.), mountain mahogany (*Cercocarpus* spp.), and many of the herbaceous species listed under the sagebrush shrubland community described in Section 3.3.1.3.

Expansion of pinyon and/or juniper into previously non-wooded areas occurred prior to Euro-American settlement on at least some sites; it is not strictly a 20th century phenomenon, and is a normal process caused by past land use or fire exclusion. Expansion of pinyon and/or juniper into previously non-wooded areas could have been more extensive in the 20th century than in the previous few centuries because of grazing and fire exclusion, at least in some regions (Romme et al. 2007). Pinyon and/or juniper woodlands expansion has occurred into more productive areas for fire and has increased fuel loading in much of the western U.S. including the WRFO Planning Area (Hood and Miller 2007).

**Ponderosa Pine, Lodgepole, and Spruce/Fir**
The combination of ponderosa pine, lodgepole, and spruce/fir woodlands encompasses about 30,718 (2 percent) of the WRFO Planning Area. This vegetation community is scattered throughout the eastern and southern portions of the WRFO Planning Area.

Ponderosa pine forests are generally found between 6,000 and 8,000 feet (BLM 2007b). They generally occur on higher mesas and mountain slopes, and could contain substantial amounts of Douglas fir (*Pseudotsuga menziesii*), aspen, or pinyon/juniper woodlands. Healthy ponderosa pine forests have somewhat open canopies and contain a substantial understory of shrubs and grasses. This type of structure provides more year-round forage for wildlife than most other coniferous forest types. Herbaceous plants found in this community typically include many of those listed for foothill/mountain shrubland described under Section 3.3.1.3.

Lodgepole pine forests occur between 8,000 and 10,000 feet (Kingery 1998). This community represents an early successional stage and is the result of past stand-replacing fires. In these stands, the community is usually dominated by dense monocultures of trees of similar age, but understory species like kinnikinnik (*Arctostaphylos* spp.) and others from the foothill/mountain shrubland community could be found in more open areas.

Spruce/fir forests are usually found between 7,000 and 11,000 feet. These areas typically have shallow soils and contain dense stands of Englemann spruce (*Picea englemanni*), Douglas fir, and

subalpine fir (*Abies lasiocarpa*) with a closed canopy. Openings in the forest support many herbaceous and woody plants that are found in the foothill and mountain shrublands and foothill and mountain grassland communities discussed in Section 3.3.1.3. The lower elevation spruce/fir forest areas found in the sheltered areas along the southwestern edge of the WRFO Planning Area contain mostly Douglas fir and very few Englemann spruce and subalpine fir.

**Aspen**
The aspen forests encompass about 18,700 acres (1 percent) of the WRFO Planning Area. These forest communities are usually found between 7,000 and 10,000 feet primarily in the southern portion of the field office and along the upper elevations of Douglas Creek and Piceance Creek. This community is early successional and consists of open to dense stands of aspen in sometimes isolated pockets in higher elevations (BLM 1994). Some of these stands do not appear to be regenerating as expected. Understory vegetation is highly variable and depends mostly on available moisture and canopy closure. Many aspen forests are very productive and contain a lush understory, whereas others could have somewhat sparse understories. Plant species commonly found in the aspen trees in this community include those listed under the foothill/mountain shrubland community described in Section 3.3.1.3.

**Old-Growth Forests and Woodlands**
Old-growth forests and woodlands stands differ in their characteristics from earlier stages of stand development. These differences include a variety of characteristics such as tree size, accumulations of large dead woody material, the number of canopy layers and species composition, and ecosystem function (FS 1993). The FS defines old-growth forest as ecosystems distinguished by old trees and related structural features (FS 1993). The BLM has interpreted this definition to mean old-growth as typically distinguished by the following (BLM 1995):

- Large-size trees of specific species;
- Wide variation in age classes and stocking levels;
- Accumulations of large-size dead standing and fallen trees;
- Decadence in the form of broken or deformed tops and boles;
- Multiple canopy layers; and
- Canopy interspaces and understory patchiness.

Five structural attributes were identified for regional consideration in developing minimum criteria for old-growth determination, with not all of them needing to be defined. The attributes were: (1) live trees in the main canopy, (2) variation in tree diameters, (3) dead trees, (4) tree decadence, and (5) number of tree canopies. The regions could also add optional attributes as criteria if they were considered important in determining old-growth (BLM 1995).

The WRFO Planning Area contains old-growth forest characteristics in the pinyon/juniper, Ponderosa pine, lodgepole, and spruce/fir vegetation communities. Specifically, the WRFO Planning Area contains areas of pinyon/juniper woodland communities with potential to contain old-growth characteristics. Suggested characteristics for old-growth pinyon/juniper stand evaluations include tree age, understory vegetation, standing or down dead woody material, and tree characteristics. Individual tree characteristics for pinyon/juniper woodlands include a flattened crown shape, large, gnarly branches throughout the living portion of the crown, and often rough and shaggy bark with relatively deep furrows (Romme et al. 2007).

**Management of Forests and Woodlands**

All BLM forestlands are managed under the principles of multiple use, sustained yield, and environmental quality protection in accordance with the FLPMA. Management of values and uses such as recreation, aesthetics, water quality, wildlife habitat, and wilderness, and forest health, is accomplished through an ecologically based program that emphasizes biological diversity, sustainability, and the long-term health of forests and woodlands. The forest and woodland resources within the WRFO Planning Area are shown on Map 3-2. Management actions are incorporated in the alternatives and described in more detail in Chapter 2.

Forest and woodlands in Colorado have been affected by drought, insects, and disease. Pinyon ips beetle, mountain pine beetle, spruce bark beetle, and balsam fir beetle have all been increasing in population. Aspen within the WRFO Planning Area are in varying stages of growth, although in overall decline with many stands exhibiting signs of rot (Colorado State Forest Service 2005). Drought is also a factor in the extensive mortality of mature aspen in the Piceance Basin, although these stands continue to respond with regeneration. Lack of regeneration in the aspen, possibly associated with livestock and big game management/use, is also a contributing factor to the decline observed in the resource area.

### 3.3.1.2   Riparian and Wetland Communities

The riparian community includes wetlands and is associated with and depends on the presence of water during some part of the growing season. This community provides the link between aquatic and upland (dry) habitats across all elevations. Typical riparian areas are lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers, streams, and shores of lakes and reservoirs with stable water levels. Excluded are such sites as ephemeral streams or washes that do not exhibit vegetation dependent on free water in the soil (BLM 2004a). Wetlands are areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of vegetation typically adapted for life in saturated soil conditions under normal circumstances. Wetlands include marshes, shallows, swamps, lakeshores, bogs, muskegs, wet meadows, estuaries, springs, seeps, and riparian areas (BLM 2004a).

Riparian areas in the WRFO Planning Area (see Table 3-13) are generally small and account for a total of only 9,500 acres (0.6 percent), but are highly productive, and provide forage and/or cover for nearly all wildlife species at some point in their life cycle. A variety of vegetation types containing riparian zones and wetlands occur with the WRFO Planning Area, such as evergreen riparian forests and woodlands, mixed coniferous and deciduous forests and woodlands, deciduous dominated forests and woodlands, tall willow shrublands, short willow shrublands, non-willow shrublands, and herbaceous vegetation (Carsey et al. 2003). Riparian areas and wetlands are key in providing water quality improvement in watersheds by buffering open waterways from surface runoff that could contain sediment, toxicants, or other undesirable constituents. The location of riparian areas and wetlands for the WRFO Planning Area can be found on the FWS National Wetlands Inventory maps, WRFO GIS layers (streams, rivers, lakes, springs, vegetation, and proper functioning condition assessment), aerial photos, USGS quadrangle maps, and WRFO specific mapping of lentic and lotic resources. Management actions pertaining to riparian and wetlands are incorporated in the alternatives and described in more detail in Chapter 2.

**Riparian Proper Functioning Condition**

BLM resource specialists record information on the condition of various riparian resources in the WRFO Planning Area. During these assessments, riparian systems and wetlands are evaluated using a qualitative assessment method called Proper Functioning Condition (PFC) (BLM 1998). On the

basis of hydrology, vegetation, and erosion/deposition (soils) attributes and processes, the PFC assessments place the riparian area in one of five ratings: PFC, Functional At-Risk (FAR) with an upward trend (FAR-UP), FAR not apparent trend (FAR-NA), FAR with a downward trend (FAR-DOWN), and Non-Functional (NF).

The approach of the PFC assessment is to evaluate most of the indicators for the Colorado Public Land Health Standards Standard 2. The resultant functional rating (PFC, FAR, NF) for each riparian area determines whether the standard is being achieved. A PFC rating means most or all of the indicators (within the system's potential) have been met and Standard 2 has been achieved. A FAR-UP rating generally means that several indicators have not been met but that significant progress is being made toward achieving Standard 2. A FAR-DOWN or FAR-NA rating means several indicators have not been met and generally Standard 2 would not have been achieved. Likewise, a NF rating means that critical indicators have not been met and consequently Standard 2 has not been achieved.

For lotic systems, a riparian-wetland area is considered to be in PFC when adequate vegetation, landform, or large woody debris is present to accomplish the following:

- Dissipate stream energy associated with high water flow, thereby reducing erosion and improving water quality;

- Filter sediment, capture bed load, and aid floodplain development;

- Improve floodwater retention and groundwater recharge;

- Develop root masses that stabilize streambank against cutting action;

- Develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and

- Support greater biodiversity (BLM 1998).

For lentic systems, riparian-wetland areas are functioning properly when adequate vegetation, landform, or debris is present to accomplish the following:

- Dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality;

- Filter sediment and aid floodplain development;

- Improve floodwater retention and groundwater recharge;

- Develop root masses that stabilize islands and shoreline features against cutting action;

- Restrict water percolation;

- Develop diverse ponding characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterbird breeding, and other uses; and

- Support greater biodiversity (BLM 1999a).

Each riparian-wetland area has to be judged against its capability and potential (1998 Technical Reference BLM-RS-ST-98-001+1737) (BLM 1998). In the WRFO Planning Area, a total of 355.3 miles of riparian areas along 86 different waterways have been inventoried and 319.6 miles

assessed. Table 3-13 summarizes the number of miles of high priority, medium priority, low priority, and other stream segments that are PFC, FAR, or NF within each geographic reference area. Of the miles assessed, 121 miles are rated as PFC, 116.3 miles are rated as FAR, and 82.3 miles are rated as NF. Riparian-wetland areas are shown in Map 3-2. Causal factors for not getting a rating of PFC include: trampling by domestic or wild animals, presence of invasive plant species, and/or degraded stream channels (e.g., downcutting, unstable banks, excessive erosion or deposition).

### Table 3-13. Number of Stream Miles within each Geographic Reference Area in PFC, FAR, or NF

| Geographic Reference Area (GRA) | Functional Rating (miles) | | | | | |
|---|---|---|---|---|---|---|
| | PFC[1] | FAR[2] | NF[3] | Inv-RIP[4] | Inv-NRIP[5] | Total |
| **High Priority Riparian Habitats** | | | | | | |
| Douglas Creek/Cathedral GRA | 68.8 | 6 | 1.1 | | 3.6 | 79.5 |
| Crooked Wash/Deep Channel GRA | 7.6 | 0.3 | 0 | | | 7.9 |
| Piceance Basin GRA | 11.7 | 34.4 | 5.3 | 0.9 | 21.6 | 73.9 |
| Blue Mountain/Moosehead GRA | 2.2 | 3.8 | 0.8 | | 2.7 | 9.5 |
| White River GRA | 6.1 | 0 | 0 | | 5.6 | **11.7** |
| Danforth/Jensen | 1.7 | 0 | 0 | | | **1.7** |
| **Medium Priority Riparian Habitats** | | | | | | |
| Douglas Creek GRA | 12.1 | 15.4 | 15.2 | 1.3 | | **44** |
| Crooked Wash/Deep Channel GRA | 1.3 | 10.8 | 4.8 | | | **16.9** |
| Piceance Basin GRA | 2.7 | 26 | 29.2 | | | **57.9** |
| Blue Mountain/Moosehead GRA | 1.5 | 1.7 | 14.3 | | | **17.5** |
| Wolf Creek/Red Wash GRA | 3.7 | 5.3 | 2.5 | | | **11.5** |
| White River GRA | 0.4 | 0 | 0 | | | **0.4** |
| Danforth/Jensen | 0.5 | 4.7 | 1.4 | | | **6.6** |
| **Low Priority Riparian Habitats** | | | | | | |
| Piceance Basin GRA | 1.2 | 3.7 | 1 | | | **5.9** |
| Douglas Creek GRA | 0.6 | 7.4 | 7 | | | **15** |
| Crooked Wash GRA | 0 | 0 | 0 | | | **0** |
| Danforth/Jensen | 1.1 | 1.5 | 1.1 | | | **3.7** |
| **TOTAL** | **121** | **116.3** | **82.3** | | **33.5** | **355.3** |

SOURCE: BLM 1994; BLM 2006b; BLM 2013.
NOTES:
[1]PFC = proper functioning condition
[2]FAR = functional at-risk
[3]NF = non-functional
[4]Inv-RIP = Inventoried, Riparian
[5]Inv-NRIP = Inventoried, Not Riparian

#### 3.3.1.3   Grassland and Shrubland Communities

Based on data from a limited number of livestock grazing Environmental Assessments (EAs), since 1997 upland areas that were analyzed were primarily achieving or making progress toward

achieving Colorado Public Land Health Standards Standard 3 (healthy, productive plant communities) (BLM 1997b). In areas that were not achieving or making progress toward achieving Standard 3, historic grazing practices and weed invasion (e.g., cheatgrass [*Bromus tectorum*]) were indicated as the main causal factors for these determinations.

## Grasslands

Grasslands are very diverse in the WRFO Planning Area and include lowland, foothill, mountain, and alpine areas. They cover a total of 74,400 (5 percent) of the WRFO Planning Area and their composition is dependent on soil type, land use, aspect, and elevation. Most of these areas are located in valley bottoms, uppermost south-facing slopes, and in scattered patches on windswept ridges (BLM 1994). Grasslands in the WRFO Planning Area have the potential to provide good forage for many wildlife species and livestock, although heavy grazing or other land use practices could adversely affect the composition and productivity of some areas.

### Lowland

Lowland grasslands (below 5,500 feet) are generally dominated by native and non-native grasses with various forbs. Many of these lowland areas could have been naturally dominated by woody vegetation or shrublands, but due to irrigation, fire, land clearing, and other land use practices, are currently grasslands. Most of these areas are actively grazed by livestock and wildlife and are dominated by grasses like Colorado wildrye (*Leymus ambiguus*), Salina wildrye (*Leymus salinus*), Indian ricegrass (*Achnatherum hymenoides*), squirreltail (*Elymus elymoides*), western wheatgrass (*Pascopyrum smithii*), beardless bluebunch wheatgrass (*Pseudoroegneria spicata*), Sandberg bluegrass (*Poa secunda*), brome (*Bromus* spp.), arrowleaf balsamroot (*Balsamorhiza sagittata*), buckwheat (*Eriogonum* spp.), and penstemon (*Penstemon* spp.) (BLM 1994). Many lower elevation grasslands are degraded and are dominated by cheatgrass.

### Foothill/Mountain

Foothill/mountain grasslands are generally located between 5,500 and 9,000 feet and mostly on south-facing slopes and ridgelines. They are usually naturally dominated by grasses but could also include scattered forbs and shrubs. Foothill/mountain grasslands are generally highly productive systems that support a wide range of plant and animal diversity. Much of this community, combined with adjacent shrublands, is used as winter range for deer, elk, and pronghorn. Common grasses include Idaho fescue (*Festuca idahoensis*), Thurber's fescue (*Festuca thurberi*), mountain muhly (*Muhlenbergia montana*), needle and thread (*Hesperostipa comata*), Junegrass (*Koeleria macrantha*), slender wheatgrass (*Elymus trachycaulus*), Sandberg bluegrass, Kentucky bluegrass (*P. pratensis*), and Letterman's needlegrass (*Achnatherum lettermanii*) (BLM 1994). Lowland grassland species that are also found at these elevations include Indian ricegrass, squirreltail, western wheatgrass, beardless bluebunch wheatgrass, Sandberg bluegrass, brome, arrowleaf balsamroot, buckwheat, mutton bluegrass (*P. fendleriana*), and penstemon.

### Alpine

The alpine grasslands include grasslands above 9,000 feet and tundra above 11,500 feet. This community is confined to the Flat Tops Wilderness along the eastern edge of the WRFO Planning Area. This area is highly productive in mid-summer, but has an extremely short growing season due to the elevation. Large herds of ungulates and many other species of wildlife use this community during the summer for forage, nesting, and brood rearing. The community is dominated by both grasses and forbs, and contains scattered pockets of small shrubs. Common plants in this community are typically low-growing and include species like kobresia (*Kobresia* spp.), sedges (*Carex* spp.), bluegrass (*Poa* spp.), and alpine avens (*Acomastylis rossii*) (Fitzgerald et al. 1994).

## Shrublands

Shrublands dominate the WRFO Planning Area, covering 659,300 (45 percent) of the WRFO Planning Area. These communities are generally very diverse in plant composition and provide very important forage and cover to wildlife and livestock (BLM 2007b). Shrublands have been split into three vegetation communities: sagebrush, salt desert, and foothill/mountain shrub. Management actions are incorporated in the alternatives and described in more detail in Chapter 2.

### Sagebrush

The sagebrush community is wide spread and diverse, covering nearly one-third of the WRFO Planning Area at 456,600 acres (31 percent). This community includes vegetation associations dominated by several different subspecies of sagebrush, including Wyoming big sagebrush (*Artemisia tridentata* subsp. *wyomingensis*), mountain big sagebrush (*Artemisia tridentata* subsp. *vaseyana*), and Basin big sagebrush (*Artemisia tridentata* subsp. *tridentata*), as well as antelope bitterbrush (*Purshia tridentata*), green rabbitbrush (*Chrysothamnus nauseosa*), and rubber rabbitbrush (*Ericameria nauseosa*). Sagebrush areas typically occur with shallow to moderately deep soils at elevations between 4,500 and 8,000 feet and 9 to 20 inches of precipitation per year (BLM 2007b).

Common grass and grass-like species found in the sagebrush community include bluebunch wheatgrass, thickspike wheatgrass (*Elymus lanceolatus*), Sandberg bluegrass, muttongrass, Indian ricegrass, needle and thread, threadleaf sedge (*Carex filifolia*), green needlegrass (*Nassella viridula*), Columbia needlegrass (*Achnatherum nelsonii*), squirreltail, and Idaho fescue. Common forbs include phlox (*Phlox* spp.), Hooker's sandwort (*Arenaria hookeri*), buckwheat, penstemon, wild onion (*Allium* spp.), Indian paintbrush (*Castilleja* spp.), globemallow (*Spheralcea* spp.), Oregon grape (*Mahonia* spp.), and prickly pear cactus (*Opuntia* spp.) (BLM 2007b).

Generally, sagebrush provides a food staple for pronghorn (*Antilocapra americana*) and sage-grouse (*Centrocercus urophasianus*) and is also one of the dominant species found on pronghorn and mule deer (*Odocoileus hemionus*) critical winter ranges (BLM 2007b). Fire is an important component of all sagebrush-dominated plant communities. Depending on the nature of the site, the fire return interval could be between 25 and 100 years (BLM 2007b).

### Salt Desert

The salt desert shrubland community covers 100,400 acres (7 percent) of the WRFO Planning Area. This community is generally located between 4,500 and 6,000 feet in areas characterized by accumulations of salt on poorly developed deep soils (BLM 2007b). Soils in these areas usually have a high pH (7.8 to 9), which restricts the uptake of water by all but the most salt-tolerant plants (BLM 2007b). Forage in these areas is excellent in the winter, as these shrubs maintain relatively high levels of protein and carbohydrates.

Dominant shrubs found in this community are drought tolerant and include Gardner's saltbush (*Atriplex gardneri*), fourwing saltbush (*Atriplex canescens*), birdfoot sagebrush (*Artemisia pedatifida*), bud sagebrush (*Picrothamnus desertorum*), spiny hopsage (*Grayia spinosa*), greasewood (*Sarcobatus vermiculatus*), broom snakeweed (*Gutierrezia sarothrae*), Basin big sagebrush, rabbitbrush, and winterfat (*Krascheninnikovia lanata*) (BLM 2007b). Grasses associated with these sites are Indian ricegrass, squirreltail, Sandberg bluegrass, bluebunch wheatgrass, needle and thread, and western wheatgrass (BLM 2007b). Forbs include wild onion, biscuitroot (*Lomatium* spp.), woody aster (*Xylorhiza* spp.), globemallow, and prickly pear cactus (BLM 2007b).

**Foothill/Mountain**

The foothill/mountain shrub community covers 102,282 (7 percent) of the WRFO Planning Area, and is generally found between 6,500 and 7,500 feet. This community receives 10 to 14 inches of precipitation annually and provides excellent cover and browse for many species of wildlife (BLM 2007b).

Foothill/mountain shrubland includes large stands of Gambel oak and other more diverse associations with Gambel oak, mountain mahogany, mountain snowberry (*Symphoricarpos* spp.), and serviceberry (*Amelanchier* spp.), with scattered sagebrush, rabbitbrush, bitterbrush, kinnikinnik, currant (*Ribes* spp.), shrubby cinquefoil (*Dasiphora fruticosa*), and skunkbush sumac (*Rhus trilobata*). Grasses found in the community include needle and thread, basin wildrye, Indian ricegrass, green needlegrass, Columbia needlegrass, thickspike wheatgrass, Idaho fescue, Thurber's fescue, mountain muhly, Junegrass, slender wheatgrass, Sandberg bluegrass, Kentucky bluegrass, Letterman's needlegrass, squirreltail, western wheatgrass, beardless bluebunch wheatgrass, Sandberg bluegrass, brome, and mutton bluegrass. Common forbs include arrowleaf balsamroot, buckwheat, Indian paintbrush, lupine (*Lupinus* spp.), penstemon, sego lily (*Calochortus nuttallii*), wild onion, larkspur (*Delphinium* spp.), violet (*Viola* spp.), bluebells (*Mertensia* spp.), and prickly pear cactus (BLM 2007b).

This cover type also includes a small area of shrubland that is found at or above timberline. This area consists of mostly willows (*Salix* spp.) and krummholz patches of subalpine fir. Herbaceous plants in this community are similar to those found in the subalpine/alpine grassland. These areas could be heavily used by wildlife (especially birds and small mammals) in the summer months for forage and cover, but are minimally used in the winter.

### 3.3.1.4   Invasive, Non-native Plant Species and Pest Control

Plants identified as invasive, non-native plant species (INPS) are invasive and not indigenous to the area. Typically, INPS are detrimental to native ecosystems and human welfare. Noxious weeds are undesirable native or non-native plants that have either been "designated" by the State of Colorado or "declared" by the county weed control districts. For the purpose of this discussion, non-native noxious weeds are a subset of INPS. With the exception of vascular plants classified as INPS, a pest could be any biological life form that poses a threat to human or ecological health and welfare.

<u>Noxious Weeds</u>

Plants that are INPS include those listed by the State of Colorado Department of Agriculture as noxious weeds and other species that are not formally listed as noxious, but that are very aggressive and tend to displace native plants in wildland situations. The BLM considers plants non-native if they have been introduced into an environment where they did not evolve. As a result, they usually have no natural enemies to limit their reproduction and spread (Westbrooks 1998). Invasive plant species and noxious weeds and their continued establishment represent a serious threat to the continued productivity, biological diversity, diversified use, and aesthetic value of the WRFO Planning Area (BLM 1994). Noxious weeds are defined by the Colorado Noxious Weed Act as plants that aggressively invade or are detrimental to economic crops or native plant communities; are poisonous to livestock; are carriers of detrimental insects, diseases, or parasites; or are detrimental to the environmentally sound management of natural or agricultural ecosystems (8 CCR 1203-9).

Colorado has published a list of 72 noxious weeds that may be found in the state. The species on the list have been assigned a rating of "A," "B," or "C," depending on the severity of the threat. Of

*Chapter 3 – Affected Environment*

these, 18 have been put on the "A" list, meaning that they are subject to eradication wherever detected. The other 54 species are either on the "B" list (discrete statewide distributions that are subject to eradication, containment, or suppression) or the "C" list (controls are recommended, but populations exist statewide).

Noxious weeds are distributed across the WRFO Planning Area. Since completion of the RMP, surface disturbing activities along with other vectors have led to the continued spread and establishment of noxious weeds.

Of the 72 species listed by the state, BLM has identified 22 noxious weed species that are present in the WRFO Planning Area and are actively being managed (Table 3-14). Management actions are incorporated in the alternatives and described in more detail in Chapter 2. Only squarrose knapweed appears on the "A" list.

### Table 3-14. WRFO Planning Area Noxious Weeds

| Common Name | Scientific Name | Colorado Rating |
|---|---|---|
| Russian knapweed | *Acroptilon repens* | B[1] |
| Cheatgrass | *Bromus tectorum* | C[2] |
| Whitetop | *Cardaria draba* | B |
| Plumeless thistle | *Carduus acanthoides* | B |
| Musk thistle | *Carduus nutans* | B |
| Diffuse knapweed | *Centaurea diffusa* | B |
| Spotted knapweed | *Centaurea maculosa* | B |
| Squarrose knapweed | *Centaurea virgata* | A[3] |
| Canada thistle | *Cirsium arvense* | B |
| Bull thistle | *Cirsium vulgare* | B |
| Chinese clematis | *Clematis orientalis* | B |
| Poison hemlock | *Conium maculatum* | C |
| Houndstongue | *Cynoglossum officinale* | B |
| Common teasel | *Dipsacus fullonum* | B |
| Leafy spurge | *Euphorbia esula* | B |
| Black henbane | *Hyoscyamus niger* | B |
| Perennial pepperweed | *Lepidium latifolium* | B |
| Oxeye daisy | *Leucanthemum vulgare* | B |
| Dalmatian toadflax | *Linaria dalmatica* | B |
| Yellow toadflax | *Linaria vulgaris* | B |
| Scotch thistle | *Onopordum acanthium* | B |
| Common mullein | *Verbascum thapsus* | C |

SOURCE: 8 CCR 1203-9.
NOTES:
[1] B – discrete statewide distributions that are subject to eradication, containment, or suppression
[2] C – controls are recommended, but populations exist statewide
[3] A – subject to eradication wherever detected

The BLM is also committed to immediately treating and eradicating any other Colorado "A" list noxious weeds that may be found in the WRFO Planning Area. Any additional "B" or "C" list species would be managed as opportunity is presented.

**Weed Free Areas**

Although much of the WRFO Planning Area contains some of the noxious weed species listed in Table 3-14, in 1996 the BLM estimated that an area covering 19 percent (497,900 acres) of the WRFO Planning Area was considered "weed free" (BLM 1996). This area covers much of the north central and northeast portions of the WRFO Planning Area. Noxious weeds are likely to have invaded some of these areas since the data were compiled. Nonetheless, particular care should be taken in these areas to avoid introducing new populations of noxious weeds. Management actions for weed free areas are incorporated in the alternatives and described in more detail in Chapter 2. For additional discussion and information about noxious weed and pest management, see the 1997 White River RMP.

### 3.3.1.5   Remnant Vegetation

The WRFO Planning Area vegetation has been affected by the construction of roadways, pipelines, facilities, and infrastructure related to energy development, livestock use, noxious weed invasions, and other natural and human-caused events. As a result, few of the native vegetation communities in the WRFO Planning Area have maintained their original species composition, vegetative cover, and size.

Surveys in part of the WRFO Planning Area have revealed numerous "remnant vegetation" areas, where the integrity of the original vegetation community has remained intact. This remnant vegetation is unique and warrants additional consideration when working in these locations. These areas are important biologically and scientifically and as such the management objective is to maintain their ecological integrity. Most of these areas are in the central part of the WRFO Planning Area and encompass 4,800 acres, or less than 0.01 percent of the total area. Management actions are incorporated in the alternatives and described in more detail in Chapter 2. These areas are found in four of the six cover type groups, as shown in Table 3-15.

### Table 3-15. WRFO Planning Area Remnant Vegetation

| Cover Type | Acres in WRFO Planning Area | Percent of Total Remnant Vegetation |
|---|---|---|
| **Grasslands** | **155** | **3** |
| **Shrublands** | | |
| Sagebrush | 492 | 10 |
| Salt Desert | 264 | 6 |
| Foothill/Mountain | 377 | 8 |
| **Subtotal** | **1133** | |
| **Forests/Woodlands** | | |
| Pinyon/Juniper | 892 | 19 |
| Aspen | 365 | 8 |
| Ponderosa | 1,180 | 25 |
| Spruce/Fir | 1,067 | 22 |
| **Subtotal** | **3,504** | |
| **Riparian and Wetlands** | **6** | **0.1** |
| **TOTAL** | **4,798** | **100** |

NOTE:
If only a cover type group is listed, the available data are not detailed enough to provide the specific cover type.

#### 3.3.1.6   Proposed Dinosaur Trail MLP

The Dinosaur Trail MLP includes the Blue Mountain/Moosehead and Wolf Creek/Red Wash geographic reference areas. Vegetation within the MLP includes sagebrush, foothill/mountain shrubland, salt desert shrubland, and pinyon/juniper (Map 3-2). Much of the Dinosaur Trail MLP is within the area identified in the RMP as "weed-free zones."

## 3.3.2   Fish and Wildlife Resources

Fish and wildlife resources highlighted for management include big game, upland game, sage-grouse, raptors, migratory birds, small mammals, reptiles and amphibians, and fish. The BLM works closely with Colorado Parks and Wildlife to manage habitat for fish and wildlife in order to achieve and maintain suitable habitat for desired population levels and distribution within the WRFO Planning Area. Colorado Parks and Wildlife is directly responsible for managing population levels, while the BLM is responsible for managing fish and wildlife habitats in a condition that would support desired levels of species. Management actions pertaining to fish and wildlife resources are incorporated in the alternatives and described in more detail in Chapter 2.

The FWS provides regulatory oversight for all species that are listed, proposed for listing, or are candidates for listing under the ESA (see Section 3.3.3.1, Federal Endangered, Threatened, Proposed and Candidate Species). The FWS also administers the Bald and Golden Eagle Protection Act and Migratory Bird Treaty Act, which protects eagles and migratory bird species.

#### 3.3.2.1   Wildlife

Wildlife habitats within the WRFO Planning Area consist of 2,648,100 acres of terrestrial uplands and 27,800 acres of riparian and wetland habitat. Of these totals, 1,445,700 acres of uplands and 9,500 acres of riparian and wetland habitats are managed by BLM.

Wildlife species distribution and abundance are closely tied to habitats, with some species being specialists that use a narrow range of habitats and some being generalists that occur across a broad range of habitats and conditions. Most habitats are defined by vegetation structure and composition, including forests, woodlands, tall and low shrublands, and grasslands. Non-vegetation habitats include cliffs and rock, dirt banks, barren areas, caves and mines, streams, ponds, and lakes.

The vegetation communities of the WRFO Planning Area are described in Section 3.3.1, Vegetative Communities, and the distribution of communities are illustrated in Map 3-2. Most of the central and western parts of the WRFO Planning Area consist of pinyon/juniper woodlands and sagebrush shrublands that are used as elk and deer winter range. Foothill and mountain shrub communities and forested lands provide big game summer ranges, including production habitat and summer concentration areas, at higher elevations along the Colorado-White River Divide, Danforth Hills, and Blue Mountain. Conifer forests (ponderosa pine, lodgepole pine, and spruce/fir) and aspen occur mainly in the eastern portion of the WRFO Planning Area in and near the Flat Tops Wilderness. Forest types on BLM-administered lands consist primarily of Douglas fir, aspen, and spruce/fir stands adjacent to the White River National Forest and along the White-Colorado River divide. Salt desert shrub and low elevation grasslands provide habitat for species such as white-tailed prairie dog and pronghorn, and occur along US 40 and in the Coal Oil Basin near Rangely. Agricultural meadows occur mostly near Meeker and along the White River and Piceance Creek.

A land health assessment has been performed for the Wolf Creek Watershed – Three Springs Ranch (BLM 2004b). This is an area of 107,800 total acres, 82,200 acres of which is BLM-managed land, located between Dinosaur National Monument and the White River. Approximately 95 percent of

*Chapter 3 – Affected Environment*

the area is achieving or moving toward achieving the public land health standard for animal communities. Areas not achieving the standard have been adversely affected by historical grazing practices, historical feeding practices, and use near water. The majority of the early seral areas that do not meet the standard are dominated by cheatgrass. These conditions are generally representative of the WRFO Planning Area.

Colorado Parks and Wildlife (CDOW 2006) and BLM share concerns related to habitats for big game and other species. Due largely to the long-term absence of fire effects, woodland and shrubland communities are increasingly represented by advanced ecological states where declining herbaceous production and vigor are the norm. Woodland stands have tended to increase in canopy density, with young trees advancing into former fire-induced disclimax shrublands. Particularly in drainage bottoms, lower elevation basins, and mid-elevation ridgelines, the density and composition of grass/forb understories are below potential and these sites are frequently heavily colonized, if not dominated, by invasive annual grasses and forbs.

In particular, deciduous browse species beneath woodland canopies on Piceance Basin's lower elevation winter ranges generally display low vigor and production due to excessive browsing. Pinyon pine is aggressively colonizing several thousands of acres of mountain shrub and mountain big sagebrush communities on the southern rim of the Basin between 7,200 and 7,800 feet. Similarly, there is heavy local utilization of Wyoming big sagebrush, black sagebrush, and rubber rabbitbrush during the late winter and early spring in the Douglas Creek drainage. Localized die-offs of Wyoming big sagebrush have occurred in GMU 21 (Douglas Creek area, described below). This mortality has likely been prompted by extended drought and aged plants, but represents a somewhat protracted reduction in the winter forage base for deer and elk. These habitat issues are attributed to a number of factors, including: plant succession toward late seral or climax communities, historic livestock grazing practices, locally heavy big game use, increasing elk populations since the late 1970s, fire suppression, the proliferation of invasive weeds, overall reductions in big game and livestock grazing use, and altered distribution of big game in response to private lands where hunting does not occur.

**Big Game Species**

The WRFO Planning Area includes all or nearly all of five CPW GMUs, including GMUs 21, 22, 23, 24, and 10, and portions of several other GMUs (Map 3-4, Map 3-5, Map 3-6, and Map 3-7). CPW manages big game species by herd units defined as Data Analysis Units (DAUs), which are comprised of one or more GMUs. Population objectives are set for each DAU and are monitored by CPW.

**Elk**

Three populations of elk (*Cervus elaphus*) occur in the WRFO Planning Area: the Blue Mountain herd, Yellow Creek herd, and White River herd (Table 3-16). The White River herd is the largest of the three elk herds, with an estimated population of 35,000-40,000 elk.

### Table 3-16. Elk Herd Populations

| Data Analysis Unit (DAU) | Current Population Estimate | CPW Population Objective |
|---|---|---|
| E-10 –Yellow Creek | 10,700-11,700 | 7,000-9,000 |
| E-6 – White River | 35,000-40,000 | 32,000-39,000 |
| E-21 – Blue Mountain | 3,800-4,300 | 1,200 |

SOURCE: CPW post hunt data, 2012.

*Chapter 3 – Affected Environment*

The White River herd (DAU E-6) occurs primarily in GMUs 23 and 24, which are east of SH 13 between Rifle and Meeker. This herd summers primarily on the White River National Forest (Map 3-6), in habitats ranging from sagebrush to subalpine/alpine grassland. Relatively small or isolated tracts of BLM-administered lands with aspen and foothill/mountain shrubland also provide summer range in the Danforth Hills, Oak Ridge and Nine Mile Gap areas. Winter range is confined (Map 3-7), and includes the benchlands along the White River and its major tributaries, extending south along the Grand Hogback and north to Nine Mile Gap and Milk Creek. These areas include both winter concentration areas and severe winter range, and consist of mostly Gambel oak, sagebrush and agricultural lands. The Oak Ridge State Wildlife Area southeast of Meeker, administered by CPW, contains about 3,000 acres of BLM land. This is a major winter concentration area that supports about 2,000 elk from December through April. This herd's numbers increased from approximately 38,000 animals in the mid-1980s, peaking at roughly 68,000 in 2003. Numbers have been declining since 2003 and currently the population is estimated to be around 35,000.

The Yellow Creek herd (DAU E-10) summers along the Piceance Rim and Roan Plateau, and west into Utah, in the southern parts of GMUs 21 and 22, and the northern edge of GMUs 31 and 32. Foothill and mountain shrub communities and forested lands provide big game summer ranges, including production habitat and summer concentration areas, at higher elevations along the Colorado-White River divide, Danforth Hills, and Blue Mountain. Due to its limited extent, summer range is considered critical (Map 3-6). About 70 percent of this herd winters in the Douglas and Piceance Creek Basins, where winter concentration areas are present. About half of SH 139 between Douglas Pass and Rangely is identified as highway crossing areas, where there are problems with vehicle collisions. Numbers in this herd have been steadily increasing since the early 1980s, with the population remaining stable (around 10,000 animals) during the 1990s and then slowly increasing to approximately 11,700 in 2012.

The Blue Mountain herd (DAU E-21) summers on Blue Mountain and east to the Citadel Plateau, in the north half of GMU 10, north of US 40. Due to their limited extent, summer ranges are considered critical habitat, especially aspen. CPW identifies much of the area around Blue Mountain as a summer concentration area, and elk production areas are also present. Critical summer ranges consist mostly of mountain shrub and higher elevation sagebrush. The Blue Mountain herd winters in lower elevation juniper and sagebrush, with significant concentrations in Lower Wolf Creek, Crooked Wash, and Dinosaur National Monument, which are mapped by CPW as winter concentration and severe winter range (Map 3-7). All of US 40 and portions of SH 64 and the road from Blue Mountain to Rangely are identified as highway crossing areas, where there are problems with collisions between elk and vehicles. Number have remained relatively stable (around 4,000 animals) since the late 1980s, with an increase in numbers (5,000-5,700) during the mid to late 1990s. Currently the population is estimated is approximately 4,200.

The Yellow Creek and White River herds have current populations that are within or slightly above CPW's population objectives, while the Blue Mountain herd is substantially larger than CPW's objective. Elk production areas, movement corridors and severe winter range are considered critical habitat in all herd units, and summer range is considered critical for the Yellow Creek and Blue Mountain herds.

**Mule Deer**
There are three general herds of mule deer in the WRFO Planning Area, the Rangely (Blue Mountain) herd, the Douglas Pass (Bookcliff) Herd, and the White River (Piceance Basin) herd.

The White River herd (identified in the 1997 White River RMP as Piceance Basin herd) (DAU D-7) is the largest, with an estimated population of 40,000-45,000 deer (see Table 3-17). It summers on the White River National Forest and the Roan Plateau, and winters in the Piceance Basin. Summer range includes higher elevation pinyon/juniper and sagebrush, as well as aspen, mountain shrub, and other higher elevation habitats (Map 3-4). Winter ranges consist largely of lower elevation pinyon/juniper woodlands and sagebrush. Winter concentration areas are located along the White River and around Meeker, and severe winter range occupies the lower Piceance Basin (Map 3-5). Historically, the White River population exceeded 100,000 deer, peaking at 120,000 animals in the early 1980s. The population has steadily declined since that time, with the current population estimate at approximately 43,000 animals.

The Rangely (Blue Mountain) herd (DAU D-6) summers on Blue Mountain, and winters on benches along the White and Yampa Rivers and the south face of Blue Mountain, mostly in GMU 10. Winter concentration areas and severe winter range are located along and south of US 40, to the White River east of Rangely. This herd has experienced a dramatic decline since the early to mid-1980s when the population exceeded 6,000. Since 1987 the population has steadily declined to its current number of less than 1,000 animals.

The Douglas Pass (Bookcliff) herd (DAU-11) occurs mostly in GMU 21. The herd summers on the Colorado/White River divide (Map 3-4). Suitable summer habitat is confined to a portion of the Cathedral Bluffs, the Baxter/Douglas Pass divide, and isolated tracts on Oil Spring, Rabbit and Texas Mountains. About 60 percent of the population winters at lower elevations in the Douglas, Missouri, and Evacuation Creek drainages. Winter concentration and severe winter areas are located along the White River and in the Douglas Creek Basin. Similar to the Rangely and White River herds, the Douglas Pass herd exhibited a dramatic decline beginning in the mid-1980s, when the population was estimated to be around 32,000 animals, extending into the mid to late-1990s. Since 1997, the population has remained relatively stable and is currently estimated to be around 10,000.

The populations of the White River and Rangely herds are substantially lower than the CPW population objective, while the Douglas Pass herd is near population objectives. Mule deer production areas, movement corridors and severe winter range are considered critical habitat by CPW for mule deer in all GMUs.

### Table 3-17. Mule Deer Populations

| Data Analysis Unit (DAU) | Current Population Estimate | CPW Population Objective |
|---|---|---|
| D-6 – Rangely | 600-1,200 | 7,000 |
| D-7 – White River | 40,000-45,000 | 67,500 |
| D-11 – Douglas Pass | 9,500-11,000 | 10,000-12,000 |

SOURCE: CPW post hunt data, 2012.

## Pronghorn

Pronghorn occur in the northwestern portion of the WRFO Planning Area, primarily between Pinyon Ridge and the Colorado-Utah state line, mostly in GMU 10 (Table 3-18 and Map 3-8). Overall range consists primarily of salt desert and sagebrush shrublands and lowland grassland.

*Chapter 3 – Affected Environment*

### Table 3-18. Pronghorn Populations

| Data Analysis Unit (DAU) | Current Population Estimate | CDOW Population Objective |
|---|---|---|
| A-10 – Maybell | 1,500-1,800 | 1,400 |
| A-21 – Dinosaur | ≤100 | 300 |

SOURCE: CPW post hunt data, 2012.

The Dinosaur herd unit (DAU A-21) currently supports less than 100 animals, while CPW's long-term goals call for an average post-season herd of 300 animals. The antelope season was closed in 2010 due to the declining number of antelope in the unit and currently remains closed. All occupied habitat in the Dinosaur herd unit is identified by CPW as "overall range," except for a resident population northwest of Rangely in the Coal Oil Basin. The general distribution shifts toward the west in winter, but no identified areas of winter range are present. A small area of pronghorn overall range is also present in the northern part of GMU 21, adjacent to pronghorn overall range and resident population areas near Rangely.

The Maybell herd unit (DAU A-10) mostly occurs north of the WRFO Planning Area. Small areas of overall range and winter range occur in the WRFO Planning Area near Elk Springs and Crooked Wash. Habitats include sagebrush and rangeland/lowland grassland. The number of pronghorn in Elk Springs and Crooked Wash area normally does not exceed 40 or 50 animals. The Maybell herd experienced a decline in numbers (from roughly 2,200 to 1200) from 1993 to 2003. From 2003-2007, the population rebounded back to its original size but has declined since that time. The current estimate for this herd is roughly 1,500 animals.

### Other Key Mammal Species

**Black Bear**

Black bear (*Ursus americanus*) regularly occur in about two-thirds of the WRFO Planning Area, including the higher elevations in the Douglas Creek and Piceance Creek drainages, the upper White River, Danforth Hills, and portions of the Blue Mountain area. Summer concentration areas occur in portions of the Danforth Hills and White River National Forest. Fall concentration areas occur on the Baxter Pass/Douglas Pass divide and Roan Plateau (NDIS 2006). Concentration area habitats include aspen, mountain shrub, higher elevation sagebrush, and Douglas fir. The WRFO has not developed specific bear management objectives, but manages their habitat integral with big game habitat.

**Mountain Lion**

The entire WRFO Planning Area is within the overall range of mountain lion (*Felix concolor*), which occur in all habitats. No areas of human conflict have been identified by CPW (NDIS 2006). Their seasonal movements largely follow those of mule deer, their main prey. The WRFO has not developed specific lion management objectives, but manages their habitat integral with big game habitat.

**White-tailed Prairie Dog**

White-tailed prairie dog (*Cynomys leucurus*) towns occur primarily in the salt desert shrubland and rangeland/low grassland along US 40 from Pinyon Ridge to the Utah border, in the Coal Oil Basin northwest of Rangely, and in the Crooked Wash area. The white-tailed prairie dog is a BLM-sensitive species, and their towns provide habitat for black-footed ferret (*Mustela nigripes*) and burrowing owl (*Athene cunicularia*), which are discussed in more detail in Special Status Species below (Section 3.3.3).

<u>Birds</u>

**Turkey**

Turkey (*Meleagris gallopavo*) were not addressed in the 1997 White River RMP, but reintroduced populations have since become established in the WRFO Planning Area. They inhabit mountain shrub, pinyon/juniper, ponderosa pine, and mixed conifer habitats. Turkey overall range occurs along the Roan Plateau, Baxter Pass/Douglas Pass divide, and upper White River Valley. Winter range and a winter concentration area are located in the White River Valley above Meeker, and a second area of winter range is located in the East Douglas Creek/Cathedral Creek area. The WRFO has not developed specific turkey management objectives, but manages their habitat integral with big game and grouse habitat.

**Dusky Grouse**

Dusky grouse (*Dendragapus obscurus*), (formerly known as blue grouse) are relatively common and widely distributed in mixed and mountain shrub, aspen, and coniferous forest habitats above 7,200 feet in the WRFO Planning Area. The BLM administers approximately 405,600 acres of dusky grouse habitat in the resource area. Population statistics show that dusky grouse populations are stable, although significant periodic swings in abundance occur due to environmental effects on annual recruitment. Blue Mountain and Piceance Basin/Roan Plateau are the two most important dusky grouse areas in terms of recreation use and abundance (BLM 2007b).

**Greater Sage-Grouse**

On March 5, 2010, the FWS concluded that the greater sage-grouse warranted listing as an endangered species under the Endangered Species Act, but that listing was precluded by the need to complete listing actions of higher priority. Range-wide, this species is considered a candidate for listing – a designation that affords management attention equivalent to that of species considered "sensitive" by the BLM. Sage-grouse are considered special status because of large-scale reductions in suitable sagebrush habitats, substantial declines in continental populations, and the near obligate relationship between these birds and sagebrush. A 2008 Colorado Greater Sage-Grouse Conservation Plan, and two local conservation plans that address the northwestern Colorado population in Moffat and Rio Blanco counties, and the PPR population in Rio Blanco and Garfield counties have been completed.

Sage-grouse are known for their strong association with sagebrush habitat. However, they require a diversity of habitats during the year, and may travel long distances between seasonal ranges, depending on their availability. Breeding habitat includes leks (communal breeding sites), nesting areas, and early brood-rearing habitat that are used from about mid-March to mid-July. Leks are generally traditional, and consist of flat, open areas surrounded by sagebrush with more than 20 percent cover, in the vicinity of nesting habitat. Nesting and early brood-rearing habitats are similar, and include appropriate sagebrush canopy cover of 10 to 25 percent with greater than 15 percent herbaceous ground cover. Young birds eat insects for their first three weeks and mostly forbs until they are three months old. As the sagebrush habitat stands begin to dry out in mid-summer, sage-grouse move to more mesic areas, including higher elevations, wet meadows, and riparian areas where succulent forbs are present. From mid-September into November, sage-grouse prefer areas with relatively dense canopy cover and late green forbs. Winter habitat generally has sagebrush greater than 12 to 16 inches tall and greater than 25 percent canopy cover in drainages with tall sagebrush and on ridges and south and west-facing slopes. Winter habitat is used by segregated flocks of males and females.

Sage-grouse are scattered through the non-forested parts of the WRFO Planning Area, with the largest populations on the Piceance Rim/Roan Plateau and on Blue Mountain (Map 3-10). Mapping

depicts newly developed (Colorado Parks and Wildlife, 2012) preliminary priority and general habitat designations. Preliminary Priority Habitat represents areas having the highest conservation value in maintaining sustainable sage-grouse populations, including breeding, later brood-rearing, and winter concentration areas. Preliminary General Habitat represents occupied habitats that are outside priority habitat. These two habitat categories conform well to former mapping that emphasized suitable habitat within 4 miles of current or recently active leks. Even more recently designated Priority Areas of Conservation (PACs) are coincident with priority habitat in the WRFO. Blue Mountain supports the largest and most productive population and has the largest contiguous block of suitable habitat in the resource area. Most of the breeding and nest activities occur on Turner and Wolf Creeks. Blue Mountain's capacity for strong production and recruitment is largely attributable to an abundance of wet meadow habitats. In the Piceance Basin/Roan Plateau area, virtually all seasonal use functions take place on relatively narrow mid-elevation ridges. The Piceance population appears to have undergone a substantial decline since the 1980s, which may be related to the advanced successional status of the mountain shrub and sagebrush communities. The remaining habitat complexes are characterized by suboptimal or fragmented habitats that support low breeding densities. However, areas such as Wolf Creek and Crooked Wash have been documented to support hundreds of wintering birds (BLM 2007b).

Approximately 115 leks have been identified in the WRFO Planning Area, of which about 25 are currently active. The status of about 20 leks is unknown, because of limited or irregular use. The count of males at leks in the WRFO Planning Area in 2006 was 646 birds, and although the highest total since 1989, is a figure that cannot be used as an accurate indicator of trend because of differences in survey effort. Until recently, it was believed that the majority of grouse nesting occurred within two miles of an associated lek, and it followed that sage-grouse production areas were described as suitable nest habitat within two miles of active leks. Based on newer telemetry data, it is currently accepted that 80 percent of nesting occurs within a four-mile radius of a lek. Particularly for the PPR population, only a small portion of the production area is suitable for nesting. Threats to greater sage-grouse include loss and degradation of habitat, including changes due to fire, invasive plant species, energy development, grazing, and fragmentation (Colorado Greater Sage-Grouse Steering Committee 2008).

**Columbian Sharp-Tailed Grouse**

Columbian sharp-tailed grouse (*Tympanuchus phasianellus columbiana*) are considered species of special concern and are discussed below under Special Status Species (Section 3.3.3).

**Raptors**

Raptors include eagles, falcons, owls, and hawks. Because they are at the top of food chains and are present in fewer numbers than their prey, they serve as important indicators of overall ecosystem health. Several species are designated as BLM-sensitive or State of Colorado species of special concern, which conveys special management status to these species. In addition, active nests of all species of raptors are protected under the Migratory Bird Treaty Act, and bald (*Haliaeetus leucocephalus*) and golden eagles (*Aquila chrysaetos*) are protected under the BGEPA. The WRFO requires nest surveys for projects potentially affecting nesting habitat, and maintains a database of raptor nest locations. Current WRFO management focuses on protecting raptor nesting efforts and maintaining the integrity of nesting habitat.

Table 3-19 summarizes raptor occurrence in the WRFO Planning Area (based on Righter et al. 2004 and the BLM databases for historic and recent raptor nests). Twenty-one species of raptors occur in the WRFO Planning Area at least occasionally, of which 20 are known or suspected to breed. Of these, 15 species of raptors have been reported to nest on BLM-administered public land. The most

common species on BLM-administered public land include red-tailed hawk (*Buteo jamaicensis*), golden eagle, ferruginous hawk (*Buteo regalis*), Cooper's hawk (*Accipiter cooperii*), and great-horned owl (*Bubo virginianus*). Nest records are more comprehensive for species that build large conspicuous cliff nests, while species that are inconspicuous and nest in trees or cavities are under represented.

Land use practices over the past 25 years or more generally favor species that forage over open country, but may be reducing the availability of suitable habitat for species that nest in woodlands, such as accipiters (Cooper's hawk, sharp-shinned hawk [*Accipiter striatus*], and northern goshawk [*Accipiter gentilis*]). The less common woodland habitats, including spruce fir, aspen and riparian, are relatively small and dispersed but have high breeding densities.

Bald eagles are considered species of special concern and are discussed below under Special Status Species (Section 3.3.3).

## Table 3-19. Raptor Species and Habitats

| Species | Scientific Name | Residency Status | Breeding in WRFO Planning Area/ Recorded to Nest on BLM[1] | Nesting Habitat | Special Status |
|---------|-----------------|------------------|------------------------------------------------------------|-----------------|----------------|
| Turkey vulture | *Cathartes aura* | Common summer resident, migrant | BR/-- | Cliffs and riparian areas | -- |
| Osprey | *Pandion haliaetus* | Uncommon migrant and rare summer resident | BR/-- | Riverine cottonwood | -- |
| Bald eagle | *Haliaeetus leucocephalus* | Fairly common summer resident, fairly common winter resident | BR/BLM | Riverine cottonwood and ponderosa pine | Federal Protected, State threatened |
| Northern harrier | *Circus cyaneus* | Uncommon summer resident and common migrant | BR/BLM | Wetlands, grasslands, sagebrush | -- |
| Sharp-shinned hawk | *Accipiter striatus* | Fairly common summer resident, migrant and winter resident | BR/BLM | Douglas fir, spruce fir, pinyon/juniper | -- |
| Cooper's hawk | *Accipiter cooperii* | Fairly common summer resident, migrant and winter resident | BR/BLM | Riparian areas, conifers, pinyon/ juniper | -- |
| Northern goshawk | *Accipiter gentilis* | Uncommon permanent resident | BR/BLM | Mature coniferous and aspen forests over 6,500 feet | BLM sensitive |
| Swainson's hawk | *Buteo swainsoni* | Uncommon summer resident, uncommon migrant | BR/-- | Gambel oak, trees in or adjacent to open country, all elevations | -- |
| Red-tailed hawk | *Buteo jamaicensis* | Common summer resident, migrant and winter resident | BR/BLM | Cliffs and forested areas, all habitats | -- |
| Ferruginous hawk | *Buteo regalis* | Uncommon summer resident, uncommon migrant and rare winter resident | BR/BLM | Isolated junipers in desert or sagebrush | BLM sensitive, State special concern |

**Table 3-19. Raptor Species and Habitats**

| Species | Scientific Name | Residency Status | Breeding in WRFO Planning Area/ Recorded to Nest on BLM[1] | Nesting Habitat | Special Status |
|---|---|---|---|---|---|
| Rough-legged hawk | *Buteo lagopus* | Fairly common winter resident | -- | NA | -- |
| Golden eagle | *Aquila chrysaetos* | Fairly common resident | BR/BLM | Cliffs, occasionally in cottonwoods, Douglas-fir | Federal Protected |
| American kestrel | *Falco sparverius* | Common resident and migrant | BR/BLM | Cavities including trees, nest boxes, magpie nests, holes cliffs, all habitats | -- |
| Merlin | *Falco columbarius* | Rare migrant and winter resident | -- | NA | -- |
| Peregrine falcon | *Falco peregrinus anatum* | Uncommon summer resident, rare migrant | BR/BLM | Cliffs near water | BLM sensitive, State special concern |
| Prairie falcon | *Falco mexicanus* | Uncommon permanent resident | BR/BLM | Cliffs adjacent to open country | -- |
| Flammulated owl | *Otus flammeolus* | Fairly common summer resident | BR/-- | Conifer forest, aspen, above 7,000 feet | -- |
| Barn owl | *Tyto alba* | Rare permanent resident | BR/-- | Lowland agricultural areas, roosts in buildings and trees | -- |
| Western screech-owl | *Megascops kennicottii* | No known records | BR/-- | Cottonwoods in riparian, urban, and rural areas, possibly pinyon/ juniper | -- |
| Great-horned owl | *Bubo virginianus* | Fairly common permanent resident | BR/BLM | Riparian areas, hawk nests, ledges, all habitat | -- |
| Snowy owl | *Nyctea scandiaca* | Casual winter visitor | -- | NA | -- |
| Northern pygmy owl | *Glaucidium gnoma* | Uncommon permanent resident | BR/BLM | Aspen, dense pinyon/juniper | -- |
| Burrowing owl | *Athene cunicularia* | Uncommon summer resident | BR/BLM | Prairie dog towns | State threatened |
| Long-eared owl | *Asio otus* | Uncommon summer and winter resident | BR/BLM | Pinyon/juniper woodlands, woody riparian growth, often occupy magpie nests | -- |
| Short-eared owl | *Asio flammeus* | Rare migrant and winter visitor | -- | NA | -- |
| Boreal owl | *Aegolius funereus* | Uncommon permanent resident | BR (Flat Tops)/-- | Mature and old-growth spruce fir forest | -- |

## Table 3-19. Raptor Species and Habitats

| Species | Scientific Name | Residency Status | Breeding in WRFO Planning Area/ Recorded to Nest on BLM[1] | Nesting Habitat | Special Status |
|---|---|---|---|---|---|
| Northern saw-whet owl | *Aegolius acadicus* | Common summer resident and migrant, uncommon winter resident | BR/BLM | All forest types | -- |

SOURCE: Righter et al. 2004 and the BLM databases.

NOTES:

[1]BR – breeding in WRFO Planning Area

BLM – recorded breeding on BLM-administered public lands

NA = not applicable

## Other Important Bird Species

More than 200 species of nongame birds, including neotropical migratory species, have been documented in the WRFO Planning Area, of which 60 percent are breeding or resident species. Many of the more uncommon breeding species are associated with riparian, wetland, or aquatic habitats, or other habitats such as aspen or spruce fir that are of limited extent on BLM lands in the WRFO Planning Area, but are common within the region. Species that occur in pinyon/juniper and sagebrush, such as juniper titmouse (*Baeolophus ridgwayi*) and gray flycatcher (*Empidonax wrightii*), are common in the WRFO Planning Area but have restricted continental distributions.

Table 3-20, provides a list of bird species present in the WRFO Planning Area that have been identified as being of conservation concern by BLM and FWS. The most recent FWS list of Birds of Conservation Concern identifies migratory and non-migratory bird species that, without conservation actions, may become candidates for listing under the ESA (FWS 2008). The birds listed below appear as Birds of Conservation Concern for Bird Conservation Region 16 (Southern Rocky Mountains/Colorado Plateau) and Region 6 (Mountain-Prairie Region). The BLM has recently disseminated a draft Strategic Plan for Migratory Bird Conservation (April 2013) that lists BLM Priority Migratory Birds, which are species of concern and management focus that supplement the list of FWS Birds of Conservation Concern. This strategic plan is intended to aid implementation of the 2010 MOU between the FWS and the BLM (To Promote the Conservation of Migratory Birds) in compliance with Executive Order 13186 (66 Federal Register 3853, January 17, 2001).

## Table 3-20. Other Important Bird Species

| Species | Scientific Name | Habitat Affiliation | Distribution | Estimated Miles[2] of Potential Habitat (BLM-administered) | Abundance[1] |
|---|---|---|---|---|---|
| **Breeding Species** | | | | | |
| Mountain plover | *Charadrius montanus* | Grassland in Wyoming big sagebrush matrix | 1 historic site | 5 | Rare, peripheral |
| Yellow-billed cuckoo[2] | *Coccyzus americanus* | Major: Riverine riparian. Minor: Urban deciduous | 1 historic report | 1 | Rare |

**Table 3-20. Other Important Bird Species**

| Species | Scientific Name | Habitat Affiliation | Distribution | Estimated Miles[2] of Potential Habitat (BLM-administered) | Abundance[1] |
|---|---|---|---|---|---|
| Lewis's woodpecker | *Melanerpes lewis* | Mature ponderosa pine, Gambel oak, cottonwood riparian | Localized | 5 | Uncommon |
| Williamson's sapsucker | *Sphyrapicus thyroideus* | Major: mature pinyon/juniper, Douglas-fir, spruce-fir, aspen, Minor: cottonwood | Widespread | 300 | Uncommon |
| Red-naped sapsucker | *Sphyrapicus nuchalis* | Major: aspen. Minor: urban deciduous | Widespread | 10 | Fairly common |
| Olive-sided flycatcher | *Contopus cooperi* | Major: Douglas fir and spruce fir. Minor: riverine cottonwood | Widespread | 50 | Fairly common |
| Willow flycatcher | *Empidonax traillii* | Willow riparian | Localized | 1 | Fairly common |
| Horned lark | *Eremophila alpestris* | Grassland/barren in salt desert and mountain big sagebrush | Widespread | 750 | Common |
| Juniper titmouse | *Baeolophus ridgwayi* | Pinyon-juniper woodland | Widespread | 1,000 | Common |
| Veery | *Catharus fuscescens* | Cottonwood-willow riparian | Localized | 1 | Uncommon |
| Sage thrasher | *Oreoscoptes montanus* | Upland big sagebrush | Abundance varies, but widespread | 500 | Locally abundant |
| Loggerhead shrike | *Lanius ludovicianus* | Major: Wyoming and basin big sagebrush, greasewood in saltbush matrix. Minor: Utah juniper/Wyoming big sagebrush | Localized | 275 | Fairly common |
| Gray vireo | *Vireo vicinior* | Utah juniper/black and Wyoming big sagebrush below 6300' | Localized | 150 | Fairly common |
| Pinyon jay | *Gymnorhinus cyanocephalus* | Pinyon/juniper woodlands | Widespread | 1,000 | Common |
| Yellow warbler | *Setophaga petechia* | Lower elevation aspen, woody riparian, urban | Widespread | 15 | Abundant |
| Virginia's warbler | *Vermivora virginiae* | Major: mountain shrub. Minor: woody riparian, pinyon/juniper | Widespread | 450 | Common |

Chapter 3 – Affected Environment

### Table 3-20. Other Important Bird Species

| Species | Scientific Name | Habitat Affiliation | Distribution | Estimated Miles[2] of Potential Habitat (BLM-administered) | Abundance[1] |
|---|---|---|---|---|---|
| Black-throated gray warbler | *Dendroica nigrescens* | Pinyon/juniper woodlands | Widespread | 1,000 | Abundant |
| Green-tailed towhee | *Pipilo chlorurus* | Big sagebrush, mountain shrubland | Widespread | 1,050 | Abundant |
| Brewer's sparrow[2] | *Spizella breweri* | Big sagebrush, saltbush | Widespread | 600 | Common to Abundant |
| Vesper sparrow | *Pooecetes gramineus* | All shrubland and grassland types | Widespread | 1,250 | Abundant |
| Sage sparrow | *Amphispiza belli* | Saltbush, Wyoming big sagebrush | Localized | 200 | Common |
| Lark bunting | *Calamospiza melanocorys* | Mid-elevation Wyoming big sagebrush | Localized | 50 | Erratic, absent to uncommon |
| Cassin's finch | *Haemorhaus cassinii* | Major: conifer/aspen; minor: pinyon-juniper | Widespread | 850 | Fairly common |
| **Strict Migrants (No Evidence of Breeding)** | | | | | |
| Snowy plover | *Chardarius alexandrinus nivosus* | Rio Blanco Lake SWA[3] | -- | -- | Uncommon |
| American avocet | *Recurvirostra americana* | Larger reservoirs and stockponds | -- | -- | Fairly common |
| Solitary sandpiper | *Tringa solitaria* | Widely scattered reservoirs, stock-tanks, beaver ponds | -- | -- | Uncommon |
| Willet | *Catoptrophorus semipalmatus* | Larger reservoirs and stockponds | -- | -- | Common |
| Upland sandpiper | *Bartramia longicauda* | Hayland, high-elevation grassland | -- | -- | 2 records |
| Long-billed curlew[2] | *Numenius americanus* | Rio Blanco Lake SWA, Piceance Creek, Wolf Creek, Coyote Basin | -- | -- | Rare |
| Marbled godwit | *Limosa fedoa* | Rio Blanco Lake SWA | -- | -- | Fairly common |
| Sanderling | *Calidris alba* | Rio Blanco Lake SWA | -- | -- | Rare |
| White-rumped sandpiper | *Calidris fuscicollis* | Rio Blanco Lake SWA | -- | -- | Rare |
| Caspian tern | *Sterna caspia* | Rio Blanco Lake SWA, Kenney Reservoir | -- | -- | Rare |
| Short-eared owl | *Asio flammeus* | Cathedral Bluffs, Wolf Creek, Rio Blanco SWA | -- | -- | Rare |

**Table 3-20. Other Important Bird Species**

| Species | Scientific Name | Habitat Affiliation | Distribution | Estimated Miles[2] of Potential Habitat (BLM-administered) | Abundance[1] |
|---|---|---|---|---|---|
| Black swift | *Cypseloides niger* | No records from BLM | -- | -- | NA |
| Rufous hummingbird | *Selasphorus rufus* | Widespread | -- | -- | Common |
| Bell's vireo | *Vireo bellii* | Lower White River valley | Peripheral | -- | 1 record |
| Bendire's thrasher | *Toxostoma bendirei* | White River valley | Peripheral | -- | 1 record |
| Blackpoll warbler | *Dendroica striata* | White River valley | -- | -- | Rare |
| McCown's longspur | *Calcarius mccownii* | Little Beaver Creek, Wolf Creek | -- | -- | Rare |
| Chestnut-collared longspur | *Calcarius ornatus* | Piceance Basin (1970s record, no details) | -- | -- | NA |

SOURCE: Combination of WRFO data and Birds of Western Colorado Plateau and Mesa Country (Robert Righter, Rich Levad, Coen Dexter, and Kim Potter). 2004.

NOTES:

[1]Abundance:

Breeding: abundant – always encountered in number; common – always encountered in lesser numbers; fairly common –usually encountered in lesser numbers; uncommon – infrequently encountered on annual basis; rare – less than 3 breeding pairs or only encountered on decade basis.

Migration: abundant – encountered daily in number; common – encountered daily in less number; fairly common – consistently recorded on annual basis; uncommon – recorded most years in very small numbers (<10); rare – recorded only infrequently on decade basis.

[2]Species discussed in detail in the Special Status Species section.

[3]SWA = State Wildlife Area

## Other Nongame Species

Based on CPW records, 47 species of nongame mammals, 6 amphibian species, and 14 reptiles are known or suspected to occur as seasonal or permanent residents. The status of small mammals associated with the pinyon/juniper and sagebrush habitat in the Piceance Basin has been documented in a limited sense through oil shale baseline studies from the 1970s and 1980s. The status of other groups, such as bats, reptiles, and amphibians, are poorly or sporadically documented.

### 3.3.2.2  Fish

#### Aquatic Habitat

Several lakes are present along or near the White River in the WRFO Planning Area, including Trappers Lake, Lake Avery, Rio Blanco Lake, and Kenney Reservoir, but are not managed by BLM. The only BLM-administered pond or lake fisheries are small and comprise intermittent or marginal fish habitat. They include Divide Creek Reservoir, a 5-acre pond that has supported black bullhead and channel catfish, and Peterson Draw Reservoir, a 2-acre impoundment stocked intermittently with rainbow trout.

*Chapter 3 – Affected Environment*

The BLM manages portions of 80 perennial stream systems in the WRFO Planning Area, of which 21 are known to support nongame and sport fish (Table 3-21 and Map 3-3). Including the White River, the BLM administers about 107 miles of stream fisheries. Many BLM-administered reaches consist primarily of small perennial headwater reaches in the Piceance and Douglas Creek areas. Most of these streams have few fish species present and are rated as fair condition, with a trend of static or improving. With few exceptions, fish abundance and distribution is limited by marginal or fluctuating flows and/or degraded stream conditions. Limitations present for these habitats include low flow, lack of woody vegetation, and high sediment. In addition, BLM manages only short, discontinuous reaches on most of these streams.

The BLM manages about 22.4 miles of the lower White River and 3.6 miles of the upper White River and North Fork of the White River. These rivers have a greater diversity of fish species than most of the streams on BLM-managed lands, including more game fish, and are in fair to good condition (BLM 2007b). Many BLM-managed segments are short and isolated, making effective management problematic. The other major river in the region, the Yampa River, occurs on the north edge of the WRFO Planning Area but is entirely within Dinosaur National Monument.

### Table 3-21. Stream Fish Habitats Managed by BLM

| Geographic Reference Area/ Streams | Total Length on BLM-Administered Lands (miles) | Cumulative Length of BLM Reaches (over 0.25 mile) (miles) | Fishery Type | Condition and Trend | Problems/ Limitations |
|---|---|---|---|---|---|
| **Danforth Hills/Jensen** | | | | | |
| Big Beaver Creek | 0.7 | 0.7 | Colorado River Cutthroat trout (CRCT), mottled sculpin | Good | Colorado River cutthroat trout Conservation Population. |
| Milk Creek | 0.3 | 0 | Colorado River cutthroat trout | Good | Limited WRFO involvement; CRCT Core Conservation Population |
| Coal Creek | 0.3 | 0.2 | Brook trout, cutthroat trout, mountain sucker, mottled sculpin | Good | Short isolated reaches |
| **Piceance** | | | | | |
| Black Sulphur Creek | 3.6 | 3.4 | Colorado River cutthroat trout, mountain sucker, speckled dace, rainbow trout | Fair-static | CRCT Conservation Population, high sediment, limited flow |
| East Willow Creek | 2.2 | 2.0 | Rainbow trout | Fair-static | Low flow, woody expression |
| Fawn Creek | 1.2 | 1.0 | Brook trout, mountain sucker, speckled dace | Fair-static | Woody expression, limited flow |
| Piceance Creek | 6.1 | 4.7 | Speckled dace, rainbow trout, brook trout, mountain sucker, flannelmouth sucker | Fair-static | Short and isolated reaches, woody expression, irrigation drawdowns |
| Willow Creek | 1.0 | 0.4 | Speckled dace, rainbow trout, brook trout, mountain sucker | Fair-static | Short, isolated reaches; wood expression |

**Table 3-21. Stream Fish Habitats Managed by BLM**

| Geographic Reference Area/ Streams | Total Length on BLM-Administered Lands (miles) | Cumulative Length of BLM Reaches (over 0.25 mile) (miles) | Fishery Type | Condition and Trend | Problems/ Limitations |
|---|---|---|---|---|---|
| Yellow Creek | 6.0 | 6.0 | Speckled dace, mountain sucker, flannelmouth sucker | Fair-static in upper, decline in lower | High salinity |
| **Douglas/Cathedral** | | | | | |
| Bear Park Creek | 1.9 | 1.7 | Speckled dace, Colorado River cutthroat trout | Fair-improve | CRCT Conservation Population, woody expression, limited flow |
| Bitter Creek | 1.9 | 1.9 | Brook trout, cutthroat trout | Fair-static | Woody expression |
| Brush Creek | 0.2 | 0 | Colorado River cutthroat trout, rainbow trout | Fair-static | Woody expression; bank stability; short, isolated reach |
| Cathedral Creek | 2.5 | 2.0 | Speckled dace, Colorado River cutthroat trout | Fair-improve | CRCT Conservation Population, irrigation drawdown |
| Douglas Creek | 23.5 | 23.0 | Speckled dace | Fair-improve | Heavy sediment, intermittent flow |
| East Douglas Creek | 15.2 | 14.6 | Brook trout (historic), Colorado River cutthroat trout, speckled dace | Fair-static | CRCT Conservation Population, channel barriers from large beaver dams, high sediment |
| Lake Creek | 2.8 | 2.8 | Colorado River cutthroat trout conservation population | Fair-static | CRCT Conservation Population, woody expression |
| Right Fork of Lake Creek | 1.1 | 1.1 | Colorado River cutthroat trout conservation population | Fair-static | CRCT Conservation Population, mass wasting |
| Soldier Creek | 2.1 | 2.1 | Colorado River cutthroat trout, conservation population brook trout (historic) | Fair-static | CRCT Conservation Population, mass wasting |
| West Douglas Creek | 7.2 | 7.2 | Speckled dace | Fair-static | Heavy sediment, intermittent flow |
| **White River** | | | | | |
| Lower White River | 22.4 | 14.3 | Mountain whitefish, roundtail chub, Colorado pikeminnow, speckled dace, bluehead sucker, flannelmouth sucker, mottled sculpin, rainbow trout, channel catfish, black bullhead | Fair/good-static | Bank stability (Tamarisk and Russian olive infestations), flow modification, short and isolated stretches |

**Table 3-21. Stream Fish Habitats Managed by BLM**

| Geographic Reference Area/ Streams | Total Length on BLM-Administered Lands (miles) | Cumulative Length of BLM Reaches (over 0.25 mile) (miles) | Fishery Type | Condition and Trend | Problems/ Limitations |
|---|---|---|---|---|---|
| North Fork White River | 1.6 | 0 | Rainbow trout, brook trout, brown trout, mountain whitefish, cutthroat trout, mountain sucker | Good-static | Short, isolated reaches |
| Upper White River | 2.0 | 0.3 | Brown trout, rainbow trout, mountain sucker, mountain whitefish, bluehead sucker, flannelmouth sucker, speckled dace, roundtail chub | Fair/good-static | Short, isolated reaches |
| **Crooked Wash/Deep Channel** | | | | | |
| Crooked Wash | 2.4 | 2.3 | Speckled dace, mountain sucker, flannelmouth sucker | Fair-static | Intermittent flow, limited site capability |
| **Colorado River** | | | | | |
| East Middle Fork of Parachute Creek | 0 | 0 | Colorado River cutthroat trout | Good | Contributing uplands; managed principally through Roan Plateau RMP |
| Brush Creek | 0.2 | 0 | Colorado River cutthroat trout | Poor/fair | Contributing uplands; limited flow, woody expression |
| Carr Creek (mainstem) | 0 | 0 | Native cutthroat trout (lineage greenback) | Unknown | Minor contributing uplands |
| Roan Creek (mainstem) | 0 | 0 | Native cutthroat trout (lineage greenback) | Unknown | Minor contributing uplands |

### Key Aquatic Species

The primary cold water game fish species are trout, including Colorado River cutthroat (*Oncorhynchus clarki pleuriticus*), rainbow (*Oncorhynchus mykiss*), brook (*Salvelinus fontinalis*), and brown trout (*Salmo trutta*). Mountain whitefish are also present in the upper White River and North Fork of the White River. Cool water game fish species include northern pike (*Esox lucius*), yellow perch (*Perca flavescens*), smallmouth bass (*Micropterus dolomieu*), largemouth bass (*Micropterus salmoides*), black crappie (*Pomoxis nigromaculatus*), bluegill (*Lepomis macrochirus*), green sunfish (*Lepomis cyanellus*), and black bullhead (*Ameiurus melas*), which are present primarily in a 100-acre off-channel reservoir along the White River (Rio Blanco Lake State Wildlife Area) and in Kenney Reservoir (a 400-acre impoundment on the White River). Channel catfish (*Ictalurus punctatus*) and black bullhead are present in the lower White River.

Non-game fish species include native species such as mountain sucker (*Catostomus platyrhynchus*), speckled dace (*Rhinichthys osculus*), bluehead sucker (*Catostomus discobolus*), flannelmouth sucker (*Catostomus latipinnis*), and mottled sculpin (*Cottus bairdi*), and non-natives such as common carp (*Cyprinus carpio*), red shiner (*Cyprinella lutrensis*), and fathead minnow (*Pimephales*

*promelas*). Speckled dace, and to a lesser extent, mountain suckers, are the most widely distributed native non-game fish, occurring regularly in many of the WRFO's perennial streams. The other native fish occur primarily in the White River and less frequently in its larger tributaries (Table 3-21). These fish generally spawn over gravel in the spring through mid-summer months, where eggs adhere to or drop among the gravel. Eggs incubate in the gravels until the fry are able to swim through the gravel and drift into quiet backwater nurseries. Populations of native fish are believed to be stable above Taylor Draw Dam. Native fish populations dominated the White River drainage prior to closure of Taylor Draw Dam in 1984. Since then, non-native fish including red shiner, fathead minnow, and to a lesser extent common carp and predatory game fish, are common in the lower White River (BLM 2007b).

### 3.3.2.3   Proposed Dinosaur Trail MLP

The majority of the Dinosaur Trail MLP is located within GMU 10 and provides habitat for the Rangely deer herd (Maps 3-4 and 3-5), the Blue Mountain elk herd (Maps 3-6 and 3-7), and the Dinosaur pronghorn herd (Map 3-8). The area also provides habitat for bear, mountain lion, dusky grouse, and a variety of raptors and other bird species. Blue Mountain supports the largest sage-grouse population within the WRFO (Map 3-10). The lower White River as well as the Divide Creek and Peterson Draw Reservoirs also occur within the MLP and provide habitat for aquatic species.

## 3.3.3   Special Status Species - Animals

Special status species are those species with populations that have declined to the point of substantial federal or state agency concern. Special status species are listed by the FWS under the federal ESA; species listed as endangered, threatened or special concern by the CPW; and those placed on the Colorado BLM State Director's Sensitive Species List. Federal threatened and endangered species and designated critical habitat are managed in cooperation with the FWS and other federal agencies in support of recovery. For listed species that have not had critical habitat identified and designated, BLM cooperates with the FWS and CPW to determine and manage habitats to support the species. Candidate species are managed to maintain viable populations, thereby preventing federal listing from occurring. State of Colorado and BLM sensitive species are treated similarly. The BLM, FWS, and the State of Colorado have developed formal and informal agreements to provide guidance on the management of species. Consultation is required on any action proposed by the BLM or another federal agency that may affect a listed, proposed, or candidate species or adversely affect designated of critical habitat.

### 3.3.3.1   Federal Endangered, Threatened, Proposed and Candidate Animal Species

There are 10 federally listed animal species that may occur in the WRFO Planning Area, including 2 candidates for federal listing (Table 3-22). Six endangered or threatened animal species are known to occur in the WRFO Planning Area, including black-footed ferret, Canada lynx (*Lynx canadensis*), and four Colorado River fish species. Critical habitat for the four fish species is present in the WRFO Planning Area. The only threatened or endangered animals that make consistent use of BLM land include black-footed ferret and Colorado pikeminnow (*Ptychocheilus lucius*). The presence of black-footed ferret is associated with a reintroduction program.

Increasing industrial development in the WRFO Planning Area could increase pressure on some federally listed and candidate species and their habitats. Since these species are protected under the ESA, federally approved developments would be subject to review under the Act and to implementation of conservation measures to protect the species and their habitats. Because of these protections, threats that could jeopardize the populations would not occur. However, additional or

more rigorous conservation measures may be needed for some species or populations in order to avoid or offset direct or indirect effects of development.

Threats to species that occur in relatively rare habitats could generally be avoided during facility siting. Special status fish are at risk from changes in water quality or flow patterns, and the condition of aquatic habitats supported by west slope streams are generally rated as declining in Colorado's Wildlife Conservation Strategy (BLM 2007b).

### Table 3-22. Federally Listed Animal Species that May Occur in the WRFO Planning Area

| Name | Species | Federal Status | Designated Critical Habitat in WRFO Planning Area |
|------|---------|---------------|--------------------------------------------------|
| **Birds** | | | |
| Mexican spotted owl | *Strix occidentalis lucidis* | Threatened | No |
| Greater sage-grouse | *Centrocercus urophasianus* | Candidate | No |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | Threatened | No |
| **Mammals** | | | |
| Black-footed ferret | *Mustela nigripes* | Endangered, Experimental Non-essential population | No |
| Canada lynx | *Lynx canadensis* | Threatened | No |
| Gray wolf | *Canis lupus* | Endangered | No |
| **Fish** | | | |
| Colorado pikeminnow | *Ptychocheilus lucius* | Endangered | Yes |
| Bonytail | *Gila elegans* | Endangered | Yes |
| Humpback chub | *Gila cypha* | Endangered | Yes |
| Razorback sucker | *Xyrauchen texanus* | Endangered | Yes |
| Lineage greenback cutthroat trout | *Oncorhynchus clarkii stomias* | Threatened | No |

## Birds

### Mexican Spotted Owl
There are no substantiated reports of Mexican spotted owls (*Strix occidentalis lucidis*) within the WRFO Planning Area, although small and widely separated areas of suitable habitat may be present at higher elevations along the Colorado-White River divide, primarily in the Douglas and Evacuation Creek drainages. The nearest recorded occurrences involve unmated birds from Dinosaur National Monument and the upper Book Cliffs in Utah. Habitat includes deep canyons with dense old-growth conifers that exhibit high canopy closure and stand density.

### Greater Sage-Grouse
Greater sage-grouse are discussed with dusky grouse and Columbian sharp-tailed grouse in Section 3.3.2.1.

### Western yellow-billed Cuckoo
The western yellow-billed cuckoo (*Coccyzus americanus occidentalis*) has declined substantially in western Colorado in the 20th century and the FWS recently extended threatened status for the bird

under the Endangered Species Act. There are no recent records of this species from the WRFO Planning Area.

Western populations of cuckoo are almost exclusively associated with native cottonwood-willow gallery forests along river corridors. Based on work in California, the most important determinants of suitable breeding habitat are patch size, habitat continuity, canopy closure, and understory condition. Although breeding pairs were found to occupy habitat patches as small as 10 acres, patches smaller than 40 acres, less than 100 meters wide, or with canopy closure of less than 40 percent were considered unsuitable.

Dense stands of cottonwood along the White River are widely separated and normally do not exceed 328 feet in width or 5 acres in areal extent; however the 3 largest stands are about 10 acres each. Under historical agricultural use, these stands tend to possess relatively open understories. Subcanopy shrubs in Fremont cottonwood stands below Stadtman Mesa (below Yellow Creek) are increasingly represented by invasive Russian olive and tamarisk. Cottonwood stands below Rangely are completely dominated by these species.

There is little likelihood that BLM-administered parcels along the White River and North Fork are capable of independently supporting a breeding pair of cuckoo. Although privately-owned riverine habitats above Yellow Creek (narrowleaf cottonwood associations) may provide suitable habitat, their configuration is likely poorly suited for the support of breeding birds. The BLM administers very little of this river reach (about 4 percent in 21 parcels). Below Yellow Creek, gallery forests are generally comprised of Fremont cottonwood with little desirable subcanopy shrubs (primarily tamarisk and Russian olive). The BLM administers a larger percentage of this river reach, but of the 17 BLM parcels between Yellow Creek and Taylor Draw dam, only 3 parcels (or about 3 percent of the reach) support willow and none of those parcels have cottonwood stands closely associated with them, private or otherwise.

## Mammals

### Black-footed Ferret

Although black-footed ferrets occurred historically in the WRFO Planning Area, they were extirpated by the mid-1980s or earlier. As part of species recovery, excess ferrets in the captive breeding population are being reintroduced into the wild in several states. Northwestern Colorado and northeastern Utah are one of ten primary recovery sites (Wolf Creek Work Group et al. 2001). Recovery goals include a pre-breeding population of 1,500 free-ranging breeding adults in 10 or more populations, with not fewer than 30 breeding pairs per population.

Reintroduced ferrets and their offspring in northwestern Colorado and northeastern Utah are designated as a nonessential experimental population. All of the WRFO Planning Area within Rio Blanco and Moffat counties west of SH 13 to the Utah state line is within the boundaries designated for the nonessential experimental population. Within this larger area, two ferret management areas have been designated for reintroduction efforts (Map 3-9). The Wolf Creek ferret management area occupies about 81 square miles, covers about half of the white-tailed prairie dog colonies within the WRFO Planning Area, and is part of a larger complex of prairie dog towns that extends along US 40 into Utah. Since 2001, about 189 ferrets have been released in the Wolf Creek management area. Minimum year-end population estimates have increased from zero in 2001 to a range of 13 to 16 in 2005 through 2007. Since reproduction was first confirmed in 2005, the number of wild born kits has progressively increased from one in 2005, two in 2006, and at least five in 2007. First detected in 2008, ferret and prairie dog populations in the Wolf Creek Management area underwent sharp decline from a plague epizootic. A single surviving 3-year old ferret remained in Wolf Creek in

2010 and is likely now dead. The remaining ferret recorded in the WRFO during the 2010 survey effort was found along the Utah border and was believed to be a wild-borne kit that originated from Utah. Further ferret releases in the WRFO have been suspended until prey populations recover sufficiently to support reintroductions. The Coyote Basin management area occupies about 10 square miles in extreme western Rio Blanco County, and is intended to complement reintroduction efforts in the primary management zone in the adjoining part of Utah.

**Canada Lynx**
Lynx occurred historically in the WRFO Planning Area, and currently occur in Colorado primarily in the southwestern part of the state where CPW released 204 lynx between 1999 and 2005. Potential habitat in the WRFO Planning Area occurs primarily on the White River National Forest, and consists of mature spruce fir forests (see Map 3-9). Dispersing lynx have been found north of I-70, and into adjacent states such as Wyoming and Utah (Schenk 2006). Based on observations of dispersing lynx, individuals may occur occasionally in the WRFO Planning Area, but there is little suitable denning or winter habitat on the largely diminutive and widely separated parcels of BLM land east of SH 13.

**Gray Wolf**
Gray wolves (*Canis lupus*) occurred historically throughout the WRFO Planning Area, but are considered to be extirpated in Colorado. Gray wolves introduced into Yellowstone National Park provide the closest source of dispersing individuals, and a probable wolf sighting was made near the Wyoming border near Walden in February 2006. Based on this sighting, wolves may occur sporadically in the WRFO Planning Area now and in the future. All of Colorado north of I-70 (including the entire WRFO Planning Area) is part of the Western Distinct Population Segment, under the FWS Section 4(d) rule, which allows for management of wolves dispersing from the reintroduced population in Yellowstone.

**Upper Colorado River Basin Fish**

**Colorado Pikeminnow, Bonytail, Humpback Chub, and Razorback Sucker**
The lower White River and its 100-year floodplain downstream from Rio Blanco Lake were designated as critical habitat for Colorado pikeminnow in 1994. The White River is used throughout the year by adult and subadult Colorado pikeminnow. Following closure of Taylor Draw Dam in 1984, pikeminnow were confined to the 32.5 miles of the White River below the dam. Based on current information, the White River in Colorado does not appear to support spawning activity, young-of-year nurseries, or juvenile concentrations areas, but portions of the White River in Utah serve as concentration areas for adults and juveniles.

Critical habitat for all four endangered fish species is present in the Yampa River and its 100-year floodplain within Dinosaur National Monument. Bonytail (*Gila elegans*), humpback chub (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*) do not occur on BLM lands within the WRFO.

All waters within the WRFO Planning Area are associated with the Upper Colorado River Basin. The White River is an important flow contributor to downstream fisheries in the Green River in Utah, which provides vital nursery habitat and most of the Upper Colorado River Basin's remaining spawning and juvenile concentration areas. Kenney Reservoir operates on a run-of-the-river basis, which generally maintains natural flow regimes.

The FWS has determined that any federally authorized depletion from the Upper Colorado River Basin has an adverse effect on listed Colorado River fishes. Depletions adversely affect listed fish populations by reducing spring peak and base flows, which limits access to and the extent of

off-channel waters, such as backwaters, eddies, and oxbows. These habitats are needed as larval and young-of-the-year rearing areas. In addition, reductions in flow velocity and depth adversely affect spawning and overwinter survival. Moderated flow regimes favor introduced fish populations, many of which are strongly competitive with or prey on endemic fish. The BLM prepared a 2008 statewide programmatic Biological Assessment (BA) that analyzed depletion impacts to the four Colorado River fishes attributable to current and projected natural gas development in the WRFO Planning Area and elsewhere in Colorado (BLM 2008c).

### 3.3.3.2 Other Special Status Species – Animals

Other special status species include Colorado state endangered, threatened, and special status species, and BLM sensitive species. The animal species are listed in Table 3-23, and each of these species is discussed below. Management actions pertaining to special status species, if applicable, are incorporated in the alternatives and described in more detail in Chapter 2.

### Table 3-23. Other Special Status Animal Species

| Name | Species | BLM Status | State Status |
|---|---|---|---|
| **Birds** | | | |
| Northern goshawk | *Accipiter gentilis* | Sensitive | -- |
| Burrowing owl | *Athene cunicularia* | Sensitive | Threatened |
| Barrow's goldeneye | *Bucepahala islandica* | Sensitive | -- |
| Ferruginous hawk | *Buteo regalis* | Sensitive | Special concern |
| Greater sage-grouse | *Centrocerus urophasianus* | Sensitive | Special concern |
| Western snowy plover | *Charadrius alexandrinus nivosus* | Sensitive | Special concern |
| Mountain plover | *Charadrius montanus* | Sensitive | Special concern |
| Black tern | *Chlidonias niger* | Sensitive | -- |
| American peregrine falcon | *Falco peregrinus anatum* | Sensitive | Special concern |
| Greater sandhill crane | *Grus canadensis tabida* | -- | Special concern |
| Bald eagle | *Haliaeetus leucocephalus* | Protected | Threatened |
| Long-billed curlew | *Numerus americanus* | Sensitive | Special concern |
| White-faced ibis | *Plegadis chihi* | Sensitive | -- |
| Columbian sharp-tailed grouse | *Tympanuchus phasianellus columbiana* | Sensitive | Special concern |
| Brewer's sparrow | *Spizella breweri* | Sensitive | -- |
| **Mammals** | | | |
| Townsend's big-eared bat | *Corynorhinus townsendii* | Sensitive | Special concern |
| Spotted bat | *Euderma maculatum* | Sensitive | -- |
| Wolverine | *Gulo gulo* | -- | Endangered |
| River otter | *Lontra canadensis* | -- | Threatened |
| Fringed myotis | *Myotis thysanodes* | Sensitive | -- |
| Big free-tailed bat | *Nyctinomops macrotis* | Sensitive | -- |
| White-tailed prairie dog | *Cynomys leucurus* | Sensitive | -- |
| **Amphibians** | | | |
| Boreal western toad | *Bufo boreas boreas* | Sensitive | Endangered |
| Northern leopard frog | *Rana pipiens* | Sensitive | Special concern |
| Great Basin spadefoot | *Spea intermontana* | Sensitive | Special concern |
| Milk snake | *Lampropeltis triangulum taylori* | Sensitive | Special concern |

**Table 3-23. Other Special Status Animal Species**

| Name | Species | BLM Status | State Status |
|------|---------|-----------|--------------|
| **Reptiles** | | | |
| Midget faded rattlesnake | *Crotalus oreganus concolor* | Sensitive | Special concern |
| **Fish** | | | |
| Bluehead sucker | *Catostomus discobolus* | Sensitive | -- |
| Flannelmouth sucker | *Catostomas latipinnis* | Sensitive | Special concern |
| Mountain sucker | *Catostomas platyrhynchus* | Sensitive | Special concern |
| Roundtail chub | *Gila robusta* | Sensitive | Special concern |
| Colorado River cutthroat trout | *Oncorhynchus clarki pleuriticus* | Sensitive | Special concern |

SOURCE: CDOW 2007.

## Birds

### Northern Goshawk

Northern goshawks are generally presumed to nest most frequently in large blocks of forested habitats above 7,000 feet in the southern and eastern portions of the WRFO Planning Area. There are six historic northern goshawk nest sites and nine more recent nest records on BLM lands in the WRFO Planning Area. Most of the nests have been located in mature pinyon/juniper woodlands as low as 6,500 feet in the Piceance Basin. Goshawk breeding activity has also been observed in higher elevation pinyon/juniper woodlands, particularly those with intermixed stands of Douglas fir in the Piceance Basin, Douglas Creek, and Evacuation Creek basins. Mature aspen woodlands on Oak Ridge, Wilson Creek, and the upper Piceance and Douglas basins also provide suitable goshawk nesting habitat. The primary threats to northern goshawk are habitat loss and degradation (Squires and Kennedy 2006). Overall threats to northern goshawks in the Southern Rockies and Colorado Plateau are considered slight to moderate and populations in this region are stable (Partners in Flight 2005).

### Burrowing Owl

Burrowing owls are uncommon summer residents, and are associated with white-tailed prairie dog colonies. They also occasionally use burrows of badgers and ground squirrels. It has been suggested that burrowing owl populations appear to be declining in western Colorado and only 20 pairs were found during extensive surveys throughout western Colorado in 2002 (Righter et al. 2004). However burrowing owl populations in the WRFO are thought to have remained relatively stable over the past five years with WRFO staff normally aware of a half-dozen nest sites annually. In 2009, the WRFO conducted comprehensive surveys for these owls in the Wolf Creek Management Area, Coal Oil Basin, and areas south of Dinosaur, CO. Thirty birds were observed with 18 documented nest sites. The primary threat in the WRFO is periodic bouts of epizootic disease that suppresses prairie dog populations and reduces the availability of suitable nesting habitat. Lesser threats include physical loss of habitat, removal or control of burrowing animals that provide nest sites, disturbance at the nest area by humans or dogs, and collisions with vehicles (CDOW 2009).

### Barrow's Goldeneye

Barrow's goldeneye (*Bucepahala islandica*) nests in tree cavities at remote ponds in the Flat Tops Wilderness, which is the only known breeding location in Colorado and the southernmost portion of their breeding range (Righter et al. 2004). During the earlier portions of the winter, these birds occur on the river and ponds along the White River and Piceance Creek. Threats to Barrow's goldeneye have not been identified.

**Ferruginous Hawk**

This species occurs from Elk Springs west to Dinosaur and south to Rangely. Their distribution coincides closely with that of white-tailed prairie dogs which, along with cottontail rabbits, form the bulk of the birds' prey base. Based on a ferruginous hawk monitoring study conducted from 1981 through 1988, there were 94 nest sites distributed among approximately 45 breeding territories within the WRFO Planning Area, of which an average of 18 were active annually (BLM 1994). The most common nest sites were Utah junipers and artificial nest platforms built from 1981-1986 as part of a coal mine mitigation program. Dead junipers, ground nests, and promontories were also used. Nests were most likely to be occupied when there was little human activity within one mile.

Ferruginous hawk nesting effort and success are strongly correlated with their prey base and populations are prone to wide fluctuations. Surveys conducted by the FWS in 1991 and 1992 along the US 40 corridor documented 5 and 14 active nests, respectively (BLM 2007b). Aerial surveys were conducted in 2009 and 2011 to document nest activity. All historical nest locations (natural and human made) were revisited in addition to areas with suitable habitat. No nests were confirmed during these efforts. With no nests now attributable to artificial platforms, there are presumably fewer breeding territories available, but both prairie dog and cottontail populations have remained high and there have been no further land use influences which would be expected to suppress territory occupancy. Ferruginous hawks are also uncommon migrants and rare winter residents in the WRFO Planning Area. Threats to ferruginous hawks include habitat loss and degradation from energy development, altered fire regimes, invasive plant species, human disturbance during the reproductive period, severe reductions in prey base due to plague, and other causes (Collins and Reynolds 2005).

**Western Snowy Plover**

The western snowy plover (*Charadrius alexandrinus*) is a rare spring migrant that has been recorded regularly (13 dates) from Rio Blanco Lake. There are no fall seasonal records from Colorado. They use open shorelines, sandbars, and mudflats during migration. The primary threats are degradation of nesting and wintering habitats, which do not occur on the WRFO.

**Mountain Plover**

The mountain plover (*Charadrius montanus*) is a casual summer resident and spring and fall migrant. Several mountain plovers summered in Mormon Gap area along the Colorado/Utah state line in 1979-1980, and there have been a few observations of migrants in western Colorado. When found in western Colorado, they are typically observed in flat areas of sparse desert shrublands and grasslands, usually in prairie dog towns. Threats to mountain plover include loss of native habitat, loss of prairie dogs, reduced nesting success on agricultural lands, oil and gas development, and unsuitable grazing practices.

**Black Tern**

The black tern (*Chlidonias niger*) is an uncommon spring migrant, rare fall migrant, and casual summer visitor. There are a number of spring records from Rio Blanco Lake and Divide Creek Reservoir. Migrant birds usually occur in flocks of two to six. There is only one record of nesting in western Colorado, on a sandbar in the Yampa River eight miles north of Elk Springs in Moffat County (Righter et al. 2004). They primarily occur over open water of larger ponds and reservoirs during migration, and typically breed at marshes. Black terns are primarily threatened by loss of marsh habitat on their breeding grounds.

**American Peregrine Falcon**

The population of American peregrine falcon (*Falco peregrinus anatum*) collapsed in the mid-20[th] century due to poor reproduction related to eggshell thinning. Recovery efforts began in 1973, and, as of 2002, there were more than 100 nesting pairs of peregrine falcons in Colorado. Peregrines nest on cliffs and often near water, and they winter near riparian areas. Suitable habitat occurs along much of the White River Valley. Prior to 2007 there were no known peregrine nest sites within the WRFO Planning Area outside Dinosaur National Monument. Persistent peregrine activity near the mouth of Piceance Creek over the last eight years culminated in BLM documenting breeding efforts here from 2007-2010. An additional eyrie was located near Meeker in 2010. Threats to peregrine falcon include disturbance of their cliff nesting sites and bioaccumulation of pesticides.

**Greater Sandhill Crane**

About 100 pairs nest in western Colorado, primarily in Rio Blanco County near Meeker and in Routt County. Eight sandhill crane (*Grus canadensis*) nests were recorded in 1997 and 1998 near Meeker and Milk Creek on private agricultural land. Activities of the breeding population are concentrated in these areas and on private and FS holdings along portions of the upper White River and Lost Creek. The BLM documented nesting efforts in 2002-2004 and 2008 at a single site on an isolated BLM parcel within the White River National Forest. They nest in flooded fields, beaver ponds, marshes, and wet meadows.

The entire Rocky Mountain population of about 18,000-20,000 birds migrate across the WRFO Planning Area during the spring and fall. Large autumn flights are consistently observed in western Rio Blanco County, particularly across Douglas Pass. Small groups of cranes make regular short-term use of irrigated meadows, sheetwater flats, broader drainage bottoms, and reservoir margins. Spring migration occurs primarily between mid-April and the end of May, and fall migration from mid-September to early December. Threats to greater sandhill crane are primarily loss or degradation of river and wetland habitat from residential and commercial development, changing agricultural practices, water diversions, oil and gas development, and other land use changes.

**Bald Eagle**

Bald eagles occur primarily as winter residents and migrants across most of the eastern and northwestern portions of the WRFO Planning Area (Map 3-9). Migrant and winter residents arrive in October and leave by mid-April. Mid-winter (December through February) populations on the White River vary from 50 to 70 birds, with migratory peaks of up to 160 birds. Winter roosts have been identified at a number of cottonwood stands along the White River between Meeker and the Utah state line and in a Douglas fir stand on private land along Piceance Creek. Winter concentrations of bald eagle occur along portions of the upper White River that remain ice-free, but opportunistic foraging occurs throughout the WRFO Planning Area. Up to 11 pairs of eagles are known to breed in the WRFO Planning Area, in cottonwood stands along the White River and, with two exceptions, on private land (NDIS 2006). Breeding pairs begin nest selection and establishment in early February, and if successful, young are fledged by mid-July. Threats to bald eagles include disruptive activities and development near communal roosts and nests, reduction in the availability of nest and roost substrate, and development in important foraging areas.

**Long-billed Curlew**

This is a rare spring migrant and casual fall migrant in the WRFO Planning Area. The BLM has records for shoreline habitat at Rio Blanco Lake, irrigated hayland in Piceance Creek, and the saltbush communities of Coyote Basin and lower Wolf Creek. There are only a few records of breeding in western Colorado, and none in the Planning Area. Historically long-billed curlews

(*Numenius americanus*) were affected by over-harvest and loss of habitat. Current threats are loss and degradation of breeding habitat from changes in agriculture and development, and disturbance and degradation of wintering habitat.

**White-faced Ibis**
The white-faced ibis (*Plegadis chihi*) is a common spring migrant in suitable habitat, especially the White River Valley. They occur on shallow pond and lake margins, and in irrigated hayland and wet meadows. Although a few ibis may be present in the summer, they primarily occur in April and May, and in August and September. White-faced ibis populations are currently increasing in the U.S. after large reductions in the 1960s and 1970s from pesticides and habitat loss. Current threats include loss or degradation of nesting habitat, mostly due to agricultural practices, ingestion of pesticides in agricultural areas, and disruption during the breeding period.

**Columbian Sharp-tailed Grouse**
Historically, Columbian sharp-tailed grouse occurred locally across the east half of the WRFO Planning Area, but currently have a more restricted distribution, mostly on private lands and land-locked BLM parcels in Axial Basin and between SH 13 north of Meeker and the White River National Forest (Map 3-9). They have been recorded in aspen, mountain shrub, and sagebrush habitats in these areas. According to CPW, habitats within the WRFO Planning Area include overall range, smaller areas of winter range, and one small production area at the northern edge of the WRFO Planning Area. Intensive surveys in 2000 found 2,454 sharp-tailed grouse and 127 leks in Moffat, Routt, and Rio Blanco County, which is one of the three largest remaining populations in the U.S. (BLM 2007b). They have increased in recent years due to availability of suitable habitat on lands placed in the Conservation Reserve Program and lands reclaimed after coal mining. The primary threat is habitat loss and degradation from development, overgrazing, changes in fire regime, oil and gas development, and other causes. Oil and gas development could result in loss and fragmentation of habitat, displacement due to human activity, and increased mortality due to vehicle collisions and predation.

**Brewer's sparrow**
Brewer's sparrows (*Spizella breweri*) are common and widely distributed in virtually all big sagebrush and mixed brush communities throughout the WRFO Planning Area. These birds are typically one of the most common members of these avian communities and breeding densities probably range between 10-40 pairs per 100 acres. Although most abundant in extensive stands of sagebrush, the birds appear regularly in small (one to two acre) sagebrush parks scattered among area woodlands. Typical of most migratory passerines in this area, nesting activities normally take place between mid-May and mid-July. Threats include loss or modification of sagebrush habitat.

**Mammals**

**Big free-tailed bat**
Big free-tailed bat (*Nyctinomops macrotis*) habitat includes rocky or canyon country where individuals roost in crevices on cliff faces or in buildings. Big free-tailed bats can migrate as far north as Canada. The diet largely consists of moths. Although big free-tailed bats are not known to breed in this area, they have been documented in the Piceance Basin.

**Townsend's Big-Eared Bat, and Fringed Myotis**
The BLM-sensitive Townsend's big-eared bat (*Corynorhinus townsendii*), and fringed myotis (*Myotis thysanodes*) occupy a broad array of habitats in the west, and limited collections have documented their presence from western Colorado's semidesert shrublands and woodlands. Townsend's big-eared bat is often closely associated with riparian communities and permanent

sources of water. The fringed myotis is more common in upland sage-steppe and xeric woodlands, including pinyon/juniper. The population of Townsend's big-eared bat is thought to be decreasing throughout much of its western range. Population trends for fringed myotis are not known.

The fringed myotis and Townsend's big-eared bat more consistently use forested habitats for roosting and foraging. More than 90 percent of the big-eared bat's diet is composed of moths. Consistent with its preferential use of uplands, the presence of non-flying invertebrates in the diet of fringed myotis suggests a foraging style that relies at least partially on foliage gleaning. Both species of bats are capable of traveling long distances between roosts and foraging areas (up to 10 miles).

Birthing and the formation of maternity colonies for these species occurs from mid-spring through mid-summer; males tend to roost singly in the summer. The core distribution of bats tends to be strongly correlated with the availability of caves, cave-like roosting habitat (e.g., mines), and buildings for night, maternity, and hibernation roosts, but these species have been found using rock crevices and trees. Bats roosting in woodland habitats use live and dead trees, roosting under loose exfoliating bark, in cavities, or vertical cracks—attributes best served by mature large-diameter pinyon and juniper trees.

Bat abundance in the WRFO Planning Area is likely constrained by the scarceness of maternity and hibernation roost habitat that could be expected to harbor large numbers of bats (e.g., caves, mines, buildings). Rock outcrops and mature pinyon/juniper woodlands, representing potential roost substrate for small numbers of bats, particularly solitary males during the summer, are widely available in the WRFO Planning Area. Threats to these species include loss or degradation of roosting habitat in caves, mines, and snags; toxic chemicals; and loss or degradation of foraging habitat from removal of forest canopy, changes in wetland habitat, or loss of native shrub and grassland habitat.

**Spotted Bat**
The spotted bat (*Euderma maculatum*) is reported in the Blue Mountain area and along the Yampa River in Dinosaur National Monument, and may occur in other areas such as the lower White River. They occur in arid canyons, cliffs, and riparian areas, and roost in cracks and crevices in rocky cliffs. Population trends are not known and its distribution is very patchy. Threats include loss or modification of foraging areas and toxic chemicals. Loss or modification of roosts (cliffs and rock walls) is not considered a range-wide threat but could be a threat on a local level.

**Wolverine**
The current status of wolverine (*Gulo gulo*) in Colorado is uncertain; however, unverified sightings persist from the central mountains. The first confirmed sighting in Colorado for more than 90 years was made in June 2009 for a male wolverine tracked by GPS from the Yellowstone area. Ruggiero et al. (1994) presents information indicating that pre-settlement wolverine distribution at the southern edge of their range was likely limited to montane boreal regions. There are historical records from lower elevation locations in the WRFO Planning Area, including the Grand Hogback and Danforth Hills, and several recent records (e.g., Blue Mountain). However, the Central Rocky Mountain Basins ecoprovince, which encompasses essentially all BLM-administered lands within the WRFO Planning Area, was specifically identified as a gap in historic wolverine distribution despite occasional records that likely represent subadult dispersal. Where they occur, wolverines have very low population densities. Threats include loss and fragmentation of habitat.

**River Otter**

River otters (*Lutra canadensis*) occur along the Yampa River where it borders the WRFO Planning Area, in the lower part of the White River, downstream from about Coal Ridge, and there is strong suspicion that they occur as far upstream as the confluence of the North and South Forks of the White River. Their habitat is large streams and lakes with fish. They were extirpated from Colorado by the early 20th century but CPW began restoration efforts in the 1970s. Populations appear to be stable or decreasing, and state status has been changed from endangered to threatened. Threats include changes in habitat including: streams flow and channel morphology; water pollution; loss of riparian vegetation; and human disturbance (Boyle 2006).

**White-tailed Prairie Dog**

Like other prairie dog species, the white-tailed prairie dog underwent an enormous reduction in population and occupied habitat by the late 20th century, mostly from poisoning, habitat changes, and plague. This species was petitioned for listing in 2002, and the FWS determined that listing was not warranted. In July 2007, the FWS announced that it would review the 2004 petition finding and take further action as appropriate because of inappropriate non-scientific influence on the finding. A status review was initiated in 2008. The Federal notice of completion of status review was published on May 28, 2010 whereupon FWS decided that listing was not warranted.

White-tailed prairie dogs occur primarily in the salt desert shrubland and lowland grassland along US 40 from Pinyon Ridge to the Utah border, in the Coal Oil Basin northwest of Rangely and the Crooked Wash area. Their towns, presently occupying about 39,000 acres in the WRFO Planning Area, provide habitat for other special status species, including black-footed ferret, ferruginous hawk, and burrowing owl. White-tailed prairie dogs are susceptible to campestral (sylvatic) plague, which periodically decimates their populations, and is the most important factor currently affecting their abundance and distribution (Pauli et al. 2006).

**Reptiles and Amphibians**

**Boreal Toad**

The boreal toad (*Bufo boreas*) occurs in marshes, wet meadows, streams and lakes, mostly at elevations of 8,500 to 11,500 feet and is likely to occur primarily on the White River National Forest in the Planning Area. There are historic records and potential habitat in the Flat Tops Wilderness and upper White River. There are no known current breeding sites, but there are reports of toad observations in recent years, mostly from the Trappers Lake area, suggesting that one or more breeding sites may be located in this area (Livo and Loeffler 2003). No boreal toads are known to exist on BLM-administered lands within the WRFO Planning Area. The primary cause of their decline and the principal continuing threat is the chytrid fungus. Other threats include alteration of wetland habitat, fragmentation of habitat, and changes in water quality.

**Northern Leopard Frog**

The northern leopard frog (*Rana pipiens*) was petitioned for listing as a threatened distinct population segment (DPS) in June 2006. In October 2011, the FWS determined that the listing was not warranted. This species occurs in permanent waters and associated wetland and moist upland vegetation. They are known to be well distributed along several of the lower elevation perennial and intermittent streams in the WRFO Planning Area, including the lower White River, Piceance Creek, Crooked Wash, Yellow Creek, East Douglas Creek, Cathedral Creek, and Black's Gulch. In the western U.S., northern leopard frog has undergone major population declines and has had range contractions and become locally extinct (Smith and Keinath 2007). Continuing threats include landscape-scale changes to habitats including increased roads; mortality from non-native organisms

including predaceous fish, bullfrogs, the chytrid fungus, and water quality issues including pesticides.

**Great Basin Spadefoot Toad**

The Great Basin spadefoot toad (*Spea intermontana*) occurs along canyons and stream floodplains in pinyon/juniper woodlands, sagebrush and semi-desert shrublands at elevations below 7,000 feet. Breeding occurs in temporary pools, intermittent streams and pools formed by floodwaters along permanent streams, particularly those that support little vegetative cover along the margins. Great Basin spadefoot toads have only been recorded a few times at widely scattered locations in the WRFO Planning Area. Although eggs hatch within days of laying and larvae develop quickly, the toads require waters that persist for at least 40 days for complete larval development. There is no evidence that this species was ever abundant or well distributed in the WRFO Planning Area. Although occurring with some regularity across the Utah border, efforts by BLM to locate calling toads in the WRFO Planning Area's saltbush desert communities have not been successful to date. However, several dozen tadpoles were found in an ephemeral roadside catchment in 2009 along Cottonwood Creek near the Utah border. Populations and distribution of Great Basin spadefoot toad appears to be fairly stable across its range, through declines have been reported in some areas (Buseck et al. 2005). Threats include alteration of aquatic breeding habitat and terrestrial foraging habitat, roads, and environmental contaminants.

**Milk Snake**

Known in the WRFO Planning Area from a single record (Hammerson 1999) at the mouth of Douglas Creek on the White River near Rangely, this reclusive species is thought to be more common and widespread than west slope records indicate. The milk snake (*Lampropeltis triangulum*) reportedly inhabits a wide variety of habitats, including pinyon/juniper, arid river valleys, and shrub-steppe, and prefers mid-seral understories that are not heavily dominated by grasses. Based on its abundance and distribution on the Front Range, the snake is not thought of as being particularly sensitive to moderate levels of habitat alteration. Populations are considered to be stable.

**Midget Faded Rattlesnake**

The midget faded rattlesnake (*Crotalus oreganus concolor*) is the smallest member of the western rattlesnake species complex. This subspecies is thought to be generally confined to the Green River geologic formation in southeast Wyoming, eastern Utah and western Colorado, and appears to have very narrow preference for bedded sandstone outcrops with fallen mid-slope slabs on south to southeast exposures below 7,000 feet in elevation. Midget faded rattlesnakes occur in small discrete groups and exhibit classic metapopulation distribution (BLM 2007b). These snakes display strong fidelity to and remain closely associated with hibernacula for overwintering and reproductive activities. Narrowly adapted to specialized habitat, this snake was documented in scattered locations across the WRFO during the summer of 2012 and may be the only rattlesnake in the MPA. Population trends are not known. Threats include ground surface-disturbing activities and mortality from vehicles.

<u>Fish</u>

Colorado BLM is signatory to the tri-state Colorado River cutthroat trout Conservation Agreement (2006) and Strategy (2006) and the Range-wide Conservation Agreement and Strategy for roundtail chub, bluehead sucker, and flannelmouth sucker (2006). These plans have similar goals and objectives and are intended as templates to guide and coordinate management in a manner that

reduces threats to and ensures the long term and self-sustained persistence of these species and their habitat.

**Bluehead Sucker**

This species occurs in a wide range of habitats from headwater streams to large rivers, in areas of moderate to fast current and rocky substrate (Woodland 1985). Within the WRFO Planning Area, they are believed to be restricted to the White River below the Meeker area and perhaps the mouths of its larger tributaries. Bluehead suckers currently occupy about 50 percent of their historic range in the Upper Colorado River Basin (Utah Department of Natural Resources 2006). Threats include diversion of water, construction of barriers to fish passage, competition with and predation by non-native fish, and destruction of riparian vegetation.

**Roundtail Chub**

Within the WRFO Planning Area, the roundtail chub (*Gila robusta*) is confined to the mainstem of the White River upstream to Meeker and perhaps the mouths of its larger tributaries. Roundtails prefer deep, turbid, slow-moving waters adjacent to areas of faster water and tend to avoid shoreline cover. Roundtail chub occupy about 45 percent of their historic range in the Colorado River Basin (Utah Department of Natural Resources 2006). Threats are similar to those identified for bluehead sucker.

**Flannelmouth Sucker**

This species is generally restricted to larger streams and rivers, where it occurs in all habitat types including riffles, runs, eddies, and backwaters (Woodland 1985). Similar to the species above, adults do not generally stray from deep mainstem habitat in the White River, but subadults appear regularly in the lower sections of large, low gradient tributaries that function as backwater habitat, including Crooked Wash, Yellow Creek, and lower Piceance Creek. Flannelmouth suckers occupy about 50 percent of their historic range in the Upper Colorado River Basin (Utah Department of Natural Resources 2006). Threats are the same as those for bluehead sucker.

**Mountain Sucker**

Mountain suckers (*Catostomus platychynchus*) occur in smaller rivers and streams, with gravel, sand and mud bottoms, in areas with undercut banks, eddies, small pools, and areas of moderate current (Woodland 1985). They are present and are often among the most frequently collected fish in the White River, Yellow Creek, and in Piceance Creek and its larger tributaries, including Black Sulphur Creek, Fawn Creek, and Willow Creek. Population trends for mountain sucker are not known, but the fish appears to be common in streams connected to the White River and in self-sustaining populations in Piceance Creek upstream of likely barriers (irrigation diversions). Potential threats include any activities that result in loss or degradation of habitat.

**Native Cutthroat Trout**

Colorado River cutthroat trout (*Oncorhynchus clarkia pleuriticus*) have been affected range-wide by loss of habitat and hybridization with non-native trout. It is thought to have historically occurred in western Colorado, western Wyoming, eastern Utah, and northwestern New Mexico, with more than half of the historic habitat located in western Colorado. This subspecies has been the subject of much conservation attention, having been reduced to about 14 percent of its historical distribution and suffering heavily from hybridization with and competition from former salmonid introductions.

The WRFO Planning Area is located primarily in the Yampa Geographic Management Unit (GMU), one of the eight GMUs evaluated in the original status review (Hirsch et al. 2006), and includes three watersheds where Colorado River cutthroat trout have historically occurred. Two

streams, Trapper Creek and minor inclusions of East Middle Fork of Parachute Creek, are located in the Parachute-Roan subunit of the Upper Colorado River GMU. These streams straddle the WRFO-Colorado River Valley Field Office (CRVFO) boundary and management of these systems as a whole was addressed in the Roan Plateau RMP Amendment (2008). The scope of the Oil and Gas Development RMP Amendment (Section 1.3.2) will not consider amending or changing resource management decisions authorized by the Roan Plateau RMP Amendment.

The Conservation Strategy for Colorado River Cutthroat Trout (2006) established a hierarchical classification for populations of CRCT that provides the basis for prioritizing genetic purity of a population and the level of conservation management applied to it. The Strategy established and identified "conservation populations" that are further distinguished by their genetic purity. "Core conservation populations" represent genetically unaltered (i.e., greater than 99 percent CRCT) populations that are intended to be the primary source for transplants and broodstock development. Remaining conservation populations are those that may be slightly hybridized (greater than or equal to 90 percent CRCT), but retain unique ecological, genetic, or behavioral attributes that are considered important in the context of preserving the full range of genetic expression developed in the species (e.g., tolerance to warm water temperatures). Until recently, none of the WRFO populations in the East Douglas Creek or Piceance Creek Basins were considered of sufficient genetic quality to be categorized as conservation populations. However, based on more advanced genetic testing, virtually all WRFO's CRCT fisheries appear to meet the criteria for designation as conservation populations and the most recent updates to the CRCT Conservation Assessment amended the status of many WRFO CRCT fisheries (Table 3-21 Stream Fish Habitats).

The Upper White River watershed has 75 miles of currently occupied streams, and more than 600 miles of historic stream miles. Most of the occupied streams are located on and managed by the White River National Forest. The BLM administers minor fractions of Big Beaver and Milk Creek. Big Beaver Creek is reported to have a population of 151 to 400 fish per mile, of mostly cutthroat origin, and with good quality habitat. Big Beaver Creek is managed mostly by the FS; the BLM administers about 0.65 mile of the stream extending downstream from the FS boundary and another 0.25 mile of isolated downstream mineral estate. The Milk Creek population is the only identified "core" population. This reach is managed principally by the USFS, with WRFO administering surface and mineral estate on 153 feet of channel and 0.4 acres of floodplain (about 0.3 percent of reach) on a diminutive land-locked tract. BLM administers several downstream parcels that are considered historic habitat (approximately 0.30 channel miles and 5 floodplain acres on 2 parcels of split estate; 0.28 channel mile and 12 floodplain acres on 2 parcels of surface estate), which comprises 2.1 percent of the reach. Other streams in this watershed with Colorado River cutthroat trout include Fawn Creek, Lost Creek, Hahn Creek, Snell Creek, Little Skinny Fish Creek, Marvine Creek, and Trappers Lake.

The Piceance-Yellow Creek watershed has up to 8 miles of occupied stream, and 62 miles of what is considered historic stream habitat. The only extant population is located in the Black Sulphur Creek system-a designated conservation population. Black Sulphur Creek and Canyon Creek offer fair habitat quality and support an estimated 50 to 150 fish per mile with high genetic purity. The BLM manages about 3 miles of this creek.

The Lower White River watershed has 16 miles of currently occupied stream habitat and 81 miles of what is considered historic habitat. Colorado River cutthroat trout with high purity occupy several streams on BLM lands in the East Douglas Creek watershed, including East Douglas Creek, Bear Park Creek, Brush Creek, Cathedral Creek, Lake Creek, and Soldier Creek. In addition, cutthroat trout of non-native origin occupy Bitter Creek, which drains to the White River in Utah.

Specific information on these streams is not presented in Hirsch et al. 2006. These small headwater streams are generally in fair condition with static or improving trends, and although they persist in supporting self-sustaining populations of cutthroat, they all tend to suffer the effects of high channel gradients, low flow volumes, and bank vegetation that is not fully capable of resisting erosion events (Maps 3-1 and 3-3).

WRFO administers relatively little of watersheds that support native cutthroat trout in the Colorado River basin, namely Brush Creek (2,200 acres BLM surface and an additional 3,370 acres of mineral estate) and the mainstems of Roan (112 BLM surface and an additional 2 acres mineral estate) and Carr Creeks (44 acres BLM surface and an additional 129 acres of mineral estate). Federal estate is generally relegated to uplands in the upper portion of the watershed and includes virtually no effective management of occupied surface streams (i.e., two mapped Brush Creek channel segments of 574 and 315 feet in length are probably uninhabited). Although Colorado River cutthroat were believed to be the only subspecies of native trout on the western slope of Colorado, recent genetics work raises the possibility that this subspecies may have developed in the White and Yampa River basins, while the greenback cutthroat subspecies (*O. c. stomias*) may have been formerly distributed throughout the Colorado River basin. Attempts to more clearly define the taxonomy and original distribution of these fish is ongoing and although the current regulatory requirements for managing these lineages (i.e., Colorado River lineage versus lineage greenback) differ, it is appropriate in this plan to regard both taxa simply as "native cutthroat trout." At the present time, it is believed that lineage greenback cutthroat trout occupy portions of Carr and Roan Creeks in the Colorado River drainage. As presented above, WRFO manages virtually no surface or mineral estate on occupied portions of these streams.

### 3.3.3.3   Proposed Dinosaur Trail MLP

The Wolf Creek and Coyote Basin black-footed ferret management areas occur within the Dinosaur Trail MLP. In addition, the Snake John Reef ferret management area in Utah borders the western boundary of the MLP. White-tailed prairie dogs also occur within the ferret management areas and along the US 40 corridor and provide habitat for burrowing owls and ferruginous hawks (Map 3-9). The lower White River within the MLP area is designated critical habitat for Colorado pikeminnow and also provides habitat for bald eagles (Map 3-9), northern leopard frogs, flannelmouth sucker, mountain sucker, plains topminnow, and roundtail chub. Brewer's sparrows, Townsend's big-eared bat, fringed myotis, and spotted bats also occur within the MLP area.

## 3.3.4   Special Status Species - Plants

Special status plant species are those listed (threatened or endangered) or in candidate or proposed status by the FWS under the federal ESA; and those placed on the Colorado BLM State Director's Sensitive Species List. Federal threatened and endangered species and designated critical habitat are managed by the FWS in cooperation with other federal agencies, in support of recovery. For listed species that do not have designated critical habitat, the BLM cooperates with the FWS to determine and manage habitats to support the species. Federal candidate species and their habitats are managed as BLM sensitive species with a greater emphasis on conservation. On BLM-administered public lands, BLM sensitive species would be managed consistent with species and habitat management objectives in land use and implementation plans to promote their conservation and to minimize the likelihood and need for listing under the ESA (i.e., maintain viable populations, thereby preventing federal listing from occurring). The State of Colorado and BLM sensitive species are treated similarly. The BLM may coordinate with State natural heritage programs to develop conservation strategies and to mitigate threats to rare plants that are not designated BLM special status species. The BLM, FWS, and the State of Colorado have developed formal and informal agreements to

provide guidance on the management of species. Under the Section 7 of the ESA federal agencies are required to consult with the FWS on any action they authorize, fund, or conduct that may affect a listed species or result in adverse modification of critical habitat. Additionally, BLM must confer with the FWS on any activity that may jeopardize a proposed species or if it is "likely to result" in adverse modification or destruction of proposed critical habitat. Section 7(a)(1) requires Federal agencies to use their authorities to further conservation of federally listed species. This involves BLM's cooperation with the FWS in species recovery and conservation as provided in species recovery plans for federally listed species. The Colorado Rare Plant Conservation Initiative has prepared BMPs for oil and gas development in Colorado (Elliott et al. 2009). These and other BMPs may be implemented on a case-by-case basis (Appendix B).

### 3.3.4.1   Federal Endangered, Threatened, Proposed and Candidate Plant Species

There are two federally listed plant species under the ESA that occur in the WRFO Planning Area (Table 3-24). Furthermore, one additional threatened species is known to occur within the BLM Field Offices surrounding the WRFO. However, despite ongoing surveys, occupied habitat has not been found within the WRFO. The two federally threatened plant species are considered endemic to the WRFO Planning Area: Dudley Bluffs bladderpod (*Physaria congesta*) and Dudley Bluffs twinpod (*Physaria obcordata*). These two wild mustards are found exclusively in the Piceance Basin of Rio Blanco County, Colorado and lie in the heart of several recent and ongoing natural gas field expansions. Because their habitats occur only in a very restricted range, on specific substrates, this greatly limits the ability of the species' to expand their range, or withstand stochastic events. Little is known about whether the species are able to occupy or re-occupy habitats in disturbed or reclaimed suitable and occupied habitats, however ongoing research may provide more insight in the future. A third federally listed plant species, Ute Ladies'- tresses (*Spiranthes diluvialis*; threatened) is currently unknown within the WRFO. However, suitable habitat may occur in the Planning Area, especially along the White River, and management actions may influence these habitats.

**Table 3-24. Federally Listed and Candidate Plant Species that May Occur in the WRFO Planning Area**

| Name | Species | Federal Status | Designated Critical Habitat in WRFO Planning Area | Habitat |
|---|---|---|---|---|
| Dudley Bluffs bladderpod | *Physaria congesta* | Threatened | No | Barren, white shale outcrops of the Green River and Uinta Formations (6,000-6,700 feet) |
| Dudley Bluffs Twinpod | *Physaria obcordata* | Threatened | No | Barren, white outcrops and steep slopes of the Parachute Creek Member of the Green River Formation (5,900-7,500 feet) |
| Ute lady's tresses orchid | *Spiranthes diluvialis* | Threatened | No | Sub-irrigated alluvial soils along streams and in open meadows in floodplains (4,500-6,800 feet) |

The 1997 White River RMP established four ACECs (Duck Creek, Dudley Bluffs, Ryan Gulch, and Yanks Gulch) designated for Dudley Bluffs twinpod and bladderpod occupied habitats, as they were then known. Since this time, survey work has increased the known distribution and abundance of both species and their suitable habitats within and external to the ACECs. Approximately 54 percent of both Dudley Bluffs twinpod and bladderpod occur within ACECs.

Increasing industrial development in the WRFO Planning Area is creating additional pressure on listed species as well as their respective habitats. The FWS is currently developing a revised recovery plan for Dudley Bluffs bladderpod and Dudley Bluffs twinpod that focuses on protecting and maintaining reproducing, self-sustaining populations, by protection of core populations and surrounding buffer zones in "key conservation areas." Conservation measures, COAs, and BMPs have been established to protect threatened species and their habitats. Because of these protections, negative impacts to populations may be reduced or would not occur. However, additional or more rigorous conservation measures may be needed in some areas to avoid or offset direct or indirect effects of development. BLM does not intend to authorize any activity that would result in jeopardy (as determined by FWS through Section 7 consultation) to any federally listed species.

The majority of habitat fragmentation of Thirteen-mile tongue formations occurred from historic county roads and from energy lease development which included well pad, pipeline, and road locations. No known occupied habitats have been fragmented by energy activities for at least a decade. However, several county roads and at least two large pipeline corridors have bisected occupied habitats prior to the species' federal listing in 1990.

Special status plant species are likely to maintain their current extant range because populations and habitats can usually be avoided during siting of facilities on BLM lands. However, fragmentation of suitable and potential habitats has occurred in the Planning Area prior to discovery of the Dudley Bluffs species. Occupied habitats received the greatest protection under the 1997 White River RMP; however, ongoing plant habitat fragmentation via soil disturbance, plant community type and/or seral conversion of suitable and potential habitats and pollinator habitats continue to be a long-term threat. Roadside vegetation in areas where dust is easily and continually aerosolized is generally coated with a hardened particulate film from dust settling and building up. This build-up generally does not get removed until a noteworthy precipitation event occurs.

**Dudley Bluffs bladderpod**
The Dudley Bluffs bladderpod grows on barren white shale outcrops of the Thirteen-mile Creek Tongue of the Green River Formation where it is exposed along downcutting drainages or windswept ridges. It often grows on level surfaces at the points of ridges or in pinyon/juniper savannah areas where narrow outcrops of somewhat level white shales are exposed. These sites may be found above steep sideslopes containing the Dudley Bluffs twinpod in the Dudley Bluffs and Ryan Gulch ACEC, but are found in exclusive habitats in the Duck Creek ACEC and surrounding drainages. Small, new populations of Dudley Bluffs bladderpod were discovered in the Dudley Gulch drainage where shallow layers of the Uinta Formation were evident above Thirteen-mile tongue substrates. The elevational range for Dudley Bluffs bladderpod is 6,140 to 6,644 feet.

The known populations of the Dudley Bluffs bladderpod include 8 populations' located in the WRFO. The species occurs on an estimated 987 acres on BLM, state, and private lands in the northern Piceance Basin in Rio Blanco County within a 10 mile by 10 mile area. Approximately 90 percent of the total occupied Dudley Bluffs bladderpod occurs on public lands managed by the BLM. The BLM has designated three ACECs (Duck Creek, Dudley Bluffs, and Ryan Gulch), which contain approximately 54 percent of the total occupied habitats. The estimated total number of known Dudley Bluffs bladderpod individuals is around 693,820. The largest population on BLM-administered lands in the WRFO is estimated to support around 504,050 individuals. Although population boundaries do show precipitation response changes, among other effects, small populations continue to be identified, and the species range has not greatly increased since the 1990 federal listing.

The BLM has conducted long-term monitoring in conjunction with the Colorado Natural Areas Program (CNAP) on the ACEC populations of both species from 1985 to 2009. At the Dudley Bluffs ACEC, the results indicate a stable, to increasing, trend in Dudley Bluffs bladderpod plant numbers. In a small area where plants were destroyed, the population continued to decline, and new recruits were very slow to recolonize the area. At the Duck Creek ACEC, bladderpod numbers decreased 10 to 35 percent from 1996 to 2002. These declines were presumed to be linked to the increasing size of the wild horse herd and low levels of precipitation. The BLM has since reduced the horse herd, but subsequent monitoring results (2002 to 2006) continued to show a substantial decline in plant numbers at two monitoring locations within the Duck Creek ACEC. The cause of the continued decline has not been determined (Rickey and Kurzel 2007). Overall, ongoing monitoring indicates mixed results, suggesting there may be other causative factors.

The primary threats to both Dudley Bluffs bladderpod and Dudley Bluffs twinpod are oil and gas development, oil shale development, and energy corridors (FWS 2008). Impacts related to energy development include habitat fragmentation, fugitive dust, increased human access and human collections, spread of invasive plant species, air pollution, and loss of pollinator habitat. Other threats include extraction of leasable solid minerals, off-highway vehicles (OHV), and invasive species. These species may also have localized effects from grazing and trampling by livestock and wild horses.

**Dudley Bluffs twinpod**
The Dudley Bluffs twinpod grows on barren white shale outcrops of the Thirteen-mile Creek Tongue of the Green River Formation where it is exposed along downcutting drainages, sometimes occurring below or interspersed with Dudley Bluffs bladderpod habitats. The twinpod occurs primarily on the Thirteen-mile Creek Tongue but also occurs without adjacent bladderpod habitats on the Parachute Creek Member of the Green River Formation near Calamity Ridge. The Dudley Bluffs twinpod occurs almost solely on steep side slopes. However, it is also found in small wash settings below sideslopes where soil and substrates have eroded and deposited on more level locations. Shifting substrates and soil loss from highly erosive soils, especially on steep slopes, are probably major sources of natural mortality. The elevation range for the Dudley Bluffs twinpod is 5,960 to 7,440 feet.

The known populations of the Dudley Bluffs twinpod include approximately 15 occurrences comprised of at least 40 distinct mapped areas. The plants occur on an estimated 456 acres on BLM, state, and private lands in the northern Piceance Basin in Rio Blanco County; within a 20 mile by 30 mile area. Approximately 80 percent of the total occupied Dudley Bluffs twinpod habitat occurs on public lands managed by the WRFO. The estimated total number of Dudley Bluffs twinpod plants is around 35,000 (CNHP 2009). At the Ryan Gulch ACEC, the Dudley Bluffs twinpod population increased in size and numbers between 1993 and 2000. This increase may be linked to a livestock exclosure (includes habitat for both species) designed to exclude cattle and prevent browsing of flower heads and trampling of plants.

During the spring of 1991 and 1992 field research by Tepedino (2009) was conducted in the Lower Ryan Gulch population, showing that the Dudley Bluffs twinpod is an obligate outcrosser (plants require pollen from other plants in order to successfully reproduce) that requires pollinators. This study focused on Dudley Bluffs twinpod but some pollinators were collected for the Dudley Bluffs bladderpod as well. Primary pollinators for Dudley Bluffs twinpod are ground-nesting native bees in the families Andrenidae and Halictidae. Most species that frequented Dudley Bluffs twinpod flowers are generalists, which also visit a variety of other flower types. Only two bee species were likely mustard family specialists (*Andrena hicksi* and *Andrena walleyi*). The only non-bee pollinator

of any importance was a species of the dipteran, *Gonia* (Tachinidae). Although no bee is likely to travel more than 0.6 of a mile from the nesting site, the field research indicated there was no evidence that sexual reproduction of plants at the Ryan Gulch population was being limited by inadequate pollination in 1992 (Tepedino 2009).

Threats are the same as described for Dudley Bluffs bladderpod.

**Ute –lady's tresses**
This species has not been found in the WRFO Planning Area, but is known in adjacent counties in Utah within Dinosaur National Monument, and within portions of the Monument north of the WRFO Planning Area in Colorado (Fertig et al. 2005). In addition to several large Green River populations, smaller populations have also been found in small creeks and hay meadows that are found more proximate to the WRFO within the Monument, especially where intermittent disturbance such as haying and irrigation were occurring that prevented late-seral plant community formation. A new population was found in 2007 in the Roaring Fork Valley, about 35 miles southeast of the WRFO (Colorado Natural Heritage Program 2007). Suitable habitats include sub-irrigated alluvial soils along rivers, streams and open meadows that display a previous disturbance regimen and usually contain a diverse, mid-seral plant community where light penetration through the herbaceous canopy is still visible to the soil level. It is likely that the species requires a decade of vegetative growth prior to flowering; consequently, areas of constantly changing alluvial deposition with early seral vegetation would be devoid of the orchid. Elevation ranges for Ute lady's tresses are about 4,500 to 7,200 feet.

## 3.3.4.2   Other Special Status Species

The BLM designated sensitive plant species also include federal candidate species and delisted species in the five years following delisting. These species are listed in Table 3-25, and each of these species is discussed below. Management actions pertaining to special status species, as applicable, are incorporated in the alternatives and described in more detail in Chapter 2.

**Table 3-25. Other Special Status Plant Species**

| Name | Species | BLM Status | State Status | Habitat |
|------|---------|------------|--------------|---------|
| Debris milkvetch | *Astragalus detritalis* | Sensitive | G3/S2 | Pinyon/juniper and mixed desert shrub, often on rocky soils ranging from sandy clays to sandy loams. Also alluvial terraces with cobbles (5,400-7,200 feet) |
| Duchesne milkvetch | *Astragalus duchesnensis* | Sensitive | G3/S1S2 | Pinyon/juniper woodland and desert shrub, around sandstone or shale outcrops (4,600-6,400 feet) |
| Ligulate feverfew | *Bolophyta ligulata* (*Parthenium ligulatum*) | Sensitive | G3/S2 | Barren shale knolls (5,400-6,500 feet) |
| Tufted cryptantha | *Cryptantha caespitosa* (*Oreocarya caespitosa*) | Sensitive | G4/S2 | Sparsely vegetation shale knolls, with pinyon/juniper or sagebrush; usually with other cushion plants (5,500-8,100 feet) |
| Rollins cryptantha | *Cryptantha rollinsii* (*Oreocarya rollinsii*) | Sensitive | G3/S2 | White shale slopes of the Green River Formation, in pinyon/juniper or cold desert shrub communities (5,300-5,800 feet) |
| Ephedra buckwheat | *Eriogonum ephedroides* | Sensitive | G3/S1 | Shale and clay flats of slopes in saltbush, sage and pinyon/juniper habitats (4,900-6,900 feet) |
| Cathedral Bluff dwarf gentian | *Gentianella tortuosa* | Sensitive | G3?/S1 | Barren shale knolls and slopes of the Green River Formation (8,500-10,800 feet) |

## Table 3-25. Other Special Status Plant Species

| Name | Species | BLM Status | State Status | Habitat |
|---|---|---|---|---|
| Narrow-stem gilia | *Alciella stenothyrsa* (*Gilia stenothyrsa*) | Sensitive | G3/S1 | Grassland, sagebrush, mountain mahogany or pinyon/juniper; silty to gravelly loam soils of the Green River formation (6,200-8,600 feet) |
| Piceance bladderpod | *Lesquerella parviflora* | Sensitive | G2/S2 | Shale outcrops of the Green River Formation, on ledges and slopes of canyons in open areas (6,200-8,600 feet) |
| Flaming Gorge evening primrose | *Oenothera acutissima* | Sensitive | G2/S2 | Seasonally wet areas in meadows, depressions or along arroyos I mixed conifer forest to sagebrush, on sandy gravelly, or rocky soils (5,300-8,500 feet) |
| Graham's beardtongue | *Penstemon grahamii* | Sensitive | G2/S1 | Talus slopes and knolls of the Green River Formation in sparsely vegetated desert scrub and pinyon/juniper (5,800-6,000 feet) |
| White River beardtongue | *Penstemon scariosus* var. *albifluvis* | Sensitive | G4T1/S1 | Sparsely vegetated shale slopes of the Green River Formation Desert in shrub and pinyon/juniper communities (5,000-7,200 feet) |
| Cathedral Bluff Meadow- rue | *Thalictrum heliophilum* | Sensitive | G2/S2 | Sparsely vegetated, steep shale talus slopes of the Green River Formation (6,300-8,800 feet) |

NOTE:

Habitat descriptions are from Spackman et al. 1997.

Increasing industrial development of coalbed methane extraction in the WRFO Planning Area is currently increasing pressure on the Debris milkvetch. Habitats for the remaining 12 BLM-sensitive species have not previously and are not currently experiencing full field energy development at the landscape level. Previous habitat changes from inter-state pipeline, and powerline corridors has influenced the Piceance bladderpod (*Lesquerella parviflora*); however, these effects have had limited impacts on local populations, and this member of the wild mustard family has shown an initial ability to re-establish following site reclamation in some areas. Pressure from oil and gas development is currently affecting populations of Ephedra buckwheat, Graham's beardtongue and White River beardtongue. A few (less than three each) Ephedra buckwheat and Cathedral Bluff dwarf gentian (*Gentianella tortuosa*) populations have been linearly bisected by historical Rio Blanco county road and BLM road construction.

Several plant species addressed in the 1997 White River RMP are no longer considered to be BLM sensitive, although most are still fully tracked by the Colorado Native Heritage Program. These include oil shale columbine (*Aquilegia barneybi*), dragon milkvetch (*Astragalus lutosus*), oil shale fescue (*Argillochloa dasyclada*), Yampa beardtongue (*Penstemon yampaensis*), and Purpus' sullivantia (*Sullivantia purpusii*). Oil shale fescue, Yampa beardtongue, and Purpus' sullivantia are still fully tracked by CNHP, and dragon milkvetch is on their watch list.

**Debris milkvetch**

On the WRFO, debris milkvetch is known to be approximately 18 scattered locations (approximately 90 acres) that are found along a north-south corridor that occurs between US 40 and Fletcher Gulch, a distance of approximately 16 miles. In addition, approximately 10 acres of occupied habitat is known just west of Meeker, Colorado, and another 22 acres of Debris milkvetch habitats from the north end of the Raven Ridge ACEC. Endemic to the Uinta Basin, the milkvetch is confined to Moffat and Rio Blanco counties in Colorado and Duchesne and Uinta counties in Utah. It has a wider distribution in Utah and is known to be within at least 36 locations (Franklin 2005). It

occurs on Colorado Plateau pinyon/juniper sites intermixed with low sagebrush shrublands on silty clay loams soil, and on alluvial terraces with cobbles, at elevations that range from 5,400 to 7,200 feet. It blooms in late April to early June and fruit start to appear in May.

Increasing industrial development of coalbed methane extraction is occurring in the southern portion of its known range on the WRFO. Road, pad, and pipeline construction is currently creating landscape-level fragmentation adjacent to several Debris milkvetch populations. However, facilities are currently being positioned to avoid occupied habitat and to minimize fragmentation of pollinator habitats between adjacent populations. COAs and BMPs have been established to protect the species and their habitats. Because of these protections, impacts that would jeopardize the populations would not occur. However, additional or more rigorous conservation measures may be needed for some sensitive plant species or populations in order to avoid or offset direct or indirect effects of development to prevent negative cumulative effects. Other threats to debris milkvetch include noxious weeds via current and ongoing energy development corridors that are proximate to populations; cheatgrass stand changes; and disturbance from OHV use, livestock and wild horses.

**Duchesne milkvetch**
There are three known occurrences of Duchesne milkvetch (*Astragalus duchesnensis*) on the west side of the WRFO – one in the Raven Ridge ACEC at an elevation of 5,800 feet, one 15 miles to the south near the top of Big Horse draw at 6,500 feet, and one at the northern edge of the Planning Area in Dinosaur near Wagon Wheel Point at 5,800 feet. These three locations are approximately 15 miles apart. Oil and gas developments have not previously and are not currently influencing known Duchesne milkvetch habitats on the WRFO, although Big Horse Draw is about 0.25 mile south of a large oil and gas trunk line. Duchesne milkvetch is a Uintah Basin endemic, only known to occur in Rio Blanco and Moffat counties, Colorado, and in three counties in Utah where there are at least 14 separate occurrences (Albee et al. 1988).

**Ligulate feverfew (Colorado Feverfew)**
This is a mound-forming herbaceous perennial that occurs on semi-barren outcrops of several geologic formations. In the WRFO, ligulate feverfew (*Bolophyta ligulata*) occurs on barren shale exposures of the Parachute Creek Member along Raven Ridge, and in Evacuation Creek, White Faced Butte, Park Canyon, and along the border with Utah west of Rabbit Mountain. At least two occurrences of the species are known in the Raven Ridge ACEC near Mormon Gap, at approximately 5,500 feet in elevation. In addition to occurrences in Rio Blanco and Moffat counties, Colorado, this species occurs in six counties in Utah where there are at least 17 separate occurrences in northeast and north-central parts of the state (Albee et al. 1988). On the WRFO, energy development has not occurred in or adjacent to ligulate feverfew habitats.

**Tufted cryptantha**
In the WRFO, tufted cryptantha (*Cryptantha (Oreocarya) caespitosa*) occurs at three locations west of the Raven Ridge ACEC on the Colorado/Utah border. The center of this plant's distribution is in Wyoming, where there are more than 130 occurrences in 11 counties (University of Wyoming 1998). In addition, this species occurs in Rio Blanco and Moffat counties in Colorado, five counties in Utah where there are at least 11 occurrences (Franklin 2005), and one county in Idaho (NRCS 2009). It occurs on sparsely vegetated clay knolls usually with other cushion plants, in pinyon/juniper and sagebrush communities. Threats are unknown.

**Rollins' cryptantha**
Rollins' cryptantha (*Cryptantha rollinsii*) is a biennial herb up to about 18 inches in height that occurs on white shale knolls in pinyon/juniper and sagebrush habitats (Natureserve Explorer 2009).

It flowers in May. Rollins cryptanth occurs on exposures of the Parachute Creek Member of the Green River Formation at elevations of 5,300 to 5,800 feet. It occurs along Raven Ridge in the Raven Ridge ACEC, White Faced Butte, Park Canyon, and Rabbit Mountain. These locations occur on the WRFO's western edge near the Colorado/Utah border. Populations are also known in five Utah counties with at least 31 separate occurrences (Albee et al. 1988) and one Wyoming County. Additional survey for this species may increase the known species' range in the WRFO as potential habitats may occur along the White River just west of Raven Ridge in Lower Evacuation Creek, and perhaps in other oil-shale barren areas within the Piceance Basin as recorded in undocumented occurrence data.

**Ephedra buckwheat**

Ephedra buckwheat, a diminutive member of the large group of buckwheats that occur on shale barren habitats in the WRFO, also prefers sparsely vegetated outcrops of Green River Formations. It is known to occur on approximately 80 acres (9 occurrences) in the Raven Ridge ACEC. At least two additional populations have been identified south of the ACEC and account for approximately 30 acres. It also occurs in Uintah County, Utah, but the distribution within the county is not known (NatureServe 2009). A few (less than three each) Ephedra buckwheat and Cathedral Bluff dwarf gentian populations have been linearly bisected by historic Rio Blanco county and BLM road construction. Energy development is currently occurring in Ephedra buckwheat habitats in the WRFO.

**Cathedral Bluff dwarf gentian**

Cathedral Bluff dwarf gentian is a clump-forming annual up to 4 inches tall that blooms in July or August. This unique dwarf upland gentian occurs on more open shale knolls and rolling slopes at several sites in open grassland saddles of the Cathedral Bluffs, which are the only known Colorado locations for this species. They occur on four sites totaling approximately 50 acres on the WRFO, with one-half of these occurrences near the east edge of the East Douglas Creek ACEC. These sites are located within the Cathedral Bluffs ACEC. Additional habitats are suspected in the area. Utah gentian populations have been linearly bisected by historical Rio Blanco CR 122 and the Calamity Ridge Road. Livestock, wild horses, and other ungulate grazing occur on Calamity Ridge; however, energy-related disturbance has not involved the Utah gentian to date. In addition to the occurrences on Cathedral Bluffs, this species also has at least 12 occurrences in 8 counties in Utah (Albee et al. 1988) and occurs in 1 county in Nevada.

**Narrow-stem gilia**

Narrow-stem gilia (*Aliciella [Gilia] stenothyrsa*) is a biennial or perennial herb up to about 20 inches tall with a basal rosette. Narrowstem gilia occurs on silty to gravelly loam soils derived from the Green River or Uintah Formations, in grassland, sagebrush, mountain mahogany, or pinyon/juniper communities, at 5,000 to 6,000 feet elevation (Spackman et al. 1997). It blooms in late May or June. Only a few acres (less than 10) of the narrowstem gilia have been found on the WRFO. It has been observed in the lower part of Greasewood Creek and near Blue Mountain in habitats located west and north of the Coal Rim ACEC. The sites in lower Greasewood Creek are located within the Lower Greasewood ACEC. Narrowstem gilia is only known to be in Rio Blanco County in Colorado, but there have been at least 25 occurrences in five Utah counties (Albee et al. 1988). Energy development is not occurring in current narrow-stem gilia habitats in the WRFO.

**Piceance bladderpod**

Piceance bladderpod grows as small rosettes with silvery leaves and blooms from June through July. Like the Dudley Bluffs twinpod, this species is an edaphic endemic, known to occur in Green River Formations in the Piceance Basin and adjacent areas. It is endemic to Colorado, occurring in Rio

Blanco, Garfield and Mesa counties. It has not been found in habitats in common with either Dudley Bluffs species. There are approximately 35 mapped occurrences that cover approximately 140 acres on the WRFO. Approximately 10 acres are found within the East Douglas Creek ACEC. These areas range in elevation from approximately 6,200 to 8,600 feet. The Piceance bladderpod occupies steep exposures of Green River-derived soils in the Piceance Basin near Timber Gulch (and surrounding drainages) and very steep, often west-facing escarpments along the Cathedral Bluffs. A few populations are also known from Calamity Ridge. Noxious weed spraying for leafy spurge in Hay Gulch, and surrounding areas, has the potential to affect isolated Piceance bladderpod populations. Previous habitat changes from inter-state pipeline and powerline corridors have also influenced the Piceance bladderpod; however, these effects have had limited impacts on local populations, and this member of the wild mustard family has shown some ability to re-establish following site reclamation. Threats include oil and gas development, oil shale, and off-road vehicles.

**Flaming Gorge evening primrose (*Oenothera acutissima*)**

Flaming Gorge evening primrose (*Oenothera acutissima*) only occurs in Moffat County in Colorado and in two counties in Utah, where there are 13 occurrences (Franklin 2005). Within the WRFO Planning Area, this species is only known in the Blue Mountain area, where it is currently in intermittent shallow soil drainages above 7,000 feet elevation. Entire sandstone beds are exposed in many areas, which create moist habitat associated with seeps, and/or late spring over-surface flow that drain into narrow rock surface fractures. One historically mapped population, and several new occurrences, are known to occur on BLM lands that lie adjacent to Dinosaur National Monument north of Blue Mountain near the Colorado/Utah border. Survey of potential habitat for this species has not been widespread and additional populations are likely to occur. The known habitats are within several grazing allotments, and some isolated two-track road and fence construction may be affecting the species in a limited manner; however, energy development in this area has not occurred and is not occurring. This species could be adversely affected by livestock grazing due to its occurrence in areas with nearby water and lush forage (O'Kane 1988).

**White River Beardtongue**

The White River beardtongue (*Penstemon scariosus* var. *albifluvis*) is known to be within five locations on the WRFO. Three of these populations occur in the Raven Ridge ACEC. Two populations have been found south of the White River; one is located approximately 11 miles south of the White River on the Utah/Colorado border and the other is located approximately 3 miles east of the Utah/Colorado border slightly south of the White River. Thirty-three percent of all known White River beardtongue populations fall within Colorado. The White River beardtongue occupies less than 50 total acres on the WRFO. Most of the population is found in Utah, where the total population was estimated in 1994 to cover about 200 acres and an estimated population of 23,000 individuals in 14 discrete occurrences. This penstemon is found on steep exposures of the Parachute Creek member of the Green River Formation. This loosely deposited formation often forms narrow benches that occur in horizontal bands within extremely steep white shale slopes. Habitat for White River beardtongue is a series of knolls and slopes of raw oil shale derived from the Green River geologic formation (Franklin 1995). These soils are often white or infrequently red, fine-textured, shallow, and usually mixed with fragmented shale. These very dry substrates occur in lower elevations of the Uinta Basin, between 5,000 and 6,700 feet (FWS 2013). The plants are found protruding from the benches, often with a small suite of other shale-barren species such as the Ephedra buckwheat (*Eriogonum ephedroides*; BLM sensitive). Suitable habitat consists of sparsely vegetated shale slopes at elevations of 5,000 to 7,800 feet (Spackman et al. 1997).

**Graham's beardtongue**

Graham's beardtongue *(Penstemon grahamii)* occurs in the WRFO Planning Area on 4 known populations primarily near Raven Ridge and along the Utah border north of Park Canyon. Most of the Graham's beardtongue populations occur in Utah in Uintah County, Utah (FWS 2006a). Graham's beardtongue occurs on approximately 1,300 acres on the WRFO, with all but approximately 14 acres occurring within the Raven Ridge ACEC. Approximately 59 percent of the total known population of Graham's beardtongue is on BLM-managed lands, with the remainder on non-Federal lands with State and private ownership (FWS 2013). Graham's beardtongue is an endemic plant found mostly in exposed oil shale strata of the Parachute Creek Member and other unclassified members of the Green River geologic formation. Most populations are associated with the surface exposure of the petroleum-bearing oil shale Mahogany ledge (Shultz and Mutz 1979, Neese and Smith 1982). Suitable habitat consists of sparsely vegetated desert shrub and pinyon/juniper communities on talus slopes and knolls of the Green River Formation, at elevations of 4,700 to 6,000 feet (Spackman et al. 1997). The steep shale barren habitats are similar, and often adjacent to White River beardtongue populations, although the two species have not been found occupying the same habitat locations.

**Cathedral Bluff meadow-rue**

The Cathedral Bluff meadow-rue (*Thalictrum heliophilum*) grows on sparsely vegetated steep talus slopes and ridges of the Parachute Creek Member of the Green River Shale. Populations of this species are found only in Garfield, Mesa, and Rio Blanco counties in Colorado, with 36 known occurrences and approximately 130,000 individuals (Neely et al. 2009). Flowers occur from June to early August.

### 3.3.4.3   Proposed Dinosaur Trail MLP

Raven Ridge occurs within the proposed Dinosaur Trail MLP and provides habitat for a variety of special status plants including White River beardtongue, Graham's beardtongue, debris milkvetch, Duchesne milkvetch, ligulate feverfew, tufted cryptantha, Rollins' cryptantha, and ephedra buckwheat. Narrow-stem gilia and Flaming Gorge evening primrose have been found near Blue Mountain.

## 3.4   Wild Horse Management

Wild horse management within BLM-administered lands of the WRFO Planning Area follows the Wild Free-Roaming Horses and Burros Act of 1971, as amended (Public Law 92-195) and 43 CFR 4700 (Protection, Management, and Control of Wild and Free-Roaming Horses and Burros). The 1975 White River Resource Area Management Framework Plan (MFP) identified two wild horse units: the Piceance Basin Herd Unit and Douglas Herd Unit. The Douglas Herd Unit included what is now the East Douglas portion of the Piceance/East Douglas Herd Management Area and the West Douglas Herd Area (HA). The East and West Douglas areas were physically separated by completion of SH 139 right-of-way fence in 1983. In 2007, BLM completed the West Douglas Herd Area Plan Amendment to the 1997 White River RMP to discontinue maintaining the wild horse population in the West Douglas HA. The wild horses are presently distributed among the Piceance-East Douglas HMA, the West Douglas HA, and the North Piceance HA (Table 3-26). A wild horse management plan for the Piceance-East Douglas HMA was approved in June 1981.

Wild horses are presently managed within the Piceance-East Douglas HMA in the WRFO Planning Area (Map 3-11). Appropriate management levels for wild horses are established in accordance with the 1975 MFP and objectives and management actions through Multiple Use Decisions. Multiple Use Decisions establish the appropriate minimum and maximum number of wild horses to

*Chapter 3 – Affected Environment*

be managed within each grazing allotment contained within an HMA or HA. Annual monitoring data are collected to evaluate progress toward meeting management objectives. AMLs are established based on "an intensive monitoring program involving studies of grazing utilization, trend in range condition, actual use, and climatic factors" (109 Interior Board of Land Appeals 120). The AML, objectives, and management actions may be modified in future Multiple Use Decisions for the grazing allotments contained within an HMA. Wild horses that establish home ranges outside of HMA or HA boundaries are removed during gathers. Wild horses are removed from private lands at the request of the landowner and after reasonable efforts to keep the animals off private lands have failed.

### Table 3-26. Wild Horse Herd Management and Herd Areas

| Herd Management Area and Herd Areas | Acres | | | | AML |
|---|---|---|---|---|---|
| | BLM | CDOW | Private | Total Acres | |
| Piceance-East Douglas HMA[1] | 158,200 | 8,000 | 23,800 | 190,000 | 135-235 |
| West Douglas HA | 123,400 | 0 | 4,800 | 128,200 | 0 |
| North Piceance HA | 76,300 | 0 | 13,000 | 89,300 | 0 |
| **Total** | **357,900** | **8,000** | **41,600** | **407,500** | **135-235** |

SOURCE: BLM 2005c.

NOTE:

[1]Includes Greasewood Addition

Current conditions within the WRFO Planning Area show that wild horse populations continue to grow, often exceeding AMLs (see Table 3-27). The estimated population of wild horses was 559 in the fall of 2010 and 583 by fall of 2011. Various factors including drought conditions, historic grazing, wildfires, and wild horse population growth may adversely affect habitat and in some instances herd health. The trend for wild horses; however, is moving toward a desired condition as wild horse management efforts (including horse gathers to attain AMLs and fertility control methods as well as sex ratio adjustments in the herd) attempt to moderate population growth and habitat degradation. During 2006, fertility control was used on 28 mares that were returned to the Piceance-East Douglas HMA. The WRFO completed a planned wild horse gather operation on September 30, 2011 which removed 260 wild horses from the HMA, North Piceance Herd Area, and areas just outside of the HMA except for the West Douglas Herd Area. Management actions are incorporated in the alternatives and described in more detail in Chapter 2.

### Table 3-27. Wild Horse Populations in Herd Management and Herd Areas

| Period | Herd Management or Herd Area | | | |
|---|---|---|---|---|
| | North Piceance HA (Number of Individuals) | Piceance-East Douglas HMA (Number of Individuals) | West Douglas HA (Number of Individuals) | Outside HMA or HA[1] (Number of Individuals) |
| Fall 1996 | 31 | 525 | 155 | 85 |
| Spring 1997 | 31 | 286 | 95 | 55 |
| Fall 1997 | 37 | 208 | 114 | 66 |
| Fall 1998 | 42 | 242 | 65 | 10 |
| Spring 1999 | 42 | 242 | 65 | 10 |
| Fall 1999 | 14 | 198 | 78 | 12 |
| Fall 2000 | 37 | 343 | 114 | 66 |
| Spring 2002 | 39 | 294 | 77 | 44 |
| Fall 2002 | 15 | 202 | 92 | 13 |
| Fall 2003 | 17 | 242 | 111 | 16 |

**Table 3-27. Wild Horse Populations in Herd Management and Herd Areas**

| Period | Herd Management or Herd Area | | | |
| --- | --- | --- | --- | --- |
| | North Piceance HA (Number of Individuals) | Piceance-East Douglas HMA (Number of Individuals) | West Douglas HA (Number of Individuals) | Outside HMA or HA[1] (Number of Individuals) |
| Fall 2004 | 18 | 291 | 133 | 19 |
| Spring 2005 | No Inventory | No Inventory | 97 | 97 |
| Fall 2005[2] | 55 | 349 | 116 | 45 |
| Spring 2006[2] | 25 | 363 | No Census | 27 |
| Fall 2006[3] | 8 | 216 | 139 | 30 |
| Spring 2010 (Inventory Year) | 49 | 265 | 73 | 79 |

SOURCE: BLM, 2006-2008.
NOTES:
[1]This area includes all of the wild horses in the Douglas Creek Basin area outside of the Piceance-East Douglas HMA.
[2]Population for these periods is based on projections.
[3]Fall gather occurred, wild horses were removed.

### 3.4.1.1   Proposed Dinosaur Trail MLP

There are no wild horse areas or herd management areas within the Dinosaur Trail MLP (Map 3-11).

## 3.5   Wildland Fire Ecology and Management

Changes in National Fire Policy since the 1997 White River RMP have resulted in greater emphasis on restoring the role of fire in ecosystem function where possible. Fire management planning begins at the land use plan level (i.e., the 1997 White River RMP) and then those land use plan decisions are implemented using activity-level plans. The 1997 White River RMP provides guidance on desired conditions and identifies allowable uses and management actions designed to achieve those desired conditions. The activity-level plan or Fire Management Plan (FMP) carries forward the direction for landscape scale planning by more specifically outlining management response and providing on-the-ground implementation direction needed to meet the objectives outlined in the RMP. The BLM maintains a current FMP that identifies fire management units (FMUs), values at risk, and communicates appropriate management response for all federally managed lands in the WRFO. Fire rehabilitation methods are described in the WRFO FMP (BLM 1999b). In those FMUs with relatively few values at risk of wildfire and where the current RMP allows, using wildfire to benefit resources is acceptable to manage unplanned ignitions. Prescribed fire and fires managed for resource benefit have increased in the WRFO since the last RMP. Prescribed and fires managed for resource benefit typically occur in the higher elevations of the WRFO.

Current fire regime condition class (FRCC) indicates the degree of departure from the historic fire regime (HFR) (Hann and Bunnell 2001) (Table 3-28). The classification is based on a relative measure describing the degree of departure from the historic natural fire regime in terms of either fire frequency or stand replacement. Extreme departure from the HFR results in changes to one or more of the following ecological components: vegetation characteristics (species composition, structural stages, stand age, canopy closure, and mosaic pattern); fuel composition; fire frequency, severity, and pattern; and other associated disturbances (e.g., insect and diseased mortality, grazing, and drought).

**Table 3-28. Current Fire Regime Condition Classes**

| FRCC Condition Class | Attributes |
|---|---|
| Condition Class 1 | • Fire regimes are within or near an historical range.<br>• The risk of losing key ecosystem components is low.<br>• Fire frequencies have departed from historical frequencies by no more than one return interval.<br>• Vegetation attributes (species composition and structure) are intact and functioning within an historical range. |
| Condition Class 2 | • Fire regimes have been moderately altered from their historical range.<br>• The risk of losing key ecosystem components has increased to moderate.<br>• Fire frequencies have departed (either increased or decreased) from historical frequencies by more than one return interval. This results in moderate changes to one or more of the following: fire size, frequency, intensity, severity, or landscape patterns.<br>• Vegetation attributes have been moderately altered from their historical range. |
| Condition Class 3 | • Fire regimes have been significantly altered from their historical range.<br>• The risk of losing key ecosystem components is high.<br>• Fire frequencies have departed from historical frequencies by multiple return intervals. This results in dramatic changes to one or more of the following: fire size, frequency, intensity, severity, or landscape patterns.<br>• Vegetation attributes have been significantly altered from their historical range. |

SOURCE: FRCC 2007.

Most of the WRFO Planning Area (72 percent) is in the FRCC 2 category. The remaining 28 percent of the WRFO Planning Area is in the FRCC 3 category. None of the WRFO Planning Area is in the FRCC 1 category (Map 3-12).

The WRFO manages wildfire and fuels by categorizing certain areas into FMU polygons. Resource specialists typically delineate each FMU according to several characteristics including: (1) FRCC category; (2) natural disturbance patterns based on fire history data and physical features such as land forms and vegetation; (3) areas of concern and limitations for fire management activities; (4) areas where wildland fire might be desired; (5) areas where use of wildland fire may be desirable but the threat to private property and life would preclude fire managed for resource benefit, such as in wildland-urban interface areas; (6) developed sites, such as recreational and cultural sites, where any type of fire is not desired.

There have been minor shifts in FRCC since the last RMP. The fuel structure is gradually changing in low elevation portions of the WRFO due to management practices and incursion of non-native annual grasses, primarily cheatgrass. Fire frequencies and size are increasing in low elevation shrub communities (sagebrush and salt desert shrub types) where cheatgrass becomes established because it provides a more continuous surface fuel than the historic vegetation community. In areas where fuels are continuous, fire spreads rapidly during the fire season. The fire season normally begins in late April and runs through early November with peak fire season occurring between May 1 and August 31.

In the higher elevation sagebrush communities where mountain big sagebrush often intermingles with early seral pinyon/juniper, a combination of factors other than cheatgrass altered current FRCC. Under HFR I or II, relatively frequent wildfires promoted the mortality of pinyon/juniper and regrowth of herbaceous vegetation in following years. Sagebrush moved in gradually afterwards

as wildfire maintained a mosaic pattern of vegetation that displayed low incidences of pinyon/juniper. Historic grazing practices reduced the herbaceous grasses and forbs which had historically carried wildfires through these communities. Meanwhile, fire suppression encouraged pinyon/juniper, a species that does not tolerate fire. Without wildfire, pinyon/juniper could create a canopy over low growing shrubs and grasses, effectively shading them out. This increase in woody vegetation and reduction in fine fuels does not carry wildfire as well. Consequently, fire extent has decreased and fire frequency has lengthened in some of these communities.

Fire suppression has not altered fire regimes in the late seral pinyon/juniper (>100 years old). The growth form of this community creates stand-replacement fires that occur very infrequently, so recent fire suppression activities have not affected fire frequencies, extents, or severity in this woodland type.

In some ponderosa pine and Douglas fir forest types of the WRFO, fire suppression has altered fuel structure over time. Under historic conditions, relatively frequent wildfire of low intensity maintained a forest with little ladder fuels and a high canopy openness ratio. Wildfires rarely reached the forest canopy, and if they did, they did not carry through the canopy due to a lack of continuity. Thirty years of effective fire suppression has increased the presence of ladder fuels in some of these forests and the tree canopy has become more continuous. In these instances, there is a greater probability of higher intensity stand-replacement fires that occur less frequently. However, this alteration is not likely to result in a loss of key ecosystem components as indicated by the lack of FRCC 3 throughout the WRFO Planning Area. It should be noted that the ponderosa pine and Douglas fir forest types of the WRFO are relatively small. They have always displayed a high incidence of pinyon/juniper, which extended their HFR to a "classic" ponderosa pine and Douglas fir forest (HFR 1).

## 3.5.1    Unplanned/Wildland Fire

Management objectives for naturally ignited fires as well as constraints on fire-fighting activities are provided in the 1997 Wither River RMP. Current wildland fire conditions are described in detail in the WRFO FMP (BLM 1999b). Table 3-29 shows, by years, all reported wildland fires in the WRFO, Wildland Fire Use, and annual acreages that were reported and submitted in the Wildland Fire Management Information System (WFMI) 1202 reports.

The 1997 White River RMP provides guidance and identifies approximately 639,600 acres where fire will be managed to achieve resource conditions. The number and acreage of wildland file use (WFU) fires have increased in the Planning Area since the last RMP. From 2000 through 2007, the WRFO managed 21 fires for 13,793 acres to help achieve resource objectives as shown in Table 3-29. The first was in 2001, the Black Mountain Fire burned 29 acres, and the first large WFU was when the Yankee Gulch Fire burned a total of 1,500 acres.

### Table 3-29. Unplanned Wildfires in the WRFO Between 2000–2007

| Year | Number of Fires | Acres | WFU | WFU Acres |
|------|-----------------|-------|-----|-----------|
| 2000 | 253 | 20,300 | 0 | 0 |
| 2001 | 232 | 5,100 | 1 | 29 |
| 2002 | 91 | 11,900 | 1 | 18 |
| 2003 | 203 | 3,200 | 7 | 1,600 |
| 2004 | 94 | 9,000 | 4 | 8,900 |
| 2005 | 128 | 3,500 | 8 | 3,255 |

**Table 3-29. Unplanned Wildfires in the WRFO Between 2000–2007**

| Year | Number of Fires | Acres | WFU | WFU Acres |
|---|---|---|---|---|
| 2006 | 112 | 1,400 | 0 | 0 |
| 2007 | 149 | 150 | 1 | 1 |
| **TOTAL** | **1,262** | **234,550** | **22** | **13,793** |

SOURCE: Wildland Fire Information System 1202 Reports, 2000-2007.

## 3.5.2   Planned/Prescribed Fire

The 1997 White River RMP provides guidance on using prescribed fire to meet resource objectives. More detailed prescribed fire management is described in the WRFO FMP (BLM 1999b). The number and acreage of prescribed fires varies each year based on available funding and weather conditions present to implement each project. Mechanical vegetation treatments are being used as an optional method to prescribed fires to reduce hazardous fuels on the landscape. The uses of mechanical methods in general cost more per acre than prescribed fire and are limited to available funding for implementation.

## 3.5.3   Proposed Dinosaur Trail MLP

North of US 40, the Dinosaur Trail MLP is classified as FRCC 2 while the southern portion of the MLP is classified as FRCC 3 (Map 3-12).

## 3.6   *Heritage and Visual Resources*

## 3.6.1   Cultural Resources

Cultural resources are recognized as fragile, irreplaceable resources with potential public and scientific uses, representing an important and integral part of our nation's heritage. Cultural resources are contained within a definite location of human activity, occupation, or use identifiable through field inventories (i.e., surveys), historical documentation, or oral evidence (BLM 2004c). Archaeological resources, a subset of cultural resources, describe any material remains of human life or activities that are at least 100 years of age and are of archaeological interest as further defined at 43 CFR 7.3(a). The term "cultural resource" also includes historic or architectural sites, structures, or places with important public and scientific uses, and may include definite locations (i.e., sites or places) of traditional cultural or religious importance to specified social and/or cultural groups. The BLM defines a definite location as having discernible, mappable, or more-or-less exact limits or boundaries, on a scale that could be established by a survey crew using conventional sensing and recording equipment, by an informant's direct on-the-ground indication, or by precise placement through documentary sources (BLM 2004c).

Resource condition is assessed by field observation, cultural resource inventories, site monitoring, and project review. The primary resource indicator is whether there is a loss of those characteristics that may qualify the property for listing on the National Register of Historic Places or would diminish the cultural value of areas important to Native American or other traditional communities. These characteristics could be affected by physical destruction, damage, or alteration of the resource; isolation of the resource; alteration of setting; neglect resulting in deterioration and destruction; or the transfer, sale, or lease of the resource. Specific indicators include the extent or intensity of natural weathering, erosion, wildfire, ground disturbance, grazing, recreation use, unauthorized collection, intrusions to setting, and vandalism. This loss affects the completeness and accuracy of the scientific information that could be derived from a resource; the aesthetic, historic,

or interpretive value of the resource; and/or the importance of the resource in maintaining social and cultural traditions.

## Identified Cultural Resources

A variety of cultural resource site types attributed to a range of culturally distinct chronological periods have been discovered in the WRFO Planning Area. These sites range in age from more than 10,000 years ago to present, and a high potential exists for additional resources to be found. Inventories have historically been implemented to support site-specific surface-disturbing projects, such as mineral and energy development, to comply with the requirements of Section 106 of the National Historic Preservation Act and other cultural resources preservation laws. Additionally, the BLM as well as academic institutions have performed research such as surveys, site recordings, and excavations, although such scientific investigations have been limited in scope and areal extent. Implemented in this manner, previous cultural resources inventories have not resulted in the identification of the variety of environmental and ecological ranges present in the WRFO Planning Area. As a result, known sites do not fully represent the extant cultural resources.

As reported in a recently prepared Class I overview (BLM 2008g), over 5,900 cultural resources localities have been identified in the WRFO Planning Area. Extant cultural resources are classified into site types based on similar physical or cultural characteristics. At the most general level, cultural resource sites are categorized as either prehistoric or historic. Because geographic locations desirable for human use at one time could be desirable for human use at other times, the number of sites (whether historic/prehistoric or within prehistoric cultural affiliations) is not aggregate, as cultural material from one site may be attributable to several time periods.

The majority of the previously recorded sites in the WRFO Planning Area have been identified as prehistoric in age and cultural affiliation. Prehistoric sites could be associated with one or more of four regional cultural traditions: Paleo-Indian, Archaic, Formative (Fremont), and Proto-historic. Documented prehistoric site types include: artifact scatters, open and sheltered camps, quarries, kill sites, rock shelters, rock art, burials, stone circles, wickiups, granaries, and rock walls. Historic sites are cultural resources with a period of significance following A.D. 1880 and are organized thematically. Table 3-30 displays the cultural chronology represented in the WRFO Planning Area.

### Table 3-30. Cultural Time Periods Represented in the WRFO Planning Area

| Cultural Time Stage | Age Range | Characteristics |
|---|---|---|
| Paleo-Indian | Before 6400 B.C. | Big-game subsistence patterns. Numerous projectile points from this period have been recovered, but no sites in the WRFO have been identified to date. Paleo-Indian sites are significant due to scarcity. |
| Archaic | 6400–400 B.C. | Nomadic lifestyle with small game hunting, seed, and nut-gathering subsistence patterns. Projectile points and camps have been found and further discoveries are possible. Archaic sites are scientifically important because of the differences between Colorado Plateau/Great Basin Archaic cultures and Northwestern Plains Archaic cultures in the WRFO Planning Area. |
| Formative | 400 B.C.–A.D. 1300 | Increased use of bow and arrow, ceramics, rock art, and farming with associated sedentary lifestyle and population growth. As a result, more permanent settlements and associated cultural resources remain from these cultures. Scientific uncertainty still remains concerning their origin and disappearance. |

**Table 3-30. Cultural Time Periods Represented in the WRFO Planning Area**

| Cultural Time Stage | Age Range | Characteristics |
|---|---|---|
| Proto-Historic | A.D. 1300–A.D. 1881 | Nomadic lifestyle with hunting-gathering traditions while retaining use of ceramics and small unnotched or side-notched projectile points. Later traits also include equestrian rock art motifs, European trade goods, wickiups, and a possible increase in the use of obsidian. |
| Historic | After ca. 1880 | Euro-American settlement patterns associated with agriculture, homesteading, limited ranching and hay farming, minerals development, and transportation. |

SOURCE: Reed and Metcalf 1999.

## Current Resource Management

BLM's mandate to manage cultural resources (BLM 2004c) includes, but is not limited to, the following authorities:

- An Act for the Preservation of American Antiquities (Antiquities Act) of 1906;
- Historic Sites Act of 1935;
- Reservoir Salvage Act of 1960, as amended by the Archaeological and Historic Preservation Act of 1974;
- National Historic Preservation Act of 1966, as amended;
- Archaeological Resources Protection Act of 1979, as amended;
- Federal Land Policy and Management Act of 1976; and
- Executive Order 13287 ("Preserve America" 63 FR 43, March 5, 2003).

Since 1965, nearly 8,500 cultural resources surveys have been conducted in the WRFO, with peaks of activity in the 1980s, 1990s, and 2000s, which mirror mineral activity in the region. The investigations have documented more than 5,900 cultural resources. Although these studies have produced a wealth of data on prehistoric and historic occupations in the WRFO, much remains to be learned. Proper management of cultural resources within the WRFO depends on the resolution of data gaps and deficiencies, threats to resources, and sensitivity areas.

The Class I overview (BLM 2008g) has identified the following gaps and deficiencies:

- Subsurface potential—information about buried sites should be integrated with surface data.
- Absence of temporal data—assigning age estimates to site occupations clarifies intra- and inter-site relationships.
- Lack of survey on private lands—private lands are generally exempt from federal laws and regulations protecting cultural resources and, as such, constitute a "hole" in the dataset.
- Lack of tested and excavated sites—surface sites are limited in the amount of information they can provide about the regional culture history.
- Lack of surface visibility—areas obscured by vegetation (especially in the eastern half of the WRFO Planning Area) can obscure cultural resources and restrict interpretations.

- Consistency in NRHP recommendations—care should be taken that systematic biases in evaluating sites for eligibility to the NRHP are minimized and all characteristics of a resource are fully considered.

In an attempt to refine methods of identifying areas where cultural resources may be concentrated, archaeologists have attempted to develop predictive models to help identify likely areas of human occupation. The MPA in the WRFO was of particular interest in the 1970's as the area was the focus of interest due to potential for oil shale and nahcolite mineral development. Robert Hurlbett (1976) began the process with his Master's Thesis from Colorado State University followed a few years later by James Grady (1980) for his Doctoral Dissertation. Grady's effort was followed in the early 1980's by a contract project funded by the BLM (Newkirk and Roper 1983) which covered an even larger area of the MPA. All three of these studies were hampered to some extend by the relative lack of data then available in the MPA area.

Hurlbett's database was only 126 sites, and only covered 17 percent of the MPA in the Piceance Creek drainage.(1976:21) Grady (1980) and Newkirk and Roper (1983) had the benefit of more data, based on additional work having been conducted in the Piceance Basin (c.f. Olson et al. 1976, Weber et al. 1977, Grand River Institute 1980). One common observation made by Hurlbett, Grady, Newkirk and Roper was that very few sites had dates associated with them. The reasons for this short coming may be many and varied but one factor that cannot be overlooked is the lack of artifacts on sites that allow for precise dating of the remains. Lacking diagnostic types of surface artifacts means that it becomes necessary to use other methods for establishing chronological associations, such as radiocarbon dating, which is often beyond the scope of Section 106 project specific inventory efforts. Newkirk and Roper (1983) also lamented the varying quality of data gathering when attempting to do predictive modeling. They specifically observed in their study that:

> "The observed differences in total site density (Table 24) probably cannot be accounted for solely by differing configurations of resource zones in the five survey areas. Real differences must be considered as a factor producing the different observed values. (1983:48)"

Hurlbett, Grady, Newkirk and Roper go into great detail about various aspects of predictive modeling which will not be revisited here. If the reader is interested in a more detailed discussion it is suggested that these sources are a good starting point as they reference a larger selection of method and theories about predictability of site locations. However, all models do appear to have certain attributes in common and they revolve around those items necessary for human survival. Two of the most critical, and general, attributes are potable water and sources of food. These are reliable in a general sense but other factors can, and should, be added to the model such as ease of access to water, horizontally and vertically (c.f. Newkirk and Roper 1983), plus availability of other critical food resources. Food resources are, to a certain degree, culturally determined but may be modeled based on general trends such as a desire for animal protein, vegetal resources and topography. Generally, for prehistoric occupants, steep slopes are not selected for occupation, whereas historical mining interests may have favored steep terrain as it might more readily expose desired mineral resources.

Other factors used by the researchers, in an attempt to refine their respective models included elevation, aspect, soil type, vegetation cover (i.e., Pinyon-juniper forest versus sagebrush parks or mountain browse communities - i.e., mountain mahogany/service berry and oakbrush dominated communities) and types of artifacts found on a site (Newkirk and Roper 1983) with varying degrees of success. Grady (1980) noted that in some of his modeling hypotheses there were surprises. One particular result was that in his study soil type had no impact at all on site location. He further noted

that while the Douglas fir/aspen communities had the highest biomass figures the food productivity for humans ranked very low. In Grady's model access to mule deer seemed to be one of the more important factors in site location after access to potable water, regardless of elevation.

More recently, in 2012, SWCA Environmental Consultants conducted predictive modeling for a 3-D geophysical exploration in the White River Dome (Kennedy et al. 2012). The SWCA model used more sophisticated technology that was previously possible, and input 14 variables in all; many of the same environmental variables as the previous researchers such as aspect, vertical and horizontal distance to potable water, vegetation type and extent of coverage. In the end, they stated that "No probability model will identify every potential site location with reasonable model efficiency...." (Kennedy et al. 2012:68).

The take away from the discussion above is that while predictive modeling may be of some value in broad, general terms, there are still too many factors that may influence cultural resource site location that are not recognized or understood. It may be that for some types of cultural resources predictability may not be feasible or practical. One factor may have to do with changes in the local environment over time, such as changes in precipitation patterns, and societal norms for certain prehistoric populations where some areas are considered acceptable for occupation or resource procurement and some are not even when similar resources are present in either area.

One particular type of cultural resource that may prove to be problematical, to predict is ancient travel and trade routes. It is generally understood from various studies that items of perceived value such as obsidian were traded over wide areas. Yet the routes used for such trade or travel are virtually unknown. One problem confronting researchers is that until the introduction of the horse to the new world, routes were foot paths, that could have been rapidly converted back to forest or grasslands through natural processes and are thus unrecognizable. A possible second factor may be that researchers are not generally trained in identification of prehistoric or even proto-historic trails. Another issue is the possibility that foot paths may have become horse paths to be followed by conversion to wagon tracks or even modern county or state roads (c.f. Hauck 1989). At the present time there is too little data to proceed further with analyzing archaeological trails.

Using known site data, the Class I overview written in 2008 in preparation for this RMPA has identified areas of low, medium, and high sensitivity based upon the distribution of two independent variables, distance to water and slope (BLM 2008g). The current sensitivity ratings are fluid and will change as more inventory data becomes available. In the end, there is no viable substitute for on the ground inventory work when it comes to identifying and locating culture resources.

Known high site sensitivity areas are found along the southern flank of Blue Mountain, in the Danforth Hills and Piceance Creek Basin, and the area west of the Cathedral Bluffs to the Colorado-Utah state line. The Canyon Pintado Historic District is listed on the National Register of Historic Places and is noteworthy as an area with high densities of rock art and archeological sites (see Map 3-18). Additionally, there are five individual sites listed on the NRHP in the WRFO. One is Duck Creek Wickiup Village, which is in the MPA area. The remaining four, Collage Shelter, the Carrot Men Site, Fremont Lookout Fortification Site, and the Thornburgh/Battle of Milk Creek site, are located in the Missouri Creek, Cottonwood Creek, Douglas Creek, and Milk Creek drainages, respectively. The medium site sensitivity areas surround the high areas. Low site sensitivity areas encompass the largest part of the WRFO Planning Area, especially in the eastern half.

### 3.6.1.1   Proposed Dinosaur Trail MLP

Within the Dinosaur Trail MLP area, the southern flank of Blue Mountain is known to be a high site sensitivity area and Moosehead Mountain ACEC was designated, in part, to protect cultural resources.

## 3.6.2   Paleontological Resources

Paleontological resources, usually thought of as fossils, include the bones, teeth, body remains, traces, or imprints of plants and animals preserved in the earth through geologic time. Paleontological resources also include related geological information, such as rock types and ages. All fossils offer scientific information, but not all fossils offer noteworthy scientific information. Fossils are generally considered to be scientifically noteworthy if they are unique, unusual, rare, diagnostically or stratigraphically important, or add to the existing body of knowledge in a specific area of science. Most fossils occur in sedimentary rock formations. Although experienced paleontologists can generally predict which formations may contain fossils and what types of fossils may be found based on the age of the formation and its depositional environment, predicting the exact location where fossils may be found is not possible (BLM 1998a).

Paleontological resources are integrally associated with the geologic rock units (i.e., formations) in which they are located. If extensive excavation on a certain formation in one geographic area results in significant paleontological resources, a potential exists that excavations throughout the extent of the formation may produce fossil material as well. To date, there are approximately 355 known paleontological localities within the WRFO Planning Area. Efforts to fully inventory fossil resources within the WRFO Planning Area have been spotty and limited in scope. The potential for the occurrence of significant paleontological resources is currently determined through the Potential Fossil Yield Classification system (BLM 2008h):

- **Class 1—Very Low.** Geologic units that are not likely to contain recognizable fossil remains.

- **Class 2—Low.** Sedimentary geologic units that are not likely to contain vertebrate fossils or scientifically significant nonvertebrate fossils.

- **Class 3—Moderate** or **Unknown.** Fossiliferous or sedimentary geologic units where fossil content varies in significance, abundance, and predictable occurrence; or sedimentary units of unknown fossil potential.

- **Class 4—High.** Geologic units containing a high occurrence of significant fossils. Vertebrate fossils or scientifically significant invertebrate or plant fossils are known to occur and have been documented, but may vary in occurrence and predictability. Surface-disturbing activities may adversely affect paleontological resources in many cases.

- **Class 5—Very High.** Highly fossiliferous geologic units that consistently and predictably produce vertebrate fossils or scientifically significant invertebrate or plant fossils, and that are at risk of human-caused adverse impacts or natural degradation.

Paleontological localities are areas of known paleontological resources with defined boundaries, usually associated with excavation and data recovery efforts. Although a comprehensive paleontological inventory has not been carried out for the WRFO Planning Area, government, academic, and private industry personnel have studied paleontological resources in various contexts, but principally in relation to surface disturbing development activities.

**Management for Paleontological Resources**

The BLM is legally mandated to manage and protect scientifically noteworthy fossils for the benefit of the public, primarily under the auspices of FLPMA and the Paleontological Resources Preservation Act (PRPA) of 2009 (16 U.S.C. 470aaa et seq.). Noteworthy fossils include all vertebrate fossil remains (body and trace fossils) and those plant and invertebrate fossils determined on a case-by-case basis to be scientifically unique.

Management of fossils found on BLM-administered lands is restricted to public surface. Collecting fossils is allowed with some restrictions, depending on the significance of the fossils. Casual collecting of a reasonable amount of common invertebrate and plant paleontological resources may be allowed for non-commercial personal use, either by surface collection or the use of non-powered hand tools resulting in only negligible disturbance to the Earth's surface and other resources. Commercial collecting of fossils is not permitted. Collection of all vertebrate and any administratively designated plant or invertebrate fossils may occur only under permits issued by the BLM to qualified researchers. The basic permit is the survey and limited surface collection permit issued for reconnaissance work and collection of surface finds within an area of 1 square meter. If the disturbance exceeds 1 square meter or requires mechanized equipment, the researcher must apply for an excavation permit. All paleontological resources collected under a permit remain public property and must be curated in an approved repository according to Sec. 6304 of the PRPA. Prior to authorization of an excavation permit, and in some cases for survey permits in special management areas, the BLM must prepare an EA for the proposed location. All fossils collected under a permit remain public property and must be curated in an approved repository according to BLM Manual 8270, Paleontological Resource Management.

Management actions pertaining to paleontological resources are incorporated in the alternatives and described in more detail in Chapter 2.

### 3.6.2.1   Proposed Dinosaur Trail MLP

The surface geology in the Dinosaur Trail MLP area is more diverse than in other portions of the field office (Map 1-3) and as such the potential for fossils also varies widely within the area from PFYC 2 to PFYC 5.

## 3.6.3   Visual Resources

The purpose of visual resource management is to manage the quality of the visual environment and reduce the visual impact of development activities while maintaining the viability of all resource programs. Visual resource management involves evaluating landscapes and determining appropriate techniques and strategies for maintaining visual quality and reducing adverse impacts. The BLM developed the Visual Resource Management (VRM) system to identify and evaluate an area's scenic values to determine the appropriate management objectives for those values. A summary of the BLM VRM program is below.

- Lands have different visual values that warrant different management.
- The VRM system is a two-part process involving an inventory phase (VRI) and designation phase (VRM), typically conducted during the land use planning process, when management classes are assigned to areas.
- The VRI process identifies and evaluates visual values that are considered throughout the land use planning process and provides the baseline from which visual change is to be measured. These visual values are assessed through three inventory components: (1) Scenic

Quality Rating Units (SQRUs), (2) Sensitivity Level Rating Units (SLRUs), and (3) Distance Zones (DZs).

- The results of the VRI are four inventory classes that are incorporated into the land use planning process. These inventory classes are the basis for visual values, and they serve as an indicator of visual quality and a baseline measurement for scenic values.

- The VRI classes are then assigned to VRM management classes with established objectives. Visual resource values are considered along with all other multiple resource values during the RMP process to determine VRM classes; management decisions reflect a multidisciplinary analysis.

- The VRM classes established by the RMP provide guidelines for the design and construction of all surface-disturbing activities.

- Proposed projects are analyzed using the contrast rating process to determine if VRM class objectives are met and to identify design adjustments and/or mitigation measures to minimize visual impacts.

**Visual Resource Inventory Classes**

As part of the VRM program, the BLM is to prepare and maintain – on a continual basis – an inventory of visual values on all its public lands. The inventory stage identifies the visual resources of an area and assigns them to an inventory class using BLM's VRI process, which is described in BLM Manual H-8410-1. The VRI process consists of the following:

- A scenic quality evaluation to rate the visual appeal of an area;

- A sensitivity level analysis to assess public concern of an area's scenic quality; and

- A delineation of distance zones to indicate the relative visibility of the landscape from primary travel routes or observation points.

On the basis of these three factors, BLM-administered lands are placed into one of three VRI classes – Class II, III, or IV – that represent the relative value of the visual resources and provide the basis for considering visual values in the land use planning process. VRI classes II, III, and IV are determined using a combination of scenic quality, sensitivity level, and distance-zone overlays to assign the proper class. In the relative scale of visual values, Class II has a higher visual value than Class III, which is moderately valued. Class IV is least valued. A fourth class – Class I – is assigned to special management areas for which a management decision has previously been made to maintain a natural landscape. These areas are the most valued landscapes and include such areas as WSAs.

A field office-wide VRI was completed for the WRFO in late 2011. The BLM's VRM system was used to inventory and classify the scenic resources across the entire field office. The VRI determined which of four VRI classes various areas of the landscape fall within. This included identifying the scenic quality, sensitivity levels, and distance zones within each of the VRI classes. According to the VRM manual, VRI classes are informational in nature, providing the basis for considering visual values in the land use planning process. They do not establish management direction and this RMPA/EIS does not include any new designations or VRM classifications. VRI classes do however provide a baseline from which potential change can be measured. Table 3-31 illustrates the acreage and percentage of each of the four VRI classes within the WRFO.

*Chapter 3 – Affected Environment*

**Visual Resource Management Classes**

The management objectives set forth in the 1997 Record of Decision and Approved Resource Management Plan provide the visual management guidelines for the design and development of future projects and for rehabilitation of existing projects (BLM 1997). Management objectives for visual resources are established by classifying the landscape into one of four VRM Classes. Table 3-31 lists the acreage for both VRM and VRI classes in the WRFO Planning Area.

The four VRM class objectives are as follows:

- **Class I.** The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.

- **Class II.** The objective of this class is to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

- **Class III.** The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

- **Class IV.** The objective of this class is to provide for management activities that require major modification of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

**Table 3-31. VRM and VRI Class Acreage in the WRFO Planning Area on BLM Surface**

| VRM Class Designations | VRI Class I Acres | % | VRI Class II Acres | % | VRI Class III Acres | % | VRI Class IV Acres | % | Total Acres | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Outside the MPA** | | | | | | | | | | |
| VRM I | 39,145 | 3 | 0 | 0 | 67 | 0 | 18 | 0 | 39,230 | 3 |
| VRM II | 18,283 | 1 | 103,729 | 7 | 122,886 | 8 | 120,908 | 8 | 365,806 | 25 |
| VRM III | 22,422 | 2 | 100,021 | 7 | 93,700 | 6 | 209,891 | 14 | 426,033 | 29 |
| VRM IV | 41 | 0 | 17,507 | 1 | 16,763 | 1 | 110,904 | 8 | 145,215 | 10 |
| **Subtotal** | **79,891** | **5** | **221,257** | **15** | **233,415** | **16** | **441,721** | **30** | **976,285** | **67** |
| **Within the MPA** | | | | | | | | | | |
| VRM I | | | | | | | | | | 0 |
| VRM II | | | 15,624 | 1 | 15,476 | 1 | 29,625 | 2 | 60,725 | 4 |
| VRM III | | | 61,757 | 4 | 102,403 | 7 | 253,500 | 17 | 417,660 | 29 |
| VRM IV | | | | | | | | | | 0 |
| **Subtotal** | **0** | **0** | **77,381** | **5** | **117,879** | **8** | **283,125** | **19** | **478,385** | **33** |