**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-2484

CITIZENS FOR A HEALTHY COMMUNITY;

HIGH COUNTRY CONSERVATION ADVOCATES;

CENTER FOR BIOLOGICAL DIVERSITY;

SIERRA CLUB;

WESTERN WATERSHEDS PROJECT;

and WILDEARTH GUARDIANS,

      Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U. S. Department
of Interior;

TRACY STONE MANNING, in her official capacity as Director of the U.S. Bureau of Land
Management;

STEPHANIE CONNOLLY, in her official capacity as Acting Director of the Bureau of Land
Management's Colorado State Office;

UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the
Interior;

MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife
Service;

      And,

ANNE TIMBERMAN, in her official capacity as Western Colorado Field Supervisor for the
U.S. Fish and Wildlife Service's Ecological Services Division.

      Federal Defendants.

**PLAINTIFFS' SECOND AMENDED PETITION FOR REVIEW OF AGENCY ACTION AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This action challenges the Bureau of Land Management's ("BLM's") approval of a revised Resource Management Plan ("RMP or "plan") for BLM's Uncompahgre Field Office ("UFO") and the associated Revised Biological Opinion ("BiOp") approved by the United States Fish and Wildlife Service ("USFWS"). BLM's approval of the RMP expands lands available to oil and gas leasing and development, committing hundreds of thousands of acres of land to oil and gas development without consideration of reasonable alternatives, without taking a hard look at the plan's greenhouse gas emissions and resulting impacts to the climate and natural resources, and without defining or taking steps to prevent unnecessary or undue degradation of the lands— particularly resulting from the plan's contribution to the climate crisis.

2.      Plaintiffs Citizens for a Healthy Community, High Country Conservation Advocates, Center for Biological Diversity, Sierra Club, Western Watersheds Project, and WildEarth Guardians (collectively, "Climate Groups" or "Plaintiffs") bring this civil action for declaratory and injunctive relief against BLM, Tracy Stone Manning, Stephanie Connolly, USFWS, Martha Williams, and Anne Timbermanin their official capacities (collectively, "Federal Defendants"), for their approval of the RMP and associated BiOp through an Environmental Impact Statement ("EIS") and Record of Decision ("ROD"), signed April 2, 2020. BLM's approval of the RMP violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations promulgated by the Council on

Environmental Quality, 40 C.F.R. §§ 1500 *et seq*, as well as the Federal Land Policy and

Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et. seq*., and FLPMA's resource management

planning regulations, 43 C.F.R. § 1610. USFWS' approval of the Revised BiOp violated the

Endangered Species Act ("ESA") 16 U.S.C. §§ 1531 *et seq.*

3. The UFO planning area is approximately 3.1 million acres in Delta, Gunnison,

Mesa, Montrose, Ouray, and San Miguel Counties, and includes 675,800 acres of BLM-

administered lands. The UFO RMP controls development on 971,220 acres of federal mineral

estate underlying private, municipal, and state-owned lands in addition to BLM-administered

federal surface estate. The RMP, as approved, allocates 871,810 acres as "open" to fluid mineral

leasing, resulting in estimated direct greenhouse gas ("GHG") emissions of 2,512,570 tons of

carbon dioxide equivalent ("$CO_2e$") per year, and indirect emissions of up to 129 million tons

$CO_2e$ over the planning period.

4. The Planning Area includes the North Fork Valley, located on the western slope

of Colorado's Rocky Mountains, which is renowned for its combination of natural beauty,

exceptional recreational opportunities, unique geology, and award-winning wines, fruits, and

vegetables. The Valley is home to the largest concentration of organic and chemical-free farms

within the State of Colorado, and is one of two American Viticulture Areas in the State. North

Fork Valley farmers, ranchers, orchardists, and winemakers, as well as the robust outdoor

recreation industry, are building a strong and resilient local economy by using the Valley's

resources wisely, conserving its soil, and valuing its water and air. The local economy and

Valley residents depend on clean air and flowing, clean water from the headwaters of the North

Fork of the Gunnison River. This bucolic valley is also home to a number of fish and wildlife species; farther downstream, the river continues to provide important fish and wildlife habitat.

5.     The United States is the world's largest producer of oil and gas. Spurred by advances in extractive technologies, industry intends for oil and gas to remain a prominent source of energy for years to come. Yet this goal is fundamentally incongruous with the action needed to keep global warming below scientifically prescribed limits to maintain a livable planet: a transition away from fossil-fuels. As demonstrated by recent events, including climate-exacerbated heatwaves, wildfires, the worst drought in a millennium, and increasingly urgent pleas from the scientific community, there is simply no defensible path by which oil and gas development can continue on public land in a manner consistent with a livable climate. Disregarding these scientific and physical realities, our federal government has committed 25,552,475 acres of public lands for oil and gas leasing, on which nearly 100,000 producing wells already exist. Oil, gas, and coal development on public lands accounts for nearly 25 percent of the country's annual emissions. In other words, it is impossible to address the existential threat of the climate crisis without completely transforming the way public lands are managed for fossil fuel exploitation.

6.     The United States, and the world, are already experiencing a multitude of impacts from the warming climate that threaten public health, species survival and ecological degradation, and ultimately our very way of life. These effects will only grow over time and increase in severity if the drivers of anthropogenic climate change—runaway greenhouse gas emissions—are not eliminated in the near term. The managed decline of the oil and gas sector is

fundamental to this process, and necessary to avoid the worst effects of the climate crisis on the environment and humanity.

7.      Efforts to reduce oil and gas sector emissions occur within the global context of the United Nations Framework Convention on Climate Change, Conference of Parties' "Adoption of the Paris Agreement" on December 12, 2015, in which official representatives of 196 nations, including the United States, agreed to a take and increase concrete measures to abate climate change by reducing global greenhouse gas emissions and, among other things, "pursue efforts to limit the [average global] temperature increase to 1.5°C above pre-industrial levels, recognizing that this would significantly reduce the risks and impacts of climate change." The United States and other countries reaffirmed this commitment in 2022 in the Glasgow Climate Pact.

8.      There is broad scientific and economic recognition, both at home and abroad, of the need to move aggressively on a path towards a clean energy future. Despite these facts—and BLM's own acknowledgement in the UFO RMP and elsewhere that oil and gas emissions are warming the planet and threatening human health and the environment—BLM is, through this RMP, persists in willfully ignoring the full impact of its decisions to authorize and facilitate the leasing and development of public lands for fossil fuels, including oil and gas in the Uncompahgre planning area.

9.      BLM also adopted the UFO RMP without considering how actions authorized by and carried out under the RMP—including expanded oil and gas development and virtually unaltered harmful levels of grazing—could affect Gunnison Sage-grouse persistence in light of its recent and precipitous population declines. The U.S. Fish and Wildlife Service has

demonstrated a similar indifference to the plight of this threatened species by issuing a Revised BiOp in July of 2021 which, rather than substantively addressing the anticipated effects of the RMP in light of the species' imperiled status, merely papered over the errors of the prior, 2018 BiOp by updating the species information without correcting the most egregious and faulty assumptions underpinning it, and without meaningfully addressing any of the threats to the species posed by implementation of the RMP.

10.     Federal Defendants, in the UFO RMP/EIS and ROD and Revised BiOp: (1) failed to analyze reasonable alternatives, including a no-leasing alternative; (2) failed to take a hard look at greenhouse gas emissions and climate impacts, including the severity and scope of emissions and the effect of those emissions on society; (3) failed to take a hard look and apply best available science to quantify methane pollution and the warming potential of such emissions; (4) failed to take a hard look at impacts affecting the survival and recovery of the threatened Gunnison sage-grouse and its habitat, and (5) failed to define and take action to prevent unnecessary and undue degradation of the lands, particularly in the context of climate impacts.

11.     Because of these failures, Climate Groups seek a declaratory judgment and injunctive relief to remedy the violations complained of herein. Climate Groups also seek an award of attorneys' fees, costs, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

## JURISDICTION AND VENUE

12. This action arises under NEPA, 42 U.S.C. §§ 4321-4370m-12; FLPMA, 43 U.S.C. §§ 1701-1787; the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*, and the ESA, 16 U.S.C. §§ 1531 *et seq.*

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because it arises under the laws of the United States and involves the United States as a defendant.

14. This action reflects an actual, present, and justiciable controversy between Climate Groups and BLM. Climate Groups' interests will be adversely affected and irreparably injured if BLM continues to violate NEPA, FLPMA, and federal regulations as alleged herein, and if this challenged decision is implemented. These injuries are concrete and particularized and fairly traceable to BLM's decision, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

15. The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706, and would redress the actual and imminent, concrete injuries to Climate Groups caused by BLM's failure to comply with duties mandated by NEPA, FLPMA, and their implementing regulations.

16. The challenged agency action is final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

17. Plaintiffs' claims against the BLM ripened and accrued on April 10, 2020, when BLM took final agency action by noticing issuance of its Record of Decision in the *Federal*

*Register.*[1] On information and belief, the Record of Decision is the first site-specific final agency action implementing the challenged UFO RMP. Plaintiffs' claims against the USFWS ripened and accrued on March 29, 2022.

18.     Climate Groups have exhausted all required administrative remedies.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the final agency actions concern federal surface and minerals located in Colorado that BLM manages pursuant to federal statutes. Venue is also proper under 28 U.S.C. § 1391(e)(1) because officers of the United States in Colorado are defendants and a substantial part of the events and omissions giving rise to this case occurred in BLM offices located in Colorado. Additionally, Plaintiffs Citizens for a Healthy Community and High Country Conservation Advocates have offices and are headquartered in western Colorado, and Plaintiffs Center for Biological Diversity, WildEarth Guardians and Sierra Club each have offices in Denver, Colorado.

## PARTIES

20.     Plaintiff CITIZENS FOR A HEALTHY COMMUNITY ("CHC") is a 500-member nonprofit organization located in Paonia, Colorado. CHC was founded in 2010 for the purpose of protecting the Delta County region's air, water, and foodsheds from the impact of oil and gas development. CHC's members and supporters include farmers, ranchers, vineyard and winery owners, and other concerned citizens impacted by oil and gas development, who currently live in, and plan to continue to live in, use, and enjoy the communities and landscapes

---

[1] Notice of Availability of the Record of Decision for the Uncompahgre Field Office Approved Resource Management Plan, CO, 85 Fed. Reg. 20296 (Apr. 10, 2020).

affected by the challenged BLM action. CHC brings this action on its own behalf and on behalf of its adversely affected members.

21.     Plaintiff HIGH COUNTRY CONSERVATION ADVOCATES ("HCCA") is a nonprofit organization located in Crested Butte, Colorado with over 900 members. HCCA was founded in 1977 to conserve and protect wild places, rivers, and wildlife in and around Gunnison County. HCCA has worked on oil, natural gas, and coal bed methane development in Gunnison County for over a decade to prevent irreparable harm to its members' interests. HCCA's members live in and use and plan to continue to live in, use, and enjoy the communities and landscapes, including public lands, affected by the challenged BLM action. HCCA brings this action on its own behalf and on behalf of its adversely affected members.

22.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit conservation organization headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center has an office in Denver, Colorado. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to advocate actively for increased protections for species and their habitats in Colorado. The Center has over 81,000 members and 1.7 million online members and activists. The Center's board, staff, and members use public lands in Colorado, including lands that will be affected by the UFO RMP, for quiet recreation, scientific research, aesthetic pursuits, and spiritual renewal. The Center brings this action on its own behalf and on behalf of its adversely affected members.

23.     Plaintiff SIERRA CLUB is one of the country's largest and oldest environmental organizations. Sierra Club was founded in 1892 and now has over 800,000 members. Sierra Club

is dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and encouraging humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club and its members advocate for management of public lands that promotes conservation and continued enjoyment of outdoor spaces. Sierra Club's Colorado chapter has over 23,000 members and is one of the largest grassroots environmental organization in the state. Sierra Club's members use and plan to continue to live in, use, and enjoy the communities and landscapes, including public lands, affected by the challenged BLM action. Sierra Club brings this action on its own behalf and on behalf of its adversely affected members.

24.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a is a nonprofit conservation organization founded in 1993, with more than 12,000 members and supporters, and has staff and field offices in Idaho, Montana, Wyoming, Arizona, Utah, Nevada, Oregon, and California. WWP works throughout the West, including in Colorado, to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250 million acres of western public lands, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness.

25.     Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians has offices in Colorado, Montana, New Mexico, Arizona, Washington, Idaho, and Oregon. With more than 200,000 members and supporters—

including more than 10,000 members and supporters in Colorado—Guardians works to effect a transition from fossil fuels to clean energy in order to safeguard the West. Guardians has actively engaged in issues related to the federal government's management of public lands and publicly owned fossil fuel minerals throughout the American West, including in the North Fork Valley of western Colorado. The organization and its members have an interest in ensuring that management of public lands and fossil fuels takes into account concerns such as climate change, water and air quality impacts, and cumulative impacts to the western Colorado landscape. Guardians brings this action on its own behalf and on behalf of its adversely affected members.

26.     Climate Groups and their members have concrete and particularized interests in the Uncompahgre planning and decision areas, and in particular, in the protection of fragile land, wildlands, air, water, habitat, wildlife, agricultural industries, and communities impacted by fluid mineral and fossil fuel leasing and production.

27.     Climate Groups and many of their members' interests are deeply rooted in the communities of the American West where Climate Groups and their members reside, work, and recreate. These interests are also bound to the land, wildlands, air, rivers, streams, habitat, wildlife, and other components of healthy, intact landscapes in the Uncompahgre RMP planning area—all of which are threatened by human-caused climate change, and other impacts associated with oil and gas development. Each of the Climate Groups and their members use and enjoy these public lands within the Uncompahgre RMP planning area for some or all of the following activities: hiking, hunting, camping, photography, aesthetic enjoyment, spiritual contemplation, agriculture, and other vocational, scientific, and recreational activities. Some of Climate Groups' members own surface lands overlying federal minerals that are subject to the Uncompahgre

RMP. Climate Groups and their members intend to continue to use and enjoy BLM and other Uncompahgre planning area lands, wildlands, wildlife habitat, rivers, streams, and environments regularly and on an ongoing basis in the future, including this year. Climate Groups' members use land that will be impacted by the UFO RMP for farming, ranching, orcharding, and wine production. Fluid mineral leasing and production will harm climate groups' concrete and particularized economic interests in these industries.

28.     The aesthetic, recreational, scientific, educational, religious, and procedural interests of Climate Groups and their members have been and will be adversely affected by the process through which the BLM approved the UFO RMP, and by BLM's resulting decision. The adverse impacts from BLM's process and decision threaten actual, imminent, concrete, and particularized harm to Climate Groups and their members' interests by interfering with their recreational, scientific, and spiritual enjoyment of these lands and their values and by compromising their economic interest in various agricultural industries. The challenged action will lead to increased noise and air pollution, the sights and sounds of industrial activity, truck and heavy equipment traffic, health effects, and other impacts, which will undermine the recreational, scientific, spiritual, and economic value of the area to Climate Groups and their members. Through their members, Climate Groups have an interest in ensuring the RMP is as environmentally protective as possible and is implemented based on the most informed decision-making possible.

29.     Climate Groups seek relief that will remedy the injuries they and their members will suffer as a result of BLM's process and decision.

30.     Federal Defendant UNITED STATES BUREAU OF LAND MANAGMENT is an agency within the United States Department of the Interior and is the federal agency charged with managing more than 245 million acres of public land in the United States and nearly 700 million acres of federal subsurface mineral estate.

31.     In this capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

32.     Federal Defendant TRACY STONE MANNING, is sued in her official capacity as the Director of the BLM. As Director, Ms. Stone Manning is the highest-ranking official within the BLM, and in that official capacity is responsible for managing the public lands, resources, and mineral estates of the United States, including lands and resources in Colorado subject to the decision at issue herein, and is responsible for implementing and complying with federal law, including the legal requirements that form the basis of this action.

33.     Federal Defendant STEPHANIE CONNOLLY is sued in her official capacity as Acting Colorado State Director of the Bureau of Land Management. In that official capacity, Ms. Connolly is responsible for managing public lands under BLM authority, including lands and resources in Colorado subject to the decision at issue herein, in accordance with NEPA, FLPMA, and other federal law. Ms. Connolly signed the Record of Decision at issue in this case in her then role as Manager of the BLM's Colorado Southwest District.

34.     Federal Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior and is the federal agency charged with managing fish and wildlife resouces in the public trust, including endangered and threatened species, migratory birds, certain marine mammals and certain native and interjurisdictional fish.

35.     Federal Defendant MARTHA WILLIAMS is sued in her official capacity as Director of the USFWS. As Director, Ms. Williams is the highest-ranking official within the USFWS, and in that official capacity is responsible for managing the fish and wildlife resources in the public trust and for implementing and complying with federal law, including the Endangered Species Act and other legal requirements that form the basis of this action.

36.     Federal Defendant ANN TIMBERMAN is sued in her official capacity as the Western Colorado Supervisor for the USFWS Ecological Services Division. In this capacity, Ms. Timberman is responsible for implementing the ESA within the Filed Office's jurisdiction. Ms. Timberman signed the Revised BiOp at issue in this case.

## STATUTORY AND REGULATORY SCHEME

### I.     National Environmental Policy Act

37.     In 1970, NEPA was enacted "to help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. §1500.1(c). "The policies and goals set forth in [NEPA] are supplementary to those set forth in existing authorizations of Federal agencies." 42 U.S.C. § 4335.

38.     Agencies must comply with NEPA before making "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(c)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

39.     Recognizing that "each person should enjoy a healthful environment," NEPA ensures that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the

widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. 42 U.S.C. § 4331(b), (c).

40.     NEPA regulations explain, in 40 C.F.R. § 1500.1(c), that:

Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

41.     The goal of NEPA is to ensure informed decisionmaking. NEPA sets forth specific procedural requirements federal agencies must follow as they carefully gather and evaluate relevant information about the potential impact of a proposed agency action on the environment. 42 U.S.C. § 4332. NEPA also aims to ensure that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process, thereby guaranteeing that the public is involved in and aware of agency processes. 40 C.F.R. §§1500.1(b); 1500.2(d); 1506.6.

42.     NEPA regulations direct that "[a]gencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

43.     To accomplish this purpose, NEPA requires that federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This environmental impact statement must, among other things, describe the "environmental impact of the proposed action," and evaluate

"alternatives to the proposal." *Id.* § 4332(2)(C)(ii), (iii). The EIS must rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16.

44.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Effects" are synonymous with "impacts." 40 C.F.R. § 1508.8.

45.     NEPA contains "'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a).

46.     Agencies are required to consider, evaluate, and disclose to the public "alternatives" to the proposed action and "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of resources." 42 U.S.C. §§ 4332(2)(C)(iii) & (E); 40 C.F.R. § 1502.14. The evaluation of alternatives must constitute a "substantial treatment," presenting the impacts of the alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and public." 40 C.F.R. § 1502.14.

47.     An agency's duty to consider "alternatives to the proposed action" is the "heart" of the NEPA process. 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); 40 C.F.R. § 1502.14(a). Agencies shall evaluate all reasonable alternatives to a proposed action. 40 C.F.R. § 1502.14.

48.     NEPA and its implementing regulations include express public participation requirements. Federal agencies "shall to the fullest extent possible encourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2 (d).

## II.     Federal Land Policy and Management Act

49.     FLPMA requires that "[t]he Secretary [of the Interior] shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). BLM must create resource management plans pursuant to FLPMA's resource management planning regulations. 43 C.F.R. § 1610.

50.     FLPMA directs that "the public lands be managed in a manner that will protect the quality of [critical resource] values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). This substantive mandate requires that BLM not elevate the development of oil and gas resources above other critical resource values in the planning area. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, conservation of these resources should be the preeminent goal.

51.     FLPMA also provides that public lands be managed "on the basis of multiple use and sustained yield." 43 U.S.C. § 1701(a)(7). "Multiple use" includes:

> [A] combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. *Id.* § 1702(c).

The nonimpairment mandate within FLPMA'S multiple use definition is unique among statutes that provide for multiple uses of natural resources.

52.     The term "sustained yield" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands *consistent with multiple use*. *Id*. § 1702(h) (emphasis added).

53.     In applying the principles of multiple use and sustained yield mandated by FLPMA, "the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

### III.     The Endangered Species Act

54.     The ESA provides a means to conserve endangered and threatened species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). To receive the full protections of the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA Section 4. *See id.* § 1533. The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A "threatened" species is "any species which is likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

55.     Concurrent with listing a species, the ESA requires the designation of critical habitat. 16 U.S.C. § 1533(a)(3)(A)(i); see also id. § 1533(b)(6)(C). Critical habitat means "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection;" and unoccupied areas "essential for the conservation of the species." *Id*. § 1532(5) (emphasis added). "Conservation" is defined as all methods that can be employed to "bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary." *Id*. § 1532(3).

56.     Once a species is listed and critical habitat is designated, Section 7 of the ESA imposes a substantive obligation on federal agencies to "insure that any action authorized, funded, or carried out by such agency...is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species. 16 U.S.C. § 1536(a)(2).  Jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.  50 C.F.R. § 402.02.  "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."  Id.  The ESA also

prohibits "take" of a species—which includes harassing, harming, wounding, killing, trapping, capturing, or collecting a listed species.  16 U.S.C. §§ 1538(a)(1), 1532(19).

57.     To fulfill the substantive mandates of section 7 of the ESA, federal action agencies must consult with an expert agency—here, FWS—before undertaking any action with that "may affect" affect listed species or their habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  If the proposed action "may affect" listed species or their critical habitats, formal consultation is required. 50 C.F.R. § 402.14(a). To complete formal consultation, FWS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or habitat.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. In carrying out the consultation process, "each agency shall use the best scientific . . . data available."  16 U.S.C. § 1536(a)(2).  The BiOp must include "a detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(1)(ii). The BiOp can either find (1) no jeopardy or no adverse modification; (2) that the action will cause jeopardy or adverse modification but such jeopardy or adverse modification can be avoided by implementing certain reasonable and prudent alternatives to the proposed action as designed; or (3) that jeopardy or adverse modification is unavoidable and thus the action cannot proceed. *Id.* § 402.14(h)(1)(iv).

58.     If the biological opinion concludes that the proposed action (or implementation of any reasonable and prudent alternatives) is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, but will result in the incidental take of the species, FWS must provide with the biological opinion an "incidental take statement." 16 U.S.C. §§ 1532(19), 1536(b)(4)(A); 50 C.F.R. § 402.14(i). The incidental take statement must specify the impact (amount or extent) of incidental taking on the

species, any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions," including but not limited to reporting requirements, that must be complied with by the agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). In order to monitor the impacts of incidental take, the agency must report the impact of its action on the listed species to FWS. *Id*. § 402.14(i)(3).

59.     After the procedural requirements of consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. The action agency must reinitiate consultation with the FWS if the projected amount of incidental take is exceeded or if : "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence;" or "a new species is listed or critical habitat designated that may be affected by the identified action." *Id*. §§ 402.14(i)(4), 402.16(a)(2-4).

## IV.     The Administrative Procedure Act

60.     The Administrative Procedure Act ("APA") requires agencies to engage in reasoned decision making based on a fully developed factual record. 5 U.S.C. §§ 701, *et seq*. An APA claim must be asserted to address NEPA and FLPMA violations set forth herein. The APA provides jurisdiction, standards of review, and available relief for persons who challenge a federal action. The APA requires the agency to substantiate its action in a contemporaneously prepared administrative record.

61.     Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action…found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)-(F).

## STATEMENT OF FACTS

### I.      Background of Planning Decision

62.     The Uncompahgre planning area includes a vast swath of land, which encompasses portions of six counties within its 3.1 million acres and stretches from Paonia in the north to Telluride in the South. The planning area includes 675,800 acres of BLM-administered lands, and controls development on 971,220 acres of federal mineral estate underlying federal, state, municipal, and private lands. The RMP, as approved, allocates the vast majority of this mineral estate—871,810 acres—as "open" to fluid mineral leasing with estimated direct greenhouse gas ("GHG") emissions of 2,512,570 tons of carbon dioxide equivalent ("$CO_2e$") per year, and up to 129 million tons $CO_2e$ in indirect emissions over 30 years.

63.     The UFO planning area contains a broad range of ecologically and socially unique landscapes. The counties within the planning area contain a diversity of land uses, environmental and wildlife resources, and associated economies, many of which depend on responsible stewardship of public lands to protect environmental resources, local economies, and the health of Colorado's communities. These resources have the potential to be impacted by the RMP in numerous ways. For example, numerous Class I air quality areas exist in and near the planning area, including Mesa Verde, Great Sand Dunes, and Black Canyon of the Gunnison National

Parks, as well as the Weminuche, West Elk, Maroon Bells-Snowmass, and La Garita Wilderness Areas.

64.     The UFO planning area also contains habitat for three of the seven remaining populations (Cerro Summit-Cimarron-Sims Mesa, Crawford, and San Miguel) of the threateed Gunnison sage-grouse (*Centrocercus minimus*). Approximately 88 to 93 percent of the species's historical range has been lost since Euro-American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all the populations to extirpation." Gunnison sage-grouse population numbers are estimated based upon the number of males counted on breeding grounds called leks. Between 2013 and 2020, the number of males counted on leks rangewide declined by over 40 percent. Lek counts both rangewide and in the Cerro Summit-Cimarron-Sims Mesa, Crawford, and San Miguel populations that use lands covered by the UFO RMP reached historic lows in 2019 and 2020. Threats to the continued survival of Gunnison sage-grouse populations within the planning area include, but are not limited to, habitat loss from grazing, energy development, and road construction, climate change, drought, invasive species, and disease.

65.     The Uncompahgre RMP/EIS revises the prior Uncompahgre Basin RMP, which was finalized in 1989, and portions of the San Juan/San Miguel Planning Area RMP, finalized in 1985, that are geographically applicable to the Uncompahgre Field Office.

66.     It is a responsibility of BLM, through development of an RMP, to balance the use of public lands and minerals through its multiple use mandate, to prevent unnecessary and undue degradation, and to minimize adverse impacts on natural, environmental, scientific, cultural, and other resources and values.

67.     The Uncompahgre RMP/EIS acts as a blueprint for how the BLM will manage areas of public land and minerals over a 20-year time horizon. The RMP establishes goals and standards for future management actions, as well as making some implementation-level decisions, based in part on the analysis of the direct, indirect, and cumulative impacts of various alternatives in the RMP's corresponding EIS.

68.     The next 20 years will determine whether global efforts to end anthropogenic greenhouse gas emissions, keep warming below the scientifically prescribed limit of 1.5°C, and to maintain a livable planet are possible. While the Uncompahgre RMP recognized anthropogenic climate change and the resulting impacts to the planning area, it failed to acknowledge this urgency, to consider alternatives, or to analyze or align management decisions consistent with the reality and timeline of the climate crisis.

69.     Without decisive action, the Gunnison sage-grouse may become extinct within the next 20 years, and the small satellite populations managed in part by the UFO certainly face extirpation during that time.

70.     Here, the process of developing the RMP, as mandated by NEPA, began in 2010, *see* 75 Fed. Reg. 8739 (Feb. 25, 2010), and included a scoping period and comment periods on draft and final environmental impact statements. Climate Groups participated extensively at all stages of development of the Uncompahgre RMP/EIS.

71.     In particular, on October 23, 2012, Western Environmental Law Center submitted to BLM a supplemental information letter, pursuant to 40 C.F.R. § 1502.9, on behalf of Plaintiff CHC.

72.     A second supplemental information letter was submitted on February 26, 2013 by a coalition of local community groups and advocates in the North Fork Valley, which proposed an alternative oil and gas leasing and management plan. This plan eventually became Alternative B-1 in the Draft RMP/EIS, also known as the "North Fork Alternative," which applied specifically to 63,390 acres of BLM-administered surface estate and 159,820 acres of federal mineral estate in the North Fork and Smith Fork drainages of the Gunnison River (referred to as the North Fork Valley), and which would close certain areas to oil and gas leasing and would impose development setbacks and strict surface-use restrictions.

73.     On February 3, 2014, Western Environmental Law Center, on behalf of a coalition of organizations, submitted a third set of supplemental comments.

74.     On June 3, 2016, BLM released the Draft RMP/EIS, beginning a 90-day public comment period. This period was extended by 60 days and ended November 1, 2016. The Draft EIS evaluated five alternatives: (1) No Action; (2) Alternative B, emphasizing environmental values and habitat conservation; (3) Alternative B-1, the North Fork Alternative; (4) Alternative C, emphasizing the maximization of resource exploitation and economic production; and (5) Alternative D, BLM's preferred alternative of mixed uses.

75.     On November 1, 2016, Western Environmental Law Center, again on behalf of a coalition of organizations, submitted comments on the Draft RMP/EIS.

76.     On June 17, 2019, BLM published the Proposed RMP and Final Environmental Impact Statement ("FEIS").

77.     The FEIS introduced a new alternative, Alternative E, as the agency's preferred alternative, which BLM described as "a reasonable combination of objectives and actions from the four alternatives (A, B, C, and D) presented in the Draft RMP/EIS."

78.     In fact, Alternative E is almost uniformly more exploitative of resources and less protective of environmental values than *any* of the initial alternatives—in some cases even more so than Alternative C—and represents a significant departure from the previous preferred Alternative.

79.     The newly inserted and preferred Alternative E is dramatically different from the Draft RMP/EIS's preferred Alternative D. Among other things, Alternative E, as compared to D, opens an additional 5,840 acres to fluid mineral leasing and reduces the protected status of many thousands of acres of land, including moving 18,320 acres of land that would have been managed to protect wilderness characteristics, and placing it in a newly established category that will be "managed to minimize impacts on wilderness character while managing for other uses."

80.     The Final RMP/EIS estimated annual direct emissions of 2,512,570 metric tons $CO_2e$ over the planning period and indirect emissions of up to 129 million tons $CO_2e$ over a 30-year period. BLM estimates that more than 500 new oil and gas wells will be drilled over the planning period.

81.     On July 29, 2019, Western Environmental Law Center, on behalf of a coalition of organizations including Climate Groups, filed a protest of the proposed RMP and final EIS. On February 7, 2020, BLM denied the protest.

82.     On April 10, 2020, BLM issued the Record of Decision approving the Final RMP/EIS. 85 Fed. Reg. 20296 (Apr. 10, 2020).

## II.   Background on the Climate Crisis

83.     The scientific consensus is clear: as a result of greenhouse gas ("GHG") emissions, our climate is rapidly destabilizing with potentially catastrophic results, including rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other destructive changes. It is now conclusively established that GHG emissions from the production and combustion of fossil fuels are the predominant drivers of climate change.

84.     Carbon dioxide ("$CO_2$") is the leading cause of climate change and the largest source of GHG emissions in the United States. According to a 2017 EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2015,* carbon dioxide comprised 82.2 percent of total U.S. GHG emissions—or 5,411.4 million metric tons—in 2015. EPA's data indicates that fossil fuel combustion accounted for 93.3 percent of $CO_2$ emissions within the U.S. in 2015.

85.     Methane ("$CH_4$") is an extremely potent GHG, with a global warming potential 87 times that of $CO_2$ over a 20-year period. Over a 100-year period, methane has a climate impact 36 times greater than that of $CO_2$ on a ton-for-ton basis. Large amounts of methane are released from underground coal mines in the North Fork Valley of Colorado, and during the extraction, processing, transportation, and delivery of oil and gas, with significant climate impacts.

86.     The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate

change. In its 2014 assessment report on climate change, the IPCC provided a summary of our understanding of human-caused climate change:

- Human influence on the climate system is clear, and recent anthropogenic emissions of [GHGs] gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic [GHG] emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20[th] century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of [GHGs] will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in [GHG] emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level will continue to rise.

87.    The western United States is particularly susceptible to the effects of climate change. The West is experiencing increasing temperatures and prolonged droughts, with widespread impacts across forests, wildlife, and human communities that threaten resilience in

the face of continued warming. Local economies, which rely on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses, have also seen significant impacts.

88.     The IPCC issued a special report in October 2018 that examined, in more depth, the impacts of global warming of 1.5°C above pre-industrial levels as compared to 2.0°C. The IPCC's findings included:

- Climate models project robust differences in regional climate characteristics between present-day and global warming of 1.5°C, and between 1.5°C and 2°C. These differences include increases in: mean temperature in most land and ocean regions (high confidence), hot extremes in most inhabited regions (high confidence), heavy precipitation in several regions (medium confidence), and the probability of drought and precipitation deficits in some regions (medium confidence).

- By 2100, global mean sea level rise is projected to be around 0.1 meter lower with global warming of 1.5°C compared to 2°C (medium confidence).

- On land, impacts on biodiversity and ecosystems, including species loss and extinction, are projected to be lower at 1.5°C of global warming compared to 2°C. Of 105,000 species studied, 6% of insects, 8% of plants and 4% of vertebrates are projected to lose over half of their climatically determined geographic range for global warming of 1.5°C, compared with 18% of insects, 16% of plants, and 8% of vertebrates for global warming of 2°C (medium confidence).

- For oceans, coral reefs are projected to decline by a further 70-90% at 1.5°C (high confidence) with larger losses (> 99%) at 2°C (high confidence).

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. Limiting warming to 1.5°C could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (medium confidence).

- Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily

in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options, and a significant upscaling of investments in those options (medium confidence).

- Estimates of the global emissions outcome of current nationally stated mitigation ambitions as submitted under the Paris Agreement would lead to global [GHG] gas emissions in 2030 of 52-58 Gt CO2eq yr–1 (medium confidence). Pathways reflecting these ambitions would not limit global warming to 1.5°C, even if supplemented by very challenging increases in the scale and ambition of emissions reductions after 2030 (high confidence). Avoiding overshoot and reliance on future large-scale deployment of carbon dioxide removal (CDR) can only be achieved if global $CO_2$ emissions start to decline well before 2030 (high confidence).

89.     The U.S. Government Accountability Office ("GAO") has recognized that federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include: "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."

90.     Western Colorado is particularly susceptible to the effects of climate change and is already experiencing them in the form of increasing temperatures and prolonged droughts. On August 7, 2020, THE WASHINGTON POST reported that the Western Slope of Colorado, along with 3 counties in Utah, has warmed more than 2 degrees Celsius, double the global average, making it one of the the largest 2°C hot spots in the continental US.[2] With the region's snowpack

---

[2] Eilperin, Juliet, "2°C Beyond the Limit: This giant climate hot spot is robbing the West of its water," The Washington Post, August 7, 2020 available at:  https://www.washingtonpost.com/graphics/2020/national/climate-environment/climate-change-colorado-utah-hot-spot/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

shrinking and melting earlier, the ground absorbs more heat. In addition, early snowmelt results in more water evaporation and less water availability for farmers later in the season. Of particular relevance to the challenged plan, all five counties included in the UFO planning area have warmed more than 2.0°C over historic levels.[3]

91.     The impacts of these changes are widespread across forests, wildlife, and human communities, threatening the area's resilience in the face of continued warming. These impacts also have significant importance to local economies that are reliant on consistent snowfall, not only for recreational pursuits within the planning area, but also for agricultural and residential water. Forty million people downstream of the Colorado River rely on the River's water, a substantial amount of which is produced in the planning area.

92.     It is not too late for the United States government to take action to significantly lower the risk of much greater warming and climate disruption, but time is rapidly running out to avert the worst of the consequent effects. On February 28, 2022, the IPCC issued its latest climate report, which has been described as "an atlas of human suffering and a damning indictment of failed climate leadership." The report concluded, in essence, that "the catastrophic impacts of climate breakdown may soon outpace humanity's ability to adapt to it" There is simply no more time to issue and defend land use planning decisions that will lock in *decades* of additional oil and gas development. BLM's intransigent refusal to acknowledge this fact is the epitome of arbitrary agency action.

93.     The Secretary of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the

---

[3] *Id.*: Delta County: 2.1°C, Montrose County: 2.4°C, Mesa County: 2.3°C, Ouray County: 2.3°C, San Miguel: 2.2°C.

international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

94.     The GAO, in a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources,* concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

95.     Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change."

96.     More Recently, President Biden issued Executive Order 13990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis" and Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad. These Orders variously directed various federal agencies to take a number of actions to address the climate crisis, including by updating values for the Social Cost of Carbon and related values, directing a

"government-wide approach to the Climate Crisis, and, in particular, directing the Interior

Department to address the massive impacts of the federal oil and gas program on the climate

crisis by conducting a "comprehensive review and reconsideration of Federal oil and gas

permitting and leasing practices."

97.     In response to these orders, the Secretary of the Interior, Deb Haaland, issued

Secretarial Order No. 3399, titled "Department-Wide Approach to the Climate Crisis and

Restoring Transparency and Integrity to the Decision-Making Process. Like Executive Order

14008, Secretarial Order 3399 recognizes that "[t]he Nation faces a profound climate crisis" and

that this crisis "requires the Department of the Interior to take a holistic approach to honor the

Nation's trust responsibilities; address the climate crisis, advance environmental justice; and

build a clean energy future that creates good-paying jobs and powers our Nation."

98.     On October 29, 2021, BLM issued a report titled the "*2020 BLM Specialist

Report on Annual Greenhouse Gas Emissions and Climate Trends*." The Report:

> [P]rovides a detailed assessment of greenhouse gas (GHG) emission trends and
> potential climate impacts from energy development projects, specifically those
> that may result from the Bureau of Land Management (BLM) authorized coal, oil,
> and gas leases and approved development on public lands managed by the
> BLM.  This report examines carbon emissions from authorized development of
> the onshore federal mineral estate in the context of the nation's carbon economy
> and the relationship between energy generation and climate issues by providing
> life-cycle estimates of fossil fuel greenhouse gas emissions from that
> development.

The Report contains much of the analysis that is notably absent from the RMP Record of

Decision.

99.     On November 26, 2021, in response to Executive Order 14008, the Interior

Department issued a "Report on the Federal Oil and Gas Leasing Program," that was anything

but "comprehensive." The Report focused entirely on fiscal reforms that the Government

Accountability Office and Interior's Office of Inspector General have recommended for decades.

The Report mentioned "climate only" three times (once in naming Executive Order 14008),

nowhere mentioned the urgency of addressing the climate crisis, and contained no

recommendations that would meaningfully reduce GHG emissions from the federal oil and gas

program.

100.    As a result, there remains a fundamental, and ever more staggering disconnect

with regard to how public lands are managed for energy production, particularly in the West,

including public lands in the Uncompahgre Field Office, and national, state, and local policies to

limit GHG emissions. Federal Defendants cannot take informed action to address the climate

crisis, as required by Executive Orders 13990 and 14008 and Secretarial Orders 3226,3289, and

3399, without taking a hard look at the climate impacts of oil and gas development on our public

lands. As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of

climate change and to coordinate an effective response to its impacts," and "management

decisions made in response to climate change impacts must be informed by [this] science." Such

tools, per Secretarial Order 3399, include the social cost of greenhouse gases, including the

social cost of carbon, nitrous oxide, and methane.

101.    The White House Council on Environmental Quality ("CEQ"), the federal agency

responsible for NEPA oversight, has long recognized that:

> [M]any agency NEPA analyses to date have concluded that GHG emissions from an individual agency action will have small, if any, potential climate change effects. Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations. This approach does not reveal anything beyond the nature of the climate change challenge itself: The fact that diverse individual sources of emissions each make relatively small additions to global atmospheric GHG concentrations that collectively have huge impact.[4]

102.    BLM is responsible for the management of nearly 700 million acres of federal onshore subsurface minerals. The ultimate downstream GHG emissions from fossil fuel extraction of federally managed minerals by private leaseholders could account for approximately 23% of total United States GHG emissions and 27% of all energy-related GHG emissions.

103.    Estimated direct GHGs from development allowed in the BLM's UFO RMP Alternative E is 2,512,570 tons of $CO_2e$ per year. Estimated indirect GHGs from the high production scenario is 129 million tons $CO_2e$ over a 30-year period, with 37% of that total coming from federally-managed minerals.

104.    BLM has failed to adequately address climate change in the Uncompahgre RMP/EIS, as NEPA requires, through robust consideration of reasonable alternatives, through evaluation of both short- and long-term climate impacts, and by use of available tools or methods

---

[4] Revised Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews, 79 Fed. Reg. 77802 (Dec. 24, 2014).  Final guidance withdrawn pursuant to 82 Fed. Reg. 16576 (Apr. 5, 2017).

generally accepted in the scientific community to evaluate the impact of GHG emissions, including the social cost of carbon and global carbon budgets.

105.     In recognition of the consequences of human-caused climate change, federal agencies have developed a protocol for assessing the social cost of $CO_2$ emissions. The social cost of carbon is "an estimate of the monetized damages associated with an incremental increase in carbon emissions in a given year." Conversely, the social cost of carbon can represent "the value of damages avoided for a small emission reduction (i.e., the benefit of a $CO_2$ reduction)." The EPA has explained:

> The [social cost of carbon protocol] is meant to be a comprehensive estimate of climate change damages and includes changes in net agricultural productivity, human health, property damages from increased flood risk, and changes in energy system costs, such as reduced costs for heating and increased costs for air conditioning. However, given current modeling and data limitations, it does not include all important damages.

106.     The federal Interagency Working Group's ("IWG") Social Cost of Carbon estimates vary according to assumed discount rates and presumptions regarding the longevity and damages caused by carbon pollution in the atmosphere, which for 2020 produced a range of between $12 and $123 per metric ton of $CO_2$. Accepted practice typically applies the median value ($42 per metric ton) to determine the social costs of a given project, although the four values provided by the IWG offer a means of comparing alternative courses of action.

107.     Although the Trump Administration, through Executive Order 13783, disbanded the IWG, The Biden Administration, through Executive Order 13990, reestablished it and directed the IWG to publish interim social cost values and publish final values "no later than January 2022.".

108.     Carbon budgeting is another well-established method for estimating the impacts of GHG emissions

109.     A "carbon budget" offers a cap on the remaining amount of greenhouse gases that can be emitted while still keeping global average temperature rise below scientifically-based warming thresholds.

110.     The October 2018 IPCC Global Warming of 1.5°C special report provided a revised carbon budget, for a 66 percent probability of limiting warming to 1.5°C, estimated at 420 gigatons (Gt) $CO_2$ and 570 $GtCO_2$ depending on the temperature dataset used, from January 2018 onwards. One gigaton is equivalent to 1 billion tons. The IPCC also explained that the global emissions rate has increased to 42 $GtCO_2$ per year. At this rate, the global carbon budget would be expended in just 10 to 14 years, underscoring the urgent need for transformative global action to transition from fossil fuel use to clean energy. The February 2022 IPCC report noted that countries that are major emitters of GHGs are nowhere near on track to meet even a 2°C Carbon Budget.

111.     To put these global carbon budgets in the specific context of domestic U.S. emissions and the United States' obligation to reduce emissions, the United States is the world's largest historic emitter of greenhouse gas pollution, responsible for 26 percent of cumulative global $CO_2$ emissions since 1870, and is currently the world's second highest emitter on an annual and per capita basis. Between 2003 and 2014, approximately 25% of all United States and 3-4% of global fossil fuel GHG emissions are attributable to federal minerals leased and developed by the Department of the Interior.

112.    To meet the 1.5°C target, the estimated total U.S. carbon budget (for all time) is 25 $GtCO_2$ to 57 $GtCO_2$ on average, depending on the sharing principles used to apportion the global budget across countries. The estimated U.S. carbon budget consistent with limiting temperature rise to 2°C ranges from 34 $GtCO_2$ to 123 $GtCO_2$, depending on the sharing principles used. EPA estimated 6.5 $GtCO_2e$ total U.S. GHG emissions in 2017. Thus, under any scenario, the remaining U.S. carbon budget compatible with the Paris climate targets is extremely small.

113.    Not accounting for revised calculations from its 2018 report, the IPCC, in its 2014 AR5 Synthesis Report, found that carbon emissions from burning existing fossil fuel reserves—the known belowground stock of extractable fossil fuels—would considerably exceed both 2°C and 1.5°C of warming. "For the 2°C or 1.5°C limits, respectively 68% or 85% of reserves must remain in the ground." The reserves in currently operating oil and gas fields alone, even with no coal, would take the world beyond 1.5°C of warming. In raw magnitude, global coal, oil and gas resources considered currently economically recoverable contain potential greenhouse gas emissions of 4,196 $GtCO_2e$, with the IPCC indicating they are as high as 7,120 $GtCO_2e$.

114.    Climate Groups raised these issues in their comments and protest of the Draft and Final RMP/EIS. BLM acknowledged that "the projected emissions sources" from the RMP "will emit greenhouse gases, and will thus contribute to the accumulation of atmospheric greenhouse gases, and potential climate change effects" as projected by the Intergovernmental Panel on Climate Change. However, instead of taking action to reduce GHG impacts from the Uncompahgre planning area, e.g. by eliminating, further limiting development and/or requiring

further emission controls and mitigation measures, the agency insists that such action is either

not possible or not meaningful:

> Unfortunately, no analysis tools currently exist to describe the planning area's incremental contributions to the global phenomenon of climate change in terms of potential warming, drought, sea level rise, or other common environmental metrics associated with increasing concentrations of greenhouse gases. The problem is, by nature, a cumulative issue, and any downscaling of the projected global climate changes effects to project/planning area scales (based on emissions scaling) does not provide meaningful analysis due to the fact that no studies have identified the precise relationship between specific levels of emissions from a particular source, and measurable differences in climate-change-related impacts. Nor has EPA or any other regulatory body adopted standards based on such impacts. Without specific thresholds with which to compare expected emissions, a quantitative analysis of potential differences in climate change impacts and mitigation among alternatives is not possible.

115.    This dismissive approach fails to satisfy the guidance outlined in Department of

Interior Secretarial Order 3226, discussed above, or the requirements of NEPA and FLPMA. It

also fails to achieve basic principles of common sense or to recognize that BLM was apparently

able, in late 2021, to conduct such an analysis—the BLM's "*2020 Specialist Report*"—using

sing it had available to it when the RMP was approved.

116.    BLM was required, but failed, to take a fact-based hard look at the GHG pollution

implications of coal, oil and gas development allowed by the Uncompahgre RMP/EIS, as an

incremental contribution to emissions from all BLM lands and from the federal fossil fuel

program more broadly.

### III.    Background on Wildlife Impacts

117.    The Fish and Wildlife Service's 2014 listing rule for Gunnison sage-grouse found

that "the persistence of Gunnison sage-grouse is dependent on large and contiguous sagebrush

habitats, that human development and disturbance contribute to the decline of this needed

habitat, and that such impacts negatively affect the survival and persistence of Gunnison sage-grouse." Numerous activities on BLM land and minerals contribute to loss of these sage-grouse habitats, including road-building, power lines, livestock grazing practices, invasive plants, fire, and leasable minerals (i.e. oil and gas development).

118.    The U.S. Fish and Wildlife Service has concluded that the approved Uncompahgre RMP/EIS will likely adversely affect the Gunnison sage-grouse and its designated critical habitat. Despite the extreme vulnerability of Gunnison sage-grouse satellite populations present in the planning area, the acknowledged likelihood of adverse impacts, and the availability of more effective mitigation measures, BLM failed to fully disclose the impacts of its planning decisions or to consider reasonable alternatives that would ensure the survival and recovery of Gunnison sage-grouse.

119.    The San Miguel, Crawford, and Cerro Summit-Cimmaron-Sims Mesa populations of Gunnison sage-grouse also substantially overlap both lands and minerals managed by BLM. The Cerro Summit-Cimarron-Sims Mesa Population Area consists of 71,400 acres (56% of the population area) of federal minerals, including 18,554 acres in occupied habitat. The Crawford Population area consists of 59%, or 73,000 acres, of federal minerals, including 31,800 acres in occupied habitat. The San Miguel Basin consists of 62%, or 165,300 acres, of federal minerals, including 66,700 acres of federal minerals in occupied habitat. BLM has previously found that "[s]urface-disturbing and disruptive activities" resulting from fluid mineral development of federal minerals "could have negative effects of GUSG and GUSG habitat."

120.    Multiple studies cited by BLM have identified the avoidance of oil and gas fields by sage-grouse, and other studies have identified declines in sage-grouse lek attendance as a

result of energy development. Although oil and gas development have been identified as most likely to occur within GUSG habitat in the Dry Creek Basin of the San Miguel Population and the eastern portion of the Monticello-Dove Creek population area, risk assessment by Colorado Parks and Wildlife and the Fish and Wildlife Service also identified signficiant threats to GUSG and GUSG habitat from oil and gas development in the Cerro Summit-Cimarron, Sims Mesa, and Crawford population areas, as well as the Hamilton Mesa sub-area of the San Miguel Basin population.

121.    Gunnison sage-grouse populations that use portions of Cerro Summit-Cimarron-Sims Mesa, Crawford, and San Miguel managed by the UFO have each declined substantially in recent years; males counted on leks located on public lands within and adjacent to the UFO declined from 53 in 2001 to 27 in 2021.  One lek in the Cerro Summit-Cimarron-Sims Mesa population occurs on lands managed by the UFO, on the Lower Horsefly grazing allotment. Males counted on that lek declined from 4 birds in 2001 to 0 birds each year from 2003 to 2019, when the lek was not surveyed. Ten active and historic leks in the Crawford population occur on the Green Mountain grazing allotment, on lands managed by the UFO under a different RMP. Males counted on the active leks declined from 28 in 2001 to 3 in 2021.  One lek in the San Miguel population occurs on public lands proximal to UFO-managed BLM lands.  Males counted on that lek declined from 27 in 2001 to 24 in 2021.  Birds from the Cerro Summit-Cimarron-Sims Mesa, Crawford, and San Miguel populations likely use habitat on BLM lands managed by the UFO.

122.     BLM prepared a Biological Assessment and initiated consultation with the FWS to ensure the proposed RMP would not jeopardize the continued existence of the Gunnison sage-grouse or adversely modify its critical habitat.

123.     On December 17, 2018, the FWS issued the BiOp for the UFO RMP, concurring with the BLM's finding that the proposed RMP "may affect and is likely to adversely affect" Gunnison sage-grouse, including designated critical habitat.

124.     Even though the 2018 BiOp anticipated adverse effects to the Gunnison sage-grouse and its critical habitat, it assumed that any such effects would be "of low intensity and severity." BiOp at 23, 24.  It also presumed that all subsequent actions that would affect Gunnison sage-grouse would be "subject to future Section 7 analysis and consultation requirements." *Id.* at 23.  Consequently, the FWS declined to issue an incidental take statement (ITS) with the RMP BiOp.  *Id.* at 24-25.

125.     BLM acknowledged the existence, but did not meaningfully assess the impact of, multiple adverse effects on Gunnison sage-grouse and its habitat from its planning decision, including effects from road construction, oil and gas development, and livestock grazing management decisions.

126.     A major threat to Gunnison sage-grouse results from indirect habitat loss resulting from new infrastructure, including roads, powerlines, and oil and gas infrastructure within four miles of lek sites. Nevertheless, BLM's selected alternative adopts no surface occupancy requirements (a) only for occupied critical habitat, and (b) subject to potential exceptions. Within the scientifically-recommended four-mile buffer zone, BLM's Final RMP/EIS requires only seasonal limits on additional operation, which do not mitigate the long-term habitat impairment

associated with oil and gas infrastructure and continuing operations. BLM's Final RMP/EIS acknowledges that these "refined" management measures "fall short of accepted minimum protection standards to maintain sage-grouse viability." BLM's selected alternative further declines to adopt reasonably available, science-based conservation measures that would mitigate known impacts to Gunnison sage-grouse from road construction and use.

127.    On September 20, 2019, BLM notified the USFWS of changes BLM had made to the RMP after the FWS' concurrence; BLM determined that these changes would not affect the species or habitat the BLM consulted with the FWS about in 2018. Even though by September 20, 2019, the 2018-19 Gunnison sage-grouse population declines were evident, neither BLM nor the USFWS introduced information about those declines into the consultation process.  Instead, the agencies relied only on population information through 2018.

128.    On August 19, 2020, Climate Groups sent BLM and USFWS a Notice of Intent to Sue, "NOI", identifying ways in which the agencies violated the law by relying on the 2018 BiOp. In response, in July 2021, the USFWS issued a Revised BiOP. Although the Revised BiOp incorporates updated species information about the Gunnison sage-grouse, it is still glaringly inadequate and does nothing to address the concerns raised in Climate Groups initial NOI. As a result, on February 28, 2022, Climate Groups sent BLM and USFWS a new NOI with respect to the Revised NOI.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Failure to Analyze a Reasonable Range of Alternatives
### (NEPA claim)

129.     Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

130.     NEPA requires BLM to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The agency must consider "alternatives to the proposed action." *Id.* § 4332(2)(C)(iii).

131.     This analysis must "[r]igorously explore and objectively evaluate all reasonable alternatives" to their proposed action.  40 C.F.R. § 1502.14(a). This analysis is the "heart" of the agency's NEPA consideration. *Id*. at § 1502.14.

132.     BLM violated NEPA in preparing, issuing, and approving the Uncompahgre RMP/EIS without consideration of all reasonable alternatives. 42 U.S.C. §§4332(2)(C)(iii) & (E); 40 C.F.R. §1502.14.

133.     Specifically, BLM's analysis failed to consider a no leasing alternative, which was necessary to: (1) establish a baseline from which to analyze the effects to resource values and greenhouse gas emissions managed by the plan; (2) is consistent with the agency's multiple use mandate and land management obligations; (3) is reasonable given the urgency of the climate crisis, the role of fossil fuel extraction on public lands, and the significant contribution to total U.S. emissions; and (4) the federal government's commitment and obligation to reduce anthropogenic fossil fuel emissions as necessary to reduce the risks of catastrophic warming and preserve a livable planet.

134.     BLM's failure to consider a reasonable range of alternatives with respect to oil and gas leasing and development is in violation of NEPA, 42 U.S.C. § 4332(2)(C)(iii), (E), and

its implementing regulations, 40 C.F.R. § 1502.14(a). This constitutes arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA, 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**Failure to Take a Hard Look at the Severity and Impacts of Greenhouse Gas Pollution**
**(NEPA Claim)**

135.     Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

136.     NEPA requires a federal agency's EIS to consider "the environmental impact of the proposed action" including "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(i)-(ii). In so doing, agencies must investigate and explain "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." *Id.* § 4332(2)(C)(iv).

137.     NEPA imposes action-forcing procedures that require agencies to take a hard look at environmental consequences. These environmental consequences may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

138.     NEPA regulations further mandate that the agency consider "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). NEPA defines "cumulative impact" to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

139.     An EIS must do more than merely identify impacts. An EIS must also enable the agency and other interested parties to "evaluate the severity" of the effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

140.     Where information relevant to foreseeable adverse impacts is unavailable, agencies must nonetheless bear in mind NEPA's mandate to "develop methods and procedures … which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.  42. U.S.C. § 4332(2)(B). Agencies must also evaluate impacts for which relevant information is lacking "based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4).

141.     Several economic and scientific tools are available for assessing the potential impact of BLM's decisions on climate caused by the production and combustion of federal coal, oil and gas resources made available for leasing and development pursuant to the Uncompahgre RMP/EIS. One generally accepted approach to evaluating the impact of greenhouse gas emissions is to estimate the costs of those emissions to society through use of the social cost of carbon and/or social cost of methane protocols, developed by an inter-agency working group comprised of more than a dozen federal agencies. Another is the use of global carbon budgets, which offers a cap on the remaining amount of greenhouse gases that can be emitted while still keeping global average temperature rise below scientifically-based warming thresholds.

142.     The Uncompahgre RMP/EIS failed to take a hard look at cumulative greenhouse gas emissions or the severity of resulting climate impacts, and declined to employ either of these protocols—or any other tool—for assessing the impact of the climate pollution caused by the

production and combustion of the federal mineral resources that will be developed under the RMP/EIS, opting instead for a "qualitative approach." BLM's failure to discuss the severity or impact of these emissions and the broader, cumulative impacts to which they incrementally contribute, despite the availability of tools to do so, is contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii) and its implementing regulations, in 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and 1508.27, and is arbitrary, capricious, an abuse of discretion, pursuant to the APA. 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
### Failure to Take a Hard Look at Methane Emissions and Global Warming Potential
### (NEPA Claim)

143.    Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

144.    NEPA requires agencies to consider long-term and short-term effects of agency action. 40 C.F.R. § 1508.27(a).

145.    BLM failed to properly quantify the magnitude of methane pollution resulting from coal, oil and gas emissions sources in the planning area. Best available science produced by the IPCC estimates methane to be 36 times as potent as $CO_2$ over a 100-year horizon, and 87 times as potent over a 20-year horizon. The Uncompahgre RMP/EIS used an outdated 100-year global warming potential for methane and, critically, altogether failed to disclose or calculate methane emissions based on the relevant 20-year global warming potential. Consequently, BLM underestimated both the amount and the impact of methane emissions resulting from its implementation of the Uncompahgre RMP.

146.     BLM's failure to take a hard look at the 20-year global warming potential of methane emissions is contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii) and its implementing regulations in 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and 1508.27, and is arbitrary and capricious agency action, an abuse of discretion, pursuant to the APA. 5 U.S.C. § 706(2).

**FOURTH CLAIM FOR RELIEF**
**Failure to Take a Hard Look at Impacts to Wildlife**
**(NEPA Claim)**

147.     Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

148.     NEPA requires a federal agency's EIS to consider "the environmental impact of the proposed action" including "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(i)-(ii). In so doing, agencies must investigate and explain "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." *Id.* § 4332(2)(C)(iv).

149.     NEPA imposes action-forcing procedures that require agencies to take a hard look at environmental consequences. These environmental consequences may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

150.     The Uncompahgre RMP/EIS failed to take a hard look at direct, indirect, and cumulative impacts to wildlife and wildlife habitat, including the survival and recovery of the threatened Gunnison sage-grouse and its habitat. Although the RMP/EIS acknowledged the likelihood of adverse impacts to Gunnison sage-grouse from authorized activities including road construction, livestock grazing, and energy development, BLM failed to employ reasonably available scientific information to evaluate or disclose the reasonably foreseeable impacts of

those BLM-authorized actions on the habitat and viability of Gunnison sage-grouse populations present within the Planning Area.

151.    BLM's failure to take a hard look at impacts threatening the survival and recovery of Gunnison sage-grouse and its habitat is contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii) and its implementing regulations in 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and 1508.27, and is arbitrary and capricious agency action, an abuse of discretion, pursuant to the APA. 5 U.S.C. § 706(2).

**FIFTH CLAIM FOR RELIEF**
**Failure to Define and Prevent Unnecessary or Undue Degradation**
**in the Context of Climate Impacts**
**(FLPMA Claim)**

152.    Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

153.    The Secretary of the Interior is required to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

154.    BLM acknowledges multiple negative environmental impacts of the Uncompahgre RMP/EIS, including millions of metric tons of GHG emissions per year. The agency also acknowledges current climate science and the scientific consensus that such emissions contribute to anthropogenic climate change, including to the planning area. BLM further acknowledged that it declined to choose the most "environmentally preferable alternative," Alternative B.

155.    However, BLM has neither defined what constitutes "unnecessary or undue degradation" in the management of the resources in the Uncompahgre planning area—with particular consideration of greenhouse gas emissions and resulting climate impacts—nor has the

agency explained why its choice of Alternative E will not result in such degradation, as required by FLPMA, 43 U.S.C. § 1732(b).

156.    BLM's failure to define or take action to prevent the unnecessary or undue degradation of lands in the context of recognized climate impacts is arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA. 5 U.S.C. § 706(2).

**SIXTH CLAIM FOR RELIEF**
**The Agencies Failed to Consider the Best Available Science**
**(ESA Claim)**

157.    Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

158.    The ESA requires that in carrying out the consultation process, "each agency shall use the best scientific . . . data available."  16 U.S.C. § 1536(a)(2). This requirement prevents agencies from disregarding available scientific evidence that may indicate conflicts with listed species.

159.    Here, the agencies ignored such evidence when they disregarded the population declines Gunnison sage-grouse suffered both rangewide and within the UFO RMP planning area between 2018 and 2019.  Updated information about the species' abundance was available by September 20, 2019, when BLM notified the FWS about changes to the proposed action.  Both agencies were obligated to consider that information but did not.

160.    The failure to consider the updated information about the species' population numbers, or status within the planning area, also infected the FWS' conclusion that any losses to Gunnison sage-grouse individuals or critical habitat from RMP implementation were likely to be

"widely distributed across GUSG habitat in the UFO" and "of low intensity and severity."  BiOp, 24.  This failure to incorporate data that shows the species' decline into their evaluation of impacts was arbitrary and capricious.

161.    The BiOp also failed to make projections about the effects of the RMP on the Gunnison sage-grouse based upon the best available science. In doing so, the FWS failed to consider the effects of the whole action in rendering the BiOp and consequently also failed to fulfill its obligation to avoid jeopardy to the species.

162.    BLM and FWS, in violation of ESA Section 7(a)(1), have declined to adopt reasonably available, science-based conservation measures that would mitigate known impacts to fragile Gunnison sage-grouse satellite populations from energy development and associated infrastructure, road construction, and road use.

## SEVENTH CLAIM FOR RELIEF
### The Biological Opinion Relies on Unsupported Assumptions about Future actions (ESA and APA Claim)

163.    Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

164.    The FWS is required to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3).

165.    Here, the FWS's finding of no jeopardy relies on assumptions about future actions that are either unlikely to be true or have been proven to be false: First, the Revised BiOp, like the 2018 BiOp, assumes that ongoing monitoring of range conditions and modification of grazing permits will avoid "large-scale detrimental effects" to Gunnison sage-grouse; second, the BiOp assumes that BLM's granting of waivers, exceptions, and modifications to oil and gas lease

stipulations intended to protect Gunnison sage-grouse will be rare; and third, the Revised BiOp

assumes that "all subsequent actions that affect [Gunnison sage-grouse] will be subject to future

section 7 analysis and consultation requirements."

166.    These assumptions are not supported by the record or practice of the BLM.  Thus,

the BiOp's reliance on assumptions about future actions to address effects to Gunnison sage-

grouse from implementation of the RMP is arbitrary and capricious and violates the ESA.

**EIGHTH CLAIM FOR RELIEF**
**The Biological Opinion Fails to Consider Gunnison Sage-Grouse Recovery**
**(ESA Claim)**

167.    Climate Groups repeat and incorporate by reference the allegations in all

paragraphs of this Complaint.

168.    The FWS is required by the consultation process to consider the the effects of a

proposed action not merely on a listed species' survival, but also its recovery.

169.    "Recovery means improvement in the status of listed species to the point at which

listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R.

§ 402.02.

170.    Here, the FWS entirely ignored impacts of the UFO RMP on Gunnison sage-

grouse recovery.  The Revised BiOp does not mention the word "recovery" in its Gunnison sage-

grouse analysis. Because actions authorized in principle by, and carried out under, the UFO RMP

will impact not only Gunnison sage-grouse survival but also the species' potential for recovery,

the Revised BiOp was obligated to consider those impacts, and its failure to do so violates the

ESA

**NINTH CLAIM FOR RELIEF**

**The Biologial Opinion Does Not Include an Incidental Take Statement Even Though it Anticipates Take will Occur as a Result of RMP Implementation.**
**(ESA Claim)**

171.     Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

172.     "If the biological opinion concludes that the proposed action (or implementation of any reasonable and prudent alternatives) is *not* likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, but will result in the incidental take of the species," the FWS must provide an incidental take statement. 50 C.F.R. § 402.14(i)

173.     Here, even though FWS concluded that "low levels" of adverse effects—in other words, take—to Gunnison sage-grouse and their critical habitat will occur from implementation of the RMP, it declined to provide the required Incidental Take Statement.

174.     As a consequence of the Revised BiOp's failure to include the required Incidental Take Statement, it also does not provide the necessary trigger for reinitiating consultation under Section 7 of the ESA.  Where, as here, the FWS finds that adverse effects to a listed species are likely to occur, the regulations require it to issue an Incidental Take Statement; its failure to do so was arbitrary and capricious and violated the ESA.

**TENTH CLAIM FOR RELIEF**
**The UFO RMP is invalid as a matter of law because William Perry Pendley was Improperly Exercising the Authority of BLM Director when BLM Approved the RMP**
**(FVRA, U.S. Constitution and APA Claim)**

175.     Climate Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

176.    Under the Federal Vacancies Reform Act ("FVRA"), a person may not serve as an acting officer for an office if the President has submitted their nomination to the Senate "for appointment to such office." 5 U.S.C. §3345(b).

177.    Pendley continued to serve as acting director to the BLM while his nomination for position of Director was pending in violation of the FVRA.  Pendley was serving in this capacity in violation of the FVRA at the time that he resolved the protest for the Uncompahgre RMP.

178.    The Appointments Clause of the U.S. Constitution requires that "Officers of the United States" must be appointed by the President "with the Advice and Consent of the Senate." U.S. Const. Art. II, §2, cl. 2.

179.    The Director of the BLM is an officer of the United States requiring senate confirmation to be appointed.  43 U.S.C. §1731(a)

180.    Pendley exercised the authority of an officer of the United States without senate confirmation in violation of Article II, Section 2 of the United States Constitution.  Pendley was serving in this capacity in violation of the Appointments Clause at the time that he resolved the protest for the Uncompahgre RMP.

181.    The APA forbids agency action that is "not in accordance with law," is taken "without observance of procedure required by law," or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (D).

182.    Secretary of the Interior David Bernhardt's appointment of Pendley as acting director on July 29, 2019, was an unlawful agency action because it violate both the FVRA and the Appointments Clause of the U.S. Constitution.  The order therefore violated the APA.

Secretary Bernhardt's subsequent orders reauthorizing Pendley to serve as acting director, including his service after his nomination was sent to the Senate, also violate the APA.

183.    Pendley's exercise of the authority of the Director, and his actions taken in that role—including his resolution of the protest for the Uncompahgre RMP—violate the APA.

184.    The BLM's approval of the Uncompahgre RMP violates the APA because the approval was taken under the supervision of an unlawfully appointed officer.  The Uncompahgre RMP is therefore invalid as a matter of law.

### REQUEST FOR RELIEF

FOR THESE REASONS, Climate Groups respectfully request that this Court:

A.    Declare that Federal Defendants' actions to approve the Uncompahgre RMP/EIS violate NEPA, FLPMA, the APA, the regulations promulgated thereunder , as well as the FVRA and the Appointments Clause of the U.S. Constitution;

B.    Declare that Federal Defendants' actions in relying upon the Revised Biological Opinion violate the APA, the ESA, and its implementing regulations;

C.    Vacate and set aside the ROD, as well as Federal Defendants' actions taken in reliance on the Uncompahgre RMP/EIS;

D.    Vacate and set aside the Revised Biological Opinion;

E.    Enjoin Federal Defendants from approving the leasing or development of fossil fuel resources, including oil and gas and coal resources, in the planning area pursuant to the Uncompahgre RMP/EIS until Federal Defendants have demonstrated compliance with NEPA and the ESA;

F.      Enjoin Federal Defendants from authorizing any actions that could cause take of the Gunnison sage-grouse until they have completed a legally-compliant ESA consultation;

G.      Remand this matter to BLM for further action in accordance with applicable laws;

H.      Award Plaintiffs their fees costs, and other expenses as provided by applicable law; and

I.      Issue such relief as Plaintiffs may subsequently request and that this Court may deem just, proper, and equitable.

RESPECTFULLY SUBMITTED thise31st day of March, 2022.

/s/ Kyle Tisdel
Kyle J. Tisdel (CO Bar No. 42098)
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602
Taos, New Mexico 87571
(p) 575.613.8050
tisdel@westernlaw.org

/s/ Melissa Hornbein
Melissa A. Hornbein
WESTERN ENVIRONMENTAL LAW CENTER
103 Reeder's Alley
Helena, MT
(p) 406.708.3058
hornbein@westernlaw.org

*Counsel for Plaintiffs*

/s/ Diana Dascalu-Joffe
Diana Dascalu-Joffe (CO Bar No. 50444)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop St., Ste. 421
Denver, CO 80202
(p) 720.925.2521
ddascalujoffe@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

/s/ Nathaniel Shoaff
_____
Nathaniel Shoaff (CA Bar No. 256641)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
(p) 415.977.5610
nathaniel.shoaff@sierraclub.org

*Counsel for Plaintiff Sierra Club*