**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-2484

CITIZENS FOR A HEALTHY COMMUNITY;

HIGH COUNTRY CONSERVATION ADVOCATES;

CENTER FOR BIOLOGICAL DIVERSITY;

SIERRA CLUB; WESTERN WATERSHEDS PROJECT;

and WILDEARTH GUARDIANS,

Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U. S. Department

of Interior;

TRACY STONE MANNING, in her official capacity as Director of the U.S. Bureau of Land

Management;

STEPHANIE CONNOLLY, in her official capacity as Acting Director of the Bureau of Land

Management's Colorado State Office;

UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the

Interior; MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and

Wildlife Service;

And, ANNE TIMBERMAN, in her official capacity as Western Colorado Field Supervisor for

the U.S. Fish and Wildlife Service's Ecological Services Division.

Federal Defendants.

---

**PLAINTIFFS' OPENING BRIEF**

---

## TABLE OF CONTENTS

Table of Authorities ................................................................................................... iii

Glossary of Terms ....................................................................................................... vi

INTRODUCTION ........................................................................................................1

STATUTORY BACKGROUND ..................................................................................2

I.      NATIONAL ENVIRONMENTAL POLICY ACT............................................2

II.     FEDERAL LAND POLICY AND MANAGEMENT ACT ...............................3

FACTUAL BACKGROUND........................................................................................4

I.      BLM'S OIL AND GAS PLANNING AND MANAGEMENT FRAMEWORK ..............5

II.     THE UNCOMPAHGRE PLANNING AREA AND BLM'S RMP AMENDMENT ........6

STANDARD OF REVIEW .........................................................................................10

STANDING ................................................................................................................10

ARGUMENT ..............................................................................................................10

I.      BLM VIOLATED NEPA BY SELECTING AN ALTERNATIVE NOT REVIOUSLY
        PRESENTED TO THE PUBLIC AND BY FAILING TO CONSIDER A
        REASONABLE RANGE OF ALTERNATIVES FOR OIL AND GAS
        DEVELOPMENT. ...........................................................................................12

        A.      BLM Violated NEPA by adopting a preferred alternative not presented to the
                public.................................................................................................13

        B.      BLM violated NEPA by failing to consider a reasonable range of alternatives
                related to oil and gas development.......................................................15

II.     BLM FAILED TO TAKE A HARD LOOK AT IMPACTS OF GREENHOUSE GAS
        EMISSIONS ON CLIMATE CHANGE. .........................................................20

        A.  BLM failed to take a hard look at climate impacts by refusing to disclose the short-term
            warming influence of methane emissions generated under the Uncompahgre RMP. .......22

        B.  BLM failed to take hard look at greenhouse gas pollution and cumulative climate
            impacts. .................................................................................................26

C.  BLM failed to use available tools, such as the Social Cost of Carbon or carbon budgeting, to allow the agency and public to understand the significance and severity of emissions from the RMP. ...................................................................................................................30

1.  BLM failed to apply the Social Cost of Carbon, which offers a measure to evaluate the magnitude and severity of GHG pollution impacts.. ....................................... 30-31

2.  BLM arbitrarily declined to apply carbon budgeting, another tool that would have allowed it to articulate the impacts of GHG emissions from the RMP... ...................34

III.    BLM FAILED TO TAKE ACTION TO AVOID UNNECESSARY AND UNDUE DEGRADATION ............................................................................................................37

CONCLUSION.......................................................................................................................42

CERTIFICATE OF SERVICE ...............................................................................................44

CERTIFICATE OF COMPLIANCE WITH RULE 32(a).......................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*350 Montana v. Haaland*, 29 F.4th 1158, 1176 (9th Cir. 2022) .............................................. 31

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)....................3, 20, 26, 36

*Border Power Plant W. Gr.v. DOE*, 260 F.Supp.2d 997, 1028-29 (S.D. Cal. 2003) ....................... 34

*Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975).................................................................. 19

*California v. Bernhardt*, 472 F. Supp. 3d 573, 623 (N.D. Cal. 2020) ...................................... 27, 30, 34

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Commn.*,
    449 F.2d 1109, 1128 (D.C. Cir. 1971)................................................................................... 12

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, (1971)............................................. 10

*Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999) ................................................. 16

*Colo. Envtl. Coalition v. Salazar*, 875 F. Supp. 2d 1233, 1251 (D. Colo. 2012)................................ 18

*Columbia Basin Land Prot. Ass'n v. Schlesinger*,
    643 F.2d 585 (9th Cir. 1981) ............................................................................................... 34

*Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996) .................................11, 12

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008).................................................. 21, 27, 30, 33, 34, 36, 39

*Diné CARE v. Bernhardt*, 923 F.3d 831, 851 (10th Cir. 2019).....................................................21, 28

*Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 712 (10th Cir. 2010) ...................... 27

*Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000)......................................................... 10

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004)............................ 12

*High Country Conservation Advocates v. USFS*, 52 F.Supp.3d 1174, 1191 (D. Co. 2014).......................... 33

*Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996) ............................. 33

*Johnston v. Davis*, 698 F.2d 1088 (10th Cir. 1983).................................................................... 33

*Kleppe v. New Mexico*, 426 U.S. 529, 539 (S.Ct. 1976)............................................................. 37

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)................................................... 12

*Mineral Policy Center v. Norton*, 292 F. Supp.2d 30, 42. (D.D.C. 2003)....................................... 38

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–79 (9th Cir. 2011)................... 18

*N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 716 (10th Cir. 2009) .............................................5

*N.M. ex rel. Richardson v. Bureau of Land Mgmnt.*, 565 F.3d 683 (10th Cir. 2009).................15, 16, 18, 27

*NRDC v. NRC*, 685 F.2d 459 (D.C. Cir. 1982)..........................................................................27, 29

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) ......................... 10

*Pease v. Udall*, 332 F.2d 62, 63 (9th Cir. 1964) ....................................................................... 19

*Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) ................................... 17

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332, 349, 109 S. Ct. 1835, 1845 (1989)........................................... 14, 20, 35, 37

*Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n. 4 (10th Cir. 1982)............................... 20

*S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013)..................................... 10

*Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th Cir. 1988) ...................................................... 27

*Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir.1992)............................................................ 27

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983).................................................................. 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 22 (D.D.C. 2020)............... 36

*State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982).................................................................. 13

*Swomley v. Schroyer*, 2021 U.S. App. LEXIS 30968 (10th Cir. Oct. 15, 2021)................................2

*Udall v. Tallman*, 30 U.S. 1, 4 (1965) .................................................................................................. 19

*Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172 (10th Cir. 2002)........................... 16

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021)........ 34

*W. Org. of Res. Councils (WORC) v. Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2018 WL
    1475470, at *7 (D. Mont. Mar. 26, 2018)................................................................................ 15, 23, 24

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853 (9th Cir. 2004)............................................. 16

*WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 255-56 (D.D.C. 2020)........................................ 36

*WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955 at *9
    (D. Mont. Feb. 3, 2021) ................................................................................................................... 34

*WildEarth Guardians v. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880 (D. Mont. 2020)................ 28, 29, 30

*WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222, 1234 (10th Cir. 2017) .............................. 31

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015) ..................................... 27

*Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) .................................................... 12

## Statutes

30 U.S.C. § 226(a) .........................................................................................................................5, 19

30 U.S.C. § 226(b)(1)(A) ..................................................................................................................... 19

30 USC §§ 226 *et seq* ......................................................................................................................... 18

42 U.S.C. § 4321 .................................................................................................................................. 2

42 U.S.C. § 4321 *et seq.* ...................................................................................................................... 2

42 U.S.C. § 4331(b)(3) ...................................................................................................................... 20

42 U.S.C. § 4332(1) ............................................................................................................................ 37

42 U.S.C. § 4332(2)(C).................................................................................................................... 2, 3

42 U.S.C. § 4332(2)(C)(ii).................................................................................................................... 3

42 U.S.C. § 4332(2)(C)(iii)................................................................................................................. 12

42 USC § 4332(2)(C)(v) ..................................................................................................................... 27

42 U.S.C. § 4332(2)(E)..................................................................................................................... 3, 12

43 U.S.C. § 1701(a)(8)...........................................................................................................4, 17, 19, 37

43 U.S.C. § 1702(c) ..................................................................................................................... passim

43 U.S.C. § 1712(a) .............................................................................................................................. 4

43 U.S.C. § 1712(c)(1)........................................................................................................................ 17

43 U.S.C. § 1712(c)(1)-(9) ................................................................................................................... 5

43 U.S.C. § 1732(a) .............................................................................................................................. 3

43 U.S.C. § 1733(a) ............................................................................................................................ 39

5 U.S.C. § 706...................................................................................................................................... 10

## Other Authorities

46 Fed. Reg. 18026 (March 23, 1981)................................................................................................ 13

75 Fed. Reg. 8739 (Feb. 25, 2010) ...................................................................................................... 8

85 Fed. Reg. 20,296 (Apr. 10, 2020) ................................................................................................... 9

## Regulations

40 C.F.R. § 1500.1 ............................................................................................................................... 2

40 C.F.R. § 1500.1(b)............................................................................................................... 22, 26, 36

40 C.F.R. § 1500.1(c)............................................................................................................... 20, 21, 22

40 C.F.R. § 1501.4 ............................................................................................................................... 3

40 C.F.R. § 1502.1 ........................................................................................................................... 3, 26

40 C.F.R. § 1502.14 ........................................................................................................................... passim

40 C.F.R. § 1502.14(a) ........................................................................................................................... 12

40 C.F.R. § 1502.24 ........................................................................................................................... 22, 26

40 C.F.R. § 1502.9(c) ........................................................................................................................... 13, 14, 15

40 C.F.R. § 1503.4(a) ........................................................................................................................... 14

40 C.F.R. § 1508.27 ........................................................................................................................... 21, 24

40 C.F.R. § 1508.8(a) ........................................................................................................................... 21

40 C.F.R. §§ 1501.2 ........................................................................................................................... 27

40 C.F.R. §§ 1502.16 ........................................................................................................................... 5, 21, 31

40 CFR § 1508.27(a) ........................................................................................................................... 22

43 C.F.R. § 1601.0-6 ........................................................................................................................... 6

43 C.F.R. § 1610 ........................................................................................................................... 4

43 C.F.R. § 3101.1-2 ........................................................................................................................... 6

43 C.F.R. § 3101.1-3 ........................................................................................................................... 6

43 C.F.R. § 3160.0-4 ........................................................................................................................... 5

43 C.F.R. § 3162.3-1(c) ........................................................................................................................... 6

43 C.F.R. §§ 1600 *et seq.* ........................................................................................................................... 5

43 C.F.R. §§ 3120 *et seq.* ........................................................................................................................... 6

## Constitutional Provisions

U.S. CONSTITUTION, ART. IV., SEC. 3, Cl. 2 ........................................................................................................................... 37

## **GLOSSARY OF TERMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| $CH_4$ | Methane |
| Citizen Groups | Citizens for a Healthy Community, High Country Conservation Advocates, Center for Biological Diversity, Sierra Club, Western Watersheds Project, WildEarth Guardians |
| $CO_2$ | Carbon Dioxide |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| GHG | Greenhouse Gas |
| IPCC | Intergovernmental Panel on Climate Change |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| RMPA | Resource Management Plan Amendment |

## **EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Declaration of Natasha Léger |
| Exhibit 2 | Declaration of Jeremy Nichols Matt Reed |
| Exhibit 3 | Declaration of Erik Molvar |
| Exhibit 4 | Declaration of Matt Reed |

## INTRODUCTION

The U.S. Bureau of Land Management's ("BLM's") Uncompahgre planning area encompasses approximately 3.1 million acres of public land in southwestern Colorado, including lands administered by the BLM, U.S. Forest Service, and National Park Service as well as federal minerals beneath state and privately-owned lands.  The Uncompahgre planning area includes the North Fork Valley, located on the western slope of Colorado's Rocky Mountains, renowned for its combination of natural beauty, outdoor recreational opportunities, unique geology, cattle and sheep ranchlands, and robust organic agriculture.  The Valley is home to the largest concentration of organic and chemical-free farms in the State, and is one of two American Viticulture Areas in the State.

Pursuant to the Federal Land Management Policy Act ("FLPMA"), BLM manages federal lands, including those in the Uncompahgre planning area, by preparing and periodically updating Resource Management Plans ("RMPs") that balance competing interests and designate allowable uses for public lands.  In April 2020, under then-President Trump, BLM revised the Uncompahgre RMP (or "plan"), designating huge swaths of public lands as available to oil and gas development, including approximately 675,000 acres of BLM-administered land and approximately 970,000 acres of federal mineral estate underlying private, municipal, and state-owned lands.[1]  In amending the Uncompahgre RMP, BLM violated the National Environmental Policy Act ("NEPA") by failing to consider all reasonable alternatives – including any alternative that would reduce the climate impact of the plan by reducing the amount of land available to oil and gas development – and by failing to take a hard look at the plan's impact on climate.  BLM also failed to define or take steps to prevent unnecessary or undue degradation of

---

[1] As noted *infra*, the planning area includes National Forest lands but those lands are not included in BLM's decision area for the RMP.

1

the lands, particularly resulting from the plan's contribution to the climate crisis, as required by FLPMA.

Plaintiffs Citizens for a Healthy Community, High Country Conservation Advocates, Center for Biological Diversity, Sierra Club, Western Watersheds Project, and WildEarth Guardians (collectively "Citizen Groups") therefore respectfully request the Court to declare Federal Defendants' (collectively "BLM's") approval of the Uncompahgre RMP arbitrary and capricious, remand relevant portions to BLM, and enjoin further oil and gas leasing pending BLM's compliance with NEPA.

## STATUTORY BACKGROUND

## I.     NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.[2] Congress enacted NEPA, 42 U.S.C. § 4321 *et seq.*, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions and evaluate all reasonable alternatives that would lessen or avoid those impacts. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14.

---

[2] The NEPA regulations, 40 C.F.R. 1500 *et. seq.*, were amended in July 2020, effective September 2020, 85 Fed. Reg. 43,304 (July 16, 2020), and again in April 2022.  87 Fed. Reg. 23,453 (April 20, 2022).  This brief cites the regulations in effect prior to the 2020 amendment that were in effect at the time of BLM's decision, and which apply to this Court's analysis. *See Swomley v. Schroyer*, 2021 U.S. App. LEXIS 30968 (10th Cir. Oct. 15, 2021) *2 n.1 (unpublished) (applying prior version of NEPA regulation where agency completed its NEPA review before September 2020).

To fulfill its mandates, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The EIS must describe "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). NEPA thus requires a "hard look at the environmental consequences" of a proposed action. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotation omitted).

Alternatives are the "heart" of the NEPA process, ensuring that agencies "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. Agencies shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). In addition to "provid[ing] [a] full and fair discussion of significant environmental impacts" associated with a federal decision, an EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

"Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

## II.    FEDERAL LAND POLICY AND MANAGEMENT ACT

FLPMA instructs the Secretary of the U.S. Department of the Interior to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). "Multiple use" means "a combination of balanced and diverse resource uses that takes into

3

account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). In carrying out this directive, BLM is to prevent "permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." *Id.*

In order to carry out its management responsibilities over federal lands, FLPMA requires that "[t]he Secretary [of the Interior] shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). Exercising the delegated authority of the Secretary, BLM creates resource management plans pursuant to FLPMA's resource management planning regulations. 43 C.F.R. § 1610.

FLPMA also requires that: "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA thus directs that BLM not elevate the development of oil and gas resources above other critical resource values in the planning area. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, conservation of these resources should be the preeminent goal. 43 U.S.C. §§ 1702(c), 1712(c)(3).

BLM is also required to "take any action necessary to prevent unnecessary or undue degradation of the lands" and to "minimize adverse impacts on the natural, environmental,

4

scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." *Id.* § 1732(b), (d)(2)(A).

## FACTUAL BACKGROUND

### I.   BLM'S OIL AND GAS PLANNING AND MANAGEMENT FRAMEWORK

BLM manages onshore oil and gas leasing and development through a three-phase process of planning, leasing, and drilling. Each phase serves a distinct purpose, and is subject to unique rules, policies, and procedures, though the three phases, ultimately, must ensure "orderly and efficient" development. 43 C.F.R. § 3160.0-4. *See also N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 716 (10th Cir. 2009) (describing three-step process).

This lawsuit concerns the first phase, in which BLM develops a macro-level resource management plan in accordance with FLPMA, NEPA, and associated planning regulations, 43 C.F.R. §§ 1600 *et seq*., with additional guidance from BLM's Land Use Planning Handbook (H-1601-1). The RMP is not specific to oil and gas leasing and drilling, but establishes administrative priorities for all multiple use values, aiming to balance, guide, and constrain BLM's management of these activities throughout the planning area. 43 U.S.C. § 1712(c)(1)-(9). With respect to fluid mineral leasing decisions, the RMP determines which lands containing federal minerals will be open to leasing and under what conditions, and must analyze the direct, indirect, and cumulative impacts from predicted implementation-stage development for alternatives considered. 30 U.S.C. § 226(a); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. Developing an RMP requires BLM to predict the extent to which different activities, if permitted, would foreseeably occur. For fluid minerals, this prediction is premised on a reasonably foreseeable development scenario ("RFDS") which forecasts the pace and scope of development. BLM's regulations require development of an EIS when preparing an RMP, and provides that "the

proposed resource management plan shall be published in a single document with the related environmental impact statement … whenever possible." 43 C.F.R. § 1601.0-6.

In the second phase of oil and gas decisionmaking, BLM accepts the nomination of lease parcels from the lands made available for mineral leasing through the RMP, and sells oil and gas development rights for particular lands in accordance with 43 C.F.R. §§ 3120 *et seq*., with additional agency guidance outlined in BLM Instruction Memorandum No. 2010-117. Prior to a BLM lease sale, the agency has the authority to subject leases to terms and conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Oil and gas leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold" except as otherwise provided by stipulation or law. 43 C.F.R. § 3101.1-2.

The third phase of federal oil and gas development occurs when the lessee applies for a permit to drill or develop the lease. 43 C.F.R. § 3162.3-1(c). At this stage, BLM may condition approval of the permit (referred to as an "APD," for application for permit to drill) on the lessees' adoption of "reasonable measures" whose scope is delimited by the lease and the lessees' surface use rights. 43 C.F.R. § 3101.1-2.

## II.   THE UNCOMPAHGRE PLANNING AREA AND BLM'S RMP AMENDMENT

BLM's Uncompahgre Field Office planning area includes 3.1 million acres of land in southwestern Colorado, including portions of Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties from north of Paonia to south of Telluride.[3]  RMP-AR-2784-162754, 162758

---

[3] Citations to the record are provided in the following format: RMP-AR-[Excel Index Row Number]-[Record Bates Number or Range]. Citations to BLM's supplement to the AR (*see* Dkt. 133) are provided in the same format with the following modification: RMP-ARsupp-[Excel Index Row Number]-[Record Bates Number or Range].

(RMP FEIS).  The planning area contains a broad range of ecologically and socially unique landscapes—the six counties within the planning area contain cattle and sheep ranches, vineyards and organic farms, environmental and wildlife resources, and associated economies, many of which depend on responsible stewardship of public lands to protect environmental resources, local economies, and the health of Colorado's communities. RMP-AR-2784-163078; RMP-AR-1786-0113828-29; RMP-AR-432-0055865-69. The planning area includes 675,800 acres of BLM-administered lands and controls development on 916,030 acres of federal mineral estate underlying federal, state, municipal, and private lands.[4] BLM-AR-2784-0162759 (RMP FEIS). BLM's April 2020 Uncompahgre RMP Amendment, which updated the prior 1989 RMP, allocates the vast majority of this mineral estate—871,810 acres or 95%—as "open" to oil and gas leasing with estimated direct greenhouse gas ("GHG") emissions of 2,512,570 tons of carbon dioxide equivalent ("$CO_2e$") per year, and up to 129 million tons $CO_2e$ in indirect emissions over 30 years. RMP-AR-2784-163133, -163140.

Numerous Class I air quality areas exist in and near the planning area, including Mesa Verde, Great Sand Dunes, and Black Canyon of the Gunnison National Parks, as well as the Weminuche, West Elk, Maroon Bells-Snowmass, and La Garita Wilderness Areas, all of which stand to be impacted by oil and gas development.  The planning area also contains habitat for three of the seven remaining populations of the threatened Gunnison sage-grouse. Approximately 88 to 93 percent of the species' historical range has been lost since Euro-American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all the populations to

---

[4] BLM declined to determine the availability for development of mineral estate underlying United States Forest Service lands in its RMP notwithstanding the fact that such lands are within the planning area. BLM-AR-2784-0162759.

extirpation." RMP-AR-841-77831 (Citizen Groups' Protest Letter, citing Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. 69,228).

The decade-long RMP amendment process began in 2010. 75 Fed. Reg. 8739 (Feb. 25, 2010). The Citizen Groups participated at all stages of development of the Uncompahgre RMP amendment and submitted multiple comment letters to BLM. *See e.g.*, RMP-AR-979-80777; RMP-AR-1076-81265 (Scoping Comments dated February 7 and March 12, 2010); RMP-AR-1750-112482 (Supplemental Information letter dated October 23, 2012); RMP-AR-2583-149941(Comments on DRMP/DEIS dated November 1, 2016); RMP-AR-841-77771 (Protest Letter dated July 29, 2019). After years of development and public engagement—and after a change in Presidential administrations—BLM's April 2020 RMP amendment/Final EIS ("FEIS") introduced an entirely new alternative, Alternative E, as the agency's preferred alternative, which BLM described as "a reasonable combination of objectives and actions from the four alternatives (A, B, C, and D) presented in the Draft RMP/EIS." RMP-AR-2784-163215. In fact, Alternative E is almost uniformly as, or more, exploitative of resources and less protective of environmental values than the previous most resource-development-intensive alternative C. RMP-AR-2784-162775 (RMP FEIS Table 2-1). Among other changes, the new Alternative E added 5,840 acres open to oil and gas leasing (compared to prior preferred Alternative D) and offers up 15,120 more acres of BLM land available for leasing subject to standard terms and conditions (i.e., absent surface occupancy or use limitations) than does Alternative C. RMP-AR-2784-162777-78. In addition, Alternative E reduced the protected status of many thousands of acres of land, including eliminating protections on 18,320 acres of land that would have been managed to protect wilderness characteristics, instead placing those lands in a newly established category that will be "managed to minimize impacts on wilderness character while managing for other

uses." RMP-AR-2784-163168. On April 10, 2020, BLM issued the Record of Decision

approving the Final RMP/EIS. 85 Fed. Reg. 20,296 (Apr. 10, 2020). RMP-AR-2821-167537 –

168040.

Citizen Groups filed the instant suit on August 19, 2020. (Dkt. 1). Concurrently with the

Agency's preparation of the administrative record in the spring of 2021, the parties commenced

discussions to determine whether a negotiated settlement would be feasible.  On June 8, 2021,

the Court granted the Parties a 45-day continuance to discuss issues related to the administrative

record and potential settlement of Plaintiffs' claims. On July 23, 2021, the Parties jointly

requested a stay to allow the ongoing settlement discussions to proceed independent of the

litigation, a request the Court granted. (Dkt. 104, 105). The Parties continued to negotiate

regarding possible settlement of Citizen Groups' claims for the next four months. On November

23, 2021, this Court notified the Parties that no additional stays would be granted following

expiration of the current stay on January 6, 2022. (Dkt. 110). On January 6, 2022, the Parties

submitted a joint status report explaining that settlement efforts were ongoing, that Citizen

Groups had submitted to Federal Defendants what they viewed as "a final effort at achieving an

agreement in principle before resumption of litigation," and that Federal Defendants were

working to respond and wished to continue to seek a negotiated resolution of Citizen Groups'

claims. (Dkt. 113).

In the meantime, the Parties submitted a revised Proposed Joint Case Management Plan,

(Dkt. 114), which the Court adopted. (Dkt. 115). The Parties continued to attempt to reach a

negotiated resolution while complying with the deadlines set forth in the revised Scheduling

Order, a process complicated by Federal Defendants' parallel settlement negotiations with two

other litigating parties who had separately challenged different aspects of the Uncompahgre

Resource Management Plan, EIS, and ROD.[5] Due at least in part to the complexities of reconciling these three parallel negotiations, progress toward a negotiated agreement was slow. Notwithstanding these delays, the Parties finally reached an agreement in principle as to all of Plaintiffs' substantive claims on June 1, 2022. Federal Defendants provided Citizen Groups with an initial draft settlement agreement on June 22, 2021, which memorializes the Parties' agreement in principle. The Parties are currently working to finalize and obtain formal approval for the settlement agreement.

## STANDARD OF REVIEW

Agency compliance with NEPA is judicially reviewed pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA, agency action is "set aside if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413, n.30 (1971)). While the standard of review is deferential, courts must nonetheless engage in a "thorough, probing, in-depth review." *Id.* at 1574.

## STANDING

Citizen Groups have standing to bring this action. Standing requires a showing of injury, traceability, and redressability. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). An organization has standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000). A plaintiff's members'

---

[5] *See*, *State of Colorado v. Bureau of Land Management*, 1:21-cv-00129 (D. Colo.), and *W. Slope Conservation Ctr. v. BLM*, 1:20-cv-2787 (D. Colo.)

"reasonable concerns" of harm caused by the defendant's activity directly affecting those members' recreational, aesthetic, and economic interests establishes injury-in-fact. *Id*. at 183-84. "Under [NEPA], an injury results not from the action authorized by the agency's decision, but from the agency's *uninformed* decisionmaking." *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996).

Here, Citizen Groups meet this standard. Citizen Groups' members are directly harmed by BLM's failure to comply with NEPA in programmatic decisionmaking and analysis for the Uncompahgre RMP and EIS. Citizen Groups' members live, work, and recreate in the planning area, with interests that are bound to the land, wildlands, air, rivers, habitat, wildlife, and other components of the healthy, intact landscapes therein.[6]  These members have long-standing ties to the Uncompahgre planning area and use public lands in the planning area for a multitude of uses including, hiking, fishing, wildlife viewing, photography, and enjoying nature, among other uses.[7] These members' use and enjoyment of the planning area will be harmed by oil and gas development, and the attendant noise, traffic, air and water pollution, and degradation of scenery, allowed under the Uncompahgre RMP.[8]

Citizen Groups' members' injuries can be traced to BLM's decision to manage public lands and minerals in the Uncompahgre planning area without taking a hard look at impacts and all reasonable alternatives under NEPA, which increases the likelihood of environmental, recreational, aesthetic, and health-related injuries to Citizen Groups from negative impacts to air,

---

[6] *See* Exhibit 1, Léger Decl. ¶¶ 5, 7, 11, 13; Exhibit 2, Molvar Decl. ¶¶15-18; Exhibit 3, Nichols Decl. ¶¶ 9-12; Exhibit 4, Reed Decl. ¶¶ 2, 8-12.
[7] *See* Exhibit 1, Léger Decl. ¶¶ 5, 7, 9, 11; Exhibit 2, Molvar Decl. ¶¶15-18; Exhibit 3, Nichols Decl. ¶¶ 9-12; Exhibit 4, Reed Decl. ¶¶ 9-12.
[8] *See* Exhibit 1, Léger Decl. ¶¶ 8-17; Exhibit 2, Molvar Decl. ¶¶ 19-21; Exhibit 3, Nichols Decl. ¶¶ 12-14; Exhibit 4, Reed Decl. ¶¶ 12, 20.

water, landscapes, and climate due to oil and gas leasing and development associated with the RMP.

Citizen Groups' members' injuries would be redressed by a favorable result in this case because BLM would be required to sufficiently analyze the direct, indirect, and cumulative impacts of oil and gas development on the environment and human health. Such analysis is fundamental to NEPA's role in agency decisionmaking, and could lead to a reduction in public lands made available to oil and gas leasing and development and/or the application of additional measures that would lessen the potential impacts to people and the environment. "Under [NEPA], 'the normal standards of redressability' are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Comm. to Save Rio Hondo*, 102 F.3d at 452 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

## **ARGUMENT**

I. **BLM VIOLATED NEPA BY SELECTING AN ALTERNATIVE NOT REVIOUSLY PRESENTED TO THE PUBLIC AND BY FAILING TO CONSIDER A REASONABLE RANGE OF ALTERNATIVES FOR OIL AND GAS DEVELOPMENT.**

NEPA requires agencies to "study, develop, and describe" reasonable alternatives to the agency's proposed action. 42 U.S.C. § 4332(2)(C)(iii), (2)(E). This analysis forms the "heart" of the NEPA process. 40 C.F.R. § 1502.14. *See also Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007). To fulfill this mandate, federal agencies must "[r]igorously explore and objectively evaluate *all* reasonable alternatives." 40 C.F.R. § 1502.14(a) (emphasis added). Through this process, BLM must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004); *see also Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Commn.*, 449 F.2d 1109, 1128 (D.C. Cir. 1971) ("Clearly, it is pointless to

'consider' environmental costs without also seriously considering action to avoid them."). The

Council on Environmental Quality, which promulgates NEPA regulations that apply to all

federal agencies, has explained that, when deciding how to balance competing resource uses,

NEPA requires consideration of alternatives that strike a range of protections. For example, in

reviewing "a proposal to designate wilderness areas within a National Forest, … [a]n appropriate

series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest

to wilderness." 46 Fed. Reg. 18026 (March 23, 1981);[9] *see also State of Cal. v. Block*, 690 F.2d

753, 767-68 (9th Cir. 1982) (finding that the Forest Service violated NEPA by refusing to

consider an alternative designating more than one-third of planning area as wilderness).

Additionally, where BLM makes substantial changes to the proposed action, it must supplement

its analysis of environmental impacts and circulate that analysis to the public for review and

comment. 40 C.F.R. § 1502.9(c).

Here, BLM violated NEPA's alternatives mandate in two ways. First, BLM selected a

new preferred alternatives that it had not previously analyzed or disclosed to the public through

the NEPA process. Second, BLM failed to consider a reasonable range of alternatives with

respect to oil and gas development.

### A. BLM Violated NEPA by adopting a preferred alternative not presented to the public.

BLM violated NEPA by selecting a preferred alternative in the final EIS ("FEIS") that it

had not previously presented to the public. In the FEIS, BLM included for the first time a new

alternative, Alternative E, that substantially reduced protections for public lands without putting

those changes to the public for review and comment. While an agency can modify a proposed

---

[9] CEQ, 40 Most Asked Questions Concerning NEPA Regulations, 46 Fed. Reg. 18026 (March 23, 1981), available at: https://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf.

action in light of public comments, 40 C.F.R. § 1503.4(a), an agency "shall" supplement its analysis where "the agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c). Here, BLM failed to meet that obligation by either adopting an alternative that had been put to the public in the draft EIS or by supplementing its analysis to allow the public to understand and comment on BLM's preferred course of action.

In introducing this new alternative as the preferred alternative only in the FEIS, BLM undermined the purpose of NEPA. NEPA's "twin aims" are to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience," the public, so it may participate in the decisionmaking process and subsequent actions related to the decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S. Ct. 1835, 1845 (1989) (internal citations omitted). In developing and selecting Alternative E only after the draft EIS stage – typically the opportunity for the public to consider and comment on the agency's proposal – BLM unlawfully subverted the NEPA process and undermined one of NEPA's two primary objectives.

BLM's approach here is especially egregious, given the dramatic difference between what it evaluated and presented to the public in the draft EIS as its preferred alternative (labelled Alternative D), and what it selected in the FEIS (Alternative E)—after the opportunity for public participation had ended. In contrast to the preferred alternative in the draft EIS (alternative D), Alternative E included the following changes:

- 18,320 acres have been changed from "managed to protect wilderness characteristics" to "managed to minimize impacts on wilderness character, while managing for other uses." RMP-AR-2784-162775-76.

- 177,700 acres of "ecological emphasis areas" identified in Alternative D were omitted entirely. RMP-AR-2784-162776.

- Thousands of acres were moved from more protective to less protective classes of visual resource management classification. RMP-AR-2784-162775.

- There are hundreds of thousands fewer acres on which surface-disturbing activities are restricted. RMP-AR-2784-162779.

- 3,950 more trails are open to cross-country motorized travel. RMP-AR-2784-162781.

- 20,000 fewer acres are protected as Areas of Critical Environmental Concern. RMP-AR-2784-162781.

Alternative E does not present mere tweaks or minor improvements to Alternative D, developed in response to comments. On the contrary, the new Alternative E represents a "substantial change[]" from the project that the public was given the opportunity to comment on, and thus under 40 C.F.R. § 1502.9(c). BLM was obligated to supplement its analysis before finalizing the NEPA process.

### B.  BLM violated NEPA by failing to consider a reasonable range of alternatives related to oil and gas development.

BLM's narrow range of alternatives violates NEPA by impermissibly omitting any option that would meaningfully limit oil and gas leasing and development within the planning area, and safeguard other environmental values. As other courts have held, BLM violated NEPA's alternatives mandate in adopting an RMP amendment in which it failed to consider reduced fossil fuel leasing alternatives. *W. Org. of Res. Councils (WORC) v. Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2018 WL 1475470, at *7 (D. Mont. Mar. 26, 2018); *see also*, *Richardson*, 565 F.3d at 710 ("Development is a *possible* use, which BLM must weigh against other possible

15

uses – including conservation to protect environmental values, which are best assessed through the NEPA process"). Throughout the NEPA process, Citizen Groups repeatedly urged BLM to consider "no leasing" and "reduced leasing" alternatives that would respond to the climate crisis by limiting or eliminating future oil and gas development on public lands throughout the planning area and thus reduce the greenhouse gas ("GHG") emissions of the Plan. RMP-AR-2583-149776-84 (Comment Letter Dated November 1, 2016); RMP-AR-841-77776-83 (Protest Letter dated July 29, 2019). With respect to reduced leasing, Citizen Groups explained that BLM should have considered an alternative eliminating oil and gas leasing in areas determined to have only moderate or low potential for oil and gas development. RMP-AR-2583-149938. Instead, BLM evaluated only alternatives that entailed massive amounts of oil and gas development—each considered alternative opens between 609,360 and 871,810 acres, or between 67% and 95% of the decision area to oil and gas leasing. RMP-AR-2784-162777 (RMP EIS, Table 2-1).

The Tenth Circuit uses two "guideposts" to evaluate whether a proposed alternative is reasonable: (1) whether the alternative "falls within the agency's statutory mandate," and (2) whether the alternative meets the purpose and need of the project. *Richardson*, 565 F.3d at 708-709. Additionally, the Tenth Circuit has recognized two exceptions under which an agency may decline to consider an otherwise reasonable alternative. First, an agency need not consider an alternative that it has in "good faith" found to be "too remote, speculative, or impractical or ineffective." *Id*. at 708 (*quoting Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999)); *accord Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172 (10th Cir. 2002). Second, an agency may refuse to consider an alternative that is not "significantly distinguishable from the alternatives already considered." *Richardson*, 565 F. 3d at 708–09 (*citing Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

When, as here, an alternative meets the guideposts and is not subject to the exceptions, an agency must consider it in detail as part of the NEPA process. *Id.* at 711.

Preservation of public lands from fossil fuel development and associated harms is squarely within BLM's statutory mandate under FLPMA. FLMPA directs that land use plans, *inter alia*, "preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8). More broadly, the statute requires that BLM's land use plan "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use," in turn, "requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999). In short, BLM has a statutory mandate to consider alternatives that reduce or eliminate the possibility of permanent damage from oil and gas leasing and development.

Reduced and no new leasing alternatives are also consistent with BLM's stated purpose and need in preparing the Uncompahgre RMP amendment. As described by BLM, the purpose and need here included: (1) "provid[ing] an overview of goals, objectives, and needs associated with public lands management;" and (2) "resolve[ing] multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP." RMP-AR-2784-162758. Neither of these objectives preclude consideration of reduced or no new oil and gas leasing alternatives. To the contrary, in the context of the scientific consensus on climate change that the agency has acknowledged, they compel it.

The keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking

action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated to be resolved by the multiple use mandate. Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.

> BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*Richardson*, 565 F.3d at 710.

BLM fails to offer a justification for why it refused to consider reduced oil and gas leasing alternatives, instead asserting that "a full closure to fluid mineral leasing alternative was not carried forward because the BLM has no suitable thresholds or standards to measure and compare the significance of impacts related to greenhouse gas emissions under that alternative relative to other alternatives." RMP-AR-2784-162785. This excuse is inaccurate, as shown by BLM's demonstrated ability to project emissions for the various alternatives. RMP-AR-2784-163133, -163140. BLM's excuse is also inadequate under NEPA, which requires BLM to engage in reasonable speculation. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–79 (9th Cir. 2011) ("Because speculation is … implicit in NEPA, [courts] must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry."); *accord Colo. Envtl. Coalition v. Salazar*, 875 F. Supp. 2d 1233, 1251 (D. Colo. 2012).

In rejecting a "no leasing alternative," BLM also states that the Mineral Leasing Act, 30 USC §§ 226 *et seq.*, "gives BLM the authority to lease and manage federal fluid mineral estate."

RMP-AR-2782-164870 (RMP FEIS Appendix R, Responses to Comments). This statement is true but irrelevant. Critically, BLM fails to acknowledge that it also has legal authority under FLPMA, the MLA and NEPA to adopt a no-leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing.

With regard to oil and gas development, the Mineral Leasing Act states: "All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits *may* be leased by the Secretary." 30 US.C. § 226(a) (emphasis added); *see also*, *Udall v. Tallman*, 30 U.S. 1, 4 (1965) (The Mineral Leasing Act "left the Secretary discretion to refuse to issue any lease at all on a given tract"); *Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975) ("The permissive word 'may' in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so."); *Pease v. Udall*, 332 F.2d 62, 63 (9th Cir. 1964) ("[T]he Mineral Leasing Act has consistently been construed as leaving to the Secretary, within his discretion, a determination as to what lands are to be leased thereunder."). Although the MLA states that, for oil and gas, "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary," quarterly leasing is not required if no lands are "eligible" and "available" due to factors including withdrawal from the operation of the MLA under FLPMA, allocation decisions under an applicable land management plan, the need for additional environmental review, or exercise of Secretarial discretion. 30 U.S.C. § 226(b)(1)(A); *see also*, 43 C.F.R. § 3120.1-1.

Nor does FLPMA require BLM to allow large-scale fossil fuel development through an RMP.  FLPMA provides that "the public lands [shall] be managed in a manner that will protect the quality of … air and atmospheric … values." 43 U.S.C. § 1701(a)(8). Under FLPMA's

"multiple use and sustained yield" management directive, *id.* § 1701(a)(7), the federal government must manage public lands and resources in a manner that, among other things, "takes into account the long-term needs of future generations." 43 U.S.C. § 1702(c). As the Tenth Circuit recognized, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." *Rocky Mtn. Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 738 n. 4 (10th Cir. 1982). Leaving vast acreage open to future oil and gas leasing, as BLM did here, entails benefits to some users and detriments to others; these trade-offs are precisely the kind that NEPA demands be explored, analyzed, and disclosed to decisionmakers and the public through the EIS process and the development of reasonable alternatives. *See* 42 U.S.C. § 4331(b)(3) (recognizing BLM must use all practicable means to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences"). By analyzing only alternatives that entailed massive amounts of oil and gas development, BLM violated NEPA's mandate to consider "all reasonable alternatives." 40 C.F.R. § 1502.14.

## II.     BLM FAILED TO TAKE A HARD LOOK AT IMPACTS OF GREENHOUSE GAS EMISSIONS ON CLIMATE CHANGE.

NEPA is a procedural statute that imposes on administrative agencies "action-forcing procedures" that compel BLM to "take a hard look" at the environmental consequences of their decisions. *Robertson*, 490 U.S. at 350. It is precisely this "hard look" that is intended to result in the "better decisions" and "excellent action," which are the end goals of the NEPA process. 40 C.F.R. § 1500.1(c). The purpose of the "hard look" requirement is to ensure that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Balt. Gas & Elec. Co.*, 462 U.S. at 97 (1983); *see also* 40 C.F.R.

§ 1500.1(c) (NEPA process intended to help public officials make decisions based on understanding of environmental consequences and take actions that "protect, restore, and enhance the environment."). Such "environmental impacts" or "environmental consequences" may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25; *see also Diné CARE v. Bernhardt*, 923 F.3d 831, 851 (10th Cir. 2019). BLM determines whether such impacts are significant by taking into consideration both their "context" and "intensity". 40 C.F.R. § 1508.27.

"Direct" emissions are those released during project development and from subsequent production, and include venting, flaring, and leaks. 40 C.F.R. § 1508.8(a). "Indirect" emissions include transportation, downstream uses, and combustion of produced oil and gas. *Id.* at § 1508.8(b). "Cumulative" emissions require consideration of the project's emissions alongside other past, present, and foreseeable emissions, which here must explicitly include all other BLM-managed oil and gas leasing and development emissions. *Id.* at § 1508.7. To meet their obligation to take a hard look at the impacts of a proposed action, agencies must not only quantify these emissions but must also analyze "the incremental impact that these emissions will have on climate change or on the environment . . . ." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008).

Here, BLM failed to take a hard look at greenhouse gas emissions and climate impacts by: (1) underrepresenting emissions and associated impacts by using outdated and inaccurate science relative to methane's global warming potential; (2) failing to consider the cumulative impacts of planning area emissions together with BLM-managed emissions at a regional and national scale; and (3) failing to use available tools, such as the social cost of carbon or carbon

budgets, to allow the decision-makers and public to understand the significance and severity of these emissions.

**A. BLM failed to take a hard look at climate impacts by refusing to disclose the short-term warming influence of methane emissions generated under the Uncompahgre RMP.**

BLM failed to take a 'hard look' at the climate impacts of direct and indirect methane emissions from the proposed project by failing to consider and disclose methane's 20-year global warming potential ("GWP"). Instead, BLM relied exclusively on methane's 100-year GWP, and thus significantly underestimated the proposed project's climate impacts. BLM's use of only the 100-year GWP for methane violates NEPA's mandate to consider "[b]oth the short- and long-term effects" of an action. 40 CFR § 1508.27(a). In so doing, BLM violated NEPA's mandate that agencies rely on "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). BLM further failed in its duty to "insure the professional integrity, including scientific integrity, of the discussions and analyses in [EISs]." 40 C.F.R. § 1502.24.

As BLM acknowledges, "[a] greenhouse gas's ability to contribute to global warming is based on its longevity in the atmosphere and its heat trapping capacity. In order to aggregate greenhouse gas emissions and assess their contribution to climate change, the EPA has assigned each greenhouse gas a global warming potential [GWP]." RMP-AR-2784-163139. Methane is "the most abundant non-CO2 greenhouse gas," and is one of the primary "near-term climate forcers," meaning that methane's impact on climate occurs primarily within the first decade following its emission. RMP-ARsupp-190-180458; RMP-AR-500-58468. Thus, relative to $CO_2$, methane has far greater near-term climate impacts. *See* RMP-AR-841-77875-76. Specifically for methane, BLM identified that methane had a GWP of 28 and that under a BLM commissioned

report, methane's GWP was 34. RMP-AR-2784-163139 (RMP FEIS citing to "Golder Report").

In both instances, BLM acknowledged that these warming potentials were based on the long-

term/100-year values. *Id.* BLM neither acknowledged nor consider methane's short-term 20-year

warming potential of 87, thus significantly underestimating the magnitude of its emission

impacts. This was arbitrary. *See e.g. WORC*, 2018 WL 1475470, at *15 ("BLM's unexplained

decision to use the 100-year time horizon, when other more appropriate time horizons remained

available, qualifies as arbitrary and capricious under these circumstances.").

      BLM should more appropriately have applied the GWP for both the 100-year and 20-year

time horizons. Indeed, scientists and federal agencies commonly measure methane's GWP over

both 20 and 100-year periods, a fact Citizen Groups emphasized in their comments. RMP-AR-

841-77802-77804. BLM failed to even to acknowledge Citizen Groups' observation that the

2013 Intergovernmental Panel on Climate Change ("IPCC") Report—on which BLM relied—

established an updated 100-year GWP for methane of 36. RMP-AR-841-77915 (Protest Letter,

citing IPCC Fifth Assessment Report ("AR5")). More egregiously, BLM entirely ignored

methane's 20-year GWP, which, as Citizen Groups noted, was estimated by IPCC variously as

between 84 and 87. RMP-AR-841-77802, 77910 (citing IPCC Fifth Assessment, RMP-ARsupp-

286-189739). Nor were Citizen Groups the only ones to draw BLM's attention to the importance

of this metric. Methane's 20-year GWP was raised in multiple comments, and commenters, in

addition to noting the importance of considering both short and long-term time horizons for

methane, also noted that the U.S. Environmental Protection Agency ("EPA") had assigned

methane a 20-year GWP of 87. *See e.g.* RMP-AR-2787-164982-83. This is particularly relevant,

given BLM's ostensible reliance on EPA's GWP calculations. RMP-AR-2784-163139.

Critically, the IPCC—a Nobel Prize-winning scientific body within the United Nations that

reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change—calculations of GWP account for methane's changing capacity to warm the atmosphere over time, and thus employ both a 100-year and a 20-year time scale to measure methane's relative impact. RMP-ARsupp-286-189735-737.

Although BLM states that it relies on the 100-year GWP for methane because the "greatest projected changes in climate … are realized over the long-term," RMP-AR-2784-163139, this does not relieve BLM of its obligation to consider both short- and long-term impacts under NEPA, 40 C.F.R. § 1508.27, nor does it allow BLM to shield those short-term climate impacts from the public's view. This is particularly relevant in light of the RMP's 20-year planning period. BLM must analyze the warming potential of methane emissions using both the current 100-year and 20-year GWPs for Methane. *WORC*, 2018 WL 1475470, at \*15. Applying the current GWPs for fossil methane for both 20 and 100 years could substantially change BLM's assumptions regarding methane pollution's impacts. Furthermore, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent as $CO_2$ over a twenty-year time period. RMP-AR-84-77915-16.

BLM's conclusion that climate effects will be primarily felt in the long-term is, moreover, inconsistent with the record. While climate models are, by definition, forecasting tools, the models on which BLM relies include both near- and long-term forecasts, and many of the scientifically accepted sources in the record before the agency are either non-time specific or are projected to occur in the relative near-term. Thus, BLM's characterization of the climate models it relies on is simply incorrect.

Of equal importance, BLM's analysis wholly ignores the effects of climate change that are *already occurring*. This is arbitrary. The 2013 National Climate Assessment ("NCA") recognizes that "[c]limate change, once considered an issue for a distant future, has moved firmly into the present." RMP-ARsupp-190-180105. With regard to the southwest region, which includes Colorado and the project area, the NCA observes:

> The Southwest is already experiencing the impacts of climate change. The region has heated up markedly in recent decades, and the period since 1950 has been hotter than any comparably long period in at least 600 years. The decade 2001-2010 was the warmest in the 110-year instrumental record, with temperatures almost 2°F higher than historic averages, with fewer cold air outbreaks and more heat waves. There is mounting evidence that the combination of human-caused temperature increases and recent drought has influenced widespread tree mortality, increased fire occurrence and area burned, and forest insect outbreaks. Human-caused temperature increases and drought have also caused earlier spring snowmelt and shifted runoff to earlier in the year same.

RMP-ARsupp-190-180568 (*internal references omitted*). The NCA continues:

> Streamflow totals in the Sacramento-San Joaquin, the Colorado, the Rio Grande, and in the Great Basin were 5% to 37% lower between 2001 and 2010 than the 20th century average flows. Projections of further reduction of late-winter and spring snowpack and subsequent reductions in runoff and soil moisture pose increased risks to the water supplies needed to maintain the Southwest's cities, agriculture, and ecosystems.

RMP-ARsupp-190-180569 (*internal references omitted*).

These sources, which were part of the record before BLM, demonstrate that significant impacts of climate change are *already occurring* in the planning area. BLM, however, arbitrarily ignored these considerations when it came to evaluating the disproportionate role of methane in contributing to those impacts, as well as its climate analysis in general, as detailed below.

The consequences of BLM's omission are easy to determine. BLM disclosed estimated direct annual methane emissions from the proposed action (Alternative E) to be 64,532 metric tons. RMP-AR-2784-163133. Multiplied by BLM's preferred GWP of 34, this yields annual

GHG emissions of more than 2.1 million tons of $CO_2e$. *Id.* But, by multiplying BLM's disclosed emissions of 64,532 tons of methane by the 20-year GWP established by the EPA of 87 yields annual GHG emissions of 5.6 million tons.  Thus, BLM disclosed to the public and decisionmakers less than half of the annual GHG emissions that will result from the plan's methane emissions alone.  When multiplied by a 20-year planning period, this difference results in BLM *underreporting* GHG emissions by roughly 70 million tons of $CO_2e$.[10]

A NEPA analysis must provide a "full and fair discussion of significant environmental impacts . . . ." 40 C.F.R. § 1502.1. Environmental information made available to the public "must be of high quality," and BLM must provide "[a]ccurate scientific analysis" which proves "essential to implementing NEPA." 40 C.F.R. § 1500.1(b). NEPA also requires BLM to ensure the "scientific integrity" of its analysis, including "*both short- and long-term effects*." 40 C.F.R. §§ 1502.24, 1508.27(a) (emphasis added); *see also WORC*, 2018 WL 1475470, at *15. Methane's short-term GWP values must be used—or at a minimum acknowledged—in the FEIS, but were instead ignored by BLM and shielded from consideration by the public and decisionmakers. As in *WORC*, where the Montana district court invalidated BLM's exclusive reliance on 100-year methane GWPs, BLM's refusal to disclose and consider BLM's short-term warming influence similarly violated NEPA and the APA. *Id.*

**B.  BLM failed to take hard look at greenhouse gas pollution and cumulative climate impacts.**

"[T]he key requirement of NEPA" is to "consider and disclose the actual environmental effects in a manner that…brings those effects to bear on decisions to take particular actions that significantly affect the environment." *Balt. Gas*, 462 U.S. at 96. Here, BLM's mere

---

[10] Calculation: (5.6 million tons per year - 2.1 million tpy = 3.5 million tpy). 3.5 tpy x 20 years = 70 million tons.

quantification of emissions "does not evaluate the incremental impact that these emissions will have on climate change or on the environment," as NEPA requires. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008). Indeed, "it is not releases of [pollution] that Congress wanted disclosed; it is the effects, or environmental significance, of those releases." *NRDC v. NRC*, 685 F.2d 459, 487 (D.C. Cir. 1982), *rev'd sub nom. on other grounds, Balt. Gas*, 462 U.S. at 106–07; *see also California v. Bernhardt*, 472 F. Supp. 3d 573, 623 (N.D. Cal. 2020) (mere quantification of emissions insufficient).

An environmental effect is "reasonably foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Sierra Club v. Marsh,* 976 F.2d 763, 767 (1st Cir.1992). An agency's hard look examination "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Forest Guardians v. U.S. Fish & Wildlife Serv.,* 611 F.3d 692, 712 (10th Cir. 2010). "Looking to the standards set out by regulation and by statute, assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *Richardson,* 565 F.3d at 718; *see also* 42 U.S.C. § 4332(2)(C)(v); 40 C.F.R. §§ 1501.2, 1502.22; *Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th Cir. 1988) (holding agencies are to perform hard look NEPA analysis "before committing themselves irretrievably to a given course of action so that the action can be shaped to account for environmental values.").

BLM must evaluate "the cumulative impacts of a project." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015). As relevant here, this consideration must include "the cumulative impact of GHG emissions generated by past, present, or reasonably foreseeable BLM [oil and gas projects] in the region and nation." *WildEarth Guardians v. Zinke*,

368 F. Supp. 3d 41, 77 (D.D.C. 2019); *see also* 40 C.F.R. §§ 1508. WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41, 77 (D.D.C. 2019)7, 1508.25(a)(2). And as the Tenth Circuit very clearly articulated in *Diné CARE,* "[o]nce the [reasonably foreseeable development scenario] issued, it became reasonably foreseeable to the BLM that the projected wells would be drilled, so the BLM needed to consider the cumulative impacts of all those wells, even if the wells were not going to be drilled imminently." 923 F.3d at 854. BLM failed to satisfy this obligation in its consideration of fossil fuel exploitation in the Uncompahgre planning area.

Notably, "NEPA also requires that agencies do more than merely catalogue relevant projects in the area." *WildEarth Guardians v. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 892 (D. Mont. 2020). Rather, BLM must examine the "ecological[,]… economic, [and] social" impacts of emissions from these projects, including an assessment of their "significance." 40 C.F.R. §§ 1508.8(b), 1502.16(a)-(b). Here, BLM neither catalogued relevant projects nor examined the impacts of such undefined projects. It merely provided a cumulative figure for GHG emissions over a 30-year period without breaking down those emissions or the role of this RMP within the federal oil and gas program. RMP-AR-2784-163-140. BLM's piecemeal NEPA documentation offers various charts and datasets, entirely disconnected from the cumulative planning area emissions, taken in context of other BLM-managed lands regionally and across the nation. RMP-AR-2784-163129-163151.

The appropriate scope of the agency's cumulative analysis must be at this scale, requiring BLM to consider cumulative emissions from its all 700 million acres of BLM-managed lands—including emissions from all 96,000 active wells managed by BLM,[11] and the approximately

---

[11] *See* BLM Oil and Gas Statistics, *available at*: https://www.blm.gov/programs-energy-and-minerals-oil-and-gas-oil-and-gas-statistics.

435,535 acres of active coal mining operations.[12] In other words, BLM must analyze the additive, not fractional, contribution of all development anticipated as a result of the RMP. "BLM cannot, as it claims, satisfy NEPA's cumulative impacts analysis simply because it put the emissions from a single [project] into context with state and national greenhouse-gas emissions." *WildEarth Guardians*, 457 F. Supp. 3d at 894. Here, BLM's comparison of plan emissions to national and global emissions is, in effect, no analysis at all. *See* RMP-AR-2784-163140-42. As the Council on Environmental Quality ("CEQ") has recognized, such a comparison "does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact."[13]

Moreover, merely listing the quantity of emissions is insufficient if the agency "does not reveal the meaning of those impacts in terms of human health or other environmental values," since "it is not releases of [pollution] that Congress wanted disclosed" but rather "the effects, or environmental significance, of those releases." *NRDC*, 685 F.2d at 486-87. BLM cannot simply catalogue emissions of past and reasonably foreseeable projects piecemeal, in disconnected charts, tables, and lists, without relating them to one another and, critically, without "analysis of that catalogue and 'their combined environmental impacts.'" *WildEarth Guardians*, 457 F. Supp. 3d at 892. But here, BLM neither explains adequately how it arrived at its cumulative emissions

---

[12] *See* BLM National Coal Statistics Table, *available at*: https://www.blm.gov/programs/energy-and-minerals/coal/coal-data.

[13] CEQ, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, 81 Fed. Reg. 51,866, 51,866 (Aug. 5, 2016), *available at*: https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (withdrawn by 82 Fed. Reg. 16576 (Apr. 5, 2017)); *see also San Juan Citizens Alliance,* 326 F. Supp. 3d at 1243 (finding withdrawn CEQ climate guidance nevertheless "persuasive and worthy of citation").

analysis nor connects these abstract quantified figures to the climate effects of its oil and gas permitting decisions.

The agency's indifference to such analysis is exemplified by its trivialization of RMP-scale emissions relative to global emissions. RMP-AR-2785-163141-42. *California v. Bernhardt*, 472 F. Supp. 3d at 623. As articulated in *San Juan Citizens Alliance*, under analogous circumstances:

> It is the broader, significant 'cumulative impact' which must be considered by an agency, but which was not considered in this case. Without further explanation, the facile conclusion that this particular impact is minor and therefore 'would not produce climate change impacts that differ from the No Action Alternative,' is insufficient to comply with Section 1508.7.

326 F. Supp. 3d. at 1248 (citing *Ctr. for Biological Diversity*, 538 F.3d at 1217); *see also WildEarth Guardians*, 457 F. Supp. 3d at 894. Even accepting that a single planning area may have a de minimis impact on global climate change, such impacts may nevertheless be significant when added to the impacts of existing and future federal oil and gas wells. *Guardians*, 368 F. Supp. 3d at 77. BLM's approach also reveals nothing about the *effects* such emissions will have on resource values and communities in the planning area, or the nation as a whole. BLM's recently-prepared *2020 BLM Specialist Report on Annual Greenhous Gas Emissions and Climate Trends* (hereinafter "2020 Climate Report")[14]—which BLM is using in current oil and gas decisionmaking—demonstrates not only that such program-wide analysis is possible, but that such analysis is indispensable to the agency's NEPA compliance.

### C. BLM failed to use available tools, such as the Social Cost of Carbon or carbon budgeting, to allow the agency and public to understand the significance and severity of emissions from the RMP.

#### 1. BLM failed to apply the Social Cost of Carbon, which offers a measure to

---

[14] BLM, 2020 Climate Report, *available at*: https://www.blm.gov/content/ghg/.

**evaluate the magnitude and severity of GHG pollution impacts.**

BLM violated NEPA by failing to take a hard look at the impact of the GHG emissions

discussed in the EIS. While BLM estimated that the adopted RMP would result in up to 129

million tons of GHG emissions over the planning period, RMP-AR-2784-163-140, NEPA

requires a more searching analysis than merely disclosing the amount of pollution. Rather, BLM

must examine the "ecological[,]... economic, [and] social" impacts of those emissions, including

an assessment of their "significance." 40 C.F.R. §§ 1508.8(b), 1502.16(a)-(b).[15] In particular,

having included in the EIS its assessment of the economic benefits from oil and gas leasing and

development under the RMP, BLM was obligated to also present available information about the

economic downsides of the consequent GHG emissions. RMP-AR-2784-163602 (Detailing $811

million in direct economic output, and $1,073 million in total economic output over the life of

the RMP, among other economic benefits). The record squarely refutes BLM's assertion that

such analysis was impossible.[16] *See WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d

1222, 1234 (10th Cir. 2017) (it is arbitrary and capricious for a government agency to use

estimates of energy output for one portion of an EIS, but then state that it is too speculative to

forecast effects based on those very outputs).

As explained by Citizen Groups' comments to BLM (RMP-AR-841-77779-80), the

---

[15]  *See also* Sec. Order 3289 (requiring BLM to "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and mandating that "management decisions made in response to climate change impacts must be informed by [this] science.").

[16] While the Ninth Circuit recently declined to prescribe use of the SCC, it nonetheless held that an agency may not "decline to consider evidence relevant to indirect and cumulative impacts simply because it cannot precisely identify direct effects." *350 Montana v. Haaland*, 29 F.4th 1158, 1176 (9th Cir. 2022). Citizen Groups nonetheless assert BLM should have used the SCC here in the absence of advancing some reasonably comparable method of describing climate change impacts.

protocol is "a well accepted, credible, and interagency-endorsed method of calculating the costs of greenhouse gas emissions and understanding the potential significance of such emissions." *Id.*[17] Even if, as BLM suggests, it is infeasible to predict the specific physical changes to the environment that will result from these specific emissions, the protocol provides a "proxy for understanding climate impacts and to compare alternatives, as required by NEPA," which BLM was not permitted to ignore. *Id.*; 40 C.F.R. § 1502.22(b)(4). The protocol is one available means of filling the essential but unmet need in the analysis of more "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* at § 1502.14. Critically, the protocol not only contextualizes costs associated with climate change, but can also be used as a proxy for understanding climate impacts and to compare alternatives. *See id.* § 1502.22(a) (stating agency "shall" include all "information relevant to reasonably foreseeable significant adverse impacts [that] is essential to a reasoned choice among alternatives).

 BLM was particularly obligated to address the economic impact of GHG emissions by estimating their social cost because the agency did provide monetized estimates of the benefits of oil and gas production. RMP-AR-2784-163602. Although NEPA does not require BLM to conduct cost-benefit analysis, 40 C.F.R. § 1502.23, it is "arbitrary and capricious to quantify the benefits of [an action] and then explain that a similar analysis of the costs [is] impossible when such an analysis [is] in fact possible." *High Country Conservation Advocates v. USFS,* 52

---

[17] Exec. Order No. 13783 (March 28, 2017) at § 5(b), disbanded the Federal Government's Interagency Working Group on the Social Cost of Carbon, and withdrew its Technical Support Document ("TSD"), AR201224 *et seq.*, "as no longer representative of governmental policy." Notably, the Order did not refute or undermine the scientific or economic basis of the TSD, rather withdrew the document for political reasons; therefore, the protocol remains a credible tool for assessing the impacts of GHG emissions. *See* 40 C.F.R. § 1502.22(b)(3) (requiring the use of "existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment.").

F.Supp.3d 1174, 1191 (D. Co. 2014); *see also Johnston v. Davis*, 698 F.2d 1088, 1094-95 (10th Cir. 1983) (holding agency may not present economic analysis in misleading way to give impression that benefits exceed costs, when evidence suggests the contrary); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446-48 (4th Cir. 1996) (stating "it is essential that the EIS not be based on misleading economic assumptions."); *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (holding if agency "trumpets" economic benefits, it must also disclose costs); *Ctr. for Biological Diversity*, 538 F.3d at 1200 (it is misleading to present economic analysis without assigning any cost to GHG emissions).

Here, BLM detailed the economic, revenue and employment benefits of its selected alternative. RMP-AR-2784-163602 (framing economic output of Alternative E variously as 1.7 times and 68% more than that of Alternative A). However, as in *High Country*, BLM declined to quantify the economic costs of oil and gas related GHG emissions. That arbitrarily created an artificial bias in favor of oil and gas leasing and development.

Thus, because BLM did not otherwise satisfy NEPA's command to disclose the impact or significance of GHG emissions, and because BLM chose to quantify monetary benefits of oil and gas extraction, BLM's refusal to use available tools to similarly monetize the social cost of carbon emissions was arbitrary. The only reasons BLM gave for its refusal to use the protocol do are not countervailing. It's asserted reasons were that, (1) the RMP was not a rulemaking, (2) NEPA does not compel a cost-benefit analysis, and (3) that then President Trump had disbanded the Interagency Working Group and rescinded the "Technical Support Documents on which the Protocol was Based." RMP-AR-2782-165020. As discussed above, BLM's choice to quantify the economic benefits of the RMP compels it to evaluate the countervailing costs, even if NEPA does not, and even outside the context of a rulemaking. Moreover, BLM may not base its use and

evaluation of available scientific or economic tools on presidential imprimatur. *WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955 at *9 (D. Mont. Feb. 3, 2021) (*quoting California v. Bernhardt*, 472 F. Supp. 3d 573, 611 (N.D. Cal. 2020)) ("The President did not alter by fiat what constitutes the best available science," and thus, the SCC "remains a viable model tool for monetizing the costs of [GHG] emissions."); *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021) (Notwithstanding presidential withdrawal of CEQ SCC guidance, court held regulatory body "was required to address Petitioners' argument concerning the significance of 40 C.F.R. § 1502.2[2], and that its failure to do so rendered its analyses of the projects' greenhouse gas emissions deficient.").

Even if, counterfactually, BLM had articulated a cogent rationale for disagreeing with the dollar costs estimated by the interagency working group, BLM could not ignore this method of analysis entirely. "[B]y deciding not to quantify the costs at all," BLM implied that there were no such costs—that the social cost of a ton of carbon dioxide emissions was $0." *High Country,* 52 F.Supp.3d at 1192. Here, as in many other case considering the issue, that implication is unsupported and arbitrary. *Id.*; *see also Ctr. for Biological Diversity,* 538 F.3d at 1200; *Border Power Plant W. Gr. v. DOE,* 260 F.Supp.2d 997, 1028-29 (S.D. Cal. 2003). Thus, BLM's treatment of GHG emissions was one-sided, misleading, and contrary to NEPA.

### 2. BLM arbitrarily declined to apply carbon budgeting, another tool that would have allowed it to articulate the impacts of GHG emissions from the RMP.

One of the tools available to BLM to help measure the magnitude and severity of BLM-managed oil and gas emissions, including those of projects such as the Uncompahgre RMP, includes the use of a carbon budget against which to evaluate those foreseeable emissions. A "carbon budget" articulates a cap on the remaining greenhouse gases that can be emitted

consistent with maintaining global average temperature increases below scientifically established thresholds—beyond which climate change impacts are expected to result in increasingly severe and potentially irreparable harm to the human environment. Information in the record shows that to retain an 80% chance of keeping global warming below a 2° Celsius threshold, a global carbon budget of 890 gigatons ("GT") of $CO_2$e remained *as of the year 2000.* RMP-AR-841-777856 (Protest Letter).

As detailed above, BLM's consideration of climate was limited to quantifying project emissions and comparing them with local, national, and global emissions. By contrast, using a carbon budget would fill the otherwise unmet need of considering the "context" and "intensity" of these emissions, to better inform the decisionmakers and the public. 40 C.F.R. § 1508.27(a), (b). Despite the fact that BLM failed to so much as mention carbon budgets in the FEIS, this tool is not new. In particular, the IPCC's Special Report on Global Warming of 1.5°C has catalogued worsening odds using the concept of carbon budgeting. As of 2018, for just a 66% chance of limiting warming to 1.5°C, the remaining global carbon budget is a mere 420 GtCO$_2$e. RMP-ARsupp-538-207517.

BLM reaffirmed its use of carbon budgets in its 2020 Greenhouse Gas Report, in which it describes the concept as "a convenient tool to simplify communication of a complex issue and to assist policymakers considering options for reducing GHG emissions on a national and global scale."[18] This characterization is consistent with BLM's statutory mandate under NEPA to ensure the "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast," which "also serves a larger informational role." *Robertson*, 490 U.S. at 349 (*citing Baltimore Gas & Electric Co, Inc*., 462

---

[18] 2020 Greenhouse Gas Report, at Section 7.2: https://www.blm.gov/content/ghg/.

U.S. at 97). It gives the public the assurance that the agency "has indeed considered environmental concerns in its decision-making process." *Id.* These dual purposes are particularly crucial in the context of the climate crisis, where every ton of remaining carbon, once combusted and released into the atmosphere in the form of greenhouse gas, cannot be retrieved.

Rather than fulfilling this dual obligation, here, BLM simply ignored it. The term "carbon budget" does not appear in the FEIS with the exception of Appendix R, summarizing comments received. *See* RMP-AR-2782-11643. BLM neither explains *why* a carbon budget would not result in better-informed decision-making, nor offer any alternative tool. While "it is within 'the expertise and discretion of the agency' to determine the methodologies underlying [its] analyses … BLM either had to explain why using a carbon budget analysis would not contribute to informed decision-making, in response to [Citizen Groups'] comments, or conduct an 'accurate scientific analysis of the carbon budget." *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 255-56 (D.D.C. 2020) (*citing WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 79; 40 C.F.R. § 1500.1(b); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 22 (D.D.C. 2020) (*vacated in part, affirmed in part, Standing Rock Sioux Tribe v. U.S. Army Corp of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021)). *See also Ctr. for Biological Diversity,* 538 F.3d at 1200 (agency refusal to use social cost of carbon protocol arbitrary where placing "no value" on emissions reduction effectively set that value at zero because "[t]he value of carbon emissions reduction is nowhere accounted for in the agency's analysis, whether quantitatively or qualitatively.")

Here, BLM's failure to address the issue suggests that there is "zero value" to informing its own decisions or the public as to what portion of that remaining budget will be consumed by the RMP, together with the cumulative emissions from the federal mineral estate. This is directly

contrary to the purpose of NEPA to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast" *Robertson*, 490 U.S. at 349 (citations omitted).

## III. BLM FAILED TO TAKE ACTION TO AVOID UNNECESSARY AND UNDUE DEGRADATION

The property clause of the United States Constitution confers upon Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONSTITUTION, ART. IV., SEC. 3, Cl. 2. Congress has exercised its power over federal public lands through the passage of FLPMA. "[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, [the U.S. Supreme Court] ha[s] repeatedly observed that '(t)he power over the public land thus entrusted to Congress is without limitations.'" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (S.Ct. 1976) (citations omitted).

BLM's duty to comply with FLPMA extends to every BLM action and coexist with NEPA's action-forcing procedures. In particular, Section 102 of NEPA provides that, "to the fullest extent possible," FLPMA (and other "policies, regulations, and public laws of the United States") "shall be interpreted and administered in accordance with [section 101 of NEPA]." 42 U.S.C. § 4332(1). FLPMA directs that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). The act requires the Secretary to account for "the long-term needs of future generations." *Id*. at § 1702(c). These substantive mandates requires that the Secretary not

elevate the development of coal, oil and gas resources above other critical resource values in a planning area. To the contrary, FLPMA requires that where coal, oil and gas development would threaten the quality of critical resources and public lands, conservation of these resources should be the preeminent goal.

FLPMA also provides that public lands be managed "on the basis of multiple use and sustained yield." 43 U.S.C. § 1701(a)(7). The term "multiple use" means:

> a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

*Id*. § 1702(c) (emphasis added). In applying the principles of multiple use and sustained yield mandated by FLPMA, "the Secretary shall, by regulation or otherwise, *take any action necessary to prevent unnecessary or undue degradation of the lands*." 43 U.S.C. § 1732(b) (emphasis added). This duty is "the heart of FLPMA." *Mineral Policy Center v. Norton*, 292 F. Supp.2d 30, 42. (D.D.C. 2003). Here, BLM has failed to defined how these FLPMA mandates apply to its decision to approve the Uncompahgre RMP and EIS, and, critically, failed to take action to prevent unnecessary and undue degradation of lands in the planning area that the agency acknowledges is already occurring.

Notably, FLPMA's unnecessary and undue degradation requirements are distinct from requirements under NEPA. "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." *Ctr. for Biological Diversity,* 623 F.3d

at 645 (quotations omitted). FLPMA expressly obliges Interior to "issue regulations necessary to implement the provisions of [FLPMA] with respect to the management, use, and protection of the public lands . . . ." 43 U.S.C. § 1733(a).

Here, BLM has acknowledged that "[c]oncentrations of greenhouse gases have increased dramatically in the earth's atmosphere in the past century. These increases, particularly for carbon dioxide, methane, nitrous oxide, and fluorinated gases have been attributed to anthropogenic (human-made) sources and human activities." RMP-AR-2784-163139. The agency continued, noting that these gases are "commonly emitted by the types of activities" analyzed through the RMP, and that "as the major component of natural gas, methane emissions from underground mining operations and oil and gas exploration and development can be considerable." *Id.* The Colorado Air Resource Protection Protocol ("CARPP") was relied upon by BLM and incorporated into the RMP/EIS. RMP-AR-2784-163139-40. That Report includes information on Colorado's climate and "the science, metrics, and trends accounting for recent and projected climate change." RMP-AR-2784-163140.

Twenty-five percent (224,950 acres) of the federal fluid mineral estate in the UFO is already leased. RMP-AR-2784-163120. BLM projected future year 2030 GHG emissions on an annual basis from federal fossil fuels resources in Colorado, including between 26.28 and 27.55 million tons of $CO_2e$ from coal production (including 13.26 million tons $CO_2e$ from the UFO), as well as Colorado federal emissions from oil and gas emissions of between 44.55 and 45.03 million tons $CO_2e$ in 2030. RMP-AR-2784-163140-41. BLM also identified that the 30-year total estimated cumulative indirect emissions from UFO oil and gas production are as high as 129 million tons of $CO_2e$. RMP-AR-2784-163140.

BLM also incorporated the Colorado Air Resources Management Modeling Study ("CARMMS") to provide the agency's analysis of cumulative impacts associated with potential Uncompahgre RMP projected emissions from multiple oil and gas development scenarios, RMP-AR-2784-163129; 163139, as well as cited to the Golder Associates Greenhouse Gas and Climate Change Report ("Golder Report"), RMP-AR-2784-163134, which provided baseline emissions data and GHG emissions projections for BLM managed fossil fuel resources, allowing BLM to quantify the GHG emissions from a proposed project developed on federal lands for comparison to national emissions. RMP-AR-2784-052950. Finally, the agency consistently references its reliance on the Intergovernmental Panel on Climate Change ("IPCC") Fifth Assessment Report ("AR5") for its analysis and scientific conclusions regarding climate impacts. RMP-AR-2784-162941; RMP-AR-2784-163140. In other words, BLM has incorporated, relied upon, and maintained a number of tools and resources to understand the linkage between its management and decisionmaking in the Uncompahgre RMP, the contribution of fossil fuel exploitation in the planning area to the climate crisis, and the reality that such climate impacts are already occurring and will only grow more severe in years to come.

As adopted by BLM, the IPCC observed that "[h]uman influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems." RMP-ARsupp-189-180064. "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen." *Id.* Anthropogenic greenhouse gas emissions are a primary driver of such warming, and "concentrations of carbon dioxide, methane and nitrous oxide" have reached levels

"unprecedented in at least the last 800,000 years." RMP-ARsupp-189-180066. About half of the cumulative anthropogenic $CO_2$ emissions have occurred in the last 40 years. *Id*. Moreover, $CO_2$ emissions from fossil fuel combustion and industrial processes contributed about 78% of the total GHG emissions increase in this period. RMP-ARsupp-189-180067. The IPCC further observed that "[c]hanges in climate have caused impacts on natural and human systems," as well as a recognition that "impacts are due to observed climate change." RMP-ARsupp-189-180068. "Evidence of observed climate change impacts is strongest and most comprehensive for natural systems. In many regions, changing precipitation or melting snow and ice are altering hydrological systems, affecting water resources in terms of quantity and quality." *Id*. These are among the climate impacts that are already occurring. The IPCC further recognized that "[c]ontinued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks." RMP-ARsupp-189-180070.

BLM also recognized various emissions scenarios at a national and subnational scale and the influence of a single contributor (e.g., the Uncompahgre Field Office) to such outcomes. RMP-AR-2784-163141-42. While recognizing the distinctive nature of the climate crisis and the relatively limited influence by any single contributor to this system in isolation, the agency concluded that "the individual behavior of each contributor, through their relative contribution, has the ability to influence which representative concentration pathway global emissions most closely resemble, and therefore which climate change projections are most likely manifest towards the end of the century." RMP-AR-2784-163142.

BLM has both acknowledged and relied on these and other scientific findings to detail the link between continued fossil fuel exploitation in the Uncompahgre planning area as being fundamentally incompatible with an adaptation pathway needed to maintain a livable climate. BLM has also recognized that climate impacts are already causing the degradation of public lands and that such impacts will worsen if unabated. Nevertheless, the agency has neither defined what constitutes "unnecessary or undue degradation" in the management of lands in the Uncompahgre planning area—with particular consideration of greenhouse gas emissions and resulting climate impacts—nor has the agency reconciled why its approval of a plan that will result in hundreds of millions of additional metric tons of greenhouse gas pollution would not violate BLM's duty to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b); RMP-AR-2784-163140-41. This type of fundamentally inconsistent and contradictory decisionmaking, as applied to BLM's substantive duties under FLPMA, is arbitrary and capricious and cannot be maintained.

## CONCLUSION

For the foregoing reasons, Citizen Groups respectfully request that this Court declare that BLM's approval of the Uncompahgre RMP and EIS violate NEPA, FLMPA, and their implementing regulations, vacate and remand relevant portions of BLM's EIS, enjoin BLM from any further oil and gas leasing pending BLM's full compliance with NEPA, and grant Citizen Groups additional relief this Court deems appropriate.

Respectfully submitted this 1st day of July, 2022.

/s/ Melissa Hornbein
Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, MT
(p) 406.708.3058

hornbein@westernlaw.org

Kyle J. Tisdel (CO Bar No. 42098)
Western Environmental Law Center
208 Paseo del Pueblo Sur, Suite 602
Taos, New Mexico 87571
(p) 575.613.8050
tisdel@westernlaw.org

*Counsel for Petitioners*

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop St., Ste. 421
Denver, CO 80202
(p) 303.641.3149
tzukoski@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

Nathaniel Shoaff (CA Bar No. 256641)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(p) 415.977.5610
nathaniel.shoaff@sierraclub.org

*Counsel for Petitioner Sierra Club*

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on July 1, 2022, I electronically filed the foregoing PLAINTIFFS' OPENING BRIEF with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to other participants in this case.

/s/ Melissa Hornbein
Western Environmental Law Center
*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Joint Case Management Plan in this case because this brief contains 12,860 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and the Joint Case Management Plan.

Dated this, 1st day of July, 2022.

/s/ Melissa Hornbein
Melissa Hornbein
Western Environmental Law Center
*Counsel for Plaintiffs*